## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**BID PROTEST** <span style="color:red">**FINAL REDACTED VERSION**</span>

|  |  |
|---|---|
| BLUE ORIGIN FEDERATION, LLC, | ) |
| | ) |
| *Plaintiff*, | ) Case No. _____ |
| | ) |
| v. | ) Judge _____ |
| | ) |
| UNITED STATES OF AMERICA, | ) ▮▮▮▮▮▮▮▮ |
| | ) |
| *Defendant*. | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.  Plaintiff Blue Origin Federation, LLC ("Blue Origin"), through its undersigned counsel, files this bid protest action for declaratory and injunctive relief against the Defendant, the United States of America.  This post-award bid protest challenges the decision of the National Aeronautics and Space Administration ("NASA" or "Agency") to award the Option A contract for the Human Landing System ("HLS") under the Option A Solicitation ("Solicitation") released under Broad Agency Announcement ("BAA") No. NNH19ZCQ001K_APPENDIX-H-HLS to Space Exploration Technologies Corporation ("SpaceX").

2.  NASA's decision in the HLS Option A procurement violates fundamental tenets of procurement law and is arbitrary, capricious, and irrational.  Historically a staunch advocate for prioritizing safety, NASA inexplicably disregarded key flight safety requirements for only SpaceX, in order to select and make award to a SpaceX proposal that NASA's evaluation team assessed as tremendously high risk and immensely complex, even before the waiver of safety requirements.  The waiver of thirteen (13) Flight Readiness Reviews permitted SpaceX to propose a technical solution that included sixteen or more launches in a launch cadence the Contracting Officer admitted was logically inconsistent with the Solicitation's requirement for one Flight

Readiness Review prior to each launch. In other words, SpaceX's initial proposal was *unawardable*. The Agency acknowledged that SpaceX failed to meet a material Solicitation requirement, ███████████████████████████████████████████████

███. The Agency's decision to select SpaceX's deficient proposal for initial, conditional award, was irrational and in direct violation of the Solicitation's ground rules stating "<u>Offerors are hereby notified that proposals evaluated as having one or more deficiencies are unawardable</u>."

3.       Blue Origin protested the award to SpaceX at the Government Accountability Office ("GAO"). When GAO ruled on the protest, GAO agreed that NASA's solicitation required one FRR per each launch of an HLS element, which included supporting spacecraft and that SpaceX did not meet that requirement. GAO explained that NASA's litigation position, which was that SpaceX had submitted a compliant proposal with sufficient FRRs, was wrong and not based on the language of the solicitation. GAO recognized that the solicitation "stated that '[a]n FRR is required prior t*o each launch of an HLS element*. Propose multiple FRRs as required.'" SpaceX's proposal did not do that. Internal NASA contemporaneous evaluation documents recognized exactly that. But when the parties litigated before GAO, NASA ignored its contemporaneous documents and argued to GAO that a FRR was not required prior to each launch element.

4.       NASA's new-for-litigation position was based on requirements NASA did not include in the Solicitation. For example, the Solicitation did not say that only one FRR is required for each launch vehicle type, regardless of how many launches one would use, and irrespective of the maturity of the launch vehicle and any propellant depots needed. Nonetheless, NASA's new-for-litigation position was that it could remove the requirement for one FRR for each launch, allow

2

SpaceX to submit just three FRRs, and select SpaceX's launch vehicle that is not yet designed, let alone operational.

5.    GAO rejected NASA's new-for-litigation argument. Specifically, GAO explained that "SpaceX's three proposed FRRs—or one for each *type* of HLS element—were insufficient when SpaceX's concept of operations will require 16 total launches."

6.    Notwithstanding GAO's finding that SpaceX's proposal was not compliant with the Solicitation's requirements, GAO determined that Blue Origin could not be heard to protest this problem, by stating that Blue Origin had not suffered prejudice from the agency's consideration of SpaceX's non-compliant proposal. GAO stated that Blue Origin had submitted a proposal that was compliant on the issue of FRRs, and, therefore, was not harmed.

7.    However, what has become clear after the GAO released its decision is there are additional substantial errors in SpaceX's proposal that were completely overlooked by NASA. SpaceX not only failed to meet the FRR requirements, ███████████████████████ ███████████████████████████████. Similar to the FRR, ███████████ ███████████████████████ the Solicitation requires that supporting spacecraft and launch vehicles be included. ███████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███. The Agency waived ██████ requirements only for SpaceX.

8.    ███████████████████████████████████ ███████████████████████████████████ the Mission Specific Preliminary Design Review must occur no later than July 2022 (L-18 months),

███████████████████████████████████

███████████████████   The Mission Specific Critical Design Review must occur no later than January 2023 (L-12 months), ███████████████████████   The System Acceptance Review must occur no later than September 2023 (L-4 months), ██████████ ███████████████████████████

9.      Until the publicly available decision was released on August 10, 2021, however, Blue Origin did not know that NASA was going to relax or be flexible on its foundational requirements, such as the FRRs.  Blue Origin was unable to address this specific issue during the pendency of the GAO protest because the entire issue was under seal and counsel could not discuss the issue with Blue Origin.

10.     GAO explained in its decision that "the pertinent question is whether the protester would have submitted a different offer that would have had a reasonable possibility of being selected for award had it known that the requirement would be waived."

11.     GAO assumed that the answer was "no."

12.     GAO lacked the information to know that the answer was "yes."

13.     Blue Origin in fact was prejudiced by the Agency's waiver of the FRR requirements and the waiver of the other review requirements.  Had Blue Origin known the Agency would waive the FRR requirements and other requirements that greatly impact schedule and risk, Blue Origin would have engineered and proposed an entirely different architecture with corresponding differences in technical, management, and price ratings.  ████████████████

4

████████████████████████████████████████████████████

████████████████████████████████████████████ Blue

Origin and Dynetics did not get such a chance to compete with waived requirements the Agency

afforded to SpaceX. Had it had such an opportunity, Blue Origin would have been able to propose

a substantially lower price, because more of the design ████████████████████████

████████████████████████████████████████████

███████████████████████████ NASA's failure to amend its solicitation requirements

and notify offerors of this change in requirements was highly prejudicial to Blue Origin.

14. The Agency violated the Solicitation, federal procurement regulations and statute,

and an implied in fact contract, where it failed to treat all offerors fairly, rationally, and in

accordance with law.

## INTRODUCTION

15. NASA seeks the protections and broad discretion typically afforded an agency in a

BAA procurement while not following the normal procurement procedures for BAAs under

Federal Acquisition Regulation ("FAR") 35.016. NASA attempted to create a solicitation which

would allow NASA to describe specific technical and management requirements, and compare

competing offerors' firm-fixed prices, but would also provide NASA with near protest-proof

discretion in choosing to whom to award. Proposals under a BAA are not typically evaluated

against each other "since they are not submitted in accordance with a common work statement."

Here, however, NASA issued a *seventy-nine* page common Statement of Work, in addition to

numerous other common requirements, including a forty-nine page common requirements

document (HLS-RQMT-002) and a one hundred and fifty-five page Data Procurement Document ("DPD") (also a common requirements document). The discriminating requirements under which offerors' proposals were evaluated in this procurement were almost entirely, if not entirely, common requirements. Yet, NASA erroneously contends that no offeror can challenge the evaluation of another offeror's proposal because proposals were purportedly not compared.

16. Further, the procurement regulations for a BAA require that "[c]ost realism and reasonableness shall also be considered to the extent appropriate." In a procurement without a common statement of work, this is necessary to determine whether offerors proposed pricing that is reasonable and realistic. Here, however, the Solicitation requests firm-fixed prices and not certified cost or pricing information because it was expected that "NASA will achieve adequate price competition." In other words, offerors' proposals were compared here. If offerors are competing against common requirements, a firm-fixed price competition will reflect the cost of performing the specific project, and thus NASA was able to accept and compare offerors' prices, rather than independently determine cost realism and reasonableness. If there was no common statement of work and each offeror submitted a proposal for a unique research or development project, NASA could not have used a firm-fixed price comparison and would have had to examine the cost information behind those proposals.

17. In addition, the Solicitation contemplated use of discussions and post-selection negotiations, but the Agency created a false distinction between discussions and post-selection negotiations. The only difference stated in the Solicitation is discussions occur before the initial selection of the prospective awardee, and post-selection discussions occur only after the initial selection(s) has been made. However, the Agency contends that these are two entirely different

types of negotiations – where normal FAR Part 15-type rules would apply to "discussions," no such rules assertedly applied to post-selection negotiations. For example, the Agency selected SpaceX for award and entered into exchanges only with SpaceX, an offeror whose initial proposal failed to meet a material Solicitation requirement and was unawardable. The Agency, through exchanges, provided SpaceX the opportunity to revise its price and management proposal, to make its proposal awardable. Under FAR Part 15-type discussion rules, the Agency clearly conducted discussions, and if an agency conducts discussions with one offeror, it must conduct discussions with all offerors under consideration for award. However, the Agency claims it was not required to conduct discussions with all offerors because the exchanges with SpaceX were not "discussions," they were "post-selection negotiations."

18.     The error in the Agency's argument is the post-selection negotiations encompassed issues that affected the basis on which the initial selection decision was founded. In other words, SpaceX's initial proposal was unawardable, and the Agency used post-selection negotiations to allow SpaceX to make changes to render its proposal acceptable to the Agency. Had the Agency correctly assessed SpaceX's initial noncompliant proposal with a deficiency during the evaluation period, SpaceX's proposal could not have been selected for award, pursuant to the Solicitation's explicit instructions that proposals containing a deficiency are unawardable. The Agency engaged in post-selection negotiations in order to correct an evaluation error made during its initial evaluation and to make SpaceX's proposal awardable. Therefore, the post-selection negotiations were part of the evaluation process. Exchanges where an offeror is allowed to revise price and other sections of its proposal are "discussions," particularly where these exchanges are part of the evaluation process. The Agency attempts to circumvent requirements in procurement statute and

the Federal Acquisition Regulations ("FAR") regarding discussions, by calling them post-selection negotiations. The Agency actions here violate fundamental procurement principles regarding fairness.

19. In spite of the substantive evidence demonstrating that this is a competitive, negotiated procurement, NASA alleges that the Solicitation's characterization of the procurement as a BAA procurement means competitive proposals were not submitted, these proposals were not compared or evaluated against each other, post-selection negotiations could properly be held with only one offeror (whose initial proposal was unawardable), and no offeror can challenge the evaluation or negotiation of the awardee's proposal because each proposal was evaluated independent of the others. These arguments are unavailing here: proposals were evaluated against common technical and management requirements; firm-fixed price competition was used to compare offerors' prices; the Solicitation provided the opportunity for discussions; and NASA made a selection for award based on technical, management, and price factors. Although NASA attempts to categorize this procurement as outside the normal rules applicable to a competitive procurement with competitive proposals, the term BAA is not a magic wand with which NASA can waive fundamental procurement rules of fairness applicable to competitive proposals and negotiated procurements. The Court of Federal Claims has consistently held that a party's characterization or mere contract formalisms cannot alter the substance of a transaction, and the Court looks to the substance of the transaction to determine whether the procurement was conducted on a fair and reasonable basis.

20. The Agency violated the Solicitation, federal procurement regulations and statute, and an implied in fact contract where it failed to treat all offerors fairly, rationally, and in

accordance with law. NASA made clear it would not award to any proposal which contained a deficiency: the Solicitation stated "<u>Offerors are hereby notified that proposals evaluated as having one or more deficiencies are **unawardable**</u>." This Solicitation standard was entirely disregarded when NASA selected SpaceX's noncompliant and deficient proposal for award.

21.     NASA admits SpaceX's initial proposal failed to meet material Solicitation requirements – requirements which ████████████████████████ are crucial safety requirements. During Blue Origin's GAO protest, it eventually was revealed that NASA offered SpaceX the opportunity to revise key sections of its initial price, technical *and* management proposals to allow SpaceX to meet these critical Solicitation requirements. NASA acknowledges it did not offer the same opportunity to any other offeror. NASA's award to SpaceX is fundamentally arbitrary, unfair, and irrational because NASA chose an initially unacceptable proposal and permitted only that offeror to revise its proposal. Moreover, NASA made final award to SpaceX even though its proposal still contained a deficiency. Such actions violate fundamental federal procurement policies to treat all offerors fairly and provide equal opportunity to all.

22.     SpaceX's proposal was selected and awarded despite its failure to meet a critical safety and technical requirement. The Solicitation requires offerors to propose one Flight Readiness Review ("FRR") prior to each launch of each HLS element, which includes each launch of all supporting spacecraft. The stated purpose of the FRR is to "examine[] tests, demonstrations, analyses, and audits that determine the system's readiness for a safe and successful flight or launch and for subsequent flight operations." Given that SpaceX's technical approach requires a minimum of sixteen launches, SpaceX was required to include sixteen (16) FRRs. Instead, SpaceX initially proposed only *one* Flight Readiness Review, two weeks prior to its last launch, ████████

9

████████. In spite of this clear deficiency in failing to have one Flight Readiness Review for each flight, NASA recognized the error in internal documents but ultimately failed to evaluate SpaceX's technical, management, or price proposals with respect to the extent of this error.

23.     NASA's exclusive waiver of FRRs for SpaceX gave SpaceX a material advantage over other offerors ████████████. Had SpaceX met the Solicitation requirement, SpaceX's initial proposal cost would likely have increased by ████████ Further, the ████ ███████████████████████████████████████████████ that, per NASA, are required to occur 14 days prior to each launch. Additionally, elimination of FRRs eliminates data reviews, accompanying documentation, program reviews, and directly impacts schedule. Ultimately, this waiver increased risk to the program ███████████████ ██████████████. This is just one instance of unequal treatment that lowered the risk evaluation and improved the scoring of SpaceX at the expense of their competitors, demonstrating concerning preferential treatment.

24.     NASA also overlooked SpaceX's failure to meet the requirements ████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████. The Agency waived ████████████████ for SpaceX.

25.     Had NASA properly assigned a deficiency to SpaceX's proposal for these errors, Blue Origin would have been next in line for award as the offeror with the second-highest rated technical proposal (the most important evaluation factor) and next lowest price. Blue Origin was clearly prejudiced by these ████████████ advantages afforded only to SpaceX.

26.     Additionally, had Blue Origin known NASA would waive the FRR requirements, ████████████████████████████████, Blue Origin would have proposed a fundamentally different technical approach – ████████████████████     ████████████████ ████████████████████████████████████████.  This revised technical approach would have given Blue Origin a substantial chance of award because it would have dramatically improved Blue Origin's evaluation, decreasing weaknesses and increasing its strengths.  This would also have led to a lower-priced proposal because Blue Origin would have both been ████████████████████████████████████████████████

████████████████████████████████████████

27.     NASA improperly favored SpaceX's technical and management proposals in many ways throughout the evaluation process.  In one egregious example, rather than assign a technical deficiency and request a corresponding price revision, NASA viewed the ████████missing ████████████████ reviews as a minor Management proposal issue, and assigned SpaceX a single weakness for "Milestone Inconsistency within IMS" (Integrated Master Schedule).  NASA's evaluation did not account for how sixteen FRRs would have required SpaceX to revise its entire technical approach and management schedule.  The Contracting Officer found that SpaceX's technical approach was "logically inconsistent" with the requirement for sixteen FRRs.  NASA's flawed evaluation ████████████████████ compounded these evaluation errors and favored SpaceX.  Other examples include NASA's failure to appropriately assess ████████████████

████████████████████████████████████████████████

████████████████████████████████ and, the Agency broadly

11

favored SpaceX by ignoring or minimizing critical weaknesses in its proposal and double crediting
its positive attributes.

28.     In its evaluation report of SpaceX's proposal, NASA found ███████████████████

███████████████████████████████████████████████████████████

███████████████████████. This assessment from NASA's Source Evaluation Panel

("SEP") was an understatement.  SpaceX's proposal, which was selected for the HLS Option A

demonstration mission, (1) proposes a risky and undeveloped launch vehicle which has not been

fully designed, much less developed or demonstrated; (2) requires this undeveloped launch vehicle

and accompanying systems to be developed at an extraordinarily rapid pace to meet NASA's 2024

goal; (3) requires this launch vehicle to be launched ████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████ (4) proposed a

launch schedule that requires sixteen (16) or more launches, with each launch only twelve (12)

days apart (even though the performance work statement in the Solicitation required an Flight

Readiness Review fourteen (14) days prior to each launch); (5) requires never-before-tested ██

████████████████████████████; and, (6) requires an undeveloped and untested ██

████████████████████████ 14 fuel tanker launches.  All

of these events must occur successfully in a short timeframe, with little margin for error, in order

for SpaceX to perform this Option A contract.  Any one of these events would create an appreciable

risk to successful contract performance, but to determine that a proposal for all of them to be

performed together, successfully, in a short period of time, creates a mere "appreciable risk to

successful contract performance" is nothing short of irrational. At least one of these cannot even logically be performed in accordance with the Solicitation's requirements – i.e., to have one FRR 14 days before each launch (which requires the launch vehicle to conduct a test fire on the launch pad) and to have each launch occur twelve days apart is "logically inconsistent," as the Contracting Officer noted during the procurement.

29. During the course of its evaluation, the Agency determined that it lacked sufficient funding to make even a single HLS award. However, the Agency changed and waived its FRR requirements with respect to SpaceX, ████████████████████████████████████ ██████████████████. The Agency changed these requirements for SpaceX, which had the effect of narrowing NASA's budget shortfall, without notifying all offerors or amending the Solicitation to advise all offerors of the funding limitations. The Agency's actions in changing this requirement for SpaceX without notice of the funding limitations to other offerors were arbitrary and violated federal procurement regulations.

## PARTIES

30. Plaintiff Blue Origin is in the business of lunar launch and landing services and is designing and developing the Blue Origin Human Landing System with the plan to return humans to the Moon. Blue Origin's principal place of business is: 21218 76th Avenue South, Kent, Washington, 98032.

31. Defendant is the United States of America, acting through the National Aeronautics and Space Administration ("NASA" or "Agency") and, more specifically, NASA's Marshall Flight Center on Martin Rd. SW, Huntsville, AL 35808.

## PROCEDURAL BACKGROUND

32.     On April 26, 2021, Blue Origin timely filed a protest at the Government Accountability Office ("GAO"), docket number B-419783.1.

33.     On June 7, 2021, Blue Origin timely filed a supplemental protest at the GAO, docket B-419783.3.

34.     On July 30, 2021, the GAO issued a decision denying Blue Origin's protest and supplemental protest.

35.     On August 10, 2021 GAO issued a public version of its July 30th decision which allowed Blue Origin to view and understand issues related to SpaceX's noncompliance with the solicitation's FRR requirements which had previously been withheld as "protected material" under GAO's protective order.

## NATURE OF THE PRESENT ACTION

36.     This is a post-award bid protest action for declaratory and injunctive relief pursuant to 28 U.S.C. § 1491(b)(1) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

37.     This post-award action challenges the selection and award to Space Exploration Technologies Corporation ("SpaceX") of the Option A contract ("Contract") for the Human Landing System under Broad Agency Announcement NNH19ZCQ001K_APPENDIX-H-HLS.

38.     Blue Origin seeks a preliminary and permanent injunction to suspend award and performance of work by SpaceX or payments under the Contract by the Agency.  Unless the Court enjoins the Agency's implementation of the Contract, Blue Origin will suffer irreparable harm. Even if Plaintiff were to prevail on its protest, Plaintiff will be severely prejudiced because SpaceX will have completed a substantial portion of the contract, and Blue Origin will have been deprived of a unique opportunity to demonstrate its HLS design, giving SpaceX an unfair advantage as a

14

result of the Agency's unlawful conduct. Additionally, NASA will have spent a significant portion of its budget for HLS, funds which cannot be recouped. For the reasons described in this Complaint, Blue Origin is likely to succeed on the merits of its claims, and it is in the public and private interest to grant injunctive relief.

39.     Blue Origin seeks a declaratory judgment, and a permanent injunction requiring the agency to: (i) terminate the illegal and erroneous award to SpaceX; (ii) conduct meaningful discussions or clarifications with Blue Origin as necessary; (iii) request final proposal revisions ("FPRs"); (iv) reevaluate proposals in accordance with the terms of the Solicitation; (v) make a valid determination consistent with the terms of the Solicitation; (vi) make a valid award determination based on the reperformed evaluation; and (vii) grant any further relief that the Court deems appropriate.

## JURISDICTION, VENUE, AND STANDING

40.     This Court has original jurisdiction over post-award protests pursuant to 28 U.S.C. § 1491(b)(1) and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.

41.     Venue is proper in this Court pursuant to 28 U.S.C. § 1491.

42.     Blue Origin is an interested party with standing to pursue this protest action because it was an actual offeror for the HLS Option A Contract and was next in line for award. Thus, Blue Origin's direct economic interests are affected by the award of this contract to SpaceX. *See* 28 U.S.C. § 1491(b)(1). Blue Origin is prejudiced because but for NASA's erroneous and flawed evaluation actions and conduct, including waiver of a critical and mandatory solicitation requirement for SpaceX, there was a substantial chance Blue Origin would have received a contract award.

43.     Blue Origin notes that the Source Evaluation Panel's ("SEP") determination, that Blue Origin's proposal was purportedly ineligible for contract award because it contained two purported advance payments, was incorrect and unreasonable.  However, as the Contracting Officer noted, the Advance Payment issue would not have precluded a contract award to Blue Origin: "the Advance Payment issue was a relatively minor issue that the Source Selection Authority ("SSA") herself stated could be resolved with Blue Origin through negotiations, should she have decided to engage in them with Blue Origin. . . . Thus, the SSA did not see this issue, in and of itself, as one that would preclude a contract award to Blue Origin."  Contracting Officer Statement at 84; *see* GAO Decision at 34 ("the SSA clearly did not exclude Blue Origin's proposal from consideration for award on this basis").

## FACTUAL BACKGROUND

44.     The HLS Option A procurement builds upon NASA's HLS Base Period contracts to develop and demonstrate landing systems to deliver humans to the Moon's surface.  On September 30, 2019, NASA released a solicitation under the NextSTEP-2 Broad Agency Announcement Appendix H, solicitation number NNH19ZCQ001K_APPENDIX-H-HLS, for this program.  This base period solicitation requested a firm-fixed price for the first ten months of development (the "Base Period"), as well as for the option period ("Option A") – effectively a firm-fixed-price contract to return NASA astronauts to the Moon for the first time in a half century. There were minor amendments released on October 2, October 16, and October 25, 2019, and two question and answer logs released on October 16, 2019, and October 25, 2019.

45.     Appendix H was formulated into two phases to achieve the first crewed lander demonstration.  The first phase was a 10-month Base Period to advance design and development of the initial lander, advance the design of a sustainable lander design, and order Long Lead Items

for the 2024 crewed landing mission. The second phase was a follow-on Option A Period to focus on Design, Development, Test, and Evaluation ("DDT&E") and to conduct the actual crewed landing mission.

46. On April 28, 2020, NASA selected Blue Origin and its partners (*i.e.*, the National Team, consisting of Blue Origin as prime contractor, with partners Lockheed Martin Corporation, Northrop Grumman Corporation, and The Charles Stark Draper Laboratory), Dynetics, Inc.—a Leidos Company ("Dynetics"), and SpaceX, for the Appendix H Base Period awards. Blue Origin received an award of $579 million, Dynetics an award of $253 million, and SpaceX an award of $135 million.

47. During the Base Period contract, Blue Origin developed detailed engineering concepts, technology development plans, and mission performance data aligned with the Agency's reference three-element HLS architecture. This contract task developed the technical baseline offerors used to compete for the next stage of the program, Option A.

**HLS Option A Solicitation**

48. The Agency released the HLS Option A Solicitation ("Solicitation"), consisting of the NextSTEP-2 Appendix H Option A BAA to the three HLS contractors on October 30, 2020, with an amendment issued on November 16, 2020, and Solicitation Attachments A-Q.

49. This procurement was conducted as an other competitive procedure in accordance with FAR 6.102(d)(2) and FAR 35.016 (as deviated).

50. The Option A Solicitation was issued as a Broad Agency Announcement, but in contrast to general BAA practice, the Solicitation contained a 79-page common Statement of Work, in addition to hundreds of other common requirements in other requirements documents.

The Solicitation stated NASA would not require certified cost or pricing information because NASA expected to achieve adequate price competition, in accordance with FAR part 15 (FAR 15.403-1(b)(1)).   NASA used FAR Part 15 price analysis techniques to evaluate the price reasonableness of offerors proposals.

**HLS Option A Solicitation Evaluation Criteria**

51.   The Solicitation required that fixed price proposals be submitted in four volumes: Technical (I); Price (II); Management (III); and Attachments (IV) – the latter consisting of 44 distinct proposal attachments.   The period of performance for Option A will be up to six years. Solicitation, Section 6.2.   Proposals were due by 3:00 PM CT on December 8, 2020.   Blue Origin timely submitted a responsive and compliant proposal.

52.   The Solicitation established three factors for evaluation:  Technical (Factor 1), Price (Factor 2), and Management (Factor 3).   The Solicitation specified these factors were in descending order of importance to NASA:  Factor 1 was more important than Factor 2, and Factor 2 was more important than Factor 3.   Factors 1 and 3, when combined, were significantly more important than Factor 2.

53.   Within Factors 1 and 3, the Solicitation established specific "focus" areas for evaluation.   For each offeror, findings (*e.g.*, strengths, weaknesses) created for the areas of focus were to be considered in totality by the Source Evaluation Panel ("SEP") to arrive at a single adjectival rating for each factor.   Areas of focus were not to receive their own adjectival ratings. In determining adjectival ratings for Factors 1 and 3, all areas of focus were to be considered as approximately of equal importance within their respective factor.   Table 1 below contains the evaluation factors and areas of focus.

| Evaluation Factor | Area of Focus |
|---|---|
| Factor 1: Technical Approach | Technical Design Concept |
| | Development, Schedule, and Risk |
| | Verification, Validation, and Certification |
| | Insight |
| | Launch and Mission Operations |
| | Sustainability |
| | Approach to Early System Demonstrations |
| Factor 2: Total Evaluated Price | No focus areas |
| Factor 3: Management Approach | Organization and Management |
| | Schedule Management |
| | Risk Reduction |
| | Commercial Approach |
| | Base Period Performance |
| | Small Business Subcontracting Plan |
| | Data Rights |

*Table 1: Option A Evaluation Factors and Areas of Focus*

54.    For evaluation of Factors 1 and 3, the SEP identified strengths and weaknesses as defined in Table 2 below.  Elements of an offeror's proposal that merely met the Agency's requirements were ineligible for a finding of either a strength or a weakness.  In such case, the SEP did not create findings.

| Finding | Definition |
|---|---|
| Significant Strength | An aspect of the proposal that greatly enhances the potential for successful contract performance and/or that appreciably exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance. |
| Strength | An aspect of the proposal that will have some positive impact on the successful performance of the contract and/or that exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance. |
| Weakness | A flaw in the proposal that increases the risk of unsuccessful contract performance. |
| Significant Weakness | A flaw in the proposal that appreciably increases the risk of unsuccessful contract performance. |

| Deficiency | A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level. |
|---|---|

*Table 2: Option A Findings Definitions*

55. Adjectival ratings definitions as applicable to Factors 1 and 3 were as follows:

| Adjectival Rating | Definition |
|---|---|
| Outstanding | A thorough and compelling proposal of exceptional merit that fully responds to the objectives of the BAA. Proposal contains strengths that far outweigh any weaknesses. |
| Very Good | A competent proposal of high merit that fully responds to the objectives of the BAA. Proposal contains strengths which outweigh any weaknesses. |
| Acceptable | A competent proposal of moderate merit that represents a credible response to the BAA. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. |
| Marginal | A proposal of little merit. Proposal does not clearly demonstrate an adequate approach to and understanding of the BAA objectives. Weaknesses outweigh strengths. |
| Unacceptable | A seriously flawed proposal that is not responsive to the objectives of the BAA. The proposal has one or more deficiencies, or multiple significant weaknesses that either demonstrate a lack of overall competence or would require a major proposal revision to correct. The proposal is unawardable. |

*Table 3: Option A Adjectival Ratings Definitions*

56. The SEP's price evaluation consisted of four components: (1) A calculation of each offeror's Total Evaluated Price (evaluation Factor 2); (2) an evaluation of each offeror's price reasonableness; (3) an evaluation of each offeror's balanced pricing; and (4) an evaluation of whether the offeror's proposal contained advance payments. The evaluation of offerors' prices did not result in the assignment of any adjectival rating nor any strengths or weaknesses. The SEP calculated each offeror's Total Evaluated Price by summing the offeror's proposed firm fixed price amounts for CLINs 005, 009, and 010; the value of certain Government contributions to the

proposed effort, including optional Government Furnished Equipment or Property and the value of any Government Task Agreements; and the minimum indefinite delivery/indefinite quantity (IDIQ) obligations as provided in the Option A solicitation.

57.     NASA stated that the Option A period would start in March 2021, but upon the conclusion of the Base Period at the end of February the Agency issued a two-month no-cost extension of the Base Period to all HLS contractors.  This extended the Base Period through the end of April 2021, with no additional funds or scope, to accommodate delays in the Option A selection.

**Discussions and Post-selection Negotiations**

58.     The Solicitation provides for both "discussions" and "post-selection negotiations." The Agency stated that it may evaluate proposals and award contracts without conducting discussions or post-selection negotiations with Offerors (except clarifications as defined in FAR 15.306(a)).

59.     Discussions are defined as "exchanges with Offerors that occur after receipt of proposals but before selection that result in the Contracting Officer inviting the Offeror to revise only those specific portions of its proposal that have been identified by the Contracting Officer as open to revision."  "Post selection negotiations" are defined as "exchanges with Offerors who have been selected for potential contract award that result in the Contracting Officer inviting the Offeror to revise only those specific portions of its proposal that have been identified by the Contracting Officer as open to revision."  The only stated difference between the two is discussions occur before the initial selection of the prospective awardee, and post-selection discussions occur only after the initial selection(s) has been made.

**Solicitation Provisions Require Flight Readiness Reviews For Launch Vehicles and Supporting Spacecraft**

60. Solicitation Attachment O states that "[a]n FRR is required prior to each launch of an HLS element" and each Flight Readiness Review must be completed "2 weeks before first launch of an HLS element." Solicitation Attachment O (AR Tab 14[1]) at row 9.

61. The Flight Readiness Review is identified as one of six critical milestone reviews. *See* Solicitation Statement of Work ("SOW") (SOW) at G-27 (the following are "Critical Milestone Reviews" -- "Critical Design Review, Flight Readiness Review (FRR), Design Certification Review, Post Mission Assessment Review (PMAR), Sustaining System Requirements Review (SRR), and Sustaining Continuation Review (CR)").

62. These critical milestone reviews are required "for the HLS Program in order to be able to assess programmatic and technical progress and performance at key decision points in the development and operational lifecycle phases, with the ultimate goal of certifying the lander for crewed operations to and from the lunar surface and assessing the likelihood of mission success."

63. The Solicitation makes clear that launch vehicles and supporting spacecraft are required to be included in the scope of review for each critical milestone review. *See* SOW at G-27 ("Additionally, supporting spacecraft that are required in the contractor's concept of operation to successfully complete the mission shall be included in the scope of the review for mission success."); *see also* SOW at G-34 (FRR Acceptance Criteria require a determination that the "flight vehicle, launch vehicle, and support spacecraft . . . are ready for flight.").

---

[1] All Agency Record ("AR") citations are to the administrative record before the GAO in Blue Origin's GAO protest.

64. SpaceX's ████████████████████████ and one ██████████ and ████████████████ are supporting spacecraft. *See* SOW at G-27 ("[Supporting] spacecraft could include propellant storage and/or propellant transfer vehicle, as well as launch vehicle upper stages that perform critical operations above and beyond insertion of a payload into a desired orbit or trajectory."); *see also* SpaceX SEP Report ("SpaceX SEPR") at 45 ("The offeror's proposal evidences that they consider their ██████████ tanker ██████████ as necessary supporting spacecraft ████████████████████████████████████████████████████████████ ████████████████████████████████████).

65. The requirements or Acceptance Criteria for Flight Readiness Reviews are listed in the table below:

**Table 5-4  FRR ACCEPTANCE CRITERIA**

| Acceptance Criteria |
| --- |
| The flight vehicle, launch vehicle, and support spacecraft (such as propellant storage, propellant transfer, and/or upper stage vehicles that provide transportation capabilities beyond the standard for orbit insertion) are ready for flight |
| The hardware is deemed acceptable safe for flight; Hardware integration testing has been successfully completed |
| Certification that flight operations can safely proceed with acceptable risk |

| |
|---|
| Class A-C software (per NPR 7150.2C, NASA Software Engineering Requirements) is deemed acceptably safe for flight, has successfully completed software integration testing, and is ready to support flight, flight operations, and lunar surface operations |
| Interfaces have been checked and demonstrated to be functional |
| The Program has demonstrated compliance with applicable NASA requirements, standards, processes, and procedures |
| TBD and TBR items are resolved |
| Open Items and Waivers have been examined and residual risk from these is deemed to be acceptable |
| The flight environmental factors are within constraints |
| All open safety and mission risk items have been addressed, and the residual risk is deemed acceptable |
| Supporting organizations are ready to support flight, to include trained operations personnel |
| Software components meet the criteria defined in NASA-HDBK-2203, NASA Software Engineering Handbook, or an accepted alternate standard. NASA software IV&V findings dispositioned. |
| Responsible spectrum manager(s) concur that all necessary spectrum certification(s) and authorization(s) have been obtained |
| Hazardous operations have been tested. |

SOW at G-35.

66. Both the Agency and the Contractor are responsible for ensuring these Acceptance Criteria are met during the Flight Readiness Review but the Agency has ultimate responsibility to certify flight readiness for all launches, including launch vehicles and supporting spacecraft. *See* SOW at G-11 ("The Government will have a shared responsibility for validating that the content of the contractor proposed milestone reviews are in compliance with the applicable acceptance criteria."); *see also* SOW at G-11 ("The Government will have responsibility for Certification of Flight Readiness.").

67. <u>The Flight Readiness Review is, in large part, a *safety* review</u>. *See* SOW at G-34 ("The FRR examines tests, demonstrations, analyses, and audits that determine the system's readiness for a safe and successful flight or launch and for subsequent flight operations."); *see also* SOW at G-55 ("The completion of the appropriate safety analysis and the Program acceptance of the residual risk is a component of the success criteria for the engineering milestone reviews, including the Flight Readiness Review (FRR)."); *see also* Wilhite Declaration, Complaint Exhibit 1 (describing the importance of FRRs in previous space shuttle missions, although Blue Origin notes that the risk to astronaut safety is different here because SpaceX's supporting spacecraft will not carry astronauts).

68. Many of the FRR Acceptance Criteria relate to ensuring the flight is safe: (a) "Certification that flight operations can safely proceed with acceptable risk"; (b) "The hardware is deemed acceptable safe for flight"; (c) "All open safety and mission risk items have been addressed, and the residual risk is deemed acceptable"; and (d) "Class A-C software (per NPR 7150.2C, NASA Software Engineering Requirements) is deemed acceptably safe for flight." SOW at G-34 and G-35.

> SpaceX was required to include FRRs to allow NASA to ensure each launch was safe for flight and ground personnel and the general public, in addition to ensuring the equipment works in orbit. *See* SOW at 55 (7. Safety and Mission Assurance — "The contractor shall provide the technical and management effort necessary to ensure the overall safety and protection of flight and ground personnel, general public, flight/ground hardware, the environment, other orbiting spacecraft and facilities through all phases of the project, including oversight of contracted efforts. The contractor shall provide the opportunity for NASA stakeholder participation, review and concurrence with access to all safety and mission assurance products, processes, and procedures. This includes participation in reviews that address safety, quality, and reliability of HLS hardware, software, operations, and associated interfaces.").**SpaceX's Initial Proposal Provided For Only One FRR ██████████.**

69. The elements of SpaceX's HLS are the HLS Starship (the Integrated Lander), one ████████████████████████████ (supporting spacecraft), and ████████████████ (launch vehicles). *See* HLS Option A SSA Selection Meeting (AR Tab 110) at 29.

70. As shown in the excerpt of the SEP's presentation to the SSA below, the SEP identified the "Elements Required" for SpaceX's HLS to include its supporting spacecraf█████ ████████████████████ ) and launch vehicles ███████████ ):



*Id*. at 28.

71. SpaceX's launch operations involve ████████████ ████████████████ ██████████ fourteen ██████████ launches of ██████████████████████ ██████████████ to conduct ██████████████████████ (which is

undeveloped technology and has never been demonstrated to work). *See* SpaceX Integrated Master Schedule ("IMS") (AR Tab 126) at 39-40; *see also* SpaceX Concept of Operations ("ConOps") (AR Tab 128) at 3. ████████████████████████ he HLS Starship will ████

████████████████████████████ and ████████████████████████████████

████████████████  *Id.* This effort requires at least sixteen launches of spacecraft.

72.   SpaceX's first launch ██████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████ unless contingency launches are

needed. *See* SpaceX IMS at 39-40. ████████████████████████████████████

██████████████████████████████ *See id.* However, ████████████████████

██████████████████████████████

███████████████████████████████████████████████████ the

HLS award date was delayed by two months and SpaceX's IMS has not been revised. *Compare* SpaceX IMS *to* SpaceX Revised Performance Work Statement ("Revised PWS") (AR Tab 199).

73.   SpaceX's initial proposal included only one FRR, which was an FRR two weeks prior to the launch of the HLS Starship ████████████████████████ SpaceX's initial proposal did not include any FRRs prior to any of the fifteen additional needed launches of its Supporting Spacecraft. ██████████████.  SpaceX's initial proposal for the Flight Readiness Review did not include a review of Supporting Spacecraft ████████████████ as required by the Solicitation.

████████████████████████████████████████



74.    SpaceX's proposed cost for ███████ is ██████████ SpaceX Payment Milestones for Option A ("Payment Milestones") (SpaceX Payment Milestones) ███████.  SpaceX's cost for ██████████ would be ██████████

**Definitions of the Terms "HLS Element," "HLS," "Supporting Spacecraft," and "Integrated Lander"**

75.    During the GAO protest, documents eventually[2] produced by the Agency revealed that SpaceX's proposal did not offer one FRR for each launch as required by the Solicitation, and that NASA knew that such a proposal was not compliant.  NASA internal documents stated specifically that SpaceX's proposal "is inconsistent with" and "not in accordance with" the requirement for the FRR milestone review.

76.    In an effort to preserve the award to SpaceX, the Agency was forced to assert that "HLS element" had the same meaning as "Integrated Lander element," in order to try to convince the GAO that SpaceX's deficient proposal could meet the Solicitation's requirements.  In regard to the requirement for one FRR prior to each launch of each HLS element, the GAO found that the Agency's interpretation of "HLS element" as having the same meaning as "Integrated Lander element" was unreasonable and completely unsupported by the text of the Solicitation.  Blue Origin GAO Protest Decision at 73 ("Thus, we find that the Option A BAA required a FRR to be completed prior to *each launch* of an *HLS element*, which definition includes *supporting spacecraft*. NASA's competing interpretation would essentially require us to read language out of and into the solicitation's requirement. Specifically, we would need to read "supporting spacecraft" out of the definition of "HLS," and the "each" out of "each launch." Additionally, we

---

[2] NASA had refused to produce these documents until losing the equivalent of motions to compel.

would need to read in the concept of each element type, specifically, that a FRR is only required to be completed prior to the launch of *each type of* HLS element. As between the two proffered interpretations, we find the protesters' interpretation--which relies on the text as written--to be more natural and compelling than the agency's proffered interpretation.").

77.     The Solicitation defines the term Human Landing System or "HLS" as being composed of four categories of items: (1) Integrated Lander (or elements thereof); (2) all Supporting Spacecraft; (3) all launch vehicles which launch the Lander and/or Supporting Spacecraft; and (4) the Active-Active docking adapter.  SOW at G-10 ("HLS: All objects, vehicles, elements, integrated systems, systems, subsystems, or components thereof that are designed, developed, and utilized by the contractor, its teammates, subcontractors, and suppliers in performance of this contract, and which collectively comprise the contractor's Integrated Lander (or elements thereof), all Supporting Spacecraft, all launch vehicles necessary for launch and delivery of the contractor's Integrated Lander (or elements thereof) and its Supporting Spacecraft, and the contractor's Active-Active docking adapter (AADA) (if required for performance of the contractor's crewed demonstration mission)").

78.     The term "Supporting Spacecraft" is defined as "[a]ny contractor spacecraft that is not otherwise the Contractor's HLS Integrated Lander, Launch Vehicle, or AADA, but that is otherwise required for the Contractor to execute its demonstration mission or any portion thereof in performance of this contract, including, but not limited to, rendezvous, proximity operations, docking and undocking (RPODU), propellant transfer, and orbital maneuvering and transfer." *Id*.

An "Integrated Lander" is defined as "[a]ny and all combinations of contractor elements (e.g. Ascent Element), including potentially a single element, which is integrated at any time crew are onboard." *Id.*

### Agency's Evaluation Determined SpaceX's HLS Option A Proposal Failed to Meet FRR Requirements

79.     The Option A technical and management adjectival ratings as assessed by the SEP for the three offerors are shown below:

|  | Technical Rating (Factor 1) | Management Rating (Factor 3) |
|---|---|---|
| **Blue Origin** | Acceptable | Very Good |
| **Dynetics** | Marginal | Very Good |
| **SpaceX** | Acceptable | Outstanding |

*Table 4: Option A Technical and Management Adjectival Ratings*

As determined by the Agency Blue Origin's evaluated price was $5.99 billion (Blue Origin Source Evaluation Panel Report (SEPR) at 45), and SpaceX's evaluated price was $2.94 billion. *See* Source Selection Statement (SSS) at 8.

80.     SpaceX's initial proposal failed to meet the Solicitation's FRR requirements. The primary Solicitation requirements at issue are: (1) FRR Acceptance Criteria require verification that "support spacecraft . . . are ready for flight"; and (2) "[a]n FRR is required prior to each launch of an HLS element." SOW at G-34; Solicitation Attachment O at Row 9. In other words, the Solicitation requires SpaceX to include supporting spacecraft in each Flight Readiness Review, and requires SpaceX to conduct one Flight Readiness Review prior to the launch of each HLS Element (*e.g.*, supporting spacecraft). ***First***, the Solicitation requires an offeror's proposed Flight Readiness Review to include a review of Supporting Spacecraft. *See* SOW at G-34 (FRR

Acceptance Criteria require that each proposed FRR verify "The flight vehicle, launch vehicle, and <u>supporting spacecraft . . . are ready for flight</u>.") (emphasis added); *see also* SOW at G-27 (In SOW Section 5 "Milestone Reviews," the Solicitation states "<u>supporting spacecraft</u> that are required in the contractor's concept of operation to successfully complete the mission <u>shall be included in the scope of the review for mission success</u>.") (emphasis added).  This is a material requirement because the failure to include a Flight Readiness Review substantially affects and offeror's price and quality of service. ████████████████████        ████████████

████        *See* ████████████████████████████        ██████

████████████        Blue Origin Payment Milestones at Rows 43-45 (showing Blue Origin's price for FRRs ranged from ████ million to ████ million, depending on the HLS element). Further, the Agency determined that for SpaceX to meet this requirement as waived by the Agency, SpaceX only had to propose one FRR for the ████████ and one FRR for the Tanker Starship (as a class of vehicles). ██████████████████████████████

████████████████████████        the FRRs affect an offeror's quality of service because FRRs are critical milestone reviews of technical and safety risk; they are the final review of outstanding technical issues and are the point at which a go or no-go decision is made.  *See* Wilhite Declaration at ¶¶ 18-23 (Complaint Exhibit 1).  The failure to include supporting spacecraft in an FRR review lowers the quality of services and increases risk of unsuccessful performance of the contract due to NASA's lack of participation and authority in the final Flight Readiness Review process.  Because the requirement to include supporting spacecraft in the Flight Readiness Review substantially impacts the price and quality of an offeror's proposal,

this requirement is material.  The proposal's noncompliance with the Solicitation rendered it unawardable.

81.  ***Second***, the Solicitation requires an FRR "prior to each launch of an HLS element." Solicitation Attachment O at Row 9.  For the same reasons discussed in paragraph 62 above, this is a material requirement because the failure to propose a required FRR substantially impacts the price and quality of an offeror's proposal.

82.  The Agency knew that SpaceX's proposal did not meet the Solicitation's requirements.  This is not hyperbole.



SpaceX SEPR at 45 (emphasis added). ████████████████████████

████████████████████ there is no interpretation of this requirement – for Flight Readiness

Reviews to include Supporting Spacecraft – which SpaceX's initial proposal met.

83.    In Blue Origin's GAO Protest, the Contracting Officer in a submission to GAO

concurred with this conclusion:

> "SpaceX neither proposed any FRR events dedicated to one or all of its supporting
> spacecraft, nor a single FRR scheduled sufficiently far enough in advance to cover
> the full scope of its demonstration mission prior to the launch of its first supporting
> spacecraft. *Id.* Specifically, the SEP reasoned that if, two weeks prior to the launch
> of its HLS Starship, the NASA FRR milestone acceptance criteria required SpaceX
> ████████████████████████████████████████
> Supporting Spacecraft were "ready" for flight, this requirem
> rendered nonsensical in light of SpaceX's flight campaign, ████████████
> ████████████████████████████████████████
> ███████ In other words, how could SpaceX use its single NASA FRR *to
> demonstrate to NASA* that its Supporting Spacecraft were "ready" for launch when
> ████████████████████████████████████████ "

Supplemental Contracting Officer Statement at 11-12. Thus, the Agency acknowledges the error

in SpaceX's proposal and concedes that SpaceX failed to incorporate supporting spacecraft into

its FRR. There is no question that SpaceX failed to meet this *first* material requirement.

84.    SpaceX's initial and revised proposals also failed to meet the *second* Solicitation

requirement for an FRR prior to each launch of an *HLS element*.

85.    As discussed in paragraph 52 above, the Solicitation defines "HLS" as being

composed of four categories of items: (1) Integrated Lander (or elements thereof); (2) all

Supporting Spacecraft; (3) all launch vehicles which launch the Lander and/or Supporting

Spacecraft; and (4) the Active-Active docking adapter. The SEP also identified SpaceX's HLS

elements as the ███████████████████████████████████

████████████████████████████████████

86.     In accordance with this FRR requirement, SpaceX was required to include one FRR prior to each launch of each supporting spacecraft, launch vehicle, and integrated lander (SpaceX's design did not utilize ███████████████). Therefore, SpaceX should have proposed a total of sixteen FRRs – one for the ██████████ launch, fourteen for each of the fourteen Tanker Starship launches, and one for the HLS Starship launch. Instead, SpaceX's initial proposal included only one FRR for the HLS Starship, ███████████████████████████████.

87.     During post-selection negotiations with NASA, SpaceX revised its proposal to include one FRR for the ██████████ and one FRR to cover all fourteen launches of the Tanker Starships. This revised proposal failed to meet the requirement for one FRR prior to each launch of an HLS element.

88.     Therefore, both SpaceX's initial and revised proposals failed to meet the *material* Solicitation requirement for one FRR prior to each launch of an HLS element. See GAO Decision at 73 ("SpaceX's three proposed FRRs--or one for each *type* of HLS element--were insufficient when SpaceX's concept of operations will require 16 total launches").

89.     As such, both the initial and revised proposals were unacceptable and the Agency's award to SpaceX was arbitrary and unlawful. GAO itself recognized this in its decision. Specifically, GAO explained that "SpaceX's three proposed FRRs—or one for each *type* of HLS element—were insufficient when SpaceX's concept of operations will require 16 total launches." By engaging in exchanges with only SpaceX to allow SpaceX the opportunity to correct its material proposal deficiencies, the Agency treated Blue Origin unequally and unfairly, in violation of Federal procurement regulations. Blue Origin was prejudiced by the Agency's improper actions.

**Agency's Evaluation of SpaceX's Proposal Was Arbitrary, Capricious, And Not In Accordance With Law**

90.     NASA failed to evaluate significant technical and management errors and risks in SpaceX's proposal in accordance with solicitation requirements and applicable regulations and law.

91.     For example, as discussed above, NASA failed to evaluate the substantial technical and management risk posed by the failure of SpaceX's initial proposal to provide for Flight Readiness Reviews prior to each of fifteen separate flights.  SpaceX's lack of FRRs not only posed heightened technical and safety risks, but the Contracting Officer determined that the requirement for one FRR prior to each launch "is logically inconsistent with [SpaceX's] technical approach." Letter to Open Negotiations_SpaceX (AR Tab 191) at 6 (the requirement for an "FRR no later than two weeks prior to the launch of every supporting spacecraft[,] every individual Tanker Starship is a Supporting Spacecraft[,] is logically inconsistent with the technical approach proposed by your firm (i.e., fourteen launches, each spaced only twelve days apart from one another)").  In essence, SpaceX's proposal not only failed to include the required FRRs, but it *could not* include these FRRs, because the amount of time required to perform sixteen FRRs was fundamentally incompatible with SpaceX's technical approach.  Yet, SpaceX's technical proposal did not receive even a single technical weakness for the noncompliant lack of FRRs.  The missing fifteen FRRs were also a substantial management risk that was not properly evaluated because the Agency believed SpaceX was only required to add two FRRs.  The many missing FRRs is a programmatic and schedule risk because an offeror must account for the tremendous amount of time and labor necessary to conduct the "tests, demonstrations, analyses, and audits" that must be completed prior to conducting the FRR.  *See* SOW at G-34.

92. Another example is the Agency's failure to properly assess  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. The SEP noted the heightened risk of SpaceX's overall Concept of Operations, but that risk is separate from ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇

93. Further, the Agency improperly awarded SpaceX multiple credits for the same positive attributes of its proposal. For example, the Agency awarded SpaceX a "Significant Strength" for "Proposed Capability Exceeds NASA Requirements for Threshold Values and Meets NASA's Goal Values in Numerous Key Areas." The features of SpaceX's proposal the Agency cited for this Significant Strength include the same features cited later for other strengths, such as:



SpaceX SEPR at 12-13 (emphasis added). In this Significant Strength, the Agency praises the same feature repeatedly — ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇ SpaceX is then awarded a separate "Strength" in the following section ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇." The Agency double counts

36

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

this attribute to award SpaceX's technical proposal as both a "Significant Strength" and a "Strength."

### NASA's Initial Selection Was Irrational Because SpaceX's Initial Proposal Should Have Been Evaluated With a Deficiency and Been Unawardable

94. NASA's initial conditional award decision was arbitrary and irrational because SpaceX's initial proposal was unawardable. SpaceX's initial proposal should have been assessed with a Deficiency because the proposal failed to meet material requirements of the Solicitation – the FRR requirements. Because it should have contained this Deficiency, SpaceX's proposal was unawardable.

95. In addition to SpaceX's failure to meet Solicitation requirements for FRRs, SpaceX also failed to ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ – ███████████ " ███████████████████████████████████████

████████████████████████████████████████████████████████████

███████████ Further, all milestone reviews, like the ████████ FRR, must include a review of the supporting spacecraft and launch vehicles. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ ███████████████████████████████

████████████████████████████████████████████████ NASA

████████████████████████████████████████████████████

completely overlooked this error and did not assess SpaceX any weaknesses for failure to meet this requirement.

96.     There are even more ████████████ SpaceX did not meet the ████████ requirements, ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████. ████████

████████████████████████████████████████████████████

████████████████████████████ NASA did not assign any weaknesses for SpaceX's failure to meet these requirements.

97.     Further, SpaceX's review plan states that ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ NASA did not assign any weaknesses for SpaceX's proposal ambiguity regarding whether SpaceX would ████████

████████████████████████████████████████████.

98.     NASA claims the evaluation process was closed once the initial selection decision was made.  Therefore, the evaluation criteria only applied during the evaluation period.  The evaluation period closed with SpaceX submitting a deficient proposal.  If the Agency can make

38

████████████████████████████████████████████████████

award to a deficient proposal, the evaluation criteria become meaningless. The Agency's selection and award decision are fundamentally arbitrary.

### Agency Conducted Post-selection Negotiations Only With SpaceX and Permitted SpaceX to Revise Its Proposal to Meet the FRR Requirements

99. On April 2, 2021, notwithstanding SpaceX's noncompliance with the Solicitation's FRR requirements, the Source Selection Authority ("SSA") made an initial selection of SpaceX for potential Option A award, and noted that this selection was non-binding on the Government. The SSA relied on the "conclusion of the SEP and the CO that SpaceX's proposal, from a solicitation compliance perspective, contains no deficiencies or similar errors and is therefore awardable without needing to engage in discussions in order to solicit for a revised proposal." SSA Initial Selection and Negotiations Determination (AR Tab 190) at 1. This conclusion was wrong; discussions were needed to resolve SpaceX's FRR noncompliance. This erroneous conclusion was a necessary and integral step in the SSA's decision to make award to only SpaceX.

100. Funding limitations and the missing FRRs were the primary issues the Agency sought to address in negotiations with SpaceX. The SSA stated that "due to insufficient current year funding, NASA is unable to award a contract to SpaceX at the price SpaceX has proposed and with the specific phasing of milestone payments it has specified." SSA Initial Selection and Negotiations Determination at 2. The SSA indicated that SpaceX's proposal contains "other outstanding milestone-related issues that, pursuant to the terms of the Option A solicitation, NASA could resolve during such negotiations." *Id.* Due to these issues, the SSA authorized the Contracting Officer to engage in post-selection negotiations with SpaceX.

101. Also on April 2, 2021, the Contracting Officer sent a letter to SpaceX inviting SpaceX to engage in post-selection negotiations. *See* Letter to Open Negotiations_SpaceX.

102.    The Agency allowed SpaceX the opportunity to revise its price, payment schedule, Review Plan, Performance Work Statement, and expenditure profile.  *See id*.

103.    In this post-selection negotiations letter, the Contracting Officer provided SpaceX with the precise funding available for each year of the Option A contract, from Fiscal Year (FY) 2021 to FY 2025.  *See id*.

104.    The CO's letter identified three issues for which SpaceX was requested to submit revised proposal sections:  (1) prices for CLINs 0005 and 0010; (2) payment phasing to accommodate budget availability; and (3) Flight Readiness Reviews ("FRRs") for Supporting Spacecraft.  *Id*.

105.    The Contracting Officer stated that the FRR Solicitation requirements were "arguably ambiguous," and noted that SpaceX's technical approach would be "logically inconsistent" with a requirement for one FRR prior to each launch of each supporting spacecraft (a total of sixteen FRRs), which the Contracting Officer indicated was one possible interpretation of the Solicitation's FRR requirements.  *Id* at 6.

106.    The Contracting Officer then stated that "in order to meet NASA's intent of its FRR requirement for supporting spacecraft" NASA requested a revised proposal to include:  (1) one FRR for all of the Tanker Starship supporting spacecraft; (2) one FRR for the ███████████ ███████████ and (3) "delta-FRRs" that would be triggered in the event of issues relevant to flight readiness.  *Id*. (emphasis added).  "Delta FRRs" are a new requirement suggested by the Contracting Officer to the SSA during the Agency's preparation for post-selection negotiations with SpaceX; "Delta FRRs" are not mentioned or included in the Solicitation.  *See* Supplemental COS at 19 ("I brought up the idea of negotiating 'delta-FRRs'").

107.    The Agency engaged in post-selection negotiations (*i.e.*, discussions) with only SpaceX; no other offeror was offered this opportunity.  *See* Source Selection Statement.  During the post-selection negotiation with SpaceX, the Agency allowed SpaceX to revise a proposal that failed to meet material Solicitation requirements and was ***unacceptable***, into a proposal that purportedly met the Agency's interpretation of the FRR requirements.  The Agency's "post-selection negotiation" with SpaceX constituted arbitrary, unequal, and improper "discussions" where it allowed only one offeror to revise an unawardable proposal into an awardable proposal.

108.    Discussions occur when an offeror is allowed to materially revise its proposal, especially to resolve a noncompliance with solicitation requirements.  The Court has noted that "the acid test for deciding whether an agency has engaged in discussions is whether the agency has provided an opportunity for quotations or proposals to be revised or modified."  *WaveLink, Inc. v. United States*, No. 20-749C, 2021 WL 2762814, at *15 (Fed. Cl. June 24, 2021) (quoting *Consol. Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 626 (2005)).  If the agency decides to award the contract after holding discussions, it must hold discussions with all responsible offerors within the competitive range.  *Id.*

109.    Here, the Agency indisputably held discussions where it allowed SpaceX the opportunity to revise its price, payment schedule, Review Plan, Performance Work Statement, and expenditure profile.  *See* AR Tab 191.  SpaceX took advantage of this opportunity and submitted a revised proposal, including a revised payment schedule and two additional Flight Readiness Reviews ██████████████     ████████████████████     █████████████

110.    Although these exchanges fit squarely within the definition of "discussions," the Agency claims these exchanges were post-selection negotiations, rather than discussions, because

the Solicitation defined as post-selection negotiations any exchanges entered into with offerors who had been selected for potential contract award. *See* Supplemental COS at 5.

111. The Agency's exchanges with SpaceX were discussions. The Agency's failure to hold discussions with Blue Origin, in violation of federal statute and case law, prejudiced Blue Origin because Blue Origin would have been able to improve its proposal, including price, resulting in a substantial chance for award. *See* Letter from Jeff Bezos to Administrator Nelson (offering to "bridge the HLS budgetary funding shortfall by waiving all payments in the current and next two government fiscal years up to $2B to get the program back on track right now") at https://www.blueorigin.com/news/open-letter-to-administrator-nelson. Blue Origin would have enhanced those aspects of its technical and management proposal rated as having a weakness or significant weakness, and it would have remedied the purported advanced payment issue discussed in Blue Origin's SEP report. In fact, NASA had evidence on this contract that Blue Origin could, if asked, substantially reduce its price (Blue Origin reduced its original base period proposal price by 46%) and maintain schedule, while having the ability to defer hundreds of millions of dollars in payments in a calendar year. It would have been easy and in NASA's best interest to simply pick up the phone and call Blue Origin.

112. The Agency's actions were arbitrary and unreasonable and violated fundamental procurement principles and regulations regarding fairness to prospective offerors. One of the guiding principles of the Federal Acquisition Regulation System is the Government must "[c]onduct business with integrity, fairness, and openness." Federal Acquisition Regulation ("FAR") 1.102. Also, FAR 1.102-2(c)(3) mandates that "[a]ll contractors and prospective

contractors shall be treated fairly and impartially . . . ."  FAR 1.602-2 states "Contracting officers shall . . . [e]nsure that contractors receive impartial, fair, and equitable treatment."

113.   Although the Solicitation does not explicitly place limits on the topics that may be discussed or extent of proposal revisions allowed during post-selection negotiations, GAO has found that similarly broad Solicitation language does not permit an agency to treat offerors arbitrarily or unfairly.  *See Innovative Management & Technology Approaches, Inc*., B-418823.3, B-418823.4, January 8, 2021, 2021 CPD ¶ 18; *see also AECOM Mgmt. Servs., Inc.*, B-418828.4 et al., March 17, 2021, 2021 CPD ¶ 152.

114.   Blue Origin was prejudiced by the Agency's decision to hold discussions with SpaceX and not Blue Origin.  Had the Agency held discussions with Blue Origin and revealed its funding limitations to Blue Origin, as it did with SpaceX, Blue Origin would have lowered it price to meet those funding limitations.   Blue Origin also would have enhanced its technical and management proposal, and modified its payment schedule to fix purported advanced payments.

**The Agency Made a Single Award to SpaceX In Spite of Communicating Intent to Offerors to Make Multiple Awards**

115.   NASA's procurement documents and public statements repeatedly recognized that it was NASA's intent to award two HLS Option A awards.  For example, the HLS Option A Source Selection Official stated, "by making three HLS base period contract awards that preceded the present Option A source selection, it was NASA's preference (as stated in the Option A BAA) to then down-select from among these contractors to two Option A awardees."  *See* Source Selection Statement (SSS) at 7.

116.   Although the Agency purportedly desired "to preserve a competitive environment at this stage of the HLS Program, at the initial prices and milestone payment phasing proposed by

each of the Option A offerors," NASA's current fiscal year budget at the time of proposal review and evaluation "did not support even a single Option A award." *Id.* Accordingly, on April 2, 2021, the Source Selection Official determined to make an initial, "conditional" selection of SpaceX to enable the Contracting Officer to engage in post-selection price negotiations with that company. *Id.* The Source Selection Officer therefore determined to open price negotiations only with SpaceX, the offeror that had "the lowest *initially*-proposed price." SSS at 3. The Agency did not enter into negotiations with any other offeror.

117. After review of the price negotiations with SpaceX, which did not result in a lower price but did change some milestone payments, the Source Selection Official determined to award HLS Option A to SpaceX. Accordingly, on April 16, 2021, NASA selected SpaceX for the HLS Option A award, at an evaluated price of $2.94 billion and a total award value of $2.89 billion, despite its publicly stated intention to down-select to two providers to maintain competition. SSS at 8.

118. NASA made this selection based on price, as the Source Selection Statement, indicates that "NASA's current fiscal year budget did not support even a single Option A award. The SSA stated: "My selection determination for SpaceX's proposal is based upon the results of its evaluation considered in light of the Agency's currently available and anticipated future funding for the Option A effort." SSS at 24.

## CLAIMS FOR RELIEF

### COUNT 1
### (Unlawful Waiver of Material Solicitation Requirement)

119.    Blue Origin incorporates by reference every preceding paragraph as if fully set forth herein.

120.    SpaceX's initial and revised proposals failed to meet the requirements for the FRR, ███████████████████████, and thus both were noncompliant and unawardable.

121.    Agency officials must conduct procurements in accordance with the terms of the Solicitation and applicable laws and regulations.  Agency actions which fail to do so are considered arbitrary, capricious, and unlawful, and must be set aside.  5 U.S.C. §706(2)(A).

122.    The Agency shall evaluate competitive proposals and make an award based solely on the factors specified in the solicitation.  10 U.S.C. §2305(b)(1).  FAR 35.016 states "Proposals received as a result of the BAA shall be evaluated in accordance with evaluation criteria specified therein."

123.    "A proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations."  *Allied Tech. Grp., Inc. v. United States*, 649 F.3d at 1329 (quoting *E.W. Bliss Co. v. United States*, 77 F.3d at 448).

124.    "A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the [proposal]." *Mortgage Contracting Services, LLC v. United States,* 153 Fed. Cl. 89, 142 (2021) (quoting *Transatlantic Lines, LLC v. United States*, 122 Fed. Cl. 624, 632 (2015) (brackets in original).

45

125.    Further, the Solicitation mandates that an offeror's proposal "shall acknowledge and be responsive to all of the requirements, standards, terms, and conditions contained in this solicitation.  The Offeror's proposal shall contain a complete approach and a firm fixed price for all of the work to be performed by the HLS contractor during the Option A period."  BAA at 23. The Solicitation also states, "Offerors are hereby notified that proposals evaluated as having one or more deficiencies are ***unawardable***."  Solicitation at 59.  The Solicitation defines a deficiency as "[a] material failure of a proposal to meet a Government requirement." These Solicitation provisions put offerors on notice that offerors must meet all material requirements of the Solicitation and the Agency would not waive any material requirements in awarding the HLS contract.

126.    However, the Agency did waive material requirements for SpaceX.  The Agency selected SpaceX's proposal for conditional award and also final award, although SpaceX's proposal did not meet the Solicitation requirement that "[a]n FRR is required prior to each launch of an HLS element."  Solicitation Attachment O at Row 9; *see* 5 U.S.C. §706(2)(A).  Such waiver violated the Solicitation's provisions.

127.    SpaceX's initial proposal contained one FRR and its revised proposal only included three FRRs.  To comply with mandatory elements of the Solicitation, its proposal should have included sixteen FRRs for its proposed sixteen total launches of HLS elements (including launch vehicles and supporting spacecraft).  As such, SpaceX's proposal failed to meet the requirement for one FRR prior to each launch of an HLS element, and it was thus noncompliant and unawardable.

128.   NASA internal documents, some of which were produced during the GAO protest admit that failure and noncompliance of SpaceX's initial proposal in regards to the FRR reviews.

129.   GAO's decision recognized and affirmed that exact point, stating explicitly that that "SpaceX's three proposed FRRs—or one for each *type* of HLS element—were insufficient when SpaceX's concept of operations will require 16 total launches."

130.   In addition to SpaceX's failure to meet Solicitation requirements for FRRs, SpaceX also failed ███████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████ – █ ███████████ ██ ███████████████████████████████████ ██████ █ ████████████████████████████████████████████ ███████████████ Further, all milestone reviews, like the ████████ FRR, must include a review of the supporting spacecraft and launch vehicles. █████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████ ████████████████████████ ██████████████████████████████████████████████████ ████████████ NASA completely overlooked this error and did not assess SpaceX any weaknesses for failure to meet this requirement.

131.   There are more ████████████ SpaceX did not meet the ████████ requirements, ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ NASA did not assign any weaknesses for SpaceX's failure to meet these

requirements.  NASA essentially waived ███████████████████ requirements that greatly

influence an offeror's schedule and overall technical offering.

132.    Further, SpaceX's review plan states that ████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████ NASA did not assign any

weaknesses for SpaceX's proposal ambiguity regarding whether SpaceX would ███████████

████████████████████████████████████████

133.    Blue Origin's technical approach to the Option A Solicitation was driven in large

part by schedule constraints.  Had Blue Origin known the Agency would waive the FRR █████,

████████████████████████████████████████████████████████ Blue

Origin would have proposed a fundamentally different HLS design, an alternative ████████████

███████████████████████████████████████████████████████████

Blue Origin would have engineered and proposed an entirely different architecture with

corresponding differences in technical management and price scores.  Blue Origin would have

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

designed its architecture to ███████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ This would also have led to a lower-priced proposal because Blue

Origin would have both been ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████. Further, Blue Origin would have been able to propose a substantially lower price

because ████████████████████████████████████████████████████████████████

███████████████████████████████ NASA's failure to amend its solicitation

requirements and notify offerors of this change in requirements was prejudicial to Blue Origin.

134.    NASA's exclusive waiver of FRRs for SpaceX also gave SpaceX specific, material

advantages over other offerors ████████████████████. If SpaceX had included the

appropriate number of FRRs, SpaceX's costs would have increased by ████████████ Further, ███

████████████████████████████████████████████████████████

███████ that, per NASA, are required to occur 14 days prior to each launch. Additionally,

elimination of FRRs eliminates data reviews, documentation, program reviews, and directly

impacts schedule. Ultimately this waiver increased risk to the program █████████████████

████████████████████████████████████████████████████. This is just one

instance of uneven, opinion-based assertions by the Source Selection Authority that lowered the

risk evaluation and improved the scoring of SpaceX at the expense of SpaceX's competitors,

demonstrating concerning and potentially dangerous preferential treatment.

135.    Blue Origin was prejudiced by these ████████████████ advantages afforded only to

SpaceX.

████████████████████████████████████████████████████████

136.     Additionally, had the Agency not unlawfully made award to SpaceX, the Agency would have either made award to Blue Origin, as the next-in-line offeror with the second high technical and management ratings and second lowest price, or the Agency would have had discussions with all offerors and allowed offerors to submit revised proposals.  As discussed previously, Blue Origin would have substantially enhanced its proposal had it been given the same opportunity to revise its proposal as SpaceX.

137.     Blue Origin seeks a declaration, under the Administrative Procedure Act ("APA"), 5 U.S.C. 706(2)(A), that NASA violated the requirements of FAR 35.016 and 41 U.S.C. §3701 by failing to evaluate SpaceX's proposal in accordance with Solicitation requirements; and, therefore, NASA's HLS Option A contract award to SpaceX was unlawful because it violated Federal statute and the Solicitation's provisions.

**COUNT 2**
**(NASA Engaged In Improper and Unequal Discussions)**

138.     Blue Origin incorporates by reference every preceding paragraph as if fully set forth herein.

139.     Agency officials must conduct procurements in accordance with the terms of the Solicitation and applicable laws and regulations.  Agency actions which fail to do so are considered arbitrary, capricious, and unlawful, and must be set aside.  5 U.S.C. §706(2)(A).

140.     The Agency shall evaluate competitive proposals and make an award based solely on the factors specified in the solicitation.  10 U.S.C. §2305(b)(1).  FAR 35.016 states "Proposals received as a result of the BAA shall be evaluated in accordance with evaluation criteria specified therein."

50

141.   "A proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d at 1329 (quoting *E.W. Bliss Co. v. United States*, 77 F.3d at 448).

142.   "A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the [proposal].'" *Mortgage Contracting Services, LLC v. United States,* 153 Fed. Cl. 89, 142 (2021) (quoting *Transatlantic Lines, LLC v. United States*, 122 Fed. Cl. 624, 632 (2015) (brackets in original).

143.   The FRR Requirements are material terms of the Solicitation.  SpaceX's initial proposal was unawardable because it failed to meet material solicitation requirements.

144.   The Agency violated procurement laws and regulations by engaging in improper and unequal discussions where it held discussions with only SpaceX and permitted SpaceX to revise its unawardable and noncompliant proposal.

145.   "A solicitation that contemplates the submission of proposals and the possibility of discussions is a negotiated procurement," and "negotiated procurements involve competitive proposals." *Tolliver Group, Inc. v. United States*, 151 Fed. Cl. 70, 90 (2020).

146.   In a negotiated procurement with competitive proposals, if an agency conducts discussions with one offeror, it must conduct discussions with all offerors under consideration for award.  10 U.S.C. §2305(b)(4)(A).

147.   The Agency's failure to hold discussions with Blue Origin, an offeror with an acceptable proposal, prejudiced Blue Origin because Blue Origin would have been able to improve its proposal, including price, resulting in a substantial chance for award.  Blue Origin would have

enhanced those aspects of its technical and management proposal rated as having a weakness or significant weakness, and it would have remedied the purported advanced payment issue discussed in Blue Origin's SEP report.

148. The Agency's actions were arbitrary and unreasonable and violated fundamental procurement principles and regulations, including those mandating fair treatment for all offerors. One of the guiding principles of the Federal Acquisition Regulation System is the Government must "[c]onduct business with integrity, fairness, and openness." Federal Acquisition Regulation ("FAR") 1.102. Also, FAR 1.102-2(c)(3) mandates that "[a]ll contractors and prospective contractors shall be treated fairly and impartially. . ." FAR 1.602-2 states "Contracting officers shall . . . [e]nsure that contractors receive impartial, fair, and equitable treatment."

149. An agency violates fundamental rules of fairness, inherent in every procurement, where: (1) an offeror's proposal fails to meet a material Solicitation requirement and is therefore unacceptable; (2) an Agency holds meaningful exchanges with only that offeror, and permits that offeror to revise its proposal such that it meets the Solicitation requirements and is awardable; and (3) the agency makes award to that favored offeror. In this situation, the Agency's actions are unequal, arbitrary, and in violation of Federal procurement law.

150. Blue Origin was prejudiced by the Agency's decision to hold discussions with SpaceX and not Blue Origin. Had the Agency held discussions with Blue Origin and revealed its funding limitations to Blue Origin, as it did with SpaceX, Blue Origin would have lowered it price to meet those funding limitations. Blue Origin also would have enhanced its technical and management proposal, as discussed above, and modified its payment schedule to fix purported advanced payments.

151.  Blue Origin seeks a declaration, under the Administrative Procedure Act ("APA"), 5 U.S.C. 706(2)(A), that NASA violated the requirements of procurement law and regulation, including 10 U.S.C. §2305(b)(4)(A), FAR 1.102, FAR 1.102-2(c)(3), and FAR 1.602-2 by failing to conduct an acquisition that treated all prospective contractors fairly, impartially, and equitably, by holding discussions with only one unacceptable offeror, rather other proposals acceptable for award.  Consequently, NASA violated Federal procurement statutes and regulations by awarding a contract to SpaceX for the HLS Option procurement.

### COUNT 3
### (Failure to Amend Solicitation with Change in Requirements)

152.  Blue Origin incorporates by reference every preceding paragraph as if fully set forth herein.

153.  It is axiomatic and a fundamental procurement principle that when, either before or after receipt of proposals, the Government's requirements change, the Government shall amend the solicitation and allow offerors to submit revised proposals based on the Government's true needs.  *See* FAR 15.206(a) ("When, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation.").

154.  A change in requirements can be shown where there is a change in circumstances that directly affects the assumptions set forth in the solicitation.  GAO decisions concur that the changing requirements doctrine applies where "changing circumstances" create a material departure from the assumptions set forth in the solicitation.

155.  The Agency notified offerors multiple times over several months that it intended to make two awards.  However, the Agency's funding, particularly its estimated out-year funding for

Fiscal Years (FY) 2023 and 2024, changed to such an extent that it did not have the funding to make even one award. Because an agency's funding directly correlates to the size and scope of its Solicitation and therefore an offeror's proposal, the Agency was required to either notify all offerors of the change in circumstance or to amend the Solicitation, once it became aware of the changed circumstances. The Agency through discussions with SpaceX changed its requirements by allowing less costly performance by SpaceX relating to the FRRs required by the Solicitation. Additionally, the Agency notified only SpaceX of its change in estimated funding and only permitted SpaceX to revise its price proposal to fit within the Agency's revised budget estimates.

156.    The Agency's decisions to not notify all offerors and to not amend its Solicitation were arbitrary and violated Federal procurement regulations.

157.    Had the Agency amended the Solicitation and made all offerors aware of its funding limitations, Blue Origin would have lowered its price and engaged with NASA to fit its proposal within the Agency's budget.

158.    Moreover, NASA decided to change its requirements for one FRR for each launch. But NASA only told SpaceX that it was doing so, and did not tell all offerors that they need not comply with, or that NASA had changed, its requirements in the solicitation for FRRs.

159.    NASA did not tell Blue Origin that it had changed its requirements for FRRs, DCR, and other reviews.

160.    Blue Origin did not learn of the change to FRRs until August 10, 2021, when GAO's decision became public.

161.  Had the Agency amended the Solicitation to note the reduced number of FRRs, and waive the requirements related to the DCR and other reviews, Blue Origin would have changed its technical and management proposal, and its price.

162.  Blue Origin seeks a declaration, under the Administrative Procedure Act ("APA"), 5 U.S.C. 706(2)(A), that NASA violated the requirements of FAR 35.016 and FAR 15.206(a) by failing to amend the Solicitation when the Agency's requirements changed.

## COUNT 4
### (Failure to Evaluate SpaceX Proposal In Accordance With the Solicitation)

163.  Blue Origin incorporates by reference every preceding paragraph as if fully set forth herein.

164.  Agency officials must conduct procurements in accordance with the terms of the Solicitation and applicable laws and regulations. Agency actions which fail to do so are considered arbitrary, capricious, and unlawful, and must be set aside. 5 U.S.C. §706(2)(A).

165.  NASA's decisions to make an initial conditional selection of award followed by final award to SpaceX were arbitrary and irrational because NASA's evaluation of the offerors' technical and management proposals was arbitrary, capricious, and not in accordance with law.

166.  In one instance, NASA failed to evaluate the effect on technical approach and technical risk of SpaceX's failure to include fifteen (15) critical safety reviews, the Flight Readiness Reviews, in its proposal. Other examples include NASA's failure to █████████████ ████████████████████████████████████████████████████████████ ████████████████████ and, the fact the Agency broadly favored SpaceX by ignoring or minimizing critical weaknesses in its proposal and double crediting its positive attributes.

167.    NASA also failed to evaluate SpaceX's failure to meet the requirements ███████

████████.

168.    Blue Origin seeks a declaration, under the Administrative Procedure Act ("APA"),

5 U.S.C. 706(2)(A), that NASA violated the requirements of FAR 35.016 and 41 U.S.C. §3701 by

failing to evaluate SpaceX's proposal in accordance with Solicitation requirements; and, NASA's

contract to SpaceX for the HLS Option A solicitation was illegal because it violated Federal statute

and regulations.

## COUNT 5
### (Breach of Implied In Fact Contract of Good Faith and Fair Dealing)

169.    Blue Origin incorporates by reference every preceding paragraph as if fully set forth

herein.

170.    As an offeror for the HLS Option A procurement, Blue Origin had an implied

contract of good faith and fair dealing with NASA.

171.    The Agency breached the implied contract to consider all bids fairly and honestly

by conducting the procurement in an arbitrary, capricious, and irrational manner.

172.    The Agency selected for award a proposal that failed to meet a material requirement

of the Solicitation and was unacceptable for award.  The Solicitation explicitly stated that proposals

containing a deficiency – such as a material failure to meet a government requirement – would be

unawardable.  Yet, the Agency selected SpaceX's deficient proposal for conditional award and

improperly entered into discussions with only SpaceX to fix the deficiency.  Although the

deficiency remained in SpaceX's proposal, the Agency made award to SpaceX.  The Agency's

failure to enter into discussions with all offerors and the Agency's award of a contract to an

unacceptable proposal violated the Solicitation's ground rules for the competition and lacked a rational basis.

173. The Agency failed to fairly and honestly consider Blue Origin's proposal. This was clear because the Agency both assumed that Blue Origin was requesting advance payments when it was not (and could have resolved via single phone call) and that Blue Origin could not change its price in any year when it could have and had done multiple times for earlier contracts with the same agency (something that could have confirmed in a single phone call).

174. The Agency improperly favored SpaceX's proposal. This was clear because NASA internal documents recognized that SpaceX submitted a proposal that did not meet the Solicitation's requirements for FRRs. NASA tried to figure out a way to determine that SpaceX's proposal met the requirements and could not do so, then decided to move forward anyway. NASA also gave SpaceX the opportunity to adjust its pricing to address NASA's purported budgetary concerns but did not do so with any other offeror. NASA also reviewed SpaceX's proposal differently than the proposals of other offerors, giving SpaceX higher marks than it gave to Blue Origin for the same issues. Finally, NASA failed to evaluate or assess weaknesses to SpaceX for SpaceX's failure to meet ███████████ requirements. By overlooking these errors, NASA gave a free pass to significant schedule errors in SpaceX's proposal. Indeed, it is highly likely SpaceX could not have met the 2024 goal if NASA enforced the schedules and other requirements for the milestone reviews ███████████.

175. Blue Origin was prejudiced by the Agency's breach of the implied contract of good faith and fair dealing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray this Court to enter judgment in Plaintiff's favor and against the NASA as follows:

a)      Declare that NASA's award of the HLS Option A contract to SpaceX is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

b)      Enjoin NASA and SpaceX from commencing or continuing performance of the HLS Option A contract;

c)      Direct NASA to open discussions with all offerors, allow proposal revisions, re-evaluate revised proposals, and make a new selection and award;

d)      Award Blue Origin its attorney's fees and costs in pursuing this action, and/or its proposal costs; and

e)      Grant Plaintiff such further relief as the Court may deem just and proper.


Dated:  August 13, 2021

Respectfully submitted;

_S. Pickens_

_____

Scott E.  Pickens
Barnes & Thornburg LLP
1717 Pennsylvania Avenue, N.W., Suite 500
Washington, DC 20006-4623
Phone:  (202) 371-6349
Email:  (Scott.Pickens@btlaw.com)

*Counsel of Record for Plaintiff*
*Blue Origin Federation, LLC*

Of Counsel:

Scott N. Godes
Barnes & Thornburg LLP
1717 Pennsylvania Avenue, N.W., Suite 500
Washington, DC 20006-4623
Phone:  (202) 408-6928
Email:  Scott.Godes@btlaw.com

Matthew J. Michaels
Barnes & Thornburg LLP
1717 Pennsylvania Avenue, N.W., Suite 500
Washington, DC 20006-4623
Phone:  (214) 566-3167
Email:  Matthew.Michaels@btlaw.com