# In the United States Court of Federal Claims

No. 21-1695C
Filed: November 4, 2021
Reissued: November 18, 2021*
FOR PUBLICATION

---

**BLUE ORIGIN FEDERATION, LLC,**

           *Plaintiff,*

**v.**

**UNITED STATES,**

           *Defendant,*

**and**

**SPACE EXPLORATION
TECHNOLOGIES CORP.,**

           *Defendant–Intervenor.*

---

*Scott E. Pickens*, Barnes & Thornburg LLP, Washington, D.C., for the plaintiff, with *Scott N. Godes* and *Matthew J. Michaels*, of counsel.

*Anthony F. Schiavetti*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant, with *Allison M. Genco* and *Brian M. Stanford*, Office of the General Counsel, National Aeronautics and Space Administration, of counsel.

*Kara L. Daniels*, Arnold & Porter Kaye Scholer LLP, Washington, D.C., for the defendant–intervenor, with *Mark D. Colley*, *Nathaniel E. Castellano*, *Thomas A. Pettit*, and *Aime JH Joo*, of counsel.

## MEMORANDUM OPINION

**HERTLING**, **Judge**

       In this post-award bid protest, the plaintiff, Blue Origin Federation, LLC ("Blue Origin"), challenges a contract award pursuant to a solicitation under a Broad Agency Announcement

---

     *Pursuant to the protective order in this case, the Court initially filed this opinion under seal on November 4, 2021 and directed the parties to propose redactions of confidential or proprietary information by November 18, 2021.  The parties have jointly submitted to the Court proposed redactions.  (ECF 76.)  The Court adopts those redactions, as reflected in this public version of the opinion.  Redactions are denoted with three asterisks in square brackets, [***].

("BAA") issued by the National Aeronautics and Space Administration ("NASA"). Under its Artemis Program, NASA seeks to develop a Human Landing System ("HLS") through public–private partnerships for the United States to return to the moon. The solicitation at issue was the second phase of those efforts. NASA awarded the contract to Space Exploration Technologies Corp. ("SpaceX"). The defendants are the United States, acting through NASA, and SpaceX, which intervened to defend its contract award.

In its complaint, Blue Origin alleges that NASA (1) waived material solicitation requirements for SpaceX; (2) conducted unequal discussions; (3) failed to amend the solicitation when NASA received less funding than anticipated; (4) improperly evaluated offerors' technical ratings; and (5) breached the implied contract of good faith and fair dealing. Blue Origin alleges that it would have submitted an alternative proposal if it had known that NASA would waive certain requirements of the solicitation. Blue Origin has moved for judgment on the administrative record under Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC").

The United States has moved to dismiss either under RCFC 12(b)(1) for lack of subject-matter jurisdiction or, in the alternative, under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. The defendant argues that Blue Origin does not have standing to bring its challenge because Blue Origin did not have a substantial chance of award, even assuming its allegations were true, and Blue Origin's alternative proposal is speculative. Alternatively, the government argues that Blue Origin's first three claims were waived by failing to raise the issues before the close of bidding. SpaceX supports the defendant's motion to dismiss.

The government and SpaceX have also both cross-moved for judgment on the administrative record. They argue that NASA did not waive solicitation requirements, and that NASA acted properly within its discretion under the solicitation and procurement law. The government and SpaceX argue that, even if the Court finds that NASA acted improperly, Blue Origin could not have been prejudiced.

The Court finds that Blue Origin does not have standing because it did not have a substantial chance of award but for the alleged evaluation errors. Its proposal was priced well above NASA's available funding and was itself noncompliant. Blue Origin argues that it would have submitted an alternative proposal, but the Court finds its hypothetical proposal to be speculative and unsupported by the record. The Court also finds that several of Blue Origin's objections are waived.

Even if Blue Origin had standing and its objections were not waived, the Court finds that it would lose on the merits. Blue Origin has not shown that NASA's evaluation or its conduct during the procurement was arbitrary and capricious or otherwise contrary to law. NASA provided a thorough, reasoned evaluation of the proposals, and NASA's conduct throughout the procurement process was not contrary to law.

Accordingly, the Court grants the government's motion to dismiss and for judgment on the administrative record and SpaceX's motion for judgment on the administrative record. Blue Origin's motion for judgment on the administrative record is denied.

## I.   BACKGROUND

The "Moon plan" under NASA's Artemis Program is "focused on achieving the goal of an initial human landing [on the moon] by 2024 with acceptable technical risks, while simultaneously working toward sustainable lunar exploration in the mid- to late 2020s."  NASA, *NASA's Lunar Exploration Program Overview* 9 (Sept. 2020), *available at* https://www.nasa.gov/sites/default/files/atoms/files/artemis_plan-20200921.pdf.  To that end, NASA began a multi-phase HLS procurement, which started with base-period contracts.  The plan follows the base period with a follow-on "Option A" solicitation, which is at issue in this case.  (AR Tab 49 at 62409-10.)

### A.   HLS Base-Period Contract

For the base-period contracts, NASA solicited proposals for the HLS procurement under Appendix H of a BAA titled "Next Space Technologies for Exploration Partnerships-2 (NextSTEP-2)."[1]  (AR Tab 28 at 33228; AR Tab 108a-002.)  NASA awarded base-period contracts to Blue Origin, SpaceX, and Dynetics, Inc.  (AR Tab 77 at 63038.)

During the base period, each contractor was enabled to develop a preliminary design of its proposed landing system.  (*See* AR Tab 49 at 62409.)  During the base period, NASA "dispositioned and approved the final list of standards uniquely applicable to [each] Contractor's adjusted proposal for Option A."  (AR Tab 27 at 24443.)  The three base-period contractors were each required to "use these standards in preparing [their] Option A proposal[s]."  (*Id.*)  NASA's intent was "to transition between the Base period and Option A period without any break in contractor performance."  (*Id.* at 24429.)

### B.   HLS Option A Solicitation

While the three base-period contractors were performing under their contracts, NASA solicited proposals from those contractors for the next phase of the HLS procurement: "Option A."  (AR Tab 27.)  Only the three awardees of base-period contracts could submit proposals under the Option A solicitation.

The solicitation consisted of the HLS Appendix H Option A solicitation, as amended; the NextSTEP-2 BAA; and attachments A through Q to the solicitation.  (*See id.* at 24434-36.)  The solicitation contemplated the award of a firm fixed-price contract.  (*Id.* at 24432.)

---

[1] Federal Acquisition Regulation ("FAR") 35.016, which governs BAAs, provides that "BAAs may be used by agencies to fulfill their requirements for scientific study and experimentation directed toward advancing the state-of-the-art or increasing knowledge or understanding rather than focusing on a specific system or hardware solution."  FAR 35.016(a).

1.     **Structure**

The HLS Option A solicitation was conducted "as an 'other competitive procedure' in accordance with FAR 6.102(d)(2) and FAR 35.016 (as deviated)." (*Id.* at 24473.) A Source Evaluation Panel ("SEP") was responsible for evaluating proposals and presenting the results to the Source Selection Authority ("SSA"). (*Id.* at 24480.) The SEP was comprised of NASA subject-matter experts. Three distinct panels were established to review different aspects of the proposals: a technical-evaluation panel, price-evaluation panel, and management-evaluation panel. After the SEP submitted its evaluations to the SSA, the SSA was "responsible for making selections and final contract award decisions based on applying the evaluation, selection, and award methodology as described in [the Option A] solicitation." (*Id.*)

The solicitation explained that NASA would "not conduct a comparative analysis and trade-off" among proposals. (*Id.* at 24473.) Instead, the SSA would "consider each proposal on its own individual merits, and [would] select for award one or more proposals that individually each present value to the Government and that optimize NASA's ability to meet its objectives as set forth in [the Option A] solicitation." (*Id.* at 24480.)

The number of awards NASA would make depended on "funding availability and evaluation results." (*Id.* at 24481.) Although NASA preferred to award two contracts, "NASA reserve[d] the right to change its HLS acquisition strategy at any time." (*Id.* at 24429.) The solicitation noted that "[f]unds are not currently available for this solicitation, but are expected to become available on or before contract award." (*Id.* at 24481.) The solicitation expressly noted that awards were contingent on those funds becoming available: "The Government's obligation to make awards is contingent upon the availability of appropriated funds from which payments can be made and the receipt of proposals that NASA determines are acceptable." (*Id.*) Consistent with this funding contingency, "NASA reserve[d] the right to select for award multiple, one, or none of the proposals received . . . ." (*Id.*)

NASA also reserved "the right to conduct post-selection negotiations or discussions if the Contracting Officer later determines them to be necessary." (*Id.* at 24433.) The solicitation gave the SSA the authority to "make initial, non-binding selections of an Offeror or Offerors for the purpose of having the Contracting Officer engage in post-selection negotiations with one or more Offerors as defined in [the Option A] solicitation." (*Id.* at 24480.) The solicitation further reserved to NASA "the right to negotiate any aspect of an Offeror's milestone payment amounts, schedule, and/or acceptance criteria prior to award of Option A." (*Id.* at 24467.)

Under the solicitation, timing is the only difference between post-selection negotiations and discussions. "Post-selection negotiations" are defined in the solicitation as "exchanges with Offerors who have been selected for potential contract award that result in the Contracting Officer inviting the Offeror to revise only those specific portions of its proposal that have been identified by the Contracting Officer as open to revision." (*Id.* at 24434.) "Discussions" are defined as "exchanges with Offerors that occur after receipt of proposals but before selection that result in the Contracting Officer inviting the Offeror to revise only those specific portions of its proposal that have been identified by the Contracting Officer as open to revision." (*Id.*) A

"'[p]roposal revision' is any change made by the Offeror to its proposal that occurs as a result of discussion or post-selection negotiations . . . ." (*Id.*)

In bold-faced type, the solicitation provided that "[t]he Government may evaluate proposals and award contracts without conducting post-selection negotiations or discussions with Offerors . . . ." (*Id.* at 24433 (bold omitted).) As a result, the solicitation directed that "each Offeror . . . submit only one proposal which represents its best approach to meeting the requirements of the solicitation." (*Id.*)

### 2.    Evaluation Criteria

The solicitation designated three evaluation factors: Technical Approach, Total Evaluated Price, and Management Approach. (*Id.* at 24475.) The technical approach was more important than the total evaluated price, which was more important than the management approach. (*Id.*) The technical approach and management approach, when combined, were "significantly more important" than the total evaluated price. (*Id.*)

As further guidance for the technical-approach and management-approach factors, the solicitation provided "areas of focus." (*Id.*) The areas of focus (each "approximately of equal importance within their respective Factor") were to be "considered in totality to arrive at a single adjectival rating for each factor." (*Id.*) The adjectival ratings consisted of Outstanding, Very Good, Acceptable, Marginal, and Unacceptable. (*Id.* at 24477.)

Regarding the technical-approach and management-approach factors, NASA would also identify and evaluate specific strengths and weaknesses of each proposal. (*Id.* at 24476.) For these purposes, NASA would "consider how an Offeror's proposed approach affects risk, such as technical risk, risk to meeting the Offeror's proposed schedule, the need for increased Government oversight, or the risk of likelihood of unsuccessful contract performance." (*Id.*) The solicitation listed five categories of strengths and weaknesses: Significant Strength, Strength, Weakness, Significant Weakness, and Deficiency. (*Id.*) Relevant here, "Weakness" was defined as "[a] flaw in the proposal that increases the risk of unsuccessful contract performance." (*Id.*) "Deficiency" was defined as "[a] material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." (*Id.*)

The solicitation notified offerors that "proposals evaluated as having one or more deficiencies are unawardable," and that NASA reserved the right to exclude from discussions or negotiations the offerors whose proposals were identified as having one or more deficiencies. (*Id.* at 24480.)

### 3.    Statement of Work

The Statement of Work ("SOW"), Attachment G to the solicitation, described the work to be performed under the HLS Option A contract. (AR Tab 27e.) The SOW was common to all offerors and described, among other topics, "major milestone reviews for the HLS Program in order to be able to assess programmatic and technical progress and performance at key decision

5

points in the development and operational lifecycle phases . . . ." (*Id.* at 32965.)  The NASA-led critical-milestone reviews included the Flight Readiness Review(s) ("FRR") and the Design Certification Review ("DCR").  (*Id.* at 32965-66.)

The FRR is the first critical-milestone review at issue in this case.  The FRR has two objectives.  First, it "examines tests, demonstrations, analyses, and audits that determine the system's readiness for a safe and successful flight or launch and for subsequent flight operations."  (*Id.* at 32972.)  Second, it "ensures that all flight and ground hardware, software, personnel, and procedures are operationally ready."  (*Id.*)  The FRR Acceptance Criteria include certification that "[t]he flight vehicle, launch vehicle, and support spacecraft (such as propellant storage, propellant transfer, and/or upper stage vehicles that provide transportation capabilities beyond the standard for orbit insertion) are ready for flight."  (*Id.*)  The SOW provided that "[t]he FRR should be completed by two (2) weeks before launch of each HLS element."  (*Id.*)  The Milestone Acceptance Criteria and Payment Schedule, Attachment O to the solicitation, phrased the FRR as a requirement: "An FRR is required prior to each launch of an HLS element."  (AR Tab 27k at 33187.)

The DCR is the second critical-milestone review at issue in this case.  This review "ensures that the qualification and verifications demonstrate design compliance with the functional and performance requirements and human spaceflight certification."  (AR Tab 27e at 32969.)  The SOW provides that the DCR "should be completed at first HLS launch – 9 Months (L-9)."  (*Id.*)  The Milestone Acceptance Criteria and Payment Schedule clarified that the DCR was to be scheduled "9 months before first *HLS element* launch (L-9 months)."  (AR Tab 27k at 33187 (emphasis added).)

Both the FRR and the DCR were to be conducted for an "HLS element."  Although the SOW did not define "HLS element," it did define "HLS":

> **HLS**: All objects, vehicles, elements, integrated systems, systems, subsystems, or components thereof that are designed, developed, and utilized by the contractor, its teammates, subcontractors, and suppliers in performance of this contract, and which collectively comprise the contractor's Integrated Lander (or elements thereof), all Supporting Spacecraft, all launch vehicles necessary for launch and delivery of the contractor's Integrated Lander (or elements thereof) and its Supporting Spacecraft, and the contractor's Active-Active docking adapter . . . (if required for performance of the contractor's crewed demonstration mission).

(AR Tab 27e at 32948 (bold in original).)  The parties disagree about how to read this definition together with other provisions of the SOW to interpret "HLS element."

C.     **Source Selection and Award**

1.     **Proposals and Evaluations**

Each of the three base-period contractors—Blue Origin, SpaceX, and Dynetics—submitted a timely proposal in response to the HLS Option A solicitation.  (AR Tab 77 at 63038-39.)  Blue Origin's Total Evaluated Price was about $6 billion, and Dynetics' Total Evaluated Price was about $9 billion.  (AR Tab 61 at 62856, 62866.)  As the SSA noted in her summary of the SEP's evaluation results, "SpaceX's Total Evaluated Price of $2,941,394,557 was the lowest among the offerors by a wide margin."  (AR Tab 77 at 63044.)  Although the prices varied, the SSA found each price to be fair, reasonable, and balanced.  (*Id.* at 63048, 63054, 63059.)

Within a few weeks of NASA receiving the Option A proposals, Congress enacted the Consolidated Appropriations Act, 2021, which appropriated $850 million for the HLS program for fiscal year ("FY") 2021.  Pub. L. 116-260, 134 Stat. 1182 (2020).  (*See also* AR Tab 108b26a at 103671-73 (explaining the appropriation and its impact during the selection process).)  For FY 2021, NASA had sought an appropriation of $3.4 billion for the development of the moon-lander systems.  Office of Management and Budget, *A Budget for America's Future: Budget of the U.S. Government (Fiscal Year 2021)* 101 (Feb. 10, 2020).[2]  Upon receipt of the FY 2021 appropriation, the SEP continued its work evaluating the proposals without amending or canceling the solicitation.  (AR Tab 108b26a at 103671.)

In their proposals, Blue Origin and SpaceX took different approaches in design and operation of their moon-landing systems.  Blue Origin proposed a three-element architecture for its Integrated Lander, which consisted of an ascent element, a descent element, and a transfer element.  (AR Tab 32a at 33339-41.)  Blue Origin's proposal would require three launches.  (AR Tab 61 at 62852.)  SpaceX, in contrast, proposed a single-element Integrated Lander called the HLS Starship.  (AR Tab 34d.55 at 56274-77.)  SpaceX also proposed two types of supporting spacecraft: propellant-storage depot and tanker vehicles.  (*Id.* at 56274.)  The supporting spacecraft launch before the HLS Starship to aggregate and store propellant in low-Earth orbit for the HLS Starship to access for the lunar mission.  (*Id.*)  SpaceX's proposal would require 16 launches.  (AR Tab 61 at 62874.)

The SEP evaluated the proposals and "produced a report for each offeror containing all of the SEP's findings, ratings, and other evaluative content."  (AR Tab 77 at 63039.)  As required

---

[2] This document is available at https://www.govinfo.gov/content/pkg/BUDGET-2021-BUD/pdf/BUDGET-2021-BUD.pdf.

by the solicitation, the SEP provided adjectival ratings for the technical and management evaluation factors:

| Offeror | Technical Rating (Factor 1) | Management Rating (Factor 3) |
|---|---|---|
| Blue Origin | Acceptable | Very Good |
| Dynetics | Marginal | Very Good |
| SpaceX | Acceptable | Outstanding |

(*Id.* at 63044.)

Although the SEP rated SpaceX's management approach "Outstanding," the SEP assigned SpaceX a weakness for an inconsistency related to milestones within SpaceX's Integrated Master Schedule ("IMS"). (AR Tab 59c at 62812.) SpaceX had proposed a single NASA-led FRR for its HLS Starship but no NASA-led FRRs for its supporting spacecraft. (AR Tab 34d.33 at 55430.) As a result, of the 16 launches required under SpaceX's proposal, only one would have a NASA-led FRR before launch. The SEP explained that "[w]hile the offeror's proposed milestones, associated acceptance criteria, and IMS are internally consistent, they are arguably not consistent with all milestone review requirements as set forth within and contemplated by the solicitation's [SOW] and the solicitation's Milestone Acceptance Criteria and Payment Schedule . . . ." (AR Tab 59c at 62812.)

The SEP found the relevant terms of the solicitation to be unclear. (*Id.* at 62813.) Under one possible interpretation, "offerors were required to propose an FRR milestone (and associated review) to be conducted and achieved for each proposed supporting spacecraft prior to launch and flight operations." (*Id.*) Under another possible interpretation, "offerors were required to propose a single FRR covering the full scope of its demonstration mission prior to the launch of any lander element or supporting spacecraft." (*Id.*) The SEP found that SpaceX's "proposed FRR milestone is not in accordance with either interpretation." (*Id.*) SpaceX "neither proposed any FRR events dedicated to one or all of its supporting spacecraft, nor a single FRR to cover the full scope of its demonstration mission prior to the launch of its first supporting spacecraft." (*Id.*) The SEP concluded that "this aspect of [SpaceX's] proposal increases risk of unsuccessful performance and constitutes a weakness." (*Id.* at 62814.)

## 2. Post-Selection Negotiation

According to the contracting officer, after the SEP presented its final evaluation results to the SSA, "the SSA noted that it was her opinion that SpaceX's proposal was both highly rated from a non-price perspective, and, in her judgment, provided abundant value at its Total Evaluated Price." (AR Tab 108b26a at 103673.) In a conversation with the SSA about the budget, the contracting officer informed the SSA that "NASA's available funding overall could potentially support a contract award to SpaceX . . . , but that NASA was unable to award a contract to SpaceX with the specific ***phasing*** of milestone payments SpaceX proposed." (*Id.* (emphasis in original).) NASA's budget analyst had determined that about $345 million would

be available for FY 2021 Option A contractor payments. (*Id.*)  SpaceX's proposed FY 2021 milestone payments totaled [***], so there was about a [***] shortfall. (*Id.*)  The contracting officer thought that the shortfall "was likely not an insurmountable situation given the flexibilities that NASA had built into the terms of the Option A solicitation," and that "post-selection negotiations could be utilized to create a situation in which the Agency would be able to afford making a contract award to SpaceX." (*Id.*)

Given the information from the contracting officer, the SSA found that, "at the initial prices and milestone payment phasing proposed by each of the Option A offerors, NASA's current fiscal year budget did not support even a single Option A award." (AR Tab 77 at 63039.)  As a result, the SSA determined "that NASA should, as a first step, open price negotiations with [SpaceX, whose proposal was] both very highly rated from a technical and management perspective and that also had, by a wide margin, the lowest initially-proposed price . . . ." (*Id.*)  The SSA concluded that "it would be in the Agency's best interests to make an initial, conditional selection of SpaceX to enable the Contracting Officer . . . to engage in post-selection price negotiations with this offeror." (*Id.*; *see also* AR Tab 64 (making the initial, non-binding selection of SpaceX for award and directing the contracting officer to engage in post-selection negotiations).)

In the contracting officer's letter to open negotiations, the contracting officer requested that SpaceX submit its best final firm-fixed prices for two contract line-item numbers ("CLINs"), adjust its payment phasing to accommodate NASA's FY 2021 funding limitations, and add FRRs to its proposal. (AR Tab 63.)  The requested additional FRRs included the following:

> (1) A single comprehensive Tanker Starship Supporting Spacecraft FRR no later than two weeks prior to the *first* launch of the Tanker Starship Supporting Spacecraft that will address flight readiness for the entire Tanker Starship Supporting Spacecraft launch campaign; (2) a Depot Starship FRR no later than two weeks prior to the launch of the Depot Starship; and (3) within Attachment 12 [Review Plan] only, NASA also requests that your firm include potential "delta-FRRs" that would be triggered to occur in the event of anomalies, mishaps, configuration changes, or other issues directly relevant to flight readiness, if and when such issues arise.

(*Id.* at 62890 (emphasis in original).)

In response, SpaceX submitted a revised proposal. (*See* AR Tab 68 (providing the cover letter for SpaceX's revised proposal and describing the revisions).)  SpaceX added the requested FRRs for its HLS depot and tanker campaign flights. (*Id.* at 62903.)  SpaceX also adjusted its payment milestones so that those that would fall within FY 2021 could be accommodated within NASA's anticipated funding levels, but SpaceX maintained its original pricing regarding the two CLINs. (*Id.* at 62902-03.)  SpaceX did not reduce its overall price. (AR Tab 77 at 63039.)

### 3.    Award

After a final review of the offerors' SEP reports and SpaceX's revised pricing proposal, the SSA selected only SpaceX for award of the Option A contract. (*Id.* at 63039.) Although the SSA reiterated NASA's preference for making two awards, she noted that the amount of the appropriation, when compared to the offerors' prices, was "incongruent with NASA's Option A acquisition strategy." (*Id.* at 63043.) The SSA analyzed each offeror's proposal and explained her selection determination for each. (*Id.* at 63044-60.)

After analyzing SpaceX's proposal, the SSA determined "that SpaceX's proposal is meritorious and advantageous to the Agency, and that it aligns with the objectives as set forth in [the Option A] solicitation." (*Id.* at 63049.) Regarding SpaceX's technical approach, the SSA found that "the qualitative attributes of SpaceX's aggregated strengths and its aggregated weaknesses are offsetting and that commensurate risk accompanies the meritorious aspects of SpaceX's technical approach." (*Id.* at 63048.) Regarding SpaceX's management approach, the SSA "concur[red] with the SEP that SpaceX's management approach is of exceptional merit and fully responsive to the objectives of the solicitation." (*Id.* at 63049.) She found "that the qualitative attributes of SpaceX's aggregated strengths, including its rating of High for its Base Period Performance, far outweigh the qualitative attributes of its evaluated weaknesses, which were relatively minor." (*Id.*)

The SSA "conclude[d] that SpaceX's acceptable technical approach coupled with its outstanding management approach provide abundant value for NASA at its Total Evaluated Price." (*Id.* at 63049-50.) She also noted that, due to NASA's post-selection negotiation with SpaceX, "the Agency's budget now permits the award of a contract to SpaceX." (*Id.* at 63050.) The SSA selected SpaceX's proposal for an award. (*Id.*)

The SSA's selection determination regarding Blue Origin's proposal was "based upon the results of its evaluation considered in light of the Agency's currently available and anticipated future funding for the HLS program." (*Id.* at 63056.) Although the SSA found that "Blue Origin's proposal has merit and is largely in alignment with the technical and management objectives set forth in the solicitation," she did not select Blue Origin for award "because [she found] that its proposal does not present sufficient value to the Government when analyzed pursuant to the solicitation's evaluation criteria and methodology." (*Id.*)

The SSA "considered whether it may be in the Government's best interests to engage in price negotiations to seek a lower best and final price from Blue Origin." (*Id.*) The SSA determined that she could not open price negotiations with Blue Origin in good faith, "given NASA's current and projected HLS budgets." (*Id.*) "After accounting for a contract award to SpaceX, . . . [the SSA did] not have enough funding available to even attempt to negotiate a price from Blue Origin that could potentially enable a contract award." (*Id.*) Accordingly, the SSA did not select Blue Origin's proposal for award. (*Id.*)

The SSA also did not select Dynetics' proposal for award. (*Id.* at 63060.) The details of that decision are not relevant to this case.

10

D.     **GAO Protest**

After receiving notice of NASA's single award to SpaceX, Blue Origin and Dynetics filed protests (later consolidated) with the Government Accountability Office ("GAO").  (AR Tab 108b67a at 105016.)  As summarized by the GAO, the protests "primarily contend[ed] that the agency was required to open discussions, amend, or cancel the Option A BAA when NASA, after the receipt of proposals, determined that it had less funding than it needed to support multiple awards for the HLS program."  (*Id.* at 105005.)  Blue Origin and Dynetics also argued "that NASA unreasonably evaluated proposals."  (*Id.*)  The GAO rejected each of the protestors' arguments but one.  *Blue Origin Fed'n, LLC; Dynetics, Inc.-A Leidos Co.*, B-419783, B-419783.2, B-419783.3, B-419783.4, 2021 CPD ¶ 265 (Comp. Gen. July 30, 2021).  (AR Tab 108b67a.)

The protestors argued that SpaceX's proposal failed to include an FRR for each launch as allegedly required by the Option A solicitation.  (AR Tab 108b67a at 105074-75.)  The SOW provided that "[t]he FRR should be completed by two (2) weeks before *launch of each HLS element*."  (AR Tab 27e at 32972 (emphasis added).)  The Milestone Acceptance Criteria and Payment Schedule provided that "[a]n FRR is required prior to *each launch of an HLS element*."  (AR Tab 27k at 33187 (emphasis added).)  The protestors alleged that NASA waived the FRR requirement for SpaceX when NASA required SpaceX to include only three FRRs, rather than 16 FRRs, one for each of its 16 launches.  (AR Tab 108b67a at 105075.)

The GAO agreed with the protestors on this issue.  (*Id.* at 105076.)  The GAO interpreted "HLS element" to include supporting spacecraft.  (*Id.*)  The GAO found that a contrary reading would require the GAO "to read 'supporting spacecraft' out of the definition of 'HLS,' and the 'each' out of 'each launch.'"  (*Id.*)  Because the solicitation required an FRR for launches of supporting spacecraft, the GAO concluded that SpaceX's three proposed FRRs were insufficient: "where the Option A BAA required an FRR before each launch of each HLS element, SpaceX's three proposed FRRs--or one for each *type* of HLS element--were insufficient when SpaceX's concept of operations will require 16 total launches."  (*Id.* (emphasis in original).)

Despite siding with the protestors on the number and timing of FRRs in SpaceX's proposal, the GAO found "no basis on which to sustain the protests because the protestors [had] failed to establish any reasonable possibility of resulting competitive prejudice."  (*Id.* at 105077.)  The protestors had not alleged "that they otherwise could or would have changed their proposals to substantially increase their likelihood of receiving the award had they known of the waiver of the FRR requirement."  (*Id.*)  The GAO noted that Blue Origin's proposed concept of operations was "materially different" from SpaceX's proposed concept of operations.  (*Id.*)  Blue Origin, therefore, could not "reasonably establish how it could have improved the competitiveness of its proposal had it known that the agency would relax the FRR requirement as it did."  (*Id.*)

Having found no prejudice to Blue Origin and Dynetics, the GAO denied the protests.  (AR Tab 108b67a at 105080.)

### E.   Procedural History

On August 13, 2021, Blue Origin filed its complaint in this court.  (ECF 1.)  Blue Origin asserts five counts, alleging that NASA (1) unlawfully waived material solicitation requirements; (2) engaged in improper and unequal discussions; (3) failed to amend its solicitation upon a change in requirements; (4) failed to evaluate SpaceX's proposal in accordance with the solicitation; and (5) breached an implied-in-fact contract of good faith and fair dealing.  (*Id.* ¶¶ 119-75.)

Blue Origin seeks declaratory and injunctive relief, requesting that the Court "[d]eclare that NASA's award of the HLS Option A contract to SpaceX is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "[e]njoin NASA and SpaceX from commencing or continuing performance of the HLS Option A contract"; and "[d]irect NASA to open discussions with all offerors, allow proposal revisions, re-evaluate revised proposals, and make a new selection and award."  (*Id.* at 58, Prayer for Relief.)  Blue Origin also seeks attorneys' fees and costs, its proposal costs, and any other relief that the Court deems just and proper.  (*Id.*)

The parties engaged in preliminary motions practice regarding how much of the complaint could be filed in redacted form.  The Court heard oral argument on the issue, rendered a tentative oral ruling, and directed the parties to continue their negotiations over the redactions.  The parties largely resolved their disagreements, and, after a ruling on two remaining issues, the parties filed public versions of their filings.

After the government filed the administrative record, which exceeds 135,000 pages, Blue Origin moved to complete that record, arguing that documents were missing from it.  (ECF 37.)  After hearing oral argument on the matter, the Court orally denied that motion.  (ECF 45.)

The government has moved to dismiss or, in the alternative, for judgment on the administrative record.  (ECF 60.)  Blue Origin and SpaceX have also moved for judgment on the administrative record.  (ECF 61 & 62.)  The motions have been fully briefed, and the Court heard oral argument on October 21, 2021.

## II.   STANDARD OF REVIEW

### A.   Motion to Dismiss

The government has moved to dismiss both for lack of subject-matter jurisdiction under RCFC 12(b)(1) and for failure to state a claim under RCFC 12(b)(6).

Under RCFC 12(b)(1), the "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  When a plaintiff's jurisdictional facts are challenged, only those factual allegations that the government does not controvert are accepted as true.  *Shoshone Indian Tribe of Wind River Rsrv. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012).  The court is not "'restricted to the face of the pleadings'" in resolving disputed jurisdictional facts, *id.* (quoting *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d

12

1573, 1584 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994)), and may review evidence outside the pleadings. *Id.*

The plaintiff has the burden of establishing jurisdiction by a preponderance of the evidence. *Trusted Integration, Inc.*, 659 F.3d at 1163. If the court finds that it lacks subject-matter jurisdiction over the plaintiff's claim, RCFC 12(h)(3) requires dismissal of the claim.

Under RCFC 12(b)(6), dismissal "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). The court must both accept as true a complaint's well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and draw all reasonable inferences in favor of the non-moving party. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). To avoid dismissal under RCFC 12(b)(6), a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiff is entitled to the relief sought. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

### B.    Motion for Judgment on the Administrative Record

On a motion for judgment on the administrative record pursuant to RCFC 52.1, the court's review is limited to the administrative record, and the court makes findings of fact as if it were conducting a trial on a paper record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005). The court must determine whether a party has met its burden of proof based on the evidence contained within the administrative record. *Id.* at 1355. Unlike motions for summary judgment, genuine issues of material fact will not foreclose judgment on the administrative record. *Id.* at 1356.

## III.    JURISDICTION

The Tucker Act, 28 U.S.C. § 1491(b)(1), establishes the jurisdiction of the Court of Federal Claims over bid protests:

> [T]he Unite[d] States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1). This provision "expressly waives sovereign immunity for claims against the United States in bid protests," covering "a broad range of potential disputes arising during the course of the procurement process." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380 (Fed. Cir. 2012).

To establish standing under this court's bid-protest jurisdiction, a protestor must be an "interested party." 28 U.S.C. § 1491(b)(1). The Federal Circuit has interpreted this term to

require a protestor to have alleged facts, which if true, "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). Here, the first prong is not at issue because Blue Origin is an actual bidder.

The second prong, in contrast, is at issue. In determining whether a protestor has alleged facts demonstrating the "requisite direct economic interest," the court must decide whether those alleged facts show the protestor was prejudiced by the alleged errors. *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996). To establish prejudice for standing purposes in a post-award bid protest, the protestor's complaint must "show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (citation omitted)). The government and SpaceX argue that Blue Origin's allegations do not establish, as a matter of law, that it was prejudiced by the alleged errors.

For the limited purpose of determining whether it has standing, a protestor's allegations are assumed to be true. *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221 (Fed. Cir. 2019) ("For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions."); *L-3 Commc'ns Corp. v. United States*, 99 Fed. Cl. 283 (2011) ("[T]he prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true."). "Prejudice is a question of fact . . . ." *Am. Relocation Connections*, 789 F. App'x at 225 (citing *Bannum*, 404 F.3d at 1353-54).

The Court first considers whether Blue Origin has standing based on the proposal it submitted to NASA and then considers whether it has standing based on an alternative proposal, which Blue Origin now alleges it would have submitted if it had known that NASA would waive certain solicitation requirements.

### A.     Submitted Proposal

In response to NASA's HLS Option A solicitation, Blue Origin proposed a three-element architecture for its Integrated Lander. (AR Tab 32a at 33339-41.) This proposed architecture would require three launches and no support spacecraft. (AR Tab 61 at 62852.) Blue Origin's Total Evaluated Price totaled just under $6 billion; Blue Origin sought about [***] during FY 2021. (AR Tab 61 at 62856; *see also* AR Tab 108b67a at 105010 (calculating price for FY 2021) (citing AR Tab 32d.87).)

The HLS procurement was conducted "as an 'other competitive procedure' in accordance with FAR 6.102(d)(2) and FAR 35.016 (as deviated)." (AR Tab 27 at 24473.) The governing BAA regulation, FAR 35.016, provides that "[w]ritten evaluation reports on individual proposals will be necessary but proposals need not be evaluated against each other since they are not submitted in accordance with a common work statement." FAR 35.016(d). The solicitation explained that NASA would "not conduct a comparative analysis and trade-off" among

14

proposals; instead, "each proposal [would] be evaluated on its own individual merits." (AR Tab 27 at 24473.)

"In light of this structure," the government argues, "Blue Origin lacks standing to challenge NASA's evaluation of SpaceX's proposal at all, because Blue Origin was not competing against SpaceX, but hoping to convince NASA that its proposal merited the investment of available NASA research and development funding." (ECF 60 at 39-40.) During oral argument, the government expanded on its position to argue that an unsuccessful bidder under a BAA could challenge an agency's failure to award it a contract but could not challenge or seek to enjoin an agency's award to another, successful bidder.

That general argument must fail in the face of the facts underlying NASA's solicitation; the government's argument elevates form over substance. The Option A solicitation noted that this procurement deviated from the typical BAA procedures. (AR Tab 27 at 24473.) Although "proposals need not be evaluated against each other since they are not submitted in accordance with a common work statement," FAR 35.016(d), for this procurement there was in fact a common work statement, the SOW. (*See* AR Tab 27e.)

Not only was there a common work statement, but NASA did in fact compare the proposals to each other during parts of the evaluation. NASA's comparison among proposals is evidenced by the SSA's Source Selection Statement. The SSA acknowledged the competitive nature of the acquisition by explaining that "NASA's HLS acquisition strategy has been to maintain a competitive environment through the initial crewed lunar demonstrations and beyond, thereby creating performance and pricing incentives for contractors at all stages of the HLS Program." (AR Tab 77 at 63043.) Moreover, her summary of evaluation results placed the technical and management adjectival ratings for all offerors in a common chart and then explicitly compared proposal prices. (*Id*. at 63044.)

Because NASA compared and competed against each other the three proposals for award, the government's argument that Blue Origin lacks standing based only on the fact that NASA used a BAA as its method of procurement is not congruent with the facts of the award at issue. The government's argument that Blue Origin is unable to show prejudice on this basis alone is insufficient to defeat Blue Origin's standing. Other facts in this case, however, do prevent Blue Origin from establishing prejudice to support its standing.

### 1.    Proposed Price Greatly Exceeded Available Funding

Blue Origin's milestone payments for FY 2021 were more than triple NASA's FY 2021 budget for the Option A contract. Upon receiving its FY 2021 appropriation from Congress, NASA determined that about $345 million would be available for FY 2021 Option A contractor payments. (AR Tab 108b26a at 103673.) Blue Origin's proposal had sought about [***] during FY 2021. (AR Tab 108b67a at 105010 (citing AR Tab 32d.87).)

Considering the funding shortfall, even if the Court found that either NASA's evaluation of SpaceX was improper or SpaceX's proposal was unawardable, Blue Origin cannot show that it would be in a position for award. NASA had anticipated when it issued the solicitation that it

may have limited funding and expressly "reserve[d] the right to select for award multiple, one, or *none* of the proposals received . . . ." (AR Tab 27 at 24481 (emphasis added).) Once Congress made its funding decision, NASA could not have awarded Blue Origin the contract at its proposed price or anything close to it.

SpaceX's proposed FY 2021 milestone payments, totaling [***], were also above NASA's funding limit. (AR Tab 108b26a at 103673.) The contracting officer concluded that the shortfall of approximately [***] between the funds available to NASA and SpaceX's proposal was not insurmountable. (*Id.*) Indeed, SpaceX did adjust its payment schedule to meet NASA's available budget during post-selection negotiations. (AR Tab 68 at 62902-03.)

Blue Origin alleges that it also would have adjusted its payment schedule to meet NASA's budget. Robert Smith, Blue Origin's final approval authority for its strategy and offer to NASA, averred that he "can state definitively that Blue Origin would have fit its proposal within the Agency's estimated budget for an HLS Option A contract." (ECF 61-1, Pl.'s Ex. 1, Decl. of Robert H. Smith, ¶ 26.) During Blue Origin's GAO protest, Jeff Bezos, Blue Origin's founder, published an open letter to NASA Administrator Nelson, offering to waive "'all payments in the current and next two government fiscal years up to $2B to get the program back on track right now.'" (ECF 1, ¶ 111 (quoting Letter from Jeff Bezos to Administrator Nelson).) In the protest before the Court, Mr. Smith raised the figure to "over $3 billion as a Blue Origin private contribution to add valuable competition and assist in addressing NASA's HLS Option A budget and funding shortfall . . . ." (ECF 61-1, Pl.'s Ex. 1, Decl. of Robert H. Smith, ¶ 24.)

These post-award offers to contribute funds were not before NASA at the time it made its award, and NASA had no obligation to ask Blue Origin to improve its proposal by absorbing costs or lowering the price. The solicitation warned offerors "that the Government may evaluate proposals and award contracts without conducting discussions or post-selection negotiations," and, "[t]herefore, each Offeror shall submit only one proposal which represents its *best* approach to meeting the requirements of the solicitation." (AR Tab 27 at 24473 (emphasis added).)

Faced with this explicit direction, Blue Origin chose to submit a proposal that did not include a $2 or $3 billion corporate contribution. Blue Origin's effort to conduct public-relations negotiations after the award in the context of its bid protest is insufficient to support a finding of prejudice when its proposed FY 2021 milestone payments were priced at more than [***] times NASA's budget for the Option A contract. When considered with other factors discussed below, the Court finds that this funding shortfall was too substantial for Blue Origin to establish that it would have had a substantial chance of award but for the alleged evaluation errors. *See Alfa Laval Separation, Inc.*, 175 F.3d at 1368 ("[W]hile price differential may be taken into account, it is not solely dispositive; we must consider all the surrounding circumstances in determining

16

whether there was a substantial chance that a protestor would have received an award but for a significant error in the procurement process.").[3]

### 2.     No Supporting Spacecraft

Blue Origin's lead claim alleges that NASA waived certain solicitation requirements for SpaceX's proposal. (ECF 1, ¶¶ 119-37.) Specifically, Blue Origin alleges that NASA waived required reviews for SpaceX's supporting spacecraft. (*Id.*) As the GAO found with respect to the FRRs, however, Blue Origin could not have benefited from a similar waiver because Blue Origin had not proposed any supporting spacecraft. (*See* AR Tab 108b67a at 105077-78.) As the Federal Circuit has held, "[w]ithout a showing of harm specific to the asserted error, there is no injury to redress, and no standing to sue." *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1381 (Fed. Cir. 2009) (finding that there was no connection between the government's error and the protestor's failure to secure the contract).

SpaceX's approach differed from Blue Origin's approach. SpaceX proposed two types of supporting spacecraft along with a single-element Integrated Lander. (AR Tab 34d.55 at 56274-77.) Blue Origin did not propose any supporting spacecraft; instead, it proposed a three-element architecture for its Integrated Lander. (AR Tab 32a at 33339-41.) As a result of this difference in approach, SpaceX's proposal would require 16 launches (of which 15 would be for supporting spacecraft) (AR Tab 61 at 62874), while Blue Origin's proposal would require three launches, one for each element of its Integrated Lander (AR Tab 61 at 62852).

Setting aside its hypothetical alternative proposal discussed below, Blue Origin cannot demonstrate that it could have benefited from a similar waiver for supporting spacecraft—Blue Origin proposed no supporting spacecraft. (*See* AR Tab 32a at 33339-41.) Even if NASA erred in not requiring reviews for the supporting spacecraft proposed by SpaceX, Blue Origin cannot meet its burden to show that it was competitively injured by such a waiver.

### 3.     Noncompliance

In order to overcome the lack of direct competitive injury attributable to the differences between SpaceX's proposal and its own, Blue Origin alleges that SpaceX's proposal was not compliant with the terms of the solicitation and unawardable. In contrast, Blue Origin alleges that its own proposal was next in line for award because it was compliant and awardable. According to Blue Origin, NASA should not have chosen SpaceX for the post-selection negotiation but instead should have fallen back on Blue Origin's proposal, because it had submitted a compliant, awardable proposal and was next in line. This argument is fatally flawed

---

[3] Although *Alfa Laval* held at the merits stage that a price differential alone is not dispositive, the price differential in that case resulted from differences between offers. *See Alfa Laval Separation, Inc.*, 175 F.3d at 1368. The support for finding no prejudice in this case is stronger because the price disparity exists between NASA's available funding and Blue Origin's proposal price. The difference between Blue Origin's proposal price and SpaceX's proposal price—though also disparate—does not factor into the Court's analysis here.

because NASA determined that Blue Origin's submitted proposal also was not in compliance with the solicitation.

The solicitation provided that "[t]he Government will not make advance payments; proposals containing an advance payment are ineligible for contract award." (AR Tab 27 at 24479.) As the SSA noted, the SEP identified "two instances of proposed advance payments within Blue Origin's proposal. . . . Specifically, Blue Origin proposed milestones at the outset of its Option A performance that the SEP determined were not commensurate with performance." (AR Tab 77 at 63054.)

The SSA "concur[red] with the SEP's assessment that [Blue Origin's] kickoff meeting-related payments are counter to the solicitation's instructions and render Blue Origin's proposal ineligible for award without the Government engaging in discussions or negotiations with Blue Origin, either of which would provide an opportunity for it to submit a compliant revised proposal." (*Id.*) The SSA found that Blue Origin's proposal was "not awardable." (*Id.* at 63056 n.1.)

Blue Origin, in a declaration of its Senior Vice President of Advanced Development Programs, alleges that it could have explained the purported advance payment issue if NASA had opened negotiations with Blue Origin. (ECF 61-1, Pl.'s Ex. 2, Decl. of Brent Sherwood, ¶ 14.) Blue Origin allegedly "would have made clear in its proposal that the purported advance payment issue discussed in Blue Origin's SEP report were [sic] not advance payments but rather were long-lead item procurement payments." (*Id.*)

NASA, however, was under no obligation to negotiate with Blue Origin. The solicitation had provided that "[t]he Government may evaluate proposals and award contracts without conducting post-selection negotiations or discussions with Offerors . . . ." (AR Tab 27 at 24433 (bold omitted).) The SSA explained that she would have allowed Blue Origin to correct the advance-payment issue through negotiations or discussions, but she did not conclude that Blue Origin's proposal "present[ed] a good value to the Government" sufficient to warrant either discussions or negotiations. (AR Tab 77 at 63056-57 n.1.)

Accordingly, even assuming its allegations to be true, Blue Origin cannot establish that it would have had a substantial chance of award but for NASA's alleged errors. Blue Origin's submitted proposal was priced at more than three times NASA's FY 2021 budget for the Option A contract, would not have benefited from waived reviews for supporting spacecraft, and was unawardable without discretionary negotiations. Considering these factors together, Blue Origin's allegations cannot establish prejudice for purposes of standing.

## B.    Alternative Proposal

As noted, the GAO found that Blue Origin could not establish prejudice for its submitted proposal. Blue Origin pivots and now alleges before the Court that it would have submitted an alternative proposal if it had known that NASA would waive solicitation requirements. Blue Origin alleges that the alternative proposal it would have submitted would have both received

higher ratings than SpaceX's proposal and been within NASA's budget.  (ECF 1, ¶ 26; *see also* ECF 69 at 46-49.)

Blue Origin alleges that it "would have proposed a fundamentally different technical approach."  (ECF 1, ¶ 26; *see also* ECF 61-1, Pl.'s Ex. 1, Decl. of Robert H. Smith, ¶¶ 12-14 (explaining Blue Origin's alternative approach), Pl.'s Ex. 2, Decl. of Brent Sherwood, ¶ 14 (same).)  Blue Origin asserts that it too would have proposed a single-element Integrated Lander, [***].  (ECF 1, ¶ 26.)  This alternative design would "take full advantage of Blue Origin's [***]."  (*Id*. ¶ 13.)  As did SpaceX's proposal, to support its own single-element Integrated Lander, "Blue Origin would have proposed a large number of launches and Low Earth Orbit rendezvous events, allowing for the incorporation of elements such as a propellant depot in Low Earth Orbit to be refueled by multiple launches." (*Id*.)

The details of Blue Origin's alternative approach are unclear, as is the precise nature of what Blue Origin would have proposed; Blue Origin has not submitted any contemporaneous documentary evidence to support its allegations of its alternative architecture.  Mr. Smith avers that "Blue Origin originally proposed to use the [***] in its Base Period proposal but changed this approach" because of the Option A requirements.  (ECF 61-1, Pl.'s Ex. 1, Decl. of Robert H. Smith, ¶ 13.)  Blue Origin, however, had proposed the same three-element lander for its proposal during the base-period contract (AR Tab 9 at 266), and the [***] is already an element of the proposal Blue Origin submitted for Option A (AR Tab 32a at 33385).  Blue Origin has not explained how to reconcile the record with its proposed approach.

The three base-period contractors were required to use the standards developed during the base period in preparing their Option A proposals.  (AR Tab 27 at 24443.)  NASA intended "to transition between the Base period and Option A period without any break in contractor performance."  (*Id*. at 24429.)  Although NASA intended to continue performance into the Option A contract, the government admits that the Option A solicitation "did not expressly prohibit an offeror from proposing an approach entirely different from the one it had spent 12 months developing during its base period performance."  (ECF 68 at 13.)

Despite Blue Origin's allegation that it had been [***], it would have had to start from scratch with NASA.  Blue Origin's alternative proposal is purely speculative, including hypothetical pricing and hypothetical technical ratings.

A protestor need not show that it would have won the contract but for the alleged errors, but conjecture is not enough.  *Bannum*, 404 F.3d at 1358; *accord HVF W., LLC v. United States*, 846 F. App'x 896, 898 (Fed. Cir. 2021) (holding that a protestor's allegations based on conjecture "are insufficient to show [the protestor] had a substantial chance of winning the award").

Blue Origin alleges that its price would have been lower and speculates that its technical ratings would have been higher.  (ECF 1, ¶ 26.)  The Court has no way to perform a hypothetical evaluation to determine whether Blue Origin's alternative proposal would even be awardable much less have a substantial chance of award.  Blue Origin is in the position of every disappointed bidder: *Oh. That's what the agency wanted and liked best?  If we had known, we*

*would have instead submitted a proposal that resembled the successful offer, but we could have offered a better price and snazzier features and options.* Blue Origin cannot use its speculative alternative proposal to establish that it would have had a substantial chance of award but for NASA's alleged evaluation errors. Such an approach runs directly counter to the judicial role in Administrative Procedure Act ("APA") review, as applied in resolving bid protests.

In cases in which an agency would be required to reopen the bidding process, the Federal Circuit has held that "all a protestor must establish to demonstrate prejudice is that . . . it is a qualified bidder and could compete for the contract." *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1360 (Fed. Cir. 2015). In *Tinton Falls*, only small-business concerns were eligible to compete for the solicitation. *Id.* at 1359. If the protestor's bid protest succeeded, then the agency would have been required to reopen the bidding process because no eligible bidders would be remaining. *Id.* The protestor itself admitted that it was not a small-business concern for purposes of the original solicitation but argued that it could compete if the bidding process was reopened on an unrestricted basis. *Id.* On these facts, the Federal Circuit upheld on clear-error review a determination by this court that the protestor had demonstrated prejudice. *Id.* at 1360.

Blue Origin alleges that its alternative proposal is evidence that it was prejudiced, but Blue Origin does not base its standing argument on *Tinton Falls*, so the parties did not brief applicability of that case to the facts and circumstances of the procurement at issue. Because Blue Origin has not raised the argument, it is waived. Nevertheless, for the sake of completeness, the Court considers whether an argument premised on *Tinton Falls* would have led to a different conclusion on standing. It would not have.

The allegations in *Tinton Falls* were different from Blue Origin's. In *Tinton Falls*, the plaintiff's protest, if successful, would have meant that there were no eligible awardees, thus requiring the government to go back to square one. In contrast, in this case, Blue Origin's allegations, even if true, would *not* require the government to go back and recompete the requirements at issue. Rather, under the express terms of the solicitation, NASA would have been permitted to select SpaceX as the presumptive awardee and to engage in post-selection negotiations with SpaceX—to the exclusion of all other offerors—and thus cure any deficiency, if there were any. (AR Tab 27 at 24480.) Because NASA did exactly what the solicitation permitted, Blue Origin cannot demonstrate a "substantial chance" of award, even assuming all its factual allegations (as opposed to legal conclusions) were true. Put differently, even if Blue Origin's allegations are assumed to be true, the result of accepting them would mean that NASA would only have to go back to engage in further negotiations with SpaceX; it would not require a complete redo of the entire evaluation and selection process. *Cf. Bluewater Mgmt. Grp., LLC v. United States*, 150 Fed. Cl. 588, 611 (2020) (finding that "nothing in the solicitation prohibited

the [agency] from concluding that a not-fully-compliant proposal could be made compliant and, therefore, eligible for award, after discussions").[4]

In sum, Blue Origin cannot establish prejudice on review of its submitted proposal or its hypothetical alternative proposal. Even assuming Blue Origin's allegations of errors to be true, Blue Origin cannot establish that it was prejudiced by those errors, especially when taking into account the broad discretion afforded NASA under FAR part 35. Accordingly, the Court lacks standing over each of Blue Origin's five claims, all of which are based on this court's 28 U.S.C. § 1491(b)(1) jurisdiction.

## IV.   WAIVER

Relying on the waiver rule established in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), the government and SpaceX also argue that many of Blue Origin's objections are waived.

Under *Blue & Gold Fleet*, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Id.* at 1313. This waiver rule furthers the statutory mandate in 28 U.S.C. § 1491(b)(3), which provides that "'the courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action*.'" *Id.* (quoting 28 U.S.C. § 1491(b)(3)) (emphasis in original).

The Federal Circuit reasoned that the rationale underlying its doctrine applicable to challenges of solicitations with patent ambiguities applies when a party recognizes a patent error in a solicitation but does not object until after the close of the bidding process. *Id.* at 1314. The "waiver rule . . . prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation." *Id.* Without a waiver rule, a contractor could discover a defect in a solicitation, remain silent, and submit its first proposal. *Id.* If the first proposal is not selected for award, "the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors." *Id.*

Expanding its application of *Blue & Gold Fleet*'s waiver rule, the Federal Circuit has held that "the reasoning of *Blue & Gold* applies to all situations in which the protesting party had

---

[4] *Bluewater Management* involved a procurement governed by FAR part 15, which permits discussions to be held with offerors who submitted deficient proposals. 150 Fed. Cl. at 611. The basis for finding that NASA could engage in further negotiations with SpaceX is even stronger in this case because the solicitation was conducted as an "other competitive procedure" under FAR 6.102(d)(2) and FAR 35.016 (as deviated). These regulations do not impose requirements on agencies regarding exchanges with offerors and, thus, leave the agency with discretion within the bounds of fairness. The solicitation here expressly reserved to NASA "the right to negotiate any aspect of an Offeror's milestone payment amounts, schedule, and/or acceptance criteria prior to award of Option A." (AR Tab 27 at 24467.)

the opportunity to challenge a solicitation before the award and failed to do so." *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012). "[A]ssuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract." *Id.*

Courts have held that when *Blue & Gold Fleet*'s waiver rule applies, a court must dismiss the action; it has no discretion to allow the plaintiff to maintain the action. *See, e.g.*, *SEKRI, Inc. v. United States*, 152 Fed. Cl. 742, 752 (2021), *appeal filed*, No. 21-1936 (Fed. Cir. 2021); *Contract Servs., Inc. v. United States*, 104 Fed. Cl. 261, 273 (2012); *Unisys Corp. v. United States*, 89 Fed. Cl. 126, 139 (2009); *see also Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1317 (Fed. Cir. 2016) (Reyna, J., concurring) ("Dismissal is mandatory, not discretionary.").

The Court considers the issue of waiver under the RCFC 12(b)(6) standard. *SEKRI, Inc.*, 152 Fed. Cl. at 752-54; *accord 10 Tanker Air Carrier, LLC v. United States*, No. 21-1084, 2021 WL 3828652, at *13 n.5 (Fed. Cl. Aug. 27, 2021); *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 266 n.15 (2021). *But see M.R. Pittman Grp., LLC v. United States*, 154 Fed. Cl. 241, 245 (2021) (dismissing claim under *Blue & Gold Fleet* for lack of subject-matter jurisdiction under RCFC 12(h)(3)), *appeal filed*, No. 21-2325 (Fed. Cir. 2021).

The government and SpaceX argue that many of Blue Origin's objections in Counts 1 through 3 of its complaint are waived pursuant to *Blue & Gold Fleet*. These counts allege that NASA (1) unlawfully waived material solicitation requirements; (2) engaged in improper and unequal discussions; and (3) failed to amend its solicitation upon a change in requirements.

## A.   Count 1: Waiver of Solicitation Requirements

Blue Origin alleges that NASA waived for SpaceX two types of critical milestone reviews—the FRRs and the DCR—and several other technical and readiness reviews. (ECF 1, ¶¶ 119-37.) In outlining the requirements for the conduct of the FRR and the DCR, the relevant provisions of the solicitation refer to milestone reviews required for an "HLS element." Blue Origin argues the reference to "HLS element" in the solicitation includes all spacecraft required by the proposal, including supporting spacecraft.

The solicitation's Milestone Acceptance Criteria and Payment Schedule provided that "[a]n FRR is required prior to each launch of an *HLS element*." (AR Tab 27k at 33187 (emphasis added).) The SOW added that "[t]he FRR should be completed by two (2) weeks before launch of each *HLS element*." (AR Tab 27e at 32972 (emphasis added).) Although the SOW provided that the DCR "should be completed at first *HLS* launch – 9 Months (L-9)" (*Id.* at 32969 (emphasis added)), the Milestone Acceptance Criteria and Payment Schedule clarified that the DCR was to be scheduled "9 months before first *HLS element* launch (L-9 months)" (AR Tab 27k at 33187 (emphasis added)).

The government and SpaceX argue that the term "HLS element" refers to only the Integrated Lander, not supporting spacecraft. (ECF 60 at 54-58; ECF 62 at 39-46.) They argue that the requirements for an FRR and a DCR preceding the launch of an HLS element are appropriate only for crewed vehicles and not uncrewed supporting spacecraft. Although all

parties argue that "HLS element" is unambiguous, the government and SpaceX argue that, if the term is ambiguous, it is patently ambiguous, and Blue Origin's challenge is waived.

### 1.    Ambiguity

To interpret a solicitation, courts employ the same principles that govern the interpretation of contracts. *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1344 (Fed. Cir. 2021). Thus, courts "begin with the plain language of the document." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004). A court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Id.* The terms of the solicitation are "ambiguous only if [the] language is susceptible to more than one reasonable interpretation." *Id.*

Although the SOW did not define "HLS element," it did define "HLS":

> **HLS**: All objects, vehicles, elements, integrated systems, systems, subsystems, or components thereof that are designed, developed, and utilized by the contractor, its teammates, subcontractors, and suppliers in performance of this contract, and *which collectively comprise the contractor's Integrated Lander (or elements thereof), all Supporting Spacecraft, all launch vehicles necessary for launch and delivery of the contractor's Integrated Lander (or elements thereof) and its Supporting Spacecraft*, and the contractor's Active-Active docking adapter . . . (if required for performance of the contractor's crewed demonstration mission).

(AR Tab 27e at 32948 (bold in original) (emphasis in italics added).)

Blue Origin interprets "HLS element" to include supporting spacecraft, arguing that "HLS element" means "element of an HLS." (ECF 69 at 4.) The SOW's definition of "HLS" includes "all Supporting Spacecraft." (AR Tab 27e at 32948.) Moreover, Blue Origin points out that the term "element" is used in contexts that require it to be interpreted as applying to something other than the Integrated Landers. (ECF 69 at 5-6.) *See e.g.*, AR Tab 27e at 32989 ("The [Assembly, Integration and Test] Plan(s) shall include the following *elements* . . . ." (emphasis added)); *id.* at 32986 ("The contractor shall perform Mission and Fault Management . . . Design, Analysis, and Test to integrate and assess design information, interfaces, requirements, and compatibility as an *element of the integrated mission design*." (emphasis added)).

Blue Origin adds that "Integrated Lander" is also a defined term in the SOW, so if NASA had intended "HLS element" to mean "Integrated Lander element," it would have used the defined term. (ECF 69 at 5; *see also* AR Tab 27e at 32948 (defining "Integrated Lander").) Blue Origin also points out that the SOW includes launch vehicles and supporting spacecraft in the scope of the FRRs. (ECF 61-1 at 14-15.) Expounding on this latter point, Blue Origin refers to the first FRR Acceptance Criterion, which provided the following: "The flight vehicle, launch vehicle, and *support spacecraft (such as propellant storage, propellant transfer, and/or upper*

*stage vehicles that provide transportation capabilities beyond the standard for orbit insertion)*
are ready for flight."  (AR Tab 27e at 32972 (emphasis added).)

The GAO agreed with Blue Origin's interpretation of "HLS element."  The GAO found
"that the Option A BAA required a FRR to be completed prior to *each launch* of an *HLS
element*, which definition includes *supporting spacecraft*.  (AR Tab 108b67a at 105076
(emphasis in original).)  The GAO found that a contrary reading would require the GAO "to read
'supporting spacecraft' out of the definition of 'HLS,' and the 'each' out of 'each launch.'"  (*Id.*)
The GAO also found that it would have to read in "each type" to accept the position ultimately
taken by NASA during negotiations requiring SpaceX to add two FRRs, one before its Tanker
Starship and one before its Depot Starship.  (*Id.*)

Blue Origin's interpretation of "HLS element," adopted by the GAO, is reasonable.

The government and SpaceX, however, demonstrate how other provisions of the
solicitation cut against Blue Origin's interpretation.  (ECF 60 at 54-58; ECF 62 at 39-46.)  They
interpret "HLS element" to refer to only the Integrated Lander.  The government notes that the
"HLS" definition includes the word "element" and uses that word to refer to parts of the
Integrated Lander.  (ECF 60 at 54.)  The government argues that the word "element" thus
facially refers to parts of the Integrated Lander.

The terms "Integrated Lander" and "Supporting Spacecraft" are also defined terms in the
SOW:

> **Integrated Lander:** Any and all combinations of *contractor
> elements (e.g. Ascent Element)*, including potentially a single
> element, which is integrated at any time crew are onboard.
>
> **Supporting Spacecraft:** *Any contractor spacecraft that is not
> otherwise the Contractor's HLS Integrated Lander*, Launch
> Vehicle, or [Active-Active docking adapter], but that is otherwise
> required for the Contractor to execute its demonstration mission or
> any portion thereof in performance of this contract, including, but
> not limited to, rendezvous, proximity operations, docking and
> undocking . . . , propellant transfer, and orbital maneuvering and
> transfer.

(AR Tab 27e at 32948 (bold in original) (emphasis in italics added); *see also* AR Tab 27 at
24430 (providing similar definitions in the main body of the Option A solicitation).)  The
definition of "Integrated Lander" refers to its "contractor elements," but the definition of
"Supporting Spacecraft" is defined in opposition to the Integrated Lander and does not use the
word "element."

The government and SpaceX collect other provisions of the SOW and the main solicitation document that use the word "element" referring only to the Integrated Lander:

- The SOW defines "HLS Flight Operations" as "the period of performance that begins with the first Earth launch of *any element of the HLS Integrated Lander*, includes the entirety of the HLS Mission, and concludes with the subsequent transition of the uncrewed HLS out of the [Crewed Staging Vehicle] approach ellipsoid." (AR Tab 27e at 32999 (emphasis added).)

- "NASA will not take ownership of the *Integrated Lander, any individual elements thereof*, or Supporting Spacecraft." (AR Tab 27 at 24443 (emphasis added).)

- "The Offeror is required to propose how it will *launch and deliver its Integrated Lander (and all elements thereof) to the Moon* using commercial launch vehicle(s), including all phases of launch vehicle flight and, if applicable, any Supporting Spacecraft. *It is permissible for individual components of the Offeror's HLS Integrated Lander to be launched as separate elements on multiple commercial launch vehicles, depending on the Offeror's architecture*." (*Id*. at 24453 (emphasis added).)

The government also argues that Blue Origin "ignores the word 'element' and seeks to make 'HLS element' coextensive with 'HLS.'" (ECF 68 at 24.) To read "HLS element" to be any constituent part of the HLS would not make any sense, the government argues, because it would lead to "unworkable over-breadth"—even "an element would be an HLS element, which is tautological but meaningless." (*Id*. at 24-25.)

Further, the government argues that its interpretation is consistent with the SOW's stated purpose of the milestone reviews. (*Id*. at 25-26.) The Integrated Lander is the only part of the HLS that carries humans onboard. The SOW provides that "[t]he HLS Program Office has defined major milestone reviews for the HLS Program in order to be able to assess programmatic and technical progress and performance at key decision points in the development and operational lifecycle phases, *with the ultimate goal of certifying the lander for crewed operations to and from the lunar surface* and assessing the likelihood of mission success." (AR Tab 27e at 32964 (emphasis added).) SpaceX adds that the first FRR Acceptance Criterion, on which Blue Origin also relies, makes "clear that the status of support spacecraft is something for NASA to consider during the FRR of something else—i.e., the launch of each HLS Lander element." (ECF 62 at 44.)

Ultimately, the government and SpaceX have provided enough context from the solicitation to support their interpretation of "HLS element," even though it appears to conflict with the SOW's own (seemingly unworkable) definition of "HLS."

The interpretation of the term "HLS element" proposed by the government and SpaceX is also reasonable.

Each side's interpretation of the solicitation term "HLS element" is internally consistent and reasonable. Each side's interpretation of the term is also flawed and inconsistent with other

terms of the solicitation.  The only conclusion to be drawn is that the term "HLS element" is ambiguous.

### 2.    Patency

For the waiver rule to apply, the ambiguity must be patent.  A patent error is "'an obvious omission, inconsistency or discrepancy of significance'" that "could have been 'discovered by reasonable and customary care.'"  *Per Aarsleff A/S*, 829 F.3d at 1312-13 (quoting *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1339 (Fed. Cir. 2004) and *Analytical & Rsch. Tech., Inc. v. United States*, 39 Fed. Cl. 34, 46 (1997)).  A document is patently ambiguous when the document "contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties."  *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000).

The term "HLS element" in the solicitation is patently ambiguous, as has been recognized at every stage of this procurement.

During Q&A, one anonymized offeror requested clarification from NASA due to the potential ambiguity in one of the solicitation's documents that included relevant definitions, including the definition of "HLS":

> Given the ubiquitous use of the term "HLS" in applicable and reference documents, the current definition creates a number of logical inconsistencies and interpretation issues.  For example, all [Interface Control Documents ("ICDs")] use the phrase "HLS shall…," often when seemingly intending "HLS Integrated Lander shall…"  This creates ambiguity in terms of which vehicles (e.g., launch vehicles or support vehicles) must contain which interfaces.

(AR Tab 20 at 448 (bold omitted).)

In response, NASA did not clarify how to read "HLS" or "HLS element" in the SOW, specifically.  Instead, NASA merely clarified its intent not to disturb the meaning of "HLS" in the solicitation documents:

> Note the caveat in section 1.3.2 [of the solicitation], "When used within this document, the following definitions apply."  The intent is not to disturb the relative ubiquitous use of "HLS" in other solicitation and contract documents.  Unless otherwise specified, the scope of ICDs remains the "HLS Integrated Lander" (as that term is defined in the main body of the solicitation).  Similarly for the [Data Procurement Document], the revised definitions are not intended to change the scope of deliverables (i.e., [Data Requirements Descriptions] are generally applicable to the Integrated Lander unless "Supporting Spacecraft" or "Launch Vehicle" are explicitly

identified).  Similarly for the Design and Construction standards, unless otherwise noted, scope is applicable to the HLS Integrated Lander.

(*Id.*)  Although NASA provided this clarification, it did not clarify or take any other action to remove the ambiguity surrounding the meaning of the term "HLS element" from the SOW.

The Q&A log was provided to all offerors as part of Amendment 1 to the Option A solicitation.  (AR Tab 26 at 24420.)

Given the exchange during Q&A to which it had access, Blue Origin could and should have discovered the ambiguity in the meaning of the term "HLS element" "'by reasonable and customary care.'"  *Per Aarsleff A/S*, 829 F.3d at 1313 (quoting *Analytical & Rsch. Tech.*, 39 Fed. Cl. at 46); *see also Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020); *M.R. Pittman Grp., LLC*, 154 Fed. Cl. at 244; *Quanterion Sols., Inc. v. United States*, 152 Fed. Cl. 434, 445 (2021) ("An ambiguity in an [Request for Proposals ("RFP")] is generally patent if offerors seek clarification of the ambiguous provision prior to submitting their proposals.").  In *Per Aarsleff A/S*, the Federal Circuit held that "the ambiguity in the solicitation was patent, as reflected in the questions received by the Air Force and the [solicitation's] two plausible interpretations . . . ."  829 F.3d at 1312.  Unlike NASA in this case, the Air Force in *Per Aarsleff A/S* removed the ambiguity through clarification.  *See id.* at 1312-13.  The ambiguity in this case remained between the SOW's definitions and requirements, even after clarification.  *See Aero Spray, Inc. v. United States*, No. 21-1079C, 2021 WL 5023371, at *24-25 (Fed. Cl. Oct. 21, 2021) (finding an ambiguity to be patent in a situation in which an ambiguity was identified during Q&A but not clarified and finding a challenge in that case to be waived).

NASA itself noticed the inconsistency in the SOW's requirements caused by the ambiguous definition of "HLS element" during its evaluation of the proposals.  The SEP recognized that the relevant terms concerning the FRRs were unclear and offered two possible interpretations.  (AR Tab 59c at 62813.)  Under the first possible interpretation, "offerors were required to propose an FRR milestone (and associated review) to be conducted and achieved for each proposed supporting spacecraft prior to launch and flight operations."  (*Id.*)  Under the other possible interpretation, "offerors were required to propose a single FRR covering the full scope of its demonstration mission prior to the launch of any lander element or supporting spacecraft."  (*Id.*)  Thereafter, in his letter to SpaceX initiating negotiations, the contracting officer also acknowledged the "arguably ambiguous nature of this topic."  (AR Tab 63 at 62890.)

Blue Origin knew or should have known that the SOW's term "HLS element" had more than one reasonable meaning and had a duty to raise the issue earlier.  It did not do so.  "HLS element" is patently ambiguous, and Blue Origin's challenge is waived.

Blue Origin's challenge regarding the FRRs is waived for an additional reason.  The solicitation reserved to NASA "the right to negotiate any aspect of an Offeror's milestone payment amounts, schedule, and/or acceptance criteria prior to award of Option A."  (AR Tab 27 at 24467.)  NASA entered negotiations with SpaceX.  As noted, NASA recognized the ambiguity in the solicitation over the FRR requirement and the meaning of "HLS element."  (AR Tab 63.)

27

NASA requested that SpaceX agree to additional FRRs "to meet NASA's intent of its FRR requirement for supporting spacecraft." (*Id.* at 62890.) If that negotiation is improper, then the terms of the solicitation giving NASA the authority to negotiate acceptance criteria must also be improper.  Any defect in the solicitation's provision reserving for NASA this authority to negotiate certain changes would be patent because that reservation is contained in clear and unambiguous language in the solicitation.  Blue Origin did not object to this provision before the close of the bidding process, and, accordingly, its objection now is waived.

Blue Origin's allegations regarding the FRRs and the DCR in Count 1 are waived.

## B.    Count 2: Unequal Discussions

Blue Origin alleges that NASA violated procurement laws and regulations by holding improper and unequal discussions because NASA "held discussions with only SpaceX and permitted SpaceX to revise its unawardable and noncompliant proposal." (ECF 1, ¶ 144.)

In the solicitation, NASA reserved "the right to conduct post-selection negotiations or discussions if the Contracting Officer later determines them to be necessary." (AR Tab 27 at 24433.)  The SSA had the authority to "make initial, non-binding selections of an Offeror or Offerors for the purpose of having the Contracting Officer engage in post-selection negotiations with one or more Offerors as defined in [the Option A] solicitation." (*Id.* at 24480.)  As noted above, the solicitation further reserved to NASA "the right to negotiate any aspect of an Offeror's milestone payment amounts, schedule, and/or acceptance criteria prior to award of Option A." (*Id.* at 24467.)

The solicitation defines "post-selection negotiations" and "discussions."  "Post-selection negotiations" are defined in the solicitation as "exchanges with Offerors who have been selected for potential contract award that result in the Contracting Officer inviting the Offeror to revise only those specific portions of its proposal that have been identified by the Contracting Officer as open to revision." (*Id.* at 24434.)  "Discussions" are defined as "exchanges with Offerors that occur after receipt of proposals but before selection that result in the Contracting Officer inviting the Offeror to revise only those specific portions of its proposal that have been identified by the Contracting Officer as open to revision." (*Id.*)  A "'[p]roposal revision' is any change made by the Offeror to its proposal that occurs as a result of discussion or post-selection negotiations . . . ." (*Id.*)

NASA followed the terms of the solicitation when it conducted post-selection negotiations with only SpaceX and allowed SpaceX to revise its proposal.  The SSA made an initial, non-binding selection of SpaceX for award, as was expressly permitted under the solicitation.  (AR Tab 64.)  The contracting officer then negotiated with SpaceX regarding the prices of CLINs, the payment phasing, and the FRR requirement.  (AR Tab 63.)

If NASA's post-selection negotiation with SpaceX was contrary to law, then the terms of the solicitation authorizing NASA's conduct must also be contrary to law.  If those terms constitute a defect in the solicitation, that defect would be patent because the clear and unambiguous terms of the solicitation authorize the precise actions that NASA undertook.  Blue

Origin did not object to those terms before the close of the bidding process. Accordingly, Blue Origin's challenge under Count 2 of its complaint, to the extent that the claim can be considered a challenge to the solicitation's terms, is waived.

## C.      Count 3: Failure to Amend the Solicitation

Blue Origin also argues that NASA unlawfully refused to amend its solicitation to give all offerors the opportunity to revise their proposals once Congress set the funding limits for the HLS program. (ECF 1, ¶¶ 152-62.) Blue Origin points to the difference between NASA's funding request of $3.4 billion FY 2021 for the HLS program and the appropriation of $850 million. Blue Origin alleges that this difference "create[d] a material departure from the assumptions set forth in the solicitation." (*Id.* ¶ 154.) Because NASA's funding allocation "directly correlate[d] to the size and scope of its Solicitation," Blue Origin argues that NASA "was required to either notify all offerors of the change in circumstance or to amend the Solicitation, once it became aware of the changed circumstances." (*Id.* ¶ 155.)

Blue Origin maintains that both NASA's decision not to notify all offerors of its changed circumstances related to the available funding and NASA's decision not to amend the solicitation to account for the new level of funding were "arbitrary and violated Federal procurement regulations." (*Id.* ¶ 156.) Blue Origin alleges that, if it had known of NASA's funding limitations, it would have reduced its proposed price and revised its technical and management proposal. (*Id.* ¶¶ 157, 161.) Blue Origin contends that these changed circumstances led NASA to change (1) its stated intention to award two HLS Option A contracts and (2) its requirements for FRRs and other mandatory reviews. (*Id.* ¶¶ 155-60, *see also* ECF 61-1 at 60-64.)

### 1.      Change in Intended Number of Awards

#### a.      Defect

The HLS Option A solicitation did not specify the amount NASA anticipated being available to fund Option A awards. Instead, the solicitation expressly provided that "[f]unds are not currently available for this solicitation, but are expected to become available on or before contract award." (AR Tab 27 at 24481.) The solicitation informed all offerors that NASA's ability to make awards was "contingent upon the availability of appropriated funds from which payments can be made and the receipt of proposals that NASA determines are acceptable." (*Id.*) Although NASA preferred to award two contracts, "NASA reserve[d] the right to select for award multiple, one, or none of the proposals received . . . ." (*Id.*)

If, as Blue Origin argues, NASA violated federal procurement regulations when it made a single award based on its available funding without amending the solicitation, then the solicitation's terms providing NASA the flexibility to do so must also have been improper because NASA did precisely what it told offerors it might do.

#### b.      Patency

The solicitation's terms were explicit in reserving NASA's right to make a single award or even no award. (*Id.*) If these terms are illegal, the defect would be patent because the terms

are clear and unambiguous. Moreover, Blue Origin knew or should have known that NASA's available FY 2021 funding would not support an award to Blue Origin.

Congress passed the Consolidated Appropriations Act for Fiscal Year 2021 on December 21, 2020, several weeks after Blue Origin submitted its final Option A proposal to NASA, but months before NASA announced the award of the Option A contract on April 16, 2021. Pub. L. 116-260, 134 Stat. 1182 (2020). (*See also* AR Tab 77 (dating Source Selection Statement April 16, 2021).) The President signed the bill into law on December 27, 2020. (*See* AR Tab 108b26a at 103671.) The Consolidated Appropriations Act appropriated $850 million in FY 2021 funding for the entire HLS program, which includes the Option A contract, money committed for FY 2021 to base-period milestone payments, HLS programmatic operations budget, and other related activities. (*Id.* at 103672-73.)

"Offerors in a government solicitation are 'charged with knowledge of law and fact appropriate to the subject matter.'" *Inserso Corp.*, 961 F.3d at 1350 (quoting *Per Aarsleff A/S*, 829 F.3d at 1314). In *Inserso*, the Federal Circuit held that a protestor had waived its right to object to an unequal disclosure regarding prices. *Id.* The case involved two competitions, and "the express terms of the solicitation contemplated overlap of bidders in the two competitions." *Id.* The protestor, "if it had taken reasonable care," would have known that unequal disclosure was likely to occur. *Id.*

Here, if Blue Origin had taken "reasonable care," it would have known that based on the level of funding appropriated to the entire HLS program, NASA could not support a single award to Blue Origin at the price it proposed, let alone multiple awards to Blue Origin and one of its competitors. Appropriation laws are matters of public record and are accessible on Congress's website, congress.gov. *See, e.g.*, Consolidated Appropriations Act of 2021, H.R.133, 116th Cong. (2020), https://www.congress.gov/bill/116th-congress/house-bill/133/text/enr. Blue Origin's proposed FY 2021 milestone payments of about [***] exceeded the FY 2021 funding appropriated for the entire HLS program. (*See* AR Tab 108b67a at 105010 (citing AR Tab 32d.87).)

Blue Origin argues that NASA "itself decided to divert HLS funds from the Option A" effort after receipt of proposals, and that no offeror can be expected to keep apprised of how agencies decide to allocate their appropriations. (ECF 69 at 30.) This argument is sensible in routine procurements but ignores the realities of the procurement at issue.

First, the diversion of funds Blue Origin identifies in its response encompassed the entire first decade of the HLS program. (*Id.* at 31 (quoting AR Tab 55 at 6206 ("This goal effectively forces ~$4B of milestone payments for 'services' into the HLS budget out to 2030 . . . [W]ithout the introduced 'services' line, the identified budget available for milestone payments between FY21-FY30 is ~$8.7B – which is over ~$1.5B more than the combined ~$7.1B of the notional" Contractor B and Contractor C proposals.)).) This argument glosses over the fact that Blue Origin's proposal was unworkable in the *first* year of the HLS Option A program, FY 2021, because it proposed 2021 milestone payments that exceeded the entire HLS program's FY 2021 funding.

30

Second, Blue Origin's argument discounts the high profile of the HLS program and Blue Origin's own role in advocating for its funding. Blue Origin was one of only three offerors in line for award of a multi-billion-dollar contract to land humans on the lunar surface. According to lobbying disclosure reports, of which the Court takes judicial notice, during the period Congress was debating the appropriations bill that funded the HLS program, the fourth quarter of 2020 ("Q4 2020"), Blue Origin spent close to a million dollars ($895,000) lobbying both houses of Congress. Most of these funds ($800,000) were spent on lobbying contacts that included efforts to influence the outcome of the appropriations bill. Blue Origin itself lobbied Congress specifically on "issues related to space transportation" in the Consolidated Appropriations Act of 2021. *See* Blue Origin, LLC, Lobbying Report Q4 2020. Blue Origin also hired several lobbying firms to advocate on its behalf with respect to NASA's appropriations. *See* Maynard, Cooper & Gale, P.C., Lobbying Report Q4 2020; K&L Gates LLP, Lobbying Report Q4 2020; Barnes & Thornburg, LLP, Lobbying Report Q4 2020; Clark Hill, PLC, Lobbying Report Q4 2020; ATS Communications, Inc., Lobbying Report Q4 2020; Red Maple Consulting, LLC, Lobbying Report Q4 2020.[5] Although the administrative record is silent on the question, it is inconceivable that Blue Origin would lobby Congress itself and pay others to lobby on its behalf and not be kept informed of the outcome of these efforts. Even though it may not generally be appropriate to impute knowledge of a procuring agency's funding levels to offerors, in this case Blue Origin must have had knowledge of the amount Congress ultimately appropriated to NASA for the HLS program.

Beyond Blue Origin's own lobbying activities, the enactment of the Consolidated Appropriations Act itself was newsworthy, and articles in the relevant trade-industry media covered the level of appropriations for the HLS program. *See, e.g.*, Marcia Smith, *Final FY2021 NASA Funding Provides Only 25 Percent of HLS Request*, SpacePolicyOnline.com (Dec. 21, 2020, 3:24 PM), https://spacepolicyonline.com/news/final-fy2021-nasa-funding-provides-only-25-percent-of-hls-request/; Chelsea Gohd, *NASA Hits Pause on its Artemis Moon Lander*

---

[5] The lobbying reports are available publicly online:
https://lda.senate.gov/filings/public/filing/d7d64b10-efcc-457b-a2e8-8d0fc4ca177a/print/ (Blue Origin); https://lda.senate.gov/filings/public/filing/7f51324b-8b82-4322-b21f-dcd66d262694/print/ (Maynard, Cooper & Gale, P.C.);
https://lda.senate.gov/filings/public/filing/86997916-1fac-41f6-8c03-3fdf625bc8f4/print/ (K&L Gates LLP); https://lda.senate.gov/filings/public/filing/0995184f-2e15-430a-99d5-85c235c834a1/print/ (Barnes & Thornburg, LLP);
https://lda.senate.gov/filings/public/filing/e292f8c6-2037-4ac7-a962-ccbbb1ea2e3b/print/ (Clark Hill, PLC); https://lda.senate.gov/filings/public/filing/24adb113-7938-40a1-9434-85ba3385e6c6/print/ (ATS Communications, Inc.);
https://lda.senate.gov/filings/public/filing/ab54faf9-bc78-4070-9f19-9501e9544631/print/ (Red Maple Consulting, LLC).

*Competition*, Space.com (Feb. 3, 2021), https://www.space.com/nasa-artemis-moon-lander-competition-delay.

In this context, Blue Origin's argument that it should not be subject to a duty to have been aware of the amount appropriated for the HLS program or to have made contemporaneous inquiries of NASA on the impact of the funding level rings hollow. Appropriations acts are laws; the appropriations act providing funding for the HLS program was directly relevant to the subject matter of the procurement. Under Federal Circuit precedent, Blue Origin was "'charged with knowledge'" of this appropriations law. *Inserso Corp.*, 961 F.3d at 1350 (quoting *Per Aarsleff A/S*, 829 F.3d at 1314). Whatever merit Blue Origin's argument would have in the run-of-the-mill procurement, it is insufficient in this procurement.

Under these circumstances, Blue Origin had the opportunity to raise any concerns about the impact of the appropriation figure for the HLS program on the proposal-selection process in the more-than-four months NASA spent evaluating the proposals and deliberating the award of the Option A contract after the enactment of the Consolidated Appropriations Act for FY 2021. If Blue Origin believed the HLS funding itself to be an agency requirement that changed after the receipt of proposals, Blue Origin had the opportunity to protest when it became clear that NASA did not intend to make an amendment of a patent, unambiguous solicitation term. Blue Origin failed to lodge such a protest.

By failing to object to NASA's election not to amend the Option A solicitation to reflect funding constraints, Blue Origin has waived its right to make that argument now. *See Blue & Gold Fleet*, 492 F.3d at 1313; *VS2, LLC v. United States*, No. 21-1028C, 2021 WL 4167380, at *10 (Fed. Cl. Sept. 1, 2021) (discussing subsequent cases applying *Blue & Gold Fleet* that "shift[ed], until the contract award date, the cut-off for a challenge to a solicitation that would not have been possible prior to the proposal due date").

## 2.    Change in Review Requirements

Blue Origin also argues that NASA was required to amend its solicitation to reflect a reduction in its need for FRRs and other critical milestone reviews. This relaxation in requirements, Blue Origin contends, resulted in "less costly performance by SpaceX relating to the FRRs, saving SpaceX (and NASA) hundreds of millions of dollars." (ECF 61-1 at 63.) Had NASA "properly revised" its solicitation to reflect this allegedly relaxed review requirement, Blue Origin asserts that it "would have proposed a fundamentally different technical approach" at a significantly lower price. (*Id.* at 68-69.)

As previously noted, NASA had reserved "the right to negotiate any aspect of an Offeror's milestone payment amounts, schedule, and/or acceptance criteria prior to award of Option A." (AR Tab 27 at 24467.) Accordingly, Blue Origin's argument that NASA was required to amend its solicitation to update the number of required FRRs and other reviews is untimely for the same reasons its objections related to NASA's funding requirements are untimely under *Blue & Gold Fleet*. If negotiating reviews is improper, then the terms of the solicitation allowing such negotiations must also be improper. That defect would be patent because the solicitation expressly reserved to NASA the right to negotiate FRRs and other

32

critical reviews to achieve the best value for the government.  Blue Origin had notice that the specific timing and acceptance criteria were subject to NASA's discretion and further negotiation.

Blue Origin argues that the solicitation's "unambiguous and specific timing required for the critical milestone requirements" forced Blue Origin to change its proposed HLS architecture. (ECF 61-1 at 69.)  The terms of the solicitation, however, establish that NASA had discretion to "negotiate *any* aspect" of an offeror's acceptance criteria.  (AR Tab 27 at 24467 (emphasis added).)  If, as Blue Origin contends, the timing of these critical milestone reviews was holding Blue Origin back from proposing a different, better architecture (ECF 61-1 at 68-69), it was incumbent upon Blue Origin to raise its concern over the express, unambiguous terms of the solicitation with NASA prior to submitting its proposal.  Blue Origin did not do so.

In Count 3, Blue Origin challenges NASA's decision not to amend its solicitation, which already anticipated the need for flexibility.  Consideration of both the allegedly changed requirements—the intended number of awards and the critical milestone review requirements— was left to NASA's discretion by the solicitation's express terms.  Being authorized by those terms, that discretion cannot now be challenged as improper.  Blue Origin's challenge under Count 3 of its complaint, to the extent that the claim can be considered a challenge to the solicitation's terms, is waived.

In sum, Blue Origin's objections regarding the FRRs and the DCR in Count 1 are waived; Counts 2 and 3 are waived in their entirety.

## V.    MERITS

Even if it had standing and portions of its complaint were not waived, Blue Origin could not succeed on the merits.

Bid protests are evaluated under the APA's standard of review.  *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706).  Under that standard, an agency's procurement action may only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  A court may grant relief only upon the finding that either "the procurement official's decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001).

On the merits, Blue Origin alleges that NASA (1) unlawfully waived material solicitation requirements for SpaceX; (2) engaged in improper and unequal discussions; (3) failed to amend its solicitation upon receiving its appropriation; (4) failed to evaluate SpaceX's proposal in accordance with the solicitation; and (5) breached an implied-in-fact contract of good faith and fair dealing.  The government and SpaceX argue that NASA acted properly.

### A.    Counts 1 and 4: Waiver of Solicitation Requirements and Improper Evaluation

The Court's review of a procuring agency's decision is "highly deferential." *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  Under the APA's rational basis test, a court determines "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." *Banknote Corp. of Am.*, 365 F.3d at 1351 (quoting *Domenico Garufi*, 238 F.3d at 1332-33) (internal quotation marks omitted).  The court does not second-guess "discretionary determinations of procurement officials" involved in challenges that "deal with the minutiae of the procurement process in such matters as technical ratings."  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).

The FAR provision governing BAAs provides that "[p]roposals received as a result of the BAA shall be evaluated in accordance with evaluation criteria specified therein through a peer or scientific review process."  FAR 35.016.  As explained in the background section above, NASA conducted a multi-layered evaluation.  The SEP was responsible for evaluating proposals and presenting the results to the SSA, who was "responsible for making selections and final contract award decisions based on applying the evaluation, selection, and award methodology as described in [the Option A] solicitation."  (AR Tab 27 at 24480.)  The SSA would "consider each proposal on its own individual merits, and [would] select for award one or more proposals that individually each present value to the Government and that optimize NASA's ability to meet its objectives as set forth in [the Option A] solicitation."  (*Id.*)

In evaluating the technical and management approaches of the proposals, NASA would "consider how an Offeror's proposed approach affects risk, such as technical risk, risk to meeting the Offeror's proposed schedule, the need for increased Government oversight, or the risk of likelihood of unsuccessful contract performance."  (*Id.* at 24476.)  NASA then would rate features of each proposal using five categories of strengths and weaknesses: Significant Strength, Strength, Weakness, Significant Weakness, and Deficiency.  (*Id.*)

In addition to the traditional discretion that courts give to agencies, the BAA in this case reserved certain rights to NASA, providing NASA flexibility in the highly technical field of rocket science.  The solicitation reserved to NASA "the right to negotiate any aspect of an Offeror's milestone payment amounts, schedule, and/or acceptance criteria prior to award of Option A."  (*Id.* at 24467.)

Blue Origin argues that NASA's evaluation was "arbitrary, capricious, and unlawful . . . ."  (ECF 1, ¶ 121 (Count 1) (citing 5 U.S.C. § 706(2)(A), ¶ 164 (Count 4) (providing same basis for challenge).)  In Counts 1 and 4, Blue Origin raises three objections to NASA's evaluation, arguing that NASA (1) either waived material review requirements or failed to rate the proposals appropriately on their proposed review requirements; (2) disparately and unequally evaluated SpaceX's and Blue Origin's communications link non-closures; and (3) improperly double-counted certain positive attributes of SpaceX's proposal.

34

1.      **Review Requirements**

Blue Origin alleges that NASA unlawfully waived for only SpaceX several required reviews, including FRRs, the DCR, and several other technical and readiness reviews. (*Id.* ¶¶ 119-37.) Blue Origin further alleges that NASA failed to evaluate properly the risk related to SpaceX's approach to these reviews. (*Id.* ¶¶ 166-67.)

a.      **FRR Requirements**

As the Court found above, the term "HLS element" in the FRR and DCR requirements is patently ambiguous, and, therefore, Blue Origin cannot now challenge NASA's interpretation. *See NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1162 (Fed. Cir. 2004) ("If an ambiguity is obvious and a bidder fails to inquire with regard to the provision, his interpretation will fail."); *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 998 (Fed. Cir. 1996) ("If a solicitation contains contract language that is patently ambiguous, a protestor cannot argue . . . that its interpretation is proper unless the protestor sought clarification of the language from the agency before the end of the procurement process.").

Blue Origin argues that SpaceX's failure to include additional FRRs should have rendered SpaceX's proposal unawardable as a Deficiency, rather than as a Weakness, the rating the SEP assigned to this aspect of SpaceX's proposal. (ECF 61-1 at 55-56; *see also* AR Tab 59c at 62812-14.) The solicitation defined "Weakness" as "[a] flaw in the proposal that increases the risk of unsuccessful contract performance." (AR Tab 27 at 24476.) "Deficiency" was defined as "[a] material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." (*Id.*)

The SEP did not find SpaceX's approach to be a material failure to meet a requirement, but the SEP did explain that SpaceX's approach increased the risk of unsuccessful contract performance. (*See* AR Tab 59c at 62812-14.) The SEP explained that SpaceX "did not propose any . . . FRR milestone review events prior to the launch of their supporting spacecraft (namely, their depot and tanker Starships) which commence their demonstration mission." (*Id.* at 62813.) Put another way, SpaceX "neither proposed any FRR events dedicated to one or all of its supporting spacecraft, nor a single FRR to cover the full scope of its demonstration mission prior to the launch of its first supporting spacecraft." (*Id.*) The SEP found that, "in either case, [SpaceX's] proposal is inconsistent with this required milestone (or milestones) as set forth in the solicitation." (*Id.*)

Consistent with a Weakness rating, the SEP concluded that SpaceX's approach to milestone review events increased risk:

> This inconsistency between [SpaceX's] proposal and the milestone review events contemplated by the solicitation has the effect of lessening NASA's involvement and participation in assessing flight readiness for [SpaceX's] supporting spacecraft prior to launch of such spacecraft.  Therefore, this aspect of [SpaceX's] proposal

increases risk of unsuccessful performance and constitutes a weakness.

(*Id.* at 62814.)

The SEP's conclusion is reasonable, and the Court will not second-guess the SEP's expertise to assess this risk, which depends on technical judgment.[6]  *See E.W. Bliss Co.*, 77 F.3d at 449.  The distinction between a Deficiency and a Weakness lies in how serious a risk a defect presents.  For a defect to rise to the level of a Deficiency, it must "increase[ ] the risk of unsuccessful contract performance to an unacceptable level."  (AR Tab 27 at 24476.)  Distinguishing a Deficiency from a Weakness entails the exercise of judgment in a highly technical area.  The Court is in no position to assess the risk in SpaceX's proposal and may not use deferential APA review to disregard the judgment of the SEP and the SSA to substitute its own judgment on such a highly technical and nuanced question.

If failing to meet a solicitation requirement required a Deficiency rating, then Blue Origin's own proposal would have several Deficiency ratings.  Although the SEP found that Blue Origin failed to meet several requirements, the SEP never assigned to Blue Origin a Deficiency.  For example, the SEP found that Blue Origin's proposal failed "to meet an important mission-related requirement" because its manual control system "is not compliant with HLS-R-0004, which requires that the offeror's approach to manual control must have single fault tolerance."  (AR Tab 59a at 62647.)  The SEP also found that Blue Origin's communications links "fall short of NASA's requirements includ[ing] critical ones as [***]."  (*Id.* at 62654.)  Neither SpaceX nor Blue Origin received any Deficiency rating.  (*See generally* AR Tab 59c; AR Tab 59a.)  Blue Origin itself, therefore, benefited from the NASA's discretion to determine which requirements were a "material failure," as required by the definition of "Deficiency."  (*See* AR Tab 27 at 24476.)  *See also IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 401 (2021) ("[I]f correcting the error would decrease [the protestor's] chance of award, it cannot establish prejudice.").

### b.    DCR and Other Reviews

Aside from the FRR requirements, Blue Origin argues that SpaceX did not meet the schedule requirements for the DCR, the Mission Specific Preliminary Design Review, the Mission Specific Critical Design Review, and the System Acceptance Review.  (ECF 1, ¶¶ 130-31.)  Blue Origin alleges that "NASA did not assign any weaknesses for SpaceX's failure to meet these requirements," so NASA "essentially waived" them.  (*Id.*)  In its motion for judgment on the administrative record, Blue Origin adds to the list of allegedly waived reviews the Launch

---

[6] Even if Blue Origin's claim were not waived regarding FRRs and even if the term "HLS element" included supporting spacecraft, NASA had the discretion to negotiate the acceptance criteria.  (*See* AR Tab 27 at 24467.)  NASA did negotiate the FRR requirement with SpaceX, and SpaceX agreed to perform additional NASA-led FRRs.  (AR Tab 63.)

Vehicle Systems Readiness Review, Pre-Mate Readiness Review, and the Launch Readiness Review. (ECF 61-1 at 44.)

The HLS Option A procurement is highly technical and contains a voluminous record. The Court's review considers "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion . . . ." *Banknote Corp. of Am.*, 365 F.3d at 1351 (quoting *Domenico Garufi*, 238 F.3d at 1332-33) (internal quotation marks omitted). Blue Origin cannot undercut NASA's thorough analysis by grasping for anything NASA specifically did not reference from its 60-page solicitation with its 78-page SOW. (AR Tab 27; AR Tab 27e.) The SEP wrote a 59-page report for SpaceX and a 75-page report for Blue Origin. (AR Tab 59c; AR Tab 59a.) The SSA wrote another 24 pages to explain her source selection. (AR Tab 77.) The Court finds NASA's explanation to be well-documented, detailed, and thorough.

In such matters as technical evaluations, courts defer to an agency's expertise because the agency is better situated to make those determinations. *Kinemetrics, Inc. v. United States*, No. 21-1626, 2021 WL 4237169, at \*7 (Fed. Cl. Sept. 10, 2021); *see also E.W. Bliss Co.*, 77 F.3d at 449; *Squire Sols., Inc. v. United States*, No. 21-1494C, 2021 WL 4805540, at \*14-16 (Fed. Cl. Sept. 30, 2021) (declining to second-guess an agency's technical evaluation involving discretionary determinations in a technical BAA). The record does not indicate that NASA ignored the review requirements; as the analysis below makes clear, the SSA acknowledged SpaceX's schedule risk but found that other attributes reduced that risk. (*See* AR Tab 77 at 63049.) The Court is not competent to determine whether SpaceX's approach increased any risk and, if so, to substitute its judgment for that of NASA in evaluating whether such risk increased the potential for unsuccessful performance to an unacceptable level. Although NASA did not specifically address by name each of the reviews that Blue Origin has put at issue, the absence of references to the other reviews is an indication that NASA was not concerned with the risks presented by those reviews. This conclusion is the logical inference to draw from the fact that the SEP did discuss concerns regarding the FRR requirement at length. (*See* AR Tab 59c at 62812-14.)

On the record before the Court and reasonable inferences therefrom, Blue Origin has not met its burden to show that NASA's award decision was arbitrary and capricious. The Court finds NASA's explanation to be "a coherent and reasonable explanation" of its award decision. *See Banknote Corp. of Am.*, 365 F.3d at 1351.

Blue Origin further argues that it was irrational for NASA to rate SpaceX's management approach Outstanding, given "SpaceX's blatant failure to meet numerous milestone review and mission specific launch vehicle review requirements as mandated by the Solicitation." (ECF 61-1 at 52.) The solicitation defined "Outstanding" as "[a] thorough and compelling proposal of exceptional merit that fully responds to the objectives of the BAA," and the "[p]roposal contains strengths that far outweigh any weaknesses." (AR Tab 27 at 24477.) The rating does not require perfection; the rating, instead, requires a weighing of strengths and weaknesses.

The SSA provided four paragraphs to support SpaceX's Outstanding rating for its management approach. (AR Tab 77 at 63048-49.) Her first paragraph highlights the attributes

of SpaceX's management approach that she found most compelling, and she notes that these attributes will help reduce SpaceX's schedule risk:

> The positive attribute of SpaceX's management proposal that I found to be the most compelling is its exceedingly thorough and thoughtful management approach and organizational structure within Area of Focus 1, Organization and Management. I concur with the SEP that this represents a significant strength in SpaceX's management approach. In particular, I acknowledge SpaceX's approach to leveraging its deep bench of personnel and expertise, its prior program management experience, and lessons learned from those experiences that SpaceX will bring to bear in its management of the HLS effort. Similarly, I find attractive SpaceX's proposal to replicate and utilize management processes, toolsets, and software that have been effectively employed on other, similar programs and will ensure effective traceability and tracking of progress on the HLS contract. *I concur with the SEP that together, these attributes will help reduce SpaceX's schedule risk and allow for more effective management of its contractual progress.*

(*Id.* (emphasis added).) The SSA continues in this thorough manner for another three paragraphs, concluding that, "[l]ike the SEP, I find that the qualitative attributes of SpaceX's aggregated strengths, including its rating of High for its Base Period Performance, far outweigh the qualitative attributes of its evaluated weaknesses, which were relatively minor." (*Id.* at 63049.)

The SSA's weighing of strengths and weaknesses is consistent with an Outstanding rating, and such determinations are left to the considered and reasoned judgment of the agency, not the Court.

## 2.    Disparate Treatment

An agency acts in an arbitrary and capricious manner when it treats like cases dissimilarly. *See Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 215 (2019) ("It is well established that treating like cases in an unequal fashion is a hallmark of arbitrary decision-making."). The Federal Circuit has established two standards for finding disparate treatment. *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372-73 (Fed. Cir. 2020). Under the first standard, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Id.* at 1372. Under the second standard, "[a] protestor may also prevail by showing that the agency inconsistently applied objective solicitation requirements between it and the other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Id.*

In this case, Blue Origin is challenging disparate technical ratings, so the first standard applies. Blue Origin argues that "NASA disparately and unequally analyzed SpaceX's and Blue

Origin's communication link non-closures." (ECF 61-1 at 58.)  Blue Origin was assigned a Significant Weakness for this issue, and SpaceX received a Weakness.  (AR Tab 59a at 62654; AR Tab 59c at 62793.)  The SEP explained that "[d]uring all portions of the mission, HLS is required to be able to communicate concurrently with Mission Systems, Suits, and the Lunar orbiting crew occupying Orion."  (AR Tab 59c at 62793.)  For Blue Origin to prevail on its disparate-treatment claim, its proposal must have been "'substantively indistinguishable' or nearly identical" to SpaceX's proposal.  *Off. Design Grp.*, 951 F.3d at 1372.

The record indicates that Blue Origin's proposal was substantively distinguishable from SpaceX's proposal.  The proposals were quantitatively different.  In its evaluation of Blue Origin's proposal, the SEP found that "[f]our of the six communications links proposed by the offeror will not close as currently designed, and for a fifth link, it may potentially close, but with very low positive margin."  (AR Tab 59a at 62654.)  In contrast, the SEP found for SpaceX that two of the communications links may not close.  (AR Tab 59c at 62793.)  In addition to the quantitative difference, the SEP provided on this communications topic a multiple-paragraph analysis of each proposal, evaluating each proposal's unique risks to the mission.  (AR Tab 59c at 62793; AR Tab 59c at 62654-55.)

Because the proposals are substantively distinguishable, NASA was entitled to treat each one distinctively on its own strengths and weaknesses, as it in fact did.  Blue Origin's disparate-treatment claim fails.

### 3. Double-Counted Attribute

Blue Origin also argues that "NASA improperly awarded SpaceX multiple credits for the same positive attributes of its proposal." (ECF 61-1 at 59.)  Specifically, Blue Origin alleges that NASA repeatedly credited SpaceX's increased ability to deliver and return an increased science payload, improperly citing this attribute of SpaceX's proposal as a Significant Strength under one factor and as a Strength under a second factor.  (*Id.* at 59-60 (citing AR Tab 59c at 62779-81.)

NASA's evaluation did not improperly double-count the attribute Blue Origin cites. NASA documented the distinct and separate benefits of the attribute in SpaceX's proposal.  The SEP rated SpaceX's proposal a Significant Strength for its proposed capability.  (AR Tab 59c at 62779.)  The SEP based its rating on the combination of 12 features, not just the cargo capacity of SpaceX's proposed vehicle.  (*Id.* at 62780-81.)  The SEP found that SpaceX's "proposal verifiably exceeds the thresholds and/or meets the goals for twelve of NASA's functional performance requirements for its initial demonstration mission," noting that "[t]ogether, [SpaceX's] proposed capabilities appreciably exceed stated requirements in a manner that will be advantageous to NASA . . . ." (*Id.*)

The SSA agreed with the SEP's rating of a Significant Strength for SpaceX's proposed capability, noting "the SEP's independent analysis and verification of these attributes, which lends credence to the feasibility of SpaceX's approach to meeting NASA's performance requirements." (AR Tab 77 at 63044.)  The SSA found "this suite of augmented capabilities and SpaceX's approach to achieving them in a manner that will not comprise its ability to meet

NASA's other requirements to be a particularly noteworthy attribute of SpaceX's design with abundant potential benefit for NASA." (*Id.* at 63044-45.)

The SSA also provided support for the separate Strength SpaceX's proposal received from the SEP for its cargo allocation:

> *I note that the SEP also assigned SpaceX an additional, separate strength within Technical Area of Focus 1 specifically concerning its science payload delivery and return allocations.* It is my assessment that SpaceX received some credit for these augmented capabilities and the flexibilities they create for NASA in the above-discussed significant strength. *However, this separate strength focused on SpaceX's unique design attributes that enable the creative use of available space, including its combination of unpressurized and pressurized cargo areas and its stowage plan, which will make efficient use of available space for science payloads and streamline their deployment and sample returns.* Thus, I find this specific strength to be noteworthy of its own accord, and I agree with the SEP that the assignment of this standalone strength was appropriate.

(*Id.* at 63045 (emphasis added).) The SSA adequately explained that the so-called double-counted positive attribute offered NASA distinct benefits in separate technical areas.

NASA "provided a coherent and reasonable explanation of its exercise of discretion" on this issue. *See Banknote Corp. of Am.*, 365 F.3d at 1351. The SSA directly addressed the issue Blue Origin raises, and she offered a reasonable basis supported by the record for her conclusions. NASA's evaluation of SpaceX's cargo capacity was not irrational.

In sum, Blue Origin has failed to demonstrate that NASA's evaluation of SpaceX's proposal was arbitrary, capricious, or otherwise contrary to law.

## B.     Count 2: Unequal Discussions

Blue Origin alleges that NASA "violated procurement laws and regulations by engaging in improper and unequal discussions where it held discussions with only SpaceX and permitted SpaceX to revise its unawardable and noncompliant proposal." (ECF 1, ¶ 144.) Specifically, Blue Origin argues that NASA violated 10 U.S.C. § 2305(b)(4)(A) and several FAR provisions requiring agencies to act fairly and impartially. Even if this claim were not waived, Blue Origin cannot succeed on the merits.

Section 2305(b)(4)(A) provides that "[t]he head of an agency . . . may award a contract . . . after discussions with the offerors, provided that written or oral discussions have been conducted with all responsible offerors who submit proposals within the competitive range." 10 U.S.C. § 2305(b)(4)(A). The FAR directs contracting officers to "[e]nsure that contractors receive impartial, fair, and equitable treatment," FAR 1.602-2(b), and provides that "[a]ll

contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same," FAR 1.102-2(c)(3). *See also* FAR 1.102 ("The Federal Acquisition System will . . . [c]onduct business with integrity, fairness, and openness."). "[T]he basic rule of fair treatment of all offerors, FAR 1.102-2(c) applies [to BAAs] even though it is not mentioned in FAR 35.016." Ralph Nash & John Cibinic, 19 Nash & Cibinic Rep. ¶ 24 (2005) ("*Nash & Cibinic*").

To determine whether an agency acted improperly under a BAA, the analysis must begin with the terms of the solicitation. BAAs are governed by FAR 35.016, which provides that "[p]roposals received as a result of the BAA shall be evaluated in accordance with evaluation criteria specified therein . . . ." FAR 35.016; *see also AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 374 (2009) ("It is a fundamental tenet of procurement law that proposals must be evaluated in accordance with the terms of the solicitation."); *WaveLink, Inc.*, 154 Fed. Cl. at 271 (citing *AshBritt*, 87 Fed. Cl. at 374).

Under the express terms of the solicitation, NASA reserved "the right to conduct post-selection negotiations or discussions if the Contracting Officer later determines them to be necessary." (AR Tab 27 at 24433.) The solicitation further provided the SSA with the authority to "make initial, non-binding selections of an Offeror or Offerors for the purpose of having the Contracting Officer engage in post-selection negotiations with *one or more Offerors* as defined in [the Option A] solicitation." (*Id.* at 24480 (emphasis added).) NASA also reserved "the right to negotiate any aspect of an Offeror's milestone payment amounts, schedule, and/or acceptance criteria prior to award of Option A." (*Id.* at 24467.)

The SSA made an initial, non-binding selection of *one offeror*, SpaceX, for award. (AR Tab 64.) The contracting officer then negotiated with SpaceX regarding the prices of CLINs, the payment phasing, and the FRR requirement. (AR Tab 63.) In short, NASA followed the procedure for post-selection negotiations explicitly set out in the solicitation when it conducted post-selection negotiations with only SpaceX and allowed SpaceX to revise its proposal.

This court recently addressed a similar dispute in which a protestor challenged an agency's characterization of certain exchanges the agency had with other offerors. *WaveLink, Inc.*, 154 Fed. Cl. at 269-72. Although the protestor argued that the exchanges were discussions, Judge Solomson held that "an express provision in the RFP controls and permitted the Agency's approach . . . ." *Id.* at 271. In language that was "clear and unambiguous," the RFP defined the exchanges at issue as clarifications, not discussions.[7] *Id.* Because "the Agency followed the RFP's terms regarding the characterization of the communication, [the exchange] was not a discussion." *Id.*

The solicitation in this case, like the RFP in *WaveLink*, differentiated forms of exchanges between the agency and offerors—the difference is timing. "Post-selection negotiations" are

---

[7] Judge Solomson also held in *WaveLink* that, if the protestor would have challenged the RFP's provision, such a challenge would be untimely, and *Blue & Gold Fleet* would require dismissal under RCFC 12(b)(6). *WaveLink, Inc.*, 154 Fed. Cl. at 271 n.21.

defined in the solicitation as "exchanges with *Offerors who have been selected for potential contract award* that result in the Contracting Officer inviting the Offeror to revise only those specific portions of its proposal that have been identified by the Contracting Officer as open to revision." (AR Tab 27 at 24434 (emphasis added).) "Discussions" are defined as "exchanges with *Offerors that occur after receipt of proposals but before selection* that result in the Contracting Officer inviting the Offeror to revise only those specific portions of its proposal that have been identified by the Contracting Officer as open to revision." (*Id.* (emphasis added).)

The solicitation's definitions of "post-selection negotiations" and "discussions" are clear and unambiguous. NASA followed the solicitation's terms regarding the characterization of the exchange as a post-selection negotiation with SpaceX. Accordingly, NASA did not conduct discussions, and 10 U.S.C. § 2305(b)(4)(A)'s provision governing discussions does not apply.

The SSA's initial selection decision was not arbitrary and capricious; she explained her rationale for her selection of SpaceX. (AR Tab 62.) After reviewing SpaceX's SEP report and receiving the SEP's briefings regarding its evaluation results for SpaceX's proposal, the SSA determined "that it is in the Agency's best interests to conditionally select SpaceX's proposal for the purposes of engaging in limited, post-selection price negotiations with this offeror." (*Id.* at 62883.) As a basis for that decision, she described the features of SpaceX's proposal significant to her reasoning: "In particular, I concur with the SEP's conclusions that SpaceX offered a uniquely meritorious proposal with notable qualitative attributes, both in terms of its technical approach and its management approach. Furthermore, SpaceX's proposal provides abundant value to NASA at the price it proposed." (*Id.*) She also noted that her selection was non-final. (*Id.*)

The SSA's explanation provides the key to the fairness question. The FAR provides that "[a]ll contractors and prospective contractors shall be treated fairly and impartially *but need not be treated the same.*" FAR 1.102-2(c)(3) (emphasis added). SpaceX was the highest-rated and lowest-priced offeror. As the SSA noted in her Source Selection Statement, she did not conclude that Blue Origin's proposal "present[ed] a good value to the Government." (AR Tab 77 at 63056-57 n.1.) In other words, Blue Origin and SpaceX were not similarly situated. *See A-T Sols., Inc. v. United States*, 122 Fed. Cl. 170, 183 (2015) ("[O]fferors who are not similarly situated may be treated differently."); *Lockheed Martin Corp. v. United States*, 124 Fed. Cl. 709, 722 (2016) ("To the extent proposals differ, the government may rationally take different action regarding different proposals."). The Court finds that the SSA's initial selection of only SpaceX to enter negotiations was rational based on the differences between proposals.

In sum, NASA followed the terms of the solicitation, explained its reasoning for selecting SpaceX for negotiations, and treated offerors fairly. Blue Origin has not shown that NASA acted improperly by holding post-selection negotiations with only SpaceX and by allowing SpaceX to revise its proposal during negotiations.

## C.    Count 3: Failure to Amend the Solicitation

In its third claim, Blue Origin alleges that NASA failed to amend the Option A solicitation upon a change in requirements, *i.e.*, a change in the intended number of awards and a

change in review requirements.  (ECF 1, ¶¶ 152-62.)  Even assuming this claim were not waived, Blue Origin cannot succeed on the merits.

In its complaint, Blue Origin cites FAR 15.206(a) as establishing the "axiomatic and . . . fundamental procurement principle" that, when the government's requirements change, agencies must amend their solicitations and allow offerors to update their proposals.  (*Id.* ¶ 153.)  FAR 15.206(a) provides that "[w]hen, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation."  FAR 15.206(a).

As the government and SpaceX point out, however, NASA solicited HLS Option A proposals not as competitive proposals subject to FAR part 15, but "as an 'other competitive procedure' in accordance with FAR 6.102(d)(2) and FAR 35.016 (as deviated)."  (*See* AR Tab 27 at 24473.)  Neither provision of the FAR on which the solicitation is based incorporates FAR part 15.  *See* FAR 6.102(d)(2); FAR 35.016.  Accordingly, there is no requirement in the FAR or the solicitation that NASA's conduct here must adhere to FAR 15.206(a), and Blue Origin has pointed to no other source of law that imposes the mandates of FAR part 15 on NASA's consideration of the offers to this solicitation.[8]  Nonetheless, as Professors Nash and Cibinic have noted, "the basic source selection rules when BAAs are used are similar to those for competitive negotiations in FAR Part 15."  *Nash & Cibinic*.  Here, NASA's solicitation anticipated a funding limitation and provided discretion to negotiate acceptance criteria.  NASA complied with the terms of the solicitation and, thus, had no legal obligation to amend its proposal under FAR 15.206(a).  *See Ocean Ships, Inc. v. United States*, 115 Fed. Cl. 577, 590-91 (2014) (finding that FAR 15.206(a) was not triggered by agreements to raise wages because the RFP expressly identified the potential for a wage increase).

In Blue Origin's response, perhaps recognizing that FAR 15.206(a) does not support its claim, Blue Origin expands the grounds of its failure-to-amend argument.  (ECF 69 at 30.)  In addition to asserting NASA was required to amend its Option A solicitation pursuant to FAR 15.206(a), Blue Origin contends that the principles of fairness and impartiality established by the FAR require NASA to amend its solicitation to reflect changed requirements.  (*Id.*)  *See* FAR 1.102-2(c)(3) ("[a]ll contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same"); FAR 1.602-2(b) ("Contracting Officers shall . . . [e]nsure that contractors receive impartial, fair, and equitable treatment.").

---

[8] The GAO has explained that, "[l]ike Subpart 36.6 and Subpart 8.4 procurements, FAR §6.102(d) carves out BAA procurements from those conducted using 'competitive proposals' and defines them as 'other competitive procedures.' . . . BAA procurements are not conducted under FAR Part 15; rather, they are conducted using procedures established by FAR §35.016." *Millennium Space Sys., Inc.*, B-406771, 2012 CPD ¶ 237, 2012 WL 3610072, at *5 (Comp. Gen. Aug. 17, 2012).

Neither the FAR's fairness provisions nor FAR 15.206, if fully applicable, support Blue Origin's claim because Blue Origin has failed to demonstrate that NASA's requirements for the HLS Option A solicitation changed during the procurement process.

Blue Origin asserts that NASA acted improperly when it did not notify all offerors of its "change in requirements" based on the allocated HLS program funds. (ECF 61-1 at 61-62.) To support its argument that agencies are obligated "to advise offerors of . . . changed conditions due to unavailability of funds," Blue Origin relies heavily on the GAO's decision in *Joint Action in Community Service, Inc.* (*Id.* at 62 (underline omitted).) In *Joint Action*, the GAO found that the government had acted improperly when it reopened negotiations with only one offeror "and negotiated [a] necessary price reduction to meet available funding limits." *Joint Action in Community Service, Inc.*, B-214564, 1984 CPD ¶ 228 (Comp. Gen. Aug. 27, 1984), *aff'd but relief modified*, B-214564.2, 1985 CPD ¶ 13 (Comp. Gen. Jan. 3, 1985). The GAO found that, if the protestor in *Joint Action* had been given the same "opportunity to negotiate a price reduction," the protestor "could have substantially reduced the difference between the two offers" and stood a substantial chance of award. *Id.*

Blue Origin argues that NASA's "action here . . . mirrors that in *Joint Action*" because "the substantial change in requirements was the level of available funding and the restructuring of the awardee's proposal to come within the level of available funding." (ECF 61-1 at 63 (underline omitted).) In making this comparison, however, Blue Origin ignores a crucial distinction; the GAO found that the government had enabled the awardee's proposal to fall within the amount of available funding by "alter[ing] the RFP requirements by substituting [Government Furnished Property] for what was previously contractor-furnished property." B-214564, 1984 CPD ¶ 228. It was this alteration that constituted improper government action. *Id.*

The change in requirements in *Joint Action* was not the level of available funding, as Blue Origin argues; rather, the government's stated requirements for furnished property changed to accommodate the funding allocated. *Id.* Here, NASA's FY 2021 funding allocation for the HLS program caused no comparable change to the BAA requirements.[9]

The FY 2021 funding itself does not constitute a change to NASA requirements. As the Court previously noted, the HLS Option A solicitation did not state the amount of funding

_____

[9] The GAO's holding in *Joint Action* is also inapplicable to the present case because in *Joint Action* the proposals of both the protestor and the awardee were "substantially equal on technical merit," and the awardee's evaluated cost was only 17 percent lower than the protestor's evaluated cost. B-214564, 1984 CPD ¶ 228. Based on the substantial technical balance between the proposals and the fact that the protestor was within the competitive range, the GAO found that the protestor was prejudiced when the agency improperly negotiated a price reduction only with the awardee. *Id.* Here, Blue Origin's proposal was rated lower than SpaceX's on management quality and was more than twice the price of SpaceX's proposal. Accordingly, these additional factors that guided the GAO to find in the protestor's favor in *Joint Action* are absent here.

NASA anticipated or considered necessary to fund Option A contract awards.  (*See* AR Tab 27 at 24481.)  The difference between the amount Congress appropriated to the HLS program and the amount requested by NASA does not imply a change in NASA's HLS requirements.  In fact, NASA explicitly provided for this type of funding situation by conditioning award of any HLS contracts "upon the availability of appropriated funds from which payments can be made and the receipt of proposals that NASA determines are acceptable."  (*Id.*)  Accordingly, Blue Origin's argument that this difference in funding constituted a change in requirements fails in the face of the express language of the solicitation.

NASA also did not change its review requirements.  The solicitation reserved to NASA "the right to negotiate any aspect of an Offeror's milestone payment amounts, schedule, and/or acceptance criteria prior to award of Option A."  (AR Tab 27 at 24467.)  NASA negotiated its FRR requirement with SpaceX (AR Tab 63), and, as the Court found above, NASA acted within its discretion regarding the other reviews.

The requirements simply did not change, so NASA did not need to amend the solicitation.  NASA anticipated that the HLS Option A contracts would be subject to funding limitations based on the amount appropriated to the HLS program.  NASA thus structured its solicitation to make all awards contingent on funding and, in this highly technical context, reserved for itself the discretion to negotiate features of offerors' proposals.  Blue Origin has failed to demonstrate that NASA acted improperly by not amending its solicitation.

### D.   Count 5: Breach of Implied-in-Fact Contract

Blue Origin's final claim alleges that NASA "breached the implied contract to consider all bids fairly and honestly by conducting the procurement in an arbitrary, capricious, and irrational manner."  (ECF 1, ¶ 171.)  Blue Origin reasserts its allegations from its other claims and adds an allegation that NASA improperly favored SpaceX's proposal.  (*Id.* ¶¶ 172-74.)

The Federal Circuit in *Safeguard Base Operations* recently held that a claim by a protestor for a breach of implied-in-fact contract in the procurement context falls within the bid-protest jurisdiction of this court under 28 U.S.C. § 1491(b)(1).  989 F.3d at 1342-43.  Courts review these breach-of-contract claims under the APA's standard, as courts do for any other § 1491(b)(1) claim.  *See id.* at 1332, 1342.  *Safeguard Base Operations* did not address, however, how these claims differ from other procurement-related claims that a protestor may allege in a bid protest.

In this case, the Court need not conduct a separate analysis.  At oral argument, Blue Origin argued that, even if the Court rejected all its other claims, pieces of each claim in combination could support its breach-of-contract claim.  A case like the one Blue Origin attempts to present might exist, but it is not this one.  Here the Court has found no portion of NASA's evaluation to have been arbitrary and capricious; the sum of Blue Origin's claims does *not* yield more than the sum of its parts.

Although Blue Origin has not alleged bad faith, its claim of favoritism implies bad faith through innuendo.  Blue Origin has not supported such a claim, has presented no facts in the

record to sustain the claim, and has not come close to meeting the heightened burden of proof that the claim requires. *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002) (adopting the "clear and convincing" burden of proof to overcome the presumption of the government's good faith).

Blue Origin has not established that NASA breached its implied-in-fact contract of good faith and fair dealing.

### E.   Failure to Demonstrate Prejudice

Even if the Court had found on the merits that NASA had erred, Blue Origin could not demonstrate prejudice on the merits. As in the standing stage of analysis, "[t]o establish prejudicial error, a protestor must show that but for that error, the protestor had a substantial chance of receiving a contract award." *Off. Design Grp.*, 951 F.3d at 1373-74. The Federal Circuit has held that "[d]e minimis errors in the procurement process do not justify relief." *Id.* at 1374.

Blue Origin cannot show prejudice for the same reasons elaborated in the standing analysis. Blue Origin's proposal was priced at more than [***] times NASA's FY 2021 budget for the Option A contract, Blue Origin could not have benefited from waived reviews for supporting spacecraft because it did not propose any, and its proposal was unawardable without discretionary negotiations. As discussed above, the SSA reasonably exercised her discretion not to engage in those negotiations.

## VI.   CONCLUSION

In summary, the Court has found that Blue Origin does not have standing, several of its objections are waived, and, in the alternative, it loses on the merits. First, Blue Origin does not have standing because it was not prejudiced by the alleged errors. In other words, Blue Origin did not have a substantial chance of award but for the alleged evaluation errors. Second, by not objecting earlier, Blue Origin has waived the objections regarding FRRs and the DCR in Count 1 and its objections in Counts 2 and 3 in their entirety. Finally, Blue Origin has not established that NASA's evaluation of SpaceX's proposal or its conduct during the procurement was arbitrary, capricious, or otherwise contrary to law.

Because Blue Origin has not succeeded on the merits, it has failed to satisfy the standards for receiving injunctive relief. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004) (requiring success on the merits as the first consideration in deciding whether to issue a permanent injunction).

For the above-stated reasons, Blue Origin's complaint is dismissed, and the Court rules on the parties' motions as follows:

- The government's motion to dismiss (ECF 60) under RCFC 12(b)(1) is granted.

- The government's motion for judgment on the administrative record (ECF 60) is granted.

- SpaceX's motion for judgment on the administrative record (ECF 62) is granted.

- Blue Origin's motion for judgment on the administrative record (ECF 61) is denied.

The Court will issue an order in accordance with this memorandum opinion.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**

47