IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

21-1695C
(Judge Richard A. Hertling)

BLUE ORIGIN FEDERATION LLC,
Plaintiff,

v.

THE UNITED STATES,
Defendant,

and

SPACE EXPLORATION TECHNOLOGIES CORP.,
Defendant-Intervenor.

## DEFENDANT'S COMBINED MOTION TO DISMISS AND CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

DOUGLAS K. MICKLE
Assistant Director

OF COUNSEL:

ALLISON M. GENCO
BRIAN M. STANFORD
Senior Attorney Advisors
NASA Office of the General Counsel

ANTHONY F. SCHIAVETTI
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7572
Fax: (202) 305-1571
anthony.f.schiavetti@usdoj.gov

October 1, 2021

Attorneys for Defendant

## TABLE OF CONTENTS

QUESTIONS PRESENTED..................................................................................................3

STATEMENT OF THE CASE.............................................................................................4

    I.     Statement Of Facts ..............................................................................................4

          A.  Procurement Background.................................................................................4

          B.  The Solicitation ...............................................................................................6

               1.   Structure Of The Procurement ...........................................................6

               2.   Definition Of Terms ............................................................................8

               3.   Evaluation Factors And Ratings .........................................................9

               4.   Discussions And Negotiations ...........................................................10

               5.   Statement Of Work .............................................................................11

           C.  Source Selection And Award To SpaceX..........................................................14

                1.   Proposals And Evaluation...................................................................14

                2.   Limited Available Funding And Selection Of SpaceX For Negotiations ........................................................................................18

                3.   Post-Selection Negotiations And Award .........................................20

    II.    Procedural History ...........................................................................................25

ARGUMENT ......................................................................................................................30

    I.     Legal Standards.................................................................................................30

          A.  Standard Of Review For A Motion To Dismiss For Lack Of Jurisdiction, And Standing In A Procurement Challenge....................................30

          B.  Standard Of Review For A Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted, And The *Blue & Gold Fleet* Waiver Rule ...................................................................................32

          C.  Standard Of Review For A Motion For Judgment On The Administrative Record And Standard For Procurement Challenges .............................................35

i

II.    The Court Should Dismiss Blue Origin's Complaint Because It Has Not
       Established Standing ........................................................................................38

       A.  Blue Origin's Proposed Price So Far Exceeded Available Funding
           And SpaceX's Pricing That It Cannot Show A Substantial Chance
           Of Award ....................................................................................................39

       B.  Even If NASA Had Waived FRRs Or Other Milestone Reviews,
           Blue Origin Cannot Establish That It Would Have Had A Substantial
           Chance Of Award In Light Of Such A Waiver.........................................43

       C.  Even If NASA Had Held Discussions Or Amended The Solicitation,
           Blue Origin Cannot Establish That It Would Have Had A Substantial
           Chance Of Award .......................................................................................46

       D.  If Blue Origin's Interpretation Of What Constitutes A Deficiency
           Were Correct, Blue Origin Would Have Been Ineligible For Award...................47

III.   The Court Should Dismiss Court Two And Other Allegations In Blue
       Origin's Complaint Because Blue Origin Has Waived Them ....................................49

IV.    The Court Should Grant Judgment On The Administrative Record To
       The United States................................................................................................51

       A.  NASA Did Not Waive A Solicitation Requirement For FRRs Or Other
           Milestone Reviews For SpaceX.................................................................52

       B.  NASA Was Not Required To Hold Discussions With Blue Origin,
           And Its Exchanges With SpaceX Were Proper In Accordance With
           The Solicitation ..........................................................................................63

       C.  NASA Had No Obligation To Amend The Solicitation, And Its Decision
           Not To Do So Was Rational .......................................................................67

       D.  NASA Evaluated SpaceX's Proposal In Accordance With The
           Solicitation .................................................................................................71

       E.  NASA Did Not Breach The Implied Covenant Of Good Faith And
           Fair Dealing ...............................................................................................73

V.     Blue Origin Has Failed To Establish That It Is Entitled To Permanent
       Injunctive Relief.................................................................................................74

CONCLUSION.................................................................................................................77

# TABLE OF AUTHORITIES

### Cases

*Microcosm, Inc.,*
  B-277326, *et al.,* 97-2 CPD ¶ 133 (Comp. Gen. Sept. 30, 1997) ............................................ 40

*Advanced Concepts Enterprises, Inc. v. United States,*
  142 Fed. Cl. 187 (2019) ................................................................................. 32

*Advanced Data Concepts v. United States,*
  216 F.3d 1054 (Fed. Cir. 2000) ..................................................................... 37

*Allied Tech. Grp., Inc. v. United States,*
  649 F.3d 1320 (Fed. Cir. 2011) ..................................................................... 65

*Am. Fed'n of Gov't Emps., AFL-CIO v. United States,*
  258 F.3d 1294 (Fed. Cir. 2001) ..................................................................... 31

*Argencord Mach. & Equip., Inc. v. United States,*
  68 Fed. Cl. 167 (2005) .................................................................................. 34

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................... 33

*Axiom Res. Mgmt., Inc. v. United States,*
  564 F.3d 1374 (2009) ................................................................................... 57

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,*
  462 U.S. 87 (1983) ....................................................................................... 59

*Banknote Corp. of Am. v. United States,*
  56 Fed. Cl. 377 (2003) ........................................................................... 59, 62

*Banknote Corp. of Am. v. United States,*
  365 F.3d 1345 (Fed. Cir. 2004) ............................................................... 53, 58

*Bannum, Inc. v. United States,*
  404 F.3d 1346 (Fed. Cir. 2005) ................................................................*passim*

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................... 33

*Blue & Gold Fleet, L.P. v. United States,*
  492 F.3d 1308 (Fed. Cir. 2007) ...............................................................*passim*

██████████████████████████████

*Briscoe v. LaHue*,
    663 F.2d 713 (7th Cir. 1981) ................................................. 30

*Brocade Commc'ns Sys., Inc. v. United States*,
    120 Fed. Cl. 73 (2015) ........................................................ 30

*Bromley Contracting Co. v. United States*,
    15 Cl. Ct. 100 (1988) ......................................................... 37

*CACI, Inc. – Federal v. United States*,
    719 F.2d 1567 (Fed. Cir. 1983) ............................................ 74

*Camp v. Pitts*,
    411 U.S. 138 (1973) ........................................................... 36

*CCL Serv. Corp. v. United States*,
    48 Fed. Cl. 113 (2000) ....................................................... 36

*Chenega Healthcare Servs., LLC v. United States*,
    138 Fed. Cl. 644 (2018) ..................................................... 65

*Cincom Sys., Inc. v. United States*,
    37 Fed. Cl. 663 (1997) ....................................................... 37

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................... 37

*CliniComp Int'l, Inc. v. United States*,
    904 F.3d 1353 (Fed. Cir. 2018) ...................................... 31, 32

*COMINT Sys. Corp. v. United States*,
    700 F.3d 1377 (Fed. Cir. 2012) ............................. 35, 51, 68

*Davis v. Federal Election Comm'n*,
    554 U.S. 724 (2008) ........................................................... 32

*Diaz v. United States*,
    853 F.3d 1355 (Fed. Cir. 2017) ............................. 30, 31, 32

*Digitalis Educ. Sols., Inc. v. United States*,
    97 Fed. Cl. 89 (2011) ......................................................... 63

*Digitalis Educ. Sols., Inc. v. United States*,
    664 F.3d 1380 (Fed. Cir. 2012) ...................................... 31, 63

*Impresa Construzioni Geom. Domenico Garufi v. United States,*
   238 F.3d 1324 (Fed. Cir. 2001) ............................................................ 37

*Dyck v. Albertelli Law,*
   98 Fed. Cl. 624 (2011) ......................................................................... 30

*Elec. Data Sys., LLC v. United States,*
   93 Fed. Cl. 416 (2010) .................................................................... 41, 70

*E.W. Bliss Co. v. United States,*
   77 F.3d 445 (Fed. Cir. 1996) ...................................................... 37, 58, 59

*Florida Power & Light v. Lorion,*
   470 U.S. 729 (1985) ............................................................................. 36

*Gen. Dynamics Mission Sys., Inc. v. United States,*
   137 Fed. Cl. 493 (2018) ........................................................................ 58

*Glob. Aerospace Corp.,*
   B-414514, 2017 CPD ¶ 198 (Comp. Gen. July 3, 2017) ........................ 40

*Grunley Walsh Int'l LLC v. United States,*
   78 Fed. Cl. 35 (2007) ........................................................................... 56

*Holley v. United States,*
   124 F.3d 1462 (Fed. Cir. 1997) ............................................................. 30

*Indium Corp. of Am. v. Semi-Alloys, Inc.,*
   781 F.2d 879 (Fed. Cir. 1985) ............................................................... 30

*Info. Tech & Apps. Corp. v. United States,*
   316 F.3d 1312 (Fed. Cir. 2003) .................................................. 29, 31, 32

*Inserso Corp. v. United States,*
   961 F.3d 1343 (Fed. Cir. 2020) ...................................................... 32, 35

*Kiewit Infrastructure W. Co. v. United States,*
   147 Fed. Cl. 700 (2020) .............................................................. 35, 36, 37

*Kinemetrics, Inc. v. United States,*
   No. 21-1626, 2021 WL 4237169 (Fed. Cl. Sept. 10, 2021) ..................... 40

*Labatt Food Serv., Inc. v. United States,*
   577 F.3d 1375 (Fed. Cir. 2009) ...................................................... 31, 32

*Lermer Germany GmbH v. Lermer Corp.,*
   94 F.3d 1575 (Fed. Cir. 1996) ............................................................. 74

*Lindsay v. United States,*
   295 F.3d 1252 (Fed. Cir. 2002) ........................................................... 33

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ................................................................... 41, 47

*M.W. Kellogg Co., v. United States,*
   10 Cl. Ct. 17 (1986) ........................................................................ 37

*Metcalf Constr. Co. v. United States,*
   53 Fed. Cl. 617  (2002) .................................................................... 56

*Metro. Interpreters & Translators, Inc. v. United States,*
   145 Fed. Cl. 495 (2019) .......................................................... 59, 71, 73

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ........................................................................ 77

*Myers Investigative & Sec. Servs. v. United States,*
   275 F.3d 1366 (Fed. Cir. 2002) ........................................................... 32

*OAO Corp. v. United States,*
   49 Fed. Cl. 478 (2001) .................................................................... 74

*Per Aarsleff A/S v. United States,*
   829 F.3d 1303 (Fed. Cir. 2016) ........................................................... 33

*PGBA, LLC v. United States,*
   389 F.3d 1219 (Fed. Cir. 2004) ........................................................... 74

*R & W Flammann GmbH v. United States,*
   339 F.3d 1320 (Fed. Cir. 2003) ........................................................... 58

*Res Rei Dev., Inc. v. United States,*
   126 Fed. Cl. 535 (2016) ................................................................... 73

*Reynolds v. Army & Air Force Exch. Serv.,*
   846 F.2d 746 (Fed. Cir. 1988) ............................................................ 30

*Rhinocorps Ltd. Co. v. United States,*
   87 Fed. Cl. 261 (2009) .................................................................... 57

*Seaborn Health Care, Inc. v. United States,*
   101 Fed. Cl. 42 (2011) ................................................................. 38

*SEKRI, Inc. v. United States,*
   152 Fed. Cl. 742 (2021) ........................................................ *passim*

*Tech Sys., Inc. v. United States,*
   50 Fed. Cl. 216 (2001) ................................................................. 36

*Weeks Marine, Inc. v. United States,*
   575 F.3d 1352 (Fed. Cir. 2009)................................................... 30

## Statutes

5 U.S.C. § 702................................................................................. 37

5 U.S.C. § 706................................................................................. 37

28 U.S.C. § 1491(b) .............................................................. *passim*

## Regulations

FAR 6.102(d)(2) ............................................................................. 50

FAR 15.206(a) ................................................................................. 67

FAR 35.002...................................................................................... 5

FAR 35.016............................................................................. *passim*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| BLUE ORIGIN FEDERATION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | No. 21-1695C |
| | ) | (Judge Richard A. Hertling) |
| Defendant, | ) | |
| | | |
| and | | |
| | | |
| SPACE EXPLORATION TECHNOLOGIES | ) | |
| CORP., | | |
| | | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S COMBINED MOTION TO DISMISS AND**
**CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims

(RCFC), defendant, the United States, respectfully requests that the Court dismiss the complaint

filed by plaintiff, Blue Origin Federation, LLC (Blue Origin), because Blue Origin lacks standing

to pursue its complaint.  Moreover, pursuant to RCFC 12(b)(6), the United States respectfully

requests that the Court dismiss portions of Blue Origin's complaint because Blue Origin has

waived the allegations contained therein.  In the event that any allegations in the complaint are

not dismissed pursuant to RCFC 12(b)(1) or 12(b)(6), the United States respectfully requests

that, pursuant to RCFC 52.1, the Court deny Blue Origin's motion for judgment on the

administrative record and grant judgment on the administrative record in favor of the United

States.

Blue Origin seeks to have this Court permanently enjoin the National Aeronautics and

Space Administration's (NASA's) award of a contract to defendant-intervenor, Space

███████████████████████████████

Exploration Technologies Corp. (SpaceX), for the development of a system to land humans on the surface of the Moon for the first time in a half-century.  NASA's research and development procurement was not a competition between offerors.  Instead, following from an earlier procurement resulting in award to three offerors including Blue Origin and SpaceX, NASA sought to make award to up to two offerors, to the extent that any such award was in the best interests of the agency and the American space mission, in light of the quality of the solutions proposed, their price tag, and the funding available.  In its expert judgment, NASA reasonably determined that, given these factors, award of a single contract to SpaceX was justified – SpaceX's proposal was the most highly rated and was a fraction of the price of the other proposals, and limited funding precluded multiple awards.

In its challenge to this decision, Blue Origin is unable to alter the fundamental facts that ultimately led NASA to decide that the award of a contract to Blue Origin was not warranted: 1) its proposal, though solid, was not as good as that proposed by SpaceX; and 2) its price, which is more than double the price proposed by SpaceX and called for payment of more than triple the funding NASA had available in the next fiscal year, was dramatically too high.  Rather than addressing its own failure to convince NASA of the merits of an award in its favor, however, Blue Origin seeks to scuttle NASA's award to SpaceX by advancing a strained, incorrect interpretation of solicitation terms that had no impact on Blue Origin's own proposal.  Blue Origin stretches this semantic sortie into neighboring solicitation territory as well, in an attempt to transform what would, even if Blue Origin's erroneous interpretation were correct, amount to at most a minor management flaw into an important concern calling SpaceX's award into question.  But NASA's expert evaluators – literal rocket scientists – diagnosed and evaluated the

2

concern. They assigned a weakness to SpaceX due to the increased risk it presented, mitigated that risk through negotiations conducted in accordance with the solicitation, and rationally determined that award to SpaceX was in NASA's best interest. The Court should decline Blue Origin's invitation to second guess NASA's considered judgments, setting back America's space exploration efforts in the process.

Moreover, even if Blue Origin's interpretation of the solicitation were correct, it cannot demonstrate that, had NASA operated under that interpretation, Blue Origin would have had a substantial chance of securing a contract award. Its proposal was not impacted by the issue on which it focuses, and its attempt to allege that it would have proposed an entirely different solution rings hollow. This claim, advanced here for the first time, is directly contradicted by the record, Blue Origin's public statements, and by its own complaint. Because Blue Origin cannot show that it was prejudiced even if it could establish that NASA erred, Blue Origin lacks standing to pursue its protest and the Court should dismiss it. The Court should likewise dismiss a number of challenges Blue Origin belatedly brings to the clear terms of the solicitation, under which it uncomplainingly submitted its proposal, only to try to dispute the rules after the procurement is resolved and it was not selected. Blue Origin's claims, which it lacks standing to bring in the first place and has largely waived, have no merit. Accordingly, the Court should dismiss or deny this protest in its entirety.

## QUESTIONS PRESENTED

1. Whether Blue Origin has standing to pursue the allegations in its complaint when, even taking each alleged procurement error to be true for the purposes of the standing analysis, Blue Origin cannot demonstrate that it was prejudiced.

3

███████████████████████████████

2.      Whether allegations contained in Count Two and elsewhere in Blue Origin's complaint are barred by the waiver rule established by the Federal Circuit in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), when they bring challenges to the terms of the solicitation after the deadline for receipt of proposals had passed, and even well after NASA made the decision to award a contract pursuant to its Option A procurement to SpaceX.

3.      Whether the United States is entitled to judgment on the administrative record when Blue Origin has failed to establish that NASA's decision to award a single Option A contract to SpaceX was arbitrary, capricious, or contrary to law.

4.      Whether Blue Origin has established that it is entitled to permanent injunctive relief when it has failed to show that it should prevail on the merits, that it has suffered irreparable harm, that the balance of harms weighs in its favor, or that the public interest weighs in favor of injunctive relief.

## STATEMENT OF THE CASE

### I.      Statement Of Facts

#### A.      Procurement Background

The procurement at issue in this case is one part of the larger NASA Artemis program, which aims to achieve the ambitious mission to return humans to the surface of the Moon for the first time since the Apollo program's last crewed landing in 1972.  Declaration of Robert D. Cabana, attached, at ¶ 4; NASA's Lunar Exploration Program Overview (September 2020), https://www.nasa.gov/sites/default/files/atoms/files/artemis_plan-20200921.pdf (last visited Oct. 1, 2021) at 9.  A return of human explorers to the Moon will aid in preparing humanity for its next great foray in space exploration – sending humans over 140 million miles to Mars.  *Id.*

Artemis will send a new generation of astronauts to the lunar surface, including the first woman and first person of color to land on the Moon.  AR Tab 77 at 63038.

The Human Landing System (HLS) program is part of an innovative public-private partnership model.  *Id.*  "While the requirements and operations concept for the HLS are specified and managed by NASA, the HLS design, development, test, and evaluation (DDT&E) will be led by the Option A contractor."  *Id.*  Although the contractor takes the lead in design of HLS systems, "NASA will provide significant support and expertise to the contractor, including the use of specialized NASA facilities, hardware, and personnel."  The desired result is "a sustainable commercial transportation system that will enable frequent access to the lunar surface for NASA and other customers."  *Id.*  Even beyond the Moon, "NASA further intends for public and private investments in lunar exploration capabilities to eventually expand to include elements necessary to support prolonged human exploration in order to accomplish increasingly advanced exploration goals, including a human mission to Mars."  *Id.*

NASA solicited for the HLS procurement at issue under Appendix H of the omnibus Broad Agency Announcement (BAA) Number NNH19ZCQ001K, titled Next Space Technologies for Exploration Partnerships -2 (NextSTEP-2).  AR Tab 28 at 33202, 33228.  A BAA is a type of solicitation used in research and development procurements conducted pursuant to Federal Acquisition Regulation (FAR) Part 35.  *Id.* at 33204; *see* FAR 35.002, 35.016.

Appendix H is a two-phase procurement that began with the issuance of a "Base Period" solicitation on September 30, 2019. AR Tab 108a-002, Base Period BAA, at 65667.  NASA designed this first phase to have up to four awardees with contract performance of approximately

████████████████████████████████

ten months.  *Id*. at 65670.  NASA ultimately awarded three Base Period contracts, to Blue

Origin, SpaceX, and Dynetics, Inc.  AR Tab 77 at 63038.  During the Base Period, these

contractors worked with NASA to mature the designs of their unique landers.

Concurrent with Base Period contract performance, on October 30, 2020, NASA solicited

for proposals from the three Base Period contractors for the second phase of Appendix H,

"Option A."  See AR Tab 27 at 24423.  This solicitation indicated that NASA would award

Option A contracts to up to two of the Base Period contractors, with contract performance of

approximately four years.  The purpose of the Option A procurement was to further facilitate the

rapid development of one or more landing systems owned and operated by contractors,

culminating in a crewed lunar surface landing demonstration mission near the Moon's South

Pole.  *Id*. at 24426.  NASA issued an amended, conformed Option A solicitation on November

16, 2020, to which all other citations in this brief refer, unless otherwise indicated. AR Tab 27.

### B.    The Solicitation

#### 1.    Structure Of The Procurement

The Option A solicitation was a critical step towards "once again establish[ing] U.S.

preeminence around and on the Moon."  *Id*. at 24427.  In particular, NASA was "focused on

engaging with U.S. Industry partners and will use innovative approaches to combine robotics, a

cislunar presence, and lunar landing capabilities to ultimately return humans to the surface of the

Moon."  *Id*.  Pursuant to the solicitation, "the design, development, test, and evaluation

(DDT&E) of the HLS will be led by one or more contractors."  *Id*. at 24428.

NASA issued the solicitation as a BAA using "other competitive procedures pursuant to

FAR Part 35."  *Id*. at 24473.  The solicitation made clear that "NASA [would] not conduct a

comparative analysis and trade-off amongst proposals." *Id*. The solicitation provided that the Source Selection Authority (SSA) would "consider each proposal on its own individual merits, and will select for award one or more proposals that individually each present value to the Government and that optimize NASA's ability to meet its objectives as set forth in this solicitation." *Id*. at 24480.

Although the solicitation indicated that NASA planned "to award Option A CLINs for up to two of the Base period contractors," *id*. at 24429, the solicitation was clear that "NASA reserves the right to change its HLS acquisition strategy at any time," *id*., and that "NASA reserves the right to select for award multiple, one, or none of the proposals received in response to this Appendix." *Id*. at 24481. It explained that "[t]he overall number of awards will be dependent upon funding availability and evaluation results." *Id*. Indeed, the solicitation expressly stated that, "[c]onsistent with FAR 35.016(e), the primary basis for selecting one or more proposals for award shall be technical, importance to Agency programs, and funds availability." *Id*. at 24475.

Further to the funding limitations, the solicitation warned offerors that "[f]unds are not currently available for this solicitation, but are expected to become available on or before contract award." *Id*. at 24481. It explained that "[t]he Government's obligation to make awards is contingent upon the availability of appropriated funds from which payments can be made and the receipt of proposals that NASA determines are acceptable." *Id*.

The solicitation contemplated the award of a firm fixed-price contract. *Id*. at 24432, 24433. The solicitation also warned offerors that the Government would not make advance

payments, and that "proposals containing an advance payment are ineligible for contract award."

*Id*. at 24479.

## 2.   <u>Definition Of Terms</u>

The solicitation provided definitions for several important terms.  *Id*. at 24430.  It defined

the term "HLS" to mean:

> all objects, vehicles, elements, integrated systems, systems, subsystems, or components thereof that are designed, developed, and utilized by the contractor, its teammates, subcontractors, and suppliers in performance of this contract, and which collectively comprise the contractor's Integrated Lander (or elements thereof), all Supporting Spacecraft, all launch vehicles necessary for launch and delivery of the contractor's Integrated Lander (or elements thereof) and its Supporting Spacecraft, and the contractor's Active-Active docking adapter (AADA) (if required for performance of the contractor's crewed demonstration mission).

*Id*.  It defined "Integrated Lander," or "HLS Integrated Lander," to mean:

> any and all combinations or configurations of the contractor's elements (e.g., the Ascent Element) which are integrated (or, alternatively, a single element achieving the same purpose) at any time when crew are onboard.

*Id*.  Finally, with relevance to this litigation, it defined "Supporting Spacecraft" to mean:

> any contractor spacecraft that is not otherwise the contractor's Integrated Lander (or an element thereof), launch vehicle, or Active-Active docking adapter (if required), but that is otherwise required for the contractor to execute its demonstration mission or any portion thereof in performance of this contract, including, but not limited to, rendezvous, proximity operations, docking and undocking (RPODU), propellant transfer, and orbital maneuvering and transfer.

*Id*.

8

### 3.   **Evaluation Factors And Ratings**

As stated above, the solicitation stated that "[c]onsistent with FAR 35.016(e), the primary basis for selecting one or more proposals for award shall be technical, importance to Agency programs, and funds availability," as delineated through the solicitation's three evaluation factors. *Id*. at 24475. These evaluation factors were Technical Approach, Total Evaluated Price, and Management Approach. *Id*. The factors were listed in descending order of importance to the Government, such that Technical Approach was the most important factor, followed by Total Evaluated Price and, finally, Management Approach, the least important of the three factors. *Id*. The non-price factors, when combined, were significantly more important than price. *Id*. The Technical Approach and Management Approach factors each listed a number of individual areas of focus for the evaluation on those factors. *Id*.

NASA would assign a single adjectival rating for each factor – areas of focus would not receive independent adjectival ratings. *Id*. In assigning overall factor adjectival ratings, areas of focus were considered of approximately equal importance. *Id*. The adjectival ratings to be assigned were as follows: Outstanding, Very Good, Acceptable, Marginal, and Unacceptable. *Id*. at 24477. Each rating was defined in the solicitation. *Id*.

In the evaluation of the areas of focus for the Technical Approach and Management Approach factors, NASA assigned findings, including strengths and weaknesses, as defined in the solicitation. *Id*. at 24476. In exercising its discretion to assign these findings, the solicitation provided that "the Government will consider how an Offeror's proposed approach affects risk, such as technical risk, risk to meeting the Offeror's proposed schedule, the need for increased Government oversight, or the risk of likelihood of unsuccessful contract performance." *Id*.

9

These risk assessments were captured in the following categories of finding, each of which was defined: Significant Strength, Strength, Weakness, Significant Weakness, and Deficiency. *Id*. With particular relevance here, a Weakness was defined as "[a] flaw in the proposal that increases the risk of unsuccessful contract performance," whereas a Deficiency was defined as "[a] material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." *Id*.

The solicitation further provided notice to offerors that "proposals evaluated as having one or more deficiencies are unawardable." *Id*. at 24480. Specifically,

> If the SEP identifies a deficiency within any Offeror's proposal at any time before selection or award, and the SSA concurs with that deficiency, the Government reserves the right to engage in discussions or negotiations with only those Offerors whose proposals have not been identified as having one or more deficiencies.

*Id*.

### 4.   Discussions And Negotiations

The solicitation provided for two main types of exchanges between NASA and offerors that would permit the offeror to revise its proposal in response: discussions and post-selection negotiations. *Id*. at 24434. Discussions were defined as: "exchanges with Offerors that occur after receipt of proposals but before selection that result in the Contracting Officer inviting the Offeror to revise only those specific portions of its proposal that have been identified by the Contracting Officer as open to revision." *Id*. Post-selection negotiations were defined as: "exchanges with Offerors who have been selected for potential contract award that result in the Contracting Officer inviting the Offeror to revise only those specific portions of its proposal that

have been identified by the Contracting Officer as open to revision." *Id*. Proposal revision was also defined, meaning "any change made by the Offeror to its proposal that occurs as a result of discussion or post-selection negotiations in accordance with Section 4.2.2. of this solicitation." *Id*. In three separate sections of the solicitation, NASA warned offerors that it "may evaluate proposals and award contracts without conducting post-selection negotiations or discussions with Offerors" and that, as a consequence, "each Offeror shall submit only one proposal which represents its best approach to meeting the requirements of the solicitation." *Id*. at 24433 (emphasis omitted), 24473, *see also* 24481. NASA expressly reserved the right to conduct discussions or post-selection negotiations if the contracting officer determined them to be necessary. *Id*. at 24473.

### 5.   Statement Of Work

The solicitation included, at Attachment G, an HLS Statement of Work (SOW) that described the work to be performed in the performance of the contract. AR Tab 27e. In a "significant change from how NASA has traditionally worked with industry," the SOW "specif[ied] the minimum NASA HLS requirements[,] allowing the contractor to tailor their design to best address their commercial interests; launch on industry-procured, commercial launch vehicles; utilize . . . commercial practices, standards, specifications, and processes; and utilize a collaborative approach with inline NASA subject matter expertise, as requested by the contractors." *Id*. at 32948.

Among many other topics, the SOW described the milestone reviews for the HLS program, designed "to assess programmatic and technical progress and performance at key decision points in the development and operational lifecycle phases, with the ultimate goal of

certifying the lander for crewed operations to and from the lunar surface and assessing the likelihood of mission success." *Id*. at 32965. Some reviews were to be led by the contractor and observed by NASA, and others were to be led by NASA. *Id*. at 32965-66. Among the NASA-led reviews specified by the statement of work were the Flight Readiness Review (FRR), which "examines tests, demonstrations, analyses, and audits that determine the system's readiness for a safe and successful flight or launch and for subsequent flight operations." *Id*. at 32972. "The FRR also ensures that all flight and ground hardware, software, personnel, and procedures are operationally ready." *Id*. The criteria for a successful FRR include certification that "[t]he flight vehicle, launch vehicle, *and support spacecraft* . . . are ready for flight," indicating an expectation that support spacecraft would be examined as part of an FRR, rather than in a separate FRR. *Id*. (emphasis added). The SOW stated that "[t]he FRR *should* be completed by two (2) weeks before launch of each HLS *element*." *Id*. (emphases added).

Also among the NASA-led reviews was the Design Certification Review (DCR), which "ensures that the qualification and verifications demonstrate design compliance with the functional and performance requirements and human spaceflight certification," and which "*should* be completed at first HLS launch – 9 Months." *Id*. at 32969 (emphasis added).

The SOW defined the terms "shall," "will," "should," and "may." *Id*. at 32949. In contrast with "shall," which it defined to indicate "a requirement, meaning it must be implemented, and its implementation verified," "should" was defined to denote "a statement of best practice or intent," an "[e]xpectation." *Id*.

Moreover, although the SOW did not expressly define the term "HLS Element," it did, mirroring the main solicitation document, define several terms, in such a way that makes clear

12

that "elements" are part of the integrated lander (which may be a single element), and that

"supporting spacecraft" is a term different from, and mutually exclusive with, the integrated

lander and elements thereof:

> **Integrated Lander**: *Any and all combinations of contractor elements (e.g. Ascent Element), including potentially a single element*, which is *integrated at any time crew are onboard.*
>
> **Supporting Spacecraft**: Any contractor spacecraft *that is not otherwise the Contractor's HLS Integrated Lander*, Launch Vehicle, or AADA, but that is otherwise required for the Contractor to execute its demonstration mission or any portion thereof in performance of this contract, including, but not limited to, rendezvous, proximity operations, docking and undocking (RPODU), propellant transfer, and orbital maneuvering and transfer.
>
> . . .
>
> **HLS**: All objects, vehicles, elements, integrated systems, systems, subsystems, or components thereof that are designed, developed, and utilized by the contractor, its teammates, subcontractors, and suppliers in performance of this contract, and *which collectively comprise the contractor's Integrated Lander (or elements thereof), all Supporting Spacecraft, all launch vehicles necessary for launch and delivery of the contractor's Integrated Lander (or elements thereof) and its Supporting Spacecraft*, and the contractor's Active-Active docking adapter (AADA) (if required for performance of the contractor's crewed demonstration mission).

*Id.* at 32948 (italics added, boldface in original).  These definitions further indicate another

important distinction between the integrated lander on one hand and supporting spacecraft on the

other – while the integrated lander transports human crew, supporting spacecraft do not.  *Id.*; *see*

*also* AR Tab 108b55-102a at 104678.

13

████████████████████████████████████████

C.   **Source Selection And Award To SpaceX**

1.   **Proposals And Evaluation**

Blue Origin, Dynetics, and SpaceX each submitted timely proposals in response to the

solicitation by the December 8, 2020 deadline.  AR Tab 77 at 63038.  A full description of each

offeror's proposal is beyond the scope of this motion but, relevant to the issues in this case,

SpaceX proposed a single-element lander, its HLS Starship, while Blue Origin proposed a three-

element solution, with separate elements for ascent, descent, and transfer.  *See, e.g.*, *id*. at 63047,

63051.

SpaceX's concept of operations utilizes its HLS Starship and two types of supporting

spacecraft, it depot and tanker Starships.  AR Tab 34d.55 at 56274.  SpaceX's supporting

spacecraft are launched in advance of its HLS, which is the final launch in SpaceX's proposal.

*Id*.  First, SpaceX's depot Starship is launched into Earth orbit, followed by multiple tanker

launches into Earth orbit.  *Id.*  Each tanker will rendezvous with the depot, filling the depot with

fuel.  When the depot is sufficiently full, the HLS launches.  *Id*.  The depot will then rendezvous

with the HLS in Earth orbit, fueling the HLS.  *Id.*  Once the HLS is sufficiently fueled, the HLS

transfers to lunar orbit.  *Id.*  In lunar orbit, the crew transfers from NASA's Orion spacecraft into

the HLS.  *Id*.  The HLS then begins the crew's descent to the surface of the Moon.  In contrast to

SpaceX's concept of operations, Blue Origin proposed to utilize a three element HLS and no

supporting spacecraft.  AR Tab 32a at 33339-40.

In accordance with the evaluation plan, the Source Evaluation Panel (SEP) evaluated the

three Option A proposals and "produced a report for each offeror containing all of the SEP's

findings, ratings, and other evaluative content."  AR Tab 77 at 63039.  The following table lists

████████████████████████████████████

the overall adjectival ratings assigned to each offeror for Factor 1, Technical Approach, and

Factor 3, Management Approach:

| | Technical Rating (Factor 1) | Management Rating (Factor 3) |
|---|---|---|
| **Blue Origin** | Acceptable | Very Good |
| **Dynetics** | Marginal | Very Good |
| **SpaceX** | Acceptable | Outstanding |

*Id*. at 63044.  For Factor 2, Total Evaluated Price, "SpaceX's Total Evaluated Price of

$2,941,394,557 was the lowest among the offerors by a wide margin."  *Id*.  In stark contrast,

Blue Origin's Total Evaluated Price was nearly $6 billion, and Dynetics's was over $9 billion.

AR Tab 61 at 62856, 62866.

Among the many finding and conclusion the SEP reached, a few merit mention here.  For

the Management Approach Factor, the SEP assigned SpaceX the highest possible rating,

Outstanding.  AR Tab 59c at 62806.  The SEP concluded that SpaceX's Management Approach

was "of exceptional merit" and "fully responsive to the BAA objectives as set forth under this

evaluation factor."  *Id*.

The SEP, however, assigned a weakness to SpaceX in its Management Approach for

"milestone inconsistency with [SpaceX's Integrated Master Schedule (IMS)]."  *Id*. at 62812.

The SEP stated that "[w]hile the offeror's proposed milestones, associated acceptance criteria,

and IMS are internally consistent, they are arguably not consistent with all milestone review

requirements as set forth within and contemplated by the solicitation's Statement of Work

(SOW) and the solicitation's Milestone Acceptance Criteria and Payment Schedule."  *Id*.  The

SEP explained that SpaceX's unique proposed concept of operations, in which the depot and

tanker Starships would be launched well in advance of the crewed single-element HLS Starship, meant that the FRR conducted two weeks prior to the launch of the HLS Starship would necessarily not be able to review whether these supporting spacecraft were ready for flight, as they would have already been launched previously. *Id*. at 62813-14. The SEP acknowledged that, in the unique circumstances presented by SpaceX's concept of operations, it was unclear whether the SOW called for "an FRR milestone (and associated review) to be conducted and achieved for each proposed supporting spacecraft prior to launch and flight operations; or alternatively, whether offerors were required to propose a single FRR covering the full scope of its demonstration mission prior to the launch of any lander element or supporting spacecraft." *Id*. at 62813. The SEP found that SpaceX's proposal was "not in accordance with either interpretation." *Id*.

In assigning the rating of Outstanding for SpaceX's Management Approach, the SEP considered all of its Management findings for SpaceX's proposal, including a weakness the SEP assigned related to SpaceX's FRR approach. *Id*. at 62812. The SOW states that "[t]he FRR should be completed by two (2) weeks before launch of each HLS element." AR Tab 27e at 32972. SpaceX proposed a single element HLS architecture. AR Tab 34d.55 at 56274. Accordingly, SpaceX proposed a single FRR for its single HLS element. Tab 34d.33 at 55430. However, as noted by the SEP, the SOW also listed over a dozen specific acceptance criteria for each FRR, one of which mentions supporting spacecraft: "The flight vehicle, launch vehicle, and support spacecraft (such as propellant storage, propellant transfer, and/or upper stage vehicles that provide transportation capabilities beyond the standard for orbit insertion) are ready for flight." AR Tab 59c at 62813.

16

SpaceX proposed its FRR to occur approximately two weeks before the targeted launch of its single HLS element, but after the launch of its supporting spacecraft. *See generally,* AR Tab34d.46-49. The proposed timing of this FRR meant that NASA would be unable to verify that SpaceX's supporting spacecraft were "ready for flight," per one of the FRR acceptance criteria, as these spacecraft would have already launched prior to the FRR. AR Tab 59c at 62813.

SpaceX proposed to conduct its own FRRs prior to the launch of its supporting spacecraft, and proposed to have NASA involvement in those FRRs, but NASA would not chair these FRRs for supporting spacecraft like it would for the FRR prior to the launch of SpaceX's HLS Starship. AR Tab 108a-117 at 92314, 92332; Tab 108b55-102a at 104678. As a result, the SEP determined that, in its expert judgment, this aspect of SpaceX's proposal warranted a weakness because it found that the timing of SpaceX's proposed FRR "has the effect of lessening NASA's involvement and participation in assessing flight readiness for the offeror's supporting spacecraft prior to launch of such spacecraft. Therefore, this aspect of the offeror's proposal increases risk of unsuccessful performance." *Id.* at 62814.

Blue Origin's proposal was also, like those of the other two offerors, assessed several strengths and weaknesses. Among the weaknesses that the SEP assigned to Blue Origin's proposal were several in which the SEP, as it did with the SpaceX management weakness detailed above, used language indicating that Blue Origin's proposal had fallen short of solicitation requirements. For example, Blue Origin was assigned a weakness for its ██████ ████████, in which the SEP stated that ████████████████████████████████████ ████████████████████████████████████████████████████████████

██████████████████████████████

██████████████████████ AR Tab 59a at 62691.  Rather than assess a deficiency,

however, the SEP concluded that the issue "meaningfully increases the risk that the parties will

need to engage in protracted negotiations for ██████ prior to award and during contract

execution," and that "[t]hese shortfalls constitute a flaw in [Blue Origin's] proposal that increase

the likelihood of unsuccessful contract performance," thus warranting a weakness.  *Id*. at 62692;

*see also id*. at 62647 (regarding Blue Origin's non-compliant fault tolerance in its Ascent

Element's manual control system, assessed as a weakness rather than a deficiency), *id*. at 62654

(regarding Blue Origin's proposal's "fail[ure] to meet . . . three key HLS requirements"

regarding radio frequency communications, assessed as a significant weakness rather than a

deficiency).

In each such similar instance, although the SEP identified solicitation requirements not

met by the proposal, the SEP, in its expert analysis, considered the flaws in the proposal to

constitute a weakness or a significant weakness rather than a deficiency.  That is, these flaws in

Blue Origin's proposal, like the problem presented by SpaceX's original proposed approach to

FRRs, increased the risk of unsuccessful contract performance, but did not constitute a material

failure to meet a Government requirement or increase the risk of unsuccessful performance to an

unacceptable level.

## 2.  Limited Available Funding And Selection Of SpaceX For Negotiations

As explained above, the Option A solicitation stated NASA's preference for making two

awards, but expressly made that preference – and, indeed, any award at all – conditional on the

availability of sufficient funding to support any such award(s).  AR Tab 27 at 24429, 24475,

24480, 24481.  Indeed, at the time that the solicitation was released, no funding had yet been

███████████████████████████████████

appropriated by Congress for the purpose, though NASA expected funding to be appropriated by the time of contract award.  *Id*. at 24481.

For Fiscal Year (FY) 2021, Congress appropriated to NASA significantly less money than had been requested in the budget for the HLS program.[1]  Appropriation of less funding than had been requested was not unusual for NASA, and NASA had planned for different potential funding scenarios.  AR Tab 108b26a at 103671.  The funding available, however, was insufficient to support the award of two Option A contracts.  AR Tab 77 at 63039, 63043; Tab 64 at 62893-94; Tab 108b26a at 103671-74.

Specifically, Blue Origin's proposal requested ███████████ in FY 2021 milestone payments; Dynetics proposed ███████████ in such payments; and SpaceX's initial proposal requested ███████.  AR Tab 108b67a at 105010 (citing AR Tabs 32d.87, 33d.12, 34d.33). Although each proposal exceeded the $345 million that NASA determined was available for FY 2021 Option A milestone payments, SpaceX's proposal exceeded that amount by ███████, while Blue Origin's proposal exceeded it by ███████ and Dynetics's proposal exceeded it by ███████.  *Id*.  NASA concluded that, given the size of the overall contract, the ███████ difference between its available FY 2021 funding and SpaceX's proposed milestone payments

---

[1] NASA requested $3.4 billion for the development of lander systems.  Office of Management and Budget, "Budget of the United States Government, Fiscal Year 2021," available at https://www.govinfo.gov/app/collection/budget/2021 (last visited September 25, 2021), at 101. Congress appropriated $850 million for the HLS program.  AR Tab 108b26a at 103671; 166 Cong. Rec. H7879-01, H7946 (Dec. 21, 2020).  Of this figure, NASA determined that $345 million would be available for Option A contract payments in FY 2021, as the rest was required to fund other commitments, including the Base Period contracts.  AR Tab 108b26a at 103672-73.

was "likely not an insurmountable situation given the flexibilities that NASA had built into the terms of the Option A solicitation."  AR Tab 108b26a at 103673.

Although NASA maintained its "desire to preserve a competitive environment at this stage of the HLS Program," it determined that two Option A awards would not be feasible given the available funding and the prices proposed by the offerors.  AR Tab 77 at 63039.  Because SpaceX's proposal was "both very highly rated from a technical and management perspective and that also had, by a wide margin, the lowest initially-proposed price," the SSA made an initial, conditional selection of SpaceX, enabling the contracting officer to engage in post-selection negotiations with SpaceX.  *Id.*

### 3.   Post-Selection Negotiations And Award

As stated, NASA's selection of SpaceX at this stage of the procurement was "non-final" and conditional, and did not amount to a decision to award an Option A contract to SpaceX.  *Id.*; AR Tab 64 at 62893.  Instead, "selection," in this context, merely enabled NASA to enter into post-selection negotiations with SpaceX.  AR Tab 64 at 62892-94.  Indeed, the selection of SpaceX did not even preclude the possibility of award to another Option A offeror.  *Id.* at 62893-94.  Instead, the SSA made the determination that it was in NASA's best interests, given the available funding and prices proposed by the offerors, to select and enter into post-selection negotiations with the highest rated and lowest priced offeror, SpaceX, then determine, following those negotiations, whether any further negotiations were in NASA's best interests.  *Id.* at 62894.

In designing the Option A solicitation, NASA had consciously expanded its flexibility in post-selection negotiations as compared with those permitted in the Base Period solicitation.  AR Tab108b55-102a at 104673-74; *compare* AR Tab 108a-002 at 65676 *with* Tab 27 at 24434.

Pursuant to the solicitation and at the direction of the SSA, the contracting officer opened post-selection negotiations with SpaceX, requesting that SpaceX make limited proposal revisions to address areas of its proposal that NASA hoped to see improved.  AR Tab 64 at 62894; Tab 63. In its letter to SpaceX opening negotiations, NASA made clear that SpaceX would only be permitted to make proposal revisions to the areas NASA identified as open to revision, which included pricing terms – including, in particular, the phasing of payments in light of funding availability – and the addition of FRRs for supporting spacecraft.  AR Tab 63 at 62886, 62888.

In its negotiations letter to SpaceX, NASA used the common strategy of presenting its negotiating position in the strongest possible terms, anticipating that a compromise would be adopted.  AR Tab 63; Tab 108b55-102a at 104694.  The letter requested that SpaceX revisit its pricing for two different contract line item numbers (CLINs), adjust its payment phasing to accommodate NASA FY 2021 funding limitations, and adjust its proposal to include additional FRRs.  AR Tab 63 at 62888-90.  NASA highlighted the fact that the solicitation called for FRRs to certify that supporting spacecraft were ready for flight (*id.* at 62889, emphasizing solicitation language), which would not be feasible during an FRR conducted after supporting spacecraft had already launched.  *Id.* at 62889-90.  NASA further noted "the unique attributes of [SpaceX's] proposed Supporting Spacecraft concept of operations." *Id.* at 62890.  In light of these and other rationales set forth in its letter, NASA, therefore, requested that SpaceX add additional FRRs to its proposal as follows:

>  (1) A single comprehensive Tanker Starship Supporting Spacecraft FRR no later than two weeks prior to the *first* launch of the Tanker Starship Supporting Spacecraft that will address flight readiness for the entire Tanker Starship Supporting Spacecraft launch campaign; (2) a Depot Starship FRR no later than two weeks prior to the launch of the Depot Starship; and (3) within Attachment 12 only, NASA

> also requests that your firm include potential "delta-FRRs" that
> would be triggered to occur in the event of anomalies, mishaps,
> configuration changes, or other issues directly relevant to flight
> readiness, if and when such issues arise.

*Id*. at 62890.

On April 7, 2021, SpaceX submitted a revised proposal, which adjusted its payment

phasing approach to accord with NASA's available funding and added FRRs for its proposed

HLS depot and tanker Starship campaign flights. *See* AR Tab 68 at 62902-03. Although

SpaceX's payment phasing revisions made award to SpaceX feasible with NASA's available

funds, SpaceX did not reduce its overall pricing. AR Tab 77 at 63039. As such, NASA

determined that, because award to SpaceX would consume essentially all of NASA's available

funds in the coming fiscal year, it would not be in NASA's interest to select one or more of the

additional Option A offerors, Blue Origin or Dynetics, to enter into post-selection negotiations.

*Id*.

Accordingly, after a final review of the SEP reports for all offerors and of SpaceX's

revised proposal, the SSA made the final determination to award an Option A contract to

SpaceX. *Id*. at 63039-40. The SSA explained her rationale for this decision at length, explaining

in particular that she "thoroughly reviewed the evaluation report for each offeror prepared by the

SEP," concluding that "this evaluation record has a rational basis, is thoroughly documented, and

provides me with information regarding the qualitative merits and drawbacks of each offeror's

proposal," and that she "consider[ed] each proposal on its own individual merits" and exercised

"independent judgment as the Agency official solely responsible for selections in this

procurement." *Id*. at 63043. Although the SSA again explained that NASA preferred to make

two Option A awards, in light of the funds available and the prices proposed, two awards would

22

not be feasible.  *Id*.  The SSA, therefore, determined that she "must first consider the merits of making a contract award to the offeror that is most highly rated and has the lowest price—SpaceX."  *Id*. at 63044.

In so doing, the SSA highlighted several aspects of SpaceX's proposal that, in her expert discretion, provided particular value for NASA.  *Id*. at 63045-49.  She also considered weaker aspects of SpaceX's proposal that tempered the positive aspects of its approach.  *Id*. at 63047. With regard to SpaceX's proposed technical approach, the SSA concluded that "the qualitative attributes of SpaceX's aggregated strengths and its aggregated weaknesses are offsetting and that commensurate risk accompanies the meritorious aspects of SpaceX's technical approach," justifying its "Acceptable" technical rating.  *Id*. at 63048.  With regard to management approach, the SSA concluded that "SpaceX's management approach is of exceptional merit and fully responsive to the objectives of the solicitation," and that "the qualitative attributes of SpaceX's aggregated strengths, including its rating of High for its Base Period Performance, far outweigh the qualitative attributes of its evaluated weaknesses, which were relatively minor."  *Id*. at 63049.

Overall, the SSA concluded that "SpaceX's proposal is meritorious and advantageous to the Agency, and that it aligns with the objectives as set forth in this solicitation."  *Id*. Specifically, she concluded that "SpaceX's acceptable technical approach coupled with its outstanding management approach provide abundant value for NASA at its Total Evaluated Price."  *Id*. at 63049-50.  Noting that, after post-selection negotiations, "the Agency's budget now permits the award of a contract to SpaceX," the SSA decided to award an Option A contract to SpaceX.  *Id*. at 63050.

███████████████████████████████████████

The SSA went on to examine the proposals of the other two Option A offerors, Blue

Origin and Dynetics, under each evaluation factor. *Id*. at 63050-60. With regard to Blue Origin,

the SSA concluded that, while its proposed technical approach was, "competent, of moderate

merit, and represents a credible response to the BAA objectives, the qualitative attributes of its

aggregated strengths are offset by the countervailing qualitative attributes of its aggregated

weaknesses," and was properly rated as "Acceptable." *Id*. at 63053. For its price, the SSA noted

that "the SEP did identify two instances of proposed advance payments within Blue Origin's

proposal," and that, pursuant to the solicitation, "proposals containing any advance payments are

ineligible for a contract award." *Id*. at 63054. The SSA "concur[ed] with the SEP's assessment

that these kickoff meeting-related payments are counter to the solicitation's instructions and

render Blue Origin's proposal ineligible for award," but noted that, if it determined that it was in

its interest, NASA could elect to engage in "discussions or negotiations with Blue Origin, either

of which would provide an opportunity for it to submit a compliant revised proposal." *Id*. With

regard to Blue Origin's management approach, the SSA concluded that it was "of high merit and

fully responsive to the objectives of the solicitation," and that it was "properly rated as Very

Good." *Id*. at 63056.

Overall, the SSA concluded that "Blue Origin's proposal has merit and is largely in

alignment with the technical and management objectives set forth in the solicitation." *Id*.

However, the SSA decided not to award an Option A contract to Blue Origin, because she found

"that its proposal does not present sufficient value to the Government when analyzed pursuant to

the solicitation's evaluation criteria and methodology." *Id*. Specifically, the SSA stated that she

"considered whether it may be in the Government's best interests to engage in price negotiations

24

to seek a lower best and final price from Blue Origin," but that, "given NASA's current and projected HLS budgets, it is my assessment that such negotiations with Blue Origin, if opened, would not be in good faith." *Id*.   She explained that, "[a]fter accounting for a contract award to SpaceX, the amount of remaining available funding is so insubstantial that, in [her] opinion, NASA [could not] reasonably ask Blue Origin to lower its price for the scope of work it has proposed to a figure that would potentially enable NASA to afford making a contract award to Blue Origin." *Id*.   She determined that NASA "[did] not have enough funding available to even attempt to negotiate a price from Blue Origin that could potentially enable a contract award." *Id*.

After reviewing in detail her assessment of Dynetics's proposal, the SSA summarized her conclusion that the award of a single Option A contract to SpaceX was in the best interests of the Agency. *Id*. at 63060.  She concluded by stating:

> This contract award is the catalyst for developing a critical element needed for the initial Artemis missions—a human lander—to return astronauts to the Moon, including the first woman to touch the lunar surface.  This Option A selection represents a critical step, but is by no means the last step, in NASA's investment in and facilitation of lunar transportation service providers. With this award and NASA's forward efforts for the acquisition of long-term recurring human lunar landing services, NASA is leading a sustainable return to the Moon, and we are doing it with our commercial and international partners to lead innovation and expand our knowledge for future lunar missions, looking towards Mars.

*Id*.

## II.   **Procedural History**

Following NASA's decision to award a single Option A contract to SpaceX, Blue Origin and Dynetics filed protests with the Government Accountability Office (GAO).  AR Tab 108b67a at 105005.  The protests "primarily contend[ed] that the agency was required to open

discussions, amend, or cancel the Option A BAA when NASA, after the receipt of proposals,

determined that it had less funding than it needed to support multiple awards for the HLS

program . . . [and] that NASA unreasonably evaluated proposals." *Id*. On July 30, 2021, in a

lengthy decision discussing the issues in detail, the GAO denied the protests. *Id*.

      The GAO found no merit to the protesters' arguments regarding NASA's decision to

make a single award pursuant to the Option A solicitation. *Id*. at 105024. The GAO recognized

that agencies enjoy broad discretion in acquiring research and development, including with

respect to the number of contract awards to make, and that even when a solicitation announces

an intent to make multiple awards, no legal obligation accompanies that statement of intent. *Id*.

at 105024-25. In this particular procurement, the GAO recognized that the solicitation's plain

terms "expressly reserved NASA's right to make no, one, or multiple awards, and clearly

advised potential offerors that the number of awards was contingent on available funding." *Id*. at

105025. As the GAO concluded, "[s]imply put, there was no requirement for multiple awards in

the solicitation, or under applicable procurement law or regulation." *Id*.

      Next, the GAO found no merit to the protesters' arguments that NASA was required,

upon learning that the available funds would not support multiple awards, to notify the offerors

and permit revised proposals. *Id*. at 105027. The GAO concluded that "NASA's ultimate

available funding for the HLS program did not constitute a change in NASA's requirements

because the solicitation and the applicable provisions in FAR part 35 unequivocally put offerors

on notice that any award decision was subject to available funds." *Id*. at 105028. Specifically,

the GAO found that "[t]he protesters fail[ed] to point to any material requirements that were

descoped, reduced, or otherwise changed as a result of NASA identifying less available HLS program funding than it had originally anticipated." *Id.* at 105030.

Likewise, the GAO found no merit to the protesters' argument that NASA acted improperly by holding post-selection negotiations only with SpaceX, rather than conducting discussions with all offerors. *Id.* The GAO found that "the Option A BAA expressly notified offerors no less than three times that NASA could evaluate proposals and award contracts without conducting discussions or post-selection negotiations," and warned that offerors should submit an initial proposal using its most favorable terms. *Id.* at 105031. Moreover, the GAO found that "an agency conducting post-selection negotiations in a BAA procurement [is] generally under no obligation to follow the specific requirements for discussions set forth in FAR part 15." *Id.* (internal quotation marks and citation omitted). In addition to finding this protest ground, which challenged the unambiguous terms of the solicitation, to be untimely, *id.* at 105033, the GAO found "no basis to conclude that NASA's decision to limit post-selection negotiations only to SpaceX was arbitrary or evidence of bad faith." *Id.* at 105032.

Next, the GAO rejected "a multitude of objections to the agency's evaluation of proposals," finding that, "on balance, NASA's evaluation was reasonable, adequately documented, and in accordance with the requirements of the Option A BAA and applicable procurement law." *Id.* at 105036. Because Blue Origin has not raised these issues in its complaint, we will not further detail these unsuccessful challenges here.

Likewise, the GAO rejected a number of challenges to NASA's evaluation of SpaceX's proposal, finding that "the protesters' objections fail to provide any basis on which to sustain the protests." *Id.* at 105074. These challenges, the GAO found, illustrate "exactly why discretion is

27

due when NASA is seeking innovative research and development approaches to fulfilling important scientific and engineering objectives." *Id*. at 105071.

Finally, in a supplemental protest ground that Blue Origin carries over to this litigation, the GAO examined the allegation that NASA waived the solicitation's FRR requirement for SpaceX. *Id*. at 105074-80. In a comparatively curtailed analysis of the solicitation language, the GAO concluded that "the Option A BAA required an FRR before each launch of each HLS element, SpaceX's three proposed FRRs--or one for each *type* of HLS element—were insufficient when SpaceX's concept of operations will require 16 total launches." *Id*. at 105076 (emphasis in original).

The GAO, however, nevertheless denied this protest ground, because "the protesters have failed to establish any reasonable possibility of resulting competitive prejudice." *Id*. at 105077. The GAO found that, in determining whether an offeror could be prejudiced by the alleged waiver of a requirement for another offeror, "the pertinent question is whether the protester would have submitted a different offer that would have had a reasonable possibility of being selected for award had it known that the requirement would be waived." *Id*. The GAO explained that neither protester even alleged that they "could or would have changed their proposals to substantially increase their likelihood of receiving the award had they known of the waiver of the FRR requirement." *Id*. The GAO further explained that, as compared with that of SpaceX, Blue Origin's proposed concept of operations, "which contemplated a single launch for each of the protester's proposed HLS element types," was "materially different." *Id*. at 105077-78. Thus, the GAO found, "Blue Origin cannot reasonably establish how it could have improved

the competitiveness of its proposal had it known that the agency would relax the FRR requirement." *Id*. at 105078.

Indeed, throughout its decision and reaffirmed at its conclusion, the GAO made a much broader finding with regard to the protesters' inability to establish competitive prejudice. Citing precedent from the United States Court of Appeals for the Federal Circuit, the GAO explained that, "to establish competitive prejudice, . . . 'the protester's chances of securing award must not have been insubstantial.'" *Id*. at 105080 (quoting *Info. Tech. & Apps. Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). Throughout the decision, the GAO repeatedly expressed doubt that Blue Origin or Dynetics could establish competitive prejudice even if there were any basis to their allegations of error, which the GAO largely found to be meritless. *See, e.g., id*. at 105036-37, 105045, 105077-80. In ultimately denying the protests, the GAO concluded that:

> Even accounting for the waiver, and even allowing for the possibility that the protesters could prevail on some small subset of their challenges to NASA's evaluation, the record reflects that NASA's evaluation was largely reasonable, and the relative competitive standing of the offerors under the non-price factors would not materially change. In light of the broad discretion afforded NASA under FAR part 35 to select the most suitable proposal to fund and its available funding for the HLS program, it is not apparent that the protesters, as detailed herein, have demonstrated that they would have had a substantial chance that they would have received the award but for the alleged errors in the procurement process.

*Id*. at 105079-80.

On August 13, 2021, Blue Origin filed its complaint in this Court.

**ARGUMENT**

I.   **Legal Standards**

A.   **Standard Of Review For A Motion To Dismiss For Lack Of Jurisdiction, And Standing In A Procurement Challenge**

It is axiomatic that, if this Court does not possess subject matter jurisdiction to entertain the claims in the complaint, the Court must dismiss the complaint.  RCFC 12(b)(1).  When deciding a RCFC 12(b) motion, a "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed."  *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (citations omitted).  "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss."  *Dyck v. Albertelli Law*, 98 Fed. Cl. 624, 629 (2011) (quoting *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981), *aff'd*, 460 U.S. 325 (1983)).  When the Court's subject matter jurisdiction is at issue, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *Brocade Commc'ns Sys., Inc. v. United States*, 120 Fed. Cl. 73, 76 (2015) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)).  In deciding a motion to dismiss for lack of subject matter jurisdiction, the Court may consider evidentiary matters outside the pleadings.  *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985) (citation omitted).

"A party seeking to establish jurisdiction under § 1491(b)(1) must show that it meets § 1491(b)(1)'s standing requirements, which are 'more stringent' than the standing requirements imposed by Article III of the Constitution. *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017) (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).  This Court's bid protest jurisdiction encompasses actions "by an interested party

30

objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to

a proposed award or the award of a contract or any alleged violation of statute or regulation in

connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  "The

statutory term 'interested party' has been held to have a particular meaning under § 1491(b)."

*SEKRI, Inc. v. United States*, 152 Fed. Cl. 742, 747 (2021).  "Based on the [Competition in

Contracting Act] definition of 'interested party,' . . . 'standing under § 1491(b)(1) is limited to

actual or prospective bidders or offerors whose direct economic interest would be affected by the

award of the contract or by failure to award the contract.'"  *Id.* at 747-48 (quoting *Am. Fed'n of

Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

"To satisfy § 1491(b)(1)'s standing requirements, a plaintiff must make two

showings."  *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (citing

*Diaz*, 853 F.3d at 1358).  "First, it must show that it is an 'interested party.' This requires the

plaintiff to show that it is 'an actual or prospective bidder' and has a 'direct economic interest' in

the procurement or proposed procurement." *Id.* (citations omitted). Critically, "[t]o prove a direct

economic interest, a party must show that it had a substantial chance of winning the

contract." *Id.* (quoting *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir.

2012)).

"Second, the plaintiff must show that it was prejudiced by a significant error in the

procurement process."  *CliniComp*, 904 F.3d at 1358 (citing *Labatt Food Serv., Inc. v. United

States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009); *Info. Tech. & Applications Corp. v. United States*,

316 F.3d 1312, 1319 (Fed. Cir. 2003)).  "A party has been prejudiced when it can show that *but

for the error*, it would have had a substantial chance of securing the contract."  *CliniComp*, 904

31

F.3d at 1358 (quoting and adding emphasis to *Labatt*, 577 F.3d at 1378) (internal quotation marks omitted).

An important distinction is that, "[a]lthough the inquiries may be similar, prejudice must be shown either as part of, or in addition to, showing a direct economic interest." *CliniComp*, 904 F.3d at 1358 (citing *Labatt*, 577 F.3d at 1379-80). "[C]ourts should not 'conflat[e] the standing requirements of prejudicial error and economic interest,' because doing so would mean that 'there would be no such thing as an error non-prejudicial to an economically interested offeror in a bid contest.'" *CliniComp*, 904 F.3d at 1358 (quoting *Labatt*, 577 F.3d at 1379-80; also citing *Diaz*, 853 F.3d at 1358–59).

Finally, "[i]t is basic that 'because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.'" *Labatt*, 577 F.3d at 1378-79 (quoting *Info. Tech.*, 316 F.3d at 1319) (other citations omitted). "[P]rejudice (or injury) is a necessary element of standing." *Info. Tech.*, 316 F.3d at 1319 (quoting *Myers Investigative & Sec. Servs. v. United States,* 275 F.3d 1366, 1370 (Fed. Cir. 2002)). "[A] plaintiff must demonstrate standing for each claim he seeks to press[.]" *Advanced Concepts Enterprises, Inc. v. United States*, 142 Fed. Cl. 187, 201 (2019) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)).

> ### B.    Standard Of Review For A Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted, And The *Blue & Gold Fleet* Waiver Rule

A motion to dismiss pursuant to the *Blue & Gold Fleet* waiver rule is properly considered under RCFC 12(b)(6). *SEKRI*, 152 Fed. Cl. at 752 (citing *Inserso Corp. v. United States*, 961 F.3d 1343 (Fed. Cir. 2020)). "Dismissal for failure to state a claim upon which relief can be

granted 'is appropriate when the facts asserted by the claimant do not entitle him to a legal

remedy.'" *SEKRI*, 152 Fed Cl. at 754, (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257

(Fed. Cir. 2002)).  Stating "a claim requires a complaint with enough factual matter (taken as

true) to suggest" an entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)

(interpreting Federal Rule of Civil Procedure 12(b)(6)) (citations omitted).  "Factual allegations

must be enough to raise a right to relief above the speculative level." *Id*. at 555.  The Court

should begin its analysis by identifying and rejecting conclusory allegations, because allegations

not supported by specific facts "are not entitled to the assumption of truth." *Ashcroft v. Iqbal*,

556 U.S. 662, 679 (2009).  The Court should next consider all "well-pleaded factual allegations .

. . assume their veracity . . . then determine whether they plausibly give rise to an entitlement to

relief" and dismiss them pursuant to Rule 12(b)(6) if they do not.  *Id*.

In the seminal *Blue & Gold Fleet* case, the Federal Circuit expressly recognized a waiver

rule in bid protest actions in the Court of Federal Claims, holding that "a party who has the

opportunity to object to the terms of a government solicitation containing a patent error and fails

to do so prior to the close of the bidding process waives its ability to raise the same objection

subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d at 1313.  When

waiver is found, "[d]ismissal is mandatory, not discretionary." *Per Aarsleff A/S v. United States*,

829 F.3d 1303, 1317 (Fed. Cir. 2016) (Reyna, J., concurring).

In announcing the waiver rule, the Federal Circuit relied on the requirement in this

Court's jurisdictional statute that the Court "shall give due regard to the interests of national

defense and national security and *the need for expeditious resolution of the action*." *Blue &*

*Gold Fleet* at 1313 (quoting 28 U.S.C. § 1491(b)(3)) (emphasis added by the Federal Circuit).

33

███████████████████████████████

Additionally, the Court of Appeals relied on the rationale underlying the doctrine of patent ambiguity, as applied in the bid protest context. The Court reasoned that a waiver rule was needed to prevent a contractor from "taking advantage of the government and other bidders" by strategically waiting to raise solicitation defects until after award, when, if it did not prevail, it would be able to restart the process, armed with increased knowledge of its competitors. *Id.* at 1313-14. In other words, "[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award and then, if unsuccessful, claim the solicitation was infirm." *Id.* (quoting *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 175 n.14 (2005)). Moreover, a waiver rule prevents the Government from having to expend time and resources to conduct a potentially needless procurement decision and then to engage in "costly after-the-fact litigation" that could have been avoided by the contractor timely raising any complaints about the competition during the bidding process. *Id.*

The Federal Circuit also found support for the waiver rule in the regulation that governs bid protests before the Government Accountability Office (GAO). *Id.* As the Court explained, a GAO regulation "requires that '[p]rotests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of initial proposals.'" *Id.* (quoting 4 C.F.R. § 21.1(a)). In light of these strong legal underpinnings and fundamental fairness concerns, the Court of Appeals recognized the waiver rule that has since drawn its name from the *Blue & Gold Fleet* case.

Although the waiver rule as stated in *Blue & Gold Fleet* required that a challenge be brought before the close of the bidding process, the Federal Circuit later made clear that the rule

extends beyond that date, and encompasses "all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012).  Moreover, the Federal Circuit has recently held that "[e]nforcing our forfeiture rule implements Congress's directive that courts 'shall give due regard to ... the need for expeditious resolution' of protest claims." *Inserso Corp. v. United States*, 961 F.3d 1343, 1352 (Fed. Cir. 2020).  The Court stressed that, had the plaintiff raised its concerns during the competitive process, the agency could have worked to mitigate or eliminate any issue.  *Id*.  Permitting it to pursue its forfeited claims after award would permit it to seek relief it could have gotten from the agency earlier, before the agency invested significant resources in evaluating proposals.  *Id*.  The Court, therefore, found that, because it had not objected to the solicitation terms before the submission of final proposals, it had forfeited its right to relief.  *Id*.

### C.   Standard Of Review For A Motion For Judgment On The Administrative Record And Standard For Procurement Challenges

Pursuant to RCFC 52.1, this Court reviews an agency's procurement decisions to determine whether the plaintiff has met its burden of proof based upon the evidence in the already-existing administrative record. *Kiewit Infrastructure W. Co. v. United States*, 147 Fed. Cl. 700, 707 (2020) (citations omitted).  The standards applicable to a motion for judgment on the administrative record differ from those applied in the context of a Rule 56 motion for summary judgment. *Bannum, Inc. v. United State*s, 404 F.3d 1346, 1355-56 (Fed. Cir. 2005). Unlike a Rule 56 motion, "proceeding under RCFC [52.1] merely restricts the evidence to the agency record." *Id*. at 1356.  "Thus, the central inquiry on a motion for summary judgment -- whether the movant has proved its case as a matter of fact and law or whether a genuine issue of

material fact precludes summary judgment -- has no bearing on a review of the administrative

record in a bid protest." *Tech Sys., Inc. v. United States*, 50 Fed. Cl. 216, 222 (2001); *accord*

*Bannum*, 404 F.3d at 1356 (holding that RCFC [52.1] requires a different standard of review

without the burden-shifting and presumptions required pursuant to RCFC 56).

 Unlike a motion for summary judgment, the question of whether an issue of material fact

is disputed has no bearing upon a review of the administrative record in a record review case,

such as a bid protest.  The inquiry, instead, is whether, given all the disputed and undisputed

facts, the plaintiff has met its burden of proof that the contracting officer's decision was

arbitrary, capricious, or contrary to law.  *Tech Sys.*, 50 Fed. Cl. at 222 (citing *CCL Serv. Corp. v.*

*United States*, 48 Fed. Cl. 113, 119 (2000)).  In reviewing an agency's action under this narrow,

deferential standard, "the focal point for judicial review should be the administrative record

already in existence, not some new record made initially in the reviewing court."  *Florida Power*

*& Light v. Lorion*, 470 U.S. 729, 743-44 (1985) (quoting *Camp v. Pitts*, 411 U.S. 138, 142

(1973)); *see also Bannum*, 404 F. 3d at 1356 (holding that RCFC [52.1] is designed to provide

for expedited trial on a paper record and that the trial court is required to make factual findings

based on the record evidence).

 "The Court evaluates bid protests under the Administrative Procedure Act's standard of

review of agency action."  *Kiewit*, 147 Fed. Cl. at 707 (citing 28 U.S.C. § 1491(b)); *Bannum,*

*Inc.*, 404 F.3d at 1351).  Judicial review of the agency's actions in bid protest cases is not a *de*

*novo* proceeding.  Rather, the scope of the review is limited to the administrative record.  The

proper standard of review is whether the agency action was arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law based solely on the administrative record.  28

U.S.C. § 1491(b)(1), (4); 5 U.S.C. § 702, 706(2)(A); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The Court must consider whether the decision was based on consideration of the relevant factors and whether there has been a clear error in judgment. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

"[T]he Court's review of a procuring agency's decision is 'highly deferential.'" *Kiewit*, 147 Fed. Cl. at 707 (quoting *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)). In reviewing the agency's procurement decisions, the Court should recognize that the decision is entitled to a "presumption of regularity," *Impresa,* 238 F. 3d at 1338, (citations omitted), and that the Court should not substitute its judgment for that of the agency. *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co., v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations"). Thus, the disappointed bidder "bears a heavy burden," and the procurement officer is "entitled to exercise discretion upon a broad range of issues confronting them." *Impresa*, 238 F.3d at 1332-33 (citations omitted). This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988) (citation omitted). In particular, "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)

████████████████████████████████████████

Finally, even if the protester can show any errors in the procurement process, the

protester must then show that it was "significantly prejudiced" by those errors. *Bannum*, 404

F.3d at 1353 (citations omitted). "A protester does not meet the prejudice requirement if the

protester's allegations, even if proven, would not change the results of the procurement process."

*Seaborn Health Care, Inc. v. United States*, 101 Fed. Cl. 42, 48 (2011) (citation omitted).

## II.     The Court Should Dismiss Blue Origin's Complaint Because It Has Not Established Standing

As we will demonstrate below, each of Blue Origin's allegations of procurement error is

without merit.  Before the Court may reach the merits, however, it must determine whether Blue

Origin has standing to press its claims.  As we explain above, to establish that it has standing to

pursue its bid protest, Blue Origin must establish that, but for the procurement errors it alleges, it

would have had a substantial chance of winning award of an Option A contract.  Blue Origin is

unable to make this showing because:  A) its proposed price dramatically exceeded both NASA's

available funding and the price of a more highly-rated offeror; B) as the GAO correctly

determined, even if NASA had waived any solicitation requirements related to FRRs or other

reviews for SpaceX, Blue Origin has not shown that it could have benefited from a similar

waiver; C) even if Blue Origin were correct that NASA was required to hold discussions with

Blue Origin or amend its solicitation, Blue Origin has not demonstrated that it would have had a

substantial chance of award; and D) even if Blue Origin were correct that SpaceX's proposal

were deficient and, thus not eligible for award, under this same logic Blue Origin's own proposal

would also be deficient and ineligible for award.

███████████████████████████████████

**A.    Blue Origin's Proposed Price So Far Exceeded Available Funding And SpaceX's Pricing That It Cannot Show A Substantial Chance Of Award**

At bottom, Blue Origin's case never gets off the ground, because of simple math.  Blue Origin proposed a price so high – requesting payments of more than ████ NASA's available funding for FY 2021, more than ████████ times SpaceX's proposal for the same FY, and with an overall price more than double that of a more highly-rated offeror, SpaceX – that it simply cannot establish that it would have had a substantial chance to receive award absent the errors it alleges.  The Court should give little if any weight to Blue Origin's self-serving position, made after award was made to SpaceX at a price then made public and during its litigation challenging that award, that it could dramatically lower its pricing.  Moreover, even this alleged offer still leaves Blue Origin's proposal priced higher than SpaceX, which NASA reasonably assessed to have proposed a better approach with regard to the non-price factors.  Accordingly, Blue Origin cannot establish standing to pursue its protest, and the Court should dismiss its complaint.

As we explain above, this procurement was conducted under FAR Part 35 as a research and development procurement under the terms of a BAA.  AR Tab 27 at 24473.  Proposals were not compared against or competing against each other, but rather NASA evaluated each proposal on its own merits for potential award.  *Id*.  NASA hoped to make multiple Option A awards, contingent on available funding being sufficient to support multiple award and on one or more offerors making a proposal for which NASA found award to be in its best interest.  *Id*. at 24480, 24481.  In light of this structure, Blue Origin lacks standing to challenge NASA's evaluation of SpaceX's proposal at all, because Blue Origin was not competing against SpaceX, but hoping to convince NASA that its proposal merited the investment of available NASA research and

development funding.  *See, e.g., Kinemetrics, Inc. v. United States*, No. 21-1626, 2021 WL

4237169, at *5 (Fed. Cl. Sept. 10, 2021) ("[B]road agency announcements . . . arguably do not

give a disappointed offeror standing.") (citing defendant-intervenor brief); *Microcosm, Inc.*, B-

277326, *et al.*, 97-2 CPD ¶ 133 (Comp. Gen. Sept. 30, 1997); *Glob. Aerospace Corp.*, B-414514,

2017 CPD ¶ 198 at *6 n.5 (Comp. Gen. July 3, 2017).

Moreover, Blue Origin simply cannot demonstrate that, given its high pricing and the

limited funding available to NASA, it ever could have had a substantial chance of award,

irrespective of the resolution of the procurement errors it alleges.  For FY 2021, NASA

determined that its available funding for milestone payments pursuant to any contract(s) under

HLS Option A was $345 million.  AR Tab 108b26a at 103672-73.  Blue Origin, however,

proposed ███████████ in FY 2021 milestone payments.  AR Tab 108b67a at 105010 (citing AR

Tabs 32d.87).  Although SpaceX also proposed FY 2021 milestone payments in excess of

NASA's available funds, SpaceX's proposal exceeded available funding by ██████████, while

Blue Origin's proposal exceeded the $345 million available by ██████████.  *Id.*  NASA

reasonably (and correctly, as it turns out) determined that the ██████████ gap between the

available funding and SpaceX's proposed milestone payments was bridgeable.  But Blue Origin

has not demonstrated that the gap between its proposal and available funds, which was over

██████ times larger, could have been bridged.

Additionally, although the offerors were not competing against each other, the

solicitation made plain that any award or awards were contingent on available funds.  *E.g.*, AR

Tab 27 at 24481.  It was perfectly reasonable for NASA to conclude that, given its available

funding, a single award to SpaceX, which submitted a proposal that was "both very highly rated

from a technical and management perspective and that also had, by a wide margin, the lowest initially-proposed price," was in NASA's interest and consistent with the solicitation.  AR Tab 77 at 63039.  In analyzing prejudice, this Court has termed a large differential in proposed prices "the proverbial elephant in the parlor," explaining that although "prejudice may be found despite the existence of a price differential, it cannot be gainsaid that a significant difference in price, when accompanied by nearly identical technical ratings, can and often does preclude such a finding."  *Elec. Data Sys., LLC v. United States*, 93 Fed. Cl. 416, 436 (2010) (collecting cases).

Blue Origin alleges that it could have changed its proposal to drastically lower the price, move payments into later years, or make other changes to its approach and pricing, if NASA were willing to make but "a single phone call."  *See*, *e.g.*, Compl. ¶¶ 111, 133, 136, 147, 150, 157, 161, and 173.  These allegations are entirely unsupported and inconsistent with the record.

Blue Origin bears the burden to establish its standing, and general factual allegations are insufficient to bear this burden at the final stage of litigation.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  In a bid protest, the final stage of litigation consists of cross-motions for judgment on the administrative record, on which the court conducts a "trial on a paper record."  *See Bannum*, 404 F.3d at 1356.

First, NASA was under no obligation to come back to Blue Origin to ask it to improve its proposal.  Indeed, in three separate admonitions in the solicitation, NASA warned offerors that it "may evaluate proposals and award contracts without conducting post-selection negotiations or discussions with Offerors" and that, as a consequence, "each Offeror shall submit only one proposal which represents its best approach to meeting the requirements of the solicitation."  AR Tab 27 at 24433 (emphasis omitted), 24473, *see also* 24481.  Blue Origin's apparent expectation

████████████████████████████████

that it may have a chance to improve the terms of its proposal later in the process has no basis in the law or in the solicitation.

Second, Blue Origin's allegations that it would have drastically lowered its pricing and/or proposed an entirely different approach are self-serving, made for litigation, contrary to the record, generally implausible, and, in at least one instance, logically incoherent. We will address Blue Origin's illogical allegation that it would have proposed an entirely different approach in light of different FRR requirements in the next section. Here, we address Blue Origin's allegation that it was ready to drastically reduce its proposed price at any moment, had NASA only asked. *See*, *e.g.*, Compl. ¶ 111. As we demonstrate above, NASA expressly warned offerors to propose their best pricing in their initial proposals, as NASA may not hold discussions or post-section negotiations. AR Tab 27 at 24433, 24473, 24481. This warning was issued *after* Blue Origin dropped its proposed base period pricing in discussions, negating Blue Origin's alleged expectation that it would be afforded the same opportunity in the Option A procurement. *See* Compl. ¶ 111. Blue Origin now alleges that it failed to heed that warning and was willing to dramatically lower its pricing, including by waiving up to two billion dollars in payments in the current and next two fiscal years. Compl. ¶ 111. Blue Origin cites an open letter, directed to NASA's Administrator and signed by Blue Origin's owner Jeff Bezos, which Blue Origin, rather than just sending to NASA directly, posted on its website. The letter was not sent to NASA during the procurement process, but posted publicly in the final stages of Blue Origin's protest against NASA before the GAO. Blue Origin makes no attempt to demonstrate how it would effectuate such an offer, or how it would be proper for NASA to accept such a non-binding offer at this late stage of the procurement process, in the middle of a GAO protest. The

42

Court should see this letter for what it plainly is – part of Blue Origin's litigation and public relations strategy, not part of its proposed approach in response to the solicitation. Finally, it is worth noting that, even if Blue Origin were to reduce its price by $2 billion, its price would still exceed that of SpaceX by over $1 billion.

Because Blue Origin cannot show that, given its significantly higher proposed pricing and NASA's limited available funding, it would have had a substantial chance of being awarded a contract even if its allegations of procurement error are true, Blue Origin lacks standing to pursue the claims in its complaint, which should be dismissed.

**B.     Even If NASA Had Waived FRRs Or Other Milestone Reviews, Blue Origin Cannot Establish That It Would Have Had A Substantial Chance Of Award In Light Of Such A Waiver**

As we demonstrate further below, the GAO's interpretation of the solicitation terms was incorrect, and NASA did not waive solicitation requirements for FRRs or other milestone reviews for SpaceX. Even if NASA had done so, however, the GAO correctly determined that Blue Origin cannot demonstrate that it was prejudiced by such a waiver. AR Tab 108b67a at 105077-80. Because it cannot demonstrate that it was prejudiced even if the Court were to determine that NASA erred, Blue Origin lacks standing to pursue these claims, and the Court should dismiss them.

In its complaint, Blue Origin, for the first time, alleges that, had it known that NASA was willing to waive FRR and other review requirements, it "would have proposed a fundamentally different technical approach – a single-element integrated lander." Compl. ¶ 26. This allegation was not advanced at the GAO, and is apparently advanced here to directly rebut a finding by the GAO that was fatal to Blue Origin's protest there. Moreover, Blue Origin's allegation is

43

██████████████████████████████

logically incoherent, and is flatly contradicted by the record, by Blue Origin's public statements, and even by the allegations in Blue Origin's complaint.

Specifically, Blue Origin alleges that, had it known that NASA would waive FRR and other review requirements, "Blue Origin would have engineered and proposed an entirely different architecture with corresponding differences in technical, management, and price ratings." Compl. ¶ 13. Blue Origin alleges that it "would have proposed a large number of launches and Low Earth Orbit rendezvous events, allowing for the incorporation of elements such as a propellant depot in Low Earth Orbit to be refueled by multiple launches." *Id*. In other words, it would have proposed a solution similar to that proposed by SpaceX. Blue Origin further alleges that, in this hypothetical scenario, it "would have been able to propose a substantially lower price." *Id*.

Blue Origin's allegations are refuted by the administrative record, Blue Origin's public statements, Blue Origin's complaint, and by basic logic. Blue Origin's allegations suggest that the FRR and other review provisions were the one aspect of the solicitation holding Blue Origin back from proposing a far superior and dramatically cheaper solution. But if this were true, Blue Origin would logically have still been better off proposing this allegedly better and cheaper solution, even accounting for many more FRRs. Blue Origin repeatedly speculates that, if SpaceX had been required to propose the total of 16 FRRs that Blue Origin alleges were required, SpaceX's total price would have increased by ███████. *See*, *e.g.*, Compl. ¶¶ 22-23. Even leaving aside the dubious credibility of this estimate, SpaceX's proposed price was more than $3 *billion* lower than Blue Origin's. Even adding ██████████ to SpaceX's price leaves it more than ███████ less expensive than Blue Origin. Additionally, it makes no

44

████████████████████████████

logical sense for Blue Origin to allege that, to save something on the order of ████████

████ in extra readiness reviews, it proposed an entirely different approach that was less

technically advantageous, had less commercial application, and was billions of dollars more

expensive.  These self-serving allegations are simply not credible, and the Court should give

them no weight.

Moreover, if these review provisions of the solicitation were the one thing holding Blue

Origin back from the dramatically improved proposal it could have put before NASA, why did it

not approach NASA about these provisions and request a change?  Before issuing the final

solicitation, NASA sent two draft versions to offerors, including Blue Origin, and answered

extensive questions about the draft solicitation and its provisions.  *See* AR Tabs 11, 15, 17-20.  If

NASA's proposed review provisions were truly the one thing holding Blue Origin back from an

entirely different and dramatically better proposal, one might expect to see Blue Origin

imploring NASA to alter those provisions to permit Blue Origin to propose its best solution.

Instead, the record does not reflect even a single question regarding the FRRs or other milestone

reviews.  AR Tabs 17-20.

Finally, Blue Origin's allegations are flatly contradicted by the administrative record,

Blue Origin's public statements, and Blue Origin's own complaint.  Blue Origin's extensive

proposal materials give no hint that, as it alleges, it had already begun preparing a design for a

single-element lander supported by supporting spacecraft and low-Earth orbit rendezvous events.

Moreover, this alleged alternate solution sounds quite similar to the concept of operations

proposed by SpaceX, which Blue Origin has repeatedly criticized in public statements, as well as

in in this litigation and the GAO litigation that preceded it, as "tremendously high risk and

immensely complex." Compl. ¶ 2; *see also* Compl. ¶ 28, AR Tab 108b49 at 104444.[2]  It strains

credulity for Blue Origin to now allege that, but for the FRR and other review provisions of the

solicitation, it actually would have proposed a very similar approach, only somehow better.

Finally, Blue Origin alleges that, if it had proposed this entirely different hypothetical

approach, it "would have dramatically improved Blue Origin's evaluation, decreasing

weaknesses and increasing its strengths."  Compl. ¶ 26.  But Blue Origin does not know that and

cannot know how NASA would have evaluated an entirely different hypothetical proposal that it

did not submit – this allegation is pure speculation.[3]  As such, it cannot carry Blue Origin's

burden to demonstrate the potential for prejudice and, thus, that Blue Origin has standing to

pursue its allegations.

> ### C.   Even If NASA Had Held Discussions Or Amended The Solicitation, Blue Origin Cannot Establish That It Would Have Had A Substantial Chance Of Award

As we demonstrate further below, there is no merit to Blue Origin's allegations that

NASA was required to hold discussions with Blue Origin or to amend the solicitation due to

allegedly changed requirements.  Even if Blue Origin could prevail on these allegations,

however, it still could not demonstrate that it would have had a substantial chance of award, for

the reasons explained in the two previous subsections.  Blue Origin's price so far exceeded the

---

[2]  For unknown technical reasons, the image on this page was dramatically reduced in size during processing, and can be read only by increasing the zoom dramatically.  For ease of reference, a copy of this image without this formatting issue is attached to this motion.

[3]  Moreover, this allegation further demonstrates that Blue Origin's claim is not credible – if it were able to propose a solution that would earn dramatically higher evaluation ratings, the addition of milestone review events at the cost of less than ███████████ should not have prevented it from doing so.

████████████████████████████

funding available to NASA and the price proposed by a more highly rated offeror that Blue

Origin cannot show that it would have had a substantial chance of award even if NASA opened

discussions with it, or amended the solicitation to advise offerors that only one award could be

made.  Blue Origin's arguments to the contrary amount to no more than speculation, and do not

carry its burden to establish standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. at 561.  Moreover,

Blue Origin's allegations that it could have proposed an entirely different and dramatically better

solution are simply not credible, as we have explained above.  Blue Origin has not established

that its prospects for award would have changed even if NASA had opened discussion with Blue

Origin, or had amended its solicitation as Blue Origin demands.  As such, Blue Origin lacks

standing to pursue these allegations, and the Court should dismiss them.

> **D.**     **If Blue Origin's Interpretation Of What Constitutes A Deficiency Were
> Correct, Blue Origin Would Have Been Ineligible For Award**

In its complaint, Blue Origin repeatedly alleges that NASA should have assigned a

deficiency, rather than a weakness, to SpaceX's proposal regarding FRRs or other milestone

reviews.  *See*, *e.g.*, Compl. ¶¶ 18, 20-22.  As we explain in detail below, Blue Origin is incorrect,

and NASA was well within its considerable discretion to assess a weakness to SpaceX rather

than a deficiency for the increased risk in SpaceX's proposed management approach entailed by

limiting NASA's involvement in the SpaceX-led FRRs it proposed prior to the launch of

supporting spacecraft, rather than conducting NASA-led FRRs.

If Blue Origin were correct, however, that any time that NASA assesses that a proposal

falls short of a solicitation provision in some respect, NASA must assign a deficiency, Blue

Origin's proposal would have warranted several deficiencies and would be ineligible for award.

We respectfully submit that this serves to further demonstrate that Blue Origin's allegations are

███████████████████████████████████

wrong and that NASA's evaluation determinations were proper.  In the event, however, that the

Court were to adopt Blue Origin's harsh reading of the solicitation terms, Blue Origin

nevertheless cannot demonstrate that it had a substantial chance of receiving award, because

under its reading its proposal would be ineligible.

In several examples described in the facts section above, NASA assigned weaknesses to

aspects of Blue Origin's proposal where Blue Origin fell short, in one respect or another, of a

requirement announced in the solicitation.   For example, Blue Origin was assigned a weakness

for its data rights assertions, regarding which the SEP stated that ████████████████

████████████████████████████████████████

████████████████████████████████   AR Tab 59a at 62691.

Similarly, Blue Origin was assigned a weakness for non-compliant fault tolerance in its Ascent

Element's manual control system, which the SEP stated "fail[ed] to meet an important mission-

related requirement."  *Id*. at 62647.  Additionally, in assessing a significant weakness for an issue

regarding Blue Origin's radio frequency communication links, the SEP noted that Blue Origin's

proposal failed to meet "three key HLS requirement."  *Id*. at 62654.

Finally, in evaluating Blue Origin's proposal, both the SEP and SSA determined that,

without revisions made pursuant to discussions or post-selection negotiations, Blue Origin's

proposal would not be eligible for contract award because it included prohibited advance

payments.  *Id*. at 62674; AR Tab 77 at 63054, 63056 n.1.  As we explain further below, NASA's

determination that, had it concluded that award to Blue Origin would otherwise be in the

Government's interests, it would have permitted Blue Origin to attempt to correct its advance

payment issues in either discussions *or* post-selection negotiations refutes Blue Origin's

characterization of the nature of post-selection negotiations and the type of revisions that were permissible pursuant thereto.  Even if Blue Origin were correct, however, Blue Origin's proposal of advance payments expressly prohibited by the solicitation would have rendered it ineligible for award and Blue Origin, therefore, cannot establish the substantial chance of contract award that it must demonstrate to support standing.

### III.  The Court Should Dismiss Count Two And Other Allegations In Blue Origin's Complaint Because Blue Origin Has Waived Them

In Count Two in particular but also in other allegations in its complaint, Blue Origin plainly challenges unambiguous terms of the solicitation.  Because Blue Origin raises these claims after contract award and long after it submitted its proposal in response to the solicitation, Blue Origin has waived these claims under the binding rule established in *Blue & Gold Fleet*, and the Court must dismiss them.

"[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet*, 492 F.3d at 1313.  "[W]hen *Blue & Gold Fleet*'s waiver rule applies, a court must dismiss the action; it has no discretion to allow the plaintiff to maintain the action." *SEKRI*, 152 Fed. Cl. at 752.

In its complaint, Blue Origin challenges the structure of the Option A HLS solicitation as a procurement conducted pursuant to FAR Part 35. *See, e.g.*, Compl. ¶¶ 15-19, 50.  Moreover, in Count Two of its complaint, Blue Origin, incorrectly incorporating law applicable to FAR Part 15 negotiated procurements to the Option A HLS solicitation that NASA conducted pursuant to FAR Part 35, alleges that NASA was required to conduct discussions with all offerors, rather

than conducting post-selection negotiations only with SpaceX.  Compl. ¶¶ 138-51.  These allegations, at bottom, challenge plain, unambiguous solicitation terms, and must be dismissed. NASA did exactly what it said it would do in the solicitation, acting in accordance with those unambiguous terms, and to the extent that Blue Origin sought to challenge those terms, it was required to do so prior to the date for receipt of proposals in response to the solicitation (or, in any case, prior to award).  Because it failed to so, these allegations are waived.

The structure of the solicitation and its organization as a research and development procurement pursuant to FAR Part 35 was unambiguous from the face of the solicitation.  AR Tab 27 at 24473 ("The Government is conducting this procurement as an 'other competitive procedure' in accordance with FAR 6.102(d)(2) and FAR 35.016 (as deviated).  NASA will not conduct a comparative analysis and trade-off amongst proposals.  Rather, each proposal will be evaluated on its own individual merits.").  Indeed, this was not the first NASA HLS procurement organized in this manner in response to which Blue Origin elected to submit a proposal.  AR Tab 108a-002, Base Period BAA, at 65716 (containing essentially the same language).  Blue Origin alleges that this structure was not in accordance with FAR 35.016, because the solicitation included a detailed SOW and other attachments, as well as other terms Blue Origin claims run counter to the FAR Part 35 structure.  Compl. ¶¶ 15-16, 19.  Not only does this allegation have no basis in the law, it is plainly waived, because the solicitation, SOW, and other attachments were all available to Blue Origin and made plain their structure.  If Blue Origin found this structure to be contrary to law or regulation, it had to bring any such challenge before submitting its proposal.  Having failed to do so, Blue Origin has waived these allegations.

In addition, Blue Origin challenges the structure that the solicitation unambiguously describes related to discussion and post-selection negotiations with offerors.  Compl. ¶¶ 17-18, 138-51.  The solicitation, however, was abundantly clear on this structure – in either discussions or post-selection negotiations, an offeror could be invited by the contracting officer to revise portions of its proposal identified as open to revision.  AR Tab 27 at 24434.  It is unambiguously clear that the only difference is the stage of the procurement at which these exchanges occur.  Blue Origin's attempt to now challenge these terms comes too late.

Indeed, in fashioning the Option A solicitation, NASA consciously expanded its flexibility in post-selection negotiations as compared with those permitted in the Base Period solicitation.  AR Tab108b55-102a at 104673-74; *compare* AR Tab 108a-002 at 65676 *with* Tab 27 at 24434.  Having competed for both procurements, Blue Origin was well aware of these terms and how they changed from the Base Period solicitation to the Option A solicitation.  If Blue Origin considered the structure of post-selection negotiations unambiguously stated in the Option A solicitation to be contrary to law, it was required to bring such a challenge prior to submitting a proposal in response to that solicitation.  It may not now "'come forward with [its objections] to restart the bidding process,' and get a second bite at the apple."  *COMINT*, 700 F.3d at 1383 (quoting *Blue & Gold Fleet*, 492 F.3d at 1314).  Because Blue Origin has waived these allegations, the Court should dismiss them.

## IV.   The Court Should Grant Judgment On The Administrative Record To The United States

As we have described above, the Court should dismiss each Count of Blue Origin's complaint because Blue Origin cannot establish standing to pursue it, because Blue Origin has waived it, or both.  To the extent, however, that the Court determines that any of Blue Origin's

claims survive to a merits analysis, the Court should nevertheless grant judgment on the administrative record in favor of the United States.

Much of Blue Origin's complaint hinges on its misinterpretation of terms of the solicitation and its statement of work related to FRRs.  Blue Origin's interpretation is incorrect, however, and because much of the rest of its complaint is built on this faulty foundation, it collapses along with Blue Origin's FRR claims.

To the extent that Blue Origin advances a separate claim that NASA's post-selection negotiations with SpaceX were improper or that NASA was otherwise required to conduct discussions with Blue Origin, this claim, to the extent not waived, also collapses in the face of clear solicitation terms describing exactly the actions that NASA took.  Similarly, NASA had no obligation to amend the solicitation in light of the level of funding Congress ultimately made available for the HLS program, because plain solicitation terms described how NASA would act in such a scenario, and NASA acted in accordance with those terms.

Finally, NASA evaluated SpaceX's proposal in accordance with the terms of the solicitation and the implied covenant of good faith and fair dealing.  Because Blue Origin cannot establish that NASA's conduct of the HLS Option A procurement was arbitrary, capricious, abusive of its discretion, or otherwise not in accordance with law, the Court should grant judgment on the administrative record to the United States.

### A.    NASA Did Not Waive A Solicitation Requirement For FRRs Or Other Milestone Reviews For SpaceX

As we explain in detail above, Blue Origin cannot prevail in its protest because, wholly apart from the lack of merit to its claims, it lacks standing to pursue them because it cannot show that it would have had a substantial chance of award even if Blue Origin were correct in its

allegations. In the event that the Court finds standing, however, Blue Origin's complaint hinges

on its faulty interpretation of a handful of terms in the solicitation and its statement of work

related to FRRs and other milestone reviews.

Interpretation of a solicitation "begin[s] with the plain language of the document."

*Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004). "If the provisions

of the solicitation are clear and unambiguous, they must be given their plain and ordinary

meaning." *Id*. (citation omitted). In interpreting solicitation terms, the Court "must consider the

solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning

to all of its provisions." *Id*.

The pivotal sentence in the SOW on which so much of Blue Origin's complaint relies

states that "[t]he FRR should be completed by two (2) weeks before launch of each HLS

element."[4] AR Tab 27e at 32972. The terms critical to interpreting this provision are "should"

and "HLS element."

Interpreting the former, the word "should," is easy, as the SOW expressly defined this

term. It defined "should" as follows: "Expectation: Should denotes a statement of best practice

or intent." *Id*. at 32949. This definition was expressly contrasted, in the same section, with the

definition of "shall," which was defined as follows: "Requirement: Shall is used to indicate a

---

[4] Blue Origin's complaint cites solicitation Attachment O, the Milestone Acceptance and
Payment Criteria, rather than the SOW, as the basis for the FRR "requirement." Compl. ¶¶ 80-
81, 126. This document was a fillable form designed for offerors to propose performance based
payments, rather than a recitation of performance requirements. AR Tab 27 at 24465-67, Tab
27k. Performance requirements were stated in the SOW. Although Attachment O contains the
phrase "[a]n FRR is required prior to each launch of an HLS element," it expressly references the
SOW as the authority for that statement. *Id*. at 33187.

requirement, meaning it must be implemented, and its implementation verified." *Id.*

Accordingly, the entire premise on which Blue Origin's complaint is built, as it is founded on the

notion that SpaceX's proposal failed to meet a solicitation requirement with regard to FRRs,

collapses before we even get to analyzing SpaceX's proposal, because the term on which Blue

Origin relies was not a mandatory solicitation requirement but rather was a statement of best

practice that NASA hoped to see in offerors' proposals.

Nevertheless, the second key term in the provision on which Blue Origin relies is the

term "HLS element." This term is not expressly defined in the solicitation or statement of work,

but other terms and definitions make its meaning clear. The first part of the term, "HLS," is

defined in the solicitation and its SOW:

> **HLS**: All objects, vehicles, elements, integrated systems, systems,
> subsystems, or components thereof that are designed, developed,
> and utilized by the contractor, its teammates, subcontractors, and
> suppliers in performance of this contract, and *which collectively
> comprise the contractor's Integrated Lander (or elements thereof),
> all Supporting Spacecraft, all launch vehicles necessary for launch
> and delivery of the contractor's Integrated Lander (or elements
> thereof) and its Supporting Spacecraft*, and the contractor's Active-
> Active docking adapter (AADA) (if required for performance of the
> contractor's crewed demonstration mission).

*Id.* at 32948 (italics added, boldface in original). That definition is very broad, and plainly

includes supporting spacecraft. The definition also includes the second part of the key phrase –

the word "element" – and uses that word to refer to parts of the integrated lander, *in contrast to*

supporting spacecraft. This important difference is further demonstrated in the definitions of

"integrated lander" and "supporting spacecraft:"

> **Integrated Lander**: *Any and all combinations of contractor
> elements (e.g. Ascent Element), including potentially a single
> element*, which is *integrated at any time crew are onboard*.

> **Supporting Spacecraft**: Any contractor spacecraft *that is not otherwise the Contractor's HLS Integrated Lander*, Launch Vehicle, or AADA, but that is otherwise required for the Contractor to execute its demonstration mission or any portion thereof in performance of this contract, including, but not limited to, rendezvous, proximity operations, docking and undocking (RPODU), propellant transfer, and orbital maneuvering and transfer.

*Id.* (italics added, boldface in original).  Supporting spacecraft is defined expressly in opposition to the integrated lander.  The word "element" is used nowhere in the definition of supporting spacecraft, but is used repeatedly in the definition of integrated lander.  The word "element," therefore, refers to a component of the integrated lander, which, by definition, is *not* a supporting spacecraft, and vice-versa.

This meaning of the word "element" is reflected throughout the solicitation and its SOW.  For example, the SOW defines "HLS Flight Operations" as "the period of performance that begins with the first Earth launch of *any element of the HLS Integrated Lander*, includes the entirety of the HLS Mission, and concludes with the subsequent transition of the uncrewed HLS out of the CSV approach ellipsoid."  *Id.* at 32999.

More examples abound in the solicitation itself.  In discussing ownership of property, the solicitation states that "NASA will not take ownership of the Integrated Lander, any individual *elements* thereof, *or Supporting Spacecraft*."  AR Tab 27 at 24443 (emphasis added).  This provision plainly demonstrates that "elements" refers to parts of the integrated lander, which supporting spacecraft are an entirely different category that requires separate invocation.  In another example, the solicitation states that "[t]he Offeror is required to propose how it will launch and deliver its *Integrated Lander (and all elements thereof)* to the Moon using commercial launch vehicle(s), including all phases of launch vehicle flight *and, if applicable,*

*any Supporting Spacecraft.*"  *Id.* at 24453.  Again, "elements" is used in conjunction with the integrated lander, while supporting spacecraft are described as a separate category.

The GAO misinterpreted the language of the solicitation by improperly minimizing the importance of the word "element."  AR Tab 108b67a at 105074-76.  In effect, the GAO found that, because the definition of HLS includes supporting spacecraft, an HLS element must include supporting spacecraft as well.[5]  *Id.* at 105075-76.  As we have demonstrated, this is not correct – "element" has a particular meaning in the solicitation and its statement of work, one that is clear from the documents read as a whole, and that meaning does not include supporting spacecraft. Moreover, the GAO's interpretation of the word "element" to instead include each item listed in the solicitation definition of HLS makes no sense, not least because the third item in that list is the word "element" itself.  AR Tab 27e at 32948.  It would be nonsensical to read the SOW to be defining HLS elements to include not only objects and vehicles, but also, somehow, "elements."

Of course, this Court is not bound to follow the GAO, or even to accord its interpretation any particular weight – although GAO decisions may be helpful given GAO's experience in the area of bid protests, GAO decisions are not entitled to deference on matters of legal interpretation.  *See Grunley Walsh Int'l LLC v. United* States, 78 Fed. Cl. 35, 39 (2007) (citing *Metcalf Constr. Co. v. United States,* 53 Fed. Cl. 617 n.17 (2002)).

---

[5] The GAO also cites a passage in the SEP report for Dynetics as supportive of its interpretation.  AR Tab 108b67a at 105076 (citing AR Tab 59b at 62738-39).  Even if this passage of the SEP report was poorly worded, it was not in any way incorporated into the solicitation, and has no legal bearing on the plain meaning of the solicitation's terms.

███████████████████████████████

Likewise, the unsolicited opinion of Blue Origin's retained expert, Dr. Alan Wilhite, should not be considered by the Court.[6]  Review of bid protest allegations should be based on "the administrative record already in existence, not some new record made initially in the reviewing court."  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (2009).  Dr. Wilhite's declaration was not before the agency, and is not part of the administrative record in this case.  Blue Origin has not even attempted to meet the high bar for admission of Dr. Wilhite's opinions as a supplement to the administrative record, but even if Blue Origin were to do so, it is clear that these opinions are not necessary for "effective judicial review" of Blue Origin's protest allegations, which hinge on the interpretation of solicitation terms.  *Id*. at 1380 (citation omitted); *see also Rhinocorps Ltd. Co. v. United States*, 87 Fed. Cl. 261, 282 (2009) (finding it inappropriate to supplement the administrative record with documents that "proffer facts that substitute plaintiff's opinion for the [agency's] technical determinations[.]").  In any event, despite Dr. Wilhite's experience in aerospace engineering, he is not better situated than this Court to interpret solicitation terms.[7]

---

[6]  Blue Origin has not moved to supplement the administrative record with this declaration, and it is not properly before the Court for consideration.  Accordingly, we have not moved to strike, but reserve the right to do so, as the declaration is not part of the administrative record, the Court's record, or a necessary supplement to either.

[7]  Dr. Wilhite also asks this Court to consider a briefing slide which loosely referred to "elements" of SpaceX's proposed concept of operations.  Decl. at ¶ 15; *see also* Compl. ¶ 70. Because the terms of the solicitation are clear and unambiguous when reading the solicitation as a whole, the Court should not consider this extrinsic evidence when interpreting the solicitation's terms.  Even if considered, however, one casual, colloquial reference to "elements" more broadly does not contradict NASA's consistent application, evidenced throughout the record, of the term "element" to refer to a component of the integrated lander.

Blue Origin also attempts to support its position by relying on a negotiating position taken by NASA in its post-selection negotiations with SpaceX. *See, e.g.*, Compl. ¶¶ 91, 105-06. This letter was not incorporated into the solicitation, and has no legal bearing on its plain terms. *See Banknote*, 365 F.3d at 1353. Moreover, even if the terms at issue were ambiguous, any such ambiguity was patent, and Blue Origin's failure to seek clarification prior to submitting its proposal "precludes acceptance of its interpretation in a subsequent action against the government." *Blue & Gold Fleet,* 492 F.3d at 1313 (citation and internal quotation marks omitted). Even if the Court were inclined to consider this letter, however, it is of no assistance in determining the proper interpretation of the solicitation's terms, because NASA intentionally framed it in the strongest possible terms as a negotiating strategy, anticipating that a compromise position would be reached. AR Tab 63; Tab 108b55-102a at 104694.

In any event, NASA was well within its considerable discretion to manage the risk presented by SpaceX's proposal's approach to FRRs as it did, by assigning a weakness due to the increased risk presented by SpaceX's approach, and mitigating that risk through post-selection negotiations. These actions were in accordance with the solicitation's plain terms, and Blue Origin's disagreement with NASA's approach is not a basis to find it unreasonable.

Contracting officials are "given broad discretion in their evaluation of bids . . . and when an officer[']s decision is reasonable a court may not substitute its judgment for that of the agency." *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citations omitted). "In addition, where a technical evaluation is at issue, the court must defer to the agency's decision." *Gen. Dynamics Mission Sys., Inc. v. United States*, 137 Fed. Cl. 493, 523 (2018) (citing *E.W. Bliss*, 77 F.3d at 449 ). Indeed, "[c]hallenges involving 'the minutiae of the

58

procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *Metro. Interpreters & Translators, Inc. v. United States*, 145 Fed. Cl. 495, 511 (2019) (citing *E.W. Bliss*, 77 F.3d at 449).  Moreover, "'[n]aked claims' of disagreement with evaluations, 'no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious.'" *Metro. Interpreters*, 145 Fed. Cl. at 511 (citing *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004)).  Deference to agency judgment is particularly appropriate in this case because, as the Supreme Court has advised, "a reviewing court must generally be at its most deferential" when an agency is "making predictions, within its area of special expertise, at the frontiers of science." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983).

In exercising its considerable discretion, NASA reasonably evaluated SpaceX's approach to FRRs as a weakness in SpaceX's management approach.  AR Tab 59c at 62812-14.  The SEP report demonstrates NASA's awareness of the issue, and recognition that SpaceX's unique proposed concept of operations presented additional risk to NASA with respect to FRRs.  *Id.* Specifically, because SpaceX's unscrewed depot and tanker Starships would be launched well in advance of its crewed single-element HLS Starship, the FRR, which SpaceX proposed to conduct two weeks prior to the launch of the HLS Starship, would necessarily not be able to review whether the supporting spacecraft were ready for flight, as they would have already been launched previously.  *Id.* at 62813-14.

████████████████████████████████████

Critically, though, the evaluators' responsibility did not end with the identification of an issue in an offeror's proposal. Instead, the solicitation terms plainly described the rubric under which evaluations were to be made regarding the impact of an undesirable aspect of a proposal on NASA's confidence in the proposal overall. AR Tab 27 at 24476. Specifically, the solicitation stated that a Weakness would be assigned for "[a] flaw in the proposal that increases the risk of unsuccessful contract performance." *Id*. By contrast, a Deficiency would only be assigned for "[a] material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." *Id*.

It is NASA, not Blue Origin or even this Court, that is charged with assessing the risk posed by each aspect of an offeror's proposal. NASA did just that with respect to the flaws it found in SpaceX's proposed approach to FRR's, which it determined "had the effect of lessening NASA's involvement and participation in assessing flight readiness for the offeror's supporting spacecraft prior to launch of such spacecraft." AR Tab 59c at 62814.

Here is it critical to note that, although it initially proposed only a single NASA-led FRR prior to the launch of its crewed, single-element integrated lander, SpaceX from the outset proposed to conduct its own FRRs prior to the launch of its supporting spacecraft. AR Tab 108a-117 at 92314, 92332; Tab 108b55-102a at 104678. Moreover, SpaceX proposed to permit NASA involvement in those FRRs – NASA was to be permitted full access to the FRRs for supporting spacecraft, but would not chair those reviews, like it would for the FRR prior to the launch of SpaceX's HLS Starship. *Id*. Because this proposal would lessen (though not eliminate) NASA's involvement in the process, NASA reasonably determined, pursuant to its

expert technical judgment to which this Court owes significant discretion, that this aspect of

SpaceX's proposal "increases [its] risk of unsuccessful performance" and warranted a weakness

in its management approach.  AR Tab 59c at 62814.

It is also important here to address Blue Origin's repeated attempts to miscast SpaceX's

approach to FRRs as a safety concern.  *See* Compl. ¶¶ 67-68.  As the solicitation terms make

clear and as NASA explained before the GAO, neither NASA's astronauts or any other crew are

ever transported by the supporting spacecraft SpaceX proposed, unlike the integrated lander, for

which SpaceX proposed a NASA-led FRR.  AR Tab 108b55-102a at 104681.  Moreover, as we

have explained, SpaceX did propose to conduct its own FRRs before the launch of its supporting

spacecraft, for which reviews the Federal Aviation Administration (FAA) has responsibility for

ensuring public safety.  *Id*.; *see also* AR Tab 108b62 at 104882-83 (discussing NASA safety

training, reviews and process, as well as FAA guidelines and responsibilities).  The record does

not support Blue Origin's allegations that SpaceX's proposed approach presented a safety

concern.

Finally, Blue Origin extends the flawed premise of its FRR allegations to other milestone

reviews described in the solicitation and SOW.  Compl ¶¶ 7-8, 24, 95-96.  For the DCR, Blue

Origin faults SpaceX for not meeting a "requirement" for the DCR to be completed 9 months

prior to the first HLS launch, but quotes the language from the solicitation, which uses the term

"should," which, as we explain above, was expressly defined to denote best practices rather than

a requirement.  Moreover, the purpose of the DCR is to "ensure[] that the qualification and

verifications demonstrate design compliance with the functional and performance requirements

and human spaceflight certification."  AR Tab 27e at 32969.  The reference to the Option A

61

"functional and performance requirements," *see* AR Tab 27d.09 at 32908, upon which

qualification, verification, and compliance demonstration are based, is to requirements contained

in the HLS Partner System Requirements Document, the scope of which is defined as "a minimal

set of HLS performance requirements identifying the functionality of the *integrated lander*

*system*." *Id*. at 32892.  Accordingly the DCR was concerned with ensuring that the integrated

lander system met applicable requirements, not with supporting spacecraft.

With regard to other reviews, NASA reasonably concluded, in the exercise of its

significant discretion in making such judgments, that SpaceX's proposed approach to these

reviews did not increase the risk of unsuccessful contract performance and, thus, did not merit a

weakness or other finding, particularly in light of SpaceX's proposal to follow "strict Federal

Aviation Administration (FAA) requirements to keep the public safe."  AR Tab 34a at 55010.

At bottom, Blue Origin's allegations amount to no more than an expression of its

disagreement with NASA's technical evaluations.  This is perhaps no more apparent than in

paragraph 28 of its complaint, in which Blue Origin lists a litany of complaints about SpaceX's

proposed approach.  We have already highlighted above the incongruity of this paragraph in a

complaint that alleges that Blue Origin would have adopted much the same approach it criticizes

so vociferously in paragraph 28, if only it were freed of making milestone reviews.  But this

paragraph also serves to demonstrate that the true nature of Blue Origin's challenge is a mere

disagreement with the expert judgment of NASA evaluators, mixed with understandable

disappointment at not receiving award of an Option A contract.  But the law is clear that agency

evaluations are due particular deference, particularly when they involve such complex topics as

the literal rocket science involved in this procurement.  *See*, *e.g.*, *Banknote*, 56 Fed. Cl. at 384.

████████████████████████████████████████████

Finally, as we explain in the standing section above, Blue Origin cannot demonstrate that, even if the Court were to find that NASA erred in some way with respect to SpaceX's approach to FRRs and other reviews, that Blue Origin was prejudiced by any such error.  "A protestor must demonstrate prejudice twice: first to establish standing and then again to prevail upon the merits."  *Digitalis Educ. Sols., Inc. v. United States*, 97 Fed. Cl. 89, 93 (2011), *aff'd,* 664 F.3d 1380 (Fed. Cir. 2012) (citations omitted).  "At both junctures, the test for prejudice . . . is the same:  whether the protestor had a substantial chance of securing the contract but for the error."  *Id*. (citations omitted).  However, "for the second prejudice inquiry, which is a component of our review of the merits, we consider only the evidence in the record."  *Id*. (citation omitted).  For the reasons we describe above, Blue Origin has not met its burden to show that it was prejudiced by any NASA error with regard to FRRs or other milestone reviews and, accordingly, the Court should grant judgment on the administrative record in favor of the United States even if it finds that NASA erred.

### B.     NASA Was Not Required To Hold Discussions With Blue Origin, And Its Exchanges With SpaceX Were Proper In Accordance With The Solicitation

As we explain in Section III above, Blue Origin has waived the allegations contained in Count Two of its complaint, and the Court should dismiss them.  These allegations challenge clear, unambiguous terms of the solicitation and, having failed to bring these challenges prior to the date for receipt of proposals, Blue Origin cannot pursue them now, long after award.

Even if these claims were not waived, however, Blue Origin has not shown that NASA's actions were arbitrary, capricious, or in any way contrary to law or the terms of the solicitation.  Instead, NASA acted appropriately and exactly in accordance with the plain solicitation terms.

███████████████████████████████

Blue Origin's allegations in Count Two rest on two false premises.  First, Blue Origin alleges that SpaceX's proposal was deficient, because it failed to comply with what Blue Origin characterizes as material solicitation requirements regarding FRRs.  Compl. ¶ 143.  As we explain in the preceding section, Blue Origin is incorrect.

Second, Blue Origin alleges that NASA conducted discussions with SpaceX, but failed to conduct discussions with Blue Origin.  Compl. ¶ 144.  Again, Blue Origin is incorrect.  NASA did not conduct discussions with SpaceX or any other offeror.  Rather, in accordance with the express terms of the solicitation, it conducted post-selection negotiations with SpaceX.

As we explain in the facts section above, the solicitation expressly defined both the term discussions and post-selection negotiations.  AR Tab 27 at 24434.  Post-selection negotiations were defined as:  "exchanges with Offerors who have been selected for potential contract award that result in the Contracting Officer inviting the Offeror to revise only those specific portions of its proposal that have been identified by the Contracting Officer as open to revision."  *Id*.  This definition was identical to the definition of discussions, except that discussions "occur after receipt of proposals but before selection," while post-selection negotiations occur "with offerors who have been selected for *potential* contract award."  *Id*. (emphasis added).  Indeed, in fashioning the Option A solicitation, NASA consciously expanded its flexibility in post-selection negotiations as compared with those permitted in the Base Period solicitation.  AR Tab108b55-102a at 104673-74; *compare* AR Tab 108a-002 at 65676 *with* Tab 27 at 24434.

The solicitation also defined proposal revision, which meant "any change made by the Offeror to its proposal that occurs as a result of discussion or post-selection negotiations in accordance with Section 4.2.2. of this solicitation."  *Id*.  Finally, in three separate sections of the

solicitation, NASA warned offerors that it "may evaluate proposals and award contracts without conducting post-selection negotiations or discussions with Offerors" and that, as a consequence, "each Offeror shall submit only one proposal which represents its best approach to meeting the requirements of the solicitation." *Id*. at 24433 (emphasis omitted), 24473, *see also* 24481.

NASA expressly reserved the right to conduct discussions or post-selection negotiations if the contracting officer determined them to be necessary. *Id*. at 24473. Moreover, the solicitation expressly provided that "[t]he Government reserves the right to negotiate any aspect of an Offeror's milestone payment amounts, schedule, and/or acceptance criteria prior to award of Option A." *Id*. at 24467.

Blue Origin did not challenge these terms during the procurement process, nor does it now establish that these terms are contrary to law. Instead, the law provides that contracting officials "generally have broad discretion regarding whether or not to engage in discussions with offerors before award." *Chenega Healthcare Servs., LLC v. United States*, 138 Fed. Cl. 644, 652 (2018) (citing *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1327-29 (Fed. Cir. 2011)).

The essence of Blue Origin's challenge appears to be allegations that SpaceX's proposal contained a deficiency and, deficiencies cannot be cured pursuant to post-selection negotiations. But not only is Blue Origin wrong that SpaceX's proposal was deficient, its argument that a deficiency could not be cured in post-selection negotiations also finds no support in the language of the solicitation or in the law. Blue Origin appears to concede that a deficiency could be cured in *discussions*. But post-selection negotiations were expressly defined by the solicitation to have exactly the same scope as discussions – it is only their timing that differed. Accordingly, as in discussions, there is no reason that a deficiency could not be cured in post-selection negotiations.

████████████████████████████████

Blue Origin appears to suggest that, if SpaceX's proposal was deficient, it could not be "selected" for post-selection negotiations in the first place.  But the solicitation does not support this allegation.  A selection for post-selection negotiations is not a selection for award, but only a selection for *potential* award.  AR Tab 27 at 24434.  Indeed, NASA's selection of SpaceX for negotiations expressly stated that it was "non-final" and conditional, and did not amount to a decision to award an Option A contract to SpaceX.  AR Tab 64 at 62893; Tab 77 at 63039.  Instead, "selection," in this context, merely enabled NASA to enter into post-selection negotiations with SpaceX, and did not even preclude the possibility of post-selection negotiations – or, for that matter, award – to another Option A offeror.  AR Tab 64 at 62892-94.  NASA's perfectly rational determination was simply that it was in NASA's best interests, given the available funding and prices proposed by the offerors, to select and enter into post-selection negotiations with the highest rated and lowest priced offeror, SpaceX, and then to determine, following those negotiations, whether any further negotiations were in NASA's best interests.  *Id*. at 62894.

Indeed, the administrative record expressly addresses the hypothetical situation of whether a proposal containing a flaw that precluded award could remedy that flaw in post-selection negotiations.  NASA determined that Blue Origin's proposal contained advance payments that were expressly prohibited by the solicitation, and rendered a proposal ineligible for award.  AR Tab 77 at 63054.  The SSA, however, explained that although these proposed advance payments "render Blue Origin's proposal ineligible for award without the Government engaging in discussions or negotiations with Blue Origin," either type of exchanges "would provide an opportunity for [Blue Origin] to submit a compliant revised proposal."  *Id*.; *see also*

*id*. at 63056 n.1 ("While it is also the case that Blue Origin's proposal is not awardable as-is in light of its aforementioned advance payments, this is an issue I would endeavor to allow Blue to correct through negotiations or discussions if I otherwise concluded that its proposal presents a good value to the Government.").

Finally, as we explain in the standing section above, even if the Court were to find that NASA should have conducted discussions with Blue Origin, it cannot demonstrate that it was prejudiced by any such error. Accordingly, the Court should grant judgment on the administrative record in favor of the United States.

### C. NASA Had No Obligation To Amend The Solicitation, And Its Decision Not To Do So Was Rational

In Count Three of its complaint, Blue Origin alleges that NASA was required to amend the solicitation upon learning of the funding available for the Option A procurement, because this was tantamount to a change in requirements. Compl. ¶ 155. On the contrary, the solicitation anticipated exactly the situation that arose and made express provision for how it would be handled, in accordance with which NASA acted. Blue Origin further alleges that NASA's requirements for FRRs, DCRs, and other reviews changed, necessitating an amendment to the solicitation. Compl. ¶¶ 158-159. As we demonstrate above, NASA's requirements did not change with respect to these reviews, so no amendment was required or warranted.

Blue Origin rests its allegations on the terms of FAR 15.206(a), which provides that "[w]hen, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation." The Option A procurement, however, was conducted pursuant to FAR Part 35, not FAR Part 15, so it is not clear that this provision is applicable.

███████████████████████████

Even if applicable, however, Blue Origin's allegations have no merit, and the GAO has previously rejected them.  First, the GAO found these allegations to be untimely, as Blue Origin knew or should have known of the level of funding available to NASA well before award but failed to bring a challenge at that time.  AR Tab 108b67a at 105027-28.  Likewise here, Blue Origin has waived these allegations by failing to bring them prior to award, despite having the clear opportunity to do so. *See COMINT*, 700 F.3d at 1382 (*Blue & Gold Fleet* waiver rule applies to "all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so.").

In addition, the GAO rejected Blue Origin's argument that the funding available to NASA necessitated a solicitation amendment.  The GAO determined that "NASA's ultimate available funding for the HLS program did not constitute a change in NASA's requirements because the solicitation and the applicable provisions in FAR part 35 unequivocally put offerors on notice that any award decision was subject to available funds."  AR Tab 108b67a at 105028. This determination is plainly correct, as the solicitation contained a panoply of terms that described exactly how NASA would handle limitations on available funding.

Although Blue Origin relies heavily on terms in the solicitation indicating NASA's preference to make multiple awards if feasible, the solicitation was clear that "NASA reserves the right to select for award multiple, one, or none of the proposals received in response to this Appendix."  AR Tab 27 at 24481.  It explained that "[t]he overall number of awards will be dependent upon funding availability and evaluation results." *Id*.  Indeed, the solicitation expressly stated that, "[c]onsistent with FAR 35.016(e), the primary basis for selecting one or

more proposals for award shall be technical, importance to Agency programs, and *funds availability*." *Id*. at 24475 (emphasis added).

Moreover, the solicitation went further, expressly warning offerors that "[f]unds are not currently available for this solicitation, but are expected to become available on or before contract award." *Id*. at 24481. It explained that "[t]he Government's obligation to make awards is contingent upon the availability of appropriated funds from which payments can be made and the receipt of proposals that NASA determines are acceptable." *Id*. That is not all: the solicitation provided that "the SSA may consider whether the proposal allows the Agency to effectuate its acquisition strategy of making two awards, *within the limits of NASA's available funds*." *Id*. at 24480 (emphasis added). Finally, the solicitation stated that "The overall number of awards will be *dependent upon funding availability* and evaluation results." *Id*. at 24481.

These terms make abundantly clear how NASA would handle a situation where funding available for the Option A procurement was lower than NASA hoped – it would reduce the number of awards it would make, potentially to zero. This should have led offerors to ensure to propose their best pricing in their *initial proposal*, not wait for NASA to request a reduced price in light of funding restrictions. Indeed, the solicitation expressly exhorted offerors to do just that, on multiple occasions: "each Offeror should submit its initial proposal to the Government using the most favorable terms from a price and technical standpoint." *Id*.; *see also id*. at 24433 ("each Offeror shall submit only one proposal which represents its best approach to meeting the requirements of the solicitation."); *id*. at 24473 (same). Blue Origin's apparent business decision to take a different approach and propose a high price, hoping to lower it, if at all, only in discussions or negotiations is a gamble that Blue Origin alone chose to make, contrary to the

express terms of the solicitation.  The law does not require NASA to relieve Blue Origin of the consequences of that choice, and neither should this Court.

Finally, as the GAO recognized, this is not a case where a limitation on funding required a change in the scope of the work envisioned in the contract awarded pursuant to the solicitation, potentially providing a reason to consider amending the solicitation to account for a changed scope of work.  *See* AR Tab 108b67a at 105029-30.  Instead, here the scope remained unchanged.  The effect of the funding limitations was to render infeasible NASA's preference for two awards, but that situation was anticipated and properly provided for within the terms of the existing solicitation, and no amendment was necessary or warranted.

Additionally, we discuss at length above that NASA did not change its requirements related to FRRs, DCRs, or other reviews, and won't repeat those arguments here.  These allegations stem from Blue Origin's misinterpretation of solicitation terms, not from any change in NASA's requirements.  Accordingly, no amendment to the solicitation was required or warranted.

Finally, as we explain in the standing section above, even if the Court were to find that NASA should have amended the solicitation, Blue Origin cannot demonstrate that it was prejudiced by any such error.  *See Elec. Data Sys.*, 93 Fed. Cl. at 437 (finding lack of prejudice despite agency's failure to amend solicitation); *see also id*. at 439 n.30 (citing leading legal commentators regarding limited situations in which solicitation amendment is required). Accordingly, the Court should grant judgment on the administrative record in favor of the United States.

████████████████████████

### D.   NASA Evaluated SpaceX's Proposal In Accordance With The Solicitation

In Count Four of its complaint, Blue Origin largely rehashes allegations it makes elsewhere in its complaint, and to which we have fully responded above.  *See* Compl. ¶¶ 166 (regarding FRRs), 167 (regarding DCRs and other reviews).  In particular, as these allegations challenge NASA's evaluation of another offeror, SpaceX, Blue Origin lacks standing to pursue them, because offerors were not competing against each other under the terms of the solicitation.  For this reason and the many other reasons stated above, the Court should reject these allegations and dismiss them or grant judgment on the administrative record in favor of the United States.

To the extent that this Count raises any new allegations, however, and even if Blue Origin possessed standing to pursue them, Blue Origin has failed to demonstrate that NASA's evaluation of SpaceX's proposal was arbitrary, capricious, or otherwise contrary to law.

As we explain above, NASA is entitled to an extremely high degree of deference in assigning particular technical ratings to an offeror's proposal, particularly in highly technical matters such as those involved in this procurement.  *Metro. Interpreters*, 145 Fed. Cl. at 511 ("Challenges involving the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess.") (citation and internal quotation marks omitted).  The Court should decline Blue Origin's invitation to second guess NASA on these highly technical matters of particular agency expertise.

Moreover, there is no basis in the record to support Blue Origin's allegation that NASA minimized weaknesses or double-counted positive aspects of SpaceX's proposal.  See Compl. ¶ 93.  The Significant Strength NASA awarded to SpaceX for exceeding NASA's requirements

for threshold values recognizes the value provided by the combination of capabilities that each demonstrably exceeded NASA's requirements.  AR Tab 59c at 62779-81.  This was in accordance with the solicitation provision expressly cited in the SEP Report.  *Id*. at 62779.  The Strength assigned for SpaceX's cargo allocation cites a different solicitation requirement, and focuses specifically on the aspect of SpaceX's proposal responsive to that requirement, the benefits associated with the nature of the cargo volume available.  *Id*. at 62781.

Likewise, there is no support in the record for SpaceX's allegation that NASA failed to assess an alleged SpaceX failure to propose inspection and refurbishment for its reusable vehicles.  Compl. ¶ 92.  On the contrary, SpaceX's proposal is filled with discussions of SpaceX's plans to inspect, maintain, and refurbish its reusable vehicles during its proposed operations.  *See*, *e.g.*, AR Tab 34a at 55038 ("███████████████████████████ █████████████████████████████████████████████████████████████████ ██████████████████████"); Tab 34d.105 at 58357 ("███████████████████████ █████████████████████████████████████████████"); Tab 34d.164 at 61486 (chart), 61573 (chart), 61580 ("█████████████████████████████████"), 61604 ("████████████████████████████████████████████████████████████████ ██████████████████████████████████").  In addition, NASA did assign SpaceX a Significant Weakness for its highly complex concept of operations, which cited the proposal's reliance on the "reuse of critical vehicles and systems," and that "the cadence required by the offeror's architecture demands inspection and refurbishment of the reusable vehicles between each flight, and at a historically undemonstrated pace."  AR Tab 59c at 62797.  Blue Origin's allegation in entirely baseless, and is yet another example of Blue Origin's attempts to

72

use mere disagreement with NASA's expert judgments to meet its burden to demonstrate arbitrary and capricious agency action.  As this Court has consistently held, such mere disagreement, however vigorous, is insufficient to carry this burden.  *Metro. Interpreters*, 145 Fed. Cl. at 511.

Finally, as we explain in the standing section above, even if the Court were to find that NASA erred in its evaluation of SpaceX's proposal, it cannot demonstrate that it was prejudiced by any such error.  Accordingly, the Court should grant judgment on the administrative record in favor of the United States.

### E.     NASA Did Not Breach The Implied Covenant Of Good Faith And Fair Dealing

In Count Five of its complaint, Blue Origin repeats the same allegations advanced elsewhere in its complaint, but argues that these allegations amount to a breach of the "implied contract to consider all bids fairly and honestly."  Compl. ¶ 171.  The Court has held that an alleged breach of the implied contract to fairly and honestly consider bids "is, at best, redundant, as any claim which could have been brought under that theory is preserved within [the Court's] jurisdiction under 28 U.S.C. § 1491(b)(1)."  *Res Rei Dev., Inc. v. United States*, 126 Fed. Cl. 535, 547 n.18 (2016).  Count Five raises no new arguments and, therefore, is merely another, superfluous way of framing the same allegations discussed above in Counts One through Four. For the reasons explained above discussing Blue Origin's lack of standing and or waiver of these claims as well as Blue Origin's failure to support them on the merits, the claims in Count Five likewise fail.  The Court should dismiss Count Five or, in the alternative, grant judgment on the administrative record in favor of the United States.

### V.    Blue Origin Has Failed To Establish That It Is Entitled To Permanent Injunctive Relief

The Federal Circuit has explained that "injunctive relief is available only in extremely

limited circumstances." *CACI, Inc. – Federal v. United States*, 719 F.2d 1567, 1581 (Fed. Cir.

1983) (internal quotes and punctuation omitted).  In the event that the Court identifies a

prejudicial error on the merits of this protest, it must consider three additional criteria before

ordering a permanent injunction: (1) "whether the plaintiff will suffer irreparable harm if the

court withholds injunctive relief"; (2) "whether the balance of hardships to the respective parties

favors the grant of injunctive relief;" and (3) "whether it is in the public interest to grant

injunctive relief."  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)

(citations omitted).  The grant of an injunction is "extraordinary relief" and, therefore, the Court

applies "exacting standards."  *Lermer Germany GmbH v. Lermer Corp.*, 94 F.3d 1575, 1577

(Fed. Cir. 1996).

Blue Origin cannot demonstrate entitlement to the injunctive relief it seeks.  As an initial

matter, Blue Origin cannot succeed on the merits of its claims, for all the reasons we explain

above.

Moreover, Blue Origin has not demonstrated that it suffered irreparable harm stemming

from NASA's decision to award a contract to SpaceX.  To secure an injunction, Blue Origin

must present evidence that it will suffer irreparable harm in its absence – mere allegations are

insufficient.  *PGBA v. United States*, 389 F.3d 1219, 1231-32 (Fed. Cir. 2004) (affirming denial

of preliminary injunction when protestor "did not come forward with evidence it would suffer

irreparable harm, such as evidence of lost profits or evidence that a monetary award would not

remedy its damages if a resolicitation or reevaluation was not ordered"); *OAO Corp. v. United*

*States*, 49 Fed. Cl. 478, 480 (2001) ("Mere allegations of an unfair competitive bidding process are not sufficient to demonstrate an irreparable injury," because "if they were, any bid protest would involve an irreparable injury.").

In the solicitation at issue, offerors were not competing against each other, and award of a contract to SpaceX did not itself prevent award of a contract to Blue Origin. Instead, NASA decided not to award a contract to Blue Origin because it found that its "proposal [did] not present sufficient value to the Government when analyzed pursuant to the solicitation's evaluation criteria and methodology," in large part owing to Blue Origin's extremely high price and NASA's limited available funding. AR Tab 77 at 63056. Even if the Court were to conclude that Blue Origin could show a substantial chance of award, Blue Origin has failed to demonstrate that it will suffer irreparable harm as a result of NASA's decision to award an Option A contract to SpaceX. Blue Origin will have other opportunities to compete for NASA contracts for similar research, development, and services, and indeed has recently been awarded one such contract, as discussed by NASA Associate Administrator Robert Cabana in the attached declaration. Decl. of Robert D. Cabana, at ¶ 10.

Additionally, even assuming that Blue Origin could prevail on the merits and would suffer irreparable harm, any such harm is outweighed by the harm that would result to NASA if the Court were to grant the injunctive relief that Blue Origin requests. Indeed, the issuance of an injunction would "force NASA to fundamentally re-plan the HLS acquisition strategy, either by revising and re-issuing the Option A solicitation to address any corrective action directed by the Court, or canceling the Option A procurement altogether." *Id.* at ¶ 6. As Mr. Cabana explains, the resultant delay to NASA's scheduled return to the lunar surface could range between 8-12

months on the low end to as much as 27 months. *Id*. at ¶ 7. Nor is NASA's harm limited to schedule delays: NASA would also incur significant additional monetary costs, which reduce funds available for other important priorities. *Id*. at ¶ 8. Moreover, an injunction risks the continued success of the Option A procurement's public-private partnership, and the terms of any eventual Option A award. *Id*. at ¶ 9.

Injunctive relief is also not in the public interest, for many of these same reasons. The HLS program is a critical part of the larger Artemis program, an ambitious and inspiring endeavor to return American astronauts to the Moon for the first time in over 50 years. *Id*. at ¶ 4. Artemis is a crucial step in creating sustainable lunar surface architectures that will pave the way for later missions to Mars. *Id*. Although HLS is only one component of the Artemis program, it is one that is on the critical path – without HLS success, Artemis cannot meet its objectives. *Id*.. at ¶ 5. In short, the cost to the public of an injunction is extremely high, as the nation's lunar exploration plans would, at minimum, be significantly delayed if the Court were to issue an injunction. Blue Origin has not carried its high burden to demonstrate that, in the absence of an injunction, it would suffer irreparable injury in any way comparable to the harm a significant delay in space exploration would entail.

Finally, even if the Court were to conclude that some relief is warranted, it should tailor any such relief as narrowly as possible to address any specific error it may identify, while not unduly encroaching on agency discretion. For example, the Court the Court could stay the case and remand to the agency for corrective action, without imposing an injunction. "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course. If a less drastic remedy … was sufficient to redress respondents' injury, no recourse to the additional

and extraordinary relief of an injunction was warranted." *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) (internal citation omitted).

## CONCLUSION

For these reasons, the United States respectfully requests that the Court dismiss Blue Origin's complaint or, in the alternative, grant judgment on the administrative record in favor of the United States.

<div style="margin-left: 40%;">

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

s/ Douglas K. Mickle
DOUGLAS K. MICKLE
Assistant Director

</div>

OF COUNSEL:

<div style="margin-left: 40%;">

s/ Anthony F. Schiavetti
ANTHONY F. SCHIAVETTI
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7572
Fax: (202) 305-1571
anthony.f.schiavetti@usdoj.gov

</div>

ALLISON M. GENCO
BRIAN M. STANFORD
Senior Attorney Advisors
NASA Office of the General Counsel

October 1, 2021

<div style="margin-left: 40%;">

Attorneys for Defendant

</div>