REDACTED VERSION

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

21-1695C
(Judge Richard A. Hertling)

BLUE ORIGIN FEDERATION LLC,
Plaintiff,

v.

THE UNITED STATES,
Defendant,

and

SPACE EXPLORATION TECHNOLOGIES CORP.,
Defendant-Intervenor.

DEFENDANT'S RESPONSE TO PLAINTIFF'S CROSS-MOTION
FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND
REPLY IN SUPPORT OF ITS COMBINED MOTION TO DISMISS AND
CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

DOUGLAS K. MICKLE
Assistant Director

OF COUNSEL:

ALLISON M. GENCO
BRIAN M. STANFORD
Senior Attorney Advisors
NASA Office of the General Counsel

ANTHONY F. SCHIAVETTI
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7572
Fax: (202) 305-1571
anthony.f.schiavetti@usdoj.gov

October 13, 2021

Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................iii

I.     The Court Should Dismiss Blue Origin's Complaint Because It Has Not
       Established Standing ...................................................................................2

       A.     Blue Origin's Proposed Price So Far Exceeded Available Funding
              And SpaceX's Pricing That It Cannot Show A Substantial Chance
              Of Award ......................................................................................4

       B.     Even If NASA Had Waived FRRs Or Other Milestone Reviews,
              Blue Origin Cannot Establish That It Would Have Had A Substantial
              Chance Of Award In Light Of Such A Waiver.........................................7

       C.     Even If NASA Had Held Discussions Or Amended The Solicitation,
              Blue Origin Cannot Establish That It Would Have Had A Substantial
              Chance Of Award ..........................................................................13

       D.     If Blue Origin's Interpretation Of What Constitutes A Deficiency
              Were Correct, Blue Origin Would Have Been Ineligible For Award..................14

II.    The Court Should Dismiss Many Of The Allegations In Blue Origin's
       Complaint Because Blue Origin Has Waived Them ........................................15

III.   The Court Should Grant Judgment On The Administrative Record To
       The United States .......................................................................................21

       A.     NASA Did Not Waive A Solicitation Requirement For FRRs Or Other
              Milestone Reviews For SpaceX..........................................................21

              1.     "HLS Element" Refers To The Integrated Lander ...................23

              2.     The DCR And Other Reviews Also Apply To The Integrated Lander.....29

              3.     NASA Was Well Within Its Discretion To Assign
                    A Weakness To SpaceX Rather Than A Deficiency................................33

       B.     NASA Was Not Required To Hold Discussions With Blue Origin,
              And Its Exchanges With SpaceX Were Proper In Accordance With
              The Solicitation..................................................................................37

       C.     NASA Had No Obligation To Amend The Solicitation, And Its Decision
              Not To Do So Was Rational .................................................................39

D.      NASA Evaluated SpaceX's Proposal In Accordance With The
        Solicitation ........................................................................................42

E.      NASA Did Not Breach The Implied Covenant Of Good Faith And
        Fair Dealing ......................................................................................46

IV.   Blue Origin Has Failed To Establish That It Is Entitled To Permanent
      Injunctive Relief..................................................................................................48

CONCLUSION..........................................................................................................49

# TABLE OF AUTHORITIES

### Cases

*Am. Safety Council, Inc. v. United States,*
122 Fed. Cl. 426 (2015) ................................................................................................40

*Argencord Mach. & Equip., Inc. v. United States,*
68 Fed. Cl. 167 (2005) ................................................................................................17

*Axiom Res. Mgmt., Inc. v. United States,*
564 F.3d 1374 (2009).................................................................................................22

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,*
462 U.S. 87 (1983).............................................................................................33, 43

*Banknote Corp. of Am. v. United States,*
56 Fed. Cl. 377 (2003) ................................................................................................14

*Banknote Corp. of Am. v. United States,*
365 F.3d 1345 (Fed. Cir. 2004)..............................................................14, 24, 26

*Bannum, Inc. v. United States,*
404 F.3d 1346 (Fed. Cir. 2005)...............................................................................12

*BayFirst Sols., LLC v. United States,*
102 Fed. Cl. 677 (2012) ..............................................................................................29

*Blue & Gold Fleet, L.P. v. United States,*
492 F.3d 1308 (Fed. Cir. 2007)................................................................... *passim*

*Caddell Constr. Co. v. United States,*
125 Fed. Cl. 30 (2016) ..................................................................................................3

*Centech Group, Inc. v. United States,*
554 F.3d 1029 (Fed. Cir. 2009)...............................................................................35

*CliniComp Int'l, Inc. v. United States,*
904 F.3d 1353 (Fed. Cir. 2018)................................................................................2

*COMINT Systems Corp. v. United States,*
700 F.3d 1377 (Fed. Cir. 2012)........................................................................16, 20

*Digitalis Educ. Sols., Inc. v. United States,*
97 Fed. Cl. 89 (2011) ..............................................................................................3, 37

*Digitalis Educ. Sols., Inc. v. United States,*
    664 F.3d 1380 (Fed. Cir. 2012)................................................................3, 37

*DynCorp Int'l, LLC v. United States,*
    10 F.4th 1300 (Fed. Cir. 2021) ...................................................................3

*Elec. Data Sys., LLC v. United States,*
    93 Fed. Cl. 416 (2010) ...............................................................................5

*E.W. Bliss Co. v. United States,*
    77 F.3d 445 (Fed. Cir. 1996)................................................................33, 43

*Gen. Dynamics Mission Sys., Inc. v. United States,*
    137 Fed. Cl. 493 (2018) ...........................................................................33

*i3 Cable & Harness LLC v. United States,*
    132 Fed. Cl. 495 (2017) ...........................................................................20

*Inserso Corp. v. United States,*
    961 F.3d 1343 (Fed. Cir. 2020)......................................................... 15-16, 20

*Medline Industries, Inc v. United States,*
    No. 21-1098, 2021 WL 3483429 (Fed. Cl. July 30, 2021) ...............................41

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010)................................................................................49

*Mortgage Contracting Services, LLC v. United States,*
    153 Fed. Cl. 89 (2021) .............................................................................34

*Off. Design Grp. v. United States,*
    951 F.3d 1366 (Fed. Cir. 2020)..................................................................43

*Omega World Travel, Inc. v. United States,*
    54 Fed. Cl. 570 (2002) .............................................................................40

*Orbital Maint. & Constr. Co. v. United States,*
    145 Fed. Cl. 71 (2019) ........................................................................ 11-12

*Per Aarsleff A/S v. United States,*
    829 F.3d 1303 (Fed. Cir. 2016)..............................................................27, 29

*Res Rei Dev., Inc. v. United States,*
    126 Fed. Cl. 535 (2016) ...........................................................................47

*Rhinocorps Ltd. Co. v. United States*,
   87 Fed. Cl. 261 (2009). ............................................................................23

*SEKRI, Inc. v. United States*,
   152 Fed. Cl. 742 (2021) ...............................................................15, 16, 20

*Stratos Mobile Networks USA, LLC v. United States*,
   213 F.3d 1375 (Fed. Cir. 2000)..................................................................27

*Tolliver Group, Inc. v. United States*,
   151 Fed. Cl. 70 (2020) .........................................................................17, 38

*Treadwell Corp. v. United States*,
   142 Fed. Cl. 650 (2019) ........................................................................23 n.2

*WaveLink, Inc. v. United States*,
   No. 20-749C, 2021 WL 2762814 (Fed. Cl. June 24, 2021).................... *passim*

*Wisconsin Physicians Serv. Ins. Corp. v. United States*,
   151 Fed. Cl. 22 (2020) ...............................................................................3

## Statutes

10 U.S.C. § 2305(b)(4) ...............................................................................38

28 U.S.C. § 1491(b)(1) ...............................................................................47

28 U.S.C. § 1491(b)(3) ...............................................................................15

## Other Authorities

*Joint Action in Community Service, Inc.*,
   B-214564, 84-2 CPD ¶ 228 (Comp. Gen. Aug. 27, 1984)..............................41

Ralph C. Nash, *Court of Federal Claims Jurisdiction: Parsing the Statues and Regulations*,
   35 Nash & Cibinic Rep. NL ¶ 9 .............................................................38 n.5

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| BLUE ORIGIN FEDERATION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | No. 21-1695C |
| | ) | (Judge Richard A. Hertling) |
| Defendant, | ) | |
| | | |
| and | | |
| | | |
| SPACE EXPLORATION TECHNOLOGIES | ) | |
| CORP., | | |
| | | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**
**AND REPLY IN SUPPORT OF ITS COMBINED MOTION TO DISMISS AND**
**CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Defendant, the United States, respectfully submits this response to the cross-motion for

judgment on the administrative record (MJAR) filed by plaintiff, Blue Origin Federation, LLC

(Blue Origin), ECF No. 61, and reply in support of its request that, pursuant to Rule 12(b)(1) of

the Rules of the United States Court of Federal Claims (RCFC), the Court dismiss Blue Origin's

complaint because Blue Origin lacks standing to pursue it; that the Court dismiss portions of

Blue Origin's complaint pursuant to RCFC 12(b)(6) because Blue Origin has waived the

allegations contained therein; and that, in the event that any allegations in the complaint are not

dismissed, the Court, pursuant to RCFC 52.1, deny Blue Origin's MJAR and grant judgment on

the administrative record in favor of the United States.

In its MJAR, Blue Origin again fails to establish that it would have had a substantial

chance of award of a contract under the Option A procurement, even if it could establish that the

National Aeronautics and Space Administration (NASA) erred in any aspect of its decision to

award an Option A contract to defendant-intervenor, Space Exploration Technologies Corp.

(SpaceX).  In its last-minute attempt to remedy this flaw, which proved fatal to its protest before

the Government Accountability Office (GAO), Blue Origin continues to change its allegations

regarding the technical approach and price of the hypothetical proposal it would have submitted

to NASA had it properly understood the terms of the Option A broad agency announcement

(BAA).  But the Court should not permit Blue Origin to revise its proposal via the litigation

process, much less to continue to revise its proposal in each successive filing.  Instead, the Court

should find that NASA acted in accordance with express solicitation terms and within its

significant discretion when it properly evaluated the proposals, conducted post-selection

negotiations, and awarded an Option A contract to SpaceX.

I.      **The Court Should Dismiss Blue Origin's Complaint Because It Has Not Established**
        **Standing**

        As we demonstrated in our moving brief, before the Court may reach any analysis of the

merits (or, in this case, lack of merit), of Blue Origin's claims, it must determine whether Blue

Origin has standing to press those claims.  Def. Mot. to Dismiss (MTD) & MJAR at 32.  As we

explained, to establish that it has standing to pursue its bid protest, Blue Origin must establish

that, but for the procurement errors it alleges, it would have had a substantial chance of winning

award of an Option A contract.  *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358

(Fed. Cir. 2018).

        As an initial matter, Blue Origin's argument in its memorandum in support of its cross-

MJAR that prejudice may be presumed in bid protest actions is incorrect.  Pl. Memo at 34, 66,

68.  On the contrary, the Federal Circuit has clearly stated that "[t]o prevail in a bid protest, a

████████████████████████████████

protestor must show a significant, prejudicial error in the procurement process." *DynCorp Int'l,*
*LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) (citations and internal quotation
marks omitted).  Blue Origin relies on a decision of this Court stating that "when an irrational or
arbitrary and capricious agency action has occurred, prejudice is presumed, but when a violation
of statute or regulation has occurred, there must be a separate showing of prejudice." *Caddell*
*Constr. Co. v. United States*, 125 Fed. Cl. 30, 50 (2016).  But this conclusion is contrary to
binding Federal Circuit precedent, as the Federal Circuit recently reaffirmed.  *DynCorp Int'l*, 10
F.4th at 1308 n.6 ("The APA does not provide an exception to the prejudicial-error rule for
arbitrary and capricious action.") (citations omitted).  This Court has likewise rejected arguments
of this kind on multiple occasions.  *See*, *e.g.*, *Digitalis Educ. Sols., Inc. v. United States*, 97 Fed.
Cl. 89, 95 (2011), *aff'd*, 664 F.3d 1380 (Fed. Cir. 2012) (holding that similar argument was
rebutted by Federal Circuit cases "that affirm the requirement of prejudice regardless of whether
the error involved the rational basis or a violation of statute or regulation."); *see also Wisconsin*
*Physicians Serv. Ins. Corp. v. United States*, 151 Fed. Cl. 22, 43 (2020) (holding that *Caddell*
*Construction* has no bearing on standing).  Blue Origin bears the burden of establishing
prejudice, first to establish that it has standing to pursue its claims and again before it may
establish success on the merits.  This prejudice may not be presumed.

As we have demonstrated, Blue Origin is unable to make this prejudice showing because:
A) its proposed price dramatically exceeded both NASA's available funding and the price of a
more highly-rated offeror; B) even if NASA had waived any solicitation requirements related to
Flight Readiness Reviews (FRRs) or other reviews for SpaceX, Blue Origin has not shown that it
could have benefited from a similar waiver; C) even if Blue Origin were correct that NASA was

██████████████████████████████

required to hold discussions with Blue Origin or amend the solicitation, Blue Origin has not

demonstrated that it would have had a substantial chance of award; and D) even if Blue Origin

were correct that SpaceX's proposal were deficient and, thus not eligible for award, under this

same logic Blue Origin's own proposal would also be deficient and ineligible for award.

> **A.**      **Blue Origin's Proposed Price So Far Exceeded Available Funding And
> <u>SpaceX's Pricing That It Cannot Show A Substantial Chance Of Award</u>**

As we demonstrated in our moving brief, Blue Origin cannot show that it had a

substantial chance of receiving award of an Option A contract, even if it could show that NASA

erred in the ways Blue Origin alleges, because it proposed a price so high that it never would

have been in line for award of an Option A contract, given available funding and the presence of

another offeror, SpaceX, that proposed a better solution at a dramatically lower price. Def. MTD

& MJAR at 39-43. Specifically, Blue Origin's proposal requested payments of more than ████

NASA's available funding for Fiscal Year (FY) 2021, more than ████████ times SpaceX's

proposal for the same FY, and with an overall price more than double that proposed by SpaceX.

*See* AR Tab 108b67a at 105010.

Blue Origin's claim that it was "next in line" for award, therefore, is rebutted by the

record. Pl. Memo at 68. First, as we explain in our moving brief, the Option A procurement

was conducted under FAR Part 35 as a research and development procurement – proposals were

not competing against each other, but rather NASA evaluated each proposal on its own merits for

potential award. AR Tab 27 at 24473. As we explained, in light of this structure, Blue Origin

lacks standing to challenge NASA's evaluation of SpaceX's proposal at all, because Blue Origin

was not competing against SpaceX, but hoping to convince NASA that its proposal merited the

investment of available NASA research and development funding. Def. MTD & MJAR at 39-

████████████████████████████████

40.  Entirely apart from its assessment of SpaceX's proposal, NASA reasonably determined that

Blue Origin's proposal "does not present sufficient value to the Government when analyzed

pursuant to the solicitation's evaluation criteria and methodology," and thus did not warrant the

award of an Option A contract.  AR Tab 77 at 63056.

As we demonstrated, the enormous difference between Blue Origin's proposed price and

both NASA's available funding and the price of a higher-rated offeror is "the proverbial elephant

in the parlor," effectively precluding a finding of prejudice under the facts of this case.  *See Elec.*

*Data Sys., LLC v. United States*, 93 Fed. Cl. 416, 436 (2010).  Blue Origin alleges that SpaceX's

proposal was deficient and should have been eliminated, but even aside from this allegation

being demonstrably incorrect, Blue Origin could *still* not prove a substantial chance of award

even if it were true, for two principal reasons:  1) Blue Origin's price so dramatically exceeded

the funding available to NASA for FY 2021 that Blue Origin cannot establish that NASA would

have even attempted to bridge the enormous gap; and 2) if NASA had taken the approach urged

by Blue Origin and assessed a deficiency in SpaceX's proposal, Blue Origin would also have

been assessed deficiencies and would have been ineligible for award.  We will address the

second point in Section I.D. below.

As we explain in our moving brief, however, Blue Origin simply cannot demonstrate that

it ever could have had a substantial chance or been "next in line" for award, irrespective of the

resolution of the procurement errors it alleges, in light of its high pricing and the limited funding

available to NASA.  For FY 2021, NASA determined that it had a total of $345 million available

for payments under any HLS Option A contract(s).  AR Tab 108b26a at 103672-73.  Blue

Origin's proposal, however, requested ████████ in FY 2021 milestone payments, exceeding

███████████████████████████████████

available funding for the year by ████████, a gap that was itself more than ██████ the

available funding.  *See* AR Tab 108b67a at 105010 (citing AR Tabs 32d.87).

NASA reasonably determined that it was unreasonable to expect that this enormous gap

could be bridged.  *See* AR Tab 77 at 63056.  Blue Origin has not demonstrated otherwise.  In its

complaint, Blue Origin alleged that its owner, Jeff Bezos, was willing to waive up to $2 billion in

payments in the current and following fiscal years to facilitate an award to Blue Origin.  Compl.

¶ 111.  As we explained in our moving brief, the Court should give little if any weight to this

self-serving allegation – it was initially made after award was made to SpaceX at a publicly

announced price, during litigation and clearly intended to impact its outcome.  Def. MTD &

MJAR at 41-43.  Blue Origin relies on an open letter posted on its website, not formal proposal

materials sent to NASA during the procurement process that might bind Blue Origin to its

alleged offer.  This "offer" should be seen as part of Blue Origin's litigation and public relations

strategy, not part of its proposed approach in response to the solicitation.

Perhaps noticing that, even if Blue Origin were to reduce its price by $2 billion, its price

would still exceed that of SpaceX by over $1 billion, Blue Origin, without explanation,

conveniently increases this figure to $3 billion in a declaration filed with its cross-MJAR.  Pl.

Memo at 70; Decl. of Robert H. Smith at ¶ 23-24.  This mid-litigation, unexplained 50 percent

increase in Blue Origin's offered price reduction underscores precisely why this Court should not

countenance Blue Origin's litigation strategy.  The Option A BAA established a process by

which offerors were to submit the prices at which they were willing to perform their proposed

scope of work, and a process by which NASA was to evaluate these proposals.  NASA and the

Option A offerors followed these prescribed processes, which led to NASA's selection of

███████████████████████

SpaceX to receive an Option A contract award. The Court should not permit Blue Origin to conduct its own, private, mid-litigation reverse auction until it arrives at a number that might help satisfy its obligation to demonstrate prejudice, in an attempt to engineer a fresh chance to submit proposal revisions in which it would not be bound to honor the commitments it makes during the course of this litigation.

Moreover, the terms of the BAA expressly warned offerors to propose their best offers in their initial proposal, and warned that NASA was under no obligation to ask offerors to improve their proposals. AR Tab 27 at 24433 ("[E]ach Offeror shall submit only one proposal which represents its best approach to meeting the requirements of the solicitation."); *see also id*. at 24473, 24481. It is plain that Blue Origin's strategy, contrary to NASA's explicit warnings that offerors should not take this approach, was to initially propose a very high price and reduce that proposed price only if necessary during the discussions process. *See, e.g.*, Decl. of Robert H. Smith at ¶ 24. This was a business decision adopted by Blue Origin, which appears now to regret its approach. Nevertheless, NASA was under no statutory, regulatory, or solicitation-based obligation to relieve Blue Origin of the consequences of its gambit, and this Court should not create such an obligation.

      **B.**      **Even If NASA Had Waived FRRs Or Other Milestone Reviews, Blue Origin Cannot Establish That It Would Have Had A Substantial Chance Of Award In Light Of Such A Waiver**

As we demonstrated in our moving brief, because Blue Origin's proposed concept of operations employed a three-element lander with no supporting spacecraft, even if Blue Origin were correct that the Option A BAA required FRRs and other milestone reviews prior to the launch of each supporting spacecraft in addition to prior to the launch of each integrated lander

element, this interpretation would have no impact on Blue Origin's proposal, which would include three FRRs under either interpretation.  Def. MTD & MJAR at 43-46.  We explained how Blue Origin's allegation that it "would have proposed a fundamentally different technical approach – a single-element integrated lander," Compl. ¶ 26, is simply not credible, as it is flatly contradicted by the record, by Blue Origin's other allegations, by its public statements, and makes no logical sense.  Def. MTD & MJAR at 43-46.

In its MJAR and accompanying declarations, Blue Origin only further compounds the confusion, and further undermines the credibility of its allegation.  Indeed, it is entirely unclear at this point what approach Blue Origin alleges it would have proposed had it understood the proper interpretation of the plain terms of the Option A BAA related to FRRs and other reviews. In its complaint, Blue Origin alleges that, had it known how NASA understood the provisions of the BAA with regard to FRRs and other milestone reviews, it would have proposed "a single-element integrated lander," Compl. ¶ 26, with a "large number of launches and Low Earth Orbit rendezvous events, allowing for . . . propellant depot in Low Earth Orbit to be refueled by multiple launches," Compl. ¶ 13.  In short, Blue Origin's complaint alleges that, had it only known that its interpretation of the BAA's milestone review provisions was wrong, it would have proposed a spacecraft architecture and a mission concept of operations very similar to that proposed by SpaceX.

In our moving brief, we explained why this allegation is simply not credible.  Def. MTD & MJAR at 44-46.  Even if Blue Origin were correct that FRRs and other reviews were required for each launch, Blue Origin would have still been better off proposing a solution along these lines if, as it alleged in its complaint, it could propose a much better and cheaper solution by

██████████████████████████████████████████

doing so, even accounting for the added cost of the reviews. *See id*.   Moreover, despite several

opportunities, Blue Origin never requested or even suggested that NASA alter these review

provisions, as one might expect if they were the one thing holding Blue Origin back from a

dramatically better and more cost-effective proposal. *Id*.   Additionally, Blue Origin's proposal

materials give no hint that, as it alleged, █████████████████████████ a single-

element lander supported by supporting spacecraft and low-Earth orbit rendezvous events. *Id*.

Finally, Blue Origin has repeatedly and publicly criticized SpaceX for proposing just such an

approach, further undermining its allegation that it would have proposed a similar one but for the

interpretation of a single solicitation term. *Id*.

Perhaps anticipating some of these rejoinders, Blue Origin appears to change its

allegations with regard to what it would have proposed in its MJAR and accompanying

declarations.   Or, more accurately, Blue Origin's MJAR and attached declarations contradict

each other on exactly what Blue Origin would have proposed, perhaps in an effort to have its

proverbial cake and eat it too.   In its memorandum in support of its MJAR, Blue Origin alleges

that it would have "retained ██████████████ it originally proposed in the base period

proposal." Pl. Memo at 68.   For the base period, Blue Origin proposed a three-element lander

and no supporting spacecraft.   *See* AR Tab 32a at 33341, 33385.   In his declaration, Blue

Origin's Chief Executive Officer (CEO), Robert Smith, alleges that "Blue Origin would have

proposed an HLS concept designed to take full advantage of Blue Origin's ████████████

██████████████ like it proposed for the base period contract.[1]   Decl. of Robert Smith at

---

[1] It is worth noting that Blue Origin *did* propose to utilize ████████ in Option A.   AR
Tab 32a at 33385 ("████████████████████████████████

███████████████████████████

¶ 12.  By contrast, Blue Origin's Senior Vice President of Advanced Development Programs,

Brent Sherwood, hews more closely to the allegations in Blue Origin's complaint, alleging that it

would have proposed an "entirely different architecture," supported by "a large number of

launches and Low Earth Orbit rendezvous events, allowing the incorporation of elements such as

a propellant depot in Low Earth Orbit to be refueled by multiple launches."  Decl. of Brent

Sherwood at ¶ 11.  If these allegations can be reconciled, Blue Origin has failed to meet its

burden to explain how.

In addition to being internally inconsistent, Blue Origin's allegations regarding what it

would have proposed fall apart under scrutiny.  Perhaps most importantly, Blue Origin fails to

link its allegations to the actual procurement errors it alleges.  Blue Origin alleges that NASA

waived (or misinterpreted) material solicitation requirements regarding FRRs and other

milestone reviews.  Blue Origin's allegation that it would have submitted a different technical

proposal is only relevant to the extent that it could demonstrate that, had NASA waived or

relaxed those same requirements for Blue Origin (or let Blue Origin know how NASA

interpreted these terms), Blue Origin would have submitted a different technical approach.

But that is not what Blue Origin's MJAR or attached declarations actually allege.

Instead, these declarations, while briefly and vaguely gesturing toward the BAA's FRR and other

review provisions as the basis for an architecture change, actually make a different argument –

that, had Blue Origin known that NASA might have relaxed "other requirements that reflected a

───────────────

████ .  If there is an important difference in how Blue Origin proposed to use ████████  in
Option A and how it would have proposed to use it under other circumstances, Blue Origin fails
to explain it.

preference towards 'immense complexity and heightened risk' solutions, . . . then Blue Origin would have proposed a significantly different technical solution."  Decl. of Robert Smith at ¶ 11; *see also id*. at ¶ 17 ("Blue Origin would have received higher technical and management ratings *had it known that NASA would discount launch architecture and maturity risks* (as evidenced by its waiving or relaxing the FRR, DCR, and other review requirements and *accepting an unproven, early development launch system*)") (emphasis added).  A close reading of these declarations shows that *this* was the key factor with the capability to have induced Blue Origin to change its concept of operations – not an alleged requirement to conduct FRRs on supporting spacecraft that Blue Origin did not even propose to employ.

In sum, seeing SpaceX's success with a more technically ambitious approach, Blue Origin now regrets taking a more conservative tack.  This is apparent throughout these declarations, which focus on a weakness NASA assigned to Blue Origin's base period proposal for unproven flight vehicles, which Blue Origin alleges helped drive its conservative approach based on existing commercial launch vehicles.  *See* Decl. of Robert Smith at ¶¶ 12-16; Decl. of Brent Sherwood at ¶ 7.  But even if these allegations are true, they have nothing to do with FRRs or other milestone reviews and whether they apply to supporting spacecraft, or with any of the procurement errors Blue Origin alleges.  Instead, they amount to no more than regrets that Blue Origin did not propose a different approach, or accurately predict how NASA would evaluate its approach.

Moreover, Blue Origin's allegation that it would have received much better evaluations from NASA had it submitted one of the hypothetical proposals described in its declarations is pure speculation, and cannot serve to establish standing. *Orbital Maint. & Constr. Co. v. United*

11

████████████████████████████████████

*States*, 145 Fed. Cl. 71, 76 (2019) ("Allegations . . . supported by only mere speculation, are not enough to confer standing.") (citing *Bannum, Inc. v. United State*s, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (rejecting offeror's claims about what the agency might do in a new procurement as too conjectural to confer standing)).  Blue Origin alleges that, if it had proposed a different approach, NASA would not have assessed certain weaknesses it assigned to Blue Origin's proposal, and would have assessed other strengths instead, increasing its overall ratings.  Decl. of Robert Smith at ¶ 17.  But much as with Blue Origin's efforts to change its proposed price during the course of this litigation, the Court should not allow Blue Origin to revise its technical and management proposals in its briefing, and then assign glowing evaluation ratings to its own hypothetical proposal.  Instead, proposals were to be submitted and evaluated in accordance with the BAA terms.  The Option A proposals were each thousands of pages in length, constituting multiple volumes and dozens of complex attachments.  Blue Origin's desire to revise the proposal it submitted does not entitle it to make vague representations about what such revisions might have been in briefing before this Court, much less to rest its standing on how it imagines NASA might have evaluated such revisions.

Finally, to the extent that Blue Origin does still allege that it would have proposed an entirely different architecture similar to that proposed by SpaceX, with a single-element lander and supporting spacecraft, it is highly speculative for Blue Origin to suggest that it could have been selected for award based on such a dramatic reversal from the approach on which it was awarded a base period contract.  The Option A procurement directly built on the base period HLS procurement.  *See* AR Tab 27 at 24429 ("It is NASA's intent to transition between the Base period and Option A period without any break in contractor performance.").  Option A was open

only to "the prime contractors that have a base period Appendix H HLS contract with NASA."
*Id*. at 24433.  Moreover, "NASA worked with each HLS Contractor during the Base period to
arrive at a unique, final set of agreed-to HLS specifications and standards that each Contractor
will be required to meet if the Contractor's Option A CLINs are awarded."  *Id*.  Although the
Option A procurement did not expressly prohibit an offeror from proposing an approach entirely
different from the one it had spent 12 months developing during its base period performance,
Blue Origin's allegation that it could have done so and received better ratings than it ultimately
achieved for its actual Option A proposal is difficult to imagine, given the structure of the
procurements.

### C.   Even If NASA Had Held Discussions Or Amended The Solicitation, Blue Origin Cannot Establish That It Would Have Had A Substantial Chance Of Award

As we demonstrated in our moving brief, even if Blue Origin could prevail on its waived
and meritless allegations that NASA was required to hold discussions with Blue Origin or to
amend the solicitation due to allegedly changed requirements, it still could not demonstrate that
it would have had a substantial chance of award.  Def. MTD & MJAR at 46-47.  As we further
explain above, Blue Origin's price so far exceeded the funding available and the price proposed
by SpaceX that Blue Origin cannot show that, even if NASA opened discussions or amended the
solicitation to advise offerors that only one award could be made, Blue Origin would have had a
substantial chance of award.  Moreover, Blue Origin's muddled allegations regarding a
hypothetical alternate concept of operations it could have proposed are speculative, contradicted
by the record, and simply not credible.  Blue Origin has not established that its prospects for

award would have improved even if NASA had amended its solicitation or opened discussion with Blue Origin and, as such, Blue Origin lacks standing to pursue these allegations.

### D.    If Blue Origin's Interpretation Of What Constitutes A Deficiency Were Correct, Blue Origin Would Have Been Ineligible For Award

As we demonstrated in our moving brief, even if Blue Origin were correct that any time NASA assessed that a proposal fell short of a solicitation provision in some respect it was required to assign a deficiency, Blue Origin's proposal would have been assessed several deficiencies and would be ineligible for award.  Def. MTD & MJAR at 47-49.  As we explained, Blue Origin is wrong – NASA's evaluation determinations were well within the significant discretion afforded by the Option A BAA and by the law more generally.  *Id*.  If the Court were to adopt Blue Origin's harsh reading of the solicitation terms, however, Blue Origin's proposal would be ineligible for award, and thus it could not demonstrate a substantial chance of receiving one.

Blue Origin's MJAR does not address any of the examples of weaknesses assigned to aspects of its proposal that fell short of BAA requirements, necessitating a finding of a deficiency under Blue Origin's strained solicitation reading.  With regard to NASA's finding that, absent revisions made pursuant to discussions or post-selection negotiations, Blue Origin's proposal would not be eligible for contract award because it included prohibited advance payments, Blue Origin does no more than express its disagreement with the finding.  Pl. Memo at 51.  Mere disagreement with NASA's determinations, however, is insufficient to carry Blue Origin's burden.  *See Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd,* 365 F.3d 1345 (Fed. Cir. 2004).  Blue Origin's reading of the BAA is wrong, and NASA possessed significant discretion to assign weaknesses or significant weaknesses for flaws

14

in a proposal, even where the proposal fell short of a requirement.  But even if Blue Origin were

correct, Blue Origin's proposal of advance payments expressly prohibited by the solicitation

would have rendered it ineligible for award.  Blue Origin cannot establish a substantial chance of

contract award and, thus, cannot demonstrate that it has standing to maintain its suit.  The Court

should dismiss Blue Origin's complaint as a consequence.

## II.     The Court Should Dismiss Many Of The Allegations In Blue Origin's Complaint Because Blue Origin Has Waived Them

Blue Origin's cross-motion confirms that it seeks to challenge express, plain,

unambiguous solicitation terms in this suit.  As we demonstrated in our moving brief, because

Blue Origin waited to bring these challenges until long after the date for receipt of proposals and

even long after the award decision was made, Blue Origin has waived these challenges and the

Court is required to dismiss them under the binding precedent of *Blue & Gold Fleet, L.P. v.*

*United States*, 492 F.3d 1308 (Fed. Cir. 2007), and its progeny.

In the seminal *Blue & Gold Fleet* case, the Court of Appeals for the Federal Circuit held

that "a party who has the opportunity to object to the terms of a government solicitation

containing a patent error and fails to do so prior to the close of the bidding process waives its

ability to raise the same objection subsequently in a bid protest action in the Court of Federal

Claims."  492 F.3d at 1313.  This rule "furthers the statutory mandate in 28 U.S.C. § 1491(b)(3),

which provides that 'the courts shall give due regard to the interests of national defense and

national security and *the need for expeditious resolution of the action*.'" *SEKRI, Inc. v. United*

*States*, 152 Fed. Cl. 742, 752 (2021) (quoting *Blue & Gold Fleet*, 492 F.3d at 1313; 28 U.S.C.

§ 1491(b)(3)).  The waiver rule applies "to all situations in which the protesting party had the

opportunity to challenge a solicitation before the award and failed to do so." *Inserso Corp. v.*

██████████████████████████████

*United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020) (quoting *COMINT Systems Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012)).  When waiver is found, "a court must dismiss the action; it has no discretion to allow the plaintiff to maintain the action."  *SEKRI*, 152 Fed. Cl. at 752 (citations omitted).

Blue Origin's cross-motion confirms that it seeks to maintain in this Court a challenge to a number of the terms of the Option A solicitation that it has plainly waived by failing to bring them prior to the close of the proposal process.  Throughout its memo, Blue Origin challenges the structure of the solicitation.  Blue Origin alleges that, despite the solicitation clearly stating that it is a BAA under FAR Part 35, *not* a competitive negotiated procurement under FAR Part 15, the terms of the solicitation conflict with that structure.  *See* Pl. Memo at 5-6, 48, 50.  Even if that were true, however, it would have been plain from the unambiguous terms of the BAA, on which Blue Origin relies in making this allegation.  *See*, *e.g.*, Pl. Memo at 5-6 (citing 79-page SOW and other solicitation attachments, as well as pricing terms), 50 (same); *see also* AR Tab 27 at 24473 ("The Government is conducting this procurement as an 'other competitive procedure' in accordance with FAR 6.102(d)(2) and FAR 35.016 (as deviated).  NASA will not conduct a comparative analysis and trade-off amongst proposals."); Tab 27 at 24480 ("This solicitation is a BAA.  BAAs are not negotiated procurements conducted on the basis of competitive proposals.").  Binding precedent prohibits Blue Origin from silently competing under the terms of the terms of the BAA as written, only to bring a protest challenging the terms of the competition after it has emerged unsuccessful.  *Blue & Gold Fleet*, 492 F.3d at 1314 ("Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was

16

infirm.") (quoting *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 175 n.14 (2005)) (alteration in original).

Blue Origin attempts to skirt this problem by characterizing these clear terms as "mere formalisms" and not determinative. Pl. Memo at 50. But the structure NASA chose for its procurement was abundantly clear from the face of the BAA, and the authority on which Blue Origin relies neither states nor implies that a challenge to the stated structure of a procurement may be brought by an offeror after participating fully in that procurement. Blue Origin's reliance on this Court's decision in *Tolliver Group, Inc. v. United States*, 151 Fed. Cl. 70 (2020), is misplaced. *See* Pl. Memo at 48-50. In *Tolliver*, the Court examined the terms of FAR Part 8, and whether the Court has jurisdiction over the cancellation of a procurement conducted pursuant thereto, given that it lacks terms present in FAR Parts 14 and 15 governing the cancellation of a procurement. *Tolliver Grp.*, 151 Fed. Cl. at 86. Here, by contrast, Blue Origin challenges terms that were plainly stated within the BAA itself. If Blue Origin considered those terms to be contrary to law, it was required to bring that challenge prior to the time the proposals were due – not months after award as it did here. *Tolliver* is of no assistance to Blue Origin in solving its waiver of its challenges to the BAA's terms.

As SpaceX points out in its MJAR, the more instructive case on this point is the Court's more recent decision in *WaveLink, Inc. v. United States*, No. 20-749C, 2021 WL 2762814 (Fed. Cl. June 24, 2021). In *WaveLink*, the Court rejected an allegation, similar to Blue Origin's here, that an agency had conducted discussions, despite characterizing its exchanges with offerors as conducted pursuant to different express solicitation terms (clarifications in *WaveLink*; post-selection negotiations here). *Id*. at *17. In *WaveLink*, after one offeror omitted a required

17

document from its proposal, the agency pointed out the error in a clarification letter, and permitted the offeror to submit the missing document. *Id*. The Court found that typically permitting such a proposal revision would constitute discussions, requiring discussions with all offerors. *Id*. The solicitation, however, had expressly provided that exchanges identifying the fact that proposals that were missing some types of supporting documentation, including the relevant type, would be considered clarifications rather than discussions. *Id*. In a footnote, the Court explained that even if the plaintiff had challenged the term providing for such an omission to be treated as clarifications rather than discussions, such a challenge would have been waived under *Blue & Gold Fleet*, because the challenge was not raised prior to the solicitation closing, and "[t]he express terms of the RFP put all offerors, including WaveLink, on notice that GSA could request such missing documentation without conducting discussions." *Id*. at *17 n.21.

Similarly here, Blue Origin plainly seeks to maintain a waived challenge to the solicitation's terms regarding exchanges with offerors. Like in *WaveLink*, Blue Origin's challenge fails for two principal and related reasons: 1) the agency (here NASA) acted in accordance with the BAA's unambiguous terms; and 2) Blue Origin failed to challenge those terms prior to closing date for receipt of proposals. The BAA was clear and unambiguous on the scope of permitted exchanges with offerors – in either discussions or post-selection negotiations, an offeror could be invited by the contracting officer to revise portions of its proposal identified as open to revision. AR Tab 27 at 24434 (definitions of each term). Indeed, the BAA even expressly provided for the exact type of negotiations Blue Origin challenges here, stating that "The Government reserves the right to negotiate any aspect of an Offeror's milestone payment amounts, schedule, and/or acceptance criteria prior to award of Option A." *Id*. at 24467. Blue

18

Origin has waived its challenge to these terms by waiting to bring it until after submitting its proposal, and indeed until months after award.

Moreover, other allegations by Blue Origin challenge agency conduct taken directly in accordance with the solicitation's plain terms and, thus, amount to waived challenges to those terms. Blue Origin alleges that NASA was required to amend the BAA when it learned that its available funding would not permit two awards, as was NASA's stated preference. Pl. Memo at 60-64. As we demonstrated in our moving brief, however, the BAA expressly explained that the number of awards was subject to the availability of funds. Def. MTD & MJAR at 67-70 (citing, *inter alia*, AR Tab 27 at 24481 ("NASA reserves the right to select for award multiple, one, or none of the proposals received in response to this Appendix. The overall number of awards will be dependent upon funding availability and evaluation results.")). As the Court determined in *WaveLink*, a challenge to agency action in accordance with the unambiguous terms of the solicitation is waived if not brought prior to the closing date for receipt of proposals. *See* 2021 WL 2762814 at *17. Blue Origin's allegation that NASA was required to amend the solicitation is waived, therefore, in addition to being meritless.

This allegation is also waived for the additional reason that Blue Origin knew or should have known, when Congress appropriated $850 million for the entire HLS program for FY 2021, that funding available to NASA would not be sufficient to award to Blue Origin under the terms of its proposal, which requested approximately ███████ of payments in FY 2021. AR Tab 108b67a at 105010. This funding amount was plain in the Consolidated Appropriations Act for FY 2021, which the President signed into law on December 27, 2020. *Id.* at 105009 (citing 166 Cong. Rec. H7879-01, H7946 (Dec. 21, 2020)). This appropriations act became law months

19

prior to NASA's April 16, 2021 decision to award an Option A contract to SpaceX, giving Blue

Origin plenty of time – and, thus, the obligation, on penalty of waiver – to bring any protest

demanding a solicitation amendment or an opportunity to engage in discussions. *See COMINT*,

700 F.3d at 1382. As the GAO correctly determined, Blue Origin's failure to press its claims

after the funds appropriated by Congress did not cover the FY 2021 payments it proposed

constituted yet another waiver of the claims Blue Origin now pursues in this Court. *See* AR

Tab108b67a at 105028; *see also Inserso*, 961 F.3d at 1350 (holding that contractor had waived

claim when it knew or should have known that debriefings held in other procurement suite that

had closed months before its procurement would reveal certain information potentially useful in

the latter procurement).

   Finally, as we demonstrated in our moving brief and address further below, the BAA's

terms regarding the applicability of FRRs and other reviews only to HLS elements – that is, to

elements of the HLS's integrated lander – are clear and unambiguous. If the Court, however,

were to find these terms to be ambiguous, any ambiguity would be patent, and Blue Origin

would have had an obligation to seek clarification prior to the close of the proposal process. As

we explain below, the effect of Blue Origin's failure to do so is to preclude the acceptance of

Blue Origin's interpretation in this action. *Blue & Gold Fleet*, 492 F.3d at 1313. In some cases,

however, the Court has viewed a failure to seek clarification of patently ambiguous terms as also

constituting a waiver under *Blue & Gold Fleet*. *See, e.g., i3 Cable & Harness LLC v. United

States*, 132 Fed. Cl. 495, 514 (2017) ("Because protestor failed to object to any such patent

ambiguity in the Solicitation prior to the close of the bidding process, it has waived its ability to

do so now."); *but see SEKRI*, 152 Fed. Cl. at 755 n.6 ("*Blue & Gold Fleet* . . . applies to cases of

███████████████████████

patent error, not patent ambiguity.") (citation omitted).  In the event that the Court were to adopt

this approach, Blue Origin has waived any challenge to terms the Court might find to be patently

ambiguous.

**III.    The Court Should Grant Judgment On The Administrative Record To The United States**

As we demonstrate in our moving brief, although the Court should dismiss the entirety of

Blue Origin's complaint because Blue Origin lacks standing to pursue it and has waived most if

not all of its claims, in the event that the Court considers whether any of Blue Origin's claims

has any substantive merit, it should conclude that they do not and grant judgment on the

administrative record to the United States.  Blue Origin's MJAR confirms that its case falls apart

upon a close and complete analysis of the terms of the Option A BAA.  Moreover, we have

demonstrated above that Blue Origin's claims that NASA was required to hold discussions or

amend the BAA are waived; even were they not, however, they are plainly inconsistent with the

express terms of the BAA and, thus, meritless.  Finally, even if the Court were to find that Blue

Origin has standing to pursue its few attempts to quibble with the technical assessments of

NASA's expert evaluators, despite having submitted a proposal at a price that dramatically

exceeded both available funding and the price of a better rated proposal, the Court should decline

Blue Origin's invitation to substitute its judgment for that of the agency, particularly in matters

so technical as newly-developed systems for human space exploration.

**A.    NASA Did Not Waive A Solicitation Requirement For FRRs Or Other Milestone Reviews For SpaceX**

In our moving brief, we explained in detail how Blue Origin's case hinges on its faulty

interpretation of the terms of the Option A BAA.  Def. MTD & MJAR at 52-63.  Contrary to

Blue Origin's strained interpretation, the plain terms of the BAA make clear that the phrase

"HLS element" refers to a component of the integrated lander and does not include supporting

spacecraft, which term the BAA defined to be mutually exclusive with the integrated lander or

elements thereof.  We will not repeat our detailed explanation here, but will respond to some of

the incorrect arguments on which Blue Origin relies, re-emphasizing certain points along the

way.

At the outset, we must take issue with Blue Origin's reliance on materials that are not

properly before the Court for the purposes of any merits analysis it may conduct.  Blue Origin

relies extensively on the two declarations it has filed, one attached to its complaint and the

second attached to its MJAR, containing the unsolicited opinions of Blue Origin's retained

consultant, Dr. Alan Wilhite.  These declarations are neither part of the administrative record nor

an appropriate supplement thereto, and the Court should disregard them.  Review of bid protest

allegations must be based on "the administrative record already in existence, not some new

record made initially in the reviewing court."  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d

1374, 1379 (2009).  Dr. Wilhite's declarations, created during the course of this litigation, were

of course not before the agency when it made the decision at issue in this case and, therefore, are

not part of the administrative record.  Moreover, Blue Origin has not moved to supplement the

administrative record with these declarations, so they are not properly part of the material on

which the Court must base any decision on the merits of Blue Origin's claims.  Even if Blue

Origin were to move to supplement to the administrative record with Dr. Wilhite's opinions,

Blue Origin could not meet the high bar for such a supplement – the Court may only add such

materials to the record if it finds that "effective judicial review" of Blue Origin's protest

███████████████████████████████████████

allegations is precluded in the absence of these materials.  *Id.* at 1380 (citation omitted); *see also*

*Rhinocorps Ltd. Co. v. United States*, 87 Fed. Cl. 261, 282 (2009) (finding it inappropriate to

supplement the administrative record with documents that "proffer facts that substitute plaintiff's

opinion for the [agency's] technical determinations[.]").  The administrative record contains all

of the documentation necessary for this Court to adjudicate Blue Origin's claims, which are

based almost entirely on the interpretation of the terms of the BAA or, in a few minor instances,

the conclusions of NASA's expert evaluators.  Dr. Wilhite's opinions on the proper

interpretation of the BAA or on how the proposal should have been evaluated, many of which

are not even pled in the complaint or discussed in Blue Origin's MJAR, are not necessary for

effective judicial review, and should not be considered.[2]

### 1.    "HLS Element" Refers To The Integrated Lander

Returning to the substance of Blue Origin's misunderstanding of the BAA's terms, Blue

Origin's memo confirms that its interpretation suffers from the same flaw that led the GAO to

the wrong conclusion – it conflates the critical term, "HLS element," with the related but not

interchangeable term "HLS."  In one example that perfectly encapsulates this analytical error,

Blue Origin states that "[t]he Solicitation requires these milestone reviews and launch vehicle

---

[2] This same conclusion applies to parts of the other two declarations that Blue Origin has
filed, from its CEO Robert Smith and Senior Vice President Brent Sherwood.  To the extent that
these declarations discuss matters related to Blue Origin's standing to pursue its protest or the
factors this Court must consider in assessing whether to grant injunctive relief, these materials,
like the declaration we filed from NASA Associate Administrator Robert Cabana, are
appropriately considered as part of the Court's record.  *See Treadwell Corp. v. United States*, 142
Fed. Cl. 650, 661 (2019).  Parts of each declaration, however, offer opinions on such issues as
the proper interpretation of terms of the BAA.  *See, e.g.*, Smith Decl. at ¶¶ 7-9; Sherwood Decl.
at ¶¶ 3-5.  These opinions are not properly before the Court, and should not be considered.

████████████████████████████

reviews to be conducted prior to the launch of the HLS." Pl. Memo at 36. This statement is

incorrect, and reveals the flaw we detailed in our moving brief – it ignores the word "element"

and seeks to make "HLS element" coextensive with "HLS." But, as we previously explained,

such an interpretation conflicts with the plain terms of the BAA.

First, the word "element" is consistently used throughout the BAA in conjunction with

the integrated lander, to refer to a component or components thereof – such as an ascent element,

descent element, or transfer element – or a single-element lander like SpaceX proposed. *See*

Def. MTD & MJAR at 55-56. Reading the BAA and all of its attachments as a whole, as the

Court must, element clearly takes on that specific meaning in the context of the BAA, rather than

its general, context-free meaning as "a constituent part." *See Banknote Corp. of Am. v. United*

*States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004) (The Court "must consider the solicitation as a

whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its

provisions.").

Second, the interpretation of "element" to be any constituent part of the HLS makes no

logical sense when attempting to harmonize it with the BAA's definition of HLS:

> **HLS**: All objects, vehicles, elements, integrated systems, systems,
> subsystems, or components thereof that are designed, developed,
> and utilized by the contractor, its teammates, subcontractors, and
> suppliers in performance of this contract, and which collectively
> comprise the contractor's Integrated Lander (or elements thereof),
> all Supporting Spacecraft, all launch vehicles necessary for launch
> and delivery of the contractor's Integrated Lander (or elements
> thereof) and its Supporting Spacecraft, and the contractor's Active-
> Active docking adapter (AADA) (if required for performance of the
> contractor's crewed demonstration mission).

AR Tab 27e at 32948. If an HLS element were any constituent part listed in that

definition, then an object would be an HLS element, which is so broad as to be meaningless; any

vehicle would be an HLS element, which would suffer from the same unworkable over-breadth; and an element would be an HLS element, which is tautological but meaningless.

Blue Origin attempts to skirt this problem by skipping the entire first half of the definition of HLS and arguing that the HLS elements are listed in the second half and, thus, include "(1) the Integrated Lander (or elements thereof); (2) all Supporting Spacecraft; (3) all launch vehicles necessary for launch and delivery of the contractor's Integrated Lander; and (4) Active-Active docking adapter (ADAA)." Pl. Memo at 14. But the text of the BAA does not support this selective reading. The definition of HLS certainly requires that, to qualify as part of the HLS, the item in question must be "designed, developed, and utilized by the contractor, its teammates, subcontractors, and suppliers in performance of this contract." AR Tab 27e at 32948. The words "and which collectively comprise," however, do not transform the words that follow into a list of "elements." The definition of HLS on its own neither precludes nor confirms Blue Origin's reading. The rest of the BAA, however, does preclude Blue Origin's reading, as it makes clear that an "element" is part of the integrated lander.

Third, there is good reason for the BAA's focus on reviews of elements of the integrated lander – safety is paramount for the integrated lander, as it is the part of the HLS that carries humans onboard. The terms of the BAA confirm that this is the purpose of the milestone reviews: "[t]he HLS Program Office has defined major milestone reviews for the HLS Program in order to be able to assess programmatic and technical progress and performance at key decision points in the development and operational lifecycle phases, *with the ultimate goal of certifying the lander for crewed operations to and from the lunar surface* and assessing the likelihood of mission success." AR Tab 27e at 32964 (emphasis added). Blue Origin's

25

███████████████████████

continued attempts to characterize SpaceX's proposal as presenting a safety risk find no support in the record, and indeed are directly and forcefully rebutted in declarations submitted to the GAO by the contracting officer, NASA's Chief Engineer, Ralph Roe (who Blue Origin absurdly characterizes as a whistleblower), NASA's Chief Health and Medical Officer, and NASA's Chief of Safety and Mission Assurance.  AR Tab 108b55-102a at 104681 ("NASA's astronauts will travel inside of the HLS Starship, but the same cannot be said for any of SpaceX's Supporting Spacecraft, which never transport astronauts or are ever connected to its HLS Starship while it is transporting astronauts."); Tab 108b62 at 104880-83 (NASA Chief Engineer Ralph Roe discussing NASA's safety focus and conclusion that SpaceX's approach did not pose a safety risk); Tab 108b61a 104871-72 (NASA Chief Health and Medical Officer Dr. James Polk coming to same conclusion); Tab 108b61c at 104878-79 (NASA Chief of Safety and Mission Assurance W. Russ DeLoach coming to same conclusion).

Blue Origin can point to no language within the solicitation itself that supports its interpretation of the term "HLS element," on which its allegations regarding FRRs and other milestone reviews entirely hinge.  Instead, Blue Origin cherry picks for support of its understanding a few minor bits of extrinsic evidence from NASA's evaluation process, while ignoring the overwhelming majority of such documentation.  *See* Pl. Memo at 37-38.  Extrinsic evidence, however, may not be used to interpret solicitation terms unless they are ambiguous, *Banknote*, 365 F.3d at 1353, and the term "HLS element" in the context of the BAA clearly refers to an element of the integrated lander.  As we have demonstrated, even if the term "HLS element" were ambiguous, any such ambiguity would have been patent on the face of the BAA and Blue Origin's failure to seek and receive clarification prior to submitting its proposal

precludes acceptance of its interpretation here. *Blue & Gold Fleet,* 492 F.3d at 1313 (citation and internal quotation marks omitted).

"A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1381 (Fed. Cir. 2000).  "By contrast, a latent ambiguity is a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification." *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016) (internal quotation marks, alteration, and citation omitted).

As we have discussed, Blue Origin contends that the term "HLS element" is of enormous significance in the BAA – Blue Origin alleges that this one term dictated its entire proposal architecture and concept of operations, and that it would have proposed a wholly different approach had it understood that milestone reviews were not required for supporting spacecraft. Pl. Memo at 68-71.  But the term "HLS element" is not even directly defined in the BAA.  If Blue Origin actually changed the entire architecture it had intended to propose because of a chain of reasoning that began with a reading that this undefined term may include supporting spacecraft (a dubious claim, as we discuss in Section I above), it had many opportunities to clarify whether NASA read the term in the same way and, if so, was willing to alter it.  This is particularly true in light of the many instances, some of which we quoted in our moving brief, in which the BAA and its attachments (including the SOW) use the term "element" to refer to a component of the integrated lander.

██████████████████████████████████

Indeed, the administrative record provides an example that highlights the incongruity of Blue Origin's allegation that so much hinged on this one undefined term, yet Blue Origin failed to ask about it in the hundreds of questions it submitted to NASA about the solicitation.  In a question and answer session, one of the Option A offerors identified a potential ambiguity introduced by the breadth of the BAA's definition of the term "HLS" and interaction with other instances in which that term seemed to refer to the integrated lander specifically, not other potential components of the HLS:

> Q:  The new definitions in section 1.3.2 of the main body of the solicitation introduced potential ambiguities.  Please provide clarification on the following items:
> A) Given the ubiquitous use of the term "HLS" in applicable and reference documents, the current definition creates a number of logical inconsistencies and interpretation issues.  For example, all ICDs use the phrase "HLS shall…," often when seemingly intending "HLS Integrated Lander shall . . . [.]"  This creates ambiguities in terms of which vehicles (e.g., launch vehicles or support vehicles) must contain which interfaces.

AR Tab 20 at 448.  NASA responded, clarifying that in general, references to HLS apply to the integrated lander, unless supporting spacecraft or the launch vehicle are identified explicitly:

> A:  Responses by Question:
> A) Note the caveat in section 1.3.2, "When used within this document, the following definitions apply."  The intent is not to disturb the relative ubiquitous use of "HLS" in other solicitation and contract documents.  Unless otherwise specified, the scope of [Interface Control Documents ("ICDs")] remains the "HLS Integrated Lander" (as that term is defined in the main body of the solicitation).  Similarly for the PD, the revised definitions are not intended to change the scope of deliverables (i.e., [Data Procurement Documents ("DRDs")]) are generally applicable to the Integrated Lander unless "Supporting Spacecraft" or "Launch Vehicle" are explicitly identified).  Similarly for the Design and Construction standards, unless otherwise noted, scope is applicable to the HLS Integrated Lander.

28

*Id*.  This question and answer log was provided to all offerors as part of Amendment 1 to the

BAA and, thus, was part of the final solicitation.  AR Tab 26 at 24420; *see Per Aarsleff*, 829

F.3d at 1311 ("'[A]nswers [to bidder's questions], when circulated to all [bidders] as an

attachment to an amendment signed by the contracting officer, constitute an amendment of the

solicitation.'") (quoting *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 689 n. 15

(2012)).

The significance of this question and answer exchange is twofold:  first, it demonstrates

that any ambiguity as to the meaning of key terms such as "HLS" and "HLS element" was

patent, and that an offeror exercising reasonable and customary care had a duty to seek

clarification as to the interaction of such terms in the context of specific BAA references where a

precise meaning could be impactful, including whether the terms would apply to peripheral

vehicles like supporting spacecraft.  Second, the substance of NASA's response is yet more

evidence that supporting spacecraft were not required to be included in milestone reviews unless

expressly identified, and that the use of "HLS element" in those contexts referred to elements of

the integrated lander, not supporting spacecraft.

**2.      <u>The DCR And Other Reviews Also Apply To The Integrated Lander</u>**

Next, Blue Origin extends it faulty reading of the term "HLS element" to the Design

Certification Review (DCR) and other milestone reviews.  Pl. Memo at 41-47.  Blue Origin

acknowledges that SpaceX's proposal was "consistent throughout its Integrated Master Schedule

in regard to the mandatory timing required by the Solicitation for other reviews."  *Id*. at 41.

There is a good reason for that – Blue Origin misinterprets the language of the BAA with regard

to the FRR, DCR, and other reviews, and SpaceX's consistent interpretation is in accordance with the solicitation.

As an initial matter, Blue Origin, in excerpting language from the BAA and its attachments related to the FRR, DCR, and other reviews, consistently quotes language from secondary documents that list the payment milestones in summary fashion, rather than citing to the SOW itself. *See*, *e.g.*, Pl. Memo at 25 (citing briefing slides containing chart from BAA Attachment O); 36-37 (citing BAA Attachment O). Perhaps Blue Origin uses this strategy because BAA Attachment O, while expressly referencing the SOW as the relevant authority, omits the full SOW description of the objectives described. AR Tab 27k at 33187. In particular, the summary chart in Attachment O omits a key word from its excerpts – the word "should." As we explained in our moving brief, the word "should" is defined in the SOW to mean "a statement of best practice or intent," in contrast to "shall," which indicated a requirement. Def. MTD & MJAR at 53-54; AR Tab 27e at 32949. When describing both the FRR and DCR objectives, the SOW uses the term "should" in conjunction with the language Blue Origin characterizes as critical requirements regarding the FRR and DCR. AR Tab 27e at 32969 (DCR), 32972 (FRR).

BAA Attachment O, however, is useful to the analysis of this issue in two ways. First, it clarifies that the DCR should be conducted "9 months before the first *HLS element* launch," whereas the SOW has used the more generic term "HLS launch." *Compare* AR Tab 27k at 33187 *with* Tab 27e at 32969. Thus, reading the BAA as a whole, it is clear that the same logic we have explained above and in our moving brief regarding the applicability of the FRRs being limited to launches of elements of the integrated lander applies with equal force to the DCR.

30

███████████████████████████████

Second, BAA Attachment O does not list the other reviews that Blue Origin wrongly alleges were required prior to the launch of each supporting spacecraft, the Mission Specific Preliminary Design Review ("MSPDR"), Mission Specific Critical Design Review ("MSCDR"), System Acceptance Review, Launch Vehicle Systems Readiness Review, Pre-Mate Readiness Review, or Launch Readiness Review.  *See* AR Tab 27k at 33187; Pl. Memo at 44-45.  There is good reason for this – these reviews are described in an entirely different section of the SOW concerned specifically with inspection of the launch vehicle for the integrated lander. Specifically, Section 10 of the SOW, dedicated to "Launch Vehicle Processing, Integration, and Operations," states that "[t]he contractor shall secure a commercial launch vehicle service for transportation of HLS module(s) or *integrated landing system* to *lunar orbit*," terms that plainly apply to the integrated lander but not supporting spacecraft.  AR Tab 27e at 33004-05.  This section provides for contractor-chaired or co-chaired reviews, *id*. at 33008, designed to ensure readiness for "integration," the transport of human crew, "one of the highest risk events of the mission," *id*. at 33005.  Supporting spacecraft are not integrated, and do not transport human crew.[3]  *See id*. at 32948.  Indeed, Blue Origin's attempt to stretch its interpretation of the BAA's

---

[3] Similarly, there is no merit to Blue Origin's claim, in the facts section of its memorandum but not in its argument or in its complaint, that "Planetary Protection Data" must be provided for SpaceX's supporting spacecraft.  Pl. Memo at 17-18.  This requirement is designed to prevent "unintended encounters with solar system objects."  AR Tab 27f at 33124; *see also* Tab 27a2.36, HLS Planetary Protection Plan, at 27288 ("The HLS nominal mission includes disposal of Integrated Lander elements and these will be designed to prevent from direct contact with any planetary bodies other than the Moon and the Sun.").  Because SpaceX's proposed concept of operations does not include any of its supporting spacecraft leaving Earth orbit, these provisions do not apply to these spacecraft.

███████████████████████████████████

terms to create a requirement that each of these reviews take place long in advance of the launch of supporting spacecraft serves mainly to further undermine the plausibility of its interpretation.

Finally, in another argument that is emblematic of Blue Origin's attempts to distort the record to its advantage in this protest, Blue Origin attempts to transform what is clearly a typographical error in SpaceX's proposal into a serious risk that NASA failed to assess.  *See* Pl. Memo at 42-44.  Unfortunately for Blue Origin, reading the document at issue as a whole refutes its theory.

Blue Origin claims that SpaceX's proposal represents that ████████████████ ████████████████████████████████████ *Id*.  Blue Origin bases this allegation on the following language from SpaceX's proposal: ████████████████ ███████████████████████████████████████████ ██████████████████████ AR Tab 34d.32 at 55414.  Blue Origin further alleges that █████████ ██████████████████████████████████████ ████████████████ Pl. Memo at 43.  What Blue Origin misses, however, is that ████████████ ████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████ ███████████████████████████████████████████ ████████ Plainly, therefore, the relevant statement from SpaceX's proposal indicates that ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████



*Id*. at 55414-55422.  In this highly technical

procurement, NASA was well within its considerable discretion to conclude that

did not increase the risk of unsuccessful contract

performance and, thus, did not warrant a weakness or other finding that would have been

documented in the administrative record.

> ### 3.     NASA Was Well Within Its Discretion To Assign A Weakness To SpaceX Rather Than A Deficiency

As we demonstrated in our moving brief, NASA was well within the considerable

discretion afforded to it by the terms of the BAA and the law more generally to assess the risk

presented by SpaceX's proposal's approach to FRRs and other reviews as it did – by assigning a

weakness due to the increased risk presented by SpaceX's approach to FRRs and mitigating that

risk through post-selection negotiations.  Def. MTD & MJAR at 58-61.  Blue Origin's

disagreement with NASA's approach, which was in direct accordance with the solicitation's

plain terms, is not a basis to find the approach irrational.

NASA's evaluation judgments are entitled to an extremely high degree of deference,

particularly in a procurement such as this one, conducted on the "frontiers of science."

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983); *see also Gen.

Dynamics Mission Sys., Inc. v. United States*, 137 Fed. Cl. 493, 523 (2018) ("[W]here a technical

evaluation is at issue, the court must defer to the agency's decision.") (citing *E.W. Bliss Co. v.

United States*, 77 F.3d 445, 449 (Fed. Cir. 1996));  *E.W. Bliss*, 77 F.3d at 449 (Challenges

33

involving 'the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess.'"). Moreover, the terms of the BAA afford substantial discretion to NASA evaluators in determining whether a flaw in an offeror's proposal "increases the risk of unsuccessful contract performance" and warrants a weakness; "appreciably increases the risk of unsuccessful contract performance" and warrants a significant weakness; or constitutes "A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses . . . that increases the risk of unsuccessful contract performance to an unacceptable level." AR Tab 27 at 24476. It is for NASA to make the assessments of how a particular aspect of these innovative proposals impacts risk to this novel mission, through its experienced expert evaluators. It is inappropriate for Blue Origin or even for this Court to second guess these assessments or substitute its own judgment for that of NASA's experts.

Blue Origin's reliance on this Court's decision in *Mortgage Contracting Services, LLC v. United States*, 153 Fed. Cl. 89 (2021), is misplaced. In that case, despite the solicitation's express requirement that 95 percent of certain tasks needed to be completed within 10 days, the awardee's proposal stated that it would achieve this threshold in 14 days. *Id.* at 140-41. Unlike here, the record showed no indication that the agency even noticed the issue, or assessed the impact on contract performance objectives. *Id.* at 141. Instead, it appeared that the agency either "overlooked or ignored the issue," and unreasonably made award based on a proposal that took exception to material solicitation terms. *Id.* That is not the situation here – NASA did evaluate the impact of SpaceX's approach to FRRs, which initially included one NASA-led milestone FRR before the launch of SpaceX's single-element integrated lander and SpaceX-led FRRs for

████████████████████████

the launch of supporting spacecraft – NASA found that this approach "has the effect of lessening

NASA's involvement and participation in assessing flight readiness for the offeror's supporting

spacecraft prior to launch of such spacecraft," and, thus, "increases risk of unsuccessful

performance and constitutes a weakness."  AR Tab 59c at 62814.  This determination was well

within the discretion afforded by the BAA terms and by the law, and is not comparable to the

bright line number of days to which the contractor's proposal took exception in *Mortgage*

*Contracting*.  Needless to say, there is also no similarity between the "property preservation and

inspection services" at issue in that case and the effort to rapidly develop novel systems to land

humans on the surface of the moon at issue in this procurement.

Blue Origin's comparison with the Federal Circuit's decision in *Centech Group, Inc. v.*

*United States*, 554 F.3d 1029 (Fed. Cir. 2009), is similarly inapt.  That case involved a protest of

agency corrective action, taken pursuant to a GAO recommendation, regarding a procurement for

advisory and assistance services for aerospace research and development for the Air Force.  *Id*. at

1031.  At issue in the case was a subcontracting limitation that was set forth in both statute and

regulation, which the Court found could not be overridden by Air Force policy.  *Id*. at 1039.

None of those issues are present here – Blue Origin does not allege that SpaceX's proposal fails

to meet a statutory or regulatory requirement.  Moreover, *Centech* is another example of a case

where the agency had little or no discretion in the matter – a pure mathematical calculation

revealed whether the offeror met the limitation on subcontracting mandated by statute and

regulation and, because it did not, the agency did not have discretion to award to that offeror.  *Id*.

at 1032.  Here, the BAA terms afford NASA significant discretion to assess the risk that a

particular aspect of an offeror's proposal present to accomplishing the highly technical, highly

ambitious mission, and to issue findings based on its assessment of that risk. The cases on which Blue Origin relies involve binary determinations regarding whether or not a proposal meets or takes exception to a clearly stated requirement – that is not the case in this procurement, and these cases are inapposite.

By contrast to those cases, the record in this case demonstrates that, unlike a failure to meet a mathematical subcontracting limitation or fixed bright line deadline, NASA was right to assess the risk presented by SpaceX's approach, rather than assess it in binary terms. As we explained in our moving brief and contrary to Blue Origin's misleading rhetoric, SpaceX did propose to conduct an FRR prior to every launch of every supporting spacecraft. Def. MTD & MJAR at 60-61, AR Tab 108a-117 at 92314, 92332; Tab 108b55-102a at 104678. Although these were not NASA-led FRRs as described in the SOW, SpaceX proposed to permit NASA full access to and input in these reviews. *Id.* Moreover, the Option A contract's "Government insight" clause, a specially-designed HLS clause by which NASA ensures is retains sufficient understanding regarding contractor-led efforts in the public-private partnership envisioned by the procurement, provided NASA with a strong foundation of performance monitoring authority that undergirds NASA's approach to assessing risk.[4] AR Tab 27c at 32175-79. NASA rationally recognized that SpaceX's proposal to lead many FRRs lessened NASA's involvement in these reviews, and thus increased the risk of unsuccessful performance – hence the weakness NASA

---

[4] Indeed, NASA assigned a strength to SpaceX for its insight implementation plan, specifically referencing its proposal to integrate NASA into pre-flight readiness reviews. AR Tab 59c at 62810 ("[T]he offeror proposes to enable NASA's continued access into and involvement in development activities (including pre-flight and pre-test readiness reviews, as well as post-flight and post-test data reviews) in support of Starship").

reasonably assessed.  AR Tab 59c at 62812-14.  But Blue Origin's repeated incantation that

SpaceX proposed initially only one FRR, and ultimately only three, is inaccurate irrespective of

how many times Blue Origin repeats it.  Instead, NASA rationally determined that SpaceX's

proposal, although it presented risk in some areas, met the BAA's requirements and was worthy

of an Option A award.

 Finally, as we explain at length in our moving brief and in the standing section above,

even were the Court to adopt its interpretation and find that NASA in some way erred in its

evaluation of SpaceX's approach to milestone reviews, Blue Origin cannot demonstrate that it

was prejudiced by any such error.  Even if the Court were to find that Blue Origin possesses

standing to maintain its suit, it must establish prejudice again before it may prevail on the merits.

*Digitalis Educ. Sols., Inc. v. United States*, 97 Fed. Cl. 89, 93 (2011), *aff'd,* 664 F.3d 1380 (Fed.

Cir. 2012) (citations omitted).  For the reasons we describe above, Blue Origin has not met its

burden to show that it was prejudiced by any NASA error with regard to milestone reviews.

Accordingly, the Court should grant judgment on the administrative record in favor of the United

States even were it to find that NASA erred.

  **B.** **NASA Was Not Required To Hold Discussions With Blue Origin, And Its
Exchanges With SpaceX Were Proper In Accordance With The Solicitation**

 As we demonstrated in our moving brief and further demonstrate above, Blue Origin has

waived its allegation that NASA held discussions with SpaceX and, thus, was required to hold

discussions with Blue Origin, because this allegation amounts to a challenge to the unambiguous

terms of the Option A BAA.  Def. MTD & MJAR at 49-51.  Even were this allegation not

waived, however, we demonstrated in our moving brief that there is no merit to Blue Origin's

allegation – NASA acted in accordance with the express, unchallenged BAA terms and in accordance with applicable law.  *Id*. at 63-67.

In its memorandum, Blue Origin attempts to draw an analogy to this Court's recent decision in *Tolliver Group*, 151 Fed. Cl. 70, to suggest that, although the solicitation was plainly and unambiguously structured as a BAA, closer analysis calls this structure into question.  Pl. Memo at 47-52.  As we demonstrate above, however, this analogy is inapt in several respects, and in any case does nothing to cure the glaring flaw in Blue Origin's discussions allegation, namely, that it is based on NASA actions taken directly in accordance with unambiguous solicitation terms that Blue Origin failed to challenge prior to the closing date for receipt of proposals.

We will not belabor the point here, but will add only that Blue Origin's reliance on 10 U.S.C. § 2305(b)(4) is also misplaced, as that section is inapplicable to this FAR Part 35 procurement altogether and, even if it were generally applicable, would apply only to discussions – not to post-selection negotiations held in direct accordance with the unchallenged, unambiguous terms of the BAA.  10 U.S.C. § 2305(b)(4) applies to an agency evaluating competitive proposals – that is, an agency conducting a FAR Part 15 procurement, not to a procurement conducted pursuant to "other competitive procedures" such as the FAR Part 35 procedures employed by NASA here.  *See* FAR 6.102(b) (defining "competitive proposal" as "other" than a "competitive procedure" under subsection (d)); *but see Tolliver Grp.*, 151 Fed. Cl. at 90 (equating competitive proposals with competitive procedures).[5]  Moreover, as we discuss

---

[5]  This portion of the Court's opinion in *Tolliver* is dicta and has been criticized as inconsistent with law and practice in academic work.  Ralph C. Nash, *Court of Federal Claims Jurisdiction: Parsing the Statues and Regulations*, 35 Nash & Cibinic Rep. NL ¶ 9 ("We want to

████████████████████████████

above, the Court's recent decision in *WaveLink* makes clear that when solicitation terms

expressly define certain exchanges to not constitute discussions, any argument that such terms

violate the law must be brought before the closing date for receipt of proposals, or be dismissed.

2021 WL 2762814 at *17.   In the absence of a timely challenge to the terms of the solicitation, a

challenge to agency exchanges in accordance with those terms are properly characterized in

accordance with the solicitation, not as discussions.  *Id.* ("As the Agency followed the RFP's

terms regarding the characterization of the communication, this exchange of information

between GSA and Spinvi was not a discussion.").  Accordingly, Blue Origin's allegation that the

post-selection negotiations NASA held with SpaceX should actually be characterized as

discussions fails, both because it is waived and because it is meritless.

### C.      NASA Had No Obligation To Amend The Solicitation, And Its Decision Not To Do So Was Rational

As we demonstrated in our moving brief and further demonstrate above, Blue Origin has

waived its allegation that NASA was required to amend the solicitation when it became aware of

FY 2021 funding limitations, because this allegation amounts to a challenge to the unambiguous

terms of the Option A BAA, and because Blue Origin was aware or should have been aware that

its proposal requested FY 2021 payments in excess of appropriated funding *for the entire HLS*

*program*, of which Option A constituted only a portion.  Even were this allegation not waived,

however, we demonstrated in our moving brief that there is no merit to Blue Origin's allegation

---

make it clear that the court is wrong in equating competitive procedures with competitive
proposals and that this part of its decision should not be relied on.").

– NASA acted in accordance with the express, unchallenged BAA terms and in accordance with applicable law.  Def. MTD & MJAR at 67-70.

Our moving brief highlighted some of the many instances in which the Option A BAA expressly provided that the number of awards would depend on available funding and that, though NASA preferred to make two awards, it reserved the right to make one award or no awards at all if sufficient funding were not available.  *Id.* at 68-69.  NASA acted in direct accordance with the unambiguous terms of the BAA when it determined, in light of available FY 2021 funding and the extremely high prices and FY 2021 payments requested by Blue Origin and Dynetics, that only one award to SpaceX, the highest rated offeror and the offeror that proposed both the lowest overall price and the lowest FY 2021 payment, both by an enormous margin, was warranted.  There is no basis to disturb NASA's conclusion, which is in accordance with the terms of the solicitation and applicable law.  *See WaveLink*, 2021 WL 2762814 at *17.

Moreover, SpaceX correctly points out in its MJAR that the law affords agencies significant discretion in deciding how many awards to make pursuant to a solicitation that contemplates the possibility of multiple awards.  Def.-Intervenor's MJAR at 67; *Am. Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 439 (2015) ("[I]t is within the sound discretion of an agency to determine its minimum needs and determine the number of contract awards, consistent with a solicitation's requirements.") (citations omitted); *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 577 (2002) ("Where an RFP does not require multiple awards, an Agency is under no obligation to award to multiple offerors.").  As we have described, the Option A BAA was explicit in providing NASA with discretion regarding whether to make zero,

one, or two awards, and Blue Origin has provided the Court with no basis to disturb NASA's decision.

In its memorandum, Blue Origin relies on the Court's recent decision in *Medline Industries, Inc v. United States*, No. 21-1098, 2021 WL 3483429 (Fed. Cl. July 30, 2021). This reliance is misplaced. In *Medline*, the Court, examining a FAR Part 15 procurement, found that, "after nearly two years of administrative challenges, corrective action, changes in agency policy, a partial transition, and a gauntlet of litigation," the agency's substantive requirements had certainly changed. *Id*. at *10. These facts bear no resemblance to the instant case – NASA's substantive requirements remain identical despite limited funding and high prices from some offerors rendering multiple awards impracticable, and the Option A BAA provided expressly for how exactly that situation would be handled should it arise. There was no need here to change any solicitation term, because the solicitation anticipated and provided for the situation that arose, at which point NASA took the action the solicitation advised that it would – adjust the number of awards in light of the available funding.

Likewise, Blue Origin's analogy to the GAO's decision in *Joint Action in Community Service, Inc.*, B-214564, 84-2 CPD ¶ 228 (Comp. Gen. Aug. 27, 1984) is equally inapt. Like the Court's decision in *Medline*, the GAO's decision in *Joint Action* hinged on its determination that that the agency's substantive requirements had changed. Specifically, in *Joint Action* the GAO determined that the agency "altered the RFP requirements by substituting [Government-furnished property] for what was previously contractor-furnished property," with a value exceeding the difference in price between the two offerors. *Id*. at 3. It was this change, not the

████████████████████████████

limitation in available funding, that the GAO determined to be a change in the material solicitation requirements.

By contrast here, NASA did not ask SpaceX to reduce the scope of work in its proposal to account for funding limitations. As we demonstrate above and in our moving brief, Blue Origin's allegation that NASA waived FRR requirements for SpaceX is meritless. Def. MTD & MJAR at 52-63. Moreover, Blue Origin's allegation that this alleged waived requirement saved NASA hundreds of millions of dollars is built entirely on speculation. Blue Origin again ignores the fact that SpaceX proposed its own FRRs prior to every launch in its proposal, and Blue Origin has no way of knowing how changing those to NASA-led FRRs would affect SpaceX's costs, if at all. Additionally, Blue Origin's allegation improperly conflates cost and price – in this firm fixed price procurement, it is only the price SpaceX charges NASA that matters to the agency, and the administrative record does provide clear evidence of how the change of a SpaceX-led FRR to a NASA-led FRR would impact the SpaceX's total proposed price: not at all. When SpaceX converted two SpaceX-led FRRs to NASA-led FRRs during post-selection negotiations, SpaceX's proposed price was unchanged. AR Tab 77 at 63039.

Finally, as we demonstrated above and in our moving brief, Blue Origin cannot demonstrate that, even if NASA had amended the solicitation, Blue Origin would have had a substantial chance of award and, thus, Blue Origin cannot demonstrate prejudice.

**D.    NASA Evaluated SpaceX's Proposal In Accordance With The Solicitation**

In our moving brief, we demonstrated that there is no merit to the allegations in Count Four of Blue Origin's complaint, in which it largely rehashes allegations made elsewhere, and vaguely gestures at failed arguments it raised before the GAO that amount to no more than mere

42

disagreements with NASA expert evaluation judgments.  Def. MTD & MJAR at 71-73.  NASA

discretion is at its zenith in making these highly technical determination, particularly in a

procurement like this one, "within its area or special expertise, at the frontiers of science."

*Baltimore Gas & Elec.*, 462 U.S. at 103; *see also E.W. Bliss*, 77 F.3d at 449 ("[C]hallenges

deal[ing] with the minutiae of the procurement process in such matters as technical ratings . . .

involve discretionary determinations of procurement officials that a court will not second

guess.") (citation omitted).  NASA's expert evaluation judgments are well supported by the

record and well within its broad discretion, and Blue Origin has provided the Court with no basis

to disturb them.

    In an allegation not specified in its complaint but soundly rejected by the GAO, Blue

Origin alleges disparate treatment by NASA of flaws in each proposal related to communication

links.  Pl. Memo at 58-59; *see* AR Tab 108b67a at 105047-52.  To prevail in a disparate

treatment claim, a plaintiff must show that the agency unreasonably downgraded its proposal for

flaws that were "substantively indistinguishable" from, or nearly identical to, those contained in

the other proposal. *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372-73 (Fed. Cir. 2020).

In the single paragraph Blue Origin devotes to the issue in its lengthy memorandum, it has not

come close to meeting this exacting standard.  Nor could it – as the GAO correctly found upon a

thorough examination of this issue, "even a cursory review of the evaluation record demonstrates

material differences between the proposals that support NASA's different evaluation findings."

AR Tab 108b67a at 105047.  Specifically, NASA expert evaluators found that four of Blue

Origin's six communication links did not close, with questions about a fifth, while only two of

SpaceX's six links did not close.  *Id*.; *see also* AR Tab 59a at 62654-55; Tab 59c at 62793.  In

████████████████████████████

addition to the number of links that failed to close, a number of qualitative differences in the nature of the broken links and corrective actions necessary to mitigate the issues explained why SpaceX's proposal was assessed a weakness and Blue Origin's a significant weakness.  AR Tab 108b67a at 105047-52; *see also* AR Tab 59a at 62654-55; Tab 59c at 62793.  NASA's evaluation was reasonable and well-supported by the record, and Blue Origin has not come close to meeting its burden to demonstrate otherwise.

Likewise, Blue Origin's allegation that NASA assigned multiple credits for the same aspect of SpaceX's proposal fall far short of the standard necessary for this Court to intrude upon the expert assessment of NASA technical evaluators, as their assessments are well supported by the record and in accordance with law and the Option A BAA.  As we explained in our moving brief, the Significant Strength NASA awarded to SpaceX for exceeding NASA's requirements for threshold values recognizes the value provided by the combination of capabilities that each demonstrably exceeded NASA's requirements, and specifically references a BAA provision concerned with "exceeding one or more thresholds."  AR Tab 59c at 62779.  This is consistent with the approach NASA took in awarding a Strength to Blue Origin with reference to the same BAA language.  *See* AR Tab 59a at 62642.  The Strength assigned for SpaceX's cargo allocation, by contrast, cites a different solicitation requirement and focuses specifically on the aspect of SpaceX's proposal responsive to that requirement, the benefits associated with the nature of the cargo volume available.  AR Tab 59c at 62781.  Blue Origin was likewise assigned a Strength for its comprehensive abort strategy and effective capability, capabilities also referenced in the Strength it was assigned for exceeding NASA requirements with reference to

BAA Section 4.4.3.1.  AR Tab 59a at 62643.  Blue Origin is wrong to suggest that NASA treated the proposals differently.

Blue Origin appears to have abandoned its allegation that NASA failed to assess an alleged SpaceX failure to propose inspection and refurbishment for its reusable vehicles.  Compl. ¶ 92.  At any rate, as we demonstrated in our moving brief, this allegation has no merit.  Def. MTD & MJAR at 72-73.

In its memo, Blue Origin hyperbolically attempts to elevate the opinion of an advisor to the Source Selection Authority (SSA) into a "whistleblowing email."  Pl. Memo at 65.  Blue Origin's misleading characterizations and quotations, however, cannot transform the nature of this email from what it was – an advisor properly exercising his role in providing advice to the SSA who, properly exercising her role, considered it for what it was worth and came to her own independent, rational conclusion.  This email provides no basis to question NASA's evaluation of SpaceX's proposal or its award decision, and Blue Origin has failed to demonstrate otherwise.

In his email about which Blue Origin attempts to make so much, Mr. Roe opines that SpaceX's proposed approach employs a spacecraft that is larger than necessary for the lunar mission, which increases NASA's risk significantly.  AR Tab 67 at 62900-901.  Mr. Roe felt that this size would bring technical challenges such as increasing the amount of propellant needed and create a need for in-orbit propellant transfer, adding complexity and risk.  *Id*.  This is no major revelation – NASA evaluated precisely this risk and assessed a Significant Weakness to SpaceX's proposal for its technical complexity and the associated risk of schedule delays, concluding that SpaceX's proposal was "unprecedented in both scale and complexity, and overall, create an appreciable risk to successful contract performance."  AR Tab 59c at 62798.

Likewise, the SSA assessed these same issues in depth, acknowledging the complexity and risk presented by SpaceX's approach, but appropriately weighing those risks against mitigating factors and associated benefits.  AR Tab 77 at 63047.

The SSA determined that the complexity associated with SpaceX's proposed approach "largely translates into increased risk of operational schedule delays."  *Id*.  This closely reflects Mr. Roe's concern, which largely focused on the risk of schedule delays.  AR Tab 67 at 62900-901.  Indeed, Blue Origin's selective excerpting of Mr. Roe's email has the effect of subtly but significantly misrepresenting his opinion – contrary to Blue Origin's suggestion that he opined that SpaceX "will not 'overcome these technical challenges,'" Pl. Memo at 65, Mr. Roe's email states exactly the opposite.  Here is the relevant sentence in full:  "Given SpaceX's performance the last two years I believe *they will overcome these technical challenges* but not on the schedule they suggest and not without us accepting significantly more risk than we would for a vehicle sized closer to what our mission really requires."  *Id*. at 62900 (emphasis added).  Intentionally or otherwise, Blue Origin's excerpt changes the meaning of Mr. Roe's email to suit its own purposes, while in reality Mr. Roe's opinion tracks closely with the conclusions the SSA explained in the document that explains NASA's decision and the rationale supporting it, the Source Selection Statement.

Additionally, Blue Origin's characterization of Mr. Roe as a whistleblower is further undermined by the administrative record, which contains a declaration from Mr. Roe submitted to the GAO in support of NASA's decision to award an Option A contract to SpaceX.  AR Tab 108b62 at 104880-83.  In his declaration, Mr. Roe reviewed his involvement in the procurement, his focus in particular on safety issues, and his efforts to "ensure [that] all technical,

programmatic, and safety concerns were properly reviewed in each offeror's proposal." Id. at

104881.  It is also worth noting that, in his declaration. Mr. Roe strongly refutes Blue Origin's

allegations related to SpaceX's proposed approach to FRRs.  *Id*. at 104881-83.  In sum, there is

nothing to Blue Origin's allegation that Mr. Roe's email in any way undermines or even

contradicts the thoroughly considered and documented conclusions of NASA's expert evaluators

or the SSA.

Finally, as we explain above and in our moving brief, even if the Court were to find that

NASA erred in its evaluation of SpaceX's proposal, Blue Origin cannot demonstrate that it was

prejudiced by any such error.  Accordingly, the Court should grant judgment on the

administrative record in favor of the United States.

### E.     NASA Did Not Breach The Implied Covenant Of Good Faith And Fair Dealing

As we explain in our moving brief, Def. MTD & MJAR at 73, Count Five of Blue

Origin's complaint need not be considered separately, as it amounts to no more than a

restatement of the same allegations stated elsewhere in the complaint under a now-obsolete legal

framework that "is, at best, redundant, as any claim which could have been brought under that

theory is preserved within [the Court's] jurisdiction under 28 U.S.C. § 1491(b)(1)."  *Res Rei*

*Dev., Inc. v. United States*, 126 Fed. Cl. 535, 547 n.18 (2016).  Therefore, for the reasons

explained above and in our moving brief discussing Blue Origin's lack of standing and or waiver

of these claims as well as Blue Origin's failure to support them on the merits, the claims in

Count Five likewise fail, and should be dismissed or, if considered on the merits, rejected.

███████████████████████████████████

## IV.  Blue Origin Has Failed To Establish That It Is Entitled To Permanent Injunctive Relief

In our moving brief, we demonstrated that Blue Origin cannot demonstrate that it is entitled to the permanent injunctive relief it seeks because, in addition to not being able to succeed on the merits, it cannot demonstrate that it is irreparably harmed by NASA's award of an Option A contract to SpaceX.  Def. MTD & MJAR at 74-75.  Moreover any harm to Blue Origin is outweighed by the harm to the United States that would result from an injunction, and injunctive relief would not be in the public interest.  *Id*. at 75-77.

Blue Origin's memorandum likewise fails to establish entitlement to injunctive relief.  Its allegations of irreparable harm are based on the speculative assumption that the Option A contract award to SpaceX's will cement SpaceX's lead and prevent Blue Origin from ever catching up and competing for future NASA contracts.  Pl. Memo at 73-75.  But Blue Origin is owned by one of the world's wealthiest people, and Blue Origin has in this litigation touted its capabilities and commitment to the mission, even alleging a willingness to invest billions of dollars to underwrite its own success.  Pl. Memo at 70.  Blue Origin cannot have it both ways.  As we described, NASA is currently procuring and will soon procure a number of other HLS opportunities, and Blue Origin is wrong to assume that only a firm that was awarded an Option A contract would be in a position to compete for these other procurements.  Def. MTD & MJAR at 75; Decl. of Robert D. Cabana at ¶ 10.

Moreover, while Blue Origin is dismissive of the harm the United States would suffer if the Court were to enjoin the award of an Option A contract to SpaceX, the delays such an injunction would entail would cause real damage to NASA's – and the nation's – lunar exploration efforts.  Def. MTD & MJAR at 75-76; Decl. of Robert D. Cabana at ¶ 6-9.  These

48

harms include significant schedule delays, potentially ranging from 8 to 27 months and rendering NASA's goal of a 2024 Moon landing essentially impossible; significant additional costs that will drain resources from other critical NASA initiatives; and real risk to the public-private partnership represented by the Option A contract, and to the terms of any eventual re-awarded Option A contract.  Def. MTD & MJAR at 75-76; Decl. of Robert D. Cabana at ¶ 6-9.

For many of these same reasons, injunctive relief is not in the public interest.  If the Option A contract is significantly delayed, NASA's larger Artemis program – and the United States' broader space exploration mission more generally – is delayed along with it.  Def. MTD & MJAR at 76; Decl. of Robert D. Cabana at ¶ 4-5.  Even if Blue Origin could demonstrate that NASA erred in some minor, technical way, correcting any such error via the extraordinary means of a permanent injunction would harm rather than serve the public interest.  Other forms of relief are available to the Court in this circumstance, and an injunction may not issue where other forms of relief are available.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).  Because the structure of this procurement did not involve direct competition for award among the offerors, even if the Court were to find a prejudicial error, the Court should consider whether appropriate relief could be fashioned without disturbing the award to SpaceX, since that award does not preclude a further Option A award to Blue Origin.

## CONCLUSION

For these reasons, the United States respectfully requests that the Court dismiss Blue Origin's complaint or, in the alternative, grant judgment on the administrative record in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

s/ Douglas K. Mickle
DOUGLAS K. MICKLE
Assistant Director

OF COUNSEL:

ALLISON M. GENCO
BRIAN M. STANFORD
Senior Attorney Advisors
NASA Office of the General Counsel

s/ Anthony F. Schiavetti
ANTHONY F. SCHIAVETTI
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7572
Fax: (202) 305-1571
anthony.f.schiavetti@usdoj.gov

October 13, 2021

Attorneys for Defendant

50