## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

| | |
|---|---|
| BLUE ORIGIN FEDERATION, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | )　　No. 21-1695C |
| | )　　Judge Richard A. Hertling |
| Defendant, | ) |
| and | ) |
| | ) |
| SPACE EXPLORATION TECHNOLOGIES CORP., | )　　REDACTED VERSION |
| | ) |
| Defendant-Intervenor. | ) |

## PLAINTIFF'S REPLY IN SUPPORT OF CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Scott E. Pickens
Barnes & Thornburg LLP
1717 Pennsylvania Avenue, N.W., Suite 500
Washington, DC 20006-4623
Phone:  (202) 371-6349
Email:  (Scott.Pickens@btlaw.com)

*Counsel of Record for Plaintiff*
*Blue Origin Federation, LLC*

*Of Counsel:*

Scott N. Godes
Matthew J. Michaels
Barnes & Thornburg LLP
1717 Pennsylvania Avenue, N.W., Suite 500
Washington, DC 20006-4623

## **Table of Contents**

I.  PRELIMINARY STATEMENT ................................................................... 1

II. ARGUMENT ......................................................................................... 3

   A.  NASA Waived or Relaxed Material Solicitation Requirements for SpaceX. ............... 3

      1.  NASA and SpaceX's Interpretation of the Term "HLS Element" is Entirely Unsupported by the Plain Language of the Solicitation. ......................................... 3
      2.  NASA's Current Interpretation of the Term "HLS Element" Conflicts with its Contemporaneous Interpretation. ............................................................... 6
      3.  Even the GAO Agreed the Only Reasonable Interpretation of the Term "HLS element" Included Supporting Spacecraft. ......................................... 8
      4.  Blue Origin's Interpretation of the Term "HLS element" Is the Only Reasonable Interpretation and Does Not Constitute An Untimely Challenge to the Solicitation's Requirements. ............................................................... 9
      5.  NASA Waived the Requirement for An FRR for Each HLS Launch. ................. 10
      6.  NASA Failed to Evaluate and Waived the DCR and Multiple Launch Vehicle Review Requirements. ............................................................... 17

   B.  NASA Unlawfully Engaged in Improper and Unequal Discussions with Only SpaceX. ................................................................................................. 25

   C.  NASA Unlawfully Refused to Amend the Solicitation to Allow Offerors to Revise Their Proposals When NASA's Requirements Changed. ........................................... 27

      1.  NASA Was Required to Amend the Solicitation. ....................................... 28
      2.  Blue Origin Was Not Required to File a Pre-Award Protest When NASA Changed Its Requirements After Submission of Proposals. ................................. 30
      3.  NASA Could Not "Draft Around" Procurement Law. ......................... 32

   D.  NASA Failed to Evaluate SpaceX's Proposal in Accordance with the Solicitation.. 33

   E.  NASA Breached the Implied-In-Fact Contract of Good Faith and Fair Dealing. ..... 35

   F.  The Government's Motion to Dismiss Count Two and Other Allegations Should be Denied. ................................................................................................. 37

   G.  Blue Origin Established It Was Prejudiced on the Merits by NASA's Procurement Errors. ................................................................................................. 40

      1.  Had NASA Amended the Solicitation Or Waived Review Requirements for All Offerors, Blue Origin Would Have Used ████████████████ as It Originally Proposed. ................................................................... 41
      2.  Had NASA Amended the Solicitation, Held Discussions, Or Waived Review Requirements for All Offerors, Blue Origin's Proposal Price Would Have

Substantially Decreased, Giving it a Substantial Chance for the Option A Contract.................................................................................................. 51

**H.   Blue Origin Has Standing to Bring this Protest.**.................................................. **58**

1.   Prejudice is Presumed When, As Here, the Agency Acted Irrationally, Arbitrarily or Capriciously............................................................................................ 58

2.   Blue Origin Has More Than Cleared the Threshold For Showing Prejudice to Satisfy Standing. ....................................................................................... 58

**I.   Blue Origin is Entitled to Injunctive Relief.** .................................................... **63**

1.   Declaratory Relief is Appropriate. ...................................................................... 63

2.   Blue Origin Has Succeeded on the Merits and the Remaining Injunctive Relief Factors All Favor Blue Origin. ............................................................................ 63

**III.   CONCLUSION** ..................................................................................................... **70**

**<u>Table of Appendix</u>**

Exhibit 1    Enabling Industry Readiness for Commercial Lunar Space ................A-1 – A-9
             Transportation Systems – SAM.GOV Notice ID 21-27-PS50 (April 28, 2021)
             https://sam.gov/opp/d4d9b5cf1c384ecfb69bf14566382f38/view

Exhibit 2    Nelson remains confident regarding funding for Artemis – ..............A-10 – A-13
             SpaceNews (October 3, 2021)
             https://spacenews.com/nelson-remains-confident-on-nasa-funding-for-artemis/

Exhibit 3    NASA OIG Report No. IG-21-025 – ..................................................A-14 – A-55
             NASA's Development of Next-Generation Spacesuits (August 10, 2021)
             https://oig.nasa.gov/docs/IG-21-025.pdf

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

2M Rsch. Servs., LLC v. U.S.,
  139 Fed. Cl. 471 (2018) ...................................................................25, 36, 37, 66

Acetris Health, LLC v. U.S.,
  949 F.3d 719 (Fed. Cir. 2020)...................................................................62

Alfa Laval Separation, Inc. v. U.S.,
  175 F.3d 1365 (Fed. Cir. 1999).............................................................52, 54

AmBuild Co., LLC v. U.S.,
  119 Fed. Cl. 10 (2014) .................................................................................4

Arch Chems. v. U.S.,
  64 Fed. Cl. 380 (2005) .................................................................................2

AshBritt, Inc. v. U.S.,
  87 Fed. Cl. 344 (2009) ...........................................................................52, 53

Asia Pacific Airlines v. U.S.,
  68 Fed. Cl. 8 (2005) ...................................................................................41

Bannum, Inc. v. U.S.,
  404 F.3d 1346 (Fed. Cir. 2005)..................................................................60

Bilfinger Berger AG Sede Secondaria Italiana v. U.S.,
  97 Fed. Cl. 96 (2010) .................................................................................59

Blue & Gold,
  492 F.3d 1308 (Fed. Cir. 2007)............................................................ passim

Blue Tech Inc. v. U.S.,
  __ Fed. Cl. __, 2021 WL 3641048 (Fed. Cl. Jul. 30, 2021) .............................11, 40

Bluewater Mgmt. Grp., LLC v. U.S.,
  150 Fed. Cl. 588 (2020) ...........................................................................1, 62

C.A.C.I., Inc.-Federal v. U.S.,
  719 F.2d 1567 (Fed. Cir. 1983)...................................................................63

Caddell Constr. Co. v. U.S.,
  111 Fed. Cl. 49 (2013) ...............................................................................65

Caddell Constr. Co. v. U.S.,
  125 Fed. Cl. 30 (2016) ...........................................................................................58, 62

CBY Design Builders v. U.S.,
  105 Fed. Cl. 303 (2012) ....................................................................................15, 17, 22

CIRCON ACMI, Div. of Circon Corp.,
  B-231108, Aug. 12, 1988.................................................................................................26

Cleveland Assets, LLC v. U.S.,
  133 Fed. Cl. 108 (2017) ..................................................................................................63

Community Heating & Plumbing Co. v. Kelso,
  987 F.2d 1575 (Fed. Cir. 1993).......................................................................................10

Confidential Informant 59-05071 v. U.S.,
  134 Fed. Cl. 698 (2017), aff'd, 745 F. App'x 166 (Fed. Cir. 2018) ................................69

CRAssociates, Inc. v. U.S.,
  95 Fed. Cl. 357 (2010) ......................................................................................................3

CW Gov't Travel, Inc. v. U.S.,
  __ Fed. Cl. __, 2021 WL 3085500 (July 21, 2021) ...................................................2, 53

CW Gov't Travel, Inc. v. U.S.,
  110 Fed. Cl. 462 (2013) .............................................................................................59, 60

CW Gov't Travel, Inc. v. U.S.,
  99 Fed. Cl. 666 (2011) ..................................................................................................9, 10

Elec. Data Sys., LLC v. U.S.,
  93 Fed. Cl. 416 (2010) .........................................................................................53, 54, 55

Ernst & Young, LLP v. U.S.,
  136 Fed. Cl. 475 (2018) ....................................................................................16, 17, 26

Femme Comp Inc. v. U.S.,
  83 Fed. Cl. 704 (2008) ....................................................................................................34

Gen'l Dynamics Info. Tech., Inc.,
  B-406059.2, Mar. 30, 2012..............................................................................................38

GEO Group, Inc. v. U.S.,
  100 Fed. Cl. 223 (2011) ..................................................................................................65

Glenn Defense Marine (Asia) PTE Ltd. v. U.S.,
  97 Fed. Cl. 568 (2011) ......................................................................................................3

Globe Savings Bank, F.S.B. v. U.S.,
    61 Fed. Cl. 91 (2004) .................................................................................68

Green Tech. Group, LLC v. U.S.,
    147 Fed. Cl. 231 (2020) ..........................................................................69, 70

Gutz v. U.S.,
    45 Fed. Cl. 291 (1999) ...............................................................................4

Heritage of Am., LLC v. U.S.,
    77 Fed. Cl. 66 (2007) ...........................................................................41, 60

Hyperion, Inc. v. U.S.,
    115 Fed. Cl. 541 (2014) ..............................................................................62

Impresa Construzioni Geom. Domenico Garufi v. U.S.,
    238 F.3d 1324 (Fed. Cir. 2001)....................................................................40

Innovative Mgmt. & Tech. Approaches, Inc.,
    B-418823.3. Jan. 8, 2021, 2021 CPD ¶ 18......................................................38

Jansen v. U.S.,
    344 F.2d 363 (Ct. Cl. 1965) ...............................................................6, 8, 11

Joint Action in Community Service, Inc.,
    B-214564, Aug. 27 1984, 84-2 CPD ¶ 228...............................................28, 29, 30

Juniper Networks, Inc. v. Shipley,
    394 F. App'x 713 (Fed. Cir. 2010) .................................................................68

Kiewit Infrastructure West Co. v. U.S.,
    147 Fed. Cl. 700 (2020) ......................................................................41, 58, 66

Kinemetrics, Inc. v. U.S.,
    2021 WL 4237169 (Fed. Cl. Sept. 10, 2021).....................................................60

Lermer Germany GmbH v. Lermer Corp.,
    94 F.3d 1575 (Fed. Cir. 1996).......................................................................63

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) ..................................................................................62

Magnum Opus Techs., Inc. v. U.S.,
    94 Fed. Cl. 512 (2010) ..........................................................................59, 60

Mausolf v. Babbitt,
    85 F.3d 1295 (8th Cir. 1996) .......................................................................62

McKing Consulting Corp. v. U.S.,
    78 Fed. Cl. 715 (2007) ........................................................................................60

Medline Indus., Inc. v. U.S.,
    __ Fed. Cl.__, 2021 WL 3483429 (July 30, 2021) ....................................... *passim*

MORI Assocs., Inc. v. U.S.,
    102 Fed. Cl. 503 (2011) ..................................................................................63, 64

Mortgage Contracting Servs., LLC v. U.S.,
    153 Fed. Cl. 89 (2021) ..........................................................................................2

N.C. Bus. Enter. Prog. v. U.S.,
    110 Fed. Cl. 354 (2013) ........................................................................................60

NOAA Md., LLC v. Admin. of Gen. Servs. Admin.,
    997 F.3d 1159 (Fed. Cir. 2021) ............................................................................8

Oak Grove Techs. v, U.S.,
    2021 WL 3627111 (Fed. Cl. Aug. 2, 2021) ................................................2, 4, 14

Raytheon v. U.S.,
    121 Fed. Cl. 135 (2015) ....................................................................................3, 14

Res Rei Dev., Inc. v. U.S.,
    126 Fed. Cl. 535 (2016) ........................................................................................36

Safeguard Base Operations, LLC v. U.S.,
    989 F.3d 1326 (Fed. Cir. 2021) ......................................................................... *passim*

SAGAM Securite Senegal v. U.S.,
    2021 WL 4621966 (Fed. Cl. Oct. 7, 2021) ............................................................36

SEKRI v. U.S.,
    152 Fed. Cl. 742 (2021) ....................................................................................39, 40

SRA Int'l, Inc.,
    B-410973; B-410973.2, Apr. 8, 2015 ....................................................................27

Strategic Analysis, Inc. v. U.S. Dep't of Navy,
    939 F. Supp. 18 (D.D.C. 1996) ............................................................................49

Tech Sys., Inc. v. U.S.,
    98 Fed. Cl. 228 (2011) ........................................................................................59

Textron, Inc. v. U.S.,
    74 Fed. Cl. 277 (2006) ........................................................................................40

The Analysis Group, LLC,
    B-401726, B-401726.2, Nov. 13, 2009, 2009 CPD ¶ 237 ...................................................26

Tolliver Group, Inc. v. U.S.,
    151 Fed. Cl. 70 (2020) ...........................................................................................26, 38

USfalcon, Inc. v. U.S.,
    92 Fed. Cl. 436 (2010) ..................................................................................................59

Valve Corp. v. Ironburg Inventions Ltd.,
    8 F.4th 1364 (Fed. Cir. 2021) ..................................................................................66, 68

ViroMed Lab'ys, Inc. v. U.S.,
    87 Fed. Cl. 493 (2009) ..................................................................................................66

VS2, LLC v. U.S.,
    No. 21-1028C, __ Fed. Cl. __, 2021 WL 4167380 (Sept. 21, 2021)......................................39

WaveLink, Inc. v. U.S.,
    No. 20-749C, 2021 WL 2762814 (Fed. Cl. June 24, 2021)...................................25, 27, 41, 43

**Statutes**

28 U.S.C. § 1491(a)(2)........................................................................................................64

28 U.S.C. § 1491(b) ......................................................................................................59, 64

**Other Authorities**

FAR 1.102-2(c)(3) .........................................................................................................27, 36

FAR 1.602-2 .............................................................................................................27, 30, 36

FAR Part 8 ..........................................................................................................................38

FAR Subpart 8.4 ............................................................................................................ *passim*

FAR Part 13 ........................................................................................................................38

FAR Part 15 .................................................................................................................25, 26, 38

FAR 15.206..........................................................................................................................30

FAR 15.306(e) ................................................................................................................27, 52

FAR Part 16 ........................................................................................................................38

FAR 16.505..........................................................................................................................38

FAR Part 35 ...............................................................................................................38

I.    **PRELIMINARY STATEMENT**

The Court should grant Blue Origin's Cross-Motion for Judgment on the Administrative Record ("MJAR") and remand the matter to NASA because NASA ignored or affirmatively waived important and mandatory Solicitation requirements only for SpaceX, then opened discussions with just one offeror, SpaceX, to allow for a changed proposal and pricing, and the Agency's actions prejudiced Blue Origin.  The Government Accountability Office's ("GAO") decision, and the record before the Court, confirm that NASA plainly waived the Solicitation requirements for Flight Readiness Reviews ("FRRs") and similarly failed to enforce or waived requirements for other critical reviews required by the Solicitation where SpaceX failed to comply with those review requirements.  The Federal Circuit has emphasized that a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.  SpaceX's proposal did not conform to the material terms and conditions of the Solicitation, as shown by its plain language, as confirmed by NASA's contemporaneous internal documents, and as confirmed by the GAO.  Further, the Administrative Record shows that NASA should have amended the Solicitation or otherwise apprised Blue Origin that it had waived Solicitation requirements, and, indeed, NASA even considered that approach.  NASA improperly failed to engage in discussions with Blue Origin.  The Agency's actions favored SpaceX and prejudiced Blue Origin.  NASA's conduct breached its obligation to deal with Blue Origin fairly and honestly in its consideration of Blue Origin's proposal.

This case is well within the recent cases that have found for plaintiff where, as here, solicitation requirements were not satisfied, and Blue Origin has met its burden of proof. Bluewater Mgmt. Grp., LLC v. U.S., 150 Fed. Cl. 588, 615 (2020) (agency did not properly assess

how awardee proposed to assess solicitation requirement); CW Gov't Travel, Inc. v. U.S., --- Fed. Cl. ---, 2021 WL 3085500, *5-10 (July 21, 2021) (agency misinterpreted solicitation requirements and applied unreasonable interpretation for those requirements in the evaluation); Mortgage Contracting Servs., LLC v. U.S., 153 Fed. Cl. 89, 142 (2021) (agency accepted awardee's proposal despite the fact that it was noncompliant with a material solicitation requirement); Oak Grove Techs. v, U.S., 2021 WL 3627111, *14-*16 (Fed. Cl. Aug. 2, 2021) (Awardee's proposal failed to comply with a material solicitation requirement. An "agency's failure to consider the issue" of non-compliance "with a material solicitation requirement" "or to exercise discretion absent any supporting rationale is, by definition, an abuse of discretion.").

    As the Court reviews the parties' papers, several threshold matters warrant the Court's attention. First, to try to create a record in support of their new-for-litigation arguments regarding the propriety of SpaceX's proposal and NASA's evaluation of it, SpaceX and the United States cite heavily to materials created well after NASA's evaluation and award decision and submitted to GAO after Blue Origin filed its protest there. These materials include the Contracting Officer's Statement of Facts and Supplemental Statement of Facts, and declarations from certain NASA employees and a graphic exhibit prepared by Blue Origin. SpaceX in particular asserts that these materials are in the administrative record and the Court must consider them. To the contrary, these post-protest materials offered in the heat of litigation should be given no weight, and NASA's attempt to rewrite the record should be disregarded. As this Court has noted, the focus of this action is the Administrative Record before the Agency at the time that it made its evaluation and award decision. Arch Chems. v. U.S., 64 Fed. Cl. 380, 385-86 (2005) ("the Court of Federal Claims reviews a decision of a procuring agency based on the record that was before the agency at the time that it made its decision."). The Agency's award decision stands or falls on the

disclosed administrative record in this matter. Raytheon v. U.S., 121 Fed. Cl. 135, 159 (2015) ("both binding and nonbinding precedent indicate that a court should limit its review of an agency's decision to the materials that were before the agency when it made its decision.") (and cases cited); CRAssociates, Inc. v. U.S., 95 Fed. Cl. 357, 377 (2010) (stating there is no legal authority that "requires the court to give" a contracting officer's statement of facts submitted during a GAO protest "any independent, let alone dispositive, weight"). The materials cited by SpaceX and the Government at AR Tab 108b7 through Tab 108b66 are not part of the record before the Agency when it made its decision and should be disregarded by the Court.

Second, as the Court is aware, the GAO determined that NASA had "expressly waived" the HLS Solicitation requirements for SpaceX relating to Flight Readiness Reviews ("FRRs"). AR Tab 108b67a at 105035 n.15, 105075-77. GAO considered and rejected NASA's various defenses and rationales, including post-hoc rationales developed exclusively for the protest litigation, such as the assertion there were "SpaceX FRRs" (which there were not). As this Court noted in Glenn Defense Marine (Asia) PTE Ltd. v. U.S., 97 Fed. Cl. 568, 577 n.17 (2011) "given the diverse factual scenarios that appear before [GAO], its decisions traditionally have been accorded a high degree of deference by the courts, particularly those involving bid protests. Although GAO decisions are not binding upon this court, they may be considered as expert opinions, which [the court] should prudently consider."

## II.   ARGUMENT

### A.   NASA Waived or Relaxed Material Solicitation Requirements for SpaceX.

#### 1.   NASA and SpaceX's Interpretation of the Term "HLS Element" is Entirely Unsupported by the Plain Language of the Solicitation.

In their replies, SpaceX and the Government offer strained and illogical explanations for why the term "HLS element" means "Integrated Lander element" and why Flight Readiness

Reviews ("FRRs") (and other reviews) assertedly were not required for each launch. The plain language of the Solicitation conflicts with those arguments, and NASA's own internal documents show that an "FRR is required prior to each launch of an HLS element." AR Tab 27k at 33187. Neither party points to any provision where the Solicitation explicitly uses the term "HLS element" to mean "Integrated Lander element." They cannot, because it does not exist. Instead, they put forward arguments with no support in the Solicitation's text. The reason they do so is clear: if the term "HLS elements" means the "elements of an HLS" – as it plainly does – then NASA overlooked many critical errors and did not perform a proper evaluation of SpaceX's proposal, and therefore NASA irrationally failed to conduct a fair competition. Such arbitrary and capricious conduct is fatal to the procurement here. See, e.g., AmBuild Co., LLC v. U.S., 119 Fed. Cl. 10, 18 (2014) (explaining that "[a]n agency's determination lacks a rational basis if the contracting officer failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or the result is so implausible that it could not be ascribed to a difference in view or the product of agency expertise") (cleaned up); Oak Grove Techs., 2021 WL 3627111 at *16 ("An agency's failure to consider the issue or to exercise discretion absent any supporting rationale is, by definition, an abuse of discretion.").

Neither SpaceX nor NASA has any rational explanation for the many substantial errors in SpaceX's schedule relating to Solicitation-required reviews. Instead, they attempt a coordinated effort to undermine plain-language Solicitation requirements by redefining the term "HLS element." The Court should reject this ploy. Gutz v. U.S., 45 Fed. Cl. 291, 298 (1999) (When "[t]he government's interpretation . . . is not one which can be reasonably derived from the language of the" controlling document, this Court rejects the interpretation.).

In arguing that "HLS element" means only an "Integrated Lander element," NASA and

SpaceX urge the Court to ignore the "HLS" part of "HLS element." But this does not "give[] reasonable meaning to all of the Solicitation's provisions, without rendering any part superfluous or void." Safeguard Base Operations, LLC v. U.S., 989 F.3d 1326, 1344 (Fed. Cir. 2021).

First, SpaceX and NASA ignore and fail to address the clear and obvious interpretation – that the term "HLS elements" means the "elements of the HLS." The Solicitation's Statement of Work ("SOW") explicitly defines "HLS" as including "[a]ll objects, vehicles, integrated systems," and numerous things listed specifically, including an "Integrated Lander (or elements thereof), all Supporting Spacecraft, all launch vehicles necessary for launch," and more. AR Tab 27e at 32948. Under SpaceX's and the Government's position, the Court would have to determine that an element of HLS includes *only* the Integrated Lander rather than the "Integrated Lander (or elements thereof), all Supporting Spacecraft, [and] all launch vehicles."

Second, the Government's and SpaceX's new-for-litigation interpretation ignores the Solicitation and defies common sense. The term "Integrated Lander" or "HLS Integrated Lander" is a defined term. AR Tab 27 at 24430. If "HLS element" meant only "Integrated Lander" or "HLS Integrated Lander," the Solicitation would use those terms. It does not.

Third, simply because the Solicitation and SOW use the word "element" to refer to the Integrated Lander in some places, as the Government's and SpaceX's litigation position asserts, it does not mean that the word "elements" exclusively refers to the Integrated Lander. There are many references to the term "elements" in the SOW where it does not refer to the Integrated Lander. See, e.g., AR Tab 27e at 32989 ("The AI&T Plan(s) shall include the following **elements**…") (emphasis added); see also id. at 32948 (**HLS**: "All objects, vehicles, **elements**, integrated systems . . . that are designed, developed, and utilized by the contractor") (emphasis added); id. at 32986 ("The contractor shall perform Mission and Fault Management (M&FM)

5

Design, Analysis, and Test to integrate and assess design information, interfaces, requirements, and compatibility as an **element** of the integrated mission design") (emphasis added).  These references to "elements" do not also mean "Integrated Lander."

### 2. NASA's Current Interpretation of the Term "HLS Element" Conflicts with its Contemporaneous Interpretation.

Notwithstanding its current assertions, NASA, during the evaluation, contemporaneously interpreted the "elements" of an offeror's HLS to include supporting spacecraft and launch vehicles.  This conduct is critical, because "the interpretation placed by the parties upon a contract during its performance is demonstrative of their intention." Jansen v. U.S., 344 F.2d 363, 369 (Ct. Cl. 1965) (citation omitted).  Here, the Court should follow the interpretation that NASA placed on "HLS element" in its contemporaneous documents, rather than the new-for-litigation position it has taken to the contrary.  For example, in the SEP's summary of SpaceX's evaluation, entitled "Pre-Briefing for Source Selection Authority," NASA listed the tanker Starships, depot Starship, and the SuperHeavy Boosters as "Elements" of SpaceX's HLS:



6

AR Tab 48 at 62391. Similarly, in the same SEP evaluation document, NASA listed the HLS "Elements" for Dynetics to include its "Main Element" – ███████████████████ – and its "Supporting Elements" – t███████████████████████████████████ ██████. Id. at 62373.



Significantly, in a second key evaluation document, Dynetics' SEP Report, <u>NASA characterized Dynetics'</u> ████████████ (supporting spacecraft) as an "HLS element" in order to assign Dynetics a significant weakness. <u>See</u> Dynetics SEP report, AR Tab 82.2a at 63389-91; <u>see also</u> GAO Decision, AR Tab 108b67a-118a at 105076 (Recognizing that NASA "treat[ed] Dynetics's ████████████ as an 'HLS element' for purposes of assessing a significant weakness for Dynetics not ████████████████████████████████████ ████████████"). In yet a third evaluation document, NASA again confirmed that supporting spacecraft ████████████████) were considered "elements" of its HLS system. AR Tab 52b at 62523 (NASA stated "[p]er the solicitation, <u>supporting vehicles</u> such as ████████████ <u>are elements of the HLS system</u>.") (emphasis added).

NASA has <u>no explanation</u> for the consistent interpretation found in NASA's own contemporaneous evaluation documents, which directly contradicts NASA's current

████████████████████████████████████████

interpretation.  In response, NASA merely states the "SEP report was poorly worded."  ECF No. 60 ("Gov. Br.") at 56 n. 5.  It may be an inconvenient truth, but nothing in the contemporaneous record shows that the four references in the Dynetics' SEP report, the March 4, 2021 Pre-Briefing to the SSA, and the March 11, 2021 Source Evaluation Briefing to the Source Selection Authority ("SSA") were "poorly-worded."

The Agency also wrongly argues that NASA's contemporaneous use and understanding of the term "HLS element" has no legal bearing on the meaning of this term.  Gov. Br. at 56 n. 5.  If the Agency is correct the term "HLS element" is ambiguous (which it is not), then the parties' use and contemporaneous understanding of this term is relevant to its interpretation.  See, e.g., Jansen, 344 F.2d at 369; see also NOAA Md., LLC v. Admin. of Gen. Servs. Admin., 997 F.3d 1159, 1169 (Fed. Cir. 2021) (stating that a document written by an agency must be construed against the agency when "the contractor's interpretation of the contract is reasonable").

The Agency's contemporaneous interpretation of the term "HLS elements" in various evaluation documents is the same as Blue Origin's interpretation of this term, and the Agency has no credible explanation for why its interpretation of this term has suddenly changed.[1]

### 3. Even the GAO Agreed the Only Reasonable Interpretation of the Term "HLS element" Included Supporting Spacecraft.

Even the GAO, which decided the initial protest in NASA's favor, rejected NASA's highly implausible definition of "HLS element":

---

[1] SpaceX alleges that during Q&A exchanges, NASA confirmed that the term "HLS" means "HLS Integrated Lander" *in the SOW*.  SpaceX Br. at 50.  But the Q&A quoted by SpaceX does not mention or reference the SOW; rather it references three specific documents, so SpaceX takes this Q&A out of context.  More important, however, is that the Statement of Facts section of SpaceX's own MJAR acknowledges the term "HLS" is explicitly defined in the SOW to refer to the four elements of the HLS, including supporting spacecraft and launch vehicles.  SpaceX Br. at 42.  To now contend that the term "HLS," *in the SOW*, means "Integrated Lander" is either intentionally misleading or a gross oversight.

> Thus, we find that the Option A BAA required a FRR to be completed prior to *each launch of an HLS element*, which definition includes *supporting spacecraft*. NASA's competing interpretation would essentially require us to read language out of and into the solicitation's requirements. Specifically, we would need to read "supporting spacecraft" out of the definition of "HLS," and the "each" out of "each launch." Additionally, we would need to read in the concept of each element type, specifically, that a FRR is only required to be completed prior to the launch of *each type of* HLS element. As between the two preferred interpretations, we find the protesters' interpretation--which relies on the text as written--to be more natural and compelling than the agency's preferred interpretation. **In our view, the agency's interpretation would require us to construe the agency's intent based on information not found in the plain text of the solicitation.**

AR Tab 108b67a-118a at 105076 (emphasis added). As recognized in the quote above, NASA's interpretation would require the Court to read "supporting spacecraft" out of the definition of "HLS", and would require the Court to read into the FRR requirements the concept of an FRR for each "*type of*" HLS element and the concept of a "delta FRR." That interpretation fails under the law. E.g., CW Gov't Travel, Inc. v. U.S., 99 Fed. Cl. 666, 674–75 (2011) (rejecting a party's interpretation of a solicitation, because the party "fail[ed] to offer an interpretation that accounts for all the terms in the Solicitation's . . . provisions"). NASA's interpretation is not based on information found in the plain text of the Solicitation and as found by GAO, does not reflect an interpretation of the Solicitation read as a whole and in a reasonable manner, which gives effect to all of its provisions. AR Tab 108b67a-118a at 105075-76.

### 4. Blue Origin's Interpretation of the Term "HLS element" Is the Only Reasonable Interpretation and Does Not Constitute An Untimely Challenge to the Solicitation's Requirements.

Because there is only one reasonable interpretation of the term "HLS element," this term is not ambiguous or subject to multiple interpretations. ECF No. 61 ("Blue Origin Br.") at 14-15.

Both NASA and SpaceX argue that if their illogical interpretations of the term "HLS element" are not correct, then the term is at least patently ambiguous, in which case it should have been challenged by Blue Origin prior to proposal submission. Gov. Br. at 58; ECF No. 62

("SpaceX Br.") at 48-49. NASA and SpaceX are incorrect, because there is only one reasonable interpretation of the term "HLS element"; it is not patently or latently ambiguous. "For a solicitation term to be ambiguous, it must be open to more than one reasonable interpretation." CW Gov't Travel, 99 Fed. Cl. at 674–75 (citing Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 997 (Fed. Cir. 1996)); see also Community Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1578-79 (Fed. Cir. 1993) (contracts "are not necessarily rendered ambiguous by the mere fact that parties disagree as to the meaning of their provisions"; rather, "[a] contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language"). Neither NASA nor SpaceX has put forward another reasonable interpretation of the term "HLS element" which is consistent with the Solicitation language. Therefore, the term "HLS element" is not ambiguous and application of the plain meaning of the term is not an untimely challenge to the Solicitation requirements.

### 5. NASA Waived the Requirement for An FRR for Each HLS Launch.

#### (a) NASA Erroneously Claims Blue Origin's Arguments Regarding Multiple FRR Requirements Cannot Succeed Because One FRR Requirement Contains the Word "Should."

Blue Origin argues that NASA waived multiple FRR requirements for SpaceX including the following:

1. "An FRR is required prior to each launch of an HLS element." (AR Tab 27k at 33187);

2. "The FRR should be completed by two (2) weeks before launch of each HLS element." (AR Tab 27e at 32972); and,

3. The FRR is to show "[t]he flight vehicle, launch vehicle, and support spacecraft . . . are ready for flight" (AR Tab 27e at 32972).

See Blue Origin Br. at 8-9, 16, 36-37.

NASA ignores the complete set of mandatory FRR requirements cited by Blue Origin. Instead, it focuses solely on the second requirement above ("FRR should be completed by two (2) weeks before launch of each HLS element.") as the purported "pivotal" requirement upon which Blue Origin relies.  Gov. Br. at 54.  NASA claims the second requirement contains the word "should" so it is not a requirement at all.  NASA's selective, new-for-litigation interpretation ignores its own contemporaneous evaluation records that SpaceX's proposal was not compliant with FRR requirements, and does not reflect a complete interpretation of all of the Solicitation's FRR requirements.  See Jansen, 344 F.2d at 369; see also Blue Tech Inc. v. U.S., --- Fed. Cl. ---, 2021 WL 3641048, at *5 (Fed. Cl. Jul. 30, 2021) (in interpreting a solicitation, the Court also "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.") (internal citations omitted).  In contrast, however, Blue Origin's assertions harmonizes all three.  Blue Origin Br. at 36-40.

Under the Solicitation, Offerors are required to propose to conduct a FRR "prior to each launch of an HLS element."  This is mandatory, not permissive.  As is clear, the term "HLS element" includes supporting spacecraft and launch vehicles.  An FRR is therefore required prior to each launch of a supporting spacecraft or launch vehicle.  The Solicitation's third FRR requirement independently also mandates that supporting spacecraft and launch vehicles must be evaluated in each FRR.  The use of "should" in the second requirement only refers to the two-week time period; it does not render every other FRR requirement optional.  In other words, the Solicitation may have permitted offerors some flexibility in *when* to conduct the required FRR for a launch (see second requirement), but not in *whether* to conduct an FRR for each launch of an HLS element (see first and third requirements).

SpaceX's proposal failed to include one FRR prior to each launch of an HLS element as

required by the Solicitation.[2]  The Agency failed to properly evaluate this error when selecting SpaceX for an award because the Agency later chose to waive those FRR requirements to instead permit one FRR for *each class or type* of HLS element in conjunction with newly created "delta FRRs" (after stating in the SEP Report that SpaceX did not meet the Solicitation's requirements for FRRs).  These are new and unstated criteria substituted for mandatory and material Solicitation requirements.  The Solicitation does not permit an FRR only for each class/type of HLS element, nor does it specify delta FRRs.  The Agency's interpretation of the FRR requirements is not in accordance with the plain language of the Solicitation.  As discussed above, the term "HLS element" includes supporting spacecraft and launch vehicles.

Furthermore, even applying the incorrect interpretation that "HLS element" means "Integrated Lander," the Agency's interpretation of the FRR requirements makes no sense.  If HLS element means Integrated Lander (it does not), then SpaceX's initial proposal would meet the requirements (it does not), because it proposed one FRR prior to the launch of its Integrated Lander.  The Agency implicitly acknowledges that HLS element *does not* and *never did* mean Integrated Lander when it contemporaneously mandated that SpaceX at least include an FRR prior to the first launch of the Depot Starship and Tanker Starships, in addition to delta FRRs, and found SpaceX was not in compliance with FRR requirements.  The Agency's failure to evaluate SpaceX's proposal in accordance with the Solicitation requirements is arbitrary, capricious and irrational.  As discussed below, the Agency's conduct prejudiced Blue Origin.

---

[2] SpaceX also asserts the waiver of the FRR requirement for SpaceX "had no bearing on Blue Origin's proposed approach, because Blue Origin's architecture consisted of a three-element Integrated Lander and no supporting spacecraft."  SpaceX Br. at 32.  This is incorrect where Blue Origin would have otherwise proposed an alternative approach.  Also, the waived requirement called for an FRR for each HLS element launch.  If this requirement is waived, then Blue Origin would not have had to propose any FRRs for its 3 HLS launches, so its proposal would have been affected in any case.

**(b) NASA Implausibly Alleges that Attachment O Does Not Contain Solicitation Requirements.**

NASA attempts to undermine the clear Solicitation requirement that "an FRR is required prior to each launch of an HLS element" by presenting a new and plainly illogical argument. NASA alleges that Attachment O – Milestone Acceptance Criteria and Payment Criteria – does not contain requirements, but rather is merely "a fillable form designed for offerors to propose performance based payments." Gov. Br. at 53, n. 4. NASA now asserts the requirements stated in Attachment O are meaningless. See id. This new argument is plainly wrong; it is explicitly contradicted by the Solicitation and NASA's contemporaneous actions during the procurement.

NASA fails to explain why those requirements would be specified in Attachment O if offerors were not required to comply with them, nor does NASA provide any basis to reject or ignore those requirements. And, NASA's argument is directly contradicted by the Solicitation itself. The Solicitation states, "for its Option A proposal, the Offeror is required to submit all volumes and proposal attachments indicated within Table 3," which includes Attachment O. AR Tab 27 at 24444. The requirements, including the FRR requirements, listed in Attachment O are, at minimum, mandatory instructions for filling out the Solicitation's Attachment O form.

**(c) SpaceX Claims Its Initial Proposal Met FRR Requirements; NASA Disagrees with SpaceX and Claims Only SpaceX's Revised Proposal Met the FRR Requirements; Neither Is Correct.**

Contrary to the evaluation record, SpaceX now alleges that its initial proposal for one FRR to occur two weeks before the Integrated Lander launch – and several months after its supporting spacecraft launches – meets the Solicitation requirement for the FRR to verify that "supporting spacecraft . . . are ready for flight." See SpaceX Br. at 46. The logical impossibility of what SpaceX proposes is apparent on its face. SpaceX's single FRR, which is set to occur several months after all the supporting spacecraft will have launched, cannot ensure that the supporting

13

spacecraft "are ready for flight."

To support this preposterous argument, SpaceX cites NASA's post-hoc litigation position during the GAO protest using Declarations from NASA's Chief Health and Medical Officer, and NASA's Chief of Safety and Mission Assurance. Id. As explained above, however, these materials are not part of the record before the Agency at the time of its evaluation and award decision, and not for consideration by the Court. Raytheon, 121 Fed. Cl. at 159 (2015) ("both binding and nonbinding precedent indicate that a court should limit its review of an agency's decision to the materials that were before the agency when it made its decision.").[3] Unfortunately for SpaceX, NASA has flipped back to its original assessment from SpaceX's SEP Report that SpaceX was noncompliant.[4] In NASA's MJAR, NASA again acknowledges that SpaceX's single-proposed FRR *did not* meet the FRR requirements:

> Specifically, because SpaceX's unscrewed [sic] depot and tanker Starships would be launched well in advance of its crewed single-element HLS Starship, **the FRR, which SpaceX proposed to conduct two weeks prior to the launch of the HLS Starship, would necessarily not be able to review whether the supporting spacecraft were ready for flight, as they would have already been launched previously.**

---

[3] See also Oak Grove Techs., LLC v. U.S., No. 21-775C, 2021 WL 3627111, at *18–19 (Fed. Cl. Aug. 2, 2021) (quoting CRAssociates, Inc. v. U.S., 95 Fed. Cl. 357, 376 (2010)) (This "Court declines to credit [an agency's] naked assertions made in the heat of litigation particularly because "'[a]ny *post hoc* rationales an agency provides for its decision are not to be considered.'") The Court explained that "*Post hoc* rationales should not form the basis of agency decision-making." Id. (citations and quotation marks omitted).

[4] Even if the Government had not walked away from its efforts to create a new story about why it picked SpaceX, NASA's efforts to do so should be disregarded. NASA has flipped-flopped back and forth throughout the course of this litigation. In the final evaluation of SpaceX's proposal, NASA determined that SpaceX *did not* meet the FRR requirement to ensure that supporting spacecraft are ready for flight. SpaceX SEP Report, AR Tab 59c at 62813 ("*However, the offeror neither proposed any FRR events dedicated to one or all of its supporting spacecraft, nor a single FRR to cover the full scope of its demonstration mission prior to the launch of its first supporting spacecraft. Thus, in either case, the offeror's proposal is inconsistent with this required milestone (or milestones) as set forth in the solicitation.*") (emphasis added). However, during the GAO protest, NASA took a different, now abandoned, position that SpaceX's initial proposal *did* meet the FRR requirements. AR Tab108b67a-118a at 105076 n. 34.

Gov. Br. at 59 (emphasis added).  The Court should reject SpaceX's incorrect argument

which even NASA now concedes is a logical impossibility and incorrect.

> ### (d) NASA's Arguments to Mitigate Its Waiver of the FRR Requirements Are Misleading and Not Grounded in the Contemporaneous Evaluation Record.

Blue Origin demonstrated that SpaceX's proposal should have been unawardable and

merited a Deficiency for its failure to include 15 additional required FRRs (in addition to its

separate, failure to meet the DCR and launch vehicle review requirements that NASA completely

failed to address).  Blue Origin Br. at 55.  In response, NASA and SpaceX both allege that:  (a)

SpaceX included "SpaceX FRRs" in lieu of the required "NASA FRRs"; (b) the inclusion of the

SpaceX FRRs mitigated the risk of the missing NASA FRRs to such an extent that NASA

reasonably assigned a weakness despite the missing 15 required FRRs; and, (c) that the waiver of

the FRR requirements is also mitigated because the lack of FRRs does not impact safety.  Gov. Br.

at 61; SpaceX Br. at 54.  First, the Solicitation contains a clear requirement that NASA must certify

flight readiness.  AR Tab 27e at 32949.  The GAO expressly rejected NASA's "SpaceX FRR"

assertions there, as inconsistent with the Option A BAA SOW.  AR Tab 108b67a-118a at 105076

n. 34.  Additionally, the "SpaceX FRR" theory was entirely a post-hoc construct presented to GAO

– there is nothing in SpaceX's proposal stating SpaceX is proposing "SpaceX FRRs," nor does the

contemporaneous evaluation record show NASA took any such SpaceX FRRs into consideration

in its evaluation.  The only FRR SpaceX indicated is the one FRR for its HLS Lander that NASA

itself found was insufficient and noncompliant with the Solicitation. NASA's failure to document

its purported assessment nullifies NASA's argument.  See CBY Design Builders v. U.S., 105 Fed.

Cl. 303, 350 (2012) (agreeing with GAO's conclusion that agency's decision was improper

because there were "no documents illuminating the evaluation process in this regard").

Second, assigning a superficial "weakness" to a proposal that failed to meet a material, mandatory requirement in the Solicitation, however, is not sufficient, and demonstrates an arbitrary and capricious evaluation. See Ernst & Young, LLP v. U.S., 136 Fed. Cl. 475, 502-03 (2018).

Third, NASA's and SpaceX's arguments about mitigating factors are wrong for several reasons. Whether NASA evaluated the proposals in accordance with Solicitation requirements does not turn on whether a noncompliant alternative, which ignores a Solicitation requirement, is "just as good." Either SpaceX proposed a process that met the Solicitation's requirements, or it did not. It did not. Once it is understood that NASA waived the FRR requirements, it does not matter whether "SpaceX FRRs" were included in SpaceX's proposal. The relevant facts are: (1) the Solicitation included a material requirement for one NASA FRR prior to each launch of each HLS element; (2) SpaceX failed to meet this material requirement where it proposed no FRRs for 15 launches of supporting spacecraft; (3) the Agency waived the requirement when it allowed for only three FRRs for all 16 launches, and thus failed to evaluate SpaceX's proposal in accordance with the FRR requirement; and, (4) Blue Origin was prejudiced by NASA's waiver of this requirement. Assuming these facts are true (which they are), any purportedly mitigating factors in SpaceX's proposal are irrelevant. The only relevant question is "did NASA's waiver of the FRR requirements prejudice Blue Origin?" The answer is yes.

> **(i) The Court Is Not Required To and Should Not Defer To the Agency Technical Evaluation Where the Agency Failed to Evaluate In Accordance with the Solicitation Requirements.**

NASA and SpaceX both argue that even if SpaceX failed to propose an adequate number of FRRs, NASA had full discretion to evaluate this error as it did by only assigning a weakness, and the Court is "essentially preclude[d] from second guessing" NASA's decision. SpaceX at 51, 55; Gov. Br. at 58. Even assuming SpaceX's citation of the Court's precedent is correct, Agency

deference would not apply here because NASA did not evaluate SpaceX's proposal against the actual Solicitation requirements. NASA evaluated SpaceX's proposal against new and unstated evaluation criteria – i.e., the requirement for one FRR for each class/type of HLS element and so-called "delta FRRs." The Court certainly owes the Agency no deference where the Agency did not evaluate in accordance with the Solicitation requirements. See, e.g., CBY Design Builders, 105 Fed. Cl. at 348-50 (agreeing with GAO's conclusion "that the [agency] departed from the solicitation's terms and thus failed to meaningfully evaluate" the protester's proposal); Ernst & Young, LLP, 136 Fed. Cl. at 502-03 (determining that agency's award was arbitrary and capricious, because, among other things, it did not follow the Solicitation's requirements).

As has been discussed, the correct interpretation of the FRR requirements, when applied to the 16 launches in SpaceX's proposal, would have required 16 FRRs (one FRR for each launch of an HLS element). Instead, NASA evaluated SpaceX's proposal against new and unstated Solicitation requirements, which required SpaceX to propose one FRR for *each type* of HLS element (one each for the Integrated Lander, Depot, and Tanker), and to propose "delta FRRs." See Negotiation Letter with SpaceX, AR Tab 63 at 62890. These requirements are not found in the Solicitation; NASA newly created and imposed these requirements during post-selection negotiations with SpaceX. Because SpaceX proposed only 1 rather than 16 FRRs, SpaceX's proposal merited a Deficiency. Because NASA did not evaluate SpaceX's proposal against the correct FRR requirements, no deference is owed to the Agency's decision to assign a mere weakness, particularly when a Deficiency rating is warranted.

### 6. NASA Failed to Evaluate and Waived the DCR and Multiple Launch Vehicle Review Requirements.

Blue Origin's principal brief demonstrated that SpaceX failed to propose other critical reviews such as the Design Certification Review ("DCR") in compliance with Solicitation

requirements, and that NASA overlooked or failed to properly evaluate these noncompliance areas. Blue Origin Br. at IV(B)(2)-(4), (D)(3). NASA and SpaceX essentially ignore these significant noncompliances and provide only a superficial and cursory discussion of the DCR, as if it is an insignificant review.

### (a) Design Certification Review ("DCR").

The Design Certification Review is a required milestone review. The SOW states that the DCR should be performed 9 months prior to first HLS launch. SOW, AR Tab 27e, at 32969. Blue Origin asserts SpaceX was noncompliant with this requirement because SpaceX proposed its DCR ▮▮▮▮ before its first HLS launch, essentially rendering its proposed review useless. Blue Origin Br. at 41-42. Both Defendant and SpaceX offer plainly illogical arguments in an attempt to undermine the requirement for a timely DCR review.

#### (i) SpaceX appears to argue the DCR was not a required review.

A (presumably) poorly-worded statement in SpaceX's MJAR appears to make the patently untrue claim that there was no mandatory requirement to conduct a DCR. SpaceX Br. at 47 ("As for DCRs, these are not established as mandatory requirements."). The DCR is one of six Government-required milestone reviews, as noted in Solicitation Attachment O, and there is no question that offerors were required to propose a DCR. See AR Tab 27 at 24466 ("The Offeror shall fill in Attachment O with proposed milestone payment amounts for all Government-required and Offeror-proposed milestones."); id. at 24467 ("The Contract PWS shall describe all work necessary to complete each Government-required milestone"); id. at 24444 ("The proposal shall fully demonstrate that the Offeror understands and can successfully perform the requirements of this solicitation . . . and has a thoughtful, comprehensive, and feasible approach for doing so on its proposed schedule and in accordance with its proposed milestone payment schedule."); id. at

24450 ("The Offeror shall propose summaries of the type and magnitude of tasks and activities to be accomplished for each Certification Milestone Review and interim milestones, including assumptions and references to work statements identified in the proposed Performance Work Statement (Attachment 14).").

> **(ii) NASA and SpaceX incorrectly argue there is no requirement for the DCR to be held 9 months prior to first HLS element launch so SpaceX met the DCR requirements.**

NASA and SpaceX argue that because the DCR requirement states the DCR "should" be completed 9 months prior to first HLS launch, the use of the word "should" indicates this is not a requirement. Gov. Br. at 61; SpaceX Br. at 47. Even granting that 9 months is not a strict timeliness requirement, every requirement for a review contains an implied requirement that the review be completed in a timely manner, such that the review is not rendered useless.

For example, NASA contemporaneously evaluated Dynetics' proposal against this implicit requirement of timely reviews, in assigning Dynetics a "significant weakness" for failing to ███████ ████████████████████████████ because its untimeliness essentially made that test ineffectual. NASA's Dynetics evaluation makes clear that proposing to conduct timely reviews are imperative and an implicit mandatory requirement for Solicitation compliance. See AR Tab 82.2a at 63389-91.[5] As the SEP Report explains in detail, NASA assigned Dynetics a significant weakness for proposing to ████████████████████████████████████████████████████████ ████████████████████████████████, stating "[b]ecause of this sequencing and substantial

---

[5] Here is an example where NASA interprets the term "HLS element" to include supporting spacecraft. The requirement for the Post-Test Review of Uncrewed Lunar Lander Test states it must be completed "Before first HLS element launch." AR Tab 27k at 33187. In this Dynetics evaluation, NASA states the uncrewed landing test should have been completed before the first supporting spacecraft launches of the crewed test, thereby demonstrating NASA considered supporting spacecraft as "HLS elements."

overlap, the offeror cannot rely on its uncrewed test to meaningfully reduce demonstration mission risk, thereby largely negating the primary purpose of the uncrewed test." AR Tab 52b at 62510. Furthermore, NASA also noted that the ███████ period between the offeror's Post-Test Review and the FRR for its Descent-Ascent Element would be too brief of a gap such that it "make[s] it unrealistic for the offeror to meaningfully evaluate, implement, and incorporate operational lessons learned and risk mitigations." See AR Tab 82.2a at 63391.

As NASA's contemporaneous interpretation and assessment here shows, the Solicitation contains an implied (and common sense) requirement that a required review must be timely scheduled so that the review can be used for its intended purpose. It is both perplexing and astonishing that NASA even attempts to argue that a DCR ███████ prior to the first launch (and ██████ before the integration operations start for that launch) would meet the DCR requirements simply because the 9 month schedule is not an expressly specific deadline. If each FRR was required to be conducted at least two weeks prior to first HLS element launch, a DCR, which must rationally occur prior to the FRR, cannot be completed ███████ before the first HLS element launch.

### (iii) SpaceX failed to meet the DCR requirements because the term HLS element includes supporting spacecraft and launch vehicles.

The DCR acceptance criteria independently demonstrate that supporting spacecraft and launch vehicles were required to be included in the DCR. However, SpaceX argues that it was fully compliant with the DCR requirements for the same reason it was purportedly compliant with the FRR requirements – because the term HLS element supposedly does not include supporting spacecraft. SpaceX Br. at 4. As shown previously in § II(A)(1)-(4), SpaceX and NASA are wrong and the term "HLS element" includes both supporting spacecraft and launch vehicles.

SpaceX further argues the DCR payment milestone acceptance criteria in the SOW do not

mention supporting spacecraft. SpaceX Br. at 12.[6] This is a patently incorrect and misleading statement. SpaceX knows the term "HLS" is explicitly defined in the SOW to include supporting spacecraft and launch vehicles, as also explained above. See § II(A)(1). The Agency makes a similarly convoluted argument that reduces to the following: the DCR ensures compliance with Option A functional and performance requirements; these requirements are contained in the HLS Partner System Requirements Document; the HLS Partner System Requirements Document only applies to the integrated lander; therefore, the DCR requirements only apply to the integrated lander. Gov. Br. at 61-62. Both SpaceX and the Government ignore the numerous references in the SOW's DCR requirements to the "HLS," a defined term which explicitly includes supporting spacecraft and launch vehicles. See AR Tab 27e at 32970 ("Docking System interfaces with the HLS are verified"); Id. ("Launch vehicle interfaces with the HLS are verified"); Id. at 32971 ("The pedigrees of the test articles directly traceable to the production unit of the HLS and the docking system."); see also Review Plan requirements, AR Tab 27f at 33078 ("**All reviews at the HLS level <u>shall</u> also include supporting spacecraft** needed to achieve the mission, including spacecraft that provide propellant storage or propellant transfer shall be included in the scope of the reviews.").

      SpaceX's and the Government's assertions that the DCR acceptance criteria do not include supporting spacecraft is obviously wrong where multiple DCR acceptance criteria explicitly relate to the defined term "HLS" which include supporting spacecraft.

---

[6] SpaceX misstates the record in stating that SpaceX scheduled its DCR milestone payment review <u>nine months prior to the HLS Starship launch</u>. See, e.g., SpaceX Br. at 13. Instead, the record actually shows that SpaceX's DCR was scheduled for ████████ months prior to the HLS Starship (Integrated Lander) launch. <u>Compare</u> AR Tab 34d.46 at 55932, row 130, <u>with</u> AR Tab 34d.46 at 55970, row 2024.

**(b)  Neither NASA nor SpaceX Offer Any Rational Explanation for SpaceX's
Failure to Meet the Launch Vehicle Review Requirements.**

The SOW notes that "integration and launch is one of the highest risk events of the mission."  AR Tab 27e at 33005.  Yet SpaceX failed to properly schedule *nearly all* of the Solicitation's integration and launch vehicle reviews to such an extent that most of these reviews would be almost entirely ineffectual in SpaceX's HLS plan.  See, e.g., Blue Origin Br. at 45 (discussing SpaceX's performance of the MSCDR months *after* ▆▆▆▆ will begin); Id. (discussing Pre-Mate Readiness Reviews and Launch Readiness Reviews that will occur ▆▆▆▆ ▆▆▆▆▆▆▆▆▆ SpaceX's HLS launches will have occurred).  NASA offers only cursory and unsupported responses to the showing that SpaceX failed to timely schedule nearly every single launch vehicle review – including the Mission Specific Preliminary Design Review ("MSPDR"), Mission Specific Critical Design Review ("MSCDR"), System Acceptance Review ("SAR"), fifteen Launch Vehicle Systems Readiness Review ("LV-SRR"), fifteen Pre-Mate Readiness Review ("PMRR"), and fifteen Launch Readiness Review ("LRR") in accordance with Solicitation requirements.  See Blue Origin Br. at 44-47.

NASA contends that it evaluated SpaceX's failure to meet the launch vehicle requirements and "concluded . . . that SpaceX's proposed approach to these reviews did not increase the risk of unsuccessful contract performance."  Gov. Br. at 62.  The Agency fails to cite to anything in the contemporaneous evaluation record to support this claim.  If substantial errors such as grossly mis-scheduled launch vehicle reviews were in fact considered, such evaluations were required to be documented.  See CBY Design Builders, 105 Fed. Cl. at 350 (agreeing with GAO's conclusion that agency's decision was improper because there were "no documents illuminating the evaluation process in this regard").  Further, NASA contends that SpaceX's proposal to follow Federal Aviation Administration ("FAA") requirements somehow mitigated its failure to meet the

22

Option A requirements. This is an irrelevant point. SpaceX's proposal to meet its obligations to the FAA does not substitute for its responsibility to meet the specified mandatory Option A Solicitation requirements.

SpaceX also asserts other non-relevant points and facially incorrect arguments. First, SpaceX argues that the launch vehicle reviews only applied to some of the HLS launch vehicles and not others. Specifically, SpaceX claims that the launch vehicle reviews did not apply to launch vehicles for supporting spacecraft, rather they only applied to the launch vehicle for the Integrated Lander. SpaceX Br. at 47. That assertion is directly contradicted by the Solicitation language and is contrary to common sense. See Solicitation, AR Tab 27 at 24430 (Identifying an HLS "launch vehicle" as "all launch vehicles necessary for launch and delivery of the contractor's Integrated Lander (or elements thereof) **and its Supporting Spacecraft**") (emphasis added); Id. at 24453 (For "Launch Delivery and Operations" – "The Offeror is required to propose how it will launch and deliver its Integrated Lander (and all elements thereof) to the Moon using commercial launch vehicle(s), including all phases of launch vehicle flight and . . . any Supporting Spacecraft."); see also Review Plan requirements, AR Tab 27f at 33078 ("**All reviews at the HLS level shall also include supporting spacecraft** needed to achieve the mission, including spacecraft that provide propellant storage or propellant transfer shall be included in the scope of the reviews.") (emphasis added). The Solicitation is clear that the launch vehicles reviews must include all HLS launch vehicles, including those used for supporting spacecraft flights, not just the launch vehicle that will launch SpaceX's Integrated Lander.

Second, SpaceX argues the launch vehicle reviews do not matter because they are not included in Attachment O – Milestone Payment Schedule. SpaceX Br. at 47 ("Not one of these launch vehicle reviews is included in the Milestone Payment Schedule at Option A BAA

Attachment O").  The logic of this argument is not apparent.  SpaceX appears to believe that because these reviews are not included as Milestone reviews in Attachment O, either it has met the requirement for reviews or these reviews are not required.  In either case, SpaceX is wrong; it scheduled these launch vehicle reviews several months later than required, in many cases after ███ HLS launches will have already occurred.  <u>See</u> Blue Origin Br. at 44-46.

Third, SpaceX argues it actually met the timing and other requirements for these launch vehicle reviews simply by SpaceX restating the review requirements in its PWS.  SpaceX Br. at 48.  SpaceX's PWS does not provide anything more than a copy-and-paste of the review requirements from the Solicitation SOW to SpaceX's PWS, and it certainly does not contain the schedule dates on which SpaceX planned to conduct these launch vehicle reviews.  <u>See</u> AR Tab 34d.34.  Those dates are included in SpaceX's Integrated Master Schedule, a document which plainly contradicts SpaceX's claim that it properly scheduled these launch vehicle reviews.  <u>See</u> Blue Origin Br. 45-46; <u>see also</u> Blue Origin Br., Wilhite Declaration, <u>Ex.</u> 3 (Wilhite Decl.") at Attachment A.

Fourth, SpaceX incoherently argues SpaceX and Blue Origin proposed a different number of reviews stemming from differences in their proposals, and such differences do not render SpaceX's proposal noncompliant.  SpaceX Br. at 47-48.  SpaceX's proposal is noncompliant because it failed to comply with the Solicitation's requirements for the launch vehicle reviews, not because SpaceX proposed something different than Blue Origin.

Given SpaceX's proposed schedule of these launch vehicle reviews, it is clear that SpaceX proposed to conduct almost all of the Launch Vehicle reviews *only after* ██ launches of the HLS launch vehicles.  It is plainly wrong and illogical for NASA and SpaceX to claim SpaceX timely or properly scheduled these reviews.

**B.      NASA Unlawfully Engaged in Improper and Unequal Discussions with Only SpaceX.**

In an effort to avoid the fact that NASA engaged in unequal and improper discussions with just SpaceX, and left Blue Origin and Dynetics out, the Government and SpaceX contend that NASA did no more than follow the Solicitation procedure completely, and therefore Blue Origin's assertion is tantamount to an untimely challenge to the Solicitation, citing Blue & Gold, 492 F.3d at 1313.  Gov. Br. at 65-67; SpaceX Br. at 59-60.  The Government's and SpaceX's arguments are strawman assertions that ignore the fact NASA had unilateral discussions with one offeror (SpaceX) that allowed SpaceX to fix its defective and noncompliant proposal and its price.  Blue Origin's challenge before this Court is not an objection to the Solicitation; it is an objection to the Agency's evaluation decision to ignore the fundamental FAR requirement to conduct discussions with all offerors.

The Government and SpaceX assert that there were not discussions, but "negotiations" post-selection for award, but this position ignores the law.  When an "agency has provided an opportunity for quotations or proposals to be revised or modified," those communications are discussions, no matter what the agency wants to call them.  WaveLink, Inc. v. U.S., No. 20-749C, 2021 WL 2762814, at *15 (Fed. Cl. June 24, 2021) (quoting Consol. Eng'g Servs., Inc. v. U.S., 64 Fed. Cl. 617, 626 (2005)); see also 2M Rsch. Servs., LLC v. U.S., 139 Fed. Cl. 471, 480 (2018) ("this Court cannot ignore that when something 'looks like a duck, walks like a duck, and quacks like a duck, then it's a duck.'") (quoting Zebel, LLC v. U.S., 135 Fed. Cl. 47, 64 (2017).

Once an agency holds discussions with one offeror, it must hold discussions with all offerors.  WaveLink, 2021 WL 2762814, at *15.  This is particularly true where discussions are initiated to render a noncompliant proposal acceptable for consideration for award.  Contrary to SpaceX's arguments, these principles apply regardless of whether FAR Part 15 is applicable to the

procurement. See Tolliver Group, Inc. v. U.S., 151 Fed. Cl. 70, 92 (2020) (applying rules of fair treatment of offerors in a procurement that *de facto* operated like a negotiated procurement, notwithstanding the agency's argument that procurement was *de jure* not a negotiated procurement); accord, e.g., The Analysis Group, LLC, B-401726, B-401726.2, Nov. 13, 2009, 2009 CPD ¶ 237 at 3-4 (Regardless of whether FAR Part 15 applied, the agency was required to provide equal treatment to the protester by providing it an opportunity to revise its quotation.).

Having initiated discussions with SpaceX to fix the acceptability of SpaceX's proposal, the Agency was required to engage in discussions with Blue Origin. Contrary to SpaceX's assertion, Blue Origin is not requesting that NASA follow different ground rules than those stated in the Solicitation. Through discussions, NASA let SpaceX fix its proposal to meet the Solicitation's requirements for FRRs and to address pricing concerns. Specifically, the negotiations addressed a material proposal noncompliance relating to FRRs. See AR Tab 63 at 62889-90.

In allowing SpaceX to revise its proposal to address the FRR noncompliance areas, the Agency engaged in discussions to obtain information from SpaceX that was necessary to determine the proposal's acceptability. The award to an offeror that does not propose to meet specific RFP requirements is generally improper since the basis for an award must be the same, in its material terms, as that upon which the competition is conducted, and when an agency allows one offeror to fix its non-compliant proposal through discussions or "negotiations," it must allow all offerors to do so. See, e.g., Ernst & Young, 136 Fed. Cl. at 502-03 (2018) (determining that agency's award was arbitrary and capricious, because, among other things, it did not follow the Solicitation's requirements); accord CIRCON ACMI, Div. of Circon Corp., B-231108, Aug. 12, 1988 ("Since the action taken, however, was tantamount to holding discussions, the agency was required to hold discussions with all offerors within the original competitive range, not just Olympus, and to

provide each an opportunity to submit a revised proposal; it is improper to hold negotiations with one offeror so as to permit it to conform its unacceptable proposal to the solicitation requirements, and not also to permit other offerors in the competitive range to revise their proposals.").

The Government's assertion that post-selection negotiations could remedy a flaw that precluded award misses the point. Gov. Br. at 66. Blue Origin does not object to the Agency's right to enter into discussions; the Government's argument on this point merely is a strawman. Instead, once NASA entered into discussions with SpaceX to resolve its proposal deficiencies, NASA also was required to enter into discussions with Blue Origin (and Dynetics). See WaveLink, 2021 WL 2762814, at *15; accord SRA Int'l, Inc., B-410973; B-410973.2, Apr. 8, 2015 (when an agency conducts discussions with one offeror, it must conduct discussions with all offerors in the competitive range). NASA's decision to not do so was improper, arbitrary, and capricious, and was conduct that favored one offeror (SpaceX) over another (Blue Origin) in violation of FAR 1.102-2(c)(3); 1.602-2 and 15.306(e). The Agency's improper actions prejudiced Blue Origin. See § II(G), infra.

### C. NASA Unlawfully Refused to Amend the Solicitation to Allow Offerors to Revise Their Proposals When NASA's Requirements Changed.

Blue Origin's MJAR explained that NASA was required to advise the parties or amend the Solicitation when its requirements changed as to available funding, and as to the changes in requirements for Flight Readiness Reviews and other critical reviews, which affected costs. Blue Origin Br. at 60-64.

The Government asserts that NASA had no obligation to amend the Solicitation, and its decision not to do so was rational. Gov. Br. at 67-70. The Government: (a) relies on GAO's previous finding that rejected Blue Origin's argument that an amendment was required; (b) asserts that Blue Origin waived the allegations by failing to assert them prior to award, citing Blue &

27

Gold, 700 F.3d at 1382; and, (c) argues that the Solicitation warned offerors that the number of awards was subject to available funding. The Government also asserts that Blue Origin made a business decision to propose at a high price and should not be relieved of that decision, and finally that the funding limits did not require a change in the scope of work, asserting that NASA did not change its requirement related to FRRs or other reviews. The Government asserts that Blue Origin was not prejudiced by any failure to amend the Solicitation. Id. at 70. SpaceX joins most of the Government's arguments. SpaceX Br. at 62-68.

### 1. NASA Was Required to Amend the Solicitation.

The assertion that "NASA did not change its requirements related to FRRs, DCRs, or other reviews" is simply an unsupportable and incorrect assertion, as detailed throughout Blue Origin's MJAR and this filing. As also shown by Blue Origin, the non-enforcement of the FRR requirement alone saved NASA a figure approaching ██████ dollars, an amount of money that NASA purportedly did not have, and which shortfall would have precluded any award. NASA's waiver of the Flight Readiness Reviews was material from a cost perspective.

This Court has recognized that when a solicitation no longer reflects the agency's requirements, the agency is obligated to revise the solicitation. See, e.g., Medline Indus., Inc. v. U.S., __ Fed. Cl.__, 2021 WL 3483429, at *10, 13 (July 30, 2021) (agency's failure to amend or resolicit the solicitation's requirements to reflect the current status and timeline was improper). GAO also has addressed that issue directly in Joint Action in Community Service, Inc., B-214564, 84-2 CPD ¶ 228, relief rec. modified, but otherwise aff'd on reconsid., B-214564.2, Jan. 3, 1985, 85-1 CPD ¶ 13 at 2, 1984 WL 46573.

In Joint Action, GAO sustained a protest where the Agency engaged in negotiations with only one selected offeror because of limitations on available funding. The agency negotiated with

only the selected offeror and "negotiated the necessary price reduction to meet available funding limits." 1984 WL 46573 at *1. GAO "recognized that agencies confronted with proposal prices in excess of available funding may properly change the RFP's statement of work in order to establish a basis for the later negotiation of lower prices *so long as all offerors within the competitive range are advised of the change*." Id., at *2 (emphasis added) (citation omitted). Contrary to what NASA did here, GAO explained that "as a general rule, it is improper for an agency, after receipt of BAFO's, to reopen negotiations (even if they are characterized as only 'touch-up' negotiations) with only one offeror where other offerors remain within the competitive range because every offeror within the competitive range has the right to change of modify its proposal, including price, for any reason whatever, as long as negotiations remain open." Id. This rule "applies to a significant or substantial change even where the competitive range has been reduced to only one offeror," and "if during final discussions it becomes obvious that the contract requirements being negotiated with the sole remaining offeror differ significantly from the requirements stated in the RFP, *the contracting officer must amend the RFP and seek new offers*." Id. (emphasis added); accord Symetrics Indus., Inc., B- 274246 *et al.*, 97-2 CPD ¶ 59, 1997 WL 529581 at *4, (GAO sustained a protest argument that the agency there was required to amend the solicitation upon receiving information that funds were unavailable for the purchase of a significant portion of an estimated quantity included in the request for proposals for an indefinite quantity/indefinite delivery order contract.).

That rule applies when the substantial change in requirements was the level of available funding and the restructuring of the awardee's proposal to come within the level of available funding. Id. The Agency's action here mirrors that in Joint Action. The Agency purportedly lacked sufficient funding to make even a single award, and in discussions solely with SpaceX,

*allowed a relaxation of mandatory specification requirements for SpaceX concerning Flight Readiness Reviews, with significant cost impacts, and allowed changing to pricing in certain years*.  The Agency's Solicitation changes for only SpaceX brings this protest squarely within the <u>Joint Action</u> decision.

SpaceX's argument that NASA could dodge this fundamental procurement rule by asserting that FAR 15.206, which mandates solicitation amendments, does not apply to BAAs, fails because NASA cannot avoid this fundamental procurement rule.  The requirement to amend a solicitation when circumstances change is a fundamental procurement rule that applies to all procurements and is embodied in 1.102-2(c)(3) (prospective contractors shall be treated fairly and impartially. . .); 1.602-2 ("Contracting Officers shall . . . [e]nsure that contractors receive impartial, fair, and equitable treatment.") as well as FAR 15.206.

### 2. Blue Origin Was Not Required to File a Pre-Award Protest When NASA Changed Its Requirements After Submission of Proposals.

The Government's and SpaceX's argument that Blue Origin should have known the level of funding well before award and that GAO properly found that its protest was untimely is misplaced.  The Administrative Record includes documents that were unavailable to GAO (and Blue Origin) and now shows that *NASA itself decided to divert HLS funds from the Option A DDT&E effort to a separate sustainable services initiative **after receipt of proposals***.  Adding insult to injury, *a NASA executive warned in a March 15, 2021[7] email, that this "new, arguably unnecessary" diversion was inconsistent with NASA's HLS direction, and that NASA was eliminating funds needed for two HLS awards*.  AR Tab 55 at 62605-06[8]:

---

[7] Proposals were due and submitted on December 8, 2020.  <u>See generally</u> AR Tabs 32-34**.**

[8] This newly discovered information, which was not available at the time of Blue Origin's protest or the filing of its complaint, along with the Agency's evaluation anomalies, would support a

This goal effectively forces ~$4B of milestone payments for 'services' into the HLS budget out to 2030, *which makes that ~$4B unavailable* to support strategies related to achieving a first return human landing on the Moon by the end of the decade. This goal effectively *takes off the table half of the projected available budget for HLS milestone payments* this decade. Correspondingly, once this is done, *this has the effect of making both 'two awards' options presented* (i.e. the Leader/Follower option, and the 50/50 split option) *seem as if they do not have enough funding* before 2030 to achieve two crewed demo landings. In fact, however, without the introduced 'services' line, the identified budget available for milestone payments between FY21-FY30 is ~$8.7B – which is over ~$1.5B more than the combined ~$7.1B of the notional KTRB [Contractor B] and KTRC [Contractor C] proposals in the analysis. In effect, stating a goal of recurring human landings by 2028 – something which there does not seem to be a current agency-level requirement for – and thereby forcing 'services' milestone payments fully into the 2021-2028 timeline, comes at the direct cost of the strategy options presented related to first returning our astronauts to the lunar surface this decade.

Id. at 62606 (emphasis added).

NASA even considered issuing an amendment to the Solicitation, but decided to not do so. In commenting on the "60 Day Team Briefing HLS Strategy," the March 15 email's author noted the possibility of issuing a solicitation amendment for uncrewed landings, in addition to "the other two 'two awards' options that were presented in the charts, both of which also required solicitation amendments." Id. Moreover, the Agency's March 19, 2021 strategy briefing (as revised to take into account these comments) noted the protest risk for amending and capping the funding. AR Tab 56 at 62619. Nonetheless, NASA decided that it could disregard procurement law and leave Blue Origin in the dark as to NASA's actual requirements. NASA's own conduct that made two awards impossible was unknown to Blue Origin until the production of the Administrative Record in this case, and is fatal to the Government's and SpaceX's claims.

Additionally, the Government's and SpaceX's attempt to invoke Blue & Gold fails, for the reasons discussed above -- there is no issue of patent ambiguity here.

_____

finding that NASA's conduct was designed to favor SpaceX and it was taking multiple steps to guarantee an award to just SpaceX.

### 3.   NASA Could Not "Draft Around" Procurement Law.

The Government's and SpaceX's repeated claim that the Solicitation reserved to NASA, "the right to select for award multiple, one, or none of the proposals received" (Gov. Br. at 68; SpaceX Br. at 64-65) does not trump the Agency's obligation to amend the Solicitation or inform offerors of changed circumstances or requirements, as specified in the legal precedent that imposes that obligation.

Seeing that NASA created a budget shortfall after receipt of proposals, NASA knew that its funding availability had dropped significantly.  NASA discussed that funding disconnect with only SpaceX before the Agency made an Option A contract award to SpaceX.  More specifically, NASA discussed with SpaceX changing SpaceX's pricing in out-years to match the amount of money that NASA would budget for paying a contractor (after setting aside appropriations to pay internal costs).  AR Tab 63 at 62888.  Indeed, only SpaceX knew exactly how much money NASA would make available to pay a contractor out of its total allocated budget.  That is evidenced by the letter to SpaceX in which NASA shows that its available budget is $2.891 billion.  Id.  If NASA knew that it was capped at $2.891 billion, then it was obligated to tell all offerors that was its requirement, so all offerors could determine how to adjust their proposals accordingly.

The Government's and SpaceX's assertion that Blue Origin cannot demonstrate that it is prejudiced by any failure to amend the Solicitation is also demonstrably wrong.  There is compelling evidence that because of the unique circumstances involving Blue Origin's existing alternative approach and its owner's ability to make a significant corporate contribution, that Blue Origin was indeed prejudiced by the Agency's conduct.  There is substantial evidence that Blue Origin would have significantly modified its price, had it been given the same opportunity as SpaceX, and it had the intent and ability to match the price offered by SpaceX, or propose a lower

price.  See Blue Origin Br., Smith Decl, Ex. 1 ("Smith Decl."), 23-24, 26; Sherwood Decl., Ex. 2 ("Sherwood Decl."), ¶ 13.

In conclusion, Blue Origin was deprived of a full and fair opportunity to compete with an accurate understanding of the agency's true requirements with regard to funding availability, and required reviews.  The Government's arguments that no RFP amendment or discussions were required because the Solicitation requirements purportedly did not change is wrong.  Blue Origin has shown substantial and sufficient prejudice to more than warrant the requested relief.  See § II(G), infra.

> **D.      NASA Failed to Evaluate SpaceX's Proposal in Accordance with the Solicitation.**

Given the numerous errors in SpaceX's proposal (particularly its schedule), it is inconceivable and improper that its unawardable proposal would be selected for award, much less that it would receive an "Outstanding" evaluation for the Management factor.  However, according to the Government and SpaceX, the Agency acted in accordance with the Solicitation when it overlooked and failed to assign any significant weaknesses or deficiencies to SpaceX's proposal for these errors.

The primary claim from the Government and SpaceX is NASA's evaluation did not assign any offeror a "Deficiency" rating for failing to meet a Solicitation requirement, so it was reasonable for NASA to also not assign SpaceX any deficiencies.  Gov. Br. at 47-48; SpaceX Br. at 55. However, where the Solicitation defines the rubric for assessment of a "Deficiency," the Agency is not free to ignore that provision and claim no error could constitute a "Deficiency".  See AR Tab 27 at 24476 (defining a "Deficiency" as "[a] material failure of a proposal to meet a Government requirement").

The Agency has reasonable discretion in determining when an error in a proposal

33

constitutes "a material failure" to meet a requirement (i.e. a Deficiency) or a Significant Weakness, and the Agency used this discretion in evaluating known errors in the proposals from Blue Origin and Dynetics. However, it has been shown that NASA completely overlooked and/or failed to assess numerous, critical errors in SpaceX's proposal that are indisputable. See §§ II.A(5), II.A(6), supra, discussing DCR, FRR, and Launch Vehicle; see also Blue Origin Br. § III.C(4) for Production errors. These errors rise to the level of a "Deficiency" because they are clear material failures of mandatory requirements that jeopardize mission safety and success. The SOW notes that "integration and launch is one of the highest risk events of the mission," and SpaceX failed to properly schedule *nearly all* of the integration and launch reviews. AR Tab 27e at 33005. If such errors do not warrant one or multiple Deficiency ratings, then it is unclear why the Deficiency rating exists in the first place. In contrast, Dynetics' failure to satisfy just one of the key review requirements resulted in assessment of a significant weakness, demonstrating the arbitrariness of the Agency's evaluation of SpaceX.

The Government and SpaceX do not provide any substantive arguments for why these clear errors do not rationally deserve a Deficiency rating for SpaceX; rather they contend that NASA had discretion to ignore the Deficiency rating and only award Weaknesses and Significant Weaknesses. Regardless, as a factual matter, NASA did not utilize its discretion because it overlooked and did not evaluate these review errors. It should have, and it should have assigned Deficiencies. Nothing in the contemporaneous administrative record shows otherwise.

Although the Government argues Blue Origin does not have standing to challenge SpaceX's proposal because offerors were not compared, that is wrong. Offerors were being compared in this procurement competition, and offerors must be treated fairly where they are competing against common requirements. See Femme Comp Inc. v. U.S., 83 Fed. Cl. 704, 740

(2008) ("Agencies 'must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria.'") (citing <u>Banknote Corp. of Am., Inc. v. U.S.</u>, 56 Fed. Cl. 377, 386 (2003)).  Also, a simple review of SpaceX's SEP report shows that the Government's claims that it did not double-count strengths in favor of SpaceX are false, as NASA plainly and repeatedly identifies the same cargo/payload abilities for multiple strengths.

SpaceX's proposal merited at least one, but likely multiple Deficiencies for the milestones and critical launch vehicle reviews it failed to properly schedule, in addition to scheduling its MSCDR after significant production activities had begun.  Had NASA properly and rationally evaluated SpaceX's proposal, it would have been unawardable.  <u>See</u> Solicitation, AR Tab 27 at 24480 ("Offerors are hereby notified that proposals evaluated as having one or more deficiencies are unawardable.").  Thus, as the next in line offeror, Blue Origin was prejudiced by NASA's failure to conduct a proper evaluation.

> **E.  NASA Breached the Implied-In-Fact Contract of Good Faith and Fair Dealing.**

This Court should neither dismiss Blue Origin's Implied-In-Fact Breach of Contract Claim (Count Five) nor grant judgment on the administrative record in favor of the Government because, through the Agency's arbitrary and capricious conduct, Defendant breached its duty of good faith and fair dealing to consider Blue Origin's proposal fairly and honestly.

The Federal Circuit recently affirmed that an implied-in-fact breach of contract claim is a separate viable claim over which this Court has jurisdiction.  <u>See</u> <u>Safeguard Base Ops., LLC v. U.S.</u>, 989 F.3d 1326, 1342 (Fed. Cir. 2021).  The Federal Circuit issued this clarification to resolve uncertainty over whether such claims remained viable.  <u>See id.</u>  However, the Government and SpaceX request that this Court dismiss or not even address an entire viable, separate cause of action that Blue Origin pled and the Federal Circuit unambiguously stated this Court has jurisdiction to

hear and decide.  See id.; see Gov. Br. at 73; SpaceX Br. at 69.  The Government's and SpaceX's argument that this Court should disregard an entire count in a complaint is an attempt to lead this Court into clear error.[9]  Such a result would require the Court disregard and make meaningless Safeguard, effectively undoing and removing (once again) the breach of implied-in-fact contract claims from this Court's jurisdiction.

Breach of the implied-in-fact contract of good faith and fair dealing is a separate cause of action which is grounded in the FAR's most fundamental principles requiring the entire bid process be conducted honestly, fairly, openly, and impartially.  See FAR 1.102-2(c)(3), 1.602-2.  An agency's arbitrary and capricious decision or actions violate the implied-in-fact of contract of good faith and fair dealing, and that conduct is enough for Blue Origin to succeed on its Count V claim. Blue Origin does not dispute that there is an overlap between Count V and other claims it has asserted, but the relevant inquiry does not end there.

The agency's obligation to conduct the bid process honestly and fairly applies to the entire process and applies where the administrative record reveals multiple errors and missteps in the agency's decision-making process, while perhaps individually not material, collectively reveal a pattern of unfairness or unequal treatment.  When the court identifies such a pattern, the violation is of the implied-in-fact contract of honest and fair dealing.  See, e.g., 2M Rsch. Servs., LLC v. U.S., 139 Fed. Cl. 471, 480 (2018) (finding a "pattern of unfairness" that the court could not ignore when looking at the agency's procurement process, including relaxing solicitation requirements

---

[9] The Government and SpaceX cite cases that should raise concern over their position.  The Government cites to a Res Rei Dev., Inc. v. U.S., 126 Fed. Cl. 535, 547 n.18 (2016), which pre-dated the Federal Circuit's Safeguard opinion.  Furthermore, the SAGAM case SpaceX's cites is "now on appeal to the Federal Circuit" SAGAM Securite Senegal v. U.S., 2021 WL 4621966, at *1 (Fed. Cl. Oct. 7, 2021) although SpaceX did not note that in its brief.  Additionally, both the Government and SpaceX cite footnotes in opinions not binding on this Court.

and errors in evaluative ratings for one offeror, collectively revealed "unequal treatment throughout the course of [the] procurement").

Here, NASA did not treat the offerors impartially, fairly, or equitably.  <u>See, e.g.</u>, Blue Origin Br. at 64-65.  The administrative record shows NASA's individual decisions were arbitrary and capricious, and favored SpaceX, showing a material breach of the implied-in-fact contract of good faith and fair dealing.  Additionally, however, when looking at NASA's errant decisions collectively, the pattern of unfairness Blue Origin faced through favoritism to SpaceX is blatant, material, and impossible to ignore or square rationally.  This "Court cannot [and should not] ignore that when something 'looks like a duck, walks like a duck, and quacks like a duck, then it's a duck.'"  <u>2M Rsch. Servs.</u>, 139 Fed. Cl. at 480.

The Court should reject the Government and SpaceX's argument that it pay less than lip service to <u>Safeguard</u> and Blue Origin's Count V and, instead, find that NASA breached its implied-in-fact contract to deal honestly and in good faith because that is what the record reveals.

## F. The Government's Motion to Dismiss Count Two and Other Allegations Should be Denied.

In three pages of superficial argument, the Government asserts the Court should dismiss Count 2 of Blue Origin's Complaint and "other allegations" on the basis that Blue Origin has waived them.  Gov. Br. at 49-51.  The Government asserts that Blue Origin "plainly challenges unambiguous terms of the solicitation," raises its claims long after submitting its proposal, and has "waived" its claims under the "binding rule" established in <u>Blue & Gold Fleet</u>.  <u>Id.</u>

<u>Blue & Gold</u> has no application here.  That decision dealt with an attempted post-award challenge to a pre-award <u>patent solicitation ambiguity</u> that the protester attempted to raise after contract award.  The case stands for the noncontroversial principle that a pre-award protest issue must be asserted prior to the closing date for receipt of proposals.  That principle is not implicated

here.  There is no issue of a patent error asserted by Blue Origin and the Government's transparent attempt to recharacterize Blue Origin's claim in a ploy to come within <u>Blue & Gold</u> is misguided and wrong.  Contrary the Government's assertion (Gov. Br. at 50), Blue Origin is not challenging the Agency's solicitation or its issuance under FAR part 35.  Instead, Blue Origin challenges NASA's <u>evaluation conduct</u> under the terms of the Solicitation as implemented by NASA here and under fundamental procurement rules that plainly apply to the Agency's conduct under the existing Solicitation.

More specifically, although this Solicitation was issued under FAR Part 35, NASA's decision to treat it like a negotiated procurement means that NASA's procurement conduct is subject to the same procurement rules and regulations as solicitations issued under other sections of the FAR with regard to fair, equal, and impartial treatment of offerors.  And as discussed elsewhere, under this Solicitation, NASA conducted the procurement using competitive procedures and against a common statement of work, subject to the same rules, as a guide, that are set forth in FAR Part 15, just as are competitions under FAR Part 8, Part 13, and Part 16.[10]  These post-award challenges cannot be "properly characterized as a challenge to the terms of the solicitation." <u>Blue & Gold</u>, 492 F.3d at 1313.

This Court has recently rejected attempts by the government and an intervenor to "land a massive knock-out punch, in the form of a novel <u>Blue & Gold</u> waiver argument, that would have

---

[10] <u>See Tolliver Group</u>, 151 Fed. Cl. at 92 (agency was obligated to treat offerors fairly, notwithstanding agency's argument that the matter was not a negotiated procurement); <u>accord, e.g.</u>, <u>Innovative Mgmt. & Tech. Approaches, Inc.</u>, B-418823.3. Jan. 8, 2021, 2021 CPD ¶ 18 ("While the requirements of FAR part 15 do not apply to procurements conducted under FAR subpart 8.4, [GAO] looks to the standards and the decisions interpreting part 15 for guidance in determining whether exchanges with vendors under a FAR subpart 8.4 procurement were fair and equitable."). <u>Gen'l Dynamics Info. Tech., Inc.</u>, B-406059.2, March 30, 2012 (FAR § 16.505 does not establish specific requirements for discussions in a task order competition; exchanges in that context, like other aspects of such a procurement, must be fair).

the effect of rendering [plaintiff's] entire protest untimely." VS2, LLC v. U.S., No. 21-1028C,
__ Fed. Cl. __, 2021 WL 4167380, at *1 (Sept. 21, 2021). The Court there stated:

> That argument, however, threatens to reforge Blue & Gold from a sensible shield
> against gamesmanship and unjustifiable delay into a broadsword capable of cutting
> down even meritorious arguments in a manner our appellate court, the United States
> Court of Appeals for the Federal Circuit, has never sanctioned. This Court declines
> to engage in such creative metallurgy. Unless and until the Federal Circuit compels
> us to do so, Blue & Gold cannot be expanded past the factual and procedural
> circumstances in which the Federal Circuit has applied it.

Id. at *2.

All that Blue & Gold and its progeny require is that any challenge to the terms of a
solicitation must be asserted before award. VS2, LLC, 2021 WL 4167380 at *26; Blue & Gold,
492 F.3d at 1313. Moreover, the Blue & Gold rule is not jurisdictional. SEKRI v. U.S., 152 Fed.
Cl. 742, 754 (2021).

Contrary to any applicability of Blue & Gold, there is no basis to assert that Blue Origin
knew or should have known prior to award any of the bases for its claims before this Court. There
is no basis to assert that Blue Origin was taking a "wait and see" approach to known protest issues.

Blue Origin is not pursuing an alleged defect in the Solicitation. Blue Origin's claims are
based on Agency misconduct and errors occurring after submission of proposals and during the
evaluation process, not that the Solicitation was "contrary to law." Gov.Br. at 51.

Cases relied upon by SpaceX are irrelevant. Here, Blue Origin's challenge to the
evaluation is "not time barred because plaintiff's argument asks the Court to analyze the 'award
[decision] based solely on the factors specified in the solicitation.'" Blue & Gold, 492 F.3d at 1313
(quoting 10 U.S.C. § 2305(b)(1)).

The Agency's evaluation conduct under the Solicitation is what is under challenge here,
not as the defendants assert, a "challenge to plain, unambiguous solicitation terms." Gov. Br. at
50. Under the provisions of RCFC 12 (b)(6), the court must accept as true the complaint's well-

pleaded factual allegations, and draw all reasonable inferences in favor of plaintiff, as the non-moving party. The allegations must only plausibly suggest that plaintiff is entitled to the relief sought. Again, under Blue & Gold, the plaintiff waives its claim only if it had the "'opportunity to object to the terms of a government solicitation containing a patent error'" and failed to do so before the close of the bidding process. SEKRI, 152 Fed. Cl. at 748, 754 (citing Blue & Gold). Blue Origin does not object to or assert any alleged patent error in the Solicitation at issue, and none is shown by any party. The Court should not dismiss Blue Origin's claims.

### G. Blue Origin Established It Was Prejudiced on the Merits by NASA's Procurement Errors.

The Government's and SpaceX's assertion that Blue Origin has not shown it was prejudiced by NASA's improper actions during the procurement process is based on speculation and not based in the law or on the facts before this Court. If an error is found in the procurement, the APA instructs that "due account shall be taken of the rule of prejudicial error"; however, to what extent a showing of prejudice is necessary, depends on the procurement error. Blue Tech Inc. v. U.S., No. 21-1053 C, 2021 WL 3641048, at *4 (Fed. Cl. July 30, 2021). Specifically, "when an irrational or arbitrary and capricious agency action has occurred, prejudice is presumed, but when a violation of statute or regulation has occurred, there must be a separate showing of prejudice." Id. (citing Caddell Constr. Co. v. U.S., 125 Fed. Cl. 30, 50-51 (2016)); accord Textron, Inc. v. U.S., 74 Fed. Cl. 277, 329 (2006) (explaining that there is "no need to continue to prejudice" analysis when "the Government has acted arbitrarily and capriciously" because that "necessarily invalidates the procurement"); see also Impresa Construzioni Geom. Domenico Garufi v. U.S., 238 F.3d 1324, 1333 (Fed. Cir. 2001) (distinguishing between protests in which the offeror must show that the award decision was irrational and protests in which the offeror most show a prejudicial violation of a statute or regulation).

Alternatively, when the protester alleges that the procuring agency violated a law or regulation, it must establish "a clear and prejudicial violation of the applicable statutes or regulations" such that the protester had a "substantial chance" of receiving the award but for that error. Kiewit Infrastructure West Co., 147 Fed. Cl. at 707 (quoting Banknote Corp of Am. v. U.S., 365 F.3d 1345, 1351 (Fed. Cir. 2004)). Importantly, "[i]n order to show it was significantly prejudiced, plaintiff does not have to show that, but for the error, plaintiff would have been awarded the contract." Heritage of Am., LLC v. U.S., 77 Fed. Cl. 66 at 71 (2007) (citing Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996)). When a protester shows that it would have improved its bidding strategy had it known how the agency would truly evaluate its proposal, it can show prejudice. See Asia Pacific Airlines v. U.S., 68 Fed. Cl. 8, 24-25 (2005) (court found prejudice to protester where protester's president testified about how it based bidding strategy on agency's flawed solicitation and how it could have employed a different strategy had it not been for the government's error); see also WaveLink, Inc., 2021 WL 2762814, at *33 (where protester showed "that it would have submitted a more advantageous proposal with a substantial chance of winning a contract award had it known the agency's true requirements or evaluation factors," that can demonstrate prejudice).

As shown herein, Blue Origin has demonstrated arbitrary and irrational Agency action because NASA failed to evaluate proposals in accordance with clear Solicitation requirements; accordingly, prejudice is presumed. Moreover, but for NASA's improper actions, Blue Origin would have had a substantial chance of being awarded a contract under the Solicitation.

### 1. Had NASA Amended the Solicitation Or Waived Review Requirements for All Offerors, Blue Origin Would Have Used ████████████ as It Originally Proposed.

Had Blue Origin known NASA was going to waive critical milestones – in contravention

41

of the Solicitation (as well as traditional certification and launch safety protocols) – Blue Origin would have submitted a substantially different technical approach, taking advantage of the greater schedule flexibility.  Blue Origin would have used ████████████████████████, along with an orbital refueling approach with supporting spacecraft (see Smith Decl., ¶¶ 12-17), which is a technical approach Blue Origin had previously considered but decided it could not do and still meet all of the Option A Solicitation's review requirements.  Use of ██████████ and supporting spacecraft would enable on-orbit refueling, allowing Blue Origin to propose a single-element lander design, which is not practicable without the use of support spacecraft.  The single-element design would also substantially decrease costs and complexity because Blue Origin would not have to certify a transfer element, and the single-element design has the added benefit of greater reusability.  Blue Origin would have proposed this alternative design but for the inflexibility in NASA's schedule, specifically caused by the mandatory (and sensible) review requirements, set forth in the Solicitation.  See id.; see also, Sherwood Decl., ¶¶ 11-12.

The Government devotes a substantial portion of its response to re-stating the prejudice discussion in the GAO's decision.  The GAO's discussion and decision regarding prejudice is irrelevant because Blue Origin did not become aware of the FRR errors in the Agency's evaluation until after the GAO decision was issued publicly.  See Smith Decl. at ¶ 5.  Similar to what has happened in this litigation, see, e.g., ECF No. 33, at the GAO, NASA and SpaceX blocked Blue Origin's counsel from unredacting and sharing the FRR waiver information with its client.  Because it was protected material at GAO, Blue Origin personnel did not know about NASA's waiver of the FRR requirements, and Blue Origin could not advise its counsel regarding how it would have changed its proposal in response to those waivers.

**(a) NASA Knew About Blue Origin's Alternative Design from the Base Period Contract.**

Blue Origin is proposing an alternative technical design that is based, in large part, on what it proposed during the base period. It is not, as SpaceX incorrectly states, "an entirely different HLS design." SpaceX Br. at 35. In its base period proposal, Blue Origin proposed to use ███ ████████████ as the basis for its technical approach. Smith Decl. at ¶¶ 13-14. Blue Origin also would have proposed additional changes based on the Agency's waiver of scheduling requirements pertaining to milestone reviews and launch vehicle reviews. These prospective changes included a refueling system with supporting spacecraft, see Sherwood Decl., ¶ 11, which is ████████████████████████████████████. The testimony that Blue Origin would have made significant technical and pricing changes, which are based on a proposal history that NASA knows (but wants to ignore), demonstrate that NASA's actions prejudiced Blue Origin. See WaveLink, Inc., 2021 WL 2762814, at *33.

Blue Origin's alternative proposal constitutes a significant shift from its original Option A proposal because the Government made major, substantive changes to the Solicitation by waiving requirements for most of the design, certification, technical and readiness reviews that occur pre-launch. The Solicitation initially sought "firm fixed-price, **milestone-based proposal(s)** to enable rapid development and a 2024 crewed flight demonstration of an HLS." AR Tab 27 at 24432 (emphasis added). In other words, offerors' proposals are built and scheduled around the milestone reviews. When NASA decided to waive or ignore these milestone reviews and launch vehicles review requirements, it had a dramatic effect, such that it is essentially a completely different Solicitation once the referenced milestones and review requirements are waived. See Wilhite Decl., ¶ 41. Indeed, more than a quarter of the Statement of Work (21 out of 79 pages) is dedicated to discussing the requirements for the milestone reviews and launch vehicle reviews.

43

More specifically, NASA waived for SpaceX the requirements for certain pre-launch Government-required "Critical Milestone Reviews." AR Tab 27e at 32966. NASA waived the requirements for two out of four of those milestones. Id. There are only seven launch vehicle reviews (i.e., technical and readiness reviews). Id. at 33008-11(Section 10.3-10.3.7). NASA waived or ignored the requirements for every single one of these reviews except for the MSRR. Thus, out of the 11 total pre-launch reviews that must occur before HLS launch, NASA waived or ignored requirements for 8 out of 11 reviews.

> **(b) Blue Origin's Changed Proposal Is Permitted and to Be Expected. Because of NASA's Significant Changes to the Solicitation.**

Given the substantial nature of the changes NASA made to the Solicitation with the waiver of these requirements, it is reasonable and to be expected that Blue Origin would make substantial changes to its proposal. SpaceX claims only minor changes to an offeror's base period design are permitted, but rather than citing provisions of the Solicitation that restrict changes to an offeror's technical approach if NASA waived key requirements, SpaceX instead relies on the "structure of this procurement." SpaceX Br. at 33. SpaceX is wrong. The Solicitation indicates that offerors were allowed to make changes from what was proposed in the base period contract. See AR Tab 27 at 24444 ("[F]or its Option A proposal, the Offeror is required to submit all volumes and proposal attachments indicated within Table 3, above. If any one of these items has not changed since the Offeror's base period proposal, the Offeror may re-submit that item unchanged as part of its Option A proposal."). In fact, Blue Origin made such changes. Further, SpaceX's discussion of NASA's evaluation of Dynetics' proposal shows that substantial changes were permitted and would be positively evaluated if the offeror presented substantiating details. SpaceX Br. at 36.

SpaceX further claims that because offeror-specific technical standards were adjudicated during the Base Period, offerors cannot change their proposals. This claim fails. First, most of

44

the adjudicated standards are broadly applicable and essentially independent of an offeror's design. SpaceX's implication that all of the adjudicated standards would have to be reset is misleading. Even a cursory review of the Blue Origin's adjudicated standards shows that the standards specifically related to Blue Origin's descent, ascent, and transfer elements are only addressed in two small sections – D.1 Safety Design and Construction Standards and D.2 Engineering Design and Construction Standards – only 25 out of 314 pages, and most of the other adjudicated standards are applicable regardless of a single-element lander or a three-element lander. Moreover, even assuming some of the adjudicated standards would have to be revised to comply with Blue Origin's revised approach, there is nothing in the Solicitation that prohibits the Government from setting new standards. Such an additional effort would be warranted given that it was the Agency that failed to adhere to key Solicitation's requirements, which then caused Blue Origin to revise its approach as a result of the new Solicitation requirements.

SpaceX, the sole benefactor of the Agency's improper waivers, attempts to muddy the waters with further conjecture. SpaceX claims that offerors may not make substantial proposal changes because the base period performance evaluation would be "entirely undermined." SpaceX Br. at 35. However, the Base Period performance was a demonstration of an offeror's "ability to successfully perform *a* complex spaceflight hardware development effort." AR Tab 27 at 24456. A preliminary design review was conducted during the Base Period, but offerors were permitted to change their designs from the Base Period to Option A. The Base Period was not the vast majority of the design and development portion for the HLS procurement after which no significant changes could be made, as SpaceX suggests. See SpaceX Br. (characterizing Option A as the "late stage," after which significant changes are "not credible."). If an offeror performed well during the Base Period, as Blue Origin did, such a performance would remain an accurate

45

demonstration of Blue Origin's "ability to successfully perform *a* complex spaceflight hardware development effort," and an offeror's HLS proposal would not be "entirely undermined" by changes to the technical approach. Further, as Dynetics' evaluation showed, the Base Period performance is one of a myriad of factors considered in the evaluation. See SpaceX Br. at 36.

### (c) Blue Origin's Changed Proposal Has a Substantial Chance for Award.

The Government's and SpaceX's claim that Blue Origin has not demonstrated that its alternative proposal would have a substantial chance of award is patently untrue. Gov. Br. at 46; SpaceX Br. at 36. First, Blue Origin's alternative proposal is to develop an HLS designed for NASA's mission to the Moon, not Mars. Unlike SpaceX's Mars vehicle – which NASA's Chief Engineer said was at least ███ what NASA needed for the Moon mission (see AR Tab 67 at 62900) – Blue Origin's HLS is sized for a mission to the Moon, rather than to Mars, thereby reducing complexity and requiring far fewer supporting spacecraft launches. See id. Thus, Blue Origin's alternative proposal would have many of the features that NASA counted as strengths in SpaceX's proposal, but it would not be nearly as high risk and excessively complex, as the SSA described SpaceX's approach.[11] AR Tab 77 at 63047. Therefore, Blue Origin would have had a least a substantial chance for award using its alternative proposal.

Second, Blue Origin discussed the increases in strengths and decreases in weaknesses that would occur as a result of that alternative proposal, thus improving Blue Origin's already

---

[11] The Government and SpaceX attempt to undermine Blue Origin's alternative design by citing to locations where Blue Origin asserts SpaceX's design is "immense complexity" or "heightened risk" is misleading and unavailing. First, it was NASA's own Source Selection Authority that assigned the phrase "immense complexity and heightened risk" to SpaceX's proposal; any mention by Blue Origin is quoting NASA's own statement in the public Source Selection Statement. AR Tab 77 at 63047. Second, unlike SpaceX's Mars vehicle, Blue Origin's alternative design would be designed for the mission – one to the Moon – which by NASA's Chief Engineer's own assessment would lower the risk.

substantial chances for award.  See Smith Decl. at ¶ 17.  Further, Blue Origin's design would have more than a substantial chance of award because Blue Origin would be submitting a design that the Government clearly favors (although Blue Origin's design would be less complex) at a cost the Government can afford (less than $3 billion).  By using ███████████ Blue Origin would be able to ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ have many of the same benefits (e.g., extra payload capacity) for which SpaceX was awarded multiple strengths.

Additionally, Blue Origin discussed in depth the primary area noted by the SSA as having prevented Blue Origin from receiving a selection – price.  As discussed in more detail below, Blue Origin's CEO's Declaration explains the alternative proposal would have reduced its price to fit within the Agency's budget, including a corporate contribution of $3 billion or more, making Blue Origin's price equal to or lower than SpaceX's price.  See Smith Decl., ¶¶ 18, 23, 26.

The Government offers a number of additional arguments/speculations, demonstrating a profound misunderstanding – perhaps intentionally so – of the reasons for Blue Origin's alternative proposal.  The Agency suggests, if the FRRs and other reviews were an issue, why Blue Origin would not go with a cheaper more technically complex proposal any way or why Blue Origin would not ask NASA to entirely remove well-established NASA critical safety and mission assurance review requirements from the Solicitation.  See Gov. Br. at 45.  These arguments are nonsensical and illustrate the Government's confusion as to why the changed requirements would cause Blue Origin to submit an alternative proposal, and why such a proposal is not possible without the Agency's newly changed requirements.  The Government's argument is more aptly phrased as:  "Why didn't Blue Origin just submit a noncompliant proposal like SpaceX did?"  As the Government points out, no questions were asked on the FRRs or other review, because the

provisions were unambiguous. Blue Origin understood (wrongly it seems) that NASA would follow the Solicitation requirements as written for all parties, as procurement law and regulation required. Despite the Government's apparent confusion, it is the change in requirements that directly impact and would lead to Blue Origin's alternate proposal. See Smith Decl., ¶ 14.

Blue Origin would have proposed this alternative design if it knew that NASA was going to waive stringent Solicitation review scheduling requirements. The Solicitation includes a number of mandatory review requirements that create schedule constraints, including: "an FRR . . . for each launch of an HLS element" requirement, which includes supporting spacecraft, (AR Tab 27k at 33187); all of the launch vehicle review completion deadlines, (AR Tab 27e at 33009-11); the provision stating that the DCR "should be completed at first HLS launch – 9 months," (Id. at 32969); and the launch vehicle certification requirement to certify "proposed launch vehicles, by three (3) months prior to the FRR" (Id. at 33005). Because all of these requirements incorporate the term "HLS elements," all of these required reviews must include supporting spacecraft. Therefore, if the DCR should be completed 9 months prior to HLS launch or if each supporting spacecraft launch requires an FRR, PMRR, and LRR, whether an offeror utilizes supporting spacecraft is limited by the offeror's schedule. Particularly for an offeror using multiple supporting spacecraft launches, like SpaceX, that offeror is required to calculate many of these requirement deadlines starting from its first supporting spacecraft launch. Because the supporting spacecraft launches generally begin months before the integrated lander launch, use of supporting spacecraft will push all of the review deadlines months earlier than they would be otherwise.

In contrast, if the term "HLS element" is defined as *not* including supporting spacecraft or launch vehicles, then offerors' schedules are no longer constrained by the deadlines that otherwise are applicable to supporting spacecraft launches. Also important for Blue Origin, it will be much

easier to achieve ███████████████████████████████. Blue Origin changed from proposing ████████ in the Base Period because it did not believe it had enough time to achieve all of the scheduled pre-launch reviews, ████████████████████████ ████████████████, in time for a 2024 deadline. The launch vehicle certification flights are required to be completed by "three (3) months prior to the FRR." AR Tab 27e at 33005. If the Flight Readiness Reviews only need to be completed for the integrated lander and not supporting spacecraft, then Blue Origin will have much more time in its schedule to complete the required certification flights if it uses supporting spacecraft and a single-element lander, rather than three separate launches for its three-element lander. In which case, the date for the single-element lander can be pushed back towards the end of 2024 and Blue Origin would gain several months of additional time. Under the current Solicitation, Blue Origin's proposal was dramatically constrained by scheduling requirements, and it would have changed its proposal if those requirements were waived or relaxed, as they were for SpaceX.

To accept the viability of an alternative proposal, SpaceX attempts to impose a near impossible standard, and certainly a much more restrictive standard than required by law to prove prejudice. See SpaceX Br. at 37. The law, however, does not require the standard that SpaceX proposes – a standard that would require Blue Origin to submit a completed proposal, including "expenditures" (i.e., pricing) and "substantiation of testing and performance analysis." See Strategic Analysis, Inc. v. U.S. Dep't of Navy, 939 F. Supp. 18, n.7 (D.D.C. 1996) (noting that the Federal Circuit has indicated that "the submission of an affidavit of a company executive . . . is a proper way to demonstrate prejudice.") (citing Data General Corp. v. Johnson, 78 F.3d 1556, 1563 (Fed. Cir. 1996)). SpaceX provides no case citations supporting its illogical standard.

SpaceX surely knows its proffered standard is impossible to meet; indeed, it is structured

49

to be that way. SpaceX essentially asks this Court to require Blue Origin to submit a complete alternative technical proposal without knowing the changes to the Solicitation. This is by definition impossible, especially since this is rocket science. But SpaceX's standard does not reflect the relevant legal standard. Blue Origin obtained some information on the FRR issue after the GAO decision became public, and recently learned that other reviews could be at issue, but it has no details about any other problematic reviews at issue, due primarily to actions taken by SpaceX and the Government to suppress that information. SpaceX and the Government have actively blocked Blue Origin from accessing relevant information at every turn. See, e.g., ECF No. 33. Given those actions, it is completely disingenuous for the Government and SpaceX to now question the timing or scope of Blue Origin's prejudice evidence and to ask this Court to hold Blue Origin to a higher standard than the law requires. This is nothing more than an improper attempt to use this Court's protective order to hide information from Blue Origin (and the public), then to use the fact Blue Origin does not know about this information to claim that Blue Origin cannot provide sufficient evidence to demonstrate prejudice.

Blue Origin has more than satisfied the legal standard for prejudice requiring demonstration of a substantial chance of award. But, even if there was any doubt whether Blue Origin provided enough information to meet the standard, the benefit should be given to Blue Origin, particularly in view of the Agency's arbitrary and irrational conduct here.

### (d) If the Solicitation Is Amended in Accordance with the Agency's New Solicitation Requirements, Full Proposal Revisions Will Be Required.

SpaceX argues that Blue Origin must establish that the Agency is obligated to invite broad proposal revisions. SpaceX Br. at 33. The Government is required to invite broad proposal revisions where it makes "major modifications—changes that could result in a substantially different proposal by those competing for the contract." Portfolio Disposition Mgmt. Grp., 64 Fed.

Cl. at 12 (citing <u>AT&T Comm. Inc. v. Wiltel, Inc.</u>, 1 F.3d 1201, 1205 (Fed. Cir. 1993) (new bids required where modifications are outside the scope of original competed contract)). The waiver of these milestone reviews and launch vehicle reviews are major modifications that necessitate broad proposal revisions. In any event, where the Court determines that the Agency's award to SpaceX was unlawful, it can remand to the Agency for subsequent corrective action consistent with its determination.

Here, the Agency waived the requirements for multiple milestone reviews and waived the requirements for 6 launch vehicle reviews. These are not perfunctory reviews. As mentioned above, the Solicitation sought firm fixed priced, *milestone-based* proposals that required proposals to be designed and scheduled around the milestone reviews. AR Tab 27 at 24432. When considering the waived requirements in context, it is a different Solicitation, as Dr. Wilhite attested. <u>See</u> Wilhite Decl. at 41.

> **2. Had NASA Amended the Solicitation, Held Discussions, Or Waived Review Requirements for All Offerors, Blue Origin's Proposal Price Would Have Substantially Decreased, Giving it a Substantial Chance for the Option A Contract.**

The Government and SpaceX argue that Blue Origin's initial price may preclude a finding of prejudice because of "simple math." Gov. Br. at 39; <u>see also</u> SpaceX Br. at 29. However, the Government's and SpaceX's arguments are fatally flawed because both wrongly assume SpaceX and Blue Origin were answering the same math problem; they were not.

Blue Origin submitted a proposal compliant with the Solicitation's milestone and other review requirements as written; SpaceX's proposal did not. Blue Origin's election to follow the Solicitation as written significantly impacted its proposal, including but not limited to its proposal price. <u>See</u> Smith Decl., ¶ 10, 18-20, 25; Sherwood Decl., ¶ 6, 11-12; Wilhite Decl., ¶ 41. In contrast, notwithstanding SpaceX's election to ignore the unambiguous Solicitation requirements,

NASA's improper evaluation gifted SpaceX with an undeserved contract.

Similarly, NASA's decision to enter into improper discussions with only SpaceX, afforded only SpaceX the opportunity to revise its proposal (to NASA's new revised FRR and delta FRR requirements) and to alter its price to meet NASA's fiscal year budgetary shortfall.  See AR Tab 63 at 62886, 62888-90.  That was improper.  "It is well established that an agency may not opt to discuss the identical aspect of a proposal with some offerors but not others."  AshBritt, Inc. v. U.S., 87 Fed. Cl. 344, 369, op. clarified, 87 Fed. Cl. 654 (2009) (citations omitted).  "The FAR does not allow contracting officers to engage in "conduct that [f]avors one offeror over another."  Id. (citing FAR § 15.306(e)(1)).  Not only was NASA's decision to discuss prices with only SpaceX improper, but also, as Blue Origin has shown, had it been afforded the same opportunity, Blue Origin would have improved its proposal, including its price, resulting in a substantial chance for the award.

Notwithstanding the Government's and SpaceX's arguments, which amount to nothing more than speculative disagreement and a wish that Blue Origin's alternative proposal and impact on price were not true, Blue Origin has sufficiently established that, but for NASA's improper actions, Blue Origin's would have and still can bridge any existing price or budgetary gap.

### (a) The Price Difference Between Blue Origin's and SpaceX's Proposals Is Not Solely Determinative of Prejudice.

The Government's and SpaceX's suggestion that Blue Origin's proposed price prevents a finding of prejudice is inconsistent with the law and facts.  Gov. Br. at 41; SpaceX Br. at 29.

The Federal Circuit has recognized that the price differential between a protester's proposal and the awardee's is not *solely dispositive* of whether the protester has established prejudice.  See, e.g., Alfa Laval Separation, Inc. v. U.S., 175 F.3d, 1365 (Fed. Cir. 1999) (holding that protester was prejudiced by an erroneous award decision even though its proposal was higher than the

awardee's technically noncompliant offer: "while price differential may be taken into account, it is not solely dispositive; we must consider all the surrounding circumstances in determining whether there was a substantial chance" of award to the protester); CW Govt. Travel, Inc. v. U.S., 2021 WL 3085500, at *10 (Fed. Cl. June 28, 2021) (argument that protester could not show prejudice because of higher price "glosses over the fact that a properly conducted" evaluation might have removed the awardee from consideration); AshBritt, Inc., 87 Fed. Cl. at 376-77 (defendant's argument that the price differential between protester and awardee's prices precluded finding prejudice was "too myopic[] in the context of this procurement"). While some cases have held the price may prevent a finding of prejudice, the facts yielding such a result are not present here. See Elec. Data Sys., LLC v. U.S., 93 Fed. Cl. 416 (2010).

The Government's reliance on Electronic Data Systems to support its argument is misguided. 93 Fed. Cl. 416 (2010). In Electronic Data Systems, the Treasury Department received three bids in response to an RFP seeking assistance with its current IT infrastructure. Id. at 419. After notifying all offerors that their initial pricing submissions were incomplete and allowing resubmission of bids, the agency awarded the contract to the lowest price bidder, BAE, even though its proposal did not comply with the RFP's requirement on submitting its pricing information. Id. at 424, 430-31. During the protest, the court found that the agency improperly veered from the RFP's requirements in accepting BAE's proposal and, therefore, veered from fundamental federal procurement regulatory requirements that would have required an amended solicitation. Id. at 430-31.

Discussing prejudice, the court pointed out that the "elephant in the parlor" was the protester's and BAE's difference in price; but that, under such circumstances, the protester is afforded the opportunity to show how it would have altered its proposal had it been given a chance

to respond to the altered requirement. Id. at 435. However, the court found that no prejudice existed because "even under the best scenario – one better than EDS could have dreamed to generate in revised proposals – plaintiff would not have received the contract." Id. at 437. The court found that the protester's revised proposals impact on its price would have been "inconsequential" because the agency's had already, on its own and during the evaluation period, considered the same pricing changes the protester suggested it would have made. Id. Thus, the court held it was not a situation where the court had to speculate as to what the new award decision would be on remand or rationalized by the agency. Id. It already knew. Id. Furthermore, the court found that the agency violated a "pricing," not a "technical" requirement. Id.; cf. Alfa Laval Separation, Inc., 175 F.3d at 1368. The scenario here, however, is vastly different.

First, unlike in Electronic Data Systems, the requirements that were waived and relaxed for SpaceX were not simply pricing submission requirements, but mandatory technical review requirements that significantly impacted the nearly every aspect of the proposal from the technical solution, the pricing proposed, the technical ratings and the management ratings. See Wilhite Decl., ¶ 41; see also AR Tabs 27 at 24450, 24457; 35d at 61996. Additionally, also unlike the protester in Electronic Data Systems, Blue Origin has shown that its technical design would have been significantly different, which would have had a significant impact on its proposed price and allowed for a larger corporate contribution that would have more than covered any price gap. See Smith Decl., ¶ 18-19, 26. Furthermore, as Blue Origin's submitted declaration makes clear, had NASA not engaged in discussions with only SpaceX and included Blue Origin as required, Blue Origin would have been able to more than meet NASA budgetary shortfalls and close the pricing gap. See id., ¶ 23-24, 26. It would go against that weight of the evidence to state here that "even under the best scenario – one better than [Blue Origin] could have dreamed to generate in revised

proposals – [Blue Origin] would not have received the contract." Elec. Data Sys., 93 Fed. Cl. at 437.

Simply put, it was not Blue Origin that placed the "proverbial elephant in the parlor." Rather, it was the Government's procurement errors that caused it to appear. As Blue Origin has shown, unlike the protester in Electronic Data Systems, if NASA's errors were remedied, the pachyderm would disappear and Blue Origin would have had a substantial chance of being awarded the contract. NASA has not had the opportunity and did not evaluate Blue Origin's revised proposal; therefore, also unlike Electronic Data Systems, it cannot be said that such revisions would be "inconsequential." It would be just the opposite – prejudicial.

Accordingly, when evaluating whether Blue Origin has been prejudiced by NASA's errors the Court must look not only at any difference in price between Blue Origin's and SpaceX's proposals, but at the totality of the circumstances surrounding the procurement. Notwithstanding this fact, if Blue Origin would have been placed on the same footing at SpaceX, Blue Origin's proposal and corporate contribution would have resulted in a total deduction of at least $3 billion, which closes any gap between Blue Origin's price and SpaceX price.

### (b) NASA's Waiver and Relaxation of Milestone and Other Reviews Effectively Created a New Solicitation, Which Prejudicially Impacted Blue Origin's Proposed Price.

The Government expresses doubt that Blue Origin's proposed price would have been lower under ███████████████████████████, which Blue Origin originally proposed during the Base Period. See Gov. Br. at 44. However, the Government's doubt is speculative, self-serving, and not based in fact.

Blue Origin proposal was compliant with and based on the Solicitation's unambiguous material milestone requirements and critical reviews. Blue Origin's proposed technical solution

and, therefore, price was directly tied to and based upon the Solicitation's milestone and critical review requirements.  See Smith Decl., ¶¶ 10-11, 13-14, 18.  SpaceX's proposal was not.

The Government's election to waive or relax these material requirements and critical reviews for only SpaceX essentially created a new Solicitation.  See Wilhite Decl., ¶ 41.  As discussed in more detail supra, had Blue Origin known that NASA was going to waive or relax the FRR, DCR, and other requirements, Blue Origin would have proposed a significantly different technical solution.  See § II(G)(1), supra.  Specifically, Blue Origin would have maintained its original Base Period proposal ███████████████████████████████████.  See id.  Using its originally proposed ████████████████████████████████ would have resulted in a significant cost reduction to Blue Origin's proposal ██████████████████████ resulted in a significantly larger proposed corporate contribution. Id., ¶¶ 18-19.

Blue Origin has demonstrated and attested that it would and could in fact make a corporate contribution in the amount of over $3 billion.  See Smith Decl., ¶¶ 23-24.  The Company uniquely has the means, support and direction from its founder to do that. Therefore, for this reason as well, neither SpaceX nor the Government could argue that such a change to Blue Origin's price would be speculative or hypothetical.

### (c) Absent NASA's Improper Discussion with Only SpaceX, Blue Origin's Price Would Have Met the Government's Budget.

SpaceX surmises that, even if NASA engaged in open and equal discussions, "Blue Origin neither contends nor demonstrates that it ever could or would reduce its proposed price to fall within NASA's budget[.]"  See SpaceX Br. at 30; see also Gov. Br. at 43.  This is wrong.  Blue Origin's CEO has made clear that ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████"  See Smith Decl., ¶ 26.  Furthermore, the amount Blue

56

████████████████████████████████████████

Origin's owner was – and is – willing to offer is over $3 billion in corporate contributions to assist in NASA's budgetary shortfalls. See Smith Decl., ¶ 23-24. Therefore, Blue Origin would have been able to fully resolve NASA's immediate FY budget constraints that drove the SSA's decision to make one award, as well as lower Blue Origin's total proposed price.

### (d) Absent NASA's Improper Discussions with Only SpaceX, Blue Origin Could Clarify No Advance Payments Were Requested.

Both Government and SpaceX mistakenly make the incorrect argument that Blue Origin's proposal would have been unawardable because NASA stated Blue Origin included advanced payments in its proposal. See Gov. Br. at 48; SpaceX Br. at 32.

As Blue Origin has attested, "the purported advance payment issue discussed in Blue Origin's SEP report were not advance payments but rather were long-lead item procurement payments." Sherwood Decl., ¶ 14. Long lead item procurement payments are not prohibited by the Solicitation and, as NASA conceded, Blue Origin could have easily corrected this misunderstanding if NASA had afforded Blue Origin the same opportunity to have discussions as it provided SpaceX. One important difference is that NASA would not have had to alter, revise or change the Solicitation (or its interpretation) for Blue Origin. Blue Origin was already compliant. The Government's and SpaceX's persistence on promoting this narrative does not make it true.[12]

---

[12] It is noteworthy that Blue Origin did not know about NASA waiving the FRRs or about the possibility that the DCRs and other reviews could have similarly been impacted until after the GAO decision was made public. See Smith Decl. ¶ 5-6; Sherwood Decl., ¶ 2. Thus, NASA's and SpaceX's less-than-forthcoming speculation about the timing of Blue Origin's prejudice argument at GAO or this Court is baseless, especially where they advocated for keeping such information concealed from Blue Origin. See, e.g., ECF No. 33. Unlike NASA, who has all the facts and is required to document its decision making contemporaneously within the procurement process, the law does not hold Blue Origin to the same standard for showing prejudice and gives it a right to submit to this Court evidence of prejudice, such as an alternate proposal. And it did so timely.

H.     **Blue Origin Has Standing to Bring this Protest.**

Blue Origin has established prejudice for standing to bring this protest.  Nevertheless, both the Government and SpaceX contend Blue Origin lacks standing solely as it relates to a showing of prejudice.  Gov. Br. at 38; SpaceX Br. at 26.  Their arguments are factually and legally wrong, as addressed below.

1.     **Prejudice is Presumed When, As Here, the Agency Acted Irrationally, Arbitrarily or Capriciously.**

To start, Blue Origin's Complaint makes clear allegations that NASA's actions were both arbitrary, capricious, and irrational as well as in violation of federal procurement law and regulation.  See, e.g., ECF No 1 ("Compl."), ¶ 2, 14, 21, 29, 89-90, 98, 121, 139, 141, 144, 151, 156, 149, 164-65, 171.  When an "irrational or arbitrary and capricious agency action has occurred, prejudice is presumed."  Caddell Constr., 125 Fed. Cl. at 50.  The Government and SpaceX do not address this Court's standard for prejudice when, as here, the allegations and actions of the agency were arbitrary, capricious and irrational.  Plaintiff adequately pled, and has shown supra, that NASA's actions were in fact irrational, arbitrary, and capricious.  Since neither the Government nor SpaceX address this standard, Plaintiff need not respond.

2.     **Blue Origin Has More Than Cleared the Threshold For Showing Prejudice to Satisfy Standing.**

The Government's and SpaceX's standing arguments only address the "substantial chance" prejudice standard that applies where the agency violated procurement law or regulation.  See Kiewit Infrastructure West Co., 147 Fed. Cl. at 707 (quoting Banknote Corp of Am., 365 F.3d at 1351).  Although their arguments span pages of their briefs, the Government's and SpaceX's arguments boil down to the fact that they simply do not want to believe Blue Origin.  Specifically, the Government's and SpaceX's arguments on standing center around personal disagreements on

58

how NASA actions would impact (1) Blue Origin's design and (2) Blue Origin's price. In the end, the Government's and SpaceX's self-serving belief about the how Blue Origin would have acted if NASA has not violated the procurement regulations is irrelevant and inaccurate. In addition to their speculative disagreements, they attempt to hold Blue Origin to a higher legal standard than is even required on the merits. Simply put, the Government's and SpaceX's standing arguments miss the mark on both the law and facts.

### (a) The Court's Standing Analysis Is for "Potential" Prejudice Based Upon a Limited Review Assuming Plaintiff's Allegations Are True.

A bid protest may be brought by any "interested party." See Bilfinger Berger AG Sede Secondaria Italiana v. U.S., 97 Fed. Cl. 96, 134 (2010); see also 28 U.S.C. § 1491(b)(1). To be an "interested party," the plaintiff must be (1) an "actual or prospective bidder", and (2) demonstrate it has a "direct economic interest in the procurement."[13] Id. Additionally, to have standing, a plaintiff must also include allegations showing potential prejudice. See CW Gov't Travel, Inc. v. U.S., 110 Fed. Cl. 462, 481 (2013).

The threshold for determining if prejudice exists for standing requires "only that a protestor be . . . a bidder or proposer who would be in contention absent the unreasonable procurement decision or violation of applicable procurement regulations." Magnum Opus Techs., Inc. v. U.S., 94 Fed. Cl. 512, 530 (2010) (citations omitted). When assessing standing, the Court must assume as true the "allegations of agency error" in Blue Origin's Complaint. Tech Sys., Inc. v. U.S., 98 Fed. Cl. 228, 244 (2011); USfalcon, Inc. v. U.S., 92 Fed. Cl. 436, 450 (2010). Furthermore, the Court's inquiry on standing is "only a limited review of plaintiff's allegations and the administrative record for the 'minimum requisite evidence necessary to demonstrate prejudice and

---

[13] The Government and SpaceX do not challenge Blue Origin's standing on any factor other than prejudice.

therefore standing.'" <u>Magnum Opus Techs., Inc. v. U.S.</u>, 94 Fed. Cl. 512, 530 (2010) (quoting citation omitted); <u>see also</u> <u>N.C. Bus. Enter. Prog. v. U.S.</u>, 110 Fed. Cl. 354, 362 (2013) (company affidavits are properly considered as part of the court record for prejudice).

Additionally, as a standing determination occurs "before" evaluation of the merits, the prejudice standard is better understood as "potential prejudice." <u>CW Gov't Travel, Inc. v. U.S.</u>, 110 Fed. Cl. 462, 481 (2013). Even at the merits stage, the "test is more lenient than showing actual causation, that is, showing that but for the errors [the protestor] would have won the contract." <u>Bannum, Inc. v. U.S.</u>, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (citing <u>Alfa Laval</u>, 175 F.3d at 1367; <u>Data Gen.</u>, 78 F.3d at 1562); <u>Heritage of Am., LLC v. U.S.</u>, 77 Fed. Cl. 66, 71 (2007) (citing <u>Data Gen.</u>, 78 F.3d at 1562). All that is required on the merits is a showing of substantial chance of being awarded the contract. <u>Id.</u> In evaluating standing, that hurdle is significantly lower. <u>See, e.g.</u>, <u>McKing Consulting Corp. v. U.S.</u>, 78 Fed. Cl. 715, 721 (2007) ("What establishes standing under the Circuit's case law is a viable allegation of agency wrong doing, "viability" here turning on the reasonableness of the likelihood of prevailing on the prospective bid taking the protestor's allegations as true.").

The Government's and SpaceX's challenge to Blue Origin's showing of potential prejudice mirrors their allegations on merits prejudice; namely, expressing personal disagreement with Blue Origin's alternative technical design and price. Blue Origin has shown above it was prejudiced on the merits and easily clears the lower hurdle to demonstrate "potential prejudice."[14]

---

[14] NASA's argument that Blue Origin lacks standing under a Broad Agency Announcement is wrong. Gov. Br. 39-40. The only Court of Federal Claims case the Government cites only states that BAA's "**arguably** do not give a disappointed offeror standing." <u>Kinemetrics, Inc. v. U.S.</u>, 2021 WL 4237169, at *5 (Fed. Cl. Sept. 10, 2021) (emphasis added). But then the court states, "[t]he court disagrees" and ruled that the protester had standing where it was one of three offerors that submitted a proposal, regardless of whether the proposals were compared to each other or if there would be multiple potential awardees. <u>Id.</u>; <u>see also</u> AR Tab 108b67a-118a at 105071.

### (b) Blue Origin's Alternate Technical Design and Resulting Impact on Its Price Is Not Speculative and Establishes Standing.

Blue Origin has shown that had it known NASA was going to waive critical milestone and other review requirements, it would have submitted a substantially different technical design, which is premised on and takes advantage of ████████████████ that Blue Origin originally proposed during the Base Period, and impacted its price to the tune of a $3 billion reduction. These statements were not merely conclusory, as the Government and SpaceX suggest. Instead, Blue Origin has provide specific details grounded in sufficient foundation to establish "potential prejudice" (and frankly merits prejudice) and standing. See, e.g., Compl. 13, 80, 110-111, 133, 135; § II(G)(1), supra; see also Smith Decl. and Sherwood Decl.

As mentioned above, SpaceX's argument (including on standing) that Blue Origin's technical design is impossible because it was not proposed during the Base Period is wrong. See § II(G)(1)(a), supra. Blue Origin's alternative proposal is premised upon ████████████████ ████ initial Base Period proposal. Id. As Blue Origin alleged and has shown, the ultimate Blue Origin design for Option A was directly tied to the Solicitation's milestone requirements and schedule criteria NASA waived for SpaceX. Id.; see also, e.g., Compl., ¶ 133-35. Furthermore, despite SpaceX's wish to the contrary, the Solicitation does not prohibit technical design changes. In fact, the Solicitation and NASA's own actions during the procurement show otherwise. See § II(G)(1)(b), supra. Moreover, Blue Origin has described in depth the impact its proposed design would have on its evaluation, providing a substantial chance of being awarded the contract. Id. To support its proposal's strength, Blue Origin even relies upon statements by NASA itself. Id.

Blue Origin's alternative proposal is more than sufficient for standing.[15]

The Government's and SpaceX's urging to this Court that Blue Origin's proposed price prevents it from establishing potential prejudice is also misguided. See Gov. Br. at 41; SpaceX Br. at 29. As discussed above, the Federal Circuit has recognized that price is not solely dispositive on prejudice. See § II(G)(2)(a), supra. This is especially the case where, as here, there is a plausible claim that the awardee's proposal was simply not awardable from the start. See, e.g., Caddell Constr. Co., 125 Fed. Cl. at 52. Additionally, the cases relied upon by the Government for this proposition do not reflect that such an outcome would be proper here. See § II(G)(2)(a), supra. Furthermore, Blue Origin alleged in its Complaint it would have lowered its price, and its CEO attested that Blue Origin would have been able to, and would, offer a reduced price of $3 billion. See, e.g., Smith Decl., ¶ 26; see also § II(G)(2), supra. SpaceX's and the Government's confusion or personal disagreement over these facts does not make this prejudice speculative.[16]

Blue Origin has established it has standing to bring this protest, including that it satisfies

---

[15] The cases the Government and SpaceX rely upon to assert Blue Origin's claims are hypothetical are inapposite. The Lujan v. Defenders of Wildlife, 504 U.S. 555, 564 (1992) decision involved an environmental group whose alleged injury was just a "vague expression" that it "hoped to visit" foreign countries "someday and [to] see leopards and elephants." Mausolf v. Babbitt, 85 F.3d 1295, 1301 (8th Cir. 1996). Blue Origin's allegations are not based on a vague expression of hope and meet the requirements for standing. Blue Origin was next in line for award, and was injured by its inability to compete on equal footing in the Solicitation's bid process; a fair procurement would have led to Blue Origin proposing ████████████████ and a reduced proposal price, and is redressable by the requested relief. Acetris Health, LLC v. U.S., 949 F.3d 719, 727 (Fed. Cir. 2020) ("[A]s the Supreme Court has explained, an Article III injury-in-fact may be, as it is here, "the inability to compete on an equal footing in the bidding process[.]") (citation omitted).

[16] Both the Government and SpaceX make numerous arguments under its "standing" header that amount to disagreement on the actual claims' merits. See Hyperion, Inc. v. U.S., 115 Fed. Cl. 541, 550 (2014) (finding standing and holding the government's arguments on the merits in the standing section will be addressed in the merits section). The very fact that the Government and SpaceX cannot even make their standing arguments without discussing the merits (which they also fail on), confirms that Blue Origin has easily cleared standing. Id.; see also Bluewater Mgmt. Grp., LLC v. U.S., 150 Fed. Cl. 588, 608 (2020) (citing See Warth, 422 U.S. at 500 ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal")).

potential prejudice and, as shown above, merits prejudice.

## I. Blue Origin is Entitled to Injunctive Relief.

Blue Origin and the Government agree on the elements required for a permanent injunction. The Government, however, overreaches in relying on C.A.C.I., Inc.-Federal v. U.S., 719 F.2d 1567, 1581 (Fed. Cir. 1983) and Lermer Germany GmbH v. Lermer Corp., 94 F.3d 1575, 1577 (Fed. Cir. 1996). This Court has distinguished C.A.C.I., stating that one of the tests applied to determine the propriety of injunctive relief in C.A.C.I. (whether it had a substantial case on the merits) had "been obviated by" statute. Cleveland Assets, LLC v. U.S., 133 Fed. Cl. 108, 112 (2017). Moreover, Lermer, addressing an appeal from the District of New Jersey, discussed a preliminary injunction, something that the court explained "is extraordinary relief that alters the status quo during the course of litigation." Lermer, 94 F.3d at 1577.

### 1. Declaratory Relief is Appropriate.

The Government and SpaceX failed to address the issue of declaratory relief in their papers, and, accordingly, there is no issue for Blue Origin to address in this response.

### 2. Blue Origin Has Succeeded on the Merits and the Remaining Injunctive Relief Factors All Favor Blue Origin.

Blue Origin relies on the assertions set forth on the merits in its MJAR here.

#### (a) Blue Origin Will Suffer Irreparable Harm.

Blue Origin has suffered irreparable harm because of the lost profits from the failure to award a contract to Blue Origin and a monetary award would not be enough to remedy the harm. The Government agrees that irreparable harm can be demonstrated by evidence of lost profits or evidence that a monetary award would not be enough (and SpaceX did not address the issue in its papers). See Gov. Br. at 74-75; SpaceX Br. at 70-73. Such a showing may be established by a preponderance of the evidence. See MORI Assocs., Inc. v. U.S., 102 Fed. Cl. 503, 553 (2011)

63

(explaining "that the preponderance of the evidence test should apply" to showing lost profits due to an agency's arbitrary conduct) (citation omitted).[17]

Blue Origin has presented evidence that it will suffer lost profits due to NASA's arbitrary and capricious actions. See Sherwood Decl., ¶ 15. The Government and SpaceX do not refute that in their papers. See Gov. Br. at 74-75; SpaceX Br. at 70-73. Blue Origin, therefore, has made the appropriate showing on this issue. See MORI Assocs., 102 Fed. Cl. at 552 (ruling that the protester demonstrated "irreparable injury" because of a cancelled procurement).[18]

The Government's first argument against injunctive relief crumbles under the weight of the Government's overall litigation position. That is, the Government asserts that because "offerors were not competing against each other," an "award of a contract to SpaceX did not itself prevent an award of a contract to Blue Origin." Gov. Br. at 75. But elsewhere, the Government asserts that there was only enough money to award a single contract, and, as such, it was

---

[17] SpaceX's assertion in footnote 29 that a breach of the implied contract of fair dealing cannot support "an award of injunctive relief" is not a principle espoused in the cited cases. Safeguard Base Operations, LLC v. U.S, 989 F.3d 1326 (Fed. Cir. 2021) explains that there is jurisdiction to hear implied-in-fact contracts, and refers to the relief for such disputes in 28 U.S.C. § 1491(a)(2). Id. at 1343. In Safeguard's discussion of claims for breach of implied contracts of fair dealing, the Federal Circuit explained that § 1491(b)(2) provides authority for "the relief historically associated with implied contract bid protest claims in the procurement context—'monetary relief limited to bid preparation and proposal costs' *while also permitting other forms of relief previously available under former § 1491(a)(3)*" – "declaratory and injunctive relief" under the plain language of the statutes. Id. (emphasis added); 28 U.S.C. § 1491(b)(2). Further, in Medline Industries, Inc v. U.S.,--- Fed. Cl. ---, 2021 WL 3483429 (July 30, 2021), this Court reiterated that it "has jurisdiction over implied-in-fact contract claims brought in bid protests," and stating that "[i]n addition to its powers to issue injunctive relief, the Court may award 'bid preparation and proposal costs' should it find the United States in breach." Id., at *16. The Court awarded injunctive relief to Medline because of the agency's arbitrary and capricious actions, then awarded monetary damages to a second protester, because had waived such recovery; it did not hold that only monetary relief was available for an agency's breach of the implied contract of fair dealing. Id., at *15-16.

[18] MORI Associates also distinguished the OAO Corp. decision that NASA cites on page 74 of its papers. 102 Fed. Cl. at 552, n.59.

appropriate to award a contract just to SpaceX, and not any other offeror.  <u>See, e.g., id.</u> at 2.  If there was only money available to award a single contract, then offerors were, by necessity, competing for the single award.  NASA's decision to make a single award to SpaceX meant there was not an award to Blue Origin.  <u>See, e.g., id.</u>[19]  SpaceX's assertion that Blue Origin can simply engage in discussions with NASA and submit a revised proposal is at odds with the record and NASA's position that it need not and would not engage with Blue Origin.  <u>Compare</u> SpaceX Br. at 70 <u>with, e.g.</u>, Gov. Br. at 42.

The Government's assertion that because "Blue Origin will have other opportunities to compete for NASA contracts for similar research, development, and services," there is no irreparable harm, is meritless.  Gov. Br. at 75.  When a protester "would lose the experience of working on a complex" contract at issue, "which would make" the protester "more competitive for similar contracts in the future," the improper refusal to award a contract to the protester is an element of irreparable harm.  <u>Caddell Constr. Co. v. U.S.</u>, 111 Fed. Cl. 49, 116 (2013).  Thus, the *opportunity* to compete for future contracts – something that is available to *all* contractors in every procurement – is not persuasive, and even less so, where Blue Origin will be less competitive because of NASA's improper conduct.[20]

---

[19] SpaceX's citation to <u>GEO Group, Inc. v. U.S.</u>, 100 Fed. Cl. 223 (2011) does not require a different result.  There, the Court ruled on a motion for a temporary restraining order just two days after the protester filed its complaint, considering the protester's potential ability to compete for a contract.  <u>Id.</u> at 226.  With a two-day-old litigation, the Court did not have the benefit of an administrative record, did not appear to address lost profits, and did not address an argument about lost opportunities to work with the agency (because the protester was the incumbent), among other arguments, all in contrast to this litigation.  <u>Id.</u> at 228-29.

[20] NASA is advertising the Lunar Exploration Transportation Services ("LETS") acquisition as purchasing services "in the late 2020s," whereas the disputed acquisition called for a 2024 timeline.  NASA, <u>Enabling Industry Readiness for Commercial Lunar Space Transportation Systems</u>, SAM.gov (visited Oct. 7, 2021), <u>https://sam.gov/opp/71642bed173841e383f484c5fbe33287/view</u>.  The Court may take judicial

Blue Origin's irreparable harm is not eliminated because it won a different award ($25.6M) for a different contract that is worth a mere 0.8% of the HLS Option A contract ($2.9B).  Compare Gov. Br. at 15, 75 with Cabana Decl., ECF No. 60-1 at 6.  Profits earned under a separate contract do not eliminate the irreparable harm caused by an unfair competition and lost profits for the subject contract.  See ViroMed Lab'ys, Inc. v. U.S., 87 Fed. Cl. 493, 503 (2009) ("declin[ing] defendant's invitation to consider prior profits under previous contract awards" as a reason to find a lack of irreparable harm, and ruling that "[b]ecause plaintiff would suffer the loss of anticipated profits" on the disputed contract, "plaintiff has established that it would suffer immediate and irreparable harm should this court not issue the proposed preliminary injunction").

The Government's and SpaceX's opening papers do not address the point that NASA's actions have resulted in Blue Origin having been deprived of the opportunity to compete in a fair competitive bidding process, with a level playing field, and to secure the resulting profit from the contract that Blue Origin would have received but for the Agency's improper rejection of its proposal.  See, e.g., 2M Research Servs. v. US, 139 Fed. Cl. 471, 480 (2018) (citing AshBritt, Inc., 87 Fed. Cl. at 378); Kiewit Infrastructure West Co. v. U.S., 147 Fed. Cl. 700 (2020).  That is evidence of irreparable harm.

### (b) The Balance of Hardships Favors Granting Injunctive Relief.

The balance of hardships also weigh in Blue Origin's favor, and the Government's and SpaceX's papers are not to the contrary.  Medline Industries[21] provides a key point to such an analysis, reiterating that, beyond the harm to a protester, "'[t]he public also has a strong interest in preserving the integrity of the procurement process.'"  2021 WL 3483429, at *14 (quoting

---

notice of this information.  See Valve Corp. v. Ironburg Inventions Ltd., 8 F.4th 1364, 1374-75 (Fed. Cir. 2021) (allowing judicial notice of archived webpages).

[21] SpaceX relies on Medline for a different premise.  See SpaceX Br. at 70.

Angelica Textile Servs., Inc. v. U.S., 95 Fed. Cl. 208, 223 (2010), appeal dismissed, 462 F. App'x

970 (Fed. Cir. 2012)).  The Court reiterated that the public "interest would be undermined if the

Court were to deny injunctive relief and allow the [agency's] actions here to stand" when the

actions were unsupported by the record.  Id.  The public interest was so strong that it outweighed

the agency's assertions that injunctive relief could "impede the medical care provided to veterans"

– an essential governmental service beyond reproach.  Id.

Here, NASA and SpaceX cite to assertions that NASA might never return to the Moon if

NASA is not given a free pass at awarding a contract to a proposal that did not meet its standard

requirements.  See Gov. Br. at 76; SpaceX Br. at 71.  The record, and NASA's own statements

elsewhere, demonstrate that these purported concerns ring hollow.  NASA's litigation counsel said

to the GAO that NASA will never "return[] the United States to the Moon" and there is risk to "the

Artemis program" if NASA has to comply with procurement law, and the Associate Administrator

asserts that complying with the law would be slow and expensive.  See SpaceX Br. at 71; Gov. Br.

at 75-76.

NASA's current Administrator, however, does not believe the proclamations of doom from

its zealous advocates and less-senior personnel.  On October 3, 2021, which was two days after

NASA and SpaceX warned this Court of the end of times for NASA's Artemis program and its

chances to go to the Moon, NASA administrator "said he was confident in congressional support

for Artemis" when he was asked about the GAO protest and this litigation.  Jeff Foust, Nelson

Remains Confident Regarding Funding for Artemis, SpaceNews (Oct. 3, 2021),

https://spacenews.com/nelson-remains-confident-on-nasa-funding-for-artemis.  Mr. Nelson

continued:  "'I'm not worried that we're going to lose support for the program,' he said. '*Despite

what the court decides, we have support for the program*.'"  Id. (emphasis added).  These

statements are admissions of a party opponent and are admissible evidence because they were made by a party, concern a matter within Mr. Nelson's employment and the scope of his agency, and were made during his role as NASA's Administrator.  See Globe Savings Bank, F.S.B. v. U.S., 61 Fed. Cl. 91, 96-97 (2004).  The Court also may take judicial notice of this information.  See Valve Corp. v. Ironburg Inventions Ltd., 8 F.4th 1364, 1374-75 (Fed. Cir. 2021) (allowing judicial notice of archived webpages); see also Juniper Networks, Inc. v. Shipley, 394 F. App'x 713 (Fed. Cir. 2010) ("it is not uncommon for courts to take judicial notice of factual information found on Internet websites" when the websites are submitted to the district court).[22]

A report from NASA's own Inspector General ("IG") further undercuts NASA's litigation position regarding delay.  NASA's schedule, for various parts of the Artemis program, has been delayed for reasons independent of the HLS Option A contract award, which have nothing to do with this protest.  For example, NASA's IG has concluded in a report issued August 10, 2021, that due to NASA's inability to complete development of new spacesuits, among other delays, a lunar landing in late 2024 "is not feasible" since the suits will not be ready until April 2025 "at the earliest":

> That said, NASA's inability to complete development of xEMUs for a 2024 Moon landing is by no means the only factor impacting the viability of the Agency's current return-to-the-Moon timetable.  For example, our previous audit work identified significant delays in other major programs essential to a lunar landing, including the Space Launch System rocket and Orion capsule.  Moreover, delays

---

[22] SpaceX's suggestion that NASA need not comply with procurement law because a report from military personnel stating that China wants to return to the Moon in 2035 is irrelevant to whether NASA's arbitrary and capricious actions caused irreparable harm to Blue Origin.  See SpaceX Br. at 72.  Moreover, the document explicitly disclaims being the position of the United States government or as containing any endorsement by NASA, and offers zero value as to purported harm to NASA.  See State Of The Space Industrial Base 2020: A Time For Action To Sustain US Economic & Military Leadership In Space 2, 11 (July 2020), at http://aerospace.csis.org/wp-content/uploads/2020/07/State-of-the-Space-Industrial-Base-2020-Report_July-2020_FINAL.pdf.  Finally, the report does not make any mention of NASA or offer evidence of why it is "no secret" that HLS is a national security interest.

related to lunar lander development and the recently decided lander contract award bid protests will also preclude a 2024 landing.

NASA Office of Inspector General, <u>NASA's Development of Next-Generation Spacesuits</u>, NASA (Aug. 10, 2021) https://oig.nasa.gov/docs/IG-21-025.pdf at 3. Moreover, the NASA IG found that this was not the only factor impacting the Agency's return to moon timetable and that significant delays in other major programs essential to a lunar landing also impacted the landing schedule. The Court may take judicial notice of this report. <u>See, e.g.</u>, <u>Confidential Informant 59-05071 v. U.S.</u>, 134 Fed. Cl. 698, 721 (2017) (taking judicial notice of Inspector General report), <u>aff'd</u>, 745 F. App'x 166 (Fed. Cir. 2018). At best, NASA's 2024 schedule is unrealistic and merely "aspirational." Accordingly, the balance of hardships weighs in Blue Origin's favor.

Finally, the Government's central argument that it would be harmed by a delay in performance of the Solicitation carries little to no weight, and is an issue that NASA both created and could resolve. Requiring an agency to conduct a procurement properly "is not a hardship, but an obligation." <u>Green Tech. Group, LLC v. U.S.</u>, 147 Fed. Cl. 231, 246 (2020). Any hardship the Agency faces results from its own actions. SpaceX's position that it should not be enjoined, even if "Blue Origin is entitled to some remedy," ignores the fact that SpaceX – as NASA's contemporaneous documents state – submitted a non-compliant and unawardable proposal.

### (c) Injunctive Relief is in the Public Interest.

NASA's assertions of a purported public interest in going back to the Moon as part of the Artemis program do not overcome the public interest in procurement law being followed, nor do they overcome the admissions of NASA's administrator that the Artemis program will proceed (without regard to the outcome in litigation). <u>See</u> <u>Nelson Remains Confident Regarding Funding for Artemis</u>, <u>supra</u>. The public interest is best served by requiring NASA to follow federal procurement law. <u>Medline Industries</u>, 2021 WL 3483429, at *14 (rejecting agency's argument

69

regarding public interest against an injunction and explaining that "[t]he public also has a strong interest in preserving the integrity of the procurement process."). Allowing NASA's award decision to stand would "'destroy the public trust in government contracting and deprive the government of the benefits of full and open competition.'" Green Tech. Grp., LLC, 147 Fed. Cl. at 246 (quoting HP Enter. Servs., 104 Fed. Cl. at 246); CliniComp, 117 Fed. Cl. at 747.

## III.    CONCLUSION

For the above reasons, Blue Origin respectfully requests that the Court grant Blue Origin's Motion for Judgment on the Administrative Record, grant its request for a declaratory judgment that the HLS Option A award to SpaceX was unlawful, enjoin the performance of that contract, and grant all such further and appropriate relief as the Court deems appropriate.


October 13, 2021                                          Respectfully submitted,

                                                         _____
*Of Counsel:*                                            Scott E. Pickens
Scott Godes                                              Barnes & Thornburg LLP
Matthew Michaels                                         1717 Pennsylvania Avenue, N.W., Suite 500
Barnes & Thornburg LLP                                   Washington, DC 20006-4623
1717 Pennsylvania Avenue, N.W., Suite 500                Phone:  (202) 371-6349
Washington, DC 20006-4623                                Email:  (Scott.Pickens@btlaw.com)
                                                         *Counsel of Record for Plaintiff Blue Origin*