**REDACTED VERSION**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

| | |
|---|---|
| BLUE ORIGIN FEDERATION, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| THE UNITED STATES, ) | Case No. 1:21-cv-01695-RAH |
| ) | Judge Richard A. Hertling |
| Defendant, ) | |
| ) | ████████████ |
| and ) | |
| ) | |
| SPACE EXPLORATION ) | |
| TECHNOLOGIES CORP., ) | |
| ) | |
| Defendant-Intervenor. ) | |
| ) | |

### DEFENDANT-INTERVENOR'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

*Of Counsel:*

Mark D. Colley
Nathaniel E. Castellano
Thomas A. Pettit
Aime JH Joo
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

Kara L. Daniels
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Phone:  (202) 942-5768
Fax:  (202) 942-5999

*Attorney of Record for Space Exploration Technologies Corp.*

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     QUESTIONS PRESENTED................................................................................. 6

III.    STATEMENT OF RELEVANT FACTS ............................................................ 7

        A.      The NASA Three-Phased, Separate HLS Acquisition Strategy ............................ 7

        B.      The Option A BAA Solicitation ................................................................... 9

        C.      Option A Milestone Review Provisions And Payment Milestones. ..................... 11

        D.      SpaceX's Proposed DCR and FRR Approach........................................................ 13

        E.      NASA Evaluation of the SpaceX and Blue Origin Proposals. ............................ 17

        F.      Initial Selection and Post Selection Negotiations After the Evaluation
                Closed. ................................................................................................. 20

        G.      The SSA's Decision To Make Only One Award To SpaceX................................ 23

IV.     STANDARD OF REVIEW ................................................................................ 25

V.      BLUE ORIGIN FAILS TO DEMONSTRATE THE PREJUDICE NECESSARY
        TO ESTABLISH STANDING, MUCH LESS SUCCESS ON THE MERITS. .............. 26

        A.      Blue Origin's Approach Exceeds NASA's Appropriations And Budget. ............ 29

        B.      Blue Origin Cannot Submit A Viable Alternative Proposal With A
                Substantial Chance For An Option A Contract........................................................ 32

VI.     THE COURT SHOULD GRANT JUDGMENT IN FAVOR OF DEFENDANT
        AND DEFENDANT INTERVENOR ................................................................. 38

        A.      Blue Origin's Milestone Review Based Allegations Misread the Option A
                BAA, Are Untimely Solicitation Challenges, And Fail For Lack Of
                Prejudice. .............................................................................................. 38

                1.      SpaceX's Single FRR Payment Milestone, Proposed Two Weeks
                        Prior To the Launch of HLS Starship, Complies With The Option A
                        BAA. ..................................................................................... 39

                2.      Blue Origin's Further Objections To SpaceX's Supposed Failure To
                        Propose Other Required Pre-launch Reviews Are Also Incorrect........... 46

                3.      Blue Origin Raises An Untimely Challenge To The BAA Terms........... 48

4. Alternatively, to the Extent There is Any Discrepancy Between SpaceX's Proposed Approach and the FRR Instructions, NASA Reasonably Assigned a Single Weakness That Had No Impact on SpaceX's Outstanding Management Approach..........................................51

5. Blue Origin Was Not Prejudiced By NASA's Evaluation Of FRRs and Other Reviews....................................................................58

B. Blue Origin's Unequal Discussions Arguments Are Untimely Challenges To The Solicitation Terms. ......................................................................59

C. Blue Origin's Argument That NASA Was Required To Amend The Solicitation Is Untimely And Incorrect. ...........................................................62

1. Blue Origin Untimely Challenges The Solicitation Ground Rules...........63

2. Any Challenge Relating To NASA's HLS Appropriation Had To Be Filed Before Award..............................................................................66

3. NASA Has No Obligation To Make Multiple Awards............................67

4. FAR 15.206 Does Not Apply To The Option A BAA, And Would Not Require Amendment In Any Event...................................................67

D. The Court Need Not Address Blue Origin's Breach Of Contract Claim. .............69

VII. THERE IS NO BASIS TO ENJOIN NASA'S OPTION A AWARD TO SPACEX. ..........................................................................................................70

VIII. CONCLUSION.............................................................................................73

# TABLE OF AUTHORITIES

CASES                                                                      Page(s)

*10 Tanker Air Carrier, LLC v. United States*,
  __ Fed. Cl. __, 2021 WL 3828652 (Aug. 27, 2021) ..............................................51

*Am. Safety Council, Inc. v. United States*
  122 Fed. Cl. 426 (2015) ..........................................................................................67

*Banknote Corp. of Am. v. United States*,
  365 F.3d 1345 (Fed. Cir. 2004)..............................................................................40

*Bean Stuyvesant, L.L.C. v. United States*,
  48 Fed. Cl. 303 (2000) ...........................................................................................26

*Blue & Gold Fleet, L.P. v. United States*,
  492 F.3d 1308 (Fed. Cir. 2007)..................................................................... *passim*

*CliniComp Int'l., Inc. v. United States*,
  904 F.3d 1353 (Fed. Cir. 2018)........................................................................27, 36

*COMINT Sys. Corp. v. United States*,
  700 F.3d 1377 (Fed. Cir. 2012)........................................................................66, 67

*Cont'l Serv. Grp., Inc. v. United States*,
  722 Fed. Appx. 986 (Fed. Cir. 2018) .....................................................................73

*E.W. Bliss Co. v. United States*,
  77 F.3d 445 (Fed. Cir. 1996)............................................................................31, 55

*Eskridge & Assocs. v. United States*,
  955 F.3d 1339 (Fed. Cir. 2020)........................................................................27, 33

*Gen. Dynamics Mission Sys., Inc. v. United States*,
  137 Fed. Cl. 493 (2018) .........................................................................................55

*GEO Grp., Inc. v. United States*,
  100 Fed. Cl. 223 (2011) .........................................................................................70

*Glenn Def. Marine (Asia) PTE, Ltd. v. United States*,
  97 Fed. Cl. 311 (2011) ...........................................................................................67

*HVF W., LLC v. United States*,
  846 F. App'x 896 (Fed. Cir. 2021)...................................................................27, 36

*iAccess Techs., Inc. v. United States*,
  143 Fed. Cl. 521 (2019) ...................................................................................26, 70

*Impresa Construzioni Geom. Domenico Garufi v. United States,*
  238 F.3d 1324 (Fed. Cir. 2001)............................................................................25

*Inserso Corp. v. United States,*
  961 F.3d 1343 (Fed. Cir. 2020).......................................................................49, 66

*Kinemetrics, Inc. v. United States,*
  __ Fed. Cl. __, 2021 WL 4237169 (Sept. 10, 2021).......................................26, 68

*Medline Indus., Inc. v. United States,*
  __ Fed. Cl. __, 2021 WL 3483429 (July 30, 2021) ............................................70

*Oak Grove Techs. LLC v. United States,*
  __ Fed. Cl. __, 2021 WL 3627111 (Aug. 2, 2021) ............................................27

*Office Design Grp. v. United States,*
  951 F.3d 1366 (Fed. Cir. 2020).......................................................................27, 69

*Omega World Travel, Inc. v. United States,*
  54 Fed. Cl. 570 (2002) ........................................................................................67

*Orbital Maint. & Constr. Co. v. United States,*
  145 Fed. Cl. 71 (2019) ........................................................................................27

*Per Aarsleff A/S v. United States,*
  829 F.3d 1303 (Fed. Cir. 2016).......................................................................49, 51

*Safeguard Base Operations, LLC v. United States,*
  989 F.3d 1326 (Fed. Cir. 2021)................................................................26, 40, 70

*SAGAM Securite Senegal v. United States,*
  __ Fed. Cl. __, 2021 WL 3140559 (June 25, 2021)............................................69

*SOS Int'l LLC v. United States,*
  127 Fed. Cl. 576 (2016) ......................................................................................28

*Tolliver Group, Inc. v. United States,*
  151 Fed. Cl. 70 (2020) ...................................................................................61, 62

*Wavelink, Inc. v. United States,*
  No. 20-749C, 2021 WL 2762814 (June 24, 2021) ...........................................33, 62

*WellPoint Military Care Corp. v. United States,*
  953 F.3d 1373 (Fed. Cir. 2020).......................................................................26, 27

*Winter v. National Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)................................................................................................72

**STATUTES**

10 U.S.C. § 2305 ................................................................................................34, 61

28 U.S.C. § 1491 ....................................................................................25, 27, 70, 72

31 U.S.C. § 3556 ........................................................................................................43

**REGULATIONS**

48 C.F.R. § 6.102 ......................................................................................................61

48 C.F.R. § 6.401 ......................................................................................................61

Pursuant to Rule 52.1(c) of this Court's rules, Defendant-Intervenor Space Exploration Technologies Corp. ("SpaceX") hereby files this Cross-Motion for Judgment on the Administrative Record ("MJAR").  As demonstrated herein, the National Aeronautics and Space Administration ("NASA") complied with the law and Broad Agency Announcement No. NNH19ZCQ001K ("Option A BAA") in awarding the initial Human Landing System demonstration mission and requirements development and design Option A contract to SpaceX. The Complaint made by Blue Origin Federation, LLC ("Blue Origin") lacks factual and legal merit in all respects.  The Court, accordingly, should grant judgment in favor of the Defendant and Defendant-Intervenor, and dismiss or deny the claims asserted in Blue Origin's Complaint.

## I.      INTRODUCTION

NASA contracted with three firms in April 2020 to begin developing a Human Landing System ("HLS"), which will transport crew from a Moon-orbiting platform to the lunar surface and back.  As those "Base Period" contracts were winding up, NASA conducted a competition among those three firms for an "Option A" contract to continue HLS development through to a manned lunar landing.  SpaceX won that competition going away, being both the most highly rated and lowest priced.  And low price by a tremendous margin—a little less than half as much as Blue Origin's next lowest price ($2,941,392,557 vs. $5,995,463,651).  SpaceX was uniquely able to offer NASA that "abundant value" because "SpaceX plan[ned] to self-fund and assume financial risk for over half of the development and test activities as an investment in its architecture."  (AR Tab 77, Source Selection Statement at 63049.)  The Source Selection Authority ("SSA") recognized this SpaceX contribution as "a substantial commitment to the success of HLS public-private partnership … and SpaceX's commitment to commercializing technologies and abilities developed under the Option A contract."  (*Id.*)

Although NASA had hoped to award two Option A contracts, significantly reduced Congressional appropriations (which were just barely enough to cover SpaceX's price), together with the significant prices of the other offerors, led NASA to make the one award to SpaceX, consistent with the solicitation ground rules.  Furious that it also did not get an Option A contract, Blue Origin has launched a vigorous legal, public relations and lobbying effort to change the outcome.  It presented 30 protest grounds to GAO, and after succeeding with none of them, is trying again here.  Blue Origin's protest gives new meaning to the adage "making mountains out of molehills."  Its principal argument is that the Option A award should be overturned and SpaceX deemed ineligible because of a milestone scheduling issue that NASA evaluators called a "relatively minor" weakness.  Notably, that issue arose in connection with the evaluation of SpaceX's management approach, which was otherwise evaluated with the highest possible rating of "Outstanding."  (AR Tab 59c, SpaceX SEP Report at 62806.)

According to Blue Origin, SpaceX did not propose enough Flight Readiness Review ("FRR") payment milestones, which are required before launch of an "HLS element."  That term is not specifically defined in the Option A BAA.  The plain meaning of the solicitation as a whole makes crystal clear, however, that "HLS element" refers to components of the HLS "Integrated Lander" (any HLS space vehicle that will transport the crew).  Consequently, given its architectural design, SpaceX correctly proposed a single NASA-chaired FRR milestone for its single-element Integrated Lander.[1]  Although SpaceX proposed SpaceX-led FRRs for all other launches, consistent with its established ███████████ practices, Blue Origin insists that, without many more FRR payment milestones, one for each of any other supporting spacecraft in the SpaceX

---

[1] SpaceX's Integrated Lander launches from and returns to Earth in one piece.  Blue Origin's view may be distorted because its proposed lander consists of three separately launched elements that are integrated in space to create the crew-carrying vehicle.

HLS (an orbiting fuel depot and multiple fuel transport tankers), the SpaceX proposal is deficient, rendering SpaceX ineligible for a contract (i.e., the mountain).

As noted, NASA disagreed, contemporaneously and reasonably evaluated SpaceX's FRR milestone approach to be a minor issue posing "relatively minor" risk (i.e., a molehill), and used the very mechanism established in the Option A BAA for just such situations to mitigate the identified risk. (*Id*.) Specifically, ***after*** NASA decided that SpaceX's proposal was both awardable and presented the most highly rated solution at the lowest price, NASA followed the Option A BAA procedures by opening "post-selection negotiations" with SpaceX in order to address two items. (*See* AR Tab 63, Negotiation Letter.)  First, it negotiated with SpaceX to add two more FRR milestones (one each for the depot and a tanker). (*Id*. at 62890.)  Second, SpaceX agreed to further adjust its milestone schedule to better align the periodic payments of its overall fixed price with NASA's fiscal year budget authority. (*Id*. at 62888-89.)  Through these negotiations SpaceX did not reduce its price or otherwise change its proposal, and thus did not modify its competitive position.  The evaluation had closed prior to the negotiations.  Accordingly, contrary to Blue Origin's inaccurate narrative, NASA has not waived or deviated from any solicitation terms, and NASA did not conduct FAR Part 15-like "discussions" with SpaceX.

Blue Origin's challenge to NASA's evaluation and award decision must be rejected for multiple reasons.  To begin with, Blue Origin cannot show that it was competitively prejudiced by the procurement errors alleged.  Even if its objections were correct (they are not), there was never a chance Blue Origin would have been awarded an Option A contract.  Its price was well beyond NASA's available funding.  Recent vague claims that it could or would offer a lower price do not go far enough, even if SpaceX were displaced.  Perhaps most far-fetched is Blue Origin's assertion that, if the Option A BAA were amended to state more explicitly that the FRR milestone

instructions are as SpaceX understood them, then Blue Origin could submit an alternative and lower-priced HLS approach (one strikingly similar to what SpaceX proposed and Blue Origin has publicly denounced as "too risky").  But this is pure fantasy.  The Option A competition—which was only open to Base Period contractors—was integrated with and depended upon those contractors' work under their Base Period contracts, and it is simply too late for Blue Origin to ████████████ an entirely different system.  Because Blue Origin cannot establish any potential that it would ever have a substantial chance for an Option A award, it does not have standing to bring this protest.  But, even if allowed to be heard, all of its protest challenges must be denied for failure to demonstrate competitive prejudice.

All of Blue Origin's claims of any procurement error also fail on the merits against the record facts and well established law.  As explained, the contention that SpaceX's proposal was deficient because of too few FRR milestones is overcome by the plain language in the Option A BAA.  SpaceX was fully compliant.  And, even if one accepts *arguendo* that SpaceX should have proposed fewer of its own FRRs and more NASA-chaired FRR payment milestones, that would not render the SpaceX proposal ineligible for award.[2]  The Option A BAA gave NASA authority and discretion to evaluate any discrepancy with the proposal instructions just as it did, by assigning a Weakness to SpaceX's proposed FRR milestone event, selecting SpaceX's otherwise technically acceptable, Outstanding management proposal for award, and making small contract adjustments thereafter.

---

[2] Nor would it impact SpaceX's proposed price or schedule as Blue Origin errantly repeats throughout its Complaint.  Blue Origin misunderstands that adding FRR payment milestones does nothing to SpaceX's launch cadence or launch preparations.  SpaceX would simply add the payment milestone two weeks before the scheduled launch in its campaign and formalize NASA's participation in the pre-launch review activities already intended.  Neither its Concept of Operations nor its fixed pricing would change.

Blue Origin extends its FRR argument to other pre-launch reviews.  But the Option A BAA also undermines these new challenges.  For the Design Certification Review ("DCR"), solicitation terms comparable to those that implement the FRR milestone lead to the same conclusion that SpaceX was fully compliant.  Any differences between SpaceX's and Blue Origin's approach to the payment milestones related to their different proposed architectures.  The same holds true for Blue Origin's claims about the non-milestone payment reviews covered in Section 10 of the Statement of Work ("SOW").  These reviews relate to the "launch vehicle for transportation of the HLS modules or integrated landing system to orbit"  (AR Tab 27e, Att. G SOW at 33005)—which for SpaceX is its HLS Starship.  SpaceX proposed each review consistent with the SOW timelines and review criteria based on the launch of its single integrated HLS Starship.

Perhaps the most straightforward resolution for all of Blue Origin's launch-review based arguments is to dismiss them as untimely.  Blue Origin claims it would have proposed differently had it understood the Option A BAA did not trigger separate FRR milestones (or other reviews) for supporting spacecraft, but that is exactly what the plain meaning of the solicitation terms communicates.  If Blue Origin truly believed that language was capable of more than one meaning—the one it advocates and claims drove it to a more costly HLS design—then the law obligated Blue Origin to raise that issue well before proposal submission.

Blue Origin offers up two other protest arguments that were denied by the Government Accountability Office ("GAO") and should be rejected again here.  First, Blue Origin claims that NASA's post-selection negotiations with SpaceX were instead improper unequal discussions.  As noted, however, these post-evaluation exchanges were provided for expressly in the Option A BAA, making Blue Origin's objection to NASA having implemented that technique a facially

untimely challenge to the solicitation terms.  (AR Tab 27, Option A BAA at 24434, 24473.)[3] Second, Blue Origin insists that NASA was obligated to amend the Option A BAA once it learned that less than expected Congressional appropriations would preclude more than one Option A contract award.  This is another untimely challenge to the procurement ground rules, which established unequivocally that NASA could award contracts in response to *"multiple, one or none,"* of the proposals, and that the number of awards would depend on still to-be-appropriated funding. (*Id*. at 24481.)[4]  And the change in NASA's expected funding did not trigger an obligation to amend the Option A BAA because it did not change NASA's HLS requirements.  The Option A award to SpaceX is to fulfill the same unchanged Option A BAA objectives and requirements.

Finally, the injunctive remedy Blue Origin seeks is inappropriate because none of its protest grounds are meritorious.  Should the Court nevertheless determine to order any relief, SpaceX's Option A performance should not be enjoined, even if Blue Origin is given some opportunity to pursue a second Option A award.  SpaceX was the legitimate winner of an Option A award in this FAR Part 35 acquisition and should be allowed to proceed with its important work, providing NASA with an "HLS that safely and affordably expedites America's sustainable return to the Moon," and concurrently "prove capabilities that will advance exploration of Mars."  (AR Tab 34, SpX Vol. I at 54980.)

## II.   QUESTIONS PRESENTED

1.   Whether Blue Origin lacks standing and/or any entitlement to relief because, even accepting the alleged procurement errors, Blue Origin has no substantial chance of award.

---

[3] Unless otherwise noted, all citations to the Option A BAA are to Amendment 1.

[4] All emphasis of quoted material in this submission is added unless expressly noted.

2.      Whether the Option A BAA calls for NASA-chaired Milestone Payment reviews based on the elements each offeror proposed for its respective HLS Integrated Lander, and if not, then did NASA properly assign an evaluation weakness, and negotiate post-award milestone adjustments with SpaceX consistent with the solicitation?

3.      Whether Blue Origin's allegations that NASA waived the Option A BAA FRR and other milestone review provisions are untimely solicitation challenges that the Court should dismiss.

4.      Must the Court also dismiss as an untimely challenge to the solicitation terms Blue Origin's objection to NASA's decision to make a single Option A award to SpaceX without amending the Option A BAA as an untimely solicitation challenge; even if not, was NASA's decision to make a single Option A award consistent with the solicitation?

5.      Alternatively, to the extent Blue Origin demonstrates any competitively prejudicial error, is Blue Origin entitled to enjoin NASA's award to SpaceX when doing so is not necessary to permit Blue Origin to continue to compete for a second Option A award?

## III.   STATEMENT OF RELEVANT FACTS

### A.      The NASA Three-Phased, Separate HLS Acquisition Strategy

The HLS acquisition is a critical and early component to NASA's *Artemis* program, a public private partnership to develop a landing capability to be demonstrated in the first lunar mission, and evolving to enable human exploration to Mars and beyond.[5]  The HLS acquisition consists of several distinct but related phases: (i) a Base Period award that has already been performed; (ii) the Option A award that is the subject of this protest and covers an HLS for a demonstration lunar

---

[5] Ex. A, ARTEMIS PLAN: NASA'S LUNAR EXPLORATION PROGRAM OVERVIEW 9 (Sept. 2020), at https://www.nasa.gov/sites/default/files/atoms/files/artemis_plan-20200921.pdf.

landing; and (iii) a future Option B award for sustained exploration missions.  (AR Tab 49, 60 Day Briefing at 62409-10.)

NASA awarded Base Period contracts to SpaceX, Blue Origin, and a third contractor (Dynetics) permitting each to begin preliminary design of its unique landing system.  (AR Tab 77, Source Selection Statement at 63038.)  The Base Period performance enabled NASA and the HLS contractors to advance and test their technologies intended for continued development through a demonstration landing under the Option A contract.  (AR Tab 43, HLS Briefing Feb. 2021 at 2247 ("NASA … successfully adjudicated hundreds of contractor-specific technical standards during the first three months of the Base Period for use during the second phase of HLS—Option A— saving time in the outyears when needing to focus on hardware."); AR Tab 77, Source Selection Statement at 63038 (noting that Option A contract serves to "further facilitate the rapid development and demonstration" of a landing system to "deliver the first woman and person of color to the moon.").)

The record confirms that NASA expected Option A proposals to build and improve on their base year performance.  For instance, NASA limited the Option A competition to the Base Period contractors  (AR Tab 27, Option A BAA at 24433 ("eligibility" requirements)), and included Base Period performance as an evaluation criterion when determining who would be awarded an Option A contract.  (*Id.* at 24475-77.)  NASA also advised the three HLS contractors, even before issuing the Option A BAA, that a subset of the deliverables for the Base Period milestone Continuation Review "will also comprise a portion of your firm's Option A proposal."  (AR Tab 12a, CR Guidance at 317; AR Tab 27, Option A BAA at 24437-39 (noting Volume IV Proposal Attachments with Base Period deliverable numbers).)   During the Base Period, NASA "dispositioned and approved the final list of standards uniquely applicable" to each contractor's

HLS solution, and required each offeror to "use these standards in preparing the Option A proposal." (AR Tab 27, Option A BAA at 24443.)

**B.    The Option A BAA Solicitation**

To enable each contractor to propose its most innovative lander solution, NASA broke from the familiar strictures of FAR Part 15 and solicited the Base Period and Option A awards, respectively, using the Broad Agency Announcement "other competitive procedure" in FAR 6.102(d)(2) and FAR 35.016. (*Id.* at 24473.) The Option A BAA thus contains a minimal set of overarching functional performance requirements that all solutions had to meet in order to satisfy NASA's minimum needs, and incorporated as Option A requirements the final adjudicated standards that had been developed uniquely for each Base Period contractor. (*Id*. at 24443.) Correspondingly, the Option A BAA requires each offeror to develop, and submit, as a proposal attachment, its own Performance Work Statement ("PWS"), documenting innovative approaches and cost effective solutions to meet the objectives that NASA defined in the SOW, Attachment G to the Option A BAA. (*Id*. at 24467.)

The Option A BAA advises that "NASA [would] not conduct a comparative assessment and trade-off amongst proposals. Rather, each proposal [would] be evaluated on its own individual merits." (*Id*. at 24473.) The ground rules state: "[T]he primary basis for selecting one or more proposals for award shall be technical, importance to the Agency's programs, and funds availability," as delineated through the evaluation factors. (*Id*. at 24475.) The Option A BAA identifies three evaluation factors, listed in descending order of importance: 1) Technical Approach, 2) Total Evaluated Price, and 3) Management Approach. (*Id*.) Factors 1 and 3 when combined are significantly more important than Factor 2, and are divided into several "Areas of Focus":

9

| Evaluation Factor | Area of Focus |
|---|---|
| **Factor 1: Technical Approach** | Technical Design Concept |
| | Development, Schedule, and Risk |
| | Verification, Validation, and Certification |
| | Insight |
| | Launch and Mission Operations |
| | Sustainability |
| | Approach to Early System Demonstrations |
| **Factor 2: Total Evaluated Price** | No focus areas |
| **Factor 3: Management Approach** | Organization and Management |
| | Schedule Management |
| | Risk Reduction |
| | Commercial Approach |
| | Base Period Performance |
| | Small Business Subcontracting Plan |
| | Data Rights |

(*Id.*)  The Areas of Focus are "considered as approximately of equal importance within their respective Factor" and are not assigned their own adjectival ratings, but are, instead, "considered in totality to arrive at a single adjectical rating for each factor." (*Id.*)

While NASA hoped to have sufficient funding to make two Option A awards, the Option A BAA makes clear that NASA's ability to make even one award depended on future appropriations.  Most prominently, the Option A BAA Section 6 "Award Information" identifies available funding as a relevant factor for NASA's ultimate determination to make one, two, or no awards, and advises that NASA's ability to make any Option A award is contingent upon funds availability.  (*Id.* at 24481.)

Consistent with NASA's need to negotiate individual solutions, the Option A BAA authorizes the SSA to "make initial, non-binding selections of an Offeror or Offerors for the purpose of having the Contracting Officer engage in post-selection negotiations." (*Id.* at 24480.)  The Option A BAA defines post-selection negotiations as "exchanges with Offerors who have been selected for potential contract award that result in the Contracting Officer inviting the Offeror

to revise only those specific portions of its proposal that have been identified by the Contracting Officer as open to revision." (*Id*. at 24434.) The Option A BAA also authorizes the Contracting Officer to "negotiate any aspect of an Offeror's milestone payment amounts, schedule, and/or acceptance criteria prior to award of Option A." (*Id*. at 24467; AR Tab 108b55, Supp. COSF at 104673-75 (describing purpose of post-selection negotiations).)

### C.   Option A Milestone Review Provisions And Payment Milestones.

The SOW contemplates that offerors will complete various milestone reviews—some led by the contractor and others led by NASA—leading up to the demonstration mission, and the solicitation ties some, but not all, of these reviews to an offeror's proposed payment milestones. (AR Tab 27e, Att. G SOW at 32964-66; AR Tab 27k, Att. O Milestone Payment Schedule at 33187.) Relevant here, a NASA-chaired FRR and DCR are addressed in SOW Section 5, "Milestone Reviews," have "Data Requirements Descriptions" ("DRDs") as deliverables, and are tied to contract payment milestones. (AR Tab 27e, Att. G SOW at 32966, 32969, 32972; AR Tab 27k, Att. O Milestone Payment Schedule at 33187.)

The DCR "milestone *should* be completed at first HLS launch - 9 Months (L-9)," and the "FRR *should* be completed by two (2) weeks before launch of each HLS element." (AR Tab 27e, Att. G SOW at 32969, 32972.) Per the SOW, "[s]hould denotes a statement of best practice or intent" or "[e]xpectation," which NASA contrasts with "[s]hall," which denotes a "[r]equirement." (*Id*. at 32949.) The Option A BAA Attachment O milestone payment template ("Milestone Payment Schedule") confirms that NASA expected the DCR and FRR reviews to be scheduled in relation to the same event: the first launch of an HLS element. (AR Tab 27k, Att. O Milestone Payment Schedule at 33187.)

11

The DCR serves to ensure "that the qualification and verifications demonstrate design compliance with the functional and performance requirements and human spaceflight certification."  (AR Tab 27e, Att. G SOW at 32969.)  The NASA-chaired FRR milestone "examines tests, demonstrations, analyses, and audits that determine the system's readiness for a safe and successful flight or launch and for subsequent flight operations." (*Id*. at 32972-73.)  The SOW specifies "Acceptance Criteria" against which NASA will determine if the contractor has met the objective and is entitled to payment.  (*Id*. at 32969-73.)  The DCR payment milestone acceptance criteria do not mention support spacecraft (*id*. at 32969-71), while the NASA-chaired FRR milestone includes the following as the first of fourteen acceptance criteria: "The flight vehicle, launch vehicle, and support spacecraft (such as propellant storage, propellant transfer, and/or upper stage vehicles that provide transportation capabilities beyond the standard for orbit insertion) are ready for flight." (*Id*. at 32972.)  In other words, assessing the readiness of associated vehicles and support spacecraft will be part of the NASA-chaired FRR for the "HLS element."

Other reviews raised in Blue Origin's Complaint—Mission Specific Preliminary Design Review, Mission Specific Critical Design Reviews, and System Acceptance Review—are addressed in SOW Section 10 relating to "Launch Vehicle Processing, Integration, and Operations," more specifically, the "launch vehicle service for transportation of HLS module(s) or integrated landing system to lunar orbit," and are not directly tied to payment milestones.  (*Id*. at 32944-45, 33005, 33009, 33010; AR Tab 27k, Att. O Milestone Payment Schedule at 33187.)

The Option A BAA does not define the term "HLS element," but as detailed in the argument below, the Solicitation provisions read together show that an HLS element is not synonymous with Supporting Spacecraft.  Rather, the definitions of "HLS," "Integrated Lander," and "Supporting Spacecraft," as well as other Option A BAA provisions, confirm that "HLS

element" denotes an element of the Integrated Lander (which may consist of a single or multiple elements), and the lander and its elements, by definition, are not the Supporting Spacecraft.  (*See e.g.*, AR Tab 27e, Att. G SOW at 32948.)  During Q&A exchanges, NASA confirmed that offerors should read "HLS" to mean the "HLS Integrated Lander" for the Option A deliverables unless otherwise "explicitly identified."  (AR Tab 20, Q&A Log at 448.)

### D.      SpaceX's Proposed DCR and FRR Approach

Rather than proposing a multi-element lander (e.g., ascent element, descent element, transfer element),[6] SpaceX's single-element lander—the HLS Starship—will travel from Earth to the lunar surface and back.  (AR Tab 34d.55, SpX Vol. IV, Att. 23a at 56277 (describing advantages of single element architecture).)  SpaceX also proposed two supporting spacecraft— the depot and tanker vehicles—which aggregate and store propellant for the lunar mission well in advance of need.  (*Id*. at 56274; AR Tab 34a, SpX Vol. I at 55037.)

Given its single element Integrated Lander, the HLS Starship, and consistent with the Option A BAA instructions, SpaceX proposed to complete the DCR and FRR milestone payment reviews based on the launch date of the HLS Starship.  (AR Tab 34d.32, SpX Vol. IV, Att. 12 Review Plan at 55425, 55426.)  More specifically, SpaceX scheduled its DCR milestone payment review nine months prior to the HLS Starship launch and the FRR milestone payment review two weeks prior to that launch.  (*See id.* at 55425, 55426; AR Tab 34d.33, SpX Att. 13 Milestone Schedule at 55430.)  SpaceX's PWS descriptions of these payment milestone reviews also directly correlates to the Option A BAA SOW, including the acceptance criteria.  (AR Tab 34d.34, SpX

---

[6] The HLS is responsible for, among other things, "descent to the lunar surface" and "ascent from the lunar surface and safe return of the crew...." (AR Tab 27e, Att. G SOW at 32986.) While SpaceX proposed a single element design, Blue Origin's approach, ever since competing for the base period contract, has involved a three element architecture (one each for transfer, descent, and ascent). (*See* AR Tab 9, HLS Overview at 266-69, 274-77.)

13

Vol. IV Att. 14 PWS at 54463-65.)  SpaceX thus expressly proposed to include in the scope of the

FRR payment milestone whether supporting spacecraft were ready.  (*Id.*; *see also* AR Tab 34.d.32,

SpX Vol. IV, Att. 12 Review Plan at 55426.)

 In addition to the NASA-chaired payment milestone reviews, SpaceX proposed a mission

development strategy ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████  (AR Tab 34d.32, SpX Vol. IV, Att. 12 Review Plan at 55413.)

Specifically, SpaceX proposed a number of early test and flight milestones for its HLS Starship,

Tanker, and Depot vehicles, explaining:



(*Id.*)  For these SpaceX-defined reviews, SpaceX proposed █████████████████████

██████████████████████████████████████████████████████.

████████████████████████████████████████████

████████████████████████████████

(*Id.* at 55414.)   These reviews include, but are not limited to, ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████. (*Id.* at 55414-27.)

SpaceX also proposed its established ██████████████████████████

██████████████████████████████████████████ shows FRRs

for each SpaceX launch.  (AR Tab 108a-90, SpX Vol. IV, Att. 8 VVCP at 125411-12 ████████

████████████████████████████████████████████████████████

████████;[7] *id*. at 125429 (offering ████████████ NASA participation in flight readiness and

launch readiness reviews ████████████████); *see also* AR Tab 108b55, Supp. COSF

at 104682 (Contracting Officer describing SpaceX FRRs and explaining "not only is SpaceX

performing a wide breadth of readiness reviews, but its proposal ████████████████

████████████████████████████████████████████████████████

████████).)

SpaceX's ██████████████████ bears responsibility for managing these SpaceX

readiness reviews, ██████████████████████████████████████████

██████████████████████████ (AR Tab 108a90, SpX Att. 8 VVCP at 125430.)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ In tandem, ██████████████████

████████████████████████████████████████████████████████

---

[7] SpaceX has cited to the version of its proposed VVCP plan (SpaceX Proposal Vol. IV Attachment
8) included in the GAO record because there was a copying error with the version included at AR
Tab 34d.27; only the first page was included.

████████████████████████████████████████████████████████
████████████████████████████████████████████



██████████████████████   (AR Tab 34d.50, SpX Vol. IV, Att. 20 PMP at 55997.)   ████████

The SpaceX Project Management Plan also describes SpaceX's Flight Readiness approach for Option A performance, explaining that SpaceX will employ its established Launch Readiness process "████████████████████████████████████████." (*Id*. at 56016.)  This process ████████████████████," and includes ████████████████████████████████████████████████████████████████████████████████" (*Id*.)   Under this SpaceX process, ████████████████████████████████████████████████████████████████████████████

Thus, contrary to Blue Origin's Complaint, SpaceX's proposal was not "missing fifteen FRRs" (Compl. ¶ 91); SpaceX proposed "pre-ship reviews, design reviews, test and flight readiness reviews, and post-flight reviews with NASA participation," for all HLS launches.  (AR Tab 34d.50, SpX Vol. IV, Att. 20 PMP at 56018.)  SpaceX, however, only proposed the HLS Starship FRR as a payment milestone review consistent with the Option A BAA.  Given that FRRs are part and parcel of SpaceX's launch operations for every launch, including those proposed for Option A performance, Blue Origin's speculation that SpaceX's schedule or fixed price would change by making these reviews "milestone payment" reviews is not only unsupported, it is

16

incorrect.  There are no "missing FRRs" and there is no "programmatic and schedule risk."  (*Cf.* Compl. ¶ 91.)  This is made clear by the fact that when NASA requested SpaceX add two FRRs to its payment milestones during the post selection negotiations, those additions had no impact on either SpaceX's proposed approach or price.  (*See e.g.*, AR Tab 68, Revised Prop. Cover Letter at 62903 ███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████.)

### E.    NASA Evaluation of the SpaceX and Blue Origin Proposals.

In light of the complex scientific and technological innovations necessary to perform the Option A work and NASA's critical focus on safety, NASA developed a 41-member HLS evaluation team comprising "NASA's top engineers, subject matter experts, and procurement professionals."  (AR Tab 108b25a, COSF at 103488.)  This cross-functional evaluation team has "expertise and experience in a wide variety of subject matter areas, such as avionics, cryogenic fluid management (CFM), mission design, health and medical systems, and safety."  (*Id.* at 103502-03.)

SpaceX's initial proposal earned an Acceptable Technical rating (3 Significant Strengths, 10 Strengths, 6 Weaknesses, and 1 Significant Weakness), an Outstanding Management rating (2 Significant Strengths, 3 Strengths, 2 Weaknesses), and its Total Evaluation Price of $2.941 million was deemed reasonable and balanced.  (AR Tab 52c, Evaluation Briefing to SSA at passim.) NASA's Source Evaluation Panel ("SEP") found that SpaceX's technical approach offered "several notably attractive attributes, including its large single-stage HLS integrated lander design that appreciably exceeds most initial requirements, as well as many sustaining requirements."  (*Id.* at 62569.)  Among other strengths, the evaluators found that SpaceX's design maintained "healthy

margins and a robust contingency and aborts approach," and SpaceX's "development approach is enabled by a robust plan for testing and demonstration, including its proposal of a comprehensive uncrewed demonstration mission that will occur in time for the offeror to incorporate lessons learned prior to its scheduled crewed mission." (*Id*.) The SEP determined, however, that while the noted strengths demonstrated "meritorious features," they were "tempered" by evaluated risks, principally in SpaceX's concepts of operation. (*Id*.) The evaluators stated: "the offeror's approach to utilizing its complex propulsion system ███████████████████████████████ ████████████, coupled with numerous LEO-based aggregation,[8] propellant transfer, and re-entry events, all of which will be required to achieve the mission, add considerable risk to successful execution." (*Id*.)

Under the Management Factor, the NASA evaluators noted that, based on its single element HLS Starship, SpaceX had proposed a single milestone FRR to occur two weeks before the launch of that Starship as the Milestone Payment Schedule required. But, given that the SpaceX FRR would occur after SpaceX launched its Depot and Tanker support spacecraft, SpaceX's unique single element Integrated Lander approach had the "effect of lessening NASA's involvement and participation in assessing flight readiness for the offeror's supporting spacecraft prior to launch of such spacecraft." (AR Tab 59c, SpaceX SEP Report at 62806, 62812-14.) The SEP determined this situation presented some added risk, and assigned SpaceX's proposal a Weakness. (*Id*. at 62812-14.) The SEP contemporaneously described this finding as one of two "relatively minor" Weaknesses, which were "far outweigh[ed]" by "the abundant benefits provided by the positively evaluated attributes of the offeror's proposal, combined with its assessed High base period

---

[8] LEO refers to Low Earth orbit. *See, e.g.*, NASA website at https://www.nasa.gov/leo-economy/faqs (attached as Ex. B).

performance." (*Id.* at 62806).   Accordingly, the SEP assigned an overall Outstanding rating to SpaceX's Management proposal, describing it as "of exceptional merit" and "***fully responsive to the BAA objectives*** as set forth under this evaluation factor." (*Id.*).

Blue Origin's proposal earned an Acceptable Technical rating (0 Significant Strengths, 13 Strengths, 14 Weaknesses and 2 Significant Weakness), a Very Good Management rating (1 Significant Strength, 2 Strengths, 6 Weaknesses), and its Total Evaluated Price of $5.9█ million was deemed reasonable and balanced, but unawardable without negotiations because Blue Origin had proposed prohibited advance payments.  (AR Tab 52a, Evaluation Briefing to SSA at passim.) The SEP noted that Blue Origin's three element technical approach offered several attractive attributes, ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████.  (*Id.* at 62454.)   But, Blue Origin's technical Strengths were balanced by countervailing Weaknesses, including: "risks to timely development of its complex propulsion ████████████████ systems; a failure to close its communications links; mission timeline challenges; a lack of manual control fault tolerance; and a substantial amount of modifications that will be necessary to evolve the offeror's initial lander to its sustainable lander." (*Id.*).

For Management, the SEP found that Blue Origin's Strengths, combined with its High Base Period performance, outweighed the risks and drawbacks of its data rights and commercial approach Weaknesses.   The evaluators expressed concern that Blue Origin's proposal "lacks evidence on how the offeror's commercial approach will result in long-term affordability for NASA and how it will apply to immediate or future applications for existing or emerging markets beyond just HLS contract performance itself." (*Id.* at 62481.)

**F.      Initial Selection and Post Selection Negotiations After the Evaluation Closed.**

As a result of the initial evaluation, SpaceX earned higher ratings than Blue Origin and Dynetics, and "SpaceX's Total Evaluated Price of $2,941,394,557 was the lowest among the offerors by a wide margin"—half as much as the next most highly rated offeror (Blue Origin) and one-third of the price of the lowest rated offeror, Dynetics.  (AR Tab 77, Source Selection Statement at 63044; AR Tab 61, SSA Selection Mtg. at 62859, 62869, 62879.)  Despite Blue Origin's repeated assertions that NASA found SpaceX's proposal non-compliant, the evaluation record and the SSA's initial selection confirms "the conclusion of the SEP and the CO that SpaceX's proposal, from a solicitation compliance perspective, ***contains no deficiencies or similar errors and is therefore awardable without needing to engage in discussions in order to solicit for a revised proposal***."  (AR Tab 62, Initial Selection. at 62882.)

NASA's available funding, however, was insufficient to make an Option A contract award to any competitor at the prices (and payment schedules) proposed.  (*Id*. at 62882-83.)  Therefore, in accordance with Option A BAA section 6.1, the SSA determined that it was in NASA's "best interest to conditionally select SpaceX's proposal for the purposes of engaging in limited, post-selection price negotiations."  (*Id.* at 62883.)  The SSA reasoned that post-selection negotiations with SpaceX made sense as SpaceX was not only the most highly rated offeror, but SpaceX was the only offeror whose price was remotely close to NASA's budget constraints.  (*Id.* at 62884.)  Negotiations with SpaceX were thus warranted because SpaceX's best and final price would help inform the SSA about "whether it is appropriate to make a final selection of SpaceX's proposal for award and whether the Agency's current budget can potentially support" more than one Option A award.  (*Id*.)

The SSA ultimately decided not to pursue price negotiations with Blue Origin because its price was so far out of line with NASA's funding that doing so would not have been a "good faith" exercise:

> [G]iven NASA's current and projected HLS budgets, it is my assessment that such negotiations with Blue Origin, if opened, would not be in good faith…. NASA cannot reasonably ask Blue Origin to lower its price for the scope of work it has proposed to a figure that would potentially enable NASA to afford making a contract award to Blue Origin. ***As specified in section 6.1 of the BAA, the overall number of Option A awards is dependent upon funding availability; I do not have enough funding available to even attempt to negotiate a price from Blue Origin that could potentially enable a contract award***.

 (AR Tab 77, Source Selection Statement at 63056.)  In response to similar complaints by Blue Origin challenging NASA's decision to hold negotiations with SpaceX only, GAO found this SSA decision to be a reasonable exercise of her discretion:

> The SSA here concluded that SpaceX submitted a strong technical proposal with a fair and reasonable price that was largely consistent with NASA's available and anticipated funding for the HLS program.  In this regard, the agency concluded that it was not "insurmountable" to negotiate with SpaceX ….  In contrast, the SSA concluded that it was implausible for Blue Origin ($5.995 billion) and Dynetics ($9.082 billion) to materially reduce their significantly higher total proposed prices without material revisions to their respective technical and management approaches, or to shift their respective proposed FY2021 milestone payments to meet NASA's FY2021 budget (for Blue Origin, it would need to shift approximately ████████, or approximately ████████ of its total proposed price)

(AR Tab 108b67a, GAO Decision at 105032-33.)

At the time of the initial selection, the SSA sought input from the HLS Program Manager, about the scope of the post-selection negotiations, and as the Contracting Officer reported, the Program Manager explained that "as a matter of effective program management, her *preference* would be to personally have … approval authority before SpaceX began its Tanker Starship and Depot Starship launch campaign," and therefore she asked that the negotiations include requests to add a NASA-chaired FRR milestone prior to the initial Tanker and Depot Starship launches.

21

(AR Tab 108b55, Supp. COSF *Id.* at 104687.)  Given that the Option A BAA provides broad post-selection negotiation authority and expressly reserves NASA's "right to negotiate any aspect of an Offeror's milestone payment amounts, schedule, and/or acceptance criteria prior to award," the Contracting Officer obliged.  (AR Tab 27, Option A BAA at 24434, 24467.)

On April 3, 2021, the Contracting Officer wrote to SpaceX asking that it address the "firm's price- and milestone-related issues."  (AR Tab 63, Negotiation Letter at 62886.)  Emphasizing the definition of "HLS" and not an "element," the Contracting Officer asked SpaceX to add FRRs—one to occur two weeks before launch of the first Tanker Starship, another to occur two weeks before launch of the first Depot Starship, along with a third optional set of "delta-FRRs" in the event any flight readiness issues arise.  (*Id.* at 62889.)  In approaching the negotiations with SpaceX, the Contracting Officer admittedly "employed the commonly-used negotiation tactic to present or take an extreme position (in this case, sixteen FRR milestones) in order to persuade the other party to agree to a middle-ground, compromise position."  (AR Tab 108b55, Supp. COSF at 104694.)  SpaceX made the changes that NASA requested, and the addition of the NASA-requested FRR payment milestones did not increase SpaceX's price or cause any other change to its approach, given that SpaceX's approach already anticipated comparable pre-launch reviews. (AR Tabs 194-200.)  SpaceX also adjusted the timing of its payment milestones to accommodate NASA's budget constraints, but did not reduce it fixed price.  (*Id.*)

NASA followed the Option A BAA's post-selection negotiation process, and those negotiations with SpaceX did not affect SpaceX's evaluation:  The SEP and the SSA reasonably evaluated SpaceX's proposal as Acceptable under the Technical Approach factor and Outstanding under the Management Approach factor prior to the post-selection negotiations, and those evaluation findings and ratings did not change after the post-selection negotiations.  (AR

Tab 77, Source Selection Statement at 63049 ("In light of my assessment above, *and in consideration of SpaceX's remaining* evaluation *record pertaining to this factor,* I concur with the SEP that SpaceX's management approach is of exceptional merit and fully responsive to the objectives of the solicitation.").)

### G. The SSA's Decision To Make Only One Award To SpaceX.

Based on the proposal evaluation results, and the available and anticipated funding, the SSA made award to SpaceX, stating that "SpaceX's proposal is meritorious and advantageous to the Agency, and that it aligns with the [solicitation] objectives," and provides "abundant value for NASA at its Total Evaluated Price." (*Id.* at 63049-50.) The SSA's selection decision provides a comprehensive explanation of the decision to select SpaceX alone for an Option A contract award, consistent with the Option A BAA ground rules. Among other technical attributes, the SSA opined that SpaceX's "suite of augmented capabilities and SpaceX's approach to achieving them in a manner that will not comprise its ability to meet NASA's other requirements to be a particularly noteworthy attribute of SpaceX's design with abundant potential benefit for NASA," and found SpaceX's "robust approach to aborts and contingencies to be compelling" because "these "capabilities mitigate risks and increase the likelihood of crew safety during multiple phases of the mission." (*Id*. at 63044-46.) The SSA also found "SpaceX's ability to deliver a host of substantial scientific and exploration-related assets to the lunar surface along with the crew is immensely valuable to NASA," noting this approach "dramatically increases the return on investment in terms of the science and exploration activities enabled." (*Id*. at 63045.) She also praised how SpaceX's initial lander design "largely obviate[s] the need for additional re-design and development work (and appurtenant Government funding) in order to evolve this initial capability into a more sustainable capability," and how SpaceX's robust early system demonstration and ground flight

campaign will "allow SpaceX to isolate and address performance and operational issues early in its development cycle, which will meaningfully inform the maturation of its capability and increase overall confidence in its performance abilities." (*Id*. at 63046-47.)  The SSA concluded that the "significantly enhanced operational flexibility and mission performance that SpaceX offers, and complementary potential for resultant long-term affordability, present immense value for NASA for lunar and deep space exploration activities." (*Id*. at 63046.)

The SSA also considered the "complexity and heightened risk" identified with SpaceX's "notably thoughtful and meritorious" technical approach, including "a significant number of vehicle launches in rapid succession, the refurbishment and reuse of those vehicles, and numerous in-space cryogenic propellant transfer events," and found these concerns "tempered because they entail operational risks in Earth orbit that can be overcome more easily than in lunar orbit, where an unexpected event would create a much higher risk to loss of mission." (*Id*. at 63047.)

The SSA also agreed with the SEP's management evaluation, noting SpaceX's "approach to leveraging its deep bench of personnel and expertise, its prior program management experience, and lessons learned from those experiences that SpaceX will bring to bear in its management of the HLS effort." (*Id*. at 63048.)  The SSA emphasized SpaceX's "effective organizational and management approach to facilitating contract insight," which she found would "effectuate immediate and meaningful insight into SpaceX's vehicles, systems, facilities, operations, and organizational practices, and will also permit NASA insight to evolve as SpaceX's Starship effort evolves." (*Id*. at 63048-49.)  She found that "SpaceX's plans to self-fund and assume financial risk for over half of the development and test activities as an investment in its architecture, which it plans to utilize for numerous commercial applications, present[] outstanding benefits to NASA." (*Id*. at 63049.)  The SSA explained that SpaceX's contribution not only "significantly reduces the

24

cost to the Government," but also evidences SpaceX's "commitment to the success of HLS public-private partnership commercial model and SpaceX's commitment to commercializing technologies and abilities developed under the Option A contract." (*Id*.)

Consistent with the procurement's ground rules providing that proposals were not compared through a best value tradeoff, after selecting SpaceX for award the SSA separately detailed her independent assessment of the Blue Origin and Dynetics proposals, and the decision not to select those proposals for award under the Option A BAA. (*Id.* at 63050-60.) In other words, NASA's decision to make award to SpaceX did not in itself preclude award to Blue Origin or Dynetics. Their high prices, however, did effectively preclude award (and still do). As GAO explained, shortly after submission of initial proposals, Congress enacted HLS appropriations far less than what NASA had requested, leaving NASA without funds needed to make award to either Blue Origin or Dynetics. (AR Tab 108b67a, GAO Decision at 105028-29.) As discussed, *infra*, any Blue Origin contention that it should have been afforded the opportunity to modify its proposal in light of NASA's available FY2021 funding for the HLS program presents an untimely challenge to the Option A BAA terms. (*Id*.)

## IV.   STANDARD OF REVIEW

This Court reviews protests like Blue Origin's under the highly deferential rational basis standard of the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4). A procurement action "may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). In addition, to "prevail in a bid protest, a protestor must show a significant, prejudicial error in the

procurement process." *WellPoint Military Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quotation omitted).

Given the highly deferential rational basis review of procurement decisions, the Court "must sustain an agency action unless the action does not evince rational reasoning and consideration of the relevant factors." *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1343 (Fed. Cir. 2021) (alterations and citations omitted).  Where, as here, "the court must 'review technical matters that are within the agency's expertise, the highest degree of deference is warranted.'" *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303, 319 (2000) (quoting *G.E. Gov't Servs., Inc. v. United States*, 788 F. Supp. 581, 590 (D.D.C. 1992)).

The degree of deference due here is further heightened because, rather than the highly regulated FAR Part 15 competitive negotiation procedures, NASA elected to solicit under the Broad Agency Announcement "other competitive procedure" mechanism pursuant to FAR 6.102(d)(2) and FAR 35.016.  (AR Tab 27, Option A BAA at 24473.)  As Judge Lettow recently held when asked to review the Air Force's use of a Commercial Solutions Offering acquisition method that "resemble[s] broad agency announcements," the court "can only evaluate whether the government followed its own process," and "may not" "substitut[e] its judgment for the agency's on a technical question." *Kinemetrics, Inc. v. United States*, __ Fed. Cl. __, 2021 WL 4237169 at *1, 5, 7 (Sept. 10, 2021).

## V.    BLUE ORIGIN FAILS TO DEMONSTRATE THE PREJUDICE NECESSARY TO ESTABLISH STANDING, MUCH LESS SUCCESS ON THE MERITS.

A protester must establish prejudice at two separate stages: (1) preliminarily to qualify as an interested party with standing, and (2) on the merits in connection with any demonstrated violation of procurement law.  *See iAccess Techs., Inc. v. United States*, 143 Fed. Cl. 521, 528-29

(2019).[9]  In both instances, Blue Origin must show that "but for the error, it would have had a substantial chance of securing the contract."  *See CliniComp Int'l., Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018).[10]  In both stages, prejudice findings are a question of fact reviewed for clear error.  *Id.*; *Office Design Grp. v. United States*, 951 F.3d 1366, 1374 (Fed. Cir. 2020)*.*  "The factors that inform a reviewing court's harmless-error determination are various, potentially involving, among other case-specific factors, an estimation of the likelihood that the result would have been different and an awareness of what body has the authority to reach that result."  *WellPoint*, 953 F.3d at 1380 (quotation and alteration omitted) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 411 (2009)).

While for standing purposes the Court assumes a plaintiff's "well-pled allegations of error to be true," *Oak Grove Techs. LLC v. United States*, __ Fed. Cl. __, 2021 WL 3627111 at *8 (Aug. 2, 2021), numerous cases confirm that vague, unsupported assertions are insufficient to establish the interested party status necessary for standing.  *See CliniComp,* 904 F.3d at 1360-61 (rejecting "vague, cursory references" as insufficient to establish protester had standing); *Eskridge*, 955 F.3d at 1344-46 (no standing where protester failed to "allege prejudice sufficient to require the Contract to be rebid"); *HVF W., LLC v. United States*, 846 F. App'x 896, 898–99 (Fed. Cir. 2021) (no interested party status where protester "only proffers allegations based upon conjecture that are

---

[9] The standing prejudice requirement is derived from this Court's bid protest jurisdiction, while the merits prejudice requirement is an essential aspect of APA review.  *See Eskridge & Assocs. v. United States*, 955 F.3d 1339, 1344 (Fed. Cir. 2020) (discussing interpretation of "interested party" in 28 U.S.C. § 1491(b)); *WellPoint*, 953 F.3d at 1380 (discussing APA harmless error analysis).

[10] The Federal Circuit regularly applies the same substantial chance test when analyzing standing prejudice and merits prejudice.  *Eskridge*, 955 F.3d at 1344–46 (quotation and alteration omitted) (protester lacked standing where it failed to "establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error."); *WellPoint*, 953 F.3d at 1380 (protester cannot succeed on merits without showing a "substantial chance that the [agency official with authority] would have made a different award decision but for the alleged error").

insufficient to show it had a substantial chance of winning the award"); *Orbital Maint. & Constr. Co. v. United States*, 145 Fed. Cl. 71, 76 (2019) ("Allegations of defects in the procurement, supported by only mere speculation, are not enough to confer standing."); *SOS Int'l LLC v. United States*, 127 Fed. Cl. 576, 588 (2016) (finding plaintiff's allegations that it would have been next in line as merely speculative and inadequate to support standing).

Even if this Court were to agree (by preliminary assumption or merits finding) with every one of Blue Origin's alleged violations of law and procurement errors, and even taking as true Blue Origin's vague assertions of how it might amend its proposal or lower its price if given the opportunity, Blue Origin's competitive status remains the same: Blue Origin has no substantial chance of award. As detailed below, Blue Origin's proposed price drastically exceeds NASA's budget constraints, and even Jeff Bezos' mid-litigation promises to waive certain payments do not bridge the gap. Blue Origin vaguely suggests it has some vastly different HLS solution that it did not pursue in the Base Period that purportedly could be proposed at some unspecified lower price (which may or may not meet NASA's budget). Blue Origin's Complaint does not substitute for an actual proposal, and there is no basis to even speculate that Blue Origin could provide all the required proposal deliverables. Nor is there reason to expect that NASA might ever accept such a proposal for this changed system architecture, much less that the non-existent proposal stands a substantial chance of award. Indeed, Strengths assigned in the evaluation of Blue Origins Technical proposal were based on the current three-element approach, and Strengths under the Management Factor were based on the Base Period performance ███████████████████ ███████████████ under Blue Origin's alternative approach. (AR Tab 59a, Bule Origin SEP Report at 62635, 62675.) These fundamental issues preclude any finding for Blue Origin on the merits; and, because the same fundamental problem prevents Blue Origin from establishing a

substantial chance for award under any of its claims, Blue Origin fails even to qualify as an interested party.

### A.    Blue Origin's Approach Exceeds NASA's Appropriations And Budget.

Blue Origin argues that it was prejudiced by NASA's failure to conduct discussions or to amend the Option A BAA to alert offerors that funding limitations would permit only one Option A award.  (Compl. ¶ 50.)  According to Blue Origin, with discussions or an amendment, it would have lowered its price to meet the funding limits.  (*Id.* ¶¶ 111, 114, 157).)[11]  These claims, even if successful, do not demonstrate prejudice.

NASA's funding constraints initially prevented NASA even from affording SpaceX's lowest priced proposal, necessitating post-selection negotiations to adjust SpaceX's proposed milestone payments.  (AR Tab 77, Source Selection Statement at 63039-40.)[12]  "SpaceX's Total Evaluated Price of $2,941,394,557 was the lowest among the offerors by a wide margin" (*id.* at 63044), nearly half of Blue Origin's proposed price of nearly $6 billion.  (AR Tab 61, SSA Selection Mtg. at 62859.)

Blue Origin's $6 billion proposal drastically exceeds NASA's funding.  As GAO recognized, "Blue Origin and Dynetics each respectively proposed FY2021 milestone payments

---

[11]  Blue Origin also asserts that it was prejudiced by lack of discussions with the Agency, contending that it could have "improve[d] its proposal" and "enhanced those aspects of its technical and management proposal rated as having a weakness or significant weakness."  (Compl. ¶111.)  Blue Origin provides no elaboration or specifics, however, about what aspects of its proposal might have been adjusted or how it would have done so in order overcome evaluation concerns.  This hardly amounts to a sufficient showing of how Blue Origin could have moved to a position where it would have a substantial chance for award.  GAO rejected Blue Origin's claims of prejudice associated with alleged misevaluation of its own and SpaceX's proposal, finding that Blue Origin had not shown that its competitive position would have changed even had those errors been corrected.  (AR Tab 108b67a, GAO Decision at 105077-78.)  The same holds true here.

[12]  SpaceX had already been tentatively selected for an Option A award before the post-selection negotiations commenced.  Although SpaceX adjusted its payment schedule as a result of those negotiations, it did not lower its proposed price or change its competitive position.  (Compl.¶ 117) (negotiations with SpaceX "did not result in a lower price but did change some milestone payments.").)  The evaluation had closed prior to the negotiations.

in excess of the entire FY2021 HLS program appropriation…." (AR Tab 108b67a, GAO Decision at 105028.) The record confirms the same. Whereas NASA projected only $328 million and $680 million available for FY21 and FY22 payments, respectively, Blue Origin's proposed expenditures seek more than $███████ in FY21 and another $███████ in FY22. (*Compare* AR Tab 46, HLS Services Options Strategy at 62315, *with* AR Tab 32d.184, BO Expenditure Profile at 41185.)

Given that Blue Origin proposed nearly $██████ in the first two years of performance, Jeff Bezos' mid-litigation public statement to "'waiv[e] all payments in the current and next two government fiscal years up to $2B to get the program back on track'" (Compl. ¶ 111)—not averred to in a signed declaration to this Court—still would not bring Blue Origin's proposed price within NASA's funding constraints, for either the near or long term. Nor can Blue Origin escape the fact that NASA determined that SpaceX offered a better solution.

Even if Blue Origin could demonstrate that NASA engaged in discussions with SpaceX and was required to open equal discussions with Blue Origin, Blue Origin has still failed to carry its burden of demonstrating competitive prejudice. Blue Origin neither contends nor demonstrates that it ever could or would reduce its proposed price to fall within NASA's budget, or how it could have improved its ratings to get in line for the limited funding ahead of SpaceX. And, as addressed below, Blue Origin's freewheeling and speculative suggestion that it would attempt to resubmit an entirely new proposal that might fall within NASA's budget—without sharing how such an alternative theory is even possible or technically feasible under the Option A BAA—does not deserve any credence.

Although not alleged in the Counts of its Complaint, but noted in its allegations, Blue Origin continues to quibble with the NASA evaluators' assignment of technical strengths, asserting that NASA "improperly awarded SpaceX multiple credits for the same positive attributes of its

proposal.  (Compl. ¶ 93.)  These arguments that "deal with the minutiae of the procurement process in such matters as technical ratings" are exactly the type of "discretionary determinations of procurement officials" that the Federal Circuit has summarily rejected and instructed this Court to "not second guess."  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).  The SEP contemporaneously details an overall significant strength under Technical Area of Focus 1 based on SpaceX proposing to exceed NASA's requirements for threshold values in twelve distinct areas.  (AR Tab 59c, SpaceX SEP Rept. at 62779-81.)  Blue Origin takes offense because the SEP Report repeatedly praises SpaceX's payload capacity throughout the significant strength and also assigns a separate strength focused specifically on SpaceX's cargo capacity.  (*Id.*; Compl. ¶ 36.)  The SEP Report speaks for itself, and is imminently reasonable on its face in detailing the numerous, independent benefits that NASA will receive from SpaceX's cargo capacity.  Even if Blue Origin could identify some error in the SEP Report's multiple references to SpaceX's cargo capacity, there is no possibility of prejudicial error, because the SSA herself addressed the multiple benefits of SpaceX's cargo capacity in the selection decision, and specifically explained why it was appropriate for SpaceX to receive the overall significant strength driven by its cargo capacity as well as a "separate strength focused on SpaceX's unique design attributes that enable the creative use of available space…," finding "this specific strength to be noteworthy of its own accord…."  (AR Tab 77, Source Selection Statement at 63045.)  Blue Origin does not attempt to undermine (or even mention) the SSA's contemporaneous explanation justifying the multiple, independent benefits NASA stood to gain from SpaceX's cargo capacity.  And, Blue Origin's disagreement with the reasoned judgments of NASA is not a valid basis of challenge.

Finally, Blue Origin cannot rest on the erroneous notion that it was prejudiced by NASA's failure to disqualify SpaceX because Blue Origin allegedly would be "next in line" for the Option

A award.  (Compl. ¶ 25.)  Any decision to disqualify SpaceX would have been a prejudicial procurement error.  But Blue Origin's $6 million initial proposal was not "next in line" in any event; Blue Origin was out-of-line with NASA's budget, and also required discussions in order to be considered for award given the evaluation finding that Blue Origin had proposed improper "advance payments".  (AR Tab 77, Source Selection Statement at 63054 (noting that, under plain language of the Option A BAA, Blue Origin's initial proposal was "ineligible for contract award without the Government engaging in discussions or negotiations with Blue Origin…."").)  The SSA, however, expressly declined to engage in "negotiations or discussions" with Blue Origin because she determined that its proposal did not otherwise "present a good value to the government."  (*Id*. at 63056-57, n.1.)  In other words, the record makes clear that Blue Origin was not "in line" for award at all.  Accordingly, Blue Origin lacks standing as an interested party (and cannot establish competitive prejudice) and its protest complaint should be dismissed (or denied).

> **B.**    **Blue Origin Cannot Submit A Viable Alternative Proposal With A Substantial Chance For An Option A Contract.**

Regarding Blue Origin's key argument that NASA waived the FRR payment milestone instructions, GAO denied that challenge because, although GAO misinterpreted those instructions, GAO accurately noted that any change to the scope of FRR milestone events for SpaceX had no bearing on Blue Origin's proposed approach, because Blue Origin's architecture consisted of a three-element Integrated Lander and no supporting spacecraft.  (AR Tab 108b67a, GAO Decision at 105077-80.)  Thus, whether or not separate FRR milestone payment events are required for support spacecraft, Blue Origin's proposal would not change.  Attempting to end-run this fatal flaw, Blue Origin now asserts that, had it known NASA would waive any FRR milestones and other reviews for supporting spacecraft, Blue Origin would have proposed an entirely different approach, essentially mimicking SpaceX, to rely on a single-element lander and supporting

spacecraft tankers.  (Compl. ¶¶ 133-34.)  This claim is both preposterous and incredible.  Blue Origin fails to establish that (1) NASA would be under any obligation to permit Blue Origin to submit a completely new proposal, or (2) that Blue Origin's alternative design concept would have anything close to a substantial chance of award.

As Judge Solomson recently detailed in *Wavelink, Inc. v. United States*, where a protester establishes that an agency waived a material solicitation requirement and attempts to demonstrate prejudice based on potential proposal revisions, the protester must establish that the agency is actually obligated to invite such broad proposal revisions.  __ Fed. Cl. __, 2021 WL 2762814 at *31 (June 24, 2021) ("there simply is no concrete, absolute requirement that the government permit offerors to submit a completely new proposal."); *see also Eskridge*, 955 F.3d at 1344-46 (no standing where protester failed to "allege prejudice sufficient to require the Contract to be rebid").  The structure of this procurement essentially precludes Blue Origin from proposing an entirely new approach.

Proceeding under NASA's NextSTEP-2 BAA, Appendix H, NASA limited the Option A BAA competition to the three firms already performing a ***Base Period*** HLS contract in order to select which (if any) might be awarded an Option A contract to continue their HLS development.  (AR Tab 27, Option A BAA at 24429, 24432-33.)[13]  During the Base Period, contractors developed and matured their HLS lander designs, which were the foundation for Option A contract proposals.  (*See* AR Tab 108b25a, COSF at 103489-92.)  Although offerors were not required to propose for the Option A contract the identical system proposed for the Base Period, the idea that a contractor might propose something radically different or that it could start anew and still submit a compliant

---

[13] The Option A award is implemented through bilateral modification of the existing HLS base period contract.  (*Id.* at 24442.)

proposal is absurd.  The solicitation did not provide for new designs to be developed under the Option A contract:  "It is NASA's intent to transition between the Base period and Option A period without any break in contractor performance."  (AR Tab 27, Option A BAA at 24429.)[14]

Further, during the Base Period, NASA worked with each contractor to develop a "final list of standards uniquely applicable to that Contractor's adjusted proposal for Option A."  (*Id.* at 24443.)  These standards, set out in an Attachment F Annex unique to each offeror, became part of the Option A BAA, and offerors were required to use those standard to prepare Option A proposals.  (*Id.*; *see* AR Tab 25a.1, Blue Origin Adjudicated Standards (Att. F, SRD Annex).) NASA designed the HLS Base Period and Option A acquisition strategies so that Option A proposals would benefit from and build on the immense investment that NASA made in each offeror's Base Period efforts. (AR Tab 43, HLS Briefing Feb. 2021 at 2247; *see also* AR Tab 49, 60 Day Briefing at 62408-11 (Base Period work intended for "preliminary design" stage of Option A "demonstration mission").)  The Option A BAA directs that proposals "fully demonstrate that the Offeror understands and can successfully perform the requirements of this solicitation (including, but not limited to, Attachment F – HLS Requirements)."  (AR Tab 27, Option A BAA at 24444.)  Each offeror was required to "provide a detailed description of its proposed HLS design concept, including the current state of design maturity and how that design will meet the requirements as described in the SOW, the HLS Requirements (Attachment F), and other solicitation attachments."  (*Id.* at 24446.)  Blue Origin's Attachment F specifications and standards expressly incorporate its three-element integrated lander design, not some new alternative that

---

[14] Offerors could provide "***updated*** technical and/or management volumes" rather than rest solely on the proposed technical design incorporated into the base period contract. (*Id.* at 24443.)  There is no hint that an entirely new alternative design would be technically acceptable (or eligible for award), and given that the competition was limited to base period contractors, ████████ ████████  ████████            would have run afoul of the Competition In Contracting Act, 10 U.S.C. § 2305.

Blue Origin claims now to contemplate, for which NASA has not adjudicated any specific performance standards.[15]

In short, the Option A proposals were derived from and dependent on the designs and standards developed uniquely for each offeror during the Base Period.  In fact, the Option A proposal deliverables overlap with the Base Period deliverables.  (AR Tab 12a, CR Guidance at 317; AR Tab 27, Option A BAA at 24437-39.)  It is not credible to expect that, at this late stage, Blue Origin could conceivably put forward an entirely different HLS design that would both (i) align with and demonstrate capable performance against the standards that were established uniquely for Blue Origin based on its previously submitted approach, and (ii) be sufficiently complete and mature to permit serious evaluation for contract award (or even eligibility).  Nor is there any reason to expect that NASA would even consider such a move.[16]

Moreover, each Option A proposal was to "demonstrate the Offeror's relevant Base Period performance as an indicator of NASA's confidence in the Offeror's ability to successfully perform a complex spaceflight hardware development effort along with successful demonstration of that hardware," and "Base Period Performance" was a specific area of focus in the evaluation criteria. (AR Tab 27, Option A BAA at 24456, 24458.)  The relevance of that evaluation would be entirely undermined if Blue Origin were now to propose a totally different technical approach ███████ for Option A from what it had pursued during the Base Period.  Whatever positive performance

---

[15] *See, e.g.*, AR Tab 25a.1, BO Adjudicated Standards at 14705 ██████████████████████████
████████████████████████████████████████████ *Id.* at 14708-21 █
████████████████████████████████████████████████████████████ .

[16] Given that the Option A procurement was only open to the base period contractors, it is not certain that ██████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ . (AR Tab 32a, BO Tech. Prop. at 33336.)  Blue Origin has not explained █████████████████████████ .

Blue Origin ████████████████████████████████████████████████████

████████ during the Base Period would not be a rational basis for confidence in Blue Origin's ability

to execute its alternative solution.

     Even if Blue Origin could establish that NASA would be required to permit Blue Origin to

██████████████ propose a different HLS approach to be evaluated for possible award of an Option

A contract, Blue Origin has not come close to demonstrating that an entirely new solution would

have any chance, much less a substantial chance, of securing such an award.  A protester's vague

assertions of its ability to meet an agency's requirements or compete is not enough to establish

prejudice.  *CliniComp* 904 F.3d at 1358-60; *see also HVF W.*, 846 F. App'x at 898-99 (no interested

party status where protester "only proffers allegations based upon conjecture that are insufficient

to show it had a substantial chance of winning the award").

     The evaluation record here confirms that there is significant risk in any offeror proposing

an Option A solution that deviates from what the offeror has already designed and NASA has

already assessed during the Base Period.  This was evident in Dynetics' evaluation when NASA

expressed extensive concerns associated with deviations in the Dynetics Option A proposal from

the design that Dynetics had developed and tested during the Base Period.  (AR Tab 109b15,

Dynetics  COSF  at  134719-23  (██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.").)  In

fact, based on the lack of substantiating details for Dynetics' altered approach, the SSA noted

"considerable doubt … as to the proposal's overall credibility."  (AR Tab 77, Source Selection

Statement at 63059.)  Given that Blue Origin's complaint alleges a completely new solution, it is not likely Blue Origin would even be a viable competitor with such an approach.

The Court should be extremely skeptical of Blue Origin's claim that ████████████████ ████████ an alternative single-element design comparable to the system SpaceX proposed. (Compl. ¶¶ 13, 14, 26, 133.)  This claim cannot be accepted absent a very compelling evidentiary showing substantiating all material considerations (*e.g.* effort commencement, status, expenditures, substantiation of testing and performance analysis).  The record demonstrates the sort of ████████████ and documentation required for a truly authentic, credible and viable HLS Option A proposal.  There is particularly good reason to doubt that Blue Origin ██ ████████████████████████████████████████████████████████████████ ████████ comparable to what SpaceX proposed in light of Blue Origin's persistent and prominent denigration of the SpaceX approach as unworkable and excessively risky.  (*See*, compiled at Ex. C, Blue Origin Website Infographic, *What "Immense Complexity & Heightened Risk" Looks Like*, at https://www.blueorigin.com/blue-moon/national-team (last visited 1 Oct. 2021); Michael Sheetz, *Bezos' Blue Origin calls Musk's Starship 'immensely complex & high risk' for NASA moon missions*, CNBC (4 Aug. 2021), at https://www.cnbc.com/2021/08/04/bezos-blue-origin-musks-spacex-starship-complex-high-risk.html (last visited 1 Oct. 2021); Isobel Hamilton, *Jeff Bezos' Blue Origin is beefing with Elon Musk's SpaceX again, claiming that Starship is too complex to safely land astronauts on the moon*, Business Insider (5 Aug. 2021), at https://www.msn.com/en-us/news/technology/jeff-bezos-blue-origin-is-beefing-with-elon-musks-spacex-again-claiming-that-starship-is-too-complex-to-safely-land-astronauts-on-the-moon/ar-AAMXRcE?li=BBnb7Kz (last visited 1 Oct. 2021); *see also* Compl. ¶ 28.)

It is not enough for Blue Origin to assert that, if given the opportunity, it would abandon its Base Period design and submit an ███████████████ an entirely new approach (which looks conspicuously similar to the same SpaceX approach that Blue Origin decries as unbearably risky).  Blue Origin must carry the burden of showing that NASA would actually have to allow such a stunt, *and* that ████████████████████████████ Blue Origin could actually submit the voluminous amounts of data and testing necessary for a compliant proposal, beat SpaceX's ratings, and offer it at a price within NASA's limited funding.

## VI.  THE COURT SHOULD GRANT JUDGMENT IN FAVOR OF DEFENDANT AND DEFENDANT INTERVENOR

### A.  Blue Origin's Milestone Review Based Allegations Misread the Option A BAA, Are Untimely Solicitation Challenges, And Fail For Lack Of Prejudice.

The Court should grant judgment in favor of Defendants and against Blue Origin on it milestone related allegations in Counts 1-4 because the record establishes that SpaceX followed the Option A BAA instructions, and NASA reasonably and contemporaneously evaluated SpaceX's milestone payment approach, noting that the unique attributes of SpaceX's proposed architecture and concept of operations presented a "relatively minor" Weakness.  Blue Origin bases its contrary arguments and disagreements with the subjective judgments of the NASA experts on an unreasonable solicitation interpretation.  If Blue Origin believed the language was ambiguous, and that ambiguity purportedly drove Blue Origin's current design (as it speciously alleges in its Complaint in response to the loss it suffered at GAO), then the law required Blue Origin to clarify that ambiguity before proposal submission.  NASA did not waive any requirement for SpaceX and Blue Origin cannot establish prejudice by how NASA applied the milestone instructions to SpaceX and Blue Origin because such application depended on their very different proposed architecture.

1.     **SpaceX's Single FRR Payment Milestone, Proposed Two Weeks Prior To the Launch of HLS Starship, Complies With The Option A BAA.**

SpaceX proposed a single element HLS Starship and two supporting spacecraft: (i) a tanker ship to deliver propellant to orbit and (ii) a propellant storage ship acting as a depot optimized to reduce Earth orbit propellant boiloff.  (AR Tab 34d.55, SpX Vol. IV, Att. 23a at 56274, 56277; AR Tab 34a, SpX Vol. I at 55037.)  Consistent with the Option A BAA, SpaceX's initial proposal offered the NASA-chaired FRR milestone for its single element Integrated Lander to occur two weeks before launch (AR Tab 34d.33, SpX Att. 13 Milestone Schedule at 55430), with Acceptance Criteria for NASA to determine when the milestone event has been accomplished that track the Option A SOW: "The flight vehicle, launch vehicle, and support spacecraft (such as propellant storage, propellant transfer, and/or upper stage vehicles that provide transportation capabilities beyond the standard for orbit insertion) are ready for flight."  (AR Tab 34d.34, SpX Vol. IV, Att. 14 PWS at 55465.)  Thus, SpaceX proposed the required FRR milestone within two weeks of the launch of its single HLS element, and included the support spacecraft in the scope of the review.

Blue Origin bases its primary protest challenge on the erroneous allegation that SpaceX's proposal was unacceptable because SpaceX did not propose 16 NASA-chaired FRR payment milestones.  (Compl. ¶ 2.)  To advance this argument, Blue Origin relies on a flawed solicitation interpretation: that "HLS element" as used in the SOW and in the Milestone Payment Schedule means *any* launch of *any* space vehicle that is part of the overall Human Landing System, i.e., both the Integrated Lander (and all elements thereof) and "all supporting spacecraft."  (*Id*. ¶ 22.)  But the plain language of the SOW and other Option A BAA provisions confirm that an "HLS element" denotes an element of the "Integrated Lander," which itself may be a single element (as with SpaceX's architecture).  By NASA's own definitions, supporting spacecraft (SpaceX's depot and

tankers) are not lander "elements" and do not require a FRR payment milestone.  SpaceX's proposal fulfilled the FRR milestone payment instruction.

Solicitation interpretation is a question of law that begins with the "plain language of the document." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004) (internal quotations and citations omitted).  The Court must consider the solicitation "as a whole and interpret 'it in a manner that harmonizes and gives reasonable meaning to all of its provisions.'" *Safeguard*, 989 F.3d at 1344 (citation omitted).  "An interpretation that gives meaning to all parts of the contract or solicitation is to be preferred over one that leaves a portion of the contract or solicitation useless, inexplicable, void, or superfluous."  *Id*. (quotation and alteration omitted) (rejecting protester's interpretation because it would render solicitation instruction useless and inexplicable).

Application of these well settled legal principles shows that, while NASA could have been more precise in its instructions, there is only one reasonable way to interpret the trigger for a NASA-chaired FRR payment milestone: offerors had to propose such a milestone two weeks before the first launch of each element of their Integrated Lander.  This is the only interpretation that harmonizes and gives meaning to all of the Option A BAA provisions, without rendering any part superfluous or void.

SOW Section 5.4.4 details the objective of the NASA-chaired FRR and the Acceptance Criteria for this review, and states that any such NASA-chaired "FRR *should* be completed by two (2) weeks before launch of each HLS element."  (AR Tab 27e, Att. G SOW at 32972 (§5.4.4).)  This provision does not, however, set forth what event prompts the need for the NASA-chaired FRR.  That is found in the Milestone Payment Schedule, which makes the NASA-chaired FRR a delivery milestone event tied to contract payments, and states: "An FRR is required prior to ***each***

*launch of an HLS element*. Propose multiple FRRs as required."[17]  (AR Tab 27k, Att. O Milestone

Payment Schedule at 33187; AR Tab 27, Option A BAA at 24466 (instructions for Attachment

O.)  This same milestone table sets the FRR due date as "2 weeks before ***first launch*** of an ***HLS***

***element*** (L-2 weeks)."  (AR Tab 27k, Att. O Milestone Payment Schedule at 33187.)

 While "HLS element" itself is not a defined term, the other SOW definitions and provisions

demonstrate that, contrary to Blue Origin's arguments, the only reasonable interpretation of "HLS

element" is that it denotes the elements of an offeror's "Integrated Lander," which excludes

"Supporting Spacecraft."  (AR Tab 27e, Att. G SOW at 32948 (§ 1.2).)  The SOW defines

"Integrated Lander" as "[a]ny and all combinations of contractor ***elements*** (e.g. Ascent Element),

***including potentially a single element***, which is integrated at any time ***crew are onboard***."  (*Id.*)

NASA thus defines "Integrated Lander" as any "element" that carries the astronauts or integrates

with an element that carries astronauts.[18]  By contrast, NASA defines "Supporting Spacecraft" as

spacecraft that are necessary for performance, but are ***not*** the Integrated Lander or any element

thereof:

 Supporting Spacecraft:  Any contractor spacecraft ***that is not otherwise the***
 ***Contractor's HLS Integrated Lander***, Launch Vehicle, or AADA, but that is
 otherwise required for the Contractor to execute its demonstration mission or any
 portion thereof in performance of this contract, including, but not limited to,

---

[17] Here lies the mischief in Blue Origin's assertions that "SpaceX initially proposed only *one* FRR ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" and calculation that with the 16 purportedly required FRR milestones, SpaceX's "initial proposed cost would likely have increased by ▓▓▓▓▓▓ (Compl. ¶¶ 22-23 (emphasis in original).  This is a fixed price procurement.  (AR Tab 27, Option A BAA at 24432.) The payment amounts listed on an offeror's proposed milestone payment schedule do not reflect the actual *cost* of anything, but rather the fixed *price* payment that the offeror proposes to receive for all of the work that is completed leading up to and including the milestone payment event. Indeed, SpaceX added the additional FRR events that NASA requested "at no additional cost to the Government."  (AR Tab 68, Cover Letter to Revised Proposal at 62903.)  Blue Origin has no basis to speculate that SpaceX would charge any additional price, much less a price equivalent to its actual costs incurred, even if SpaceX switched a few more of its planned SpaceX-led FRRs to payment milestones.

[18] The HLS elements have been understood as the components of the aggregated lander (transfer, ascent, descent) from the outset of this procurement.  (*See* AR Tab 3, Acquisition Strategy Overview (June 25, 2019) at 71.)

rendezvous, proximity operations, docking and undocking (RPODU), propellant transfer, and orbital maneuvering and transfer.

(*Id.*)  With regard to the overall HLS, the SOW originally defined it as the aggregate of several distinct defined components, without any mention of "elements": "HLS: The contractor's Integrated Lander + Supporting Spacecraft + Launch Vehicles for the Integrated Lander or Supporting Spacecraft + AADA (if proposed) + Mission Systems."  (AR Tab 21e, Initial SOW at 8530.)  Prior to the Option A proposal submission, NASA amended the SOW to give a more detailed, all-encompassing definition of HLS, which includes "elements" and demonstrates repeatedly that elements are associated with the Integrated Lander:

> HLS: ***All objects, vehicles, elements, integrated systems, systems, subsystems, or components thereof*** that are designed, developed, and utilized by the contractor, its teammates, subcontractors, and suppliers in performance of this contract, ***and which collectively comprise the contractor's Integrated Lander (or elements thereof)***, all Supporting Spacecraft, all launch vehicles necessary for launch and delivery of the contractor's ***Integrated Lander (or elements thereof)*** and its Supporting Spacecraft, and the contractor's Active-Active docking adapter (AADA) (if required for performance of the contractor's crewed demonstration mission).

(*See* AR Tab 27e, Att. G SOW at 32948.)  Thus, while all three terms (element, Integrated Lander, and Supporting Spacecraft) are used in the amended definition of "HLS," that definition repeatedly ties "element" to the Integrated Lander, and is entirely consistent with the more specific definitions confirming that an "element" is a piece (perhaps the only piece) of the Integrated Lander, and therefore distinct from Supporting Spacecraft.

Similar but slightly different definitions in the main body of the Option A BAA confirm that "elements" are those architectural aspects associated with "HLS Integrated Lander", and that Supporting Spacecraft are not synonymous with a contractor's lander or any element thereof:

> "Integrated Lander" or "HLS Integrated Lander" means any and all combinations or configurations of the contractor's ***elements (e.g., the Ascent Element)*** which are

integrated (*or, alternatively, a single element achieving the same purpose*) at any time when crew are onboard.

"Supporting Spacecraft" *means any contractor spacecraft that is not otherwise the contractor's Integrated Lander (or an element thereof),* launch vehicle, or Active-Active docking adapter (if required), but that is otherwise required for the contractor to execute its demonstration mission or any portion thereof in performance of this contract, including, but not limited to, rendezvous, proximity operations, docking and undocking (RPODU), propellant transfer, and orbital maneuvering and transfer.

(AR Tab 27, Option A BAA at 24430 (§1.3.2).)  Again, these definitions in the SOW and Option A BAA directly and repeatedly associate "element" with the "Integrated Lander," and define Integrated Lander and Supporting Spacecraft as mutually exclusive.  Thus, the use of "element" clearly denotes the "Integrated Lander" and, therefore, excludes "Supporting Spacecraft."[19]

Other solicitation terms further confirm that NASA's use of "element" refers to the Integrated Lander and is distinct from a Supporting Spacecraft.  Most notably, section 4.4.3.5.2, addressing "launch and delivery operations," identifies the components of the offeror's HLS Integrated Lander "as separate elements" for launch, "depending on the Offeror's architecture":

The Offeror is required to propose how it will *launch and deliver its Integrated Lander (and all elements thereof) to the Moon* using commercial launch vehicle(s), including all phases of launch vehicle flight and, if applicable, any Supporting Spacecraft.  *It is permissible for individual components of the*

---

[19] The Contracting Officer's Statement of Facts submitted to GAO—which is incorporated into the record for review as a matter of law, 31 U.S.C. § 3556—avers that an "HLS element" means an element of the Integrated Lander, and therefore can never mean a Supporting Spacecraft.  (AR Tab 108b55, Supp. COSF at 104677.)  The Contract Officer explained that NASA tied the NASA-chaired FRR milestones to the Integrated Lander elements because:  "NASA's astronauts will, at some point during each offeror's mission, either be traveling inside of an HLS element, or traveling within an aggregated spacecraft that is connected to or comprised of one or more HLS elements. The same cannot be said for Supporting Spacecraft, which never transport astronauts and are never connected to one or more HLS elements while the elements (individually or as part of an Integrated Lander) are transporting astronauts.  As such, this heightens the importance that NASA be sufficiently involved with, and approve of, all FRRs for HLS elements." (*Id.* at 104678.)  NASA's Chief Engineer, NASA's Chief Health and Medical Officer, and NASA's Chief of Safety and Mission Assurance all confirmed the same as part of the Agency Report submitted to GAO.  (AR Tab 108b62, Decl. Of Ralph Roe at 104880-83; AR Tab 108b61a, Decl. of James Polk at 104872; AR Tab 108b61c, Decl. of Russ Deloach at 104879.)

> *Offeror's HLS Integrated Lander to be launched as separate elements on multiple commercial launch vehicles, depending on the Offeror's architecture*.

(*Id*. at 24453; *see also e.g.*, *id*. at 24443 (§ 4.3.1 ("NASA will not take ownership of the Integrated Lander, any individual **elements** thereof, **or** Supporting Spacecraft.").)  These provisions, read as a whole, confirm that an HLS element is **not** a Supporting Spacecraft.[20]

But that's not all.  The NASA-led FRR "acceptance criteria" specified in the SOW further confirm that support spacecraft, like the SpaceX depot and tanker ships, cannot be the "HLS element" triggering a FRR milestone.  After SOW Section 5.4.5 states that the NASA-chaired FRR "should be completed by two (2) weeks before launch of each HLS element," it then provides 14 "Acceptance Criteria" that the Contracting Officer will consider when determining whether SpaceX has passed the milestone and is eligible for payment.  (AR Tab 27e, Att. G SOW at 32972.)  The first criterion states: "The flight vehicle, launch vehicle, **and support spacecraft** (such as propellant storage, propellant transfer, and/or upper stage vehicles that provide transportation capabilities beyond the standard for orbit insertion) are ready for flight." (*Id*.)  This criterion, like the introductory SOW description of the milestone reviews that Blue Origin erroneously relies on (Compl. ¶¶ 63, 80), make clear that the status of support spacecraft is something for NASA to consider during the FRR of something else—i.e., the launch of each HLS Lander element.  Indeed, the introductory section of the SOW Milestone Review section explains that these milestone reviews serve to "assess programmatic and technical program and performance … with the ultimate goal **of certifying the lander for crewed operations** to and from the lunar surface." (AR Tab 27e, Att. G SOW at 32965.)  To accept Blue Origin's interpretation—that each launch of a supporting spacecraft triggers a separate NASA-chaired FRR—would render the first acceptance

---

[20] A further confirmation that "elements" are components of the Integrated Lander is found in the Lunar Orbit Checkout Review Acceptance Criteria, which include "Aggregation of HLS Lander Elements…if applicable."  (AR Tab 27e, Att. G SOW at 32975.)

criterion redundant and superfluous (i.e., no need to assess whether the support spacecraft is "ready" because a separate NASA-led FRR would have already been conducted on the support spacecraft). This is an unreasonable result.

Also unavailing is Blue Origin's misplaced reliance on the evaluation team's use of the word "Element" or Elements in a briefing to the SSA, when describing the architecture of the competing solutions. (Compl. ¶ 70.) Part of Blue Origin's confusion arises because SpaceX and Blue Origin proposed conceptually different approaches for the HLS Integrated Lander. As the SOW explains: "The HLS will deliver a crew from lunar orbit to the lunar surface, provide capabilities for surface extra-vehicular activities, and then return the crew to lunar orbit to enable their return to Earth." (AR Tab 27e, Att. G SOW at 32948.) SpaceX proposed a single element Integrated Lander, the HLS Starship, which performs all functions with one vehicle launched from Earth. (AR Tab 61, SSA Selection Mtg. at 62872.) Other separately launched Supporting Spacecraft—the Depot and Tanker—supply fuel to the Integrated Lander in Earth orbit. (*Id.* at 62873.) Conversely, Blue Origin proposed an HLS with an Integrated Lander consisting of multiple "elements"—an Ascent Element, a Descent Element and a Transfer Element. (*Id.* at 62852-54.)[21] Each of the three elements are launched from Earth separately and then integrated in space. (*Id.*) The briefing slides start with the analysis of Blue Origin's three-element architecture and then use the same header conventions to discuss every other offerors' architecture. The slides also properly identify SpaceX's Depot and Tanker as "Supporting Spacecraft." (*Id.* at 62873.)[22] Regardless, these presentation slides do not address or alter the plain language of the

---

[21] The Transfer element ███████████████████████████████████████████████████████████████████████. (AR Tab 61, SSA Selection Mtg. at 62852-54.)

[22] The slides also describe the "3 elements on 3 launches" in the Blue Origin design as the elements of the Integrated Lander. (AR Tab 61, SSA Selection Mtg. at 62852.)

Milestone Payment Schedule or the Option A BAA definitions, and are themselves legally irrelevant.

Once recognized that the Milestone Payment Schedule instructs offerors to propose a NASA-chaired FRR milestone before the first launch of an *HLS Integrated Lander element*—i.e., the Integrated Lander or a component thereof, each of Blue Origin's contentions fail.  SpaceX's proposal meets the FRR milestone payment instruction.  SpaceX proposed its NASA-chaired FRR milestone two weeks prior to the launch its single-element lander, the HLS Starship, and included the support spacecraft in the acceptance criteria.  (*See* AR Tab 34d.33, SpX Att. 13 Milestone Schedule at 55430; AR Tab 34d.34, SpX Vol. IV, Att. 14 PWS at 55465.)  The NASA Contracting Officer confirmed the same before GAO:

> SpaceX proposed to use an Integrated Lander—the HLS Starship—that is a single element architecture.  Applying the Solicitation's FRR language to this design, a reasonable interpretation is that SpaceX should have proposed a single FRR (for its single element) at least two weeks prior to the launch of HLS Starship.  SpaceX did just that: SpaceX proposed an FRR as a SOW-defined critical milestone review within its Option A proposal, two weeks ahead of its HLS Starship launch.

(AR Tab 108b55, Supp. COSF at 104679.)  NASA's Chief Engineer, NASA's Chief Health and Medical Officer, and NASA's Chief of Safety and Mission Assurance all confirmed the same as part of the Agency Report submitted to GAO.  (AR Tab 108b62, Decl. Of Ralph Roe at 104880-83; AR Tab 108b61a, Decl. of James Polk at 104872; AR Tab 108b61c, Decl. of Russ Deloach at 104879.)

### 2. Blue Origin's Further Objections To SpaceX's Supposed Failure To Propose Other Required Pre-launch Reviews Are Also Incorrect

Based on the same  flawed premise that "HLS Element" means Supporting Spacecraft, Blue Origin contends that SpaceX also failed to comply with other prelaunch reviews in the Milestone Payment Schedule and/or SOW.  (Compl. ¶¶ 96, 130.)  None of these arguments have merit.

As for DCRs, these are not established as mandatory requirements.  Just as with FRRs, the Option A BAA SOW provides that the DCR "milestone *should* be completed at first HLS launch - 9 Months (L-9)," but without specifying which HLS launch requires a DCR.  (AR Tab 27e, Att. G SOW at 32969 (§5.4.2).)  NASA provided this information in the Milestone Payment Schedule, which instructs offers to schedule the DCR "9 months before first **HLS element** launch (L-9 months)," once more making "HLS element" launch the operative action.  (AR Tab 27k, Att. O Milestone Payment Schedule at 33187.)  Consequently, the above discussion applies with equal force; the timing for the NASA-chaired DCR milestone review is triggered by the launch of the first Integrated Lander element.  SpaceX followed the BAA instructions and proposed a DCR nine months before the HLS Starship launch.  (AR Tab 34d.33, SpX Att. 13 Milestone Schedule at 55430-31; AR Tab 34d.34, SpX Att. 14 PWS at 55463-64.)

The Court can also quickly dispose of Blue Origin's other contentions regarding the Mission Specific Preliminary Design Review, Mission Specific Critical Design Review, and System Acceptance Review.  Each is addressed in SOW Section 10 relating to "Launch Vehicle Processing, Integration, and Operations"—more specifically, the "launch vehicle for transportation of the HLS modules or *integrated landing system* to orbit" (AR Tab 27e, Att. G SOW at 33005)— and the SOW contemplates that these reviews be completed at "not later than L-18 months," "not later than L-12 months," and "not later than L-4 months," respectively.  (*Id.* at 32944-45, 33009, 33010.)  Not one of these launch vehicle reviews is included in the Milestone Payment Schedule at Option A BAA Attachment O.  (AR Tab 27k, Att. O Milestone Payment Schedule at 33187.)  Neither SpaceX nor Blue Origin included these launch vehicle reviews in their proposed milestone payment schedules.  (AR Tab 32d.87, BO Att. 13 Milestones at 34854-56; AR Tab 34d.33, SpX Att. 13 Milestone Schedule at 55430-31.)  Instead, both SpaceX and Blue Origin addressed these

reviews in their proposed PWSs, each committing to satisfy them just as they are described in the Option A SOW.  (AR Tab 32d.88, BO Att. 14 PWS at 34922-24; AR Tab 34d.34, SpX Vol. IV, Att. 14 PWS at 55498-55500.)  Any differences between the SpaceX and Blue Origin proposals regarding the number of these reviews is driven by differences in the offerors' Integrated Lander architecture.  Such differences do not, as Blue Origin contends, render SpaceX's proposal noncompliant.  SpaceX proposed to satisfy these Integrated Lander launch vehicle reviews just as they are described in the Option A BAA SOW, based on the timing of its HLS Starship launch so Blue Origin cannot identify any error, much less a prejudicial one.

### 3.    Blue Origin Raises An Untimely Challenge To The BAA Terms.

Alternatively, even assuming arguendo that Blue Origin's interpretation of the term "HLS element" also was reasonable (which it is not), the Court must dismiss Blue Origin's claims that SpaceX proposed insufficient NASA-led FRR or DCR milestones (and other pre-launch reviews) as untimely challenges to the Option A BAA terms.  According to the unverified Complaint, if only Blue Origin had known that NASA would permit offerors to schedule the FRR payment milestone based on the launch date for a single Integrated Lander, instead of for each Supporting Spacecraft launch, then Blue Origin would have submitted an entirely different proposal.  Blue Origin purportedly would have proposed SpaceX's approach—early launch of several refueling tankers and a different launch vehicle, all of which, the Court is asked to believe, would result in a significant reduction to Blue Origin's price and better technical ratings.  (Compl. ¶¶ 133-34.)

Blue Origin's contention that it developed its entire Option A architecture based on an assumption that "HLS element" includes "Supporting Spacecraft" defies the plain text of the Option A BAA (and aerospace engineering).  As discussed, the Option A BAA, read correctly, precludes an "HLS element" from including Supporting Spacecraft.  But even assuming that the

term, which is itself not expressly defined in the Option A BAA, could reasonably be read in more than one way, any such ambiguity would be patent.  Given the weight that Blue Origin claims it put on the term, Blue Origin had an obligation to raise the issue with NASA prior to award.

A "party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007).  The *Blue & Gold* rule applies "to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." *Inserso Corp. v. United States*, 961 F.3d 1343 (Fed. Cir. 2020).  The appeal of *Per Aarsleff A/S v. United States* is particularly instructive.  829 F.3d 1303 (Fed. Cir. 2016).  In that case, offerors raised concerns regarding the solicitation's eligibility requirements during pre-award question and answer sessions, but ultimately declined to submit pre-award protests. *Id.* at 1306-09.  The Federal Circuit dismissed as untimely the post-award protests challenging the awardee's eligibility against those same requirements, recognizing that, particularly in light of the pre-award dialog, the protester's could have discovered the issue before proposal submission by exercising "reasonable and customary care." *Id.* at 1310-14 (quotation omitted); *see also id.* at 1317 (Reyna J., concurring) ("The disappointed bidders in this case knew there were unresolved questions about the solicitation's eligibility requirement prior to submitting their proposals, but they failed to protest that issue until after award.  As such, their protests of the eligibility requirement were untimely….").

Similarly, here, Blue Origin should have been aware from the plain language of the Option A BAA that there was reason for Blue Origin to doubt its supposedly essential assumption that the FRR and DCR milestones were triggered by any and every Supporting Spacecraft launch.  Again,

the operative term "HLS element" is not even defined, and the BAA and SOW use the term "element" expressly in connection with the definition of Integrated Lander, which excludes Supporting Spacecraft.  And, during Q&A, one offeror called out NASA's definition of HLS as creating ambiguity in the SOW—to which NASA responded by telling offerors to continue interpreting SOW provisions as applying only to the HLS Integrated Lander unless otherwise noted.

> 18. Q: The new definitions in section 1.3.2 of the main body of the solicitation introduced potential ambiguities.  Please provide clarification on the following items:
>
> A) Given the ubiquitous use of the term "HLS" in applicable and reference documents, the current definition creates a number of logical inconsistencies and interpretation issues.  For example, all ICDs use the phrase "HLS shall…," often when seemingly intending "HLS Integrated Lander shall…"  This creates ambiguities in terms of which vehicles (e.g., launch vehicles or support vehicles) must contain which interfaces.
>
> ….
>
> A)  Note the caveat in section 1.3.2, "When used within this document, the following definitions apply."  The intent is not to disturb the relative ubiquitous use of "HLS" in other solicitation and contract documents.  Unless otherwise specified, the scope of [Interface Control Documents ("ICDs")] remains the "HLS Integrated Lander" (as that term is defined in the main body of the solicitation).  Similarly for the PD, the revised definitions are not intended to change the scope of deliverables (i.e., [Data Procurement Documents ("DRDs")] are generally applicable to the Integrated Lander unless "Supporting Spacecraft" or "Launch Vehicle" are explicitly identified).  Similarly for the Design and Construction standards, unless otherwise noted, scope is applicable to the HLS Integrated Lander.

(AR Tab 20, Q&A Log at 448.)[23]  This Q&A further seals Blue Origin's fate as untimely, as that exchange recognizes ambiguity as to whether the SOW provisions apply to Supporting Spacecraft, and the NASA response indicates a presumption of limiting HLS references in the SOW to the Integrated Lander absent some explicit provision to the contrary.

---

[23] Although not defined in the Q&A document, the undersigned understands the term "PD" as a reference to "Data Procurement Document."  (AR Tab 27e, Att. G SOW at 32952.)

In all, Blue Origin knew or should have known of the purported ambiguity, on which its present Complaint rests, with regard to whether the milestone payment reviews were tied to the launch of an Integrated Lander element or launch of a Supporting Spacecraft.  This is particularly so given that Blue Origin now claims it would have ███████████ submitted an entirely different Option A proposal—completely wasting its Base Period performance—had it known that "HLS element" did <u>not</u> mean a Supporting Spacecraft.  If ambiguous, it is patently ambiguous, as any measure of "reasonable and customary" care by Blue Origin would have uncovered the issue.  The undefined term "HLS element" on its own "would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency," particularly an offeror that is purportedly planning its entire procurement strategy around its interpretation of that term.  *Per Aarsleff*, 829 F.3d at 1312-13 (quotation omitted); *10 Tanker Air Carrier, LLC v. United States*, __ Fed. Cl. __, 2021 WL 3828652 (Aug. 27, 2021) at *14-16 (applying same to dismiss untimely challenge to patent solicitation terms).  Having failed to raise that concern in a formal protest prior to submitting its proposal, Blue Origin cannot now be heard to raise the issue after award.

### 4. Alternatively, to the Extent There is Any Discrepancy Between SpaceX's Proposed Approach and the FRR Instructions, NASA Reasonably Assigned a Single Weakness That Had No Impact on SpaceX's Outstanding Management Approach.

Based on its flawed solicitation interpretation, Blue Origin maintains that NASA had to find SpaceX unacceptable, and that NASA's failure to do so amounted to a waiver of a material requirement for SpaceX.  There is no need for the Court to even reach this line of argument.  As described above, SpaceX proposed milestone reviews in accordance with the Option A BAA instructions.  But, even assuming *arguendo* that SpaceX's proposed approach is not fully consistent with those instructions, NASA, not Blue Origin is responsible for evaluating the merits of the approach. And, in this BAA procurement, soliciting and evaluating three very different

development approaches, NASA intentionally drafted the solicitation to accommodate a broad range of technical solutions, while providing for its involvement and participation to mitigate risk. NASA reasonably exercised its discretion to assign a single Weakness to SpaceX's FRR milestone approach based on a "relatively minor" risk the evaluators identified, and then through post-selection negotiations, NASA mitigated that risk, consistent with the Option A BAA. NASA did not relax any Option A BAA requirement for SpaceX; NASA negotiated a revision to the proposed contract terms for its selected contract awardee, consistent with SpaceX's unique solution, the Option A BAA, and NASA's objectives. That is no basis to upend the lawful award to SpaceX.

### a.     NASA Rationally Found SpaceX's Proposal Awardable

Even if Blue Origin were correct that SpaceX's FRR milestone approach does not fully satisfy the solicitation instructions, because SpaceX intends its supporting spacecraft to be in orbit by the time of the FRR payment milestone, NASA contemporaneously identified and noted the issue "as a relatively minor" weakness, exercised its discretion not to find the proposal noncompliant, and documented a full and reasoned explanation for its decision.

The Option A BAA defines a "deficiency" as "[a] material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level. (AR Tab 27, Option A BAA at 24476.) Thus, when considering a deficiency NASA must exercise judgment and discretion to determine what constitutes a "material" failure, and under what circumstances an offeror's proposed approach "increases the risk of unsuccessful contract performance to an unacceptable level." (*Id.*) The Option A BAA confirms that when doing so, "the Government will consider how an Offeror's proposed approach affects risk, such as technical risk, risk to meeting the Offeror's proposed schedule, the need for increased Government oversight, or the risk of

likelihood of unsuccessful contract performance." (*Id.*)  The solicitation also put all on notice that NASA had discretion to determine whether any noncompliance results in either a negative evaluation finding or award ineligibility:

> If unexplained discrepancies are found within an Offeror's proposal, the Government *may* use that as a basis for evaluating such proposals negatively, and *if the discrepancies are significant*, the Offeror *may* be deemed ineligible for award.  Offerors who take exception to any terms and conditions of this solicitation *may* also be deemed ineligible for award and excluded from further competition.

(*Id.* at 24433.)

The evaluation record shows that the SEP was not concerned with the number of SpaceX proposed FRR milestones, but rather, based on SpaceX's unique architecture, the evaluators documented a concern that they and SpaceX had a different view of how to address the first acceptance criterion.  (AR Tab 59c, SpaceX SEP Report at 62812-14; AR Tab 108b55, Supp COSF at 104677-78, 104679-81.)   The SEP stated: "[T}he SOW's acceptance criteria for the FRR milestone review and event require that 'the flight vehicle, launch vehicle, and support spacecraft (such as propellant storage, propellant transfer, and/or upper stage vehicles that provide transportation capabilities beyond the standard for orbit insertion) are ready for flight.'" (AR Tab 59c, SpaceX SEP Report at 62813.)   As discussed, SpaceX proposed to include the support spacecraft in the review—which based on its concept of operations would be in orbit at that time— allowing NASA to confirm that those vehicles were performing in orbit as intended and thus mission ready.  (AR Tab 34d.34, SpX Vol. IV, Att. 14 PWS at 55465.)  The evaluators, however, sought additional specified NASA involvement in the readiness of those spacecraft pre-launch. (AR Tab 59c, SpaceX SEP Report at 62814.)  Given that SpaceX proposed its own established FRR procedures for those vehicles, to which NASA was invited (AR Tab 108b55-102a, Supp. COSF at 104682 (Contracting Officer describing SpaceX FRRs); AR Tab 34d.50, SpX Vol. IV,

Att. 20 PMP at 56018 (SpaceX proposing "pre-ship reviews, design reviews, test and flight readiness reviews, and post-flight reviews with NASA participation")), the evaluators judged the risk of the differing approaches to that FRR acceptance criterion as" relatively minor."  (AR Tab 59c, SpaceX SEP Report at 62806, 62814; AR Tab 108b55, Supp COSF at 104679-84 (explaining the minor Weaking finding and how SpaceX's approach proposed no safety concerns).)  NASA's Chief Engineer, explained that

> [N]one of [the Technical Authorities serving as advisors to the SSA] . felt that SpaceX's single NASA FRR constituted a deficiency, nor even a technical shortcoming in any capacity, or that the SEP's evaluation of this aspect of SpaceX's proposal was in error in any capacity…. I noted that SpaceX has an FRR process embedded in its Verification, Validation and Certification Plan (VVCP). SpaceX follows this FRR process for all of its flights, including the Depot Starship, Tanker Starship and HLS Starship flights. Varying levels of NASA participation are provided for in all of SpaceX's proposed FRRs. Moreover, through my understanding of SpaceX's proposal, I was otherwise satisfied from an engineering and safety perspective that the proposed SpaceX FRR process appropriately addressed compliance to NASA standards, including safety standards.

(AR Tab 108b62, Decl. Of Ralph Roe at 104881.  *See also* AR Tab 108b61a, Decl. of James Polk at 104872 (same); AR Tab 108b61c, Decl. of Russ Deloach at 104879 (same).)[24]

Accordingly, the NASA evaluators, in exercising their judgment and discretion, did not find SpaceX's FRR milestone approach to be a significant discrepancy triggering ineligibility for award.  The NASA evaluators thus contemporaneously noted their issue with SpaceX's FRR approach to fulfilling the milestone acceptance criterion, described the associated risk, and explained why it amounted to a single, "relatively minor" Weakness that did not undermine an Outstanding rating:  "[W]hen evaluated holistically, the abundant benefits provided by the positively evaluated attributes of the offeror's proposal, combined with its assessed High Base

---

[24] Despite moving to complete the record, Blue Origin elected not to seek leave to supplement the record with the Wilhite Declaration attached to its Complaint, and cannot meet the high standard to do so.  To the extent Blue Origin nevertheless attempts to rely on that declaration in its MJAR, SpaceX reserves the right to move to strike it in its response.

Period performance, far outweigh the relatively minor risks and drawbacks accompanying the negatively evaluated attributes of its proposal." (AR Tab 59c, SpaceX SEP Report at 62806.) The SSA agreed: "SpaceX offered a uniquely meritorious proposal with notable qualitative attributes, both in terms of its technical approach and its management approach," and "provides abundant value to NASA at the price it proposed." (AR Tab 62, Initial Selection at 62883.)[25]

The Federal Circuit has expressly disapproved of a court second guessing an agency's discretionary determinations about a proposal's relative merit. *See E.W. Bliss*, 77 F.3d at 449 (summarily rejecting arguments that "deal with the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement, which involve discretionary determinations of procurement officials that a court will not second guess."). As this Court explained in *Gen. Dynamics Mission Sys., Inc. v. United States*, the Federal Circuit's holding in *E.W. Bliss* essentially precludes this court from second guessing an agency's decision not to assign a deficiency when the solicitation, as here, provides the agency discretion to determine the impact or risk of any proposal discrepancy or noncompliance. 137 Fed. Cl. 493, 522-24 (2018).

Blue Origin's Complaint conveniently ignores where Blue Origin benefitted from this same NASA exercise of discretion. The NASA evaluators noted that Blue Origin failed to meet the Option A BAA requirements in several instances, but did not assign a deficiency or declare Blue Origin's proposal unacceptable based on those proposal flaws, as Blue Origin urges for SpaceX's

---

[25] The Option A BAA definition of an "Unacceptable" also shows that NASA reasonably did not eliminate SpaceX based on its proposed approach to FRRs. (AR Tab 27, Option A BAA at 24477.) An Unacceptable rating was reserved for egregious situations involving "*A seriously flawed proposal that is not responsive to the objectives of the BAA*. The proposal has one or more <u>deficiencies,</u> or multiple significant weaknesses *that either demonstrate a lack of overall competence or would require a major proposal revision to correct.*" (*Id.*) The SpaceX proposal unquestionably did not align with that standard. In fact, if NASA had evaluated SpaceX as Blue Origin demands, then NASA would have departed from the Option A BAA criteria—an irrational result.

approach to the milestone instructions.  Instead, where NASA found that Blue Origin failed against a requirement, NASA assigned a Weakness proportionate to the perceived risk, just as the evaluators did with respect to SpaceX's FRR approach.  For example, NASA found that Blue Origin's manual control system "is not compliant with HLS-R-0004, which requires that the offeror's approach to manual control must have single fault tolerance."  (AR Tab 59a, Blue Origin SEP Report at 62647.)  And, NASA found that several Blue Origin communication links "fall short of NASA's requirements," identifying numerous Option A performance requirements that Blue Origin failed to satisfy.  (*Id.* at 62654.)  The Court should reject Blue Origin's selective preference for unequal evaluation treatment and the attempt to substitute the Protester's judgment for that of the NASA technical experts.

> **b.** **SpaceX Received No Competitive Advantage Through The Evaluation of Its FRR Payment Milestone Approach Or The Post-Selection Negotiations.**

Desperate to contrive competitive prejudice where none exists, Blue Origin insists that NASA waived its actual needs and conferred on SpaceX some schedule and price advantage by only negotiating two additional FRR payment milestones.  (*See e.g.*, Compl. ¶¶ 126, 134.)  Once again, Blue Origin is wrong.  Protester bases its argument on its tactical, yet fabricated premise that an FRR milestone dictates SpaceX's proposed technical solution.  Not so.  As demonstrated in Section III.D, *supra*, SpaceX's established practice is to perform an FRR for every launch— whether tied to a NASA payment milestone or not.  Thus, changing some or all of the SpaceX FRRs into payment milestone events chaired by NASA would not increase SpaceX's proposed pricing on this fixed price contract or change its launch cadence schedule.[26]  Whether purposefully

---

[26] As a consequence of the post-selection negotiations, SpaceX added two FRRs and adjusted the schedule of milestone payments consistent with NASA's fiscal year funding.  But, SpaceX did not reduce its price or otherwise change its proposal, and so did not alter its competitive position relative to other offerors. Blue Origin argues incorrectly that SpaceX avoided substantial costs

or unintentionally, Blue Origin has it backwards (*see e.g.*, Compl. ¶ 134 (erroneously stating that SpaceX cannot perform FRRs with its launch cadence)); if SpaceX-led or NASA-led, the FRRs do not dictate the launch cadence, but rather the fact of the launch dictates when the FRR occurs.

Finally, NASA did not conduct discussions with SpaceX.  The negotiations happened after the close of the evaluation and were not as Blue Origin's alleges required to fix any technical defect in SpaceX's proposed approach.  The Management evaluation noted a perceived "relatively minor" weakness related to SpaceX's payment milestones, and the Contracting Officer acted well within the authority provided by the Option A BAA to raise that issue for resolution in negotiations after the SSA had selected SpaceX for a contract award.  (AR Tab 27, Option A BAA at 24467 (giving NASA the right to "*negotiate any aspect of* an Offeror's milestone payment amounts, *schedule, and/or acceptance criteria* prior to award of Option A."))

Even if Blue Origin were correct that the term "HLS element" applies to supporting spacecraft, that interpretation is still perfectly consistent with the milestones that NASA and SpaceX negotiated.  During negotiations, SpaceX agreed with NASA's request to revise its proposed payment milestones to provide an FRR before the first Depot Starship launch and an FRR before the first Tanker Starship launch.  (AR Tab 63, Negotiation Letter at 62889-90; AR Tab 68, Cover Letter to Revised Proposal at 62903.)  Blue Origin contends that this negotiated resolution is insufficient, asserting that SpaceX's approach requires no fewer than 16 NASA FRRs to be compliant.  (Compl. ¶ 22.)  But even if "HLS element" includes supporting spacecraft, the

---

when NASA purportedly waived requirements, claiming that "SpaceX's proposed cost for one FRR is" ████████████.  (Compl. ¶¶ 74, 80.)  For support, Blue Origin references the SpaceX table of milestone payments.  (AR Tab 34d.33, SpX Att. 13 Milestone Schedule at 55430-31.)  But, the payment amount tied to the FRR milestone is not the cost to perform an FRR.  This is a fixed priced contract with payments for all contracted efforts spread across the contract duration and disbursed when various milestones are met.  The payment amount at a particular milestone thus does not represent the cost of the particular activity identified as a milestone.

Option A BAA does not require a separate FRR for each and every HLS element launch.  Instead, the Option A BAA Milestone Acceptance Criteria provides for an FRR "2 weeks before *first* launch of an HLS element (L-2 weeks)."  (AR Tab 27k, Att. O Milestone Payment Schedule at 33187.)  That is exactly what NASA and SpaceX negotiated.

Blue Origin, of course, would now prefer that the Option A BAA state: "For every launch of an HLS element or any HLS supporting spacecraft, the Contractor shall conduct a separate and independent FRR at least two weeks in advance of the launch."  But, that is not the Option A BAA text, and Blue Origin did not protest its terms.  Nothing in NASA's solicitation language prohibits SpaceX from conducting one FRR prior to the launch of the Tanker Starship, the Depot Starship, and the HLS Starship, and NASA did not waive any requirements or confer any advantage on SpaceX by negotiating that approach.

### 5.    Blue Origin Was Not Prejudiced By NASA's Evaluation Of FRRs and Other Reviews.

As discussed in Section V above, Blue Origin cannot establish prejudice.  It has been committed from the outset of the Base Period contract to an HLS technical approach that required three FRRs (one for each Integrated Lander element), and a change or waiver to any payment milestones regarding FRRs for supporting spacecraft would have had no effect on that approach.  Blue Origin did *not* propose supporting spacecraft.  Blue Origin's present assertions that it would have proposed an entirely different and far less expensive architecture for Option A had NASA more explicitly announced  milestone review instructions for supporting spacecraft rings hollow,

███████████████████████████████████████████████████████████

███████████████████.  GAO resolved the prejudice question related to these Blue Origin's challenges correctly and nothing has changed.  (AR Tab 108b67a, GAO Decision at 105077-78.)

███████████████████████████████████████████████████████████

**B.      Blue Origin's Unequal Discussions Arguments Are Untimely Challenges To The Solicitation Terms.**

Blue Origin's Count 2 alleges that NASA "violated procurement laws and regulations by engaging in improper and unequal discussions where it held discussions with only SpaceX and permitted SpaceX to revise its unawardable and noncompliant proposal."  (Compl. ¶ 144; *see id.* ¶¶ 138-151.)  Several problems exist with Blue Origin's narrative.  There was no violation of law or regulation—NASA followed the Option A BAA procedures for post-selection negotiations with SpaceX as the offeror "selected for potential contract award."  (AR Tab 27, Option A BAA at 24434.)  These negotiations—held after the evaluation closed—could not and did not improve SpaceX's competitive position over Blue Origin; NASA only began the negotiations after selecting SpaceX for potential contract award.  Blue Origin's complaints about this process—disclosed in the Option A BAA—amount to an untimely challenge to the solicitation terms, which Blue Origin waived when it decided to compete.  *Blue & Gold*, 492 F.3d at 1313

The Option A BAA explicitly defines and differentiates between "discussions" and "post-selection negotiations," confirming that "post-selection negotiations" would only be conducted with offerors selected for potential award:

> "Discussions" are exchanges with Offerors that occur after receipt of proposals but before selection that result in the Contracting Officer inviting the Offeror to revise only those specific portions of its proposal that have been identified by the Contracting Officer as open to revision.
>
> ….
>
> "Post-selection negotiations" are exchanges with Offerors ***that have been selected for potential contract award*** that result in the Contracting Officer inviting the Offeror to revise only those specific portions of its proposal that have been identified by the Contracting Officer as open to revision.

(AR Tab 27, Option A BAA at 24434.)  The Option A BAA allows NASA, *if it chooses*, to engage

offerors in "discussions" prior to source selection, but imposed no obligation to do so, and also

provides NASA the discretion to engage in "post-selection negotiations."

> Offerors are reminded that the Government may evaluate proposals and award
> contracts without conducting discussions or post-selection negotiations with
> Offerors (except clarifications as defined in FAR 15.306(a)).  Therefore, each
> Offeror shall submit only one proposal which represents its best approach to
> meeting the requirements of the solicitation.  The Government reserves the right to
> conduct discussions or post-selection negotiations if the Contracting Officer later
> determines them to be necessary.

(*Id.* at 24473.)

At the close of the initial evaluation, SpaceX and Blue Origin were not similarly situated.

SpaceX was the highest rated and lowest price offeror by a significant margin.  (Section III.F.,

*supra*.)  When NASA opened post-selection negotiations with SpaceX only, NASA did no more

than follow the Option A BAA post-selection negotiations procedures quoted above.  (AR Tab 62,

Initial Selection at 2882-84.)  The SSA reasoned that post-selection negotiations with SpaceX

made sense, as SpaceX was not only the most highly rated offeror, but SpaceX was the only offeror

whose price was remotely close to NASA's budget constraints.  (*Id.* at 62884.)  Blue Origin offers

nothing to challenge this reasoned, discretionary decision.  GAO recognized the same, and rejected

Blue Origin's assertions that FAR Part 15 principles required NASA to open discussions with all

Option A competitors:

> [E]ven if we were to conclude that FAR part 15 principles should apply in this
> procurement conducted pursuant to FAR part 35, such an objection to the Option
> A BAA's contrary explicit ground rules would be patently untimely at this time.
> *See, e.g.*, *Gulf Civilization Gen. Trading & Contracting Co.*, B-419754, B-
> 419754.2, June 10, 2021, 2021 CPD ¶ 208 at 6-7 n.2 ("[E]ven assuming for the sake
> of argument that FAR part 15 principles did or should apply by analogy, as
> explained above, the protester's post-award objections to the RFP's unambiguous
> reservation of [the agency's] right not to evaluate proposals in a manner consistent
> with a FAR part 15 procurement are patently untimely."). . . .

> Relevant to the issues presented here, we have routinely rejected as untimely post-award challenges alleging that an agency's scope or conduct of discussions violated applicable procurement law when the agency's discussions were consistent with the express, unambiguous ground rules set forth in the solicitation.

(AR Tab 108b67a, GAO Decision at 105033.)

Attempting to avoid the same legal outcome under the same operative facts, Blue Origin pretends to change tacks, now arguing that 10 U.S.C. § 2305(b)(4)(A) required discussions with all offerors here.  (Compl. ¶¶ 138-51.)  But this statutory provision—applicable to "competitive proposals"—i.e., FAR Part 15 procurements—offers no safe harbor to Blue Origin in this FAR Part 35 BAA procurement.  48 C.F.R. §§ 6.102, 6.401.

Equally unavailing is Blue Origin's reliance on *Tolliver Group, Inc. v. United States*, 151 Fed. Cl. 70 (2020).  That decision did not involve a BAA procurement, nor can it save Blue Origin from its *Blue & Gold* problem.  Unlike the facts at issue here, *Tolliver* involved challenges to an agency's decision to cancel a solicitation and resolicit work under a separate contract vehicle without adequate market research.  This Court found that, even though the cancelled solicitation was superficially styled as a request for quotations under FAR Subpart 8.4, it actually contemplated a competitive proposal, the cancellation of which was subject to this Court's bid protest jurisdiction.[27]  Blue Origin is not challenging NASA's decision to cancel a solicitation, or the adequacy of NASA's market research and acquisition plan in issuing the Option A BAA, nor could Blue Origin timely do so after competing under the Option A BAA terms.  Unlike anything presented in *Tolliver*, Blue Origin competed under the Option A BAA ground rules without protest, and now asks this Court to find that NASA was required to follow different ground rules than those

---

[27] Beyond its irrelevance here, the quoted jurisdictional *dicta* is far from settled precedent.  Ralph C. Nash, *Court of Federal Claims Jurisdiction: Parsing the Statues and Regulations*, 35 Nash & Cibinic Rep. NL ¶ 9 ("We want to make it clear that the court is wrong in equating competitive procedures with competitive proposals and that this part of its decision should not be relied on.")

stated in the Option A BAA.  *Tolliver* does not sanction Blue Origin's incredible request, which is barred by *Blue & Gold*.

The more apt case is *WaveLink, Inc. v. United States,* in which Judge Solomson held that where, as here, a solicitation expressly provides that certain exchanges will not constitute discussions, any post-award protest arguing otherwise must be dismissed as untimely:

> At first glance, this communication would appear to be a discussion, which would be problematic for the government given that GSA did not intend to open discussions with offerors and that having done so likely would have required GSA to accept FPRs from all offerors….
>
> The Court need not definitively resolve this issue, however, because an express provision in the RFP controls and permitted the Agency's approach here. The RFP provided that during the initial screening (i.e., step one of the evaluation process outlined *supra*), all proposals would be reviewed to ensure that supporting documentation was submitted for each claimed point (without the Agency verifying the contents or substance of that document). Proposals that omitted supporting documentation, if unrelated to a minimum submission requirement, would be treated as clarifications.  This language is clear and unambiguous.  Consistent with this RFP provision, GSA sought missing documents from Spinvi for claimed points not relating to a minimum requirement….  As the Agency followed the RFP's terms regarding the characterization of the communication, this exchange of information between GSA and Spinvi was not a discussion.

2021 WL 2762814 at *17 (internal citations omitted).

Finally, as detailed above in Section V, even if Blue Origin could demonstrate that NASA engaged in improper unequal discussions with SpaceX (which it cannot), Blue Origin has failed to carry its burden of demonstrating competitive prejudice by any such error.  The Court, accordingly, should grant judgment in Defendants' favor on Count 2.

## C.  Blue Origin's Argument That NASA Was Required To Amend The Solicitation Is Untimely And Incorrect.

Blue Origin's Count 3 complains that NASA's requirements changed, obligating NASA to "either notify all offerors of the change in circumstance or to amend the Solicitation."  (Compl. ¶ 155; *id.* ¶¶ 152-62.)  Blue Origin asserts two supposed categories of requirements changes: (i)

NASA's lower-than requested HLS appropriations, which constrained NASA's ability to award more than one Option A contract, and (ii) milestone payment requirements for Supporting Spacecraft. Taking them out of order, the second argument fails for the reasons articulated earlier in Section VI.A: NASA's payment milestone requirements did not change, FRR or otherwise, so there was nothing to amend. SpaceX and Blue Origin proposed to accomplish those payment milestone events differently based on their different architectures. Blue Origin's arguments about NASA's funding constraints, and its pleas for an Option A BAA amendment based thereon, are also unfounded, warranting judgment in favor of Defendants for several reasons.

First, as with the rest of Blue Origin's protest, the argument amounts to an untimely challenge to the procurement ground rules. Second, ground rules aside, Blue Origin knew well before award that Congress' HLS appropriation would not permit award to Blue Origin, and Blue Origin waived any right to protest on that basis by waiting until after the award decision. Third, on the merits, Blue Origin essentially challenges NASA's decision to make one rather than two awards, which is a decision vested in NASA discretion that does not provide a viable basis for protest. Fourth, the only legal obligation Blue Origin has identified to purportedly require amendment is FAR 15.206, but that FAR Part 15 provision does not apply to this BAA procurement, and, even if FAR 15.206 applied, it would not require amendment here. Finally, Blue Origin again fails to demonstrate competitive prejudice. Each of these independently fatal flaws in Blue Origin's position is addressed in turn below.

### 1.    Blue Origin Untimely Challenges The Solicitation Ground Rules.

Blue Origin insists that, just because NASA received lower appropriations than anticipated, effectively precluding NASA's goal of multiple awards (particularly at the high prices Blue Origin and Dynetics proposed), NASA was required to amend the Option A BAA. But, by the clear

Option A BAA ground rules, NASA was never obligated to make *any* awards, and its award decision was always subject to the availability of future appropriations—funding amounts not specified in the Option A BAA.  Blue Origin's post-award protest position that NASA was required to inform offerors of the specific number of awards NASA actually would make, or any other indication of NASA's funding estimates, is an untimely solicitation challenge that Blue Origin waived when it elected to compete.

The Option A BAA unequivocally and repeatedly warns offerors that NASA's ability to make multiple awards (or even a single award) was dependent on future, unknown appropriations. Most glaringly, the opening paragraph of the Option A BAA Section 6 "Award Information" identifies available funding as a relevant factor for NASA's ultimate determination to make one, two, or no awards.  (AR Tab 27, Option A BAA at 24481.)

Section 6 then warns all offerors to submit their most favorable pricing and terms in the initial offer (as NASA made no guarantee of discussions) and again cautioned that all Option A awards were subject to future appropriations:

> NASA reserves the right to select for award multiple, one, or none of the proposals received in response to this Appendix.  The overall number of awards will be dependent on funding availability and evaluation results.  NASA may evaluate and select for award, based on initial proposals, without discussion or negotiations. However, NASA reserves the right to conduct discussions or post-selection negotiations if deemed in the best interest of the Government.  Accordingly, each Offeror should submit its initial proposal to the Government using the most favorable terms from a price and technical standpoint.
>
> ….
>
> Funds are not currently available for this solicitation, but are expected to become available on or before contract award.  ***The Government's obligation to make awards is contingent upon the availability of appropriated funds*** from which payments can be made and the receipt of proposals that NASA determines are acceptable.

(*Id.*)

Similar language is repeated throughout the Option A BAA, establishing that no offeror, and not even NASA, would know the number of awards or funding limits at the time of initial proposal submission.  (*See id.* at 24429 ("NASA intends to determine whether to award Option A to **one or more** Base period contractors….***no guarantee is made that an option will be awarded***…."); *id.* at 24431 ("NASA anticipates exercising Option A for up to two contractors."); *id.* at 24449 ("NASA anticipates awarding up to two contracts….."): *id.* at 24473 ("The Government intends to award **one or more** contracts…."); *id.* at 24475 ("Consistent with FAR 35.016(e), the primary basis for selecting **one or more** proposals for award shall be technical, importance to agency programs, and ***funds availability***…."); *id.* at 24480 ("the SSA will consider each proposal…and will select for award **one or more proposals**….", "[t]he SSA may make … selections of **an Offeror or Offerors** for the purpose of … post-selection negotiations with ***one or more Offerors***…."); *id*. at 24481 ("Following the award of **one or more contracts**, NASA will provide informal feedback to any Offeror upon request.").)

Blue Origin never objected to or questioned any of these clear Option A BAA terms before submitting its initial proposal.  Blue Origin never protested before proposal submission that, in order to compete, it needed to know the number of contracts that would be awarded or the funding available.  Blue Origin accepted these clear ground rules, yet evidently assumed (despite the warnings) that NASA would award multiple contracts.  Knowing now that its assumption was wrong, and that the Option A BAA meant what it said, Blue Origin contrives this thinly-veiled post-award protest to the unequivocal ground rules.  This is the exact sort of gamesmanship that the *Blue & Gold* waiver rule was designed to prevent:

> It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation. ***Vendors cannot sit on their rights***

65

*to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award and then, if unsuccessful, claim the solicitation was infirm*.

*Blue & Gold*, 492 F.3d at 1314 (quotation and alteration omitted).

### 2. Any Challenge Relating To NASA's HLS Appropriation Had To Be Filed Before Award.

Blue Origin's single award challenge has yet another timeliness problem. *Blue & Gold* does not disappear at the proposal submission deadline, but is extended by Federal Circuit precedent to all procurement challenges that the protester knew or should have known *before award*. *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382–83 (Fed. Cir. 2012). As the Federal Circuit explained in *COMINT*, although the *Blue & Gold* rule most often requires a protester to file before submitting its proposal, when a solicitation challenge becomes apparent after final proposal submission but before award, the *Blue & Gold* rule requires any solicitation challenge to be filed before award, or as soon thereafter as possible. *See id.* (solicitation amendment issued after proposal submission deadline must be protested before award); *Inserso*, 961 F.3d at 1349 (expanding *Blue & Gold* to "apply to all situations in which the protesting party had the opportunity to challenge a solicitation *before the award* and failed to do so.").

As GAO explained, Congress enacted NASA's HLS appropriation after proposal submission but before award, and on that basis alone Blue Origin knew or should have known that NASA did not have sufficient funds to afford Blue Origin's proposed price, triggering its obligation to protest before award:

> the closing date for proposals in response to the Option A BAA was December 8. On December 21, Congress passed the Consolidated Appropriations Act for FY2021 appropriating $850 million. The President then signed the Consolidated Appropriations Act into law on December 27. Thus, the protesters knew or reasonably should have known of NASA's available FY2021 funding for the HLS program upon enactment into law of the Consolidated Appropriations Act for FY2021 on December 27. **As addressed above, Blue Origin and Dynetics each respectively proposed FY2021 milestone payments in excess of the entire FY2021**

> ***HLS program appropriation.*** To the extent that the protesters now contend,
> months later and after award, that they should have been afforded the opportunity
> to modify their proposals in light of NASA's available FY2021 funding for the HLS
> program, such arguments present untimely challenges to the terms of the Option A
> BAA.

(AR Tab 108b67a, GAO Decision at 105028.)  Federal Circuit precedent, *COMINT* in particular,

demands the same conclusion here; Blue Origin's complaints related to NASA's HLS

appropriations must be dismissed as untimely.

### 3.   NASA Has No Obligation To Make Multiple Awards.

Timeliness aside, the crux of Blue Origin's claim is a challenge to NASA's decision to

award only a single contract rather than two.  But this Court has long recognized that, where a

solicitation provides the agency discretion to make one or multiple awards, challenges to a single

award are groundless.  *See Am. Safety Council, Inc. v. United States* 122 Fed. Cl. 426, 439 (2015)

(holding it is within agency's sound discretion to determine its minimum needs and determine

number of contract awards, consistent with solicitation");  *Glenn Def. Marine (Asia) PTE, Ltd. v.*

*United States*, 97 Fed. Cl. 311, 318-19 (2011) (holding that agency did not violate solicitation by

making multiple awards contrary to communicated intent where the solicitation allowed agency to

award either single or multiple awards); *Omega World Travel, Inc. v. United States*, 54 Fed. Cl.

570, 577 (2002) (holding that "[w]here an RFP does not require multiple awards, an Agency is

under no obligation to award to multiple offerors").

### 4.   FAR 15.206 Does Not Apply To The Option A BAA, And Would Not Require Amendment In Any Event.

Recognizing that it cannot directly challenge NASA's discretionary decision to award only

a single contract, Blue Origin attacks NASA's purported failure to amend the Option A BAA to

announce that it would only be making a single award.  Setting aside the fact that there is nothing

to amend because the Option A BAA already allows for a single award, the only legal authority

Blue Origin relies on, FAR 15.206(a) (Compl. ¶ 153), does not apply to this BAA procurement.

NASA structured this procurement as a BAA, stating in the Option A BAA itself that "[t]he Government is conducting this procurement as an 'other competitive procedure' in accordance with FAR 6.102(d)(2) and FAR 35.016," not under FAR Part 15.  (AR Tab 27, Option A BAA at 24473.)  Blue Origin does not explain why a FAR Part 15 regulation would govern a procurement conducted under FAR Part 35.  GAO correctly rejected Blue Origin's attempt to import FAR Part 15 rules into this BAA procurement, recognizing that "[t]he Option A BAA was issued pursuant to the rules established by FAR section 35.016, which are materially different from a FAR part 15 procurement."  (AR Tab 108b67a, GAO Decision at 105035 (citing *Millennium Space Sys., Inc.*, B-406771, Aug. 17, 2012, 2012 CPD ¶ 237).)  And, this Court recently confirmed when reviewing an acquisition method that "resemble[s] broad agency announcements," the court "can only evaluate whether the government followed its own process."  *Kinemetrics*, 2021 WL 4237169 at *1, 5.  Thus, Blue Origin can point to no legal basis for its presumption that NASA was required to amend the solicitation upon learning how much funding had been appropriated.

Even if FAR Part 15 rules applied, however, they would not require an amendment because the change in NASA's funding did not change the contractual performance required.  The HLS demonstration mission solicited remains the same.  Stated otherwise, the performance called for in the Option A BAA and the performance called out in SpaceX's Option A award are the same.  NASA just lacks sufficient funding to award more than one contract.  Accordingly, NASA had no obligation to amend the Option A BAA, and the single contract award to SpaceX was proper.  The Court should grant judgment in favor of Defendants on Blue Origin's Count 3.

### D.     The Court Need Not Address Blue Origin's Breach Of Contract Claim.

Blue Origin's Complaint Count 5 alleges that NASA breached an implied contract to consider Blue Origin's proposal fairly, re-asserting essentially the same allegations raised in Blue Origin's prior Counts and various other gripes from its sprawling statement of facts.  (Compl. ¶¶ 169-75.)  While breach of implied contract allegations have historically served as a distinct cause of action in bid protest cases, as Judge Sweeney recently recognized, the Federal Circuit has confirmed that "the arbitrary and capricious standard of review for bid protests encompasses such a claim," and, therefore, where a plaintiff has already alleged that an agency's procurement actions are arbitrary and capricious, as Blue Origin has in its first four counts, then "the court will not separately address [protester] arguments alleging a breach of the agency's duty of good faith and fair dealing."  *SAGAM Securite Senegal v. United States*, __ Fed. Cl. __, 2021 WL 3140559 at *4 & n.3 (June 25, 2021) (citing *Safeguard*, 989 F.3d at 1332).  In other words, on the merits, Count 5 is redundant to the allegations raised in Blue Origin's prior claims, and there is no need for separate analysis.[28]  The Administrative Record confirms that NASA's Option A evaluation and award decision to SpaceX are rational and lawful, and Blue Origin has not and cannot demonstrate any prejudicial violation of procurement law or arbitrary action.  For these reasons, Blue Origin's Count 5 allegations lack merit and must be denied along with the rest of its Complaint, and the Court should grant judgment in favor of Defendants on Blue Origin's Count 5.

---

[28]  Blue Origin also vaguely alleges that "NASA reviewed SpaceX's proposal differently from the other proposals, giving SpaceX higher marks than it gave to Blue Origin for the same issues." (Compl. ¶ 174.)  To the extent Blue Origin meant to allege unequal treatment in the evaluation, this allegation is not sufficient.  Blue Origin offers no detail about what "issues" it claims were treated differently, much less that any such different treatment was not properly the product of differences in the offerors' proposals.  *Office Design*, 951 F.3d at 1372 (citing FAR 1.102-2(c)(3) and noting "An agency is under no obligation to assign dissimilar proposals the same evaluation rating."))  SpaceX reserves the right to respond to any such allegation if Blue Origin provides sufficient factual information in its MJAR.

## VII.   THERE IS NO BASIS TO ENJOIN NASA'S OPTION A AWARD TO SPACEX.

As discussed in Sections V and VI, *supra*, Blue Origin fails to demonstrate success on the merits—the award to SpaceX was legal and rational and Blue Origin cannot demonstrate prejudice in any event.  Accordingly, Blue Origin is not entitled to injunctive relief.  *iAccess*, 143 Fed. Cl. at 539 (citing *Dell Fed. Sys., L.P v. United States*, 906 F.3d 982, 999 & n.13 (Fed. Cir. 2018). Even if Blue Origin could succeed on the merits, the maximum scope of injunctive relief Blue Origin could possibly be entitled to is the ability to engage NASA in discussions and submit a revised proposal for consideration as a possible second contract awardee.  Blue Origin cannot demonstrate any irreparable harm from NASA proceeding with performance of its Option A contract with SpaceX, and certainly none that would outweigh the harm to NASA, SpaceX, and public interests that would accompany an injunction of SpaceX's contract.[29]

First, given the nature of this BAA procurement, the award to SpaceX does not prevent Blue Origin from engaging in discussions with and submitting a revised proposal to NASA.  The Option A BAA plainly allows NASA to make multiple awards; the contract award to SpaceX does not preclude a second contract award to Blue Origin—that depends on NASA's available funding and the merit and cost of Blue Origin's proposal.  Where a plaintiff cannot show that "it will lose the opportunity to compete for the contract in question if the court does not grant some form of temporary injunctive relief," it cannot establish irreparable harm.  *GEO Grp., Inc. v. United States*, 100 Fed. Cl. 223, 228 (2011).

---

[29] Blue Origin's Count 5 allegations that NASA breached an implied contract of fair dealing cannot, even if successful, result in an award of injunctive relief.  As the Federal Circuit recently detailed, such allegations are historically rooted in a claim under 28 U.S.C. § 1491(a) and permit award of only proposal preparation costs; therefore if successful Blue Origin's Count 5 would result at most in the award of monetary manages.  *See Safegaurd*, 989 F.3d at 1339-43; *Medline Indus., Inc. v. United States*, __ Fed. Cl. __, 2021 WL 3483429 at *16 (July 30, 2021) (addressing breach of implied contract and proposal costs separate from injunctive relief).

Conversely, the harm to NASA of further delays is significant and may risk the mission altogether, as NASA recounted in its opening brief to GAO:

> But it is not an overstatement to say that all of the successes upon which the Option A procurement is built, all of this once-in-a-generation momentum, can easily be undone by one party—in this case, Blue Origin—who seeks to prioritize its own fortunes over that of NASA, the United States, and every person alive today who dreams to see humans exploring worlds beyond our own. Plainly stated, a protest sustain in the instant dispute runs the high risk of creating not just **_delays_** for the Artemis program, **_but that it will never actually achieve its goal of returning the United States to the Moon._** What begins as a mere procurement delay all too easily turns into a lack of political support, a budget siphoned off for other efforts, and ultimately, a shelved mission.

(AR Tab 108b25, NASA MOL at 103442.)

Moreover, SpaceX won its Option A contract because it offered the best solution at the lowest price—electing in its initial proposal to make a significant corporate contribution demonstrating its commitment to NASA and this mission.  (Unlike Blue Origin, which waited until it lost the competition and months after GAO's decision to announce publicly an intention to show any commitment to this mission that its litigation tactics are endangering.)  The continued delay in SpaceX's contract performance will also cause NASA irreparable harm—as it has throughout this litigation— ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████ .

Finally, delaying implementation would also cause significant harm to the public interest, and the national interest in the "space race."  This Court must "give due regard to the interests of

████████████████████████████████████████████████████████████
█████████████████████████████████████████████

national defense and national security" when exercising bid protest jurisdiction, 28 U.S.C. § 1491(b)(1)(3), and must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *Winter v. National Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  It is no secret that NASA's HLS acquisition is directly tied to national security interests in space, and the United States' ability to maintain and sustain human presence on the moon is a critical aspect of competition with other powers, particularly China:

> Space is again a focal point of renewed great power competition.  The once significant lead enjoyed by the US in space is challenged as the barriers of space access have lowered and US technological superiority has eroded….The 2017 US National Security Strategy calls for advancing space as a priority domain, promoting space commerce, and maintaining the US lead in space exploration. A recurring theme in US policy is "maintaining and advancing United States dominance and strategic leadership in space."
>
> ….
>
> Increased awareness of the criticality of US space capabilities is driving a national sense of urgency for whole of government alignment and resourcing.  The US is pursuing aggressively a return to the Moon by 2024 and the development of true capabilities and infrastructure for a sustained lunar presence is an intermediate step to Mars and beyond.
>
> ….
>
> The US is not alone in planning to return humans to the Moon or expanding the use of space. China has announced its intention to do so by 2035. China is committed and credible in its pledge to become the leading, global super-power, to include space, by 2049 marking the 100th anniversary of the People's Republic. A key component of China's strategy is to displace the US as the leading power in space and lure US allies and partners away from US-led space initiatives, through its Belt and Road initiative and plans for an Earth Moon Economic Zone. Nor is China alone. An expanding number of nations are emerging as space competitors and potential adversaries. Meanwhile, the US lacks a national-level "North Star" vision for space industrial and economic development to align efforts across the space sector to maintain US leadership. [30]

---

[30] Ex. D, State Of The Space Industrial Base 2020: A Time For Action To Sustain Us ECONOMIC & MILITARY LEADERSHIP IN SPACE 6, 9, 11 (July 2020), at http://aerospace.csis.org/wp-content/uploads/2020/07/State-of-the-Space-Industrial-Base-2020-Report_July-2020_FINAL.pdf.

In sum, because NASA's award to SpaceX's does not prevent Blue Origin from continuing to compete for a second Option A award, and an injunction of SpaceX's Option A award places at risk the U.S. national interests in returning humans to the moon as soon as possible, even if this Court does conclude that Blue Origin is entitled to some remedy, there is no equitable basis to permanently enjoin SpaceX's Option A contract. *See Cont'l Serv. Grp., Inc. v. United States*, 722 Fed. Appx. 986, 995-97 (Fed. Cir. 2018) (overturning order for injunctive relief in bid protest).

## VIII.  CONCLUSION

For the reasons described herein, this Court should grant SpaceX's Cross-MJAR and deny Blue Origin's MJAR.[31]

Dated:   October 1, 2021

*Of Counsel:*
Mark D. Colley
Nathaniel E. Castellano
Thomas A. Pettit
Aime JH Joo
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

/s/ Kara L. Daniels
Kara L. Daniels
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Phone:  (202) 942-5768
Fax:  (202) 942-5999

*Attorney of Record for Space Exploration Technologies Corp.*

---

[31] Given the simultaneous briefing schedule, this opening brief is dedicated to refuting the primary bases of protest raised in Blue Origin's Complaint, which SpaceX expects will comprise the bulk of Blue Origin's opening brief.  That SpaceX does not engage here in a tit-for-tat rebuttal of every factual assertion and misstatement in Blue Origin's Complaint, however, is no concession that any such assertion in Blue Origin's Complaint is correct.  To the contrary, the administrative record amply demonstrates that NASA's award decision is rational, well documented, eminently reasonable, and correct.  As demonstrated herein, Blue Origin has not and cannot identify any prejudicial error that would warrant setting aside NASA's decision.  Nevertheless, to the extent Blue Origin raises additional arguments in its opening brief that SpaceX has not preemptively rebutted here, SpaceX will respond to those arguments in its response brief.