REDACTED VERSION

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

| | |
|---|---|
| BLUE ORIGIN FEDERATION, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| THE UNITED STATES, ) | Case No. 1:21-cv-01695-RAH |
| ) | Judge Richard A. Hertling |
| Defendant, ) | |
| ) | ███████████ |
| and ) | |
| ) | |
| SPACE EXPLORATION ) | |
| TECHNOLOGIES CORP., ) | |
| ) | |
| Defendant-Intervenor. ) | |
| ) | |

**DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND REPLY IN SUPPORT OF DEFENDANT'S AND DEFENDANT-INTERVENOR'S CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

*Of Counsel:*

Mark D. Colley
Nathaniel E. Castellano
Thomas A. Pettit
Aime JH Joo
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

Kara L. Daniels
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Phone:  (202) 942-5768
Fax:  (202) 942-5999

*Attorney of Record for Space Exploration Technologies Corp.*

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  BLUE ORIGIN HAS NOT SHOWN COMPETITIVE PREJUDICE FROM ANY PROCUREMENT ERROR AND THUS HAS NO STANDING TO PURSUE ITS CLAIMS AND IS NOT ENTITLED TO RELIEF............................................................. 5

    A.  Blue Origin Must Prove Prejudice; This Court May Not Presume Prejudice. ................................................................................................. 8

    B.  Blue Origin Has No Substantial Chance Of Award............................... 9

        1.  Blue Origin Cannot Submit a Viable Alternative Proposal With a Substantial Chance for an Option A Contract Award................................ 9

        2.  Blue Origin's Approach Exceeds NASA's Appropriations and Budget. ................................................................................................ 16

III.  THE COURT SHOULD GRANT JUDGMENT IN FAVOR OF DEFENDANT AND DEFENDANT INTERVENOR. ................................................................ 18

    A.  Blue Origin's Milestone Review Based Allegations Misread The Option A BAA, Are Untimely Solicitation Challenges, And Fail For Lack Of Prejudice. ................................................................................................ 18

        1.  Blue Origin Interprets "HLS Element" Incorrectly................................... 26

        2.  Blue Origin's Interpretation of the Launch Vehicle Reviews Is Similarly Unreasonable.............................................................................. 30

        3.  Blue Origin Raises an Untimely Challenge to the BAA Terms. .............. 33

        4.  NASA's Interpretation of the FRR Milestone Requirements Did Not Change and Its Evaluation of SpaceX Was Reasonable.......................... 34

        5.  Blue Origin Was Not Prejudiced by NASA's Evaluation of FRRs and Other Reviews. ................................................................................... 40

    B.  Blue Origin's Discussions Argument Is Untimely And Without Merit. ............... 40

    C.  Blue Origin's Argument That NASA Was Required To Amend The Solicitation Is Untimely And Incorrect.................................................. 45

    D.  NASA's Evaluation Of Other Aspects Of The Blue Origin And SpaceX Technical Proposals Was Reasonable.................................................... 49

i

1.      The Findings Assigned to the Offerors' Communications Approaches Resulted From Proposal Differences and Not Unequal Treatment. .................................................. 50

2.      NASA's Strengths Findings Did Not Constitute Unequal Treatment. ............................................................. 52

E.      The Court Need Not Address Blue Origin's Breach Of Contract Claim. ............. 54

IV.     THERE IS NO BASIS TO ENJOIN NASA'S OPTION A AWARD TO SPACEX. ............................................................................. 54

V.      CONCLUSION ............................................................................. 60

## TABLE OF AUTHORITIES

CASES                                                                                          Page(s)

*Agile-Bot II, LLC v. United States*,
   __ Fed. Cl. ___, 2021 WL 4484870 (Sept. 4, 2021)........................................................52, 53

*AgustaWestland N.A., Inc. v. United States*,
   880 F.3d 1326 (Fed. Cir. 2018)........................................................................35

*Alfa Laval Separation, Inc. v. United States*,
   175 F.3d 1365 (Fed. Cir. 1999)........................................................................25

*Alfa Laval Separation, Inc. v. United States*,
   40 Fed. Cl. 215 (1998) ........................................................................25

*Am. Safety Council, Inc. v. United States*,
   122 Fed. Cl. 426 (2015) ........................................................................47

*Astellas Pharma US, Inc. v. Food & Drug Admin.*,
   642 F. Supp. 2d 10 (D.D.C. 2009) ........................................................................57

*Avtel Servs., Inc. v. United States*,
   70 Fed. Cl. 173 (2006) ........................................................................24

*Bannum, Inc. v. United States*,
   404 F.3d 1346 (Fed. Cir. 2005)........................................................................14

*Blue & Gold Fleet, L.P. v. United States*,
   492 F.3d 1308 (Fed. Cir. 2007)........................................................34, 41, 43, 46

*CGS Administrators, LLC v. United States*,
   110 Fed. Cl. 431 (2013) ........................................................................54

*Cleveland Assets, LLC v. United States*,
   133 Fed. Cl. 108 (2017) ........................................................................55

*Cleveland Assets, LLC v. United States*,
   883 F.3d 1378 (Fed. Cir. 2018)........................................................................38

*CliniComp Int'l, Inc. v. United States*,
   904 F.3d 1353 (Fed. Cir. 2018)........................................................................15

*Comput. Scis. Corp. v. United States*,
   51 Fed. Cl. 297 (2002) ........................................................................59

*Concurrent Techs. Corp.*,
   B-415513, Jan. 18, 2018, 2018 CPD ¶ 59........................................................................54

*CRAssociates, Inc. v. United States*,
   103 Fed. Cl. 23 (2012) ...................................................................................55

*Criterion Sys., Inc. v. United States*,
   144 Fed. Cl. 409 (2019) ...........................................................................4, 46, 47

*Distributed Sols., Inc. v. United States*,
   106 Fed. Cl. 1 (2012), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013) ...........................................24

*E.W. Bliss Co. v. United States*,
   77 F.3d 445 (Fed. Cir. 1996)...................................................................................38

*Elec. Data Sys., LLC v. United States*,
   93 Fed. Cl. 416 (2010) ...................................................................................49

*Eskridge & Assocs. v. United States*,
   955 F.3d 1339 (Fed. Cir. 2020)...................................................................................9, 11

*Femme Comp Inc. v. United States*,
   83 Fed. Cl. 704 (2008) ...................................................................................54

*Galen Med. Assocs., Inc. v. United States*,
   369 F.3d 1324 (Fed. Cir. 2004)...................................................................................56

*Glenn Def. Marine (ASIA), PTE Ltd. v. United States*,
   720 F.3d 901 (Fed. Cir. 2013)...................................................................................8

*Guardian Moving & Storage Co. v. United States*,
   122 Fed. Cl. 117 (2015), *aff'd*, 657 F. App'x 1018 (Fed. Cir. 2016) ...............................49, 50

*H.G. Props. A, L.P. v. United States*,
   68 F. App'x 192, 195 (Fed. Cir. 2003) ...........................................................................14, 15

*Harmonia Holdings Grp., LLC v. United States*,
   999 F.3d 1397 (Fed. Cir. 2021)...................................................................................19

*HVF W., LLC v. United States*,
   846 F. App'x 896 (Fed. Cir. 2021)...................................................................................15

*IBM Corp. v. United States*,
   118 Fed. Cl. 677 (2014) ...................................................................................59

*Inserso Corp. v. United States*,
   961 F.3d 1343 (Fed. Cir. 2020)...................................................................................46

*Inspace 21 LLC v. United States*,
   128 Fed. Cl. 69 (2016) ...................................................................................38

*Ironclad/EEI v. United States*,
    78 Fed. Cl. 351 (2007) ...............................................................................................15

*Joint Action in Cmty. Serv., Inc.*,
    B-214564, Aug. 27, 1984, 84-2 CPD ¶ 228 .............................................................48

*Kinemetrics, Inc. v. United States*,
    __ Fed. Cl. __, 2021 WL 4237169 (Sept. 10, 2021) ...............................................44

*L3 Comms. EOTech, Inc. v. United States*,
    83 Fed. Cl. 643 (2008) .........................................................................................25, 26

*Landmark Land Co. v. F.D.I.C.*,
    256 F.3d 1365 (Fed. Cir. 2001) ...........................................................................27, 28

*Medline Indus., Inc. v. United States*,
    __ Fed. Cl. ___, 2021 WL 348342 (July 30, 2021) .............................................47, 54

*Mortgage Contracting Servs., LLC v. United States*,
    153 Fed. Cl. 89 (2021) ...............................................................................................26

*Office Design Group v. United States*,
    951 F.3d 1366 (Fed. Cir. 2020) ...........................................................................50, 52

*Omega World Travel, Inc. v. United States*,
    54 Fed. Cl. 570 (2002) ...............................................................................................47

*Orion Tech., Inc. v. United States*,
    101 Fed. Cl. 492 (2011) .............................................................................................35

*Per Aarsleff A/S v. United States*,
    829 F. 3d 1303 (Fed. Cir. 2020) ...............................................................................34

*PGBA, LLC v. United States*,
    60 Fed. Cl. 196 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004) ...............................59

*Richey v. United States*,
    322 F.3d 1317 (Fed. Cir. 2003) ...........................................................................39, 40

*Rivada Mercury, LLC v. United States*,
    131 Fed. Cl. 663 (2017) .............................................................................................44

*RMGS, Inc. v. United States*,
    140 Fed. Cl. 728 (2018) .............................................................................................15

*Safeguard Base Operations, LLC v. United States*,
    989 F.3d 1326 (Fed. Cir. 2021) ...........................................................................27, 38

*SAGAM Securite Senegal v. United States*,
   __ Fed. Cl. __, 2021 WL 3140559 (June 25, 2021)..............................................54

*Sampson v. Murray*,
   415 U.S. 61 (1974)...........................................................................................56

*Savantage Fin. Servs., Inc. v. United States*,
   150 Fed. Cl. 307 (2020) ...................................................................................56

*Sigmatech, Inc. v. United States*,
   141 Fed. Cl. 284 (2018) ...................................................................................44

*Sirius Fed., LLC v. United States*,
   153 Fed. Cl. 410 (2021) ...................................................................................38

*SOS Int'l LLC v. United States*,
   127 Fed. Cl. 576 (2016) .....................................................................................8

*Symetrics Indus., Inc.*,
   B-274246 et al., Aug. 20, 1997, 97-2 CPD ¶ 59 ..............................................48

*Sys. Dynamics Int'l, Inc. v. United States*,
   130 Fed. Cl. 499 (2017) ...................................................................................44

*Sys. Studies & Simul., Inc. v. United States*,
   152 Fed. Cl. 20 (2020) ..................................................................................9, 10

*Tolliver Group, Inc. v. United States*,
   151 Fed. Cl. 70 (2020) ................................................................................41, 42

*Unisys Corp. v. United States*,
   89 Fed. Cl. 126 (2009) .....................................................................................44

*WaveLink, Inc. v. United States*,
   __ Fed. Cl. __, 2021 WL 2762814 (June 24, 2021).......................................11, 42

*WellPoint Mil. Care Corp. v. United States*,
   953 F.3d 1373 (Fed. Cir. 2020)..........................................................................8

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)............................................................................................55

*Wisconsin Gas Co. v. F.E.R.C.*,
   758 F.2d 669 (D.C. Cir. 1985)......................................................................55, 57

*Zeidman Techs., Inc. v. United States*,
   144 Fed. Cl. 294 (2019) ...................................................................................15

**STATUTES**

10 U.S.C. § 2305 ...................................................................................................................41, 42, 44

28 U.S.C. § 1491 ...............................................................................................................................8

**REGULATIONS**

48 C.F.R. § 1.102-2 ........................................................................................................................44

48 C.F.R. § 15.306 .........................................................................................................................44

**OTHER AUTHORITIES**

Ralph C. Nash, *Court of Federal Claims Jurisdiction: Parsing the Statues and
Regulations*, 35 Nash & Cibinic Rep. NL ¶ 9 .........................................................................42

Defendant-Intervenor Space Exploration Technologies Corp. ("SpaceX"), by undersigned counsel, submits this Reply in Support of its Cross-Motion for Judgment on the Administrative Record ("MJAR") and Response Opposing the Blue Origin Federation, LLC ("Blue Origin") MJAR. The record demonstrates that National Aeronautics and Space Administration ("NASA") complied with the law and Broad Agency Announcement No. NNH19ZCQ001K ("Option A BAA") in awarding the initial Human Landing System ("HLS") demonstration mission and requirements development and design Option A contract to SpaceX. The Court, accordingly, should grant judgment in favor of the Defendant and Defendant-Intervenor, and dismiss or deny the claims asserted in Blue Origin's Complaint.

## I.   INTRODUCTION

Before this Court, Blue Origin has reprised and expanded its overwrought and mistaken claim to the Government Accountability Office ("GAO") that SpaceX's proposal was deficient based on the number and timing of proposed milestone and other reviews. Blue Origin insists that the solicitation required a milestone event for every launch in SpaceX's Concept of Operations. SpaceX and NASA disagreed based on the plain language of the Option A BAA. As NASA and SpaceX have demonstrated, GAO misinterpreted the solicitation language. GAO did, however, rightly deny Blue Origin's claim because, given the type of architecture Blue Origin proposed, one that included only launches of lander elements and no supporting spacecraft, Blue Origin could show no prejudice. Its protest was futile. The same is true here.

Although two Blue Origin executives spin a tall tale about how the Option A milestone and other review instructions purportedly "forced" Blue Origin to change architecture it supposedly proposed originally in the base period (ECF 61-1 at 69-70), the record refutes these claims. Blue Origin proposed a three element lander both in the base period and for the Option A contract, and in both instances ███████████████████████████████████ to get those lander elements in orbit.
███████████████████████████████████████████████████████
███████████████████████████████████████████

Blue Origin suggests that in an alternative or reopened procurement it could have developed and presented instead, apparently out of whole cloth, a "simpler lander design and ███████ ██████"—evidently with supporting spacecraft and essentially adopting SpaceX's different technical solution. (ECF 61-1 at A-9, A-17.)  Nonsense.  The record confirms this is fantasy.

Equally incredible are Blue Origin's claims that in a reopened procurement it would propose a far better, but far less costly, HLS solution more in line with NASA's funding.  The Option A BAA warned offerors to propose their best solution and price.  Blue Origin elected not to do so, and before GAO refused to commit to any specific price reduction.  Since then, Blue Origin continues its "offer to meet" NASA's funding limits (whatever that means), yet now caveats that offer with the unspecified demand that "some of the Solicitation requirements can be waived or substantially modified." (ECF 61-1 at A-12.)  Worse still, Blue Origin fails to describe what solution it would offer at any reduced price or proffer any evidence that such a solution would have a substantial chance of securing a contract award.  The inability to demonstrate prejudice from the procurement errors alleged undermines and overcomes Blue Origin's entire protest.

Blue Origin's substantive objections fare no better.  The predicate for Blue Origin's histrionics collides with the facts.  Reading the Blue Origin MJAR, one would think that NASA's overarching, guiding need in this procurement was the scheduling of milestone payment and other reviews, that the structure of and instructions for those reviews drove nearly all of the offerors' material design and pricing decisions, and how these reviews were to be conducted was the program's most critical risk consideration.  Blue Origin's consuming focus on these reviews not only creates a distorted framework, but also misstates the solicitation and the record.

While Blue Origin insists that SpaceX failed to meet, and NASA failed to apply correctly, solicitation instructions for various milestone and other reviews, Blue Origin does so by

misinterpreting key provisions and ignoring many others.  Accurately read, and as a whole, the Option A BAA's plain meaning is apparent and SpaceX complied with the instructions.  Because SpaceX proposed a unique single-element HLS Integrated Lander, it correctly proposed a single Flight Readiness Review ("FRR") milestone event, two weeks before the launch of a lander element, precisely as the Option A BAA instructed.

But the FRR milestone event was not the only means that SpaceX proposed in order to give NASA insight and collaboration opportunities and to ensure mission success.  SpaceX's approach includes loads of flight tests and reviews, with NASA fully involved and informed at every stage. Blue Origin, of course, ignores all those aspects of SpaceX's solution (as does its paid consultant). NASA, however, did not.  Consequently, although NASA found that SpaceX's single FRR milestone event did not provide the level of participation NASA would prefer with regard to supporting spacecraft, i.e., the SpaceX approach had the effect of "lessening" (not excluding) NASA's participation, this was evaluated as only a "relatively minor" and easily correctable management risk, which did not overcome SpaceX's otherwise "Outstanding" project management approach.  (AR Tab 59c, SEP Report at 62806, 62814.)  NASA then addressed this Weakness via a small adjustment to SpaceX's proposed milestone payment schedule (with no price increase), using the very mechanism that the solicitation prescribed, *after* having determined that awarding an Option A contract to SpaceX was in the government's best interest.

Blue Origin's protest presents an alternative view that is neither credible nor supported by the record.  As Blue Origin would have it, NASA deliberately ignored the solicitation and rampant risk concerns, just to award a contract on the cheap.  Blue Origin gets there, however, only with a careless read of the solicitation, and a distorted portrayal of both the SpaceX proposal and the

NASA evaluation.  Again, when the record is considered in full and accurately, Blue Origin's allegations collapse.

Yet, rigorous analysis of the solicitation terms is not even necessary in order to resolve these Blue Origin objections.  Blue Origin contends that its view of the solicitation requirements was critical to its system design decisions.  But the different interpretation that SpaceX followed is apparent from the face of the solicitation.  Blue Origin's objections now to this alternative, but self-evident, solicitation interpretation must be rejected as untimely under the *Blue & Gold* waiver rule.  In fact, that straightforward principle resolves multiple issues against Blue Origin.

For instance, Blue Origin's contention that NASA's post-selection negotiations with SpaceX were actually "discussions" subject to FAR Part 15 requirements ignores both the nature of the procurement and the clear solicitation terms.  Blue Origin competed under this announced procurement process without protest and so waived its present challenge.

Blue Origin also persists in misapplying FAR 15.206 and claiming that NASA was obligated to amend the solicitation upon learning that funding limitations would restrict the number of Option A contracts to be awarded.  The foundational problem with this argument is that the solicitation ***already*** alerted offerors that funding limits would control the number of contracts to be awarded.  So, if Blue Origin truly believed that uncertainty about funding and the number of contracts to be awarded was problematic, then its protest was due long ago.  Moreover, the reduced funding did not change any requirements; the performance solicited and required under the awarded contract remained the same.  And FAR 15.206 does not apply here.  *Criterion Sys., Inc. v. United States*, 144 Fed. Cl. 409, 416 (2019) (dismissing argument that agency violated FAR 15.206 to reflect changed requirements where protester "participated in the competition without complaint until its quote was rejected").

Blue Origin's MJAR also resurrects two unsuccessful technical objections raised at GAO, but gives them relatively short shrift treatment, reflecting Blue Origin's apparent recognition that they have no merit.  The first relates to NASA's reasoned and documented judgment to assign Blue Origin a Significant Weakness for its quantitatively more and qualitatively worse communications approach shortfalls.  The second involves Blue Origin's disagreement with judgments by the Source Evaluation Panel ("SEP") and Source Selection Authority ("SSA") that credited two separate benefits of SpaceX's proposed approach.  Blue Origin offers no basis for the Court to reject NASA's evaluation as unreasonable or incorrect, and it would be legal error for the Court to substitute its own assessments for NASA's, as Blue Origin requests.

Accordingly, Blue Origin is not entitled to any relief.  Blue Origin's failure to secure an Option A contract was not due to some procurement error or mistake by NASA.  Instead, Blue Origin did not get a contract because its proposed HLS approach was not that good and was *way* too expensive.  For this reason, SpaceX respectfully requests that the Court dismiss or deny each of Blue Origin's unfounded allegations, grant judgment in favor of the United States and SpaceX, and permit SpaceX and NASA to proceed with the important Option A contract without further undue delay.

## II.   BLUE ORIGIN HAS NOT SHOWN COMPETITIVE PREJUDICE FROM ANY PROCUREMENT ERROR AND THUS HAS NO STANDING TO PURSUE ITS CLAIMS AND IS NOT ENTITLED TO RELIEF.

As SpaceX and the United States thoroughly detailed in their opening briefs, Blue Origin has not and cannot demonstrate the competitive prejudice necessary to establish (i) that it is an interested party with standing to bring this protest, or (ii) that it can succeed on the merits.  (ECF 60 at 38-49; ECF 62 at 26-38.)  Tellingly, Blue Origin saves its superficial discussion of prejudice to the tail end of its brief, and leads by asking this Court simply to presume prejudice.  (ECF 61-1

at 65-68.)  Such a presumption is prohibited by statute, and by Supreme Court and Federal Circuit precedent; and, even under the misguided strand of decisions that rely on such a presumption, Blue Origin would not qualify.

Desperate not to suffer the same fate as its unsuccessful GAO protest, Blue Origin asks this Court to suspend disbelief and adopt an unfathomable and unsubstantiated fantasy scenario refuted by the Administrative Record, which the highly questionable Blue Origin executive declarations attached to its MJAR attempt to articulate in a nebulous and mismatched manner.  (*Id.* at 68-71, A-1 to A-21.)  For reasons described in the accompanying motion to strike, the Court should not consider these out-of-court statements or afford them any presumption of good faith, completeness, or objectivity.   These declarations claim that, had Blue Origin known that supporting spacecraft do not trigger various milestone reviews—the predicate for its main protest objection, Blue Origin would have retained the architecture Blue Origin purportedly proposed in the base period, which apparently—in Blue Origin's altered reality for this litigation—would have been a much better Option A solution than the one it proposed.  (ECF 61-1 at A-7 to A-9, A-16 to A-17.)  Blue Origin's MJAR goes even further, boldly claiming that the Option A BAA's "unambiguous and specific timing required for the critical milestones" purportedly "forced" Blue Origin to change its proposed base period architecture.  (*Id*. at 68-69.)  These statements are demonstrably false.  The record reveals that Blue Origin proposed a three-element HLS Integrated Lander without supporting spacecraft in the base period and retained that three-element HLS architecture without supporting spacecraft in Option A—unremarkable and expected given that the Option A procurement was a follow-on to the base period contract.  (*Compare* AR Tab 9, HLS Overview at 267-68 *with* AR Tab 32a, BO Vol. I at 33346.)  In other words, whether or not the Option A BAA instructions provide that supporting spacecraft launches trigger a NASA-led FRR

milestone event, those instructions had no impact on Blue Origin's proposed technical solution that did not include such support spacecraft.

Blue Origin's contrived prejudice contentions (and the supporting declarations) also do not offer a settled position on what solution Blue Origin claims it would have proposed. Instead, they vacillate between alleging that Blue Origin would have proposed a completely different solution—an undefined and nonspecific ████████████████████████" (ECF 61-1 at A-9, A-17 to A-18), and alleging that Blue Origin would have proposed something to address the Weaknesses and Significant Weakness identified in its current solution. (*Id.* at 69, A-10, A-19.)

Equally defeating to Blue Origin, none of Blue Origin's claims resolve the fact that Blue Origin's proposed price drastically exceeds NASA's budget, itself precluding any chance of award. Even Blue Origin's evolving protest-prices cannot bridge the gap. And, Blue Origin's capricious price reduction claims are likewise too indeterminate to demonstrate any substantial chance of award, even if Blue Origin could identify a serious procurement error, which it has not. Neither the declarations nor the Blue Origin MJAR explain what solution, at what price, Blue Origin asserts it could have or would have proposed. (*Id*. at 69-71.) Although one of the declarants claims that Blue Origin's owner is willing to add $3 billion in private contributions, neither the declarations nor Blue Origin's MJAR tie this purported price reduction to a specific Blue Origin proposal. (*Id.* at A-10; 70.) The only thing certain is that, whatever alternative technical solution it anticipates, Blue Origin's willingness to meet NASA's funding limits is conditioned on "knowledge that some of the Solicitation's requirements can be waived." (*Id*. at A-12.)

Accordingly, the objections Blue Origin has raised to the evaluation and contract award to SpaceX are not only unsound, they are fruitless. Blue Origin lacked a substantial chance of award

based on the Option A award criteria and evaluation results,[1] and its chances have not improved with its untenable prejudice claims.

### A.    Blue Origin Must Prove Prejudice; This Court May Not Presume Prejudice.

Blue Origin argues that, if this Court finds an error, then the Court must presume prejudice. (ECF 61-1 at 66-68.)  Blue Origin is wrong.  The Federal Circuit has never endorsed a presumption of prejudice in bid protests; instead, it has held that to "prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process."  *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quotation omitted).  The bid protest prejudice requirement is rooted in this Court's statutory mandate to apply the Administrative Procedure Act ("APA") standard of review, 28 U.S.C. § 1491(b)(4), which expressly requires that, when a court is exercising APA review, "due account shall be taken of the rule of prejudicial error."  953 F.3d at 1377 (quoting 5 U.S.C. § 706 and citing *Shinseki v. Sanders*, 556 U.S. 396, 406 (2009) (confirming that every case of APA review requires that court give due regard to harmless error rule)); *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) ("protestor bears the burden of proving that a significant error marred the procurement in question.").

---

[1] Blue Origin also declares itself "next in line" for award, suggesting that if NASA had rejected SpaceX's proposal, then NASA would have awarded the Option A contract to Blue Origin.  (ECF 61-1 at 68.)  This is false.  Blue Origin's $6 billion initial proposal was out-of-line with NASA's budget, and also required discussions in order to be considered for award given the evaluation finding that Blue Origin had proposed improper "advance payments".  (AR Tab 77, Source Selection Statement at 63054 (noting that, under plain language of the Option A BAA, Blue Origin's initial proposal was "ineligible for award without the Government engaging in discussions or negotiations with Blue Origin….").)  The SSA, however, expressly declined to engage in "negotiations or discussions" with Blue Origin because she determined that its proposal did not otherwise "present[] a good value to the Government."  (*Id*. at 63056-57, n.1.)  In other words, the record makes clear that Blue Origin was not "in line" for award at all. *SOS Int'l LLC v. United States*, 127 Fed. Cl. 576, 588 (2016) (finding plaintiff's allegations that it would have been next in line as merely speculative and inadequate to support standing).

Blue Origin's articulation of this flawed argument also ignores that, in the various non-binding decisions from this Court invoking such a presumption, the record establishes that the procurement error "***actually affected the protestor's ability to be awarded the contract.***" *Sys. Studies & Simul., Inc. v. United States*, 152 Fed. Cl. 20, 26-28 (2020).[2] Here, however, as SpaceX and the United States have already explained, and further confirmed below, the objections Blue Origin raises did not impact Blue Origin's ability to obtain an Option A award. Instead, the business decisions Blue Origin made in its proposal precluded an Option A award.

### B.    Blue Origin Has No Substantial Chance Of Award.

To establish both standing and success on the merits, Blue Origin must demonstrate that but for the error, "it would have had a substantial chance of winning the Contract." *See Eskridge & Assocs. v. United States*, 955 F.3d 1339, 1344-46 (Fed. Cir. 2020) (quotation and alteration omitted) (protester lacked standing where it failed to "establish[] not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error."). Blue Origin cannot meet this standard; it offers no evidence based argument that it would have a substantial chance for award.

### 1.    Blue Origin Cannot Submit a Viable Alternative Proposal With a Substantial Chance for an Option A Contract Award.

Blue Origin's contrived theory of harm from its milestone review allegations are untenable. In its unverified Complaint, Blue Origin claimed that, had it only known how NASA would treat supporting spacecraft in the milestone and other reviews, Blue Origin would have ███████ ████████████████████████ "proposed a fundamentally different HLS design, an alternative single-element design ████████████████████████ the three-element lander proposal it

---

[2] All emphasis of quoted material in this brief is added unless otherwise expressly noted.

ultimately submitted," essentially mimicking SpaceX's proposed architecture to rely on a single-element lander and supporting spacecraft tankers.  (Compl. ¶¶ 133, 26.)  Certain allegations in the Sherwood and Smith declaration appear to proceed down this ill-advised path of Blue Origin proposing a "simpler lander design ██████████████████████████████ yet neither aver that ███████████████████████████.  (ECF 61-1 at A-9 to A-10, A-11, A-16 to A-19.)  With an interesting (yet equally false) twist, Blue Origin's MJAR and the Smith declaration misleadingly contend that this solution "was the approach it originally put forward in the HLS Base Period."  (*Id*. at 70, A-7 to A-16.)

This Blue Origin prejudice claim is false.  The record reveals plainly that Blue Origin's base period proposal offered a three-element architecture, each created by a different company, and ████████████████████████████████████████████
█████████████████████████████████████████████.
(AR Tab 108a.106, Base Period Source Selection Statement at 91986 (noting that Blue Origin and its two partners each will develop a lander element); AR Tab 9, HLS Overview at 267-68.)

The record also confirms that, contrary to the MJAR arguments and statements in the declarations, Blue Origin's Option A proposal also offered this multiple element approach, utilizing three launches ██████████████████████████.  (AR Tab 32a, BO Vol. I at 33346 ("██████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████); *id*. at 33385 ("███████████
██████████████████████████████████████████████
███████████████████████████████").)

Equally fatal, Blue Origin cannot show that NASA would permit Blue Origin to waste all

10

████████████████████████████████████████████████
██████████████████████████████████

the base period work and propose a completely different purportedly "simpler lander design" and

███████████████████. (ECF 61-1 at A-9.) Where a protester establishes that an agency waived a

material solicitation requirement and attempts to demonstrate prejudice based on potential

proposal revisions, the protester must establish that the agency is actually obligated to invite such

broad proposal revisions, and, critically—"there simply is no concrete, absolute requirement that

the government permit offerors to submit a completely new proposal." *WaveLink, Inc. v. United

States*, __ Fed. Cl. __, 2021 WL 2762814 at *31 (June 24, 2021); *see also Eskridge*, 955 F.3d at

1344-46 (no standing where protester failed to "allege prejudice sufficient to require the Contract

to be rebid"). As SpaceX detailed in its MJAR, the structure of the Option A BAA procurement

essentially precludes Blue Origin from proposing an entirely new approach that departs from what

NASA and Blue Origin developed during the base period. (ECF 62 at 33-36.) Indeed, the purpose

of the Option A award was to take advantage of the base period collaboration and initial HLS

design work, culminating in a demonstration mission of the same HLS design that NASA funded

during the base period. (*See id.*) The Option A proposal and evaluation was structured around

specific standards NASA developed for Blue Origin based on the technical solution being

developed during the base period. There was no provision for alternative standards for an

alternative Option A approach. Besides, as discussed, the record is clear that Blue Origin in fact

did propose and develop a three-element HLS for the base period of performance, and spent that

base period of performance working with NASA to develop its three-element HLS approach,

which it then proposed for the Option A contract. (AR Tab 108a.106, Base Period Source

Selection Statement at 91985-87 (discussing multi-element HLS approach); AR Tab 32d.84, BO

Base Period Performance Narrative at 34782-84 (describing three element approach)). Simply,

Blue Origin neither can show that NASA would accept a completely different solution nor that

Blue Origin had a viable alternative solution with a substantial chance of award.

Even if this Court finds NASA waived material solicitation requirements relating to the milestone reviews (and that Blue Origin's objections are timely), it is not credible to expect that, at this late stage, Blue Origin could conceivably put forward an entirely different HLS design that would both (i) align with and demonstrate capable performance against the standards that were established uniquely for Blue Origin based on its previously submitted approach, and (ii) be sufficiently complete and mature to permit serious evaluation for contract award.  (ECF 62 at 32-38.)  Nor is there any reason to expect that NASA would consider such a move.

Other than its self-serving heat-of-litigation executive declarations—declarations filled with inadmissible testimony and speculative opinions refuted by the Administrative Record, Blue Origin does not offer a single piece of evidence to support its claims that, if only Blue Origin knew that milestone reviews were not required for every supporting spacecraft, then Blue Origin would have proposed a simpler lander, ███████████████████████████.[3] No credible evidence exists upon which the Court can make a factual finding that Blue Origin could propose an entirely different solution, much less that any such proposal would offer Blue Origin a substantial chance of an Option A award.[4]

Suffice it to say that Blue Origin's inability to offer any evidence to support its fanciful theory that it would ██████████████████████████████ and propose an entirely

---

[3] Just the opposite, as described above and in the motion to strike, the declaration appear to conflate ██████████████████ with Blue Origin's lander architecture, speciously claiming "Blue Origin would have retained the ████████████████ architecture" in Option A had it understood the milestone and other review instructions.  (ECF 61-1 at A-9.)

[4] For example, Blue Origin has not sought to present any contemporaneous documentary evidence regarding internal deliberations about how the FRR instructions were preventing it from proposing a better, cheaper alternative technical approach, or showing activity, funding, testing, performance analysis and substantiation, plans, etc. for the supposed alternative approach purportedly ██████████████████████.

new lander solution ████████████████████████████ is not surprising.  Blue Origin's
████████████████████████████████████████████ BE-4 engine.[5]  But, it
is widely reported that Blue Origin's effort is *more than four years* behind schedule, which was
originally estimated to be ready for flight by 2017, and it is doubtful that Blue Origin will be able
to deliver even the first two BE-4 engines by the end of this year.[6]  That Blue Origin asks this
Court to assume Blue Origin could successfully ███████████████████████████
██████████████, without bothering to mention that Blue Origin is years behind schedule █
████████████████████████████, should confirm that Blue Origin's
prejudice position is largely smoke and mirrors.

　　　　Also notable is that Blue Origin's prejudice story is inconsistent with its claimed irreparable
harm.  In its Complaint and MJAR, Blue Origin asks this Court to take Blue Origin's word for it
that the undescribed "████████ architecture" would have been less expensive because
Blue Origin could have relied more on its internal, integrated solutions rather than "████████
██████████████" (Compl. ¶ 133; ECF 61-1 at A-18 to A-19 ("████████
██████████████████████████████████████████████
██████████"); *id.* at A-9 (touting potential of ████████████████████████
██████████████████████████████████████████████
██████").)  Yet, in the next breath, Blue Origin asks this Court to enjoin SpaceX's performance
because Blue Origin purportedly will be irreparably harmed by its National Team members

---

[5] "█████████████████████████████████████████████████████
██████████████████████ Ex. A, Blue Origin, ████████ at https://www.blueorigin.com
██████████ (last visited 13 Oct. 2021).

[6] Ex. B, Berger, Eric, *Blue Origin's powerful BE-4 engine is more than four years late--here's why*,
ARSTECHNICA (5 Aug. 2021), https://arstechnica.com/science/2021/08/blue-origins-powerful-be-
4-engine-is-more-than-four-years-late-heres-why/ (last visited 13 Oct. 2021).

moving on to new projects, "foreclosing the benefit to Blue Origin and themselves of competing together in this area as a uniquely qualified, experienced and knowledge team." (*Id.* at A-21, 73-74.))  This double speak only confirms that Blue Origin's prejudice story is one of convenience, not evidence; if Blue Origin is actually able to propose an entirely new, ██████████ HLS, that is not only technically superior, but also cheaper because ███████████████████ ███████████████████████, then why is Blue Origin so concerned ████████ █████████████████████████████?

The Federal Circuit and this Court have repeatedly confirmed that a protester cannot satisfy its burden to demonstrate a substantial chance of award by simply asserting, even by declaration, that a revised proposal would be evaluated more favorably.  In *Bannum, Inc. v. United States*, the Federal Circuit affirmed this Court's no-prejudice finding where "[t]here is nothing besides [the protester's] conjecture to support the contention that another review, comporting with the FAR, would provide it a substantial chance of prevailing in the bid," noting that the protester's prejudice argument "rests on mere numerical possibility, not evidence."  404 F.3d 1346, 1357-58 (Fed. Cir. 2005).  In *H.G. Properties A, L.P. v. United States*, the protester, like Blue Origin here, offered numerous ways that, if given the opportunity, "its new proposal would include improved space layout and building design relating to protection of secure storage and work areas, as well as HVAC zoning," and thereby "its improved proposal would reduce the difference in the technical scores."  68 F. App'x 192, 195 (Fed. Cir. 2003).  Even though the protester had the benefit of a lower price (an advantage not present for Blue Origin here), the Federal Circuit still found the protester's assertions insufficient to show it "would likely be awarded a contract under the revised requirements."  *Id.*  These are just two of several Federal Circuit decisions confirming that the prejudice inquiry requires a protester to present compelling evidence of a substantial chance of

award, not just optimism.  *See CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1360-61 (Fed. Cir. 2018) (rejecting "vague, cursory references" as insufficient to establish protester had standing); *HVF W., LLC v. United States*, 846 F. App'x 896, 898-99 (Fed. Cir. 2021) (no interested party status where protester "only proffers allegations based upon conjecture that are insufficient to show it had a substantial chance of winning the award").

This Court's decisions, as they must, consistently test and reject unsupported protester claims of competitive prejudice like Blue Origin's here.  Recently, in *Zeidman Techs., Inc. v. United States*, the Court explained that the protester's "theory seems to amount to an assertion that had defendant not committed various errors, plaintiff's chance of receiving the award—as a matter of logic, rather than as a matter of evidence—necessarily would have improved," and correctly concluded: "This position fails to address the applicable standard."  144 Fed. Cl. 294, 302-03 (2019); *see also RMGS, Inc. v. United States*, 140 Fed. Cl. 728, 737-39 (2018) ("In a nutshell, there is nothing in the record to indicate that RMGS more likely than not could have won the award."); *Ironclad/EEI v. United States*, 78 Fed. Cl. 351, 362-63 (2007) (even if plaintiff had been included in competitive range and received solicitation amendments, given limited nature of proposal revisions permitted, "plaintiff has presented no persuasive argument regarding how plaintiff was prejudiced" where its "allegations regarding the probable outcome of the solicitation, had plaintiff received Amendment 12 and been permitted to amend its proposal, are at best speculative.").

Blue Origin's executive-level assurances of the non-existent "simpler lander" that Blue Origin might have proposed, if only it knew that NASA would not require milestone reviews to be scheduled based on supporting spacecraft launches, are simply too speculative to carry weight here.  Even if the Court believes Blue Origin might have submitted a different lander design if NASA amended the milestone review requirements (something Blue Origin has not proven here),

15

the Court still must deny this protest for lack of prejudice because Blue Origin has failed to establish that NASA would permit Blue Origin to so drastically revise its proposal, and has failed to provide the evidence needed to conclude that the different design would have a substantial chance of an Option A award, rather than the award to SpaceX.[7]

### 2. Blue Origin's Approach Exceeds NASA's Appropriations and Budget.

Blue Origin's proposed $6 billion price for an Option A contract drastically exceeded NASA's HLS appropriations.  As GAO recognized, "Blue Origin and Dynetics each respectively proposed FY2021 milestone payments in excess of the entire FY2021 HLS program appropriation…."  (AR Tab 108b67a, GAO Decision at 105028.)  The record confirms the same. Whereas NASA projected only $328 million and $680 million available for FY21 and FY22 payments, respectively, Blue Origin's proposed expenditures seek more than ███████ in FY21 and another ███████ in FY22.  (*Compare* AR Tab 46, HLS Services Options Strategy at 62315 *with* AR Tab 32d.184, BO Expenditure Profile at 41185.)   Thus, contrary to Blue Origin's unsupported assertions (ECF 61-1 at 68), it was not in line for anything, as its proposal was prohibitively expensive (and the SSA found that its proposal did not otherwise "present[] a good value to the government").  (AR Tab 77, Source Selection Statement at 63056-57, n.1.)

Blue Origin persists on a path that it was willing all along to reduce its price if given the opportunity, suggesting that NASA should have assumed Blue Origin could have fit within a funding limitation that allowed only for award to the better-rated SpaceX because, during post-selection negotiations in the base period procurement, Blue Origin reduced its price by ██% (for a

---

[7] Because of the limited funding discussed in the next section, permitting only one contract award, Blue Origin must establish that its mythical alternative proposal would have been both qualitatively superior to SpaceX's as well as less expensive.

contract valued at 9.5% of Blue Origin's Option A proposal).[8]  (*Compare* ECF 61-1 at 70 *with* AR Tab 9, HLS Overview at 284 (showing Blue Origin proposed the highest Base Award price $578.██████) *and* AR Tab 32b, BO Vol. II at 33395 (proposing $5.992 billion for Option A).) This is absurd.  Even assuming a ██% reduction, NASA did not have sufficient funding for an award to Blue Origin (even before making an award to the more highly rated SpaceX).

After the GAO denied Blue Origin's protest, Jeff Bezos issued an open letter to NASA offering to waive up to $2 billion in the first three fiscal years of performance, which featured prominently in Blue Origin's Complaint.  (Compl. ¶ 111.)  Now, based on self-serving and unsubstantiated declarations, Blue Origin asserts that its owner is willing to absorb $3 billion in private contributions.  (ECF 61-1 at 70, A-10.)  Significantly, however, neither the declarations nor the Blue Origin MJAR explain what solution Blue Origin would offer for this proposed price, much less why that solution has a substantial chance of award.  (*Id*. at 69-71.)  Repeatedly the declarations and Blue Origin suggest that Blue Origin would have "retained" whatever architecture it proposed in the base period, which the declarants assert without any foundation would have "significantly reduced [the] overall Total Evaluated Price to NASA."  (*Id*. at A-9; *see also* A-9 to A-10 ("Blue Origin would have proposed its simpler lander design ██████████████ at a significantly lower proposed price"); *id.* A-18 to A-19 (same).)  The record also disproves this misleading argument.  As discussed, Blue Origin's base period proposal offered the same three-element architecture and National Team as its Option A proposal—the efficiencies it asks the Court to assume from any retention of its base period approach are nonexistent.  But even assuming arguendo that Blue Origin's Option A proposal did include changes from the approach it had

---

[8]  Blue Origin's declarant asserts that it reduced its base period proposal price by ██% to accommodate NASA's budget needs in the base period of performance.  (ECF 61-1 at A-11.)  The Contracting Officer, however, reported to GAO that during the base period price negotiations, Blue Origin discounted its price by "roughly ██%".  (AR Tab 108b26a, COSF at 103654.)

proposed for the base period, the record shows that any such alterations made Blue Origin more competitive than Blue Origin had originally assumed.  In its base period proposal, Blue Origin projected its Option A price at ▮▮▮▮▮▮▮▮ but its Option A proposal was $5.99 billion. (*Compare* AR Tab 9, HLS Overview at 284 *with* AR Tab 32b, BO Vol. II at 33395.)  In other words, there is no reason to think that any term in the Option A BAA caused Blue Origin's anticipated Option A pricing to increase; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Moreover, whatever solution Blue Origin is willing to offer at a reduced price, the Court cannot assume NASA will want it, as Blue Origin conditioned its willingness and ability to "meet the Agency's funding limits" on "knowledge that some of the Solicitation requirements can be waived."  (ECF 61-1 at A-12.)

Finally, even if one were to accept Blue Origin's nebulous offer of some unspecified solution for $3 billion less than its current Option A proposal, Blue Origin offers no evidence to establish that this indeterminable and undescribed solution would have been so much more favorably evaluated as to make Blue Origin's proposal favored over SpaceX for the limited Option A funding available.  For this reason alone Blue Origin has failed to demonstrate a substantial chance of award, and its protest must be rejected for failure to demonstrate prejudice, if not for lack of standing then on the merits.

## III.   THE COURT SHOULD GRANT JUDGMENT IN FAVOR OF DEFENDANT AND DEFENDANT INTERVENOR.

### A.   Blue Origin's Milestone Review Based Allegations Misread The Option A BAA, Are Untimely Solicitation Challenges, And Fail For Lack Of Prejudice.

Blue Origin dedicates most of its MJAR to *re-evaluating SpaceX's proposal* based on several flawed solicitation interpretations.  This tactical approach is legally improper.  *See, e.g.,*

*Harmonia Holdings Grp., LLC v. United States*, 999 F.3d 1397, 1408 (Fed. Cir. 2021) (court's "role in reviewing procurement decisions … is not to evaluate proposals anew or to substitute [its] judgment for that of the agency").) It is also wrong. As described in SpaceX's MJAR and below, the plain language of the Option A BAA neither supports Blue Origin's reading of the milestone events and other reviews on which Blue Origin is focused, nor demands that the Court find SpaceX's approach to these reviews unacceptable. Blue Origin predicates its objection to the SpaceX award on arguments that ignore or distort material record facts and applicable law confirming that NASA reasonably evaluated SpaceX's Technical approach as Acceptable and its Management approach as Outstanding.

NASA structured the Option A procurement as a FAR Part 35.016 Broad Agency Announcement in order to allow "contractors freedom to exercise innovation and creativity." (AR Tab 4a, Deviation Request at 109 ("This flexibility and responsiveness facilitates the advancement of scientific and technical knowledge to the extent necessary to achieve agency and national goals by allowing contractors freedom to exercise innovation and creativity.")) NASA did not establish a single HLS design template. Instead, NASA set forth performance criteria that any design had to satisfy (e.g., landing on the moon), and then worked with each contractor to adjudicate different technical requirements tailored to the unique design each one had developed during its base period contract, against which each offeror's unique Option A proposed solution would be evaluated. (AR Tab 27, Option A BAA at 24443.) The three offerors proposed different lander architectures, different technologies at different levels of maturity, different processes to mature those technologies, different launch vehicles, different operational policies and processes, different schedules, and different prices.

In accordance with the language in the Option A BAA and Statement of Work ("SOW"),

which instructed offerors to schedule milestone and launch vehicle reviews based on the launch of the "HLS element" or "L" minus a specified time frame, SpaceX proposed the challenged milestone and other reviews based on the launch of its single element Integrated Lander—the HLS Starship.  (AR Tab 34d.33, SpX Att. 13 Milestone Schedule at 55430-31; AR Tab 34d.32, SpX Vol. IV, Att. 12 Review Plan at 55414-27; AR Tab 34a, SpX Vol. I at 55030 (Table 5).)  SpaceX's Performance Work Statement ("PWS") establishes that SpaceX proposed to cover all subjects for these reviews just as they are described in the SOW.  (*Compare* AR Tab 34.d.34, SpX Vol. IV, Att. 14 PWS at 55439-42, 55462-65, 55497-501 *with* AR Tab 27e, Att. G SOW at 32969-73, 33008-12.)  SpaceX's PWS similarly follows the SOW discussion of each party's role and responsibility, noting that the contractor bears responsibility "for all activities associated with the design, development, manufacture, test, system verification, and system demonstration of the HLS" and NASA "will have responsibility for Certification of Flight Readiness."  (*Compare* AR Tab 34d.34 SpX Vol. IV Att. 14 PWS at 55444-45 *with* AR Tab 27e, Att. G SOW at 32948-49.)

The record also soundly refutes Blue Origin's premise that SpaceX's proposal "expos[ed] NASA to tremendous launch and mission performance risk."  (ECF 61-1 at 2.)  SpaceX proposed

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████   as SpaceX has successfully done with NASA on the Commercial Crew Program.  (AR Tab 34a, SpX Vol. I at 55031; AR Tab 59c, SpaceX SEP Report at 62786 (recognizing that SpaceX's proposed approach and comprehensive understanding of requirements "will greatly improve the operability and safety of the final Starship design"); *id*. at 62808 (noting that "[SpaceX's] systems engineering approach and processes have been audited and have received approval from NASA," and its "systems engineering approach was positively reviewed by the

NASA Aerospace Safety Advisory Panel….").)  The single integrated lander architecture and concept of operations that SpaceX offered for Option A was the same design solution that earned SpaceX a base period award, and that SpaceX, with NASA collaboration and insight, matured under that contract.  (AR Tab 9, HLS Overview at 274-77.)  NASA experts were intimately familiar with and understood SpaceX's proposed solution, concept of operations, and approach to milestone and other program reviews.[9]  Unlike Blue Origin, SpaceX proposed many more program reviews than those called for in the Option A BAA, as well as early system demonstrations and testing in order to mitigate risks and provide fidelity to its schedule:



(AR Tab 34d.52, SpX Vol. IV, Att. 21 Mission Ops at 56035-37; AR Tab 34d.32, SpX Vol. IV, Att. 12 Review Plan at 55413 ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[9]   Blue Origin's MJAR misleadingly suggests that the evaluators did not recognize SpaceX's proposed approach to the FRR milestone in the Pre-Briefing Slides at AR Tab 48.  (ECF 61-1 at 26.)  Even a cursory review of the slides disproves Blue Origin's suggestion.  In the slides, just as it had done for the other offerors, the SEP describes the key characteristics of SpaceX's proposal and unique architecture (AR Tab 48, HLS Pre-Briefing Slides at 62390-91), the mission overview of the concept of operations (*id*. at 62392), the development approach—which includes a timeline describing the critical launch dates and milestones, including Design Critical Review ("DCR") and FRR (*id*. at 62397), and the launch and mission operations (*id*. at 62400-01).

████████████████████████████████████

████████████████████████████████████

█████████████████ AR Tab 34a, SpX Vol. I at 55040-42.)  The SEP recognized SpaceX's early testing and major program reviews approach as a Significant Strength which "greatly increases NASA's confidence in this offeror achieving successful contract performance":

████████████████████████████████████████

(AR Tab 59c, SpaceX SEP Report at 62808; *id*. at 62800 ("By proposing an extensive and robust early ground and flight system development and demonstration campaign, the offeror increases the probability of finding and correcting design, performance, and operational problems as early as possible in its development cycle, which will influence the ultimate fidelity of the offeror's approach. ***This approach appreciably reduces the risk to the offeror's development and mission execution schedules, which greatly enhances the potential success in these endeavors***. Therefore, this aspect of the offeror's proposal is a significant strength.").[10]

---

[10] The SEP noted other schedule risk reducers present in SpaceX's technical and management approaches.  (*See, e.g.*, AR Tab 59c, SpaceX SEP Report at 62784 ████████ *id*. at 62785 ████████████████████████ *id*. at 62796 ████████████ *id*. at 62812 ████████████████████████

SpaceX also proposed "pre-ship reviews, design reviews, test and flight readiness reviews, and post-flight reviews with NASA participation" for all HLS launches and also proposed to provide NASA insight ████████████████████████████████████████ ██████████████████████. (AR Tab 34d.50, SpX Vol. IV, Att. 20 PMP at 56018; AR Tab 34d.26, SpX Vol. IV, Att. 7 Insight Plan at 55230.)  SpaceX explained:

██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

(AR Tab 34d.26, SpX Vol. IV, Att. 7 Insight Plan at 55224; *id.* at 55226 (proposing to provide "NASA insight into the Launch Readiness Reviews and Post Flight Reviews for each flight test" ████████████████████████); AR Tab 34a, SpX Vol. I at 55021████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████; *id.* at 55028-29 ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████)

The SEP recognized the ████████████████████ insight SpaceX proposed as a Strength, enabling "NASA's continued access into and involvement in development activities (including pre-flight and pre-test readiness reviews, as well as post-flight and post-test data reviews)," and effectuating "meaningful Government insight into critical and relevant operational details of the offeror's vehicles, systems, and organizational practices…."  (AR Tab 59c, SpaceX

23

████████████████████████████████████████████████████████████████
████████████████████████████████████████████

SEP Report at 62810-11.)  Blue Origin's narrative that NASA "disregarded important safety and technical requirements—only for SpaceX" is demonstrably false.  (ECF 61-1 at 1.)

Equally erroneous is Blue Origin's speculation that funding constraints "motivated" NASA to waive purported costly reviews for SpaceX.  (ECF 61-1 at 61, 63.)  This attempt to impute improper motives to NASA crosses the line into a specious claim of bad faith.  In order to rebut the presumption that government officials act in good faith, "a protestor must provide 'almost irrefragable,' 'clear and convincing' proof of bad faith," requiring "evidence of some specific intent to injure the plaintiff."  *Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 25 (2012), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013) (quotation omitted); *see also Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173, 210 (2006) (collecting cases regarding presumption of good faith).  Blue Origin's spurious inferences and record distortions fall woefully short of this demanding standard.

Blue Origin contrives this untenable bad faith theory on the flawed premise that NASA purportedly determined to forego milestone reviews in order to save ███████████.  Blue Origin's cost savings speculation is just as fallacious as its off-base waiver argument.  Blue Origin derives the ███████████ from an overly simplistic and misleading math calculation, multiplying the portion of its fixed price that SpaceX proposed would be paid at its FRR milestone by sixteen (the number of milestone events Blue Origin claims SpaceX was required to propose).  (ECF 61-1 at 39.)  Blue Origin seems unable to grasp that the Option A contract is fixed price, and thus the amount paid at a particular milestone does not represent the cost of that particular milestone activity (or of any other one thing); instead the milestone amount reflects the share of the contract's fixed price that the offeror proposes to receive for all of the work that is completed leading up to and including the milestone event (i.e., everything since the last milestone payment).  (AR Tab 27, Option A BAA at 24432, 24465-66.)  Blue Origin thus presents a totally bogus speculation.

SpaceX-led FRRs were already planned for supporting spacecraft launches.  If SpaceX converted them into payment milestones, there is no reason to expect any material impact on SpaceX's price, much less something equivalent to multiples of the milestone payment amount SpaceX proposed upon completing the comprehensive FRR milestone for the Starship HLS.[11]

In sum, the predicate for Blue Origin's milestone and review based arguments is false. Neither the Option A BAA terms nor SpaceX's proposal support protester's re-evaluation, and objection to NASA's evaluation and award decision.  SpaceX scheduled its milestone events and other challenged reviews consistent with the Option A BAA terms and with SpaceX's architecture employing a single-element HLS Integrated Lander.  SpaceX's proposal did not lack any essential and required data, nor did the Option A BAA require NASA to evaluate the offerors' proposals any differently than it did.  For these reasons, Blue Origin's reliance on *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365 (Fed. Cir. 1999), and *L3 Comms. EOTech, Inc. v. United States*, 83 Fed. Cl. 643 (2008), is entirely misplaced.  (ECF 61-1 at 35-36.)

In *Alfa Laval*, the solicitation required offerors to provide specified testing data "in order to be deemed responsive," which the awardee admittedly did not provide.  175 F.3d at 1367, 1368; *Alfa Laval Separation, Inc. v. United States*, 40 Fed. Cl. 215, 217 (1998).  In *L3 EOTech*, the solicitation utilized a two-phase evaluation, with the first "Essential Criteria" elimination phase requiring that each proposal obtain "passing grades in all fifteen of the[] tests" to be eligible for award.  83 Fed. Cl. at 654; *id*. at 646.  Although the awardee was the only offeror to pass the first round, questions existed as to whether the agency properly disqualified the protester and during

---

[11] During post-selection negotiations, SpaceX added the two NASA requested FRR milestone events "at no additional cost to the Government."  (AR Tab 68, Cover Letter to Revised Proposal at 62903.)

the second phase the agency permitted a modification to the awardee's solution that cast doubt on its ability to still meet the Essential Criterion that disqualified the protester. *Id*. at 652-63.

Conversely, here, while the Option A BAA includes an initial eligibility determination, that review focused solely on compliance with Domestic Sourcing requirements, and is thus irrelevant. (AR Tab 27, Option A BAA at 24479-80 ("If an Offeror's proposal is not unambiguously, fully compliant with these eligibility requirements, the Government will eliminate that Offeror from further evaluation and that Offeror will be ineligible for award.").) Following the initial eligibility determination, the Option A BAA advises offerors that the SEP "will evaluate proposals, and where warranted, assign strengths and weaknesses for Factors 1 and 3," based on "how an Offeror's proposed approach affects risk"—which is exactly what NASA did. (*Id*. at 24480, 24476.) Blue Origin's persistence that NASA did not evaluate SpaceX's proposal in accordance with the Option A BAA is demonstrably wrong.[12]

### 1.   Blue Origin Interprets "HLS Element" Incorrectly.

Blue Origin's argument begins by proclaiming that SpaceX's proposal "does not meet the plain language of the Solicitation." (ECF 61-1 at 35.) Tellingly, however, Blue Origin spends little to no time engaging with the actual Option A BAA language. All agree that the Option A BAA instructions for the FRR and DCR milestone events describe the trigger for these reviews as the launch of an "HLS element." Blue Origin then simply assumes that that this term is synonymous with "HLS," which would ignore the word "element"—an unreasonable result. Blue

---

[12] Blue Origin's citation to *Mortgage Contracting Services, LLC v. United States* (ECF 61-1 at 39) is also misplaced, as in that case the awardee's proposal expressly proposed performance metrics that were patently inconsistent with the solicitation's required performance metrics, and the agency evaluation did not address that issue. 153 Fed. Cl. 89, 140-42 (2021). Here, SpaceX's proposal, through its PWS, commits to the SOW milestone and launch vehicle reviews, and far from ignoring the issue altogether, the record here confirms NASA evaluated SpaceX to have submitted a compliant proposal with a single Weakness stemming from its FRR milestone approach.

Origin essentially invites this Court to commit the same legal error that Blue Origin prompted GAO to make, which violates the maxims that solicitations must be interpreted as a whole, and that specific terms take priority over the general.  *See, e.g., Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1344 (Fed. Cir. 2021) ("We must consider the Solicitation as a whole and interpret it in a manner that harmonizes and gives reasonable meaning to all of its provisions."); *Landmark Land Co. v. F.D.I.C.*, 256 F.3d 1365, 1376 (Fed. Cir. 2001) ("It is well established that when interpreting a contract, a specific provision will dominate a general provision.").  This Court should decline the invitation.

Instead, the only reading that harmonizes the other pertinent Option A BAA provisions, without rendering any part superfluous or void, is that "HLS element" denotes the elements that make up the contractor's proposed "Integrated Lander."  (AR Tab 27e, Att. G SOW at 32948 (§ 1.2).)  The SOW's definition of "Integrated Lander" makes this clear:  "Any and all combinations *of contractor elements* (e.g. Ascent Element), *including potentially a single element*, which is integrated at any time *crew are onboard*."  (*Id.*)  By contrast, the SOW provides a different and specific definition for "Supporting Spacecraft" as spacecraft that are necessary for performance, but are *not* the Integrated Lander, i.e., *not the "contractor elements."*  (*Id*.)  To be sure, the SOW also provides a broad, all-encompassing definition of the term "HLS," but even that definition (like the Integrated Lander definition) repeatedly associates "element" with the Integrated Lander, and therefore distinct from a Supporting Spacecraft:

> HLS: *All objects, vehicles, elements, integrated systems, systems, subsystems, or components thereof* that are designed, developed, and utilized by the contractor, its teammates, subcontractors, and suppliers in performance of this contract, *__and which __collectively__ comprise the contractor's Integrated Lander (or elements thereof)__*, all Supporting Spacecraft, all launch vehicles necessary for launch and delivery of the contractor's *Integrated Lander (or elements thereof)* and its Supporting Spacecraft, and the contractor's Active-Active docking adapter

(AADA) (if required for performance of the contractor's crewed demonstration mission).

(*Id*.)

Other SOW provisions and the main body of the Option A BAA further confirm that "element" relates to the lander and is distinguishable from the Supporting Spacecraft. (*Id*. at 32975 ("lander elements"); *id*. at 32980 (calling for definition of technical interfaces between "internal elements" in the HLS Integrated Lander System specification); *id*. at 32999 ("HLS Flight Operations means the period of performance that begins with the first Earth launch of any element of the HLS Integrated Lander").) Most notably, section 4.4.3.5.2, addressing "launch and delivery operations," identifies the components of the offeror's HLS Integrated Lander "as separate elements" for launch, "*depending on the Offeror's architecture*":

> The Offeror is required to propose how it will *launch and deliver its Integrated Lander (and all elements thereof) to the Moon* using commercial launch vehicle(s), including all phases of launch vehicle flight and, if applicable, any Supporting Spacecraft. *It is permissible for individual components of the Offeror's HLS Integrated Lander to be launched as separate elements on multiple commercial launch vehicles, depending on the Offeror's architecture*.

(AR Tab 27, Option A BAA at 24453; *see also e.g.*, *id*. at 24443 (§ 4.3.1:"NASA will not take ownership of the Integrated Lander, any individual *elements* thereof, *or* Supporting Spacecraft.").)

Blue Origin also misconstrues the opening paragraph to SOW Section 5, which reads:

> The HLS Program Office *has defined major milestone reviews* for the HLS Program in order to be able to assess programmatic and technical progress and performance at key decision points in the development and operational lifecycle phases, *with the ultimate goal of certifying the lander for crewed operations to* and from the lunar surface and assessing the likelihood of mission success. *Additionally, supporting spacecraft that are required in the contractor's concept of operation to successfully complete the mission shall be included in the scope of the review for mission success. These spacecraft could include propellant storage and/or propellant transfer vehicle*, as well as launch vehicle upper stages that perform critical operations above and beyond insertion of a payload into a desired orbit or trajectory.

(AR Tab 27e, Att. G SOW at 32965.) Blue Origin argues that this paragraph requires every

28

supporting spacecraft launch to have its own set of milestone reviews, or that any milestone review must be scheduled in relation to a Supporting Spacecraft launch. (ECF 61-1 at 14-17.) That is incorrect. This paragraph instead advises offerors to include supporting spacecraft "in the *scope of the review*" if applicable. (AR Tab 27e, Att. G SOW at 32965.) This is the only reading that is consistent with the FRR milestone event "Acceptance Criteria" which, among other criteria for review, state: "The flight vehicle, launch vehicle, and support spacecraft (such as propellant storage, propellant transfer, and/or upper stage vehicles that provide transportation capabilities beyond the standard for orbit insertion) are ready for flight." (*Id.* at 32972.) This criterion, read together with the opening paragraph of SOW Section 5, makes clear that the status of support spacecraft is something for NASA to consider during the FRR of something else—i.e., the launch of each Integrated Lander element. This is further confirmed from the opening paragraph of SOW Section 5, which, as quoted above, notes that the "ultimate goal" of the major milestone reviews is to "***certify[] the lander for crewed operations*** to and from the lunar surface." (*Id.* at 32965.) To accept Blue Origin's interpretation—that each launch of a supporting spacecraft triggers a separate FRR milestone review—would render the first acceptance criterion redundant and superfluous (i.e., no need to assess whether the support spacecraft is "ready" because a separate NASA-led FRR would have already been conducted on the support spacecraft).[13] Plus, it would

---

[13] Blue Origin likewise falsely states that SpaceX will not provide required Planetary Protection Data. (ECF 61-1 at 17-18 (quoting AR Tab 27f, Att. H DRD at 33124).) SpaceX's proposal commits to provide the required Planetary Protection Data, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, including the pre-launch deliverable ▮▮▮▮▮▮▮▮ before SpaceX's scheduled FRR milestone. (AR Tab 34.d.34, SpX Vol. IV, Att. 14 PWS at 55461, 55463, 55487; AR Tab 34d.46, SpaceX Vol. IV, Att. 19 IMS at 55938; AR Tab 34.d.30, SpX Vol. IV, Att. 10 Safety & Mission Assurance at 55304.) Nothing in the Planetary Protection Data provisions demands that SpaceX conduct a separate FRR milestone event. Likewise, SpaceX committed to provide all deliverables specified for the Critical Design Review ("CDR") and DCR. (AR Tab 34.d.34, SpX Vol. IV, Att. 14 PWS at 55460-64); AR Tab 34.d.32, SpX Vol. IV, Att. 12 Review Plan at 55423, 55425.) Based on its early testing and flight demonstrations, as well as its other program reviews, SpaceX proposed to have ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

be circular and nonsensical for an FRR milestone of a support spacecraft to depend on whether that same support spacecraft is ready for launch.  Besides, the "support spacecraft" are supporting the Integrated Lander, not the other support spacecraft, so whether or not a "support spacecraft" is ready for launch is meaningless in the context of an FRR milestone event of a support spacecraft. This all goes to show that Blue Origin's interpretation yields an unreasonable result.

      **2.**      **Blue Origin's Interpretation of the Launch Vehicle Reviews Is Similarly Unreasonable.**

Equally unavailing are Blue Origin's contentions regarding the Mission Specific Preliminary Design Review, Mission Specific Critical Design Review ("MSCDR"), and System Acceptance Review.  (ECF 61-1 at 44-47.)  As with FRR and DCR, Blue Origin predicates these challenges on the flawed premise that these reviews had to be scheduled in relation to the first SpaceX Supporting Spacecraft launch, rather than the launch of SpaceX's single-element HLS Integrated Lander.  Blue Origin does not even analyze the applicable Option A BAA text, which again does not support Blue Origin's interpretation.

Each of these reviews are addressed in SOW Section 10, relating to "Launch Vehicle Processing, Integration, and Operations"—more specifically, the "launch vehicle service for transportation of HLS module(s) or *integrated landing system* to lunar orbit."  (AR Tab 27e, Att. G SOW at 33005.)  None of these SOW provisions uses the term "HLS element;" rather each SOW provision instructs the contractor to complete the review by a certain period of time from "L," e.g., "not later than L-18 months," "not later than L-12 months," and "not later than L-4 months," respectively.  (*Id.* at 32944-45, 33009, 33010.)  In view of the foregoing, SpaceX, accordingly, scheduled each review based on the launch of its Integrated Lander, and committed to provide all

--------

███████████████████████████.  (AR Tab 34d.26, SpX Vol. IV, Att. 7 Insight Plan at 55225.)

███████████████████████████████████████████

deliverables just as they are described in the Option A SOW.  (AR Tab 34d.34, SpX Vol. IV, Att. 14 PWS at 55498-500; *see also* AR Tab 34a, SpX Vol. I at 55036 (committing to "comply with mission operations, ground segment, and data availability requirements" and incorporating by reference AR Tab 34d.52, SpX Vol. IV, Att. 21 Mission Ops).)  As discussed in SpaceX's MJAR, any differences between the SpaceX and Blue Origin proposals regarding the number of these reviews is driven by differences in the offerors' Integrated Lander architecture.  Such differences do not, as Blue Origin contends, render SpaceX's proposal noncompliant under the Option A BAA.

Blue Origin focuses in particular on the MSCDR, for which the SOW states: "At not later than L-12 months, the contractor shall conduct an MSCDR prior to design freeze and before significant fabrication activity begins."  (AR Tab 27e, Att. G SOW at 33010.)  Blue Origin objects that ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████. (ECF 61-1 at 22.)  Blue Origin is confused.  The cited SOW language does not dictate a "design freeze" or prohibit "fabrication activity" of the proposed *launch vehicle*, as Blue Origin knows given that Blue Origin proposed ██████████████████ as its primary launch vehicle—an existing flight proven vehicle, which is already in production (i.e., "design freeze" and "significant fabrication activity" are old news).  (AR Tab 48, HLS Pre-Briefing Slides at 62364 ██████████████████████████████████████████████████; AR Tab 32a, BO Vol. I at 33346 ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████.)  Blue Origin thus errantly demands that the Court adopt an interpretation of the SOW Blue Origin itself does not meet.

███████████████████████████████████████████████████
██████████████████████████████████████

Blue Origin also mistakenly objects to SpaceX's proposal statement that: ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (ECF

61-1 at 42-44.)  Specifically, Blue Origin contends that, because ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SpaceX purportedly

proposes to ▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at 43.)  The predicate for Blue

Origin's objection is wrong.  First, Blue Origin's contentions ignore the many "SpaceX-defined"

(i.e., not NASA-specified) early milestone reviews expressly discussed in connection with the

proposal language Blue Origin emphasizes.  (AR Tab 34d.32, SpX Vol. IV Att. 12 Review Plan

at 55414-27.)  Second, the sentence on which Blue Origin's speculation rests has an obvious

typographical error.  ▮▮▮▮▮▮ of SpaceX's review plan *is* ▮▮▮▮; the ▮▮▮▮▮▮

▮▮.  (*Id.* at 55425.)  In other words, SpaceX's proposal merely advised that some of the SpaceX-

defined milestone reviews, i.e., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ may

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that is sufficient to

achieve the objective of the review.  This reading of the text is confirmed by other sections of

SpaceX's proposal, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮  (AR Tab 34d.26, SpX Vol. IV Att. 7 Insight Plan at 55225; *see also* AR Tab

34d.34, SpX Vol. IV Att. 14 PWS at 55461 ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮  Similarly, SpaceX's proposal explains that

its joint certification review with NASA for the HLS Starship will take place ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ specifying that ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



██████████████████████████████████████████████████████████████

████████████  AR Tab 34a, SpX Vol. I at 55021.)  Thus, any reviews ████████████████████

██████████████████████████████████████.

### 3.    Blue Origin Raises an Untimely Challenge to the BAA Terms.

As discussed, in an attempt to contrive prejudice, Blue Origin's MJAR relies on the declarations of two executives, which the Court should disregard for the reasons set forth in the accompanying SpaceX motion to strike.  Based on these inadmissible, inconsistent, and not credible declarations, Blue Origin falsely contends that it "was forced to change its proposed architecture as direct result of the Solicitation's unambiguous and specific timing required for the critical milestone requirements, including the FRRs, DCR, and other reviews."  (ECF 61-1 at 69.)  This is false.  (*See* Section II.B.)

Even assuming arguendo, however, that Blue Origin's fantastical theory—that it had to change its base period approach based on what it believed triggered the Option A BAA milestone and other reviews—had any truth to it, Blue Origin has waived the right to challenge the evaluation based on how NASA interpreted these review instructions.  For the reasons explained above, SpaceX maintains that there is only one reasonable interpretation of the "HLS element" and "L-[time frame]" review instructions.  If Blue Origin's interpretation is considered likewise reasonable, however, then the Option A BAA must be treated as patently ambiguous about whether the SOW Section 5 and 10 reviews are required to be scheduled based on Supporting Spacecraft or Integrated Lander element launches.  If Blue Origin persists in asking this Court to suspend disbelief, and accept that Blue Origin based its proposal team and system architecture on whether a supporting spacecraft launch would trigger the need for any FRR and DCR milestone event, without ever raising the issue before proposal submission, then Blue Origin cannot expect this

████████████████████████████████████████████████████████████

Court to now remedy its incredible silence and inaccurate assumption about what was supposedly for it such a pivotal consideration. *Per Aarsleff A/S v. United States*, 829 F. 3d 1303, 1312-13 (Fed. Cir. 2020) (dismissed post award challenges to ambiguous solicitation requirements).

As SpaceX previously noted, during a pre-proposal question and answer exchange, one offeror questioned whether use of the term "HLS" is meant to refer to the Integrated Lander specifically or to encompass launch vehicles and support spacecraft, and NASA confirmed that the SOW uses that term to refer to the Integrated Lander, except where Supporting Spacecraft or Launch Vehicle are explicitly identified. (AR Tab 20, Q&A Log at 448.) Given that this response contradicts Blue Origin's current interpretation, Blue Origin had a duty to raise its objection before now. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007).

### 4.   NASA's Interpretation of the FRR Milestone Requirements Did Not Change and Its Evaluation of SpaceX Was Reasonable.

At the outset, Blue Origin's misplaced reliance on the SEP Report and other extrinsic evidence to support its interpretation of term "HLS element" undermines Blue Origin's contention that the language is not ambiguous, and provides further evidence showing that, at best, Blue Origin has waived this challenge to the Option A BAA language. Nevertheless, contrary to Blue Origin's invective, NASA's understanding of the FRR milestone event instructions and other reviews has not changed, nor has its view of SpaceX's proposed approach. (ECF 61-1 at 38.) The evaluators' comments on the briefing slides at AR Tab 52c, the SEP Report at AR Tab 59c, and the Contracting Officer's Supplemental Statement at AR Tab 108b55, are all consistent. Each note that SpaceX's proposed approach is "arguably" inconsistent with the FRR instructions, the possible inconsistency was a Weakness that presented a "relatively minor risk[]," and SpaceX's overall Management approach deserved an Outstanding rating because the qualitative attributes of the proposal's "aggregated significant strengths and strengths far outweigh the qualitative attributes of

34

its aggregated weaknesses." (AR Tab 52c, SpX Eval Briefing at 62591; AR Tab 59c, SpaceX SEP

Report at 62806, 62812-14; AR Tab 108b55, Supp. COSF at 104679.)   The SEP Report and

Contracting Officer Supplemental Statement make clear that it was not the number of FRR

milestone events that triggered the Weakness (and thus not the definition of HLS element), but

rather the evaluators' concern that the sequence of the launches planned in SpaceX's Concept of

Operations had the "effect of *lessening* NASA's involvement and participation in assessing flight

readiness for the offeror's supporting spacecraft" under the FRR milestone acceptance criteria.

(AR Tab 59c, SpaceX SEP Report at 62813-14; AR Tab 108b55, Supp. COSF at 104679-80.)

There was no technical or safety risk associated with this finding.   (AR Tab 59c, SpaceX SEP

Report at *passim*; AR Tab 108b55, Supp. COSF at 104680-83.)   NASA's Chief Engineer, NASA's

Chief Health and Medical Officer, and NASA's Chief of Safety and Mission Assurance all

confirmed the same as part of the Agency Report submitted to GAO.   (AR Tab 108b62, Decl. Of

Ralph Roe at 104880-83; AR Tab 108b61a, Decl. of James Polk at 104872; AR Tab 108b61c,

Decl. of Russ Deloach at 104879.)[14]   This reasoned and documented evaluation of SpaceX's

proposal complied with the Option A BAA evaluation process.

---

[14]   Throughout its brief Blue Origin consistently relies on its paid expert, Dr. Alan Wilhite to
contend that SpaceX's proposal creates technical and safety risks and that the NASA evaluation
ignored these safety risks.  As argued in the motion to strike filed concurrently with this Reply and
Response, Blue Origin has not moved to supplement the record with Dr. Wilhite's declaration, and
even if it had, the Court should not consider Dr. Wilhite's declaration because Dr. Wilhite's
declaration is not necessary for meaningful judicial review of this matter, which principally turns
on solicitation interpretation, and because Dr. Wilhite seeks to substitute his opinions for those of
the SSA and NASA evaluators.  *See AgustaWestland N.A., Inc. v. United States*, 880 F.3d 1326,
1331-32 (Fed. Cir. 2018) (trial court abused its discretion in supplementing record in a bid protest);
*Orion Technology, Inc. v. United States*, 101 Fed. Cl. 492, 497 (2011) (striking declaration because
"[c]onsideration of an expert opinion directed solely at the propriety of the [agency's] decision,
like the expert opinion here, risks improperly converting the court's more deferential undertaking
into a de novo review" and recognizing that "it would be nonsensical for [court] to consider or
adopt an opinion from a putative expert attempting to … substitute his judgment for that of the
agency.").

As demonstrated in the MJARs of the United States and SpaceX, nothing in the Option A BAA or the law required NASA to find that any purported inconsistency in SpaceX's proposed milestone events or other reviews rendered SpaceX noncompliant.  (ECF 60 at 58-63; ECF 62 at 51-58.)  Just the opposite, the Option A BAA expressly gave NASA discretion to determine whether any inconsistencies and exceptions with the solicitation terms result in either a negative finding or award ineligibility:

> If unexplained discrepancies are found within an Offeror's proposal, the Government may use that as a basis for evaluating such proposals negatively, and if the discrepancies are significant, the Offeror may be deemed ineligible for award. Offerors who take exception to any terms and conditions of this solicitation may also be deemed ineligible for award and excluded from further competition.

(AR Tab 27, Option A BAA at 24433.)

Blue Origin denies that NASA's evaluation of SpaceX complied with the Option A BAA terms, but it does.  The Option A BAA advises offerors that, following the initial eligibility determination, the SEP "will evaluate proposals, and, where warranted, assign strengths and weaknesses for Factors 1 and 3," based on "how an Offeror's proposed approach affects risk"— which the record confirms is exactly what NASA did.  (*Id*. at 24480, 24476.)  The SEP, exercising their judgment and discretion under Factor 3, contemporaneously noted their issue with SpaceX's FRR approach to fulfilling the milestone acceptance criterion, described the associated risk, and explained why it amounted to a single, "relatively minor" Weakness that did not undermine an Outstanding Management approach rating.  And, executing her role under the Option A BAA, the SSA agreed.  (*Id*. at 24480; AR Tab 62, Initial Selection at 62883 ("SpaceX offered a uniquely meritorious proposal with notable qualitative attributes, both in terms of its technical approach and its management approach," and "provides abundant value to NASA at the price it proposed.").)

It bears noting here that Blue Origin repeatedly quotes an email from Ralph Roe to the SSA opining that SpaceX designed its HLS solution for a mission to Mars, which purportedly adds more complexity and risk than is required for the initial crewed moon landing demonstration mission.  (AR Tab 67, Roe Email to SSA at 62900.)  Blue Origin mischaracterizes Mr. Roe's opinion as a "whistleblowing" email that undermines NASA's evaluation and award decision.  Blue Origin overreaches.  The record shows that Mr. Roe served in an advisory capacity to the SSA (AR Tab 108b62, Decl. of Ralph Roe at 104880-81), and the SSA's decision to disagree with his opinion, adopt the SEP's findings, and award the contract to SpaceX was consistent with the Option A BAA and NASA's long term program objectives, and well within the SSA's authority and discretion.  (AR Tab 27, Option A BAA at 24480.)  Recall that, under the *Artemis* program, NASA intends to execute numerous sequential missions, including the demonstration mission, future sustaining missions, and eventually a crewed mission to Mars.  (AR Tab 108b26a, COSF at 103650.)[15]  NASA Associate Administrator Robert Cabana confirms the same.  (ECF 60-1 at 2.)  And, the Source Selection Statement shows that the SSA made a reasoned business judgment to invest in a public private partnership with SpaceX to develop a solution that could serve not only the initial demonstration, but be available for future sustaining missions and other deep space exploration:

> The collective effect of these attributes is that SpaceX's initial lander design will largely obviate the need for additional re-design and development work (and appurtenant Government funding) in order to evolve this initial capability into a more sustainable capability. While I acknowledge that some development and technical risk necessarily accompany SpaceX's innovative approach to designing a capability that is sustainable from the outset, I find that SpaceX has provided a feasible path to executing on this capability. Accordingly, I conclude that the significantly enhanced operational flexibility and mission performance that SpaceX

---

[15] ECF 62-1, Ex. A, ARTEMIS PLAN: NASA'S LUNAR EXPLORATION PROGRAM OVERVIEW 9 (Sept. 2020).

offers, and complementary potential for resultant long-term affordability, present immense value for NASA for lunar and deep space exploration activities.

(*See, e.g.*, AR Tab 77, Source Selection Statement at 63046.)  To borrow from *Inspace 21 LLC v. United States*, "[t]his is not an arbitrary decision, but rather a judgment with which [one member] of the … team, as well as [protester], disagree." 128 Fed. Cl. 69, 86 (2016).

NASA's evaluation and award decision are "subject to a highly deferential rational basis review." *Safeguard*, 989 F.3d at 1343.  The Federal Circuit has warned against the exact type of second guessing of evaluation ratings that Blue Origin asks for here.  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (summarily rejecting arguments that "deal with the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement, which involve discretionary determinations of procurement officials that a court will not second guess.").

And, while Blue Origin consistently asks this Court to assume bad faith where NASA officials did not document explanations to support Blue Origin's false narrative, as discussed, APA review demands the opposite assumption.  *Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018).  That the evaluators did not document any concern with SpaceX's proposed approach to the DCR and launch vehicle reviews that Blue Origin raises here is not evidence of any NASA error or of some nefarious scheme to ensure SpaceX received the contract.  Rather, the fact that NASA's voluminous procurement record contains no documented concerns with SpaceX's approach to these program reviews is the evidence that defeats Blue Origin's claims, showing only that the NASA evaluators had no such concerns to record.  *See Sirius Fed., LLC v. United States*, 153 Fed. Cl. 410, 422 (2021) (invoking presumption of regularity to reject protester's argument that "lack of documentation … means that the Government ignored the requirement," because that position "turns the analysis on its head because the Court assumes the Government acted in

38

compliance with the law unless shown otherwise."); *see also Richey v. United States*, 322 F.3d 1317, 1326 (Fed. Cir. 2003) ("the record before the Court of Federal Claims here does not contain evidence to overcome the presumption of regularity that attaches to all administrative decisions.").

Finally, Blue Origin's reliance on NASA's evaluation of Dynetics' approach to a different milestone—the Post-Test Uncrewed Landing Test Review—one that Blue Origin agrees SpaceX satisfied—provides little support for Blue Origin's challenge. (ECF 61-1 at 38.) To the extent relevant, this evaluation provides more context for the reasonableness of NASA's decision to assign SpaceX only a Weakness regarding its FRR milestone approach. The SOW provides that this Post-Test review shall include analyses, identification of risk reduction achieved due to the Uncrewed Lunar Landing Test, and lessons learned of the "***HLS systems and/or subsystems*** necessary to demonstrate precision landing capabilities, at a scale representative of the planned Initial crewed demo landing, providing safety and risk mitigation prior to the crewed demonstration mission." (AR Tab 27e, Att. G SOW at 32972 (§ 5.4.3 (referencing § 6.7)), 32988.) The SEP observed that Dynetics proposed to begin its initial crewed demonstration mission (by launching its first supporting spacecraft) immediately after the first launch of that same supporting spacecraft for the uncrewed lunar landing test. (AR Tab 59b, Dynetics SEP Report at 62740.) The proposed mission sequencing and ***significant overlap between Dynetics' uncrewed lunar landing test and the initial crewed demonstration*** rendered the Post-Test review meaningless: "This issues [sic] results in a contract milestone activity that is not only in clear contravention of the solicitation's Milestone Acceptance Criteria and Payments ground rule, but more importantly, provides limited value to both the Government and to the offeror in the lead up to the offeror's crewed demonstration." (*Id.*) The evaluators assigned a Significant Weakness stating: "the offeror's lack of impactful risk reduction through these test activities represents a flaw in its

proposal that will appreciably increase the risk of unsuccessful contract performance." (*Id.*)  In essence, Dynetics failed to provide a meaningful Post-Test milestone review, and yet NASA did not find Dynetics unacceptable.  Rather, applying the Option A BAA evaluation criteria, NASA noted that proposal flaw, evaluated the risk, and assigned a Significant Weakness based on its judgment that the flaw appreciably increased the risk of unsuccessful performance.  As noted in the United States and SpaceX MJARs, NASA consistently evaluated Blue Origin's own failures against the Option A BAA requirements and instructions in an equal manner, making Weakness findings rather than declaring Blue Origin unacceptable.  (ECF 60 at 47-48; ECF 62 at 55-56.)

#### 5.    Blue Origin Was Not Prejudiced by NASA's Evaluation of FRRs and Other Reviews.

As discussed in Section II above, Blue Origin cannot establish prejudice as a result of NASA's milestone evaluation in any event.

### B.    Blue Origin's Discussions Argument Is Untimely And Without Merit.

As the SpaceX and United States MJARs detail, Blue Origin's objection that it was unfair for NASA to hold post-selection negotiations only with SpaceX constitutes an untimely challenge to the Option A BAA ground rules, which Blue Origin has waived.  (ECF 60 at 49-51, 63-67; ECF 62 at 59-62.)  The Option A BAA advised all competitors that NASA reserved the right to (i) make award without discussions, or (ii) select conditionally one or more offerors for award, and open post-selection negotiations with only the selected offeror(s).  (AR Tab 27, Option A BAA at 24434, 24473.)  NASA followed those ground rules, conditionally selected SpaceX, and opened post-selection negotiations with SpaceX.  (ECF 61-1 at 48 ("The facts here are not in dispute."))  Blue Origin cannot avoid the fact that it submitted its proposal under a solicitation that permitted post-selection negotiations with only the offeror(s) selected for potential award, and Blue Origin never objected until after learning it lost.  That ends the matter.  Under the *Blue & Gold* waiver rule,

Blue Origin's objections to the post-selection negotiations with SpaceX must be denied.  *Blue &*
*Gold*, 492 F.3d at 1314 ("Vendors cannot sit on their rights to challenge what they believe is an
unfair solicitation, roll the dice and see if they receive award and then, if unsuccessful, claim the
solicitation was infirm.").

Because the Option A BAA terms under which Blue Origin competed do not support its
false narrative, Blue Origin's MJAR ignores them.  Instead, Blue Origin pretends that this FAR
Part 35 procurement was actually a FAR Part 15 procurement, that the exchanges between NASA
and SpaceX purportedly were discussions, and that NASA allegedly violated 10 U.S.C. §
2305(b)(4) by not also holding "discussions" with Blue Origin.  (ECF 61-1 at 48-49 (citing 151
Fed. Cl. 70 (2020).)  As discussed in SpaceX's MJAR, Blue Origin is wrong on all counts, and
none of these arguments overcome Blue Origin's waiver problem.  (ECF 62 at 59-62.)

First, Blue Origin's MJAR continues to misconstrue *Tolliver Group, Inc. v. United States*,
which involved a challenge to the Army's decision to cancel two FAR Part 8 solicitations and to
resolicit under a different contract vehicle.  151 Fed. Cl. 70, 79 (2020).  Unlike with this post-
award protest, which falls squarely within the Court's bid protest jurisdiction, the *Tolliver* Court
needed to confirm its jurisdictional basis for reviewing the cancellation, and did so by finding that
there was an "alleged violation of statute or regulation in connection with a procurement or
proposed procurement."  *Id.* at 84-87 (quoting 28 U.S.C. § 1491(b)).  The Court explained that this
analysis was slightly more complicated because, unlike FAR Parts 14 and 15, FAR Part 8 does not
expressly address cancellation.  *Id.* at 87.  The Court ultimately found that it had jurisdiction based
on the plaintiffs' allegation that the agency's cancellation violated FAR 1.602-2(b).  *Id.* at 86.  The
Court also found in dicta that *under the specific factual circumstances of the FAR Part 8*

*procurements at issue* it also had jurisdiction under 10 U.S.C. § 2305(b)(2). *Id.* at 89-92.[16]  The

Court did not address whether FAR Part 35 procurements involve "competitive proposals" subject

to 10 U.S.C. § 2305(b)(4)(A).  Nor did the Court allow an offeror to compete under one set of

stated ground rules, and then after losing, successfully object to this Court on the ground that the

agency actually was required to follow a different set of rules—such a result would violate *Blue*

*& Gold*'s straightforward waiver principle.

Rather, as the SpaceX MJAR discussed, Judge Solomson, the author of the *Tolliver*

decision, recently rejected the position Blue Origin advances, holding that, where a solicitation

(like the Option A BAA) expressly provides that certain exchanges are not discussions, any post-

award protest insisting otherwise fails:

> At first glance, this communication would appear to be a discussion, which would
> be problematic for the government given that GSA did not intend to open
> discussions with offerors and that having done so likely would have required GSA
> to accept FPRs from all offerors….
>
> **The Court need not definitively resolve this issue, however, because an express
> provision in the RFP controls and permitted the Agency's approach here.** The
> RFP provided that during the initial screening (i.e., step one of the evaluation
> process outlined *supra*), all proposals would be reviewed to ensure that supporting
> documentation was submitted for each claimed point (without the Agency verifying
> the contents or substance of that document). Proposals that omitted supporting
> documentation, if unrelated to a minimum submission requirement, would be
> treated as clarifications. **This language is clear and unambiguous**. Consistent
> with this RFP provision, GSA sought missing documents from Spinvi for claimed
> points not relating to a minimum requirement….  **As the Agency followed the
> RFP's terms regarding the characterization of the communication, this exchange
> of information between GSA and Spinvi was not a discussion.**

*WaveLink*, 2021 WL 2762814 at *17 (internal citations omitted).  In *WaveLink*, the Court also

recognized that, if the protester had challenged the legality of the solicitation provision, the "the

---

[16] As noted previously, this aspect of the decision is far from settled precedent.  Ralph C. Nash,
*Court of Federal Claims Jurisdiction: Parsing the Statues and Regulations*, 35 Nash & Cibinic
Rep. NL ¶ 9 ("We want to make it clear that the court is wrong in equating competitive procedures
with competitive proposals and that this part of its decision should not be relied on.").

42

Court would be required pursuant to the *Blue & Gold* waiver rule … to dismiss the challenge as untimely." *Id*. at n.21.

Like the clear and unambiguous solicitation in *WaveLink* that defined clarifications separate from discussions, the Option A BAA distinguishes post-selection negotiations from discussions as "exchanges with Offerors who have been selected for potential contract award." (AR Tab 27, Option A BAA at 24434.)  The Option A BAA was unambiguous that NASA was ***not*** conducting a FAR Part 15 source selection, with the potential for discussions, revised proposals, and a trade-off analysis to select which offeror would receive a contract.

> The SSA will not conduct a comparative analysis and trade-off amongst proposals. Rather, the SSA will consider each proposal on its own individual merits, and will select for award one or more proposals that individually each present value to the Government and that optimize NASA's ability to meet its objectives as set forth in this solicitation.
>
> ….
>
> Finally, the SSA may make initial, non-binding selections of an Offeror or Offerors for the purpose of having the Contracting Officer engage in post-selection negotiations with one or more Offerors as defined in this solicitation.

(*Id.* at 24480.)  NASA followed precisely the acquisition approach that the solicitation announced.

NASA's exchanges with SpaceX, ***after*** selecting SpaceX—the highest rated and lowest (by a significant margin) priced offeror—for potential award, are by definition ***not*** discussions and were consistent with the stated procurement grounds rules.  (*See also id.* at 24434, 24467 (expressly reserving "right to negotiate any aspect of an Offeror's milestone payment amounts, schedule, and/or acceptance criteria prior to award."))  The law required nothing more of NASA. Instead, this Court recently confirmed when reviewing an acquisition method that "resemble[s] broad agency announcements," like the Option A BAA, its review is limited to evaluating "whether

the government followed its own process." *Kinemetrics, Inc. v. United States*, __ Fed. Cl. __, 2021 WL 4237169, *1, *5 (Sept. 10, 2021).)

Second, the fact that NASA followed the stated process for post-selection negotiations negates Blue Origin's fairness claim.  NASA's rationale for engaging in the Option A BAA post-selection negotiations with SpaceX is fully documented in the record (AR Tab 62, Initial Selection at 62882-84), and Blue Origin does not challenge the reasonableness of that decision—a decision which GAO found was not "arbitrary or made in bad faith."  (AR Tab 108b67a, GAO Decision at 105033 (denying Blue Origin's objection to NASA's decision to hold post-selection negotiations with only SpaceX and also finding Blue Origin's objection "patently untimely"); ECF 62 at 20-23.)  While competitors shall be treated fairly and impartially, they need not be treated the same. 48 C.F.R. § 1.102-2(c)(3).  Given that NASA did not select Blue Origin for potential award, Blue Origin was not similarly situated to SpaceX, and thus it was reasonable for NASA to treat them differently, i.e., elect to hold post-selection negotiations with SpaceX.  *See, e.g., Sigmatech, Inc. v. United States*, 141 Fed. Cl. 284, 313 (2018) (denying unequal treatment claim where offerors were not similarly situated); *Unisys Corp. v. United States*, 89 Fed. Cl. 126, 140-41 (2009) (holding that GSA's post-selection negotiations with successful bidder did not violate fairness principles).[17]

---

[17] Moreover, even assuming arguendo that 10 U.S.C. § 2305(b)(4) or FAR Part 15.306 applied to the Option A BAA, neither prohibit NASA's exchanges with SpaceX.  Both expressly authorize an agency to limit the competitive range in order to conduct discussions with only those offerors that are most competitive.  10 U.S.C. § 2305(b)(4)(B); 48 C.F.R. § 15.306(c)(2).  There is nothing improper about creating a competitive range of one and conducting discussions with that offeror. *See, e.g., Rivada Mercury, LLC v. United States*, 131 Fed. Cl. 663 (2017) (agency reasonably excluded protester from competition to create competitive range of one before opening discussions); *Sys. Dynamics Int'l, Inc. v. United States*, 130 Fed. Cl. 499, 514 (2017) (same).  Had NASA engaged in discussions, it could have easily excluded Blue Origin (and Dynetics) from the competitive range and proceeded to open discussions with SpaceX alone based on the underlying evaluation, which showed more relative merit in SpaceX's proposed approach and a proposed Blue Origin price that drastically exceeded NASA's funding.

Finally, as detailed at the outset, Blue Origin cannot demonstrate prejudice.  Even with multiple rounds of protest price revisions, Blue Origin has still failed to commit to reducing its price below NASA's funding limits, much less any meaningful way to overcome that SpaceX proposed the higher rated solution.  And it is not even clear which proposed solution at which price Blue Origin contends it would offer if given a second chance.[18]

### C. Blue Origin's Argument That NASA Was Required To Amend The Solicitation Is Untimely And Incorrect.

Showing that it did not propose its most competitive offer in the original competition and desperate for another chance, Blue Origin insists that purported changed milestone or funding requirements obligated NASA to amend the Option A BAA.  (ECF 61-1 at 60-64.)  But as demonstrated in the SpaceX and United States MJARs, there was no change in NASA's requirements, so there was nothing for NASA to amend.  (ECF 62 at 62-68; ECF 60 at 49-51, 67-70.)  As discussed, SpaceX's proposal complied with the milestone instructions; the difference in the offerors' proposals to accomplish those events resulted from their different architectures and not a waiver of any requirement.  Similarly, as explained below, Blue Origin's contention that funding constraints compelled a solicitation amendment is a fallacy.

**First**, Blue Origin insists that "[w]hen an Agency cannot make any award due to funding, it is fair to say that its circumstances and requirements have fundamentally changed."[19]  (ECF 61-1 at 61.)  This bold proclamation ignores the Option A BAA ground rules, which repeatedly and emphatically warned offerors that "NASA reserves the right to select for award multiple, one, or

---

[18] According to Blue Origin, even after the proposal alterations that followed the post-selection negotiations, SpaceX still should have been disqualified from receiving the Option A contract. (ECF 61-1 at 28-30.)  Thus, the post-selection negotiations are immaterial both to the contract award decision and to Blue Origin's protest.

[19] NASA, of course, was able to make one award, after engaging in the exact post-selection negotiations that the Option A BAA prescribed.

none of the proposals," and that the "overall number of awards will be dependent on funding availability and evaluation results." (AR Tab 27, Option A BAA at 24481.) Blue Origin did not heed those instructions prior to proposal submission and continues to ignore them today. NASA's receipt of less than anticipated funding was not a "change"—NASA already anticipated and accounted for this possibility in the Option A BAA ground rules, advising competitors that NASA's ability to make one or more awards depended on future, unknown appropriations. Blue Origin never objected to these terms before submitting its initial proposal and has waived its right to object to them now. *Blue & Gold*, 492 F.3d at 1314; *see also Criterion Sys.*, 144 Fed. Cl. at 416 (dismissing argument that agency violated FAR 15.206 to reflect changed security requirements associated with shifting geopolitical relations where protester "participated in the competition without complaint until its quote was rejected").

**Second**, as GAO recognized when it denied this same objection, Blue Origin knew shortly after Congress enacted NASA's FY 2021 HLS appropriations that NASA could not afford Blue Origin's proposal, yet Blue Origin failed to file any protest prior to award seeking a solicitation amendment or requesting an opportunity to revise its proposal based on the funding shortfall. (AR Tab 108b67a, GAO Decision at 105028 ("To the extent that the protesters now contend, months later and after award, that they should have been afforded the opportunity to modify their proposals in light of NASA's available FY2021 funding for the HLS program, such arguments present untimely challenges to the terms of the Option A BAA.")) The same result must follow here pursuant to the Federal Circuit precedent that extends the *Blue & Gold* rule to "appl[y] to all situations in which the protesting party had the opportunity to challenge a solicitation ***before the award*** and failed to do so." *Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020) (citing *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382-83 (Fed. Cir. 2012)).

**Third**, timeliness aside, the crux of Blue Origin's argument is a challenge to NASA's decision to award only a single contract rather than two.  But this Court has long recognized that, where a solicitation provides the agency discretion to make one or multiple awards, challenges to a single award are groundless.  *See, e.g.*, *Am. Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 439 (2015) (holding it is within agency's sound discretion to determine its minimum needs and determine number of contract awards, consistent with solicitation); *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 577 (2002) (holding that "[w]here an RFP does not require multiple awards, an Agency is under no obligation to award to multiple offerors").

**Fourth**, there is no requirement that NASA amend the Option A BAA.  In its Complaint, the only authority Blue Origin cited for this duty to amend was FAR 15.206 (Compl. ¶ 153) but, as GAO found, that provision does not apply to this solicitation issued under FAR Part 35.016. (AR Tab 108b67a, GAO Decision at 105035 ("The Option A BAA was issued pursuant to the rules established by FAR section 35.016, which are materially different from a FAR part 15 procurement.").  *See also Criterion Sys.*, 144 Fed. Cl. at 416 (declining to apply FAR 15.206 to FAR Part 8 procurement).

Even if the FAR Part 15 rules applied, the results would be the same because NASA's funding shortfall did not change the contractual performance solicited and obtained.  The cases that Blue Origin relies on are not helpful to its cause.  For instance, *Medline Industries, Inc. v. United States,* __ Fed. Cl. ___, 2021 WL 348342 (July 30, 2021), involved a complex set of protests challenging the agency's decision to transfer its recently solicited requirements to another agency.   2021 WL 3483429 at *2-*5.   *Medline* is not remotely analogous to the instant circumstances.  There, the procuring agency solicited and awarded ten year contracts while hiding the fact that it planned to descope those contracts soon after performance began, and the agency

solicited the services for all ten years knowing that it required a significantly smaller period of performance.  Here, NASA advised all offerors in the Option A BAA that its ability to make one or more awards was dependent on appropriations, and the appropriations that Congress approved were immediately public, confirming NASA would not be able to make award at Blue Origin's proposed price.  And, NASA solicited an HLS demonstration mission and procured an HLS demonstration mission with the same requirements.

Blue Origin's reliance on *Joint Action in Community Service, Inc.* is similarly misplaced.  Blue Origin mischaracterizes the procurement error identified in *Joint Action*; GAO did not sustain that protest based on any blanket prohibition against negotiating with a single offeror to address funding limitations.  (*Compare* ECF 61-1 at 62 *with Joint Action in Cmty. Serv., Inc.*, B-214564, Aug. 27, 1984, 84-2 CPD ¶ 228.)  Just the opposite, the *Joint Action* decision shows approval of the agency's decision to conduct negotiations with the presumptive awardee to meet those budget constraints.  *Joint Action in Cmty. Serv., Inc.*, B-214564, Aug. 27, 1984, 84-2 CPD ¶ 228.  GAO sustained the protest, however, because during those negotiations the procuring agency changed the solicited performance: the agency agreed to substitute government furnished property ("GFP") for contractor-furnished property.  While Blue Origin is determined to hone the square peg facts of this record into the round hole circumstances of *Joint Action*, as GAO found, "this is not an instance where the lack of available funding necessitated material changes to the scope, quality, or amount of the government's requirements."  (AR Tab 108b67a, GAO Decision at 105029.)  NASA did not relax or lessen the Option A development and capability solicited to fit its funding profile.[20]

---

[20] Blue Origin also briefly cites to *Symetrics Industries, Inc.*, B-274246 et al., Aug. 20, 1997, 97-2 CPD ¶ 59 for the proposition that "the agency there was required to amend the solicitation upon receiving information that **funds were unavailable** for the purchase of a significant portion of an estimated quantity included in the request for proposals for an indefinite quantity/indefinite delivery order contract."  (ECF 61-1 at 62-63 (emphasis in original).)  This too is unavailing.  In *Symetrics*, the agency learned before award that the majority of sequencers called for in the

(*Id*. at 105030 ("The record shows that SpaceX proposed to fulfill the Option A BAA's existing requirements within the scope of its total proposed price, which remained unchanged following post-selection negotiations."))

**Finally**, as with all of Blue Origin's claims, Blue Origin cannot establish the prejudice necessary to succeed.  Blue Origin has never shown that, had NASA amended the solicitation to state that only one contract would be awarded due to funding constraints, it could or would have reduced its proposed price and revised its technical solution to have a substantial chance of award. Even now it is unclear what technical solution and price Blue Origin would propose.  *See Elec. Data Sys., LLC v. United States*, 93 Fed. Cl. 416, 435-36 (2010) ("Several cases hold that, to demonstrate prejudice in the context of a failed amendment, the protestor must show that it would have altered its proposal to its competitive advantage had it been given the opportunity to respond to an altered requirement.") (quotation and citations omitted); *Guardian Moving & Storage Co. v. United States*, 122 Fed. Cl. 117, 134 (2015), *aff'd*, 657 F. App'x 1018 (Fed. Cir. 2016) ("even if a likelihood that a change would cause offerors to alter their proposals is not the defining factor in whether an amendment to the solicitation was required, it certainly is the defining factor in determining whether an offeror was prejudiced by an agency's failure to issue an amendment…. Here, the absence of an amendment caused no prejudice to Guardian….").

### D.     NASA's Evaluation Of Other Aspects Of The Blue Origin And SpaceX Technical Proposals Was Reasonable.

Blue Origin accuses NASA of committing "a number of errors in the technical evaluations of SpaceX's proposal demonstrating a pattern of unfair treatment trending to favoritism for

---

solicitation were no longer required during performance.  There was thus a disconnect between the performance called for in the solicitation and the performance that the agency knew (or should have known) it would actually require under the solicited contract.  That is not what happened here, and Blue Origin's reliance on *Symetrics* is inapposite.

SpaceX." (ECF 61-1 at 58.)  Blue Origin cannot meet the high standard of proof needed to advance this thinly-veiled bad faith claim.  The record confirms that the only pattern present here is Blue Origin's repeated mischaracterizations of the facts.  First, Blue Origin resurrects its unsuccessful objection to GAO that NASA's evaluation of the offerors' communication links was unfair because NASA assigned a Weakness to SpaceX and a Significant Weakness to Blue Origin.  (*Id*.)[21] Second, Blue Origin alleges that NASA credited SpaceX multiple times "for the same positive attributes of its proposal." (*Id.* at 59-60.)  Both contentions are meritless and must be denied.

### 1. The Findings Assigned to the Offerors' Communications Approaches Resulted From Proposal Differences and Not Unequal Treatment.

The Federal Circuit in *Office Design Group v. United States* affirmed that to prevail on a claim of unequal treatment, the protester bears a heavy burden of proving that "the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." 951 F.3d 1366, 1372 (Fed. Cir. 2020). Absent this showing, "the court should dismiss the claim," because "[t]o allow otherwise would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings." *Id*. at 1373.  Blue Origin cannot meet the requisite threshold showing.  The record confirms that the evaluation findings regarding the offerors' communication links were different because the proposals and their respective shortfalls were different.

NASA's concerns with SpaceX's communication links were both fewer in number and qualitatively less problematic than the problems with Blue Origin's proposal.  (*See* AR Tab

---

[21] Blue Origin's initial GAO protest challenged the Significant Weakness it received, which Blue Origin affirmatively withdrew after receipt of the Agency Report rebutting Blue Origin's claims. (AR Tab 108b67a, GAO Decision at 105051.)  After receiving SpaceX's evaluation, Blue Origin attempted a different, yet still meritless tack, arguing unequal treatment, which GAO denied. (*Id.* at 105047-52 ("evaluation record demonstrates material differences between the proposals that support NASA's different evaluation findings").)

108b55, Supp. COSF at 104695-700.)  The evaluators assessed the same elements of both offerors'

proposed system, and identified quantitative and qualitative differences that drove the different

findings.   Quantitatively, the evaluators found that "[f]our of the six communications links

proposed by [Blue Origin] *will not close as currently designed,*" and a fifth potentially may not

close (AR Tab 59a, Blue Origin SEP Report at 62654-55), while these same evaluators noted that

only two of SpaceX's links "may" not close.  (AR Tab 59c, SpaceX SEP Report at 62793.)  The

qualitatively differences were even more stark as NASA explained to GAO:

> ***Both of the SpaceX broken links are relatively easily fixed, requiring only minor design changes to permit the links to close, whereas*** ██████████ ***Blue Origin broken links*** ██████████
> ████████████████████████████████████████ For these
> reasons, NASA assigned Blue Origin a *Significant Weakness* rating, whereas
> SpaceX was assigned a *Weakness* rating.

(AR Tab 108b55, Supp. COSF at 104696-97.)  The qualitative differences, which NASA detailed

with citation to the offerors' proposals, stemmed partly from the distinct approaches to addressing

multipath degradations and mitigations.[22]   While Blue Origin's proposal ████████████

████████████████████████ (a major contributing factor to its Significant Weakness)

(AR Tab 108b26a COSF at 103693-705), SpaceX confronted the problem head on, with detailed

analysis and mitigations for multipath effects.  (AR Tab 108b55, Supp. COSF at 104697-99; *see

e.g.*, AR Tab 34d.157, SpX DDB 4.7 at 61254-60.)  Moreover, NASA recognized that the few

issues noted with SpaceX's communications approach were correctible with minor design changes

████████████████████ while resolving NASA's concerns with Blue Origin's communication

links would require more significant changes to its proposed system.  (AR Tab 108b55, Supp.

COSF at 104699-70; AR Tab 108b67a, GAO Decision at 105049-51.)

---

[22] "Multipath" refers to interference sources along a radio signal's path, something offerors were
warned to address with regard to lunar transmissions.  (AR Tab 108a.004 Reference Library at
72053-56.)

Blue Origin also falsely contends that SpaceX "proposed a completely non-functioning communications system" that "impermissibly relies on the Gateway." (ECF 61-1 at 58-59.) NASA successfully rebutted Blue Origin's mischaracterizations of the evaluation and SpaceX's proposal before GAO, which Blue Origin ignored at GAO and continues to ignore here. The Contracting Officer explained, again with citation to the evaluation and SpaceX's proposal, that the SEP noted a potential ambiguity in SpaceX's proposal about Gateway because a single graphic in SpaceX's proposal indicated that Gateway could be used for a relay, but four other proposal references showed flexibility to communicate with either Orion or Gateway. (AR Tab 108b55, Supp. COSF at 104699-700.) GAO denied Blue Origin's unsupported recharacterizations of SpaceX's communications approach and this Court should do the same. (AR Tab 108b67a, GAO Decision at 105051.)

In sum, given the qualitative and quantitative differences the evaluators noted with regard to the SpaceX and Blue Origin proposed communication systems, NASA had a reasonable basis for assigning a Weakness to one and a Significant Weakness to the other. *Office Design Group*, 951 F.3d at 1373. Blue Origin's disagreement with NASA's technical judgements is of no consequence. *Agile-Bot II, LLC v. United States,* __ Fed. Cl. ___, 2021 WL 4484870, at *44 (Sept. 4, 2021) (denying protester's assertion that agency should have viewed weakness as disqualifying as insufficient disagreement).

### 2.    NASA's Strengths Findings Did Not Constitute Unequal Treatment.

Blue Origin's challenge to NASA's assessment of a Significant Strength and Strength for SpaceX's proposal also fall flat. NASA thoroughly documented the separate benefits stemming from the features in SpaceX's proposal. The SEP determined that SpaceX's proposal "verifiably exceeds the thresholds and/or meets the goals for twelve of NASA's functional performance

requirements for its initial demonstration mission," and that "*[t]ogether,* these proposed capabilities appreciably exceed stated requirements in a manner that will be advantageous to NASA." (AR Tab 59c, SpX SEP Report at 62780-81.) Thus, the combination of various features exceeding twelve of NASA's performance requirements warranted a Significant Strength. (*Id.*) The SSA concurred, finding that SpaceX's "suite of augmented capabilities" was "a particularly noteworthy attributed of SpaceX's design with abundant potential benefit for NASA." (AR Tab 77, Source Selection Statement at 63045.) The SSA also noted the separate Strength assigned for "science payload delivery and return allocations," and explained why the benefit to NASA was different and appropriate for a separate, standalone Strength:

> *I note that the SEP also assigned SpaceX an additional, separate strength within Technical Area of Focus 1 specifically concerning its science payload delivery and return allocations.* It is my assessment that SpaceX received some credit for these augmented capabilities and the flexibilities they create for NASA in the above-discussed significant strength. *However, this separate strength focused on SpaceX's unique design attributes that enable the creative use of available space, including its combination of unpressurized and pressurized cargo areas and its stowage plan, which will make efficient use of available space for science payloads and streamline their deployment and sample returns.* Thus, I find this specific strength to be noteworthy of its own accord, and I agree with the SEP that the assignment of this standalone strength was appropriate.

(*Id.*) Unable to confront the SSA's rationale for why the benefits credited were different, Blue Origin ignores the SSA's explanation.

Contrary to Blue Origin's "double count" accusation, the SSA explicitly recognized that SpaceX's proposal provided multiple distinct benefits for NASA's scientific mission that warranted Strength findings. That Blue Origin disagrees with NASA's determination that SpaceX deserved Strengths for the separate benefits its proposal provided does not render the judgment unreasonable or unfair. *See CGS Administrators, LLC v. United States*, 110 Fed. Cl. 431, 456 (2013) (finding "nothing irrational or unequal in the award of [] related strengths to Noridian's proposal"); *see also*

*Concurrent Techs. Corp.*, B-415513, Jan. 18, 2018, 2018 CPD ¶ 59 ("[W]e do not find the agency's assessment of two separate strengths for two separate benefits based on a single paragraph from [an offeror's] proposal objectionable or inconsistent with the solicitation."); *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 740 (2008).

### E.     The Court Need Not Address Blue Origin's Breach Of Contract Claim.

The SpaceX and United States MJARs both explained that the Court need not address Blue Origin's breach of implied contract claim (Count 5), as that claim is both redundant to and encompassed within the rest of Blue Origin's challenges to NASA's evaluation and award decision under the APA standard.  (ECF 62 at 69; ECF 60 at 73.)  Blue Origin's MJAR confirms the same. In the two pages of Blue Origin's brief addressing breach of implied contract, Blue Origin simply restates and cross-references Blue Origin's other arguments.  (ECF 61-1 at 64-65.)  Blue Origin's derivative breach of implied contract allegations fail for the same reasons as to its primary arguments.  To the extent Blue Origin might have sought bid and proposal costs stemming from its breach of implied contract claim, *cf. Medline*, 2021 WL 3483429 at *16, Blue Origin does not even request that money remedy, seeking instead only declaratory and injunctive relief.  (ECF 61-1 at 71-78.)  Accordingly, given that Blue Origin's breach of implied contract claim does not raise any independent issues, and Blue Origin has not sought the relief associated with this claim, the Court should dismiss or deny count 5.  *See SAGAM Securite Senegal v. United States*, __ Fed. Cl. __, 2021 WL 3140559 at *4 & n.3 (June 25, 2021).

## IV.     THERE IS NO BASIS TO ENJOIN NASA'S OPTION A AWARD TO SPACEX.

Like Blue Origin's fictional prejudice narrative, Blue Origin's claim of irreparable harm is fatally speculative and causally divorced from any potential procurement error.  Because Blue Origin has not proven a serious procurement error that prejudiced its chance for award, Blue Origin

is not entitled to any relief.  And, as noted in SpaceX's MJAR, even if Blue Origin could succeed on the merits, none of the harm it alleges qualify as the "likely" and "irreparable" harms that might warrant an injunction of NASA's contract award to SpaceX.  (ECF 62 at 70-73.)

It is black letter law that, to show entitlement to injunctive relief, the protester must show not just a possibility of irreparable harm, but that "the irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). In other words, "surmise and mere speculation … is simply not proof of irreparable harm." *CRAssociates, Inc. v. United States*, 103 Fed. Cl. 23, 26-27 (2012).  As the D.C. Circuit has framed the standard, "the injury must be both certain and great; it must be actual and not theoretical," and injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time." *Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur." *Id.* Critically, "the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Id.* Consistent with these principles, this Court rejects speculative allegations of irreparable harm that fail to demonstrate the asserted harm is actually likely to occur. *Cleveland Assets, LLC v. United States*, 133 Fed. Cl. 108, 112 (2017) (quoting *Winter*, 555 U.S. at 22).

Blue Origin's primary asserted harm not only requires the Court to speculate as to what NASA will do in the future, but also to speculate that NASA will engage in bad faith.  Specifically, Blue Origin asserts, based on nothing more than the inadmissible executive declarations, that "NASA will build its entire lunar architecture around SpaceX's Starship," which "[b]y definition … creates an un-level competitive landscape and effectively gives SpaceX a lunar system monopoly."  (61-1 at 73.)  Blue Origin provides no evidence on which this Court may find that

NASA would preclude future competition, much less that NASA would do so in manner that is inconsistent with procurement competition requirements. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quotation and alteration omitted) ("to overcome the presumption of good faith on behalf of the government, the proof must be almost irrefragable"). To the contrary, as explained by NASA Associate Administrator Cabana, NASA is currently planning several, significant procurements to enable "HLS recurring services to meet NASA's requirement for annual Artemis mission to the Moon," and NASA has already awarded Blue Origin a $25.6 million contract to further invest in its HLS, seriously undermining Blue Origin's suggestion that through the Option A award NASA has handed SpaceX a lunar monopoly.  (ECF 60-1 at 3, 6.)  Moreover, if NASA does preclude Blue Origin from competing for future lunar opportunities, Blue Origin has a remedy: bring a bid protest in this Court, which will permit this Court to review the merits of what NASA actually does, rather than what Blue Origin speculates NASA may do. *Cf.*, *Savantage Fin. Servs., Inc. v. United States*, 150 Fed. Cl. 307 (2020).  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Just as fatally speculative is Blue Origin's claim of irreparable harm due to lost profits. (ECF 61-1 at 75.)  But what profits does Blue Origin expect to earn form an Option A award?  One of Blue Origin's primary themes is that it is willing to perform the Option A work at a significant loss (unless its original price was unreasonable).  Whether or not Blue Origin could possibly obtain an Option A award at a price that would permit a profit, it is Blue Origin's burden to show that the risk of those lost profits is "both certain and great … actual and not theoretical." *Wisconsin Gas*,

758 F.2d at 674.  Blue Origin has not met that burden.[23]  Even if Blue Origin demonstrated

significant lost revenue or profits, such economic harms alone are generally not accepted as

irreparable harm except where the losses are shown to threaten the existence of the company,

which Blue Origin has not even alleged.  *See Astellas Pharma US, Inc. v. Food & Drug Admin*.,

642 F. Supp. 2d 10, 22 (D.D.C. 2009) (quotation omitted) ("financial harm alone cannot constitute

irreparable injury unless it threatens the very existence of the movant's business").

Likewise fatally speculative are Blue Origin's assertions that "[a]bsent an injunction, Blue

Origin's National Team partners will move on to new opportunities elsewhere." (ECF 61-1 at 73-

74.)  As discussed above in Section II, these claims are directly inconsistent with Blue Origin's

prejudice argument that, if given the opportunity, Blue Origin would submit a simpler lander

solution that would be less expensive ███████████████████████.  (*See, e.g.*, ECF

61-1 at A-18 to A-19.)  If anything, this alleged harm merely reinforces the lack of prejudice here—

as Blue Origin's purported revised solution and price are indeterminate.  *See Wisconsin Gas*, 758

F.2d at 674 ("Bare allegations of what is likely to occur are of no value since the court must decide

whether the harm will in fact occur.").

Blue Origin also asserts irreparable harm from the "lost opportunity to work with NASA

and to gain valuable insights that cannot be remedied by other work for NASA outside the full

design, development, test, and evaluation of a lunar lander." (ECF 61-1 at 73.)  That is odd, given

that Blue Origin spent the entire base period working with NASA to develop and test the same

HLS design that Blue Origin now claims it is prepared to walk away from in favor of an HLS that

it purportedly ██████████████████████ (Compl. ¶ 13 ("████████

---

[23] The fact that Blue Origin's supporting declaration is only willing to assert that "as a result of not being able to perform the contract, Blue Origin will also be deprived of the ***lost revenues*** it would have accrued," is a strong indication that Blue Origin knows it will not lose any ***profit*** if it does not receive an Option A award.  (ECF 61-1 at A-21.)

██████████████████████████████████████████████████████████████████

████████ .").)  If Blue Origin has ███████████████ a single-element HLS that actually has

a substantial chance of an Option A contract award, then how can it seriously claim that losing the

opportunity to collaborate with NASA during HLS development is irreparable harm?   And,

allowing NASA and SpaceX to move forward with the Option A HLS demonstration mission

hardly forecloses Blue Origin's ability to collaborate with NASA, as demonstrated by the fact that

Blue Origin has already received another NASA contract to further its HLS development, and

there are future NASA procurements on the horizon to enable sustained lunar landing missions.

(ECF 60-1 at 3, 6.)  Critical here is the fact that Blue Origin is asking this Court to stop the *initial*

*demonstration mission*, as though that one mission alone will prevent Blue Origin from ever being

able to conduct its own HLS demonstration.  That is simply not the case; it is imperative that

NASA complete the initial demonstration so that NASA can move forward with future, sustainable

missions, but Blue Origin has not come close to establishing that, if SpaceX completes the initial

demonstration, then Blue Origin will have no future opportunity to demonstrate its own HLS.

Finally, there is also no irreparable harm in Blue Origin's claims regarding the risk of losing

more employees.  (ECF 61-1 at 74.)  This Court has recognized that a contractor's potential loss of

employees (even key employees) does not amount to irreparable harm in any event.  Blue Origin

offers no evidence that any future loss of employees will result from the challenged award as

opposed to Blue Origin's reported toxic work environment.[24]  *See, e.g., IBM Corp. v. United States*,

118 Fed. Cl. 677, 684-85 (2014) ("the mere fact that an incumbent's employees begin to move over

to work for the awardee does not, without more, constitute irreparable harm"); *PGBA, LLC v.*

---

[24] Ex. C, Davenport, Christian and Lerman, Rachel, *Inside Blue Origin: Employees say toxic, dysfunctional 'bro culture' led to mistrust, low morale and delays at Jeff Bezos's space venture*, WASHINGTON POST (Oct. 11, 2021), https://www.washingtonpost.com/technology/2021/10/11/blue-origin-jeff-bezos-delays-toxic-workplace/.

██████████████████████████████████████████████████████████████████

*United States*, 60 Fed. Cl. 196, 221 (2004) (loss of employees is "significant," but not an irreparable injury, because the court would then be required "to consider any incumbent contractor's loss of a successor contract to be irreparable harm"), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004); *Comput. Scis. Corp. v. United States*, 51 Fed. Cl. 297, 323 n.91 (2002) ("[A] potential loss of employees is not an irreparable harm.").

Even to the extent Blue Origin has met its burden of showing any degree of irreparable harm, that harm is plainly outweighed by the harm to NASA, SpaceX, and the public interest from an injunction that would prohibit NASA and SpaceX from moving forward with the initial demonstration mission. (ECF 62 at 71-73.) As detailed in Associate Administrator Cabana's declaration, such an injunction would, at best, significantly delay the *Artemis* program and hamstring an already over-worked NASA team; at worst, stopping the initial demonstration mission places the entire *Artemis* program at risk. (ECF 60-1 at 3-5.) And, as explained in SpaceX's MJAR, any delay in the *Artemis* objective of establishing the United States lunar presence is not just an impediment to NASA's mission, but a serious threat to national interest in deep space exploration, as U.S. competitors, particularly China and Russia, seek to establish their own lunar presence. (ECF 62 at 72.)

## V.      CONCLUSION

The Court should dismiss or deny Blue Origin's Complaint, deny Blue Origin's MJAR, and

grant judgment in favor of Defendant and Defendant-intervenor.

Dated:   October 13, 2021                    Respectfully submitted,

*Of Counsel:*                                ARNOLD & PORTER KAYE SCHOLER LLP
Mark D. Colley
Nathaniel E. Castellano                      /s/ Kara L. Daniels
Thomas A. Pettit                             Kara L. Daniels
Aime JH Joo                                  Arnold & Porter Kaye Scholer LLP
Arnold & Porter Kaye Scholer LLP             601 Massachusetts Ave., N.W.
601 Massachusetts Ave., N.W.                 Washington, D.C. 20001
Washington, D.C. 20001                       Phone:  (202) 942-5768
                                             Fax:  (202) 942-5999

                                             *Attorney of Record for Space Exploration*
                                             *Technologies Corp.*

60

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of October 2021, I caused a true and correct copy of

the foregoing Reply and Response to be served by electronic delivery on:

Scott E. Pickens
Barnes & Thornburg, LLP (DC)
1717 Pennsylvania Avenue, N.W.
Suite 500
Washington, DC 20006-4623
(202) 371-6349
Fax: (202) 289-1330
Email: scott.pickens@btlaw.com

*Counsel for Plaintiff*

Anthony Francis Schiavetti
U.S. Department of Justice - Civil Division
P. O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 305-7572
Fax: (202) 307-0972
Email: anthony.f.schiavetti@usdoj.gov

*Counsel for Defendant*